# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MORTON GROVE PHARMACEUTICALS, INC., ) ) ) | |
| Plaintiff, ) ) | No. 06-CV-3815 |
| vs. ) ) | Judge Bucklo |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., ECOLOGY CENTER, INC., WILLIAM WEIL, M.D., ) ) ) ) | Magistrate Judge Mason **JURY TRIAL DEMANDED** |
| Defendants. ) ) | |

## DEFENDANT THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant The National Pediculosis Association, Inc. ("NPA"), by its attorneys, in response to Plaintiff Morton Grove Pharmaceuticals, Inc.'s ("Morton Grove") First Set of Interrogatories, states as follows:

### Preliminary Statement

NPA has completed neither its investigation, discovery nor preparation for trial in this matter. Accordingly, all responses contained herein are based solely upon such information that is presently available to and known by NPA. NPA expressly reserves the right to supplement or otherwise amend any of its responses or objections to these interrogatories based on the results of NPA's continuing investigation and discovery in this proceeding. NPA further reserves the right to produce evidence of any subsequently discovered facts not yet obtained or known, and to otherwise assert factual and legal contentions as additional facts are ascertained, analyses are made, and legal research is completed.

### General Objections

1.       NPA objects to plaintiff's interrogatories to the extent they contain discrete

subparts which properly should be separate, individual interrogatories.  Because plaintiff has not

yet served in excess of 25 interrogatories as provided by Federal Rule of Civil Procedure 33,

NPA will answer each discrete subpart as if each were a separate, individual interrogatory.  NPA

objects to answering more than 25 interrogatories, including discrete subparts, absent a Court

order or mutual agreement between the parties.  NPA responds to plaintiff's interrogatories

subject to and without waiving this objection.

2.       NPA objects to plaintiff's interrogatories, definitions and instructions to the extent

they seek to impose obligations different from, or in addition to, those imposed by the Federal

Rules of Civil Procedure, the Rules of the United States District Court for the Northern District

of Illinois or any other applicable Local Rules or Standing Orders.

3.       NPA objects to plaintiff's interrogatories, definitions and instructions to the extent

they seek information that is protected from discovery by any applicable privilege or exemption,

including the attorney-client privilege and the work-product doctrine.  NPA will provide only

non-privileged, non-exempt information.  To the extent NPA inadvertently discloses any

privileged information, such inadvertent disclosure shall not be deemed a waiver of any

applicable privilege or exemption.

4.       NPA objects to plaintiff's interrogatories to the extent they seek information not in

its possession, custody or control.

5.      NPA objects to plaintiff's interrogatories to the extent they seek information that can be obtained from public sources or other sources that are more convenient, less burdensome and/or less expensive.

6.      NPA objects to plaintiff's interrogatories, definitions and instructions to the extent they assume facts that do not exist or are incorrect.  By responding to a particular interrogatory, NPA does not indicate that it agrees, admits or otherwise acknowledges Morton Grove's characterizations or assumptions of fact or law contained in the interrogatory.

7.      NPA objects to plaintiff's interrogatories, definitions and instructions to the extent they seek information that is not relevant to any claim or defense in this action.  By disclosing information, NPA does not admit the relevance thereof to the subject matter of this litigation. NPA expressly reserves any and all objections to the relevance and admissibility of any information provided in response to these interrogatories.

8.      NPA expressly reserves the right to supplement or modify its objections and responses to plaintiff's interrogatories based on the results of NPA's continuing investigation and discovery in this proceeding.

9.      NPA objects to the definition of the terms "NPA," "You," and "Your" in Instruction 4 because they are overly broad and seek information that is neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence.  As a non-profit 501(c)(3) organization, NPA has no parents, subsidiaries, investment bankers, or divisions.  NPA will define these terms to mean the National Pediculosis Association, its predecessors, affiliates, officers, directors and employees.  NPA further objects to the extent these terms are used to seek

information that is covered by the attorney-client privilege, work-product, or other applicable privileges.

10.     NPA objects to Instruction 7 to the extent that the instruction requires NPA to answer on behalf of the "Ecology Center," which is named in that instruction.  NPA also objects to the extent the instruction requires NPA to answer as to what it "should know."  NPA further objects to this instruction to the extent it improperly characterizes NPA as colluding or conspiring with Ecology Center.  NPA has not colluded or conspired with the Ecology Center, and had minimal and inconsequential knowledge of and/or contacts with the Ecology Center prior to this litigation.

11.     NPA objects to the instructions with respect to NPA's claims of privilege set forth in Instruction 21 to the extent that they impose obligations in addition to those imposed by Federal Rule of Civil Procedure 26(b)(5).  To the extent NPA asserts any claims of privilege, it will do so in accordance with Rule 26(b)(5).

12.     NPA objects to the term "LiceMeister product" in plaintiff's interrogatories on the ground that it is vague and ambiguous and undefined.  NPA will define "LiceMeister product" to mean NPA's LiceMeister® Comb.

13.     NPA objects to the definition of "communication" in Instruction 5 on the ground that it is overly broad, unduly burdensome, and seeks disclosure of matters not relevant to any claim or defense in this action.  Among other things, this definition would require NPA for some interrogatories to identify all visitors to NPA's websites.  This is either impossible or unduly burdensome.

