**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC. | ) ) ) | |
| Plaintiff, | ) ) | No: 08-CV-1384 |
| v. | ) ) | Judge Bucklo |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., | ) ) ) | Magistrate Judge Mason |
| Defendant. | ) ) ) | |

**MORTON GROVE PHARMACEUTICALS, INC.'S MEMORANDUM IN SUPPORT
OF ITS MOTION FOR PROTECTIVE ORDER AND TO QUASH SUBPOENA**

By this motion, Morton Grove seeks relief from the Court in relation to the NPA's continued efforts to harass Morton Grove and its lobbying website vendor, Closerlook, Inc., with irrelevant first- and third-party discovery related to Morton Grove's lobbying activities— activities that have no relevance to this litigation, implicate numerous privileges, and which are an exercise of Morton Grove's First Amendment right to core political speech.

This litigation was born out of the NPA's campaign of misinformation regarding Morton Grove's lindane medications. The NPA's campaign included (1) false commercial advertisements aimed at increasing sales of the NPA's LiceMeister comb and reducing sales of lindane medications (for which relief is sought), and (2) efforts to convince the FDA, the EPA, and numerous state legislative bodies to ban FDA-approved Lindane medications (for which *no* relief is sought). Morton Grove is not claiming, and could not properly claim under controlling law, damages for the injuries it has suffered at the hands of the NPA in the legislative arena. Despite this undeniable fact, the NPA has sought Morton Grove's lobbying strategy documents for nine months and now seeks such documents from third parties.

The NPA seeks these documents, not because they are relevant to, or admissible in, this litigation, but because the NPA and Morton Grove are currently embroiled in a legislative fight—bills to ban or restrict the use of lindane medications have been introduced in Illinois, Michigan, Minnesota, and New York. Quite simply, the NPA wants Morton Grove's lobbying

playbook to gain an advantage on the legislative battlefield. The documents the NPA seeks are not the basic lobbying documents that Morton Grove's lobbyists sent to members of the legislature (documents Morton Grove has produced through a discovery compromise), but are Morton Grove's lobbying strategy documents, including communications between Morton Grove's lawyers and its lobbyists—many of whom themselves are lawyers. Requiring Morton Grove to disclose these documents would not only impinge upon Morton Grove's rights, but also send a chilling policy message to all those who petition elected officials that their work product is under siege regardless of relevance.

With no basis in law, fact, or public policy to seek these documents, the NPA's actions can only be explained by its desire to gain a tactical advantage in the legislative process or its desire to harass Morton Grove. With respect to the latter, it is unfortunate that the NPA's behavior might be explained by its financial motivation—the NPA is funded by a $5,000,000 policy of insurance in this litigation, none of which needs to be reserved to pay a judgment, since Morton Grove is seeking only injunctive relief and corrective advertising.

This type of harassing discovery, pursued for an improper purpose, warrants the issuance of a protective order. Morton Grove respectfully requests that the Court issue such an order mandating that no further lobbying discovery be had and quashing the third-party subpoena issued to Closerlook.

## BRIEF SUMMARY OF DISCOVERY DISPUTE

As set forth in greater detail below, the *only* documents that the NPA has requested but not received are:

- documents related to Morton Grove lobbying strategy;
- communications by Morton Grove to any doctors, health professionals, or organizations requesting assistance in Morton Grove's lobbying efforts;
- documents sufficient to show the amount of money Morton Grove has spent on lobbying;
- documents reflecting political contributions by Morton Grove; and
- documents from Closerlook, Inc., Morton Grove's vendor for its lobbying website, www.lindane.com.

Moreover, to avoid the expense of this motion and the imposition on the Court, Morton Grove participated in several extensive discovery conferences, prepared numerous letters in an attempt to resolve this dispute, and ultimately agreed to a discovery compromise. While

preserving all of its objections, Morton Grove agreed to and has produced the following categories of documents:

- communications between Morton Grove and any governmental entities or officials;

- documents that Morton Grove distributed in connection with any lobbying campaign it conducted;

- documents sufficient to identify those persons involved with Morton Grove's lobbying efforts; and

- Morton Grove's testimony relating to lindane medications.