14.     NPA objects to the definition of "Lindane" in Instruction 3 as vague, overly broad, assuming facts not in evidence, and not reasonably calculated to lead to the discovery of relevant admissible evidence to the extent it is predicated upon the false assertion that the chemical compound, lindane, is synonymous, and/or may be used interchangeably, with Morton Grove or any specific product Morton Grove purportedly manufactures, including Lindane Lotion and Lindane Shampoo. NPA will define "Lindane" to mean Morton Grove's Lindane Lotion and/or Lindane Shampoo, other peliculicidal treatments containing the chemical lindane, and/or the chemical lindane. By employing the word "Lindane" in its responses, NPA does not indicate that it agrees, admits or otherwise acknowledges Morton Grove's characterizations or assumptions of fact or law contained in Instruction 3.

15.     To the extent NPA states that it will produce documents responsive to a particular interrogatory pursuant to Fed. R. Civ. P. 33(d), NPA will make non-electronic documents available for review and copying at a mutually agreeable time and place. Electronically stored information will be reviewed and produced once the parties have agreed on a protocol for its production, including agreements as to the production format, the use of search terms, and related issues.

16.     Each of the General Objections listed above is to be considered applicable to, and is hereby incorporated by reference into, each of the specific responses below as if fully set forth therein.

## Responses to Interrogatories

1.     Identify all employees, agents, or third parties who acted at Your direction, who were or are involved in Your efforts to inform consumers of the alleged dangers of Lindane or the alleged comparative benefits of Your products, including any such individuals who have conducted or reviewed any research, studies, or tests referring or relating to Lindane.

**RESPONSE:** In addition to the General Objections, NPA objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks disclosure of matters not relevant to any claim or defense in this action. NPA further objects to the term "who were or are involved in Your efforts to inform consumers of the alleged dangers of Lindane" on the ground that it is vague and ambiguous. NPA will define this term to mean persons or entities who acted at NPA's direction in NPA's efforts to inform consumers of potential dangers of certain peliculicidal treatments, including but not limited to treatments containing the chemical lindane. NPA further objects to the term "who were or are involved in Your efforts to inform consumers of . . . the alleged comparative benefits of Your products" on the ground that it is vague and ambiguous. NPA will define this term to mean persons or entities who acted at NPA's direction in NPA's efforts to inform consumers of the existence and availability of certain methods of head lice treatment, including but not limited to the LiceMeister® Comb. NPA further objects to the term "Your efforts to inform consumers" to the extent that it seeks to mischaracterize the facts. NPA's mission is to protect children and educate the public about dealing with head lice, and is not focused on "consumers." NPA further objects to the term "comparative benefits of your products" to the extent that it seeks to mischaracterize the facts. NPA does not compare the LiceMeister® Comb to Morton Grove's Lindane Lotion and/or Lindane Shampoo. NPA further objects to the term "alleged dangers of Lindane" to the extent that it seeks to mischaracterize the facts. There are reliable indications that Lindane can be and is dangerous, including, among numerous others, the EPA's ban of Lindane, the state of California's ban of Lindane, and the FDA's black box warning imposed on Lindane. NPA further objects to this interrogatory because it contains two discrete subparts. NPA responds to each of these subparts as if they were

separate, individual interrogatories. Subject to and without waiving the foregoing objections and the General Objections, NPA states as follows:

(a)     NPA states that the following persons acted at NPA's direction in NPA's efforts to inform the public of potential dangers of certain peliculicidal treatments, including but not limited to treatments containing the chemical lindane:

| Name | Present or last known address and telephone |
|------|---------------------------------------------|
| Deborah Altschuler | P.O. Box 610189, Newton, MA 02461, (617) 905-0176 |
| Bethezda Cervantes | 8862 S. 51st Street H2, Phoenix, AZ, (602) 324-9803 |
| Jane Cotter | P.O. Box 610189, Newton, MA 02461, (401) 828-6340 |
| Eric Phan | CIRE Consulting, 19921 Buckhaven Lane, Saratoga, CA 95070, (408) 234-9218 |
| Dan Sheridan | Somerville, MA, (617) 224-3524 |

NPA further states that contact with these individuals in the first instance should be through NPA's attorneys.

(b)     NPA states that the following persons have acted at NPA's direction in NPA's efforts to inform the public of the existence and availability of certain methods of head lice and scabies treatments, including but not limited to the LiceMeister® Comb:  Deborah Altschuler, Bethezda Cervantes, Jane Cotter, and Dan Sheridan.

NPA further states that contact with these individuals in the first instance should be through NPA's attorneys.

2.     Identify all persons or entities to whom You, or any third party acting at Your suggestion or direction, have disseminated any documents to referring or relating to Lindane or Morton Grove, including, but not limited to, brochures, pamphlets, letters, correspondence, newspaper opinion pieces, "fact sheets," magazine or journal articles of any kind, press releases,

and all other public relations materials. For each such person or entity, identify the specific document(s) they received and the approximate date they received them.

**RESPONSE:** In addition to the General Objections, NPA objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks disclosure of matters not relevant to any claim or defense in this action. As written, this interrogatory would require NPA to identify every email, web-posting, and hard-copy document containing the word "Lindane" or "Morton Grove," and every recipient of thereof, disseminated by NPA or "any third party acting at [NPA's] suggestion or direction." NPA further objects to the term "any third party acting at Your suggestion or direction" on the ground that it is vague and ambiguous because it is impossible for NPA to know which third parties (if any) may have acted at NPA's "suggestion" and what documents they may have disseminated. NPA will define this term to mean NPA, its employees, agents or third parties acting at NPA's direction. NPA further objects to the term "all persons or entities to whom You, or any third party acting at Your suggestion or direction" to the extent it improperly characterizes NPA as colluding or conspiring with anyone who is not an employee, director, or agent of NPA. Subject to and without waiving the foregoing objections and the General Objections, NPA states as follows:

The majority of "documents" disseminated by NPA that may refer or relate to Lindane or Morton Grove since January 1, 2003 would have been web content and emails. Identification of all visitors to NPA's websites is either impossible or unduly burdensome. With respect to recipients of NPA emails that refer or relate to Lindane or Morton Grove, pursuant to Fed. R. Civ. P. 33(d), NPA will produce documents, including emails which often identify the recipient(s), disseminated by NPA, its employees, agents or third parties acting at NPA's direction to the extent they exist, are in NPA's possession, and are not covered by any privilege.