Morton Grove provided these documents not because they were relevant, but solely because the NPA argued that it needed to review these documents (Morton Grove's lobbyists' communication with third-parties) on the chance that they contain "prior inconsistent statements" about Lindane medications. (Of course, there were no such prior inconsistent statements, but Morton Grove compromised and provided the information to the NPA so that it could see that for itself.)

## **FACTUAL BACKGROUND**

### A.     **The NPA's First Request for Lobbying Documents**

More than nine months ago, on August 14, 2007, the NPA issued its first set of documents requests, which sought, *inter alia*:

- documents sufficient to identify all lobbyists Morton Grove used to assist in legislative advocacy relating to Lindane medications (Request No. 26);

- documents showing monies Morton Grove spent on lobbying relating to Lindane medications (Request No. 28);

- documents "reflecting communication between Morton Grove and any governmental entity" relating to Lindane medications or NPA's LiceMeister comb (Request No. 31); and

- documents "reflecting political contributions by Morton Grove, its executives, and directors since January 1, 2000." (Request No. 32).

(Exhibit A, NPA's First Set of Document Requests.)

Morton Grove objected to producing irrelevant documents related to its lobbying activities. (Exhibit B, Morton Grove's Response to NPA's First Set of Document Requests; Exhibit C, October 19, 2007 Letter.) The parties met and conferred regarding these requests. To avoid motion practice, and (Morton Grove believed) put the issue of lobbying documents behind

it, Morton Grove agreed to a discovery compromise while preserving its objections.[1]  Through
this discovery compromise, Morton Grove agreed to produce:

- "documents sufficient to identify those persons/entities involved with Morton
  Grove's legislative efforts regarding lindane" and

- "documents reflecting communications between Morton Grove and any
  governmental entities/officials about lindane."

**B.      The NPA's Second, Redundant Request for Lobbying Documents**

Apparently not satisfied with the discovery compromise it made, the NPA issued
a second set of document requests seeking more lobbying documents, including:

- documents "reflecting communications by Morton Grove to any doctors,
  health professionals or organizations relating to requests for assistance in
  lobbying . . ."  (Request No. 19); and

- documents "related to Morton Grove lobbying strategy or campaigns
  regarding . . . legislative advocacy" (Request No. 21).

(Exhibit D, NPA's Second Set of Document Requests.)

Morton Grove again objected, reiterating its previous position.   (Exhibit E,
Morton Grove's Response to NPA's Second Set of Document Requests.)   After a meet and
confer, Morton Grove stood on its objections, noting:

> As you know, the NPA previously served numerous document
> requests relating to Morton Grove's lobbying efforts under the
> theory that what Morton Grove told members of the legislature about
> the truth or falsity of Defendant's statements was somehow relevant
> to this litigation even though Morton Grove has claimed no injury as
> a result of the legislative process.   In this regard, we vehemently
> disagreed, but ultimately reached a compromise to produce the
> documents identified in the fourth paragraph of your October 30,
> 2007 letter.  Request No. 19 seeks something far different – it seeks
> non-public documents related to Morton Grove's lobbying strategy.
> Morton Grove fails to see any possible connection between these

---

[1]      It is important to note that, at this time, Morton Grove had a defamation count in its complaint.
This count has since been voluntarily dropped by Morton Grove.   Based on the presence of the
defamation allegation, the NPA argued that Morton Grove's lobbying documents were relevant to Morton
Grove's status as an alleged "public figure."   This argument no longer carries any weight, if it ever did,
given that the defamation allegation has been dropped.   In fact, the only documents relevant to whether
Morton Grove was or is a public figure would be documents in the *public* domain demonstrating just that.
Of course, none of the internal and privileged documents sought relate to that question, and the NPA has
never even cited to any material demonstrating that Morton Grove is a "public figure."  But in any case,
the defamation count was dropped months ago.

documents and this litigation. In addition, Morton Grove hardly envisioned that once it agreed to the October 30, 2007 compromise, the NPA would pull an end-run on that compromise by serving new lobbying requests, such as this one.