NPA is not currently aware of any mailing list for recipients of other types of documents that refer or relate to "Lindane" or "Morton Grove."

3.    Describe the circumstances under which You became involved in activities relating to Lindane.

**RESPONSE:** In addition to the General Objections, NPA objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks disclosure of matters not relevant to any claim or defense in this action. NPA further objects to the term "circumstances under which You became involved in activities relating to Lindane" because it is vague and ambiguous. This interrogatory as written would require NPA to opine about subjective matters for numerous individuals (and entities) who are not employed by or under the direction of NPA. NPA will define this term to mean the circumstances under which current NPA employees became involved in activities relating to NPA's mission to protect children from the misuse and abuse of potentially harmful lice treatments, including but not limited to Lindane. Subject to and without waiving the foregoing objections and the General Objections, NPA states as follows:

In or around 1982, Deborah Altschuler, a mother of two boys, used increasingly larger doses of Kwell to treat her sons for head lice. She found that treatment offensive and ineffective, and her intuition told her to investigate the chemicals she was using on her children. Ms. Altschuler conducted her own research on Kwell, which was then the pre-eminent head lice treatment product and contained the chemical lindane. Ms. Altschuler learned that the chemical lindane was associated with certain harmful effects.

In or around 1982, Ms. Altschuler, concerned about ways to prevent and/or deal with head lice in the local Newton, Massachusetts schools, started a grass-roots group known as Parents Against Lice by inviting several neighborhood mothers, including co-founder Leslie

Kenney, who had two daughters in the local schools, to help establish standards for dealing with head lice.

In 1983, Parents Against Lice was renamed The National Pediculosis Association, Inc.

In or about 2001, Deborah Altschuler hired Jane Cotter after running an advertisement in the Boston Globe seeking an office manager.

4.    Identify all employees, agents, representatives, or third parties who acted at Your suggestion or direction in preparing any document or communication referring or relating to Lindane.

**RESPONSE:** In addition to the General Objections, NPA objects to this interrogatory on the grounds that it is overly broad, duplicative, and unduly burdensome. NPA further objects to the term "third parties who acted at Your suggestion " on the ground that it is vague and ambiguous because it is impossible for NPA to know which third parties (if any) may have acted at NPA's "suggestion." NPA will define this term to mean NPA, its employees, agents or third parties acting at NPA's direction. NPA further objects to the term "third parties who acted at Your suggestion or direction" to the extent it improperly characterizes NPA as colluding or conspiring with anyone who is not an employee, director, or agent of NPA. Subject to and without waiving the foregoing objections and the General Objections, NPA states as follows:

Deborah Altschuler, Bethezda Cervantes, Jane Cotter, Eric Phan, and Dan Sheridan.

5.    For each statement or communication identified in Paragraphs 23 through 31 of the Second Amended Complaint, describe the process or procedure by which You assembled the statement or communication, including, but not limited to, the supporting research, if any; the drafting; the editing, if any; the peer review, if any; and the dissemination.

**RESPONSE:** In addition to the General Objections, NPA objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. NPA further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege or the work product immunity doctrine. NPA further objects to the term "statement or

communication identified in Paragraphs 23 through 31" on the ground that it is vague and ambiguous. This interrogatory as written would require NPA to respond as to each "statement and communication identified in Paragraphs 23 through 31" despite the fact that Paragraphs 23 through 31 contain some "statement[s] and communication[s]" not attributed to NPA. For example, Paragraph 24 refers to no statement or communication by NPA. NPA will define the term "statement or communication" to mean statements or communications attributed to NPA in Paragraphs 23 through 31. Subject to and without waiving the foregoing objections and the General Objections, NPA states as follows:

In 1983, NPA incorporated as a non-profit 501(c)(3) organization and established a scientific advisory board, which included highly-respected people in the medical and scientific communities who were knowledgeable in the various disciplines required to make decisions regarding the health and safety of children being treated for head lice.

Early on, NPA, in conjunction with its scientific advisory board, concluded -- based on reviews of scientific and medical journals, their own experiences in various disciplines, and consultations with numerous others in various disciplines who had experience in treating head lice -- that the chemical lindane was not a fully effective or safe treatment method for head lice.

Pursuant to NPA's mission to protect children and educate the public about treating head lice, NPA drafted and disseminated numerous documents, including coloring books for children, educational materials for parents and school nurses, press releases, and occasionally scientific or medical documents, including surveys, medical texts or journal articles. Many of the statements attributed to NPA in Paragraphs 23 through 31 were originally published in these materials and subsequently transferred onto NPA's websites, headlice.org and/or lindane.org. All of the

statements attributed to NPA in Paragraphs 23 through 31 were at one time or another on one or more of NPA's websites.