(Exhibit F, January 14, 2008 Letter.) More than four months have passed since this correspondence and the NPA has *not* filed a motion to compel regarding Morton Grove's lobbying documents. Just this week, however, the NPA sought to revisit the topic with Morton Grove. During a meet and confer conference, Morton Grove gave the NPA one final opportunity to withdraw its lobbying requests. The NPA refused.

**C.     The NPA Next Attempts to Depose Morton Grove's Lead Trial Counsel**

Having harassed Morton Grove for months with requests for lobbying documents, in December 2007, the NPA next decided to notice the first deposition in this matter—Morton Grove's lead trial counsel, W. Gordon Dobie, under the theory that Mr. Dobie was Morton Grove's lobbyist in this case. (Exhibit G.) This outrageous conduct was only dropped after a partner-to-partner conference. Morton Grove explained to the NPA that Mr. Dobie was not Morton Grove's lobbyist and refused to produce Mr. Dobie for deposition. (Exhibit H.)

**D.     The NPA Revisits the Lobbying Document Issue Again via Third-Party Subpoena**

Not wanting to fight Morton Grove on a motion to compel Morton Grove's lobbying strategy documents, the NPA sought an end-run around Morton Grove's valid objections by serving a third-party subpoena on Closerlook, Inc., the company that designed and hosted Morton Grove's lobbying website, www.lindane.com. (Exhibit I.) This subpoena seeks the production of documents regarding "any legislative advocacy by Morton Grove" and the tender of a 30(b)(6) witness. Counsel for Closerlook has objected to this subpoena on numerous grounds. (Exhibit J.)

<u>**ARGUMENT**</u>

Morton Grove asks this Court to exercise its broad discretion in managing pretrial discovery and protect Morton Grove from "annoyance, embarrassment, oppression, or undue burden or expense." *See* Fed. R. Civ. P. 26(c); *Olivieri v. Rodriguez*, 122 F.3d 406, 409 (7th Cir. 1997) (noting broad discretion). The NPA's continued pursuit of this discovery, both from Morton Grove and third parties, is harassing. These documents are irrelevant and protected by various privileges as explained in more detail below.

"Discovery has limits and these limits grow more formidable as the showing of need decreases." *Rubin v. Islamic Republic of Iran*, 349 F. Supp. 2d 1108, 1111 (N.D. Ill. 2004). Here, Morton Grove has agreed to produce the only even arguably relevant category of lobbying documents—its lobbyists' communications with third parties. Morton Grove has only refused to produce documents generally relating to its lobbying strategy and communications. The NPA has little, if any, need for the additional documents it seeks about the same, irrelevant subject matter. *See* 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Fed. Practice & Procedure* § 2040 (an order restricting discovery is appropriate where the burden is unduly, compared to any advantage).

Morton Grove also requests, pursuant to Federal Rule of Civil Procedure 45(c)(3), that this Court quash the Closerlook subpoena, precluding the NPA's efforts to backdoor discovery on Morton Grove's lobbying activities.

## A.      Morton Grove's Lobbying Documents Are Irrelevant

The ultimate issue in this case is whether the statements contained in the NPA's commercial advertisements are false and deceptive, or have the tendency to deceive, Morton Grove's target audience. Documents relating to Morton Grove's lobbying activities are simply not relevant to this inquiry. *See* Fed. R. Civ. P. 26(b)(1) (parties may obtain discovery regarding matters that  are "relevant to any party's claim or defense").

Thus, discovery would properly focus on whether the NPA's advertisements are false or not, and whether they did in fact deceive MGP's target audience. MGP and the NPA have produced thousands of documents on these issues (more than 150,000 pages) and the parties have more than enough paper to consider all these issues (every document that could be located was produced after extensive, tremendously expensive searches of Morton Grove's hard copy and electronically stored information). Further, even if the requested documents *were* relevant to the subject matter of this action, the NPA cannot show good cause for their discovery. *See* Fed. R. Civ. P. 26(b)(1) ("For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action."); *Hollinger Int'l Inc. v. Hollinger Inc.*, 230 F.R.D. 508, 522-23 (N.D. Ill. 2005) (citing same and noting party making a request for documents relevant to the subject matter of a suit should be able to articulate a reason why such discovery is warranted). Discovery of irrelevant lobbying documents should be precluded. *See, e.g.*, *Wachovia Capital Partners, LLC v. Frank Harvey Inv. Family Ltd. P'ship*, 2007 WL