In or around 1997, NPA created headlice.org to establish an educational presence on the web, to advocate for children being treated for head lice, to encourage traditional preventive measures, and to share information for parents dealing with head lice.

In or around 1999 or 2000, NPA created lindane.org. NPA intended lindane.org to be a repository of information regarding the dangers associated with the chemical lindane.

As part of its mission to protect children and educate the public, NPA routinely reviewed numerous sources of information, including but not limited to federal and state government reports, legislation, medical and scientific journals, news reports, and health-related websites. Additionally, NPA received information from other sources, including but not limited to NPA's national reporting registry, individuals seeking help in dealing with head lice, members of its scientific advisory board, and consumer and healthcare anecdotes as reported to NPA. Specifically, among other sources, NPA obtained information from the Food and Drug Administration ("FDA"), the Environmental Protection Agency ("EPA), the Centers for Disease Control ("CDC"), the California State Legislature, the New York State Assembly, the Illinois General Assembly, the Pesticide Action Network North America ("PANNA"), the Agency for Toxic Substances and Disease Registry ("ATSDR"), the National Institute of Health ("NIH"), the National Library of Medicine ("NLM"), and the National Toxicology Program ("NTP"), an interagency program of the U.S. Department of Health and Human Services ("DHHS") associated with the National Institute of Environmental Health Sciences ("NIEHS").

Generally, the content of NPA's websites was comprised of direct quotes, copies, summaries, amalgamations, reports, syntheses, and/or opinions of the information from these

sources.  NPA provided links and references to the sources of information that underlied the majority of its web content.  From time to time, NPA would review the content of its websites. NPA would occasionally add, remove, update, and edit the content of these websites for a variety of reasons, but primarily for aesthetics or formatting, or to provide additional information.

NPA is not currently aware of making any edits to the statements or communications attributed to it in Paragraphs 23 through 31 prior to receiving Winston & Strawn's January 22, 2007 letter.

For the statements or communications attributed to NPA in Paragraphs 23 through 31, NPA did the following:

**Statement #1, in Paragraph 23:** "Signs" and "symptoms" list[1]:

NPA initially published this statement on lindane.org more than 3 years prior to the filing of the Morton Grove's Amended Complaint ("Complaint").  In addition to NPA's extensive research, experience and information-gathering process described above, it reported symptoms found within materials available from the website of the National Library of Medicine.  As the statement says at the bottom, "The signs and symptoms of exposure listed here are complied [*sic*] from all the data contained within the links of this site."

_____

[1] The complete list is as follows:  "[Signs and symptoms of exposure to lindane] may include one or combination of the following manifestations:  acute renal failure with azotemia, ADD/ADHA[,] anxiety, autism, atonia, agranulocytosis, aplastic anemia, anorexia, apprehensive mental state, behavior-mood disturbances, bullae, cancer, cardiac arrhythmias, clumsiness, coma, confusion, conjunctivitis, convulsions, cough, cyanosis, death, dermatitis, diaphoresis, diarrhea, disorientation, dizziness, dyspnea, emotional lability, excitement, excessive hair growth, fast heartbeat, fatigue, fever, giddiness, grinding teeth, headaches, heart palpitations, hematuria, hyperirritability, hypersensitivity, incoordination, kidney damage, liver damage, liver enlargement, loss of appetite, mania, mental retardation, muscle cramps, muscle spasms, muscle tremors, nausea, nervousness, oliguria, pallor, paraesthesia, paresis, paresthesia, porphyria, proteinuria, pulmonary edema, restlessness, respiratory failure, seizures, shaking, sweating, tachycardia, tearing, thirst, trouble breathing, trouble swallowing, urticaria, vertigo, vomiting, weakness, wheezing, elevated LDH, GOT, GPT, alkaline phosphatase, ALT, AST enzymes."  That list concludes with the following statement:  "The signs and symptoms of exposure listed here are complied [*sic*] from all the data contained within the links of this site."

**Statement #2, in Paragraph 25:** Lindane is "sold or prescribed without adequate warnings or guidance on use.  It is applied to the scalp and overuse is encouraged":

NPA initially published this statement on lindane.org more than 3 years prior to the filing of the Complaint.  This statement reflects NPA's opinion derived from NPA's extensive research, experience and information-gathering process described above, including but not limited to its national reporting registry relating to head lice treatments, anecdotal evidence, and FDA warnings and statements, including but not limited to a 1996 FDA warning about the misuse of lindane products.

**Statement #3, in Paragraph 26:** "Illinois Bans Lindane" and "Illinois Banned Lindane":

NPA initially published this statement on headlice.org sometime in 2005.  In addition to NPA's extensive research, experience and information-gathering process described above, NPA based this statement on information found on the Illinois General Assembly website and PANNA's website.  As was clear from NPA's website at the time, this statement summarizes activity in the Illinois General Assembly (a link to the Illinois General Assembly webpage and the relevant legislation is included in NPA's statement).  The Illinois General Assembly website shows that on April 8, 2005, the same date of the text posted on NPA's website, the Illinois House "passed" the bill against lindane with 108 "aye" votes, zero "nay" votes, and one "present" vote.

**Statement #4, in Paragraph 27:**  "When these [first-line] treatments fail, the guidelines unfortunately recommend the prescription pesticides malathion and Lindane.  There are health risks inherent with the use of pesticides on children and these risks increase dramatically when you follow one chemical treatment with another":

NPA initially published this statement on headlice.org more than 3 years prior to the filing of the Complaint.  Additionally, NPA published this statement, or a substantially similar statement, in other media more than 3 years prior to the filing of the Complaint.  This statement

reflects NPA's opinion derived from NPA's extensive research, experience and information-gathering process described above, including but not limited to its national reporting registry relating to head lice treatments, anecdotal evidence, industry guidelines, and FDA warnings and statements, including but not limited to a 1996 warning about the misuse of lindane products.