2570838, at *12 (N.C. Super. Mar. 5, 2007) (denying motion to compel lobbying-related documents for lack of relevance, under similar state rule); *EEOC v. Bice of Chicago*, 229 F.R.D. 581, 582-83 (N.D. Ill. 2005) (granting protective order regarding discovery sought on irrelevant topic); *Apel v. Murphy*, 70 F.R.D. 651, 653-55 (D.R.I. 1976) (granting protective order and quashing subpoenas aimed at gathering information from third-party reporters about motivation behind legislation as irrelevant).

        Morton Grove is not seeking to recover for any injury it has suffered at the hands of the NPA in the legislative arena—which has been extensive, given the aggressive and well-organized nature of the NPA's lobbying campaign that began in the early 1980s.  Well aware of this, the NPA has now attempted to "creatively" plead Morton Grove's lobbying activities into this action, by claiming that certain statements on www.lindane.com, Morton Grove's lobbying website, violated the Lanham Act and constituted trade disparagement.  As explained in greater detail below, the NPA's counterclaim is frivolous—www.lindane.com is not a "commercial advertisement" as required by the Lanham Act.  It is a non-promotional, lobbying website not linked to Morton Grove or any sale of the product.  In any event, should the Court deem Morton Grove's documents relevant only to the NPA's counterclaim, Morton Grove respectfully requests that this Court grant this motion without prejudice, so that the NPA can revisit this decision in the unlikely event that the NPA's counterclaim survives a motion to dismiss.[2]  This approach also avoids the need to parse the privilege issues discussed further below.

**B.    The NPA's Lobbying Requests Were Issued To Gain a Competitive Lobbying Advantage**

        "Discovery requests that relate to information unquestionably relevant to the legal issues raised in a case should be honored, but when requests approach the outer bounds of relevance and the information requested may marginally enhance the objectives of providing

---

[2]      In addition to failing because Morton Grove's statements are not "commercial advertisements," the NPA's counterclaims suffer from numerous other legal and factual deficiencies, including that the statements do not concern the NPA, do not promote Lindane medications, did not injure the NPA, and are the *opinions* of leading physicians which on their face are letters to legislators that advocate that they not ban Lindane—hardly "commercial advertisements."  One example of these letters that formed the basis of the NPA's counterclaim is attached hereto as Exhibit K.  These statements are thus not *Morton Grove's* statements.  Moreover, these statements were made are in opposition to legislation seeking to ban Lindane and hence protected by the legislative privilege.  The NPA's attempt at creative lawyering certainly allows it to burn through its insurance defense fund, but is not appropriate for a filing with this busy Court.

information to the parties or narrowing the issues, courts must weigh the request with the hardship to the party from whom the discovery is sought."  8 Wright, Miller & Marcus, *Fed. Practice & Procedure* § 2040.  The balancing of hardships further favors non-production when, as here, the documents are sought for a competitive advantage.  *See qad, inc. v. ALN Assocs.*, 1991 WL 183854, at *3 (N.D. Ill. Sept. 16, 1991) (denying motion to compel and admonishing: "No conceivable justification appears for [the party] obtaining access to the withheld documents, except for the entirely impermissible one that it could gain some competitive advantage through such production."); *Litton Indus., Inc. v. Chesapeake & Ohio Ry. Co.*, 129 F.R.D. 528, 531 (E.D. Wis. 1990) (quashing subpoena for certain documents because, *inter alia*, protective order could not prevent experts, who would read documents, from using that information in later consultations, and sharing information would cause competitive harm to third-party subpoena recipient); *Manitowoc Milk Producers Coop. v. Kornely Guernsey Farms Dairy*, 61 F.R.D. 499, 500 (E.D. Wis. 1973) (denying discovery of recent business information until plaintiff could convince the court that it would "serve the furthering of this lawsuit rather than [the plaintiff's] potential competitive advantage").