**Statement #5, in Paragraph 28:** "[T]he main source of lindane in sewers is from treatment of headlice and scabies and that a single treatment of lindane pollutes 6 million gallons of water":

NPA initially published this statement on lindane.org more than 3 years prior to the filing of the Complaint. NPA published a later iteration of this statement in a press release on headlice.org in or around February 9, 2004. As is clear from the press release itself (attached to the Complaint), this statement summarized New York State Assembly bill A08628 (indeed, NPA's press release contains a hyper-link to this bill). New York State Assembly bill A08628 states: "the main source of Lindane in sewers are from treatment of head lice and scabies and a single treatment of Lindane pollutes 6 million gallons of water." In addition, and as NPA had previously posted on its website, the California State Legislature passed a bill in 2000 that banned the use of lindane in that state. That bill, AB 2318, states: "The main source of Lindane in sewers is from the treatment of head lice and the treatment of scabies . . . A single treatment of Lindane to kill head lice or scabies pollutes 6 million gallons of water." Moreover, other legislative entities and/or persons have made similar statements, such as an Illinois State Representative who, during General Assembly discussions of a bill against lindane on April 8, 2005, said, "1 ounce of lindane could pollute 6 hundred gallons of water in our society."

**Statement #6(a), in Paragraph 29:** "[T]he U.S. EPA classif[ies] lindane as a possible human carcinogen":

NPA initially published this statement, or a substantially similar statement, on lindane.org more than 3 years prior to the filing of the Complaint. As was clear from the webpage itself (as

attached to the Complaint), at the time, this statement relied upon, among things, the EPA's own statements.

In addition to NPA's extensive research, experience and information-gathering process described above, on information and belief, this statement summarizes the findings of several governmental sources, including but not limited to the following:  the Armed Forces Pest Management Board (posted verbatim on NPA's website and attached to the Complaint), which finds that "Lindane should be handled as a CARCINOGEN WITH EXTREME CAUTION" and "Lindane may be a CARCINOGEN in humans" (emphasis in original); the New Jersey Department of Health and/or the New Jersey Department of Environmental Protection and Energy; and New York State Assembly Bill A08628 (hyperlinked to an NPA press release posted on NPA's website and attached to the Complaint), which finds that "[Lindane] is a carcinogen and can cause seizures or even death when absorbed through the skin" and "Lindane has been shown to be a human carcinogen.  Recent case control studies report high rates of childhood brain cancer treated with lindane shampoo."  In addition, other entities have made similar statements, including but not limited to the Merck Index (referenced in an NPA website page attached to the Complaint), which finds that "Lindane and other hexachlorocyclohexane isomers may reasonably be anticipated to be carcinogens;" State of California Proposition 65, which found that lindane is a carcinogen; the World Health Organization; and the DHHS. Moreover, Winston & Strawn's January 22, 2007 letter acknowledges that Lindane had been classified at one point as a "possible/probable" carcinogen.

**Statement #6(b), in Paragraph 29:**  "Lindane should be handled as a CARCINOGEN WITH EXTREME CAUTION":

NPA initially published this statement on lindane.org more than 3 years prior to the filing of the Complaint.   In addition to NPA's extensive research, experience and information-

gathering process described above, on information and belief, this statement summarizes the findings of several governmental sources, including but not limited to the following: the Armed Forces Pest Management Board (posted verbatim on NPA's website and attached to the Complaint), which finds that "Lindane should be handled as a CARCINOGEN WITH EXTREME CAUTION" and "Lindane may be a CARCINOGEN in humans" (emphasis in original); the New Jersey Department of Health and/or the New Jersey Department of Environmental Protection and Energy; the EPA; and New York State Assembly Bill A08628 (hyperlinked to an NPA press release posted on NPA's website and attached to the Complaint), which finds that "[Lindane] is a carcinogen and can cause seizures or even death when absorbed through the skin" and "Lindane has been shown to be a human carcinogen. Recent case control studies report high rates of childhood brain cancer treated with lindane shampoo." In addition, other sources have made similar statements, including but not limited to the Merck Index (referenced in an NPA website page attached to the Complaint), which finds that "Lindane and other hexachlorocyclohexane isomers may reasonably be anticipated to be carcinogens;" State of California Proposition 65, which found that lindane is a carcinogen; the World Health Organization; and the DHHS. Moreover, Winston & Strawn's January 22, 2007 letter acknowledges that Lindane had been classified at one point as a "possible/probable" carcinogen.

**Statement # 7, in Paragraph 30:** "Case-controlled research shows a significant association between the incidences of brain tumors in children with the use of lindane-containing lice shampoos":

On information and belief, NPA initially published this statement, or a substantially similar statement, on lindane.org more than 3 years prior to the filing of the Complaint. In addition to NPA's extensive research, experience and information-gathering process described above, this statement reports on the conclusion of experts in the medical and health care

- 17 -

community, including but not limited to a study by Davis JR, Brownson RC, Garcia RB, et al.,

Family pesticide use and childhood brain cancer. Arch. Environ. Contam. Toxicol. 24:87-92,

1993. Additionally, this statement summarizes New York State Assembly Bill A08628

(hyperlinked to an NPA press release posted on NPA's website and attached to the Complaint),

which finds that "[Lindane] is a carcinogen and can cause seizures or even death when absorbed

through the skin" and "Lindane has been shown to be a human carcinogen. Recent case control

studies report high rates of childhood brain cancer treated with lindane shampoo." This

statement is also consistent with adverse reports received by NPA. Moreover, other sources have

made similar statements, including Physicians for Social Responsibility - Los Angeles, and the

Cancer Prevention Coalition.