The NPA and Morton Grove are embroiled in a legislative battle in roughly a half-dozen states.  Moreover, the NPA is a member of a broader national organization called the "Ban Lindane Network," which is made up of other anti-lindane advocates who lobby nationally in favor of a ban on lindane.  (Exhibit L.)  This group meets monthly.  (*Id.*)  It is abusive for the NPA to seek this information to further the NPA's legislative agenda and to drive up litigation costs.

As in the past, the NPA will surely respond to this argument by claiming that it is a non-profit, that Morton Grove is "big pharma," and that Morton Grove brought the burden of producing such irrelevant and privileged documents upon itself when it voluntarily chose to file this lawsuit.  Nothing could be further from the truth.  Upon closer investigation, the NPA's argument is skin deep.

The NPA is registered as a 501(c)(3) non-profit, but their non-profit status has been publicly questioned.  (*See* Exhibit M ("in its 2000 federal 990 tax return, NPA reported nearly $2 million in revenue from the sales of nit combs . . . The bottom line is that NPA is not public-benefit nonprofit group.  It is really just a clever mail order scheme taking advantage of the tax laws and using its ability to reopen debate on a scientifically closed medical issue with

8

emotion and junk science—so that it can sell more of its hair care product.").)  Moreover, the NPA is fully funded in this litigation through a policy of insurance.  (Exhibit N.)  In exchange for a modest $5,125 premium, the NPA is taking full advantage of a $5 million legal defense fund, using it to harass Morton Grove, including for the lobbying documents that are the subject of this motion.  A cursory review of the docket sheet in this action and the prior related action (Case No. 06-cv-3815) shows hostility and efforts to increase Morton Grove's litigation costs at every turn.

Morton Grove, on the other hand, is hardly "big pharma."  Instead, Morton Grove is a small Illinois-based generic drug manufacturer which recently was sold following financial difficulties.  Morton Grove's lindane medications are its top-selling products, but their market share is declining dramatically as a result of the NPA's actions.  With no policy of insurance to lean on, Morton Grove is forced to take money away from its bottom line to fund this litigation, and to specifically counter each of the NPA's insurance-funded maneuvers.

Finally, Lindane mediations are FDA approved and have been successfully used in clinical practice for more than 50 years.  The NPA and others have repeatedly petitioned the FDA to take lindane off the market (and the FDA has reviewed the product more than a dozen times)—each attempt has been unsuccessful and the NPA's arguments determined "without merit" by the subject matter experts working with FDA.  In the wake of eroding sales at the hands of the NPA's misinformation campaign, Morton Grove chose to defend its product.  When Morton Grove filed this action, it was not required to sign a blank consent form granting the NPA free reign to take discovery on irrelevant and burdensome topics which have no bearing to this lawsuit.  Restraint and some logical boundaries must be imposed on the NPA—the public misinformation campaign of commercial advertising has now morphed into a litigation harassment campaign.  The Court's intervention is needed.

## C.    Morton Grove's Lobbying Documents Are Protected by Privilege

Even if Morton Grove's lobbying strategy documents were somehow relevant, they are privileged communications, protected by the legislative privilege, the attorney-client privilege, and/or the work product doctrine.  The NPA's nine-month quest for these documents in the face of these privileges further demonstrates the appropriateness of a protective order in this instance.

A.    <u>Lobbying Activities Are Protected by a Legislative Privilege</u>

Morton Grove's complaint alleges that the NPA has disparaged Morton Grove's lindane medications through false and misleading commercial advertisements. These advertisements are posted on the NPA's commercial website (www.headlice.org), which receives more than 130,000 visitors per month, and where the NPA sells hundreds of thousands of dollars per year of its competitive product, the LiceMeister comb. Morton Grove's complaint alleges that the following statements, among others, were false, misleading and caused consumer deception:

- "one dose of a lindane treatment for head lice can pollute 6 million gallons of water to levels exceeding drinking water standards";

- "Lindane should be handled as a **CARCINOGEN WITH EXTREME CAUTION**"; and

- "Lindane, first used as smoke bomb during WWI, is an endocrine disrupting, bio-accumulative toxic chemical. It is a known health risk to humans, especially children, with potential adverse effects ranging from learning disabilities, to birth defects, to breast cancer, to leukemia, to seizures, to death."