> **Statement #8(a), in Paragraph 31:** "Be Sure You Provide a Non-Chemical Choice For Your Children . . . Because it's not worth taking unnecessary risks when the bottom line will always be the manual removal of lice and nits."

NPA initially published this statement on headlice.org more than 3 years prior to the

filing of the Complaint. This statement reflects NPA's opinion derived from NPA's extensive

research, experience and information-gathering process described above.

> **Statement #8(b), in Paragraph 31:** "Never resort to dangerous remedies such as lindane, kerosene, or pet shampoos."

NPA initially published this statement on headlice.org more than 3 years prior to the

filing of the Complaint. Additionally, NPA had previously published this statement in NPA

educational materials, including but not limited to the NPA's newsletter, Progress. This

statement reflects NPA's opinion derived from NPA's extensive research, experience and

information-gathering process described above.

> **Statement #8(c), in Paragraph 31:** "When used for early detection and manual removal, the LiceMeister comb is the realistic and practical alternative to unnecessary

and potentially harmful pesticides.  The LiceMeister is the safe and cost effective way to win the war against head lice and keep the kids in school safe, lice and nit free."

This statement reflects NPA's opinion derived from NPA's extensive research, experience and information-gathering process described above.  NPA is not currently aware of when this statement was initially published.  NPA further states its investigation continues.

**Statement #8(d), in Paragraph 31:** "Do not recommend products containing lindane. The Food and Drug Administration (FDA) regards it as potentially more toxic than all other pediculicidal choices and no more effective."

NPA initially published this statement on headlice.org more than 3 years prior to the filing of the Complaint.  Additionally, NPA had previously published this statement in its educational materials, including but not limited to its Pharmacist's Guide to Controlling Head Lice.  This statement reflects NPA's opinion derived from NPA's extensive research, experience and information-gathering process described above.

Given the amount of time that has passed since some or all of the NPA statements were first published, and the large amount of information NPA has amassed and reviewed over the years, NPA further states that it continues to review its files and will supplement its answer to this interrogatory if it is able to identify additional documents or other supporting materials upon which it relied for each statement.

6.      Identify any and all witnesses with knowledge of any facts or circumstances relating to any of the claims or defenses in this litigation.  For each such witness, state the facts or circumstances known to such witness.

**RESPONSE:** In addition to the General Objections, NPA objects to this interrogatory on the grounds that it is overly broad and unduly burdensome.  There are literally thousands of individuals with "knowledge of any facts or circumstances relating to any of the claims or defenses in this litigation."  This interrogatory as written would require the identification of all the authors, scientists, researchers, reporters, nurses, etc. who have written about the dangers of

lindane, all doctors and medical professionals who have experience with the dangers of Lindane, all sales representatives who have sold lindane-containing products, and all parents and children who used lindane-containing products -- just to name a few of the numerous groups of individuals who NPA would be required to identify.  NPA will define this interrogatory to mean the persons discussed in NPA's response to Interrogatory number 1, above.  NPA further objects to the term "facts and circumstances known to such witness" on the grounds that it is vague and ambiguous and NPA does not know the facts and circumstances known to every witness.  NPA will define this term to mean the areas of general knowledge possessed, or believed to be possessed, by the persons discussed in NPA's response to Interrogatory number 1, above.

Subject to and without waiving the foregoing objections and the General Objections, NPA states as follows:

| Name | General Knowledge |
|------|-------------------|
| Deborah Altschuler | General knowledge regarding the daily operations of NPA and NPA's mission; knowledge of some or all of the statements attributed to NPA in Paragraphs 23 through 31 in the Complaint. |
| Bethezda Cervantes | Knowledge of some or all of the statements attributed to NPA in Paragraphs 23 through 31 in the Complaint. |
| Jane Cotter | General knowledge regarding the daily operations of NPA and NPA's mission; knowledge of some or all of the statements attributed to NPA in Paragraphs 23 through 31 in the Complaint. |
| Eric Phan | Knowledge of web-related technical issues relating to some or all of the statements attributed to NPA in Paragraphs 23 through 31 in the Complaint. |

| Dan Sheridan | General knowledge regarding the daily operations of NPA and NPA's mission; knowledge of some or all of the statements attributed to NPA in Paragraphs 23 through 31 in the Complaint. |
|---|---|

With respect to authors, scientists, researchers, reporters, nurses, etc., who have written about the dangers of lindane, pursuant to Fed. R. Civ. P. 33(d), NPA will produce their publications, to the extent they are within NPA's possession and are not covered by any privilege.

In order for NPA to provide additional information in response to this interrogatory, Morton Grove must narrow its scope.

7.    Identify any and all expert witnesses You intend to rely upon to support any of your claims or defenses in this litigation.

**RESPONSE:** In addition to the General Objections, NPA states that it has not yet identified the expert witnesses it may call at trial. NPA further states that it will identify its experts witnesses, if any, in accordance with the schedule set forth in Fed. R. Civ. P. 26(a)(2), or as otherwise ordered by the Court.