(Complaint at ¶¶ 26, 33, 38.)[3] Thus, Morton Grove is not in any way challenging whatever false statements the NPA made in the legislative arena.

By the same token, Morton Grove cannot be held liable for any statement it made in the lobbying process based on the legislative privilege—particularly where it has excluded all lobbying injury from its complaint. The "privilege rests upon the idea 'that conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to protection' . . . the policy interest is of 'paramount importance, considerations of policy may require that the defendant's immunity for false statements be absolute, without regard to his purpose or motive, or the reasonableness of his conduct.'" *Krueger v. Lewis*, 794 N.E.2d 970, 974-75 (Ill. App. Ct. 2003) (*quoting* W. Keeton, Prosser & Keeton on Torts, § 114, at 815-16 (5th ed.1984). Such communications are deemed "so much in the public interest that the publisher should speak fully and fearlessly." *Busch v. Bates*, 753 N.E.2d 1184, 1192 (Ill. App. Ct. 2001); *see Mihailovic v. Soldato*, 2004 WL

---

[3]    This Court may further recall that the NPA's former co-Defendant, The Ecology Center, has retracted the key false statements it has made about Lindane and consented to jurisdiction in this Court if the statements are made again. (*See* Exhibit O.)

528010, at *6 (N.D. Ill. Mar. 17, 2004) ("Public comments to a legislative body concerning the conduct of its public business are the type of conduct that the privilege . . . is designed to protect."). This absolute privilege applies both to members of the legislative body and members of the public. *See id.*

It is undisputed that neither the NPA nor Morton Grove's lobbying statements can form the basis of any liability in this action and that a strong public policy interest favors protecting lobbying speech. Despite this, the NPA not only demands Morton Grove's lobbying statements (documents which were produced), but also demands the underlying privileged strategy documents behind these statements. The NPA thus seeks to drill down on and invade Morton Grove's thought process regarding the manner in which it exercised its First Amendment rights, rights which preclude this entire subject manner from forming the basis for any liability and hence any relevance to these proceedings. *See Wachovia Capital Partners, LLC*, 2007 WL 2570838, at *12 (denying motion to compel lobbying-related documents for lack of relevance).

Morton Grove has respected the bounds of the privilege and the NPA's First Amendment rights within the lobbying arena—for all the falsehoods the NPA has uttered in hearings across the country that have made Morton Grove's blood boil, Morton Grove has never once sought to make any of those statements the subject of this lawsuit. The NPA's bold desire to travel down this one-way street can be explained by nothing other than its desire to harass Morton Grove and its desire to gain a tactical advantage in the legislative process.

B.    Many Lobbying Documents Are Protected by Attorney-Client Communication or Work Product Doctrine Privilege

Regardless of relevance, many of Morton Grove's lobbying documents also implicate the attorney-client privilege and the work product doctrine. Communications that "satisfy the elements of privilege do not lose their protection merely because they are given by a lawyer who also performs lobbying services or because the legal advice given relates to legislation that is the subject of lobbying efforts." *United States v. Ill. Power Co.*, 2003 WL 25593221, at *3 (S.D. Ill. Apr. 24, 2003). This fact only increases the "oppression" and "undue burden" on Morton Grove that is discussed in Rule 26(c). Here, where a potential state ban on FDA approved medications raises the substantial likelihood of a legal challenge by Morton Grove on grounds of federal preemption, this is even more the case. Indeed, Morton Grove has found it necessary to have legal counsel and lobbyists (who are mostly lawyers) involved in

these issues precisely because of the interplay of legal issues and legislative matters. Thus, while documents to third parties about Lindane medications have been produced (as part of the compromise discussed above), there is no reason to invade the company's privileges.