8.    Describe any communications referring or relating to Lindane between You and any government agency, including, but not limited to, the Food and Drug Administration (FDA), the Environmental Protection Agency (EPA), and the Center for Disease Control (CDC).

**RESPONSE:** In addition to the General Objections, NPA objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, and seeks disclosure of matters not relevant to any claim or defense in this action. NPA further objects to the extent that communications with a government agency are privileged. Subject to and without waiving the foregoing objections and the General Objections, NPA states as follows:

Between approximately 2004 and 2006 Mark Howard from EPA contacted NPA on a few occasions to inquire as to how much lindane was being sold. Ms. Altschuler indicated that she did not have that information.

In or around the summer of 2005, Ms. Altschuler made phone calls to members of the New York State Assembly to ask them to support pending legislation concerning lindane.

From January 1, 2003 through approximately the time Morton Grove filed its Complaint in February 2007, NPA participated in occasional conference calls organized by PANNA, 49 Powell St., Suite 500, San Francisco, CA 94102, (415) 981-1771, in which numerous individuals would participate, some of whom are not known to NPA. Ann Heil, of the Los Angeles County Sanitation District, P.O. Box 4998, Whittier, CA 90607-4998, (562) 908-4288, would occasionally participate in these conference calls.

Since January 1, 2003, NPA also had other communications with Ms. Heil relating to the California ban on lindane.

On July 17, 2007, one of NPA's attorneys submitted a Freedom of Information Request to the FDA on behalf of the NPA.

NPA is not currently aware of other communications with the CDC, FDA, or other government agencies relating to Lindane.

Given the amount of information NPA has amassed and reviewed over the years, and the number of communications it has had, NPA further states that it continues to review its files and will supplement its answer to this interrogatory if it is able to identify other communications relating to Lindane between it and any government agency.

9.  Describe any communications referring or relating to the LiceMeister product between You and any government agency, including, but not limited to, the Food and Drug Administration (FDA), the Environmental Protection Agency (EPA), and the Center for Disease Control (CDC).

- 22 -

**RESPONSE:** In addition to the General Objections, NPA objects to this interrogatory on the grounds that it is overly broad, unduly burdensome and not reasonably calculated to lead to admissible evidence in that it seeks "any communications" that refer or relate to the LiceMeister® Comb without respect to whether those documents are in any way relevant to the statements at issue in this lawsuit. NPA further objects to the extent that communications with a government agency are privileged. Subject to and without waiving the foregoing objections and the General Objections, NPA states as follows:

Every year, NPA is required to re-register its LiceMeister® Comb with the FDA as a medical device. Thus, NPA communicates with the FDA annually pursuant to this requirement by completing the requisite forms.

Additionally, attorneys for NPA have communicated with U.S. Patent and Trademark Office regarding intellectual property protections concerning the LiceMeister® Comb.

NPA is not currently aware of other communications with the CDC, the EPA, or other governmental agencies relating to the LiceMeister® Comb. NPA further states that its investigation continues.

10.    Describe any communications referring or relating to the letter sent to You by Morton Grove dated January 22, 2007, concerning certain statements made by You, including, but not limited to, any defenses You may have to such statements and any retractions or alterations to Your website that You have made or contemplated making.

**RESPONSE:** In addition to the General Objections, NPA objects to this interrogatory on the grounds that it seeks disclosure of privileged communications and attorney opinion work product. NPA further objects to this interrogatory on the grounds that it seeks information that is neither relevant to this matter nor reasonably calculated to lead to the discovery of admissible evidence. NPA further objects to this interrogatory because it has made no retraction. NPA responded to Morton Grove's January 22, 2007 letter with a request for time to properly review

- 23 -

the allegations of the letter, explaining that NPA is a "small non-profit organization with two staff members and limited resources." Morton Grove did not respond to NPA's request and instead filed suit.

Subject to and without waiving the foregoing objections and the General Objections, NPA states as follows:

After receiving Winston & Strawn's January 22, 2007 letter, NPA reviewed the allegations in the letter, including the statements attributed to it in Paragraph 23 through 31 of the Complaint. Out of an abundance of caution, NPA initially removed the statement attributed to it in Paragraph 23 of the Complaint (the list of "symptoms" from "exposure" to Lindane) because it was not immediately able to identify the source(s) upon which it had relied several years earlier when this statement was initially published. Some days later, upon finding a substantially similar list in the NTP chemical repository, NPA posted the NTP chemical repository list.

With respect to the statement attributed to NPA in Paragraph 26 of the Complaint ("Illinois Bans Lindane" and "Illinois Banned Lindane"), NPA decided, in an abundance of caution, to take down all the state legislation pages, including this statement, as those pages had not been updated in some time. Sometime later, NPA discovered that despite its previous efforts, part of this statement was still on its website. NPA again made efforts to remove the remaining parts of the statement and any caches of the statement.

After receiving the January 22, 2007 letter, NPA called The Ecology Center because it was aware that it had previously been sued by Morton Grove. NPA did not know who to ask for by name and eventually spoke with Tracey Easthope. NPA relayed the fact that it had received the January 22, 2007 letter, and Ms. Easthope said that she could not talk about the matter

- 24 -

because of pending litigation with Morton Grove, but that NPA should request more time from Morton Grove to review the allegations in the letter and that Morton Grove's legal tactics could ruin innocent lives.