**D.    Morton Grove's Website (www.lindane.com) Was Designed Exclusively For Lobbying Purposes—Not Sales Or Marketing Purposes—And Is Thus Irrelevant**

The NPA's document requests and newly-filed counterclaim make much ado of a website Morton Grove maintains, www.lindane.com. The NPA ignores the vital point that www.lindane.com is not Morton Grove's commercial or promotional website (that website is www.mgp-online.com). Instead, www.lindane.com was constructed and maintained as a website *for lobbying purposes only*, not for marketing or sales purposes. As such, it cannot be relevant to any of the claims or defenses in this action, which necessarily center around the Lanham Act, the Illinois Uniform Deceptive Trade Practices Act, and common law trade disparagement. The central theme of these causes of action (and their related defenses) is advertising, not lobbying.

As Morton Grove's Director of Regulatory Affairs, Dr. Ralph Hodosh, explains in the affidavit attached hereto as Exhibit P, www.lindane.com was exclusively constructed for lobbying purposes, not commercial, sales, or marketing purposes. (*Id.* at ¶¶ 4, 6, 7.) The website was created as part of a political strategy to counter false and misleading information circulated in support of efforts to ban, on a state-by-state basis, FDA-approved lindane medications. (*Id.* ¶ 5.) Indeed, when the website was conceptualized, the ban in California was in place and several other states, including Illinois, were considering similar bans. The website has never been used as a sales and marketing tool and was purposefully fire-walled from anyone at Morton Grove involved in sales and marketing. (*Id.* ¶ 7.) In fact, much of the information would be unsuitable for commercial purposes and would potentially deter sales, such as the web pages on carcinogenic risks and water contamination, and the redundancy of safety warnings built into the site. (*Id.*) Nonetheless, Morton Grove has been put in the position of defending itself against these false and scientifically complex accusations, and www.lindane.com was created as an on-line legislative handout. Finally, a detailed search engine optimization strategy was implemented, which optimized key words and content to match search engine algorithms to ensure the highest placement of the website in the results for internet searches for "lindane." (*Id.* ¶ 6.) Using "lindane" as a search term drives most visits to the website's advocacy pages (e.g., points of view, facts, downloads). This optimization strategy aims to target hits for this website to the policy issue audience. Furthermore, *lindane medications cannot be bought on*

*www.lindane.com* and no link to Morton Grove's promotional website (www.mgp-online.com) can be found on www.lindane.com. (*Id.* ¶ 7.)

A scientific advisory board made up of leading medical thought leaders provided an independent review of the website and certainly would *not* have endorsed a commercial website. The Advisory Board consists of Amy Paller, MD, Walter J. Hamlin Professor and Chair, Department of Dermatology, Professor of Pediatrics, Feinberg School of Medicine at Northwestern University; Adelaide Ann Hebert, MD, Professor, Department of Dermatology and Pediatrics at the University of Texas Medical School at Houston; and Shayne Gad, PhD, DABT, ATS Principal, Gad Consulting, Adjunct Professor of Toxicology at Duke University Medical Center. (*Id.* at ¶ 8.)

## **CONCLUSION**

For the reasons described above, Morton Grove respectfully requests that this Court enter a protective order precluding discovery regarding documents relating to Morton Grove's lobbying activities and quashing the subpoena issued to Closerlook, Inc.


Dated:  May 22, 2008                      Respectfully Submitted,

                                          **MORTON GROVE PHARMACEUTICALS, INC.**


                                          By:__/s/ W. Gordon Dobie_____
                                                  One of its Attorneys

W. Gordon Dobie (wdobie@winston.com)
Timothy Rivelli (trivelli@winston.com)
William C. O'Neil (woneil@winston.com)
Cherish M. Keller (ckeller@winston.com)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
T:  (312) 558-5600
F:  (312) 558-5700

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 22nd day of May 2008, I caused a copy of **Morton Grove Pharmaceuticals, Inc.'s Memorandum In Support of its Motion for Protective Order and to Quash Subpoena** to be served on counsel of record via ECF electronic filing:

> Debbie L. Berman
> Jennifer A. Hasch
> Amanda S. Amert
> Wade A. Thomson
> April A. Otterberg
> JENNER & BLOCK LLP
> 330 North Wabash Avenue
> Chicago, Illinois 60611
> T: (312) 222-9350
> F: (312) 527-0484

_____ /s/ William C. O'Neil _____