After receiving the January 22, 2007 letter, NPA communicated with the following people to relay the fact that it had received the January 22, 2007 letter: Ann Heil; Pam LaBrake of Parents Against Lindane, 349 Schenectady St., Schenectady, NY 12307, (518) 346-7190; Bethezda Cervantes; Gina Soloman and Jennifer Sass, both scientists with the National Resources Defense Council ("NRDC"), 40 West 20th Street, New York, NY 10011, (212) 727-2700; Aaron Colangelo, a lawyer at NRDC; and NPA board members Gershon Saxe, Phil Lieberman, and Paul Kroner (all of whom can be reached through NPA at P.O. Box 610189, Newton, MA 02461; contact with these individuals in the first instance should be through NPA's attorneys).

NPA further states that its investigation continues.

11.     Identify all persons or entities who are involved in efforts to ban the sale or use of Lindane with whom You, or any third party acting at Your suggestion or direction, have cooperated or collaborated, or to whom You have given assistance, in connection with their efforts, and describe that cooperation, collaboration, or assistance.

**RESPONSE:** In addition to the General Objections, NPA objects to this interrogatory on the grounds that it is overly broad, duplicative, and unduly burdensome. NPA further objects to the term "persons or entities who are involved in efforts to ban the sale or use of Lindane with whom You, or any third party acting at Your suggestion or direction, have cooperated or collaborated, or to whom You have given assistance, in connection with their efforts" on the ground that it is vague and ambiguous because it is impossible for NPA to know which third parties (if any) may have acted at NPA's "suggestion." NPA shall define this term to mean persons or entities, known to NPA to be involved in efforts to ban the sale or use of Lindane, to

- 25 -

whom NPA, its employees, agents or third parties acting at NPA's direction have provided

assistance or support.  NPA further objects to the term "cooperation, collaboration, or assistance"

to the extent it improperly characterizes NPA as colluding or conspiring with anyone who is not

an employee, director, or agent of NPA.  Subject to and without waiving the foregoing objections

and the General Objections, NPA states as follows:

From January 1, 2003 through approximately the time Morton Grove filed its First

Amended Complaint in February 2007, NPA participated in occasional conference calls

organized by PANNA, in which numerous individuals would participate, some of whom are not

known to NPA.  During these calls, individuals discussed efforts to ban Lindane, and NPA

would offer its experience and any information it could provide.  In addition to members of

PANNA, individuals from NRDC and Ann Heil would occasionally participate in these

conference calls.

Since January 1, 2003, NPA has been in contact with Pamela LaBrake, to whom NPA

offered its experience and any information it could provide.

12.    Describe any communications referring or relating to Lindane that You have had
with any person or entity associated with Wikepedia.com or the Wikimedia Foundation or with
any person or entity that is involved or associated with the distribution of documents or
communication about Lindane, including, but not limited to, authors, publishers, or other
websites.

**RESPONSE:**  In addition to the General Objections, NPA objects to this interrogatory on

the ground that it is overly broad and unduly burdensome.  This interrogatory as written would

require NPA to identify all communications it has had with "any person or entity that is involved

or associated with the distribution of documents or communication about Lindane, including, but

not limited to, authors, publishers, or other websites."  NPA further objects to that term on the

grounds its vague and ambiguous.  NPA will define the term to mean any person or entity that

NPA knows is involved or associated with the distribution of documents or communication about

Lindane, including, but not limited to, authors, publishers, or other websites. NPA further objects to this interrogatory because it contains two discrete subparts. NPA responds to each of these subparts as if they were separate, individual interrogatories. Subject to and without waiving the foregoing objections and the General Objections, NPA states as follows:

(a) NPA is not currently aware of any communications referring or relating to Lindane that it had with any person or entity associated with Wikepedia.com or the Wikimedia Foundation. NPA further states that its investigation continues.

(b) Pursuant to Fed. R. Civ. P. 33(d), NPA will produce documents reflecting communications referring or relating to Lindane with persons or entities NPA knows is involved or associated with the distribution of documents or communication about Lindane, including, but not limited to, authors, publishers, or other websites, to the extent they exist, are responsive, and are not covered by any privilege.

Dated: August 27, 2007

Respectfully Submitted,

THE NATIONAL PEDICULOSIS
ASSOCIATION, INC.

By: _____
One of Its Attorneys

Debbie L. Berman (#6205154)
Jennifer A. Hasch (#6272366)
Amanda S. Amert (#6271860)
Wade A. Thomson (#6282174)
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, Illinois 60611
312-222-9350

## VERIFICATION

I, Deborah Altschuler, on behalf of The National Pediculosis Association, Inc. (the "NPA"), having read the foregoing Defendant The National Pediculosis Association, Inc.'s Response to Plaintiff's First Set of Interrogatories, declare under penalty of perjury that the statements made therein are true and correct to the best of her knowledge, information, and belief.

Deborah Altschuler

## CERTIFICATE OF SERVICE

I, the undersigned, an attorney, hereby certify that on this 27th day of August, 2007, I

caused a copy of **DEFENDANT THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'S**

**RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** to be served by

U.S. Mail, postage pre-paid, upon the following:

> Richard M. Waris
> James J. Sipchen
> Pretzel & Stouffer, Chartered
> 1 South Wacker Drive
> Suite 2500
> Chicago, Illinois 60606
> Telephone: 312 578-7404
> Fax: 312 346-8242
>
> W. Gordon Dobie
> Timothy J. Rivelli
> William C. O'Neil
> Cherish M. Keller
> Winston & Strawn LLP
> 35 W. Wacker Drive
> Chicago, Illinois 60601
> Telephone: 312-558-5600