**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC. | ) ) ) | |
| Plaintiff, | ) ) | No: 08-CV-1384 |
| v. | ) ) | Judge Bucklo |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., | ) ) ) | Magistrate Judge Mason |
| Defendant. | ) ) ) | |

**MORTON GROVE'S REPLY IN SUPPORT OF ITS MOTION
FOR PROTECTIVE ORDER AND TO QUASH SUBPOENA**

**APPENDIX OF UNPUBLISHED CASES**

Tab 1    *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, 2007 U.S. Dist LEXIS 19475 (D. Kan. Mar. 16, 2007).

Tab 2    *Woods v. Fresenius Med. Care Group of N. Am.*, 2008 WL 151836 (S.D. Ind. Jan. 16, 2008).

Tab 3    *American Roller Co., LLC v. Foster-Adams Leasing, LLP*, 2006 WL 1371441 (N.D. Ill. May 16, 2006).

Tab 4    *Muzikowski v. Paramount Pictures Corp.*, 2005 U.S. Dist. LEXIS 13127 (N.D. Ill. June 10, 2005).

Tab 5    *MasterCard Intern. Inc. v. Nader 2000 Primary Committee, Inc.*, 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004).

# TAB 1

LEXSEE 2007 U.S. DIST LEXIS 19475

**HEARTLAND SURGICAL SPECIALTY HOSPITAL, LLC, Plaintiff, v. MIDWEST DIVISION, INC. d/b/a HCA MIDWEST DIVISION, et al., Defendants.**

**Case No. 05-2164-MLB-DWB**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

*2007 U.S. Dist. LEXIS 19475*

**March 16, 2007, Decided**
**March 16, 2007, Filed**

**SUBSEQUENT HISTORY:** Motion granted by, in part, Motion denied by, in part, Motion denied by, Motion to strike denied by, Motions ruled upon by *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc., 2007 U.S. Dist. LEXIS 22090 (D. Kan., Mar. 26, 2007)*

**PRIOR HISTORY:** *Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc., 2007 U.S. Dist. LEXIS 16816 (D. Kan., Mar. 8, 2007)*

**COUNSEL:** [*1] For Heartland Surgical Specialty Hospital, LLC, Plaintiff: Norman E. Siegel, Patrick J. Stueve, Rachel E. Schwartz, Todd M. McGuire, LEAD ATTORNEYS, Stueve Siegel Hanson Woody LLP, Kansas City, MO.

For Midwest Division, Inc., doing business as HCA Midwest Division, Defendant: Brian E. Kowalski, Eric J. McCarthy, Margaret M. Zwisler, Marguerite M. Sullivan, LEAD ATTORNEYS, Latham & Watkins - DC, Washington, DC.; David E. Everson, Jr., Erin N. Schmidt, R. Kent Sullivan, LEAD ATTORNEYS, Stinson Morrison Hecker LLP- Walnut, Kansas City, MO.; Richard N. Bien, LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

For St. Luke's Health System, Defendant: Floyd R. Finch, Jr, Shelley A. Runion, LEAD ATTORNEYS, Blackwell Sanders Peper Martin LLP- KC, Kansas City, MO.; Richard N. Bien, LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

For Carondelet Health System, Defendant:David B. Helms, Richard B. Walsh, Jr., Winthrop B. Reed, III, LEAD ATTORNEYS, Lewis, Rice & Fingersh, LC -- St. Louis, St. Louis, MO.; John D. Seaton, LEAD ATTORNEY, Lewis, Rice & Fingersh, LC -- Kansas City, Kansas City, MO.

For Shawnee Mission Hospital of Kansas City, Defendant: John M. McFarland, [*2] Scott E. Harvison, LEAD ATTORNEYS, Kutak Rock LLP -- Kansas City, Kansas City, MO.

For North Kansas City Hospital, Defendant: Charles W. German, Joselyn R. Treadway Verschelden, Randall E. Hendricks, LEAD ATTORNEYS, Rouse Hendricks German May PC, Kansas City, MO.

For Blue Cross and Blue Shield of Kansas City, Defendant: Craig S. O'Dear, Lynn S. McCreary, Staci Olvera Schorgl, William Perry Brandt, LEAD ATTORNEYS, Bryan Cave LLP - KC, Kansas City, MO.; Richard N. Bien, LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

For Coventry Health Care of Kansas, Inc., Defendant: Jeffrey J. Simon, Leonard L. Wagner, Michael S. Hargens, William A. Lynch, LEAD ATTORNEYS, Husch & Eppenberger, LLC -- Kansas City, Kansas City, MO.; Richard N. Bien, LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

For United Healthcare, Inc., Defendant: Allen D. Allred, Lawrence Friedman, LEAD ATTORNEYS, Thompson Coburn LLP, St. Louis, MO.; H. Reed Walker, LEAD ATTORNEY, Mission, KS.; Mitchell D. Raup, Robert E. Bloch, LEAD ATTORNEYS, Mayer, Brown, Rowe Maw LLP - DC, Washington, DC.

2007 U.S. Dist. LEXIS 19475, *2

For Humana Health Plan Inc., Defendant: Benjamin T. Clark, Douglas M. Weems, Philip W. Goodin, [*3] LEAD ATTORNEYS, Spencer Fane Britt & Browne-- KC, Kansas City, MO.; Brian D. Boyle, LEAD ATTORNEY, O'Melveny & Myers, LLP -- Washington, Washington, DC.; Gerald A. Stein, LEAD ATTORNEY, O'Melveny & Myers LLP, New York, NY.; Richard N. Bien, LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

For Aetna, Inc., Defendant: Edward R. Spalty, Gerald A. King, LEAD ATTORNEYS, Armstrong Teasdale LLP - KC, Kansas City, MO.; Erica L. Calderas, Robert J. Fogarty, Sean M. Ansberry, LEAD ATTORNEYS, Hahn, Loeser & Parks, LLP, Cleveland, OH.

For Cigna Healthcare of Ohio, Inc., formerly known as CIGNA Healthcare of Kansas/Missouri Inc, Defendant: D. Bruce Hoffman, LEAD ATTORNEY, Hunton & Williams- DC, Washington, DC.; James Moloney, Richard N. Bien, Robyn Lyn Anderson, LEAD ATTORNEYS, Lathrop & Gage, LC - KC, Kansas City, MO.; John S. Martin, LEAD ATTORNEY, Hunton & Williams - Richmond, Richmond, VA.

For Board of Trustees of the North Kansas City Hospital, Defendant: Brandon J.B. Boulware, Lawrence A. Rouse, LEAD ATTORNEYS, Rouse Hendricks German May PC, Kansas City, MO.; Charles W. German, Joselyn R. Treadway Verschelden, Randall E. Hendricks, LEAD ATTORNEYS, Rouse Hendricks German [*4] May PC, Kansas City, MO.; Richard N. Bien, LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

For United Healthcare of the Midwest, Inc., United Healthcare Insurance Co, Defendants: Allen D. Allred, Lawrence Friedman, LEAD ATTORNEYS, Thompson Coburn LLP, St. Louis, MO.; H. Reed Walker, LEAD ATTORNEY, Mission, KS.; Mitchell D. Raup, Robert E. Bloch, Sarah E. Josephson, LEAD ATTORNEYS, Mayer, Brown, Rowe & Maw LLP - DC, Washington, DC.

For Saint Luke's Health System, Inc., Defendant: Floyd R. Finch, Jr, Shelley A. Runion, Laura K. Brooks, LEAD ATTORNEYS, Blackwell Sanders Peper Martin LLP- KC, Kansas City, MO.; Richard N. Bien, LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

For Carondelet Health, Defendant: Allen Spencer Boston, LEAD ATTORNEY, Lewis, Rice & Fingersh, LC -- St. Louis, St. Louis, MO.; John D. Seaton, LEAD ATTORNEY, Lewis, Rice & Fingersh, LC -- Kansas City, Kansas City, MO.; Richard N. Bien, LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

For St. Joseph Medical Center, St. Mary's Medical Center, Defendants: Allen Spencer Boston, David B. Helms, Richard B. Walsh, Jr., Winthrop B. Reed, III, LEAD ATTORNEYS, Lewis, [*5] Rice & Fingersh, LC -- St. Louis, St. Louis, MO.; John D. Seaton, LEAD ATTORNEY, Lewis, Rice & Fingersh, LC -- Kansas City, Kansas City, MO.; Richard N. Bien, LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

For Shawnee Mission Medical Center, Inc., Defendant: John M. McFarland, Scott E. Harvison, LEAD ATTORNEYS, Kutak Rock LLP -- Kansas City, Kansas City, MO.; Richard N. Bien, LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

For Aetna Health Inc., Aetna Life Insurance Company, Defendants: Edward R. Spalty, Gerald A. King, LEAD ATTORNEYS, Armstrong Teasdale LLP - KC, Kansas City, MO.; Richard N. Bien, LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

For Coventry Health and Life Insurance Company, Southcare PPO Inc, Defendants: Michael S. Hargens, LEAD ATTORNEY, Husch & Eppenberger, LLC -- Kansas City, Kansas City, MO.; Richard N. Bien, LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

For Humana Insurance Company, Defendant: Benjamin T. Clark, Douglas M. Weems, Philip W. Goodin, LEAD ATTORNEYS, Spencer Fane Britt & Browne-- KC, Kansas City, MO.; Gerald A. Stein, LEAD ATTORNEY, O'Melveny & Myers LLP, New York, NY.; Richard N. Bien, [*6] LEAD ATTORNEY, Lathrop & Gage, LC - KC, Kansas City, MO.

For Kansas Hospital Association, Movant: Charles R. Hay, LEAD ATTORNEY, Goodell, Stratton, Edmonds & Palmer - Top, Topeka, KS.

**JUDGES:** DONALD W. BOSTWICK, U.S. MAGISTRATE JUDGE.

**OPINION BY:** DONALD W. BOSTWICK

**OPINION**

**MEMORANDUM AND ORDER**

Before the Court is Plaintiff Heartland Surgical Specialty Hospital LLC's ("Heartland's") motion to compel production of documents from the Kansas Hospital Association ("KHA") (Doc. 404.) [1] In its motion, Heartland asks that KHA be compelled, pursuant to a subpoena, to produce all documents withheld on the basis of *First Amendment* privilege. The parties have fully briefed the matter. (Doc. 405, 441, 467.) The nature of the underlying anti-trust litigation is well-known to the Court and all entities involved in this matter and need not be detailed here. KHA is not a party to the underlying anti-trust litigation.

> 1 Heartland made its motion pursuant to *FED. R. CIV. P. 37(a)* and *45(e)* and D. Kan. Rule 37.1. As KHA correctly points out, however, *Rule 37(a)* does not address a motion to compel production of documents based on a subpoena to a nonparty. *See FED. R. CIV. P. 37(a)* (governing motions to compel disclosure pursuant to *Rule 26(a)* or discovery pursuant to *Rules 30, 31, 33, and 34*). In its Reply, Plaintiff states that its motion is properly considered as a motion to compel production pursuant to *FED. R. CIV. P. 45(c)(2)(B)*. The Court will treat it as such. The Court will address the applicability of *FED. R. CIV. P. 45(e)* in connection with discussion of Plaintiff's request for expenses, *infra*.

[*7] FACTUAL BACKGROUND

KHA is an association of at least 125 hospitals across the state of Kansas. One of its primary missions is to represent the interests of its members in the Kansas legislature. KHA has advocated for bills in the Kansas legislature impacting general and specialty hospitals in both the 2005 and 2006 legislative session. (Doc. 441 at 3.)

On August 26, 2006, Heartland served a subpoena on KHA asking for production of twelve categories of documents. (Doc. 405, Ex. 1.) The twelve categories generally relate to the "activities of the Hospital and Managed Care Defendants in this lawsuit regarding

competition from physician-owned specialty hospitals or freestanding surgery centers." (Doc. 405 at 1.) On September 13, 2006, KHA produced 192 pages of documents to Heartland and also served Heartland with objections to the subpoena. (Doc. 405, Ex. 2.) KHA objected to Heartland's subpoena with overbreadth, unnecessary burden, *First Amendment* privilege, attorney-client privilege, "privacy/HIPAA," relevance, and "reasonable compensation" objections. [2] KHA also produced documents to Heartland throughout October and November, for a total production of about 1000 pages. (Doc. 441 [*8] at 2.) Some of the documents produced by KHA were redacted in accordance with its objections. KHA also produced a privilege log to Heartland in November 2006, which identified 56 documents it was withholding or had redacted. Of those 56 documents, 47 of the documents were logged in the privilege log solely based on *First Amendment* privilege grounds. (Doc. 405, Ex. 3.) Heartland clarifies in its reply that its motion seeks only the 47 documents identified by KHA in its privilege log as withheld solely based on the *First Amendment* privilege. (Doc. 467 at 2.)

> 2 KHA's objections are as follows: Category 1, overbreadth and unnecessary burden objections. Category 2, overbreadth and *First Amendment* privilege, attorney-client privilege, and unnecessary burden objections. Category 3, an overbreadth objection. Category 4, overbreadth, *First Amendment* privilege, and attorney-client privilege objections. Category 5, overbreadth, *First Amendment* privilege, and attorney-client privilege objections. Category 6, an overbreadth objection. Category 12, "privacy/HIPAA," relevance, and "reasonable compensation" objections. Objections were not made to categories 7 through 11. (Doc. 405, Ex. 2.)

[*9] DISCUSSION

*FED. R. CIV. P. 45* governs subpoenas to non-parties. [3] Regarding compliance with a subpoena by the party served, *Rule 45(c)(2)(B)* states, in pertinent part:

> [A] person commanded to produce and permit inspection, copying, testing, or sampling may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon

the party or attorney designated in the subpoena written objection to producing any or all of the designated materials . . . . If objection is made, the party serving the subpoena shall not be entitled to inspect, copy, test, or sample the materials . . . except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production, inspection, copying, testing, or sampling. Such an order to compel shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection, copying, testing, or sampling commanded.

Regarding [*10] claims of privilege, *Rule 45(d)(2)(A)* states:

When information subject to a subpoena is withheld on a claim that it is privileged ..., the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

3  *Rule 45* was amended effective December 1, 2006, to conform the provisions for subpoenas to changes in other discovery rules largely related to discovery of electronically stored information. While the subpoena at issue here was served prior to the effective date of the amendments, the Court does not believe that the amendments affect the issue presented in this case, and the Court will therefore apply and cite to the amended version of the rule.

KHA's objection to Heartland's subpoena based on the *First Amendment* privilege states as follows:

The plaintiff has advised that it considers that this request, and other similar requests identified below, [*11] to encompass any materials related to

Kansas Hospital Associations lobbying efforts. During both the 2005 and 2006 legislative sessions, the Kansas Hospital Association presented legislative proposals and testimony as to issues concerning specialty hospitals. As part of developing its legislative proposal, it utilized a task force involving representatives of member institutions, including but certainly not limited to St. Luke's South and the Shawnee Mission Medical Center, along with Kansas Hospital Association staff and counsel. KHA is currently in the process of preparing a log of items that it has identified associated with this legislative process. These may include task force minutes, meeting agendas, reports, recommendations from counsel, draft legislative bills, and board minutes.

The *First Amendment* protects association efforts to influence government to enact laws. In addition, the Supreme Court has recognized that the *First Amendment* creates a qualified privilege from disclosure of certain information in discovery. The claim of *First Amendment* privilege requires the trial court to conduct a balancing test before ordering disclosure. This requires that the parties seeking [*12] information have independently attempted to obtain the information elsewhere without success, that the information sought go[es] to the 'heart of the matter,' and that the information be of certain relevance. '[I]t has been concluded that compulsory disclosure in the course of a 'fishing expedition' is ruled out in a *First Amendment* case.' A 'fishing expedition' is exactly the plaintiff's purpose and the plaintiff has made no showing as to any of the required elements. . . .

(Doc. 405, Ex. 2 at 4) (internal citations omitted). Heartland argues that KHA has not shown that the *First Amendment* applies to the documents requested and, even if the Court finds that the privilege does apply, the balance of factors weighs in favor of an Order of

production. (Doc. 405 at 4-7.)

The *First Amendment* protects "a right to associate for the purpose of engaging in those activities protected by the *First Amendment* -- speech, assembly, petition for the redress of grievances, and the exercise of religion." ***Roberts v. United States Jaycees,*** *468 U.S. 609, 618, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984).* This is generally referred to as "freedom of expressive association." *Id.* The courts have "long understood [*13] as implicit in the right to engage in activities protected by the *First Amendment* a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends. *Id. at 622* (citations omitted).

*First Amendment* protections may be implicated in the context of discovery orders, even if all the litigants are private entities. ***Grandbouche v. Clancy,*** *825 F.2d 1463, 1466 (10th Cir. 1987)*; ***Britt v. Superior Court of San Diego County,*** *20 Cal. 3d 844, 143 Cal. Rptr. 695, 574 P.2d 766, 773-74 (Cal. 1978)* (en banc) (noting that the chilling effect on *First Amendment* rights "is not diminished simply because disclosure is compelled pursuant to a litigation-oriented discovery order" in a private lawsuit). KHA claims the *First Amendment* privilege protects the documents listed in its privilege log from production in this case.

Initially, KHA has the burden to show that the privilege it is asserting applies. ***McCormick v. City of Lawrence, Kansas,*** *No. 02-2165-JWL, 2005 U.S. Dist. LEXIS 37396, 2005 WL 1606595, at *7 (D. Kan. Jul. 8, 2005)* (stating that the party asserting the *First Amendment* associational privilege [*14] must first make a *prima facie* showing that the privilege applies). Then, if the party claiming the privilege has made this *prima facie* showing, the burden shifts to the party seeking the information, and the Court will apply a balancing test considering the following factors: (1) the relevance of the evidence; (2) the necessity of receiving the information sought; (3) whether the information is available from other sources; and (4) the nature of the information. ***Grandbouche,*** *825 F.2d at 1466* (*citing Silkwood v. Kerr-McGee Corp.,* *563 F.2d 433, 438 (10th Cir. 1977)*).

The *First Amendment* associational privilege applies when a discovery order "entails the likelihood of a substantial restraint upon the exercise by petitioner's members of their right to freedom of association." ***NAACP v. Alabama,*** *357 U.S. 449, 462, 78 S. Ct. 1163, 2*

*L. Ed. 2d 1488 (1958).* Thus, if the compelled disclosure is likely to adversely affect the ability of an organization and its members to collectively advocate for the organization's beliefs by inducing members to withdraw from the organization or dissuading others from joining because fear of exposure [*15] of their beliefs will lead to threats, harassment, or reprisal, it runs afoul of the *First Amendment*. *Id. at 462-63.* The type of threats, harassment, and reprisal discussed by the Supreme Court in ***NAACP*** are threats of physical coercion or bodily harm, economic harm or reprisal, loss of employment, and other public manifestations of hostility. *Id. at 462.*

As the Court noted in ***Roberts v. United States Jaycees,*** the *First Amendment* right to associate with others may apply to a wide variety of political, and economic associations. *468 U.S. at 622.* For example, the Tenth Circuit has stated that the *First Amendment* protects "advocacy concerning the lawful modification or elimination of the federal tax system." ***Pleasant v. Lovell,*** *876 F.2d 787, 795 (10th Cir. 1989).* Therefore, KHA's advocacy for modification of Kansas laws concerning general and speciality hospitals would appear to be a type of political or economic association that would also be protected by the *First Amendment* privilege. *See e.g.,* ***East. R.R. President's Conference v. Noerr Motor Freight, Inc.,*** *365 U.S. 127, 1356 (1961)* [*16] (holding that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to tackle particular action with respect to a law that would produce a restraint or a monopoly"); ***United Mine Workers of Am. v. Pennington,*** *381 U.S. 657, 670, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965)* (noting that a "concerted effort to influence public officials regardless of intent of purpose" does not violate the Sherman Act even though intended to eliminate competition).

Heartland argues that the *First Amendment* privilege is only to protect the "relatively powerless" from serious threats of economic reprisal, loss of employment, threat of physical coercion or similar manifestations of public hostility. (Doc. 405 at 5.) The Court does not believe that the privilege is as restricted in nature as Plaintiff implies. *See e.g.,* ***Austl./E. USA Shipping Conference v. United States,*** *537 F. Supp. 807, 809-10 (D.C. Cir. 1982)* (gathering cases recognizing precedent that "forced disclosure of activities and associations protected by the *First Amendment*" is subject to a balancing of harms and

stating that "petitioning the government [*17] is equally central to *first amendment* values"); *State of Wyoming v. United States Dep't of Agric., 208 F.R.D. 449, 454 (D.D.C. 2002)* (protecting environmental organizations who allegedly had influence with U.S. Department of Agriculture in the drafting of forest regulations and noting the broad scope of the *First Amendment* privilege to include not only association membership lists, but also encompassing "the freedom to protest policies to which one is opposed, and the freedom to organize, raise money, and associate with other like-minded persons so as to effectively convey the message of the protest"). Finally, courts have rejected similar contentions that the *First Amendment* protects only dissident, unorthodox or unpopular organizations, noting that the Amendment should afford "constitutional protection to the privacy interests of members of *all* politically oriented associations." *Britt v. Superior Court of San Diego County, 574 P.2d at 772* (emphasis in original).

Heartland also argues that KHA has not shown a "reasonable probability" that production of the requested documents to Heartland will threaten, intimidate or harass KHA or [*18] its members. (Doc. 405 at 5; Doc. 467 at 7.) The Court disagrees. It has been recognized that there are several ways that actions may infringe on the *First Amendment* right of association: (1) by the government imposition of penalties or withholding of benefits; (2) by attempting to require disclosure of the fact of membership where anonymity is desired; or (3) by attempts to interfere with the internal organization or affairs of the group. *Pleasant v. Lovell, 876 F.2d 787, 795 (10th Cir. 1989)* (*citing Roberts v. United States Jaycees, 468 U.S. 609, 622-23, 104 S. Ct. 3244, 82 L. Ed. 2d 462 (1984)).* Here, the attempt to require production of KHA's "evaluations of possible legislation and legislative strategy" (Doc. 441 at 8) is the type of action that would appear to interfere with KHA's internal organization and with its lobbying activities, and therefore would have a "chilling effect" on the organization and its members. *See e.g., Austl./E. USA Shipping Conference v. United States, 537 F. Supp. at 810-11* (concluding that "[a] factual showing of actual chilling is not a necessity for a decision forbidding disclosure . . ." and it is for the court [*19] to evaluate the likelihood of a chilling effect under the circumstances); *Britt v. Superior Court of San Diego County, 574 P.2d at 773-74.*

In Plaintiff's Reply, it quotes from a portion of Judge Brimmer's opinion in *State of Wyoming v. United States*

*Department of Agriculture, 239 F. Supp. 2d 1219 (D. Wyo. 2002), vacated as moot, 414 F. 3d 1207 (10th Cir. 2005).* In discussing the issue of what constitutes a *prima facie* showing that the associational privilege applies, Judge Brimmer noted that where discovery seeks disclosure of an organization's "internal associational activities (i.e., membership lists, volunteer lists, financial contributor lists, and past political activities of members)" this is a sufficient showing "because disclosure of these activities chills freedom of association." *239 F. Supp. 2d at 1237* (emphasis added). He continues by stating that as to these types of activities, "federal courts assume, sometimes implicitly, that the party seeking protection has made his *prima facie* showing. . . ." *Id.* [4]

> [4] Judge Brimmer notes that "[I]n a sense, courts have taken judicial notice of the fact that disclosure of these internal associational activities -- membership lists, volunteer lists, financial contributor lists, and political activities of the organization's members -- will lead to threats, harassment, or reprisal, thereby chilling freedom of association. *239 F. Supp. 2d at 1238 n.14.*

[*20] KHA asserts Heartland is seeking documents related to KHA's strategy of advocating for bills in the Kansas legislature that would have impacted specialty hospitals. (Doc. 441 at 3.) This is precisely the type of internal associational activity and past political activity that the *First Amendment* is designed to protect. Therefore, the Court concludes that KHA has met its *prima facie* burden of showing that production of such material would have a chilling effect and thus the *First Amendment* privilege applies. The burden then shifts to Heartland to show how the balancing of factors weighs in support of compelling disclosure of the information covered by the *First Amendment* privilege.

To overcome KHA's *prima facie* showing, Heartland must show how the following factors weigh in favor of disclosure: (1) the relevance of the evidence; (2) the necessity of receiving the information sought; (3) whether the information is available from other sources; and (4) the nature of the information. *Grandbouche, 825 F.2d at 1466.* And, as the Tenth Circuit noted in *Silkwood v. Kerr McGee Corp., 563 F.2d 433, 438 (10th Cir. 1977),* "[f]rom these criteria [*21] [the four balancing factors noted above], it has to be concluded that compulsory disclosure in the course of a 'fishing

expedition' is ruled out in the *First Amendment* cases."

With regard to the first factor, the relevance of the evidence, Heartland argues that the documents are relevant, but supports this assertion only by stating that the documents "pertain to the claims" Heartland made in its Third Amended Complaint. (Doc. 405 at 6.) Heartland goes on to argue relevance by stating that it believes the documents "may reveal these Defendants' views and opinions about specialty hospitals as well as affirmative actions taken by Defendants to exclude Plaintiff Heartland and other doctor-owned facilities from the market." (Doc. 405 at 7.) With regard to the fourth factor, the nature of the information sought, Heartland argues that the documents it seeks are "highly important." Heartland supports this assertion only by stating that "KHA does not hide its opposition to physician-owned specialty hospitals" and KHA "provides a setting where Defendants, including horizontal competitors, can work together to limit the opportunities and viability of specialty hospitals." (Doc. 407 at 7.)

[*22] Heartland addresses the second factor, the necessity of receiving the information sought, and the third factor, whether the information is available from other sources, together, without distinguishing the two. With regard to these factors, Heartland claims it is unable to obtain the documents it seeks elsewhere. Heartland relates that it has requested KHA documents from another Defendant, but that Defendant refused to produce the documents. Heartland also states that, even if Defendants produced the KHA documents in their possession, the production would be unlikely to contain all the documents KHA created. (Doc. 405 at 7.)

KHA replies to these arguments by stating: (1) the privileged documents are of minimal relevance because KHA is not a party, the documents relate only to efforts of KHA before the Kansas legislature, and the documents relate only broadly to KHA's members' views of specialty hospitals (of which membership, "[o]ver 95%" are not parties to this litigation); (2) KHA has produced as much information as possible without specifically disclosing its legislative strategy; and (3) Heartland has not made an attempt to obtain the information from the Defendants who were [*23] members of the task force underlying the creation of the privileged documents. (Doc. 441 at 8-10.)

After considering the balance of the factors, the Court finds that Heartland has not met its burden of showing the balance of the factors weighs in its favor. The information sought is only *minimally* relevant to the claims made in this lawsuit. *Cf. Austl./E. USA Shipping Conference v. United States, 537 F. Supp. at 810, 812* (a greater showing of relevance and need is required where *First Amendment* issues are at stake in order to give more protection to *First Amendment* values); *State of Wyoming v. United States Dep't of Agric., 239 F. Supp. 2d at 1241* (when a claim of Associational Privilege is asserted, the relevance standard is more exacting than the minimal showing of relevance under *Rule 26(b)(1)*, and the information must go to the heart of the matter). Heartland seeks information about Defendants' involvement in discussions regarding exclusion of specialty hospitals, the substance of the claims in this litigation, but the privileged documents are tangential to those claims as they relate only to KHA's legislative strategy and proposed [*24] legislative language. In addition, only two of the present Defendants in this case were a part of the KHA task force.

The necessity of the information sought has also not been shown. This is a civil matter and the requested information is not central to the litigation because of its minimal relevance. Therefore, Heartland has not shown a truly compelling need for the information. In addition, the nature of the information sought is privileged and "central to *first amendment* values." *Austl./E. USA Shipping Conference v. United States, 537 F. Supp. 807, 809-10 (D.C. Cir. 1982)*. This all suggests that the subpoena for the KHA documents may be a "fishing expedition." *Silkwood v. Kerr McGee Corp., 563 F.2d 433, 438 (10th Cir. 1977)*. Further, KHA is not a member to this lawsuit and this weighs against compelling disclosure. *See e.g., Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto, 211 F.R.D. 658, 662 (D. Kan. 2003), citing Katz v. Batavia Marine & Sporting Supplies, 984 F.2d 422, 424 (Fed.Cir. 1993)* (the status of a person as a nonparty is a factor that weighs against disclosure); *Echostar Comms. Corp. v. News Corp. Ltd., 180 F.R.D. 391, 394 (D. Colo. 1998)* [*25] ("the status of a person or entity as a non-party is a factor which weighs against disclosure").

Finally, Heartland has failed to show that the information Heartland seeks is clearly unavailable from other sources. Heartland can directly ask the two Defendants who were involved in the task force about matters relating to Heartland, without the need for privileged lobbying strategy materials. [5] Even if the

2007 U.S. Dist. LEXIS 19475, *25

information was wholly unavailable to Heartland, however, the balance of the factors outweighs this one factor in Heartland's favor: the information sought is not highly relevant; it is not necessary for Heartland to receive the information to continue to pursue its claims, and the nature of the information is highly privileged.

> 5 Heartland has filed a motion to compel against Defendant Saint Luke's Health System, Inc. seeking a Court Order for the production of lobbying documents from KHA. (Doc. 399 at 12.) That motion will be the subject of a separate Memorandum and Order from this Court.

Because the Court [*26] finds that the balance of the factors weighs in support of maintaining the privilege of the documents as asserted by KHA, Heartland's motion is accordingly DENIED.

### AWARD OF MOVANT'S EXPENSES

Heartland requests that KHA be ordered to pay Heartland's reasonable expenses in making this motion, including its attorneys' fees. (Docs. 404 at 1-2; 405 at 8.) Heartland does not articulate the basis for its request for attorneys' fees.

Courts considering this issue have concluded that the only authority in the Federal Rules of Civil Procedure for imposition of sanctions against a nonparty for failure to comply with a subpoena are found in *FED. R. CIV. P. 45(e)*. **Cruz v. Meachum,** *159 F.R.D. 366, 368 (D. Conn. 1994)*; **24 Hour Fitness U.S.A., Inc. v. 24/7 Tribeca Fitness, L.L.C.,** *No. 03 Civ. 4069 (RLE), 2006 U.S. Dist. LEXIS 46063, 2006 WL 1881763 at * 2 (Jul. 6, 2006)*. *Rule 45(e)* states that the failure, without "adequate excuse," to comply with a subpoena may be deemed contempt of court, and further states that an "adequate cause for failure to obey exists when a subpoena purports to require a nonparty to . . . produce at a place not within [*27] the [proscribed] limits." The Rule says nothing more with regard to sanctions.

However, courts construing the contempt provisions of *Rule 45(e)* have concluded that sanctions such as costs, should not be imposed on a nonparty unless the court has

already issued an order compelling discovery. **Cruz v. Meachum,** *159 F.R.D. at 368*; **24 Hour Fitness U.S.A., 2006 U.S. Dist. LEXIS 46063, 2006 WL 1881763 at * 2-3.** The Court agrees with this approach. Here the Court has not previously entered any order compelling production. In fact, the Court has found the documents listed in KHA's privilege log to be privileged pursuant to the *First Amendment*. Under these circumstances, Heartland has not stated any basis for an award of attorneys' fees and the request for fees is DENIED.

In its response, KHA asks for "costs of complying with the subpoena." (Doc. 441 at 10.) KHA does not support its request in any manner or cite any authority providing for such an award of costs. Clearly, if the Court had entered an order compelling KHA to produce the subpoenaed documents, *FED. R. CIV. P. 45(c)(2)(B)* specifically provides that "such an order to compel the production [*28] shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded." In this case, however, the Court did not enter an order commanding KHA to produce the records, so this provision of the rule does not support KHA's request for the costs of complying with the subpoena. Because KHA has failed to state any legal basis for the Court to order the payment of the requested costs, KHA's request for costs is DENIED.

### CONCLUSION

Heartland's motion to compel production of documents from the Kansas Hospital Association is DENIED. Heartland's request for an award of costs incurred in bringing the present motion, and KHA's cross-request for an award of costs for complying with the subpoena, are also DENIED.

**IT IS SO ORDERED.**

Dated at Wichita, Kansas on this 16<th> day of March, 2007.

s/ DONALD W. BOSTWICK

U.S. MAGISTRATE JUDGE

# TAB 2

Slip Copy                                                                                    Page 1

Slip Copy, 2008 WL 151836 (S.D.Ind.)
**(Cite as: 2008 WL 151836 (S.D.Ind.))**

ℭ

Woods v. Fresenius Medical Care Group of North America
S.D.Ind.,2008.
Only the Westlaw citation is currently available.
United States District Court,S.D. Indiana,Indianapolis Division.
Josephine WOODS, Plaintiff,
v.
FRESENIUS MEDICAL CARE GROUP OF NORTH AMERICA, d/b/a Renal Care Group, Inc., et al., Defendants.
**No. 1:06-cv-1804-RLY-WTL.**

Jan. 16, 2008.

Tae K. Sture, Sture Legal Services LLC, Indianapolis, IN, for Plaintiff.

Nadine C. Abrahams, Jackson Lewis LLP, Chicago, IL, Andrew W. Gruber, Christopher R. Taylor, Bingham Mchale LLP, Indianapolis, IN, for Defendants.

### *ENTRY ON MOTION TO QUASH*

Hon. WILLIAM T. LAWRENCE, United States Magistrate Judge.

**\*1** This cause is before the Magistrate Judge on the Plaintiff's motion to quash. The motion is fully briefed, and the Magistrate Judge, being duly advised, **GRANTS** the motion for the reasons set forth below.

Plaintiff Josephine Woods alleges in this case that the Defendants discriminated against her on the basis of her race by reducing her work hours and denying her a promotion and then retaliated against her for filing discrimination charges and otherwise complaining about discriminatory conduct. In the instant motion, the Plaintiff seeks to quash the nonparty subpoenas issued by Defendant Fresenius Medical Care Group of North America (hereinafter "the Defendant") seeking her employment records from her employer immediately prior to the De-

fendant and her current employer.[FN1] The Plaintiff argues that she has a privacy interest in the documents sought by the subpoenas and that the documents are irrelevant to the claims and defenses in this case.

> FN1. As an initial matter, the Plaintiff argues that the Defendant violated Federal Rule of Civil Procedure 45(b)(1) by failing to give her notice of the subpoenas before it served them. The subpoenas were issued prior to the December 1, 2007, amendment of Rule 45(b)(1) which makes it clear that such notice is required. Under the previous version of the rule, it was ambiguous whether the notice was required prior to service of a subpoena or prior to the return date listed on the subpoena, although courts had "tended to converge on an interpretation that requires notice to the parties before the subpoena is served."Rule 45(b)(1) Advisory Committee's Note.

In response, the Defendant first argues that the Plaintiff lacks standing to seek to quash the subpoenas. This argument is without merit. "A party has standing to move to quash a subpoena addressed to another if the subpoena infringes upon the movant's legitimate interests."U.S. v. Raineri, 670 F.2d 702, 712 (7th Cir.1982) .[FN2] The Plaintiff correctly asserts that she has a legitimate interest in protecting the confidentiality of much of the information contained in her employment records and also in maintaining her relationship with her current employer. The Defendant responds to this argument as follows: "If Plaintiff's argument is taken to its logical extreme, any time a defendant issues a subpoena for employment records in an employment discrimination matter, such subpoena should be quashed because it seeks personnel records. That is contrary to the law and illogical."Defendant's Response at 2. It is the Defendant's argument that is illogical, however. To say that the Plaintiff's interest in the private information con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy    Page 2
Slip Copy, 2008 WL 151836 (S.D.Ind.)
(Cite as: 2008 WL 151836 (S.D.Ind.))

tained in the records sought by the Defendant gives her standing to object to the subpoenas is not the equivalent of saying that the subpoenas should be quashed; rather, it simply means that the Plaintiff is entitled to have her arguments heard on the issue.

> FN2. The Defendant cites to three unpublished decisions in support of its argument that the Plaintiff lacks standing to move to quash the subpoenas because they were not issued to her. However, the Defendant fails to acknowledge that while these cases each state the proposition that "[p]arties do not *generally* have standing to bring a motion to quash on behalf of a subpoena recipient,"*Hunt v. Northwest Sub. Comm. Hosp.,* 2006 U.S. Dist. LEXIS 3281 at *4 (N .D.Ill. Jan. 30, 2006) (emphasis added), they also each recognize the fact that "a party to the case gains standing when an assertion of 'personal right or privilege' is made regarding the sought-after documents."*Manufacturer Direct, LLC v. Directbuy, Inc.,* 2007 U.S. Dist. LEXIS 10250 at *5,2007 WL 496382 (N.D.Ind. Feb. 12, 2007).

Next, the Defendant argues that the information sought by the subpoenas is relevant and discoverable because it is "information relating to [the Plaintiff's] employment, which she has put at issue in this matter."However, the Plaintiff has not placed her entire employment history at issue, but rather only her employment with the Defendant. While it is certainly theoretically possible that records from a previous or subsequent employer might be relevant in an employment discrimination case, such a theoretical possibility does not make the records discoverable. Rather, the Defendant must demonstrate that the documents it seeks actually are relevant to the claims and defenses in this case. Further, it is the Court's duty to consider whether "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in contro-

versy, the parties' resources, the importance of the issues at stake in this litigation, and the importance of the proposed discovery in resolving the issues ."Applying these factors leads to the conclusion that an employment discrimination plaintiff does not open her entire work history up for discovery by the defendant as a matter of course; rather, the defendant must demonstrate a specific reason why the information is relevant to the particular claims and defenses in the case at hand. In other words, absent a showing that the subpoenas are reasonably calculated to lead to the discovery of admissible evidence, the Defendant is simply embarking on the proverbial fishing expedition, and the theoretical potential relevance of any information obtained by such discovery is outweighed by the interests of the plaintiff discussed above.

**\*2** The Defendant makes several arguments regarding the relevance of the information it seeks in this case. First, it argues that because "Plaintiff's managerial and supervisory experience were among the reasons for its decision not to select Plaintiff for the Clinic Manager position[,] Plaintiff's experience, including her employment records from her prior employer, is directly relevant to Plaintiff's failure to promote claims."Defendant's Response at 6. This argument is entirely without merit. Any consideration by the Defendant of the Plaintiff's experience had to be based upon the information that the Defendant had at the time it made the decision not to promote her. Therefore, it is completely irrelevant what her actual experience was; what is relevant is what the Defendant believed it to be at the time.

Next, the Defendant argues that it is entitled to the information it seeks because "evidence concerning Plaintiff's prior employment is discoverable and relevant to show Plaintiff's credibility and motive in bringing suit."However, the Defendant points to nothing that indicates that the Plaintiff was untruthful to the Defendant or her other employers; rather, the Defendant simple wants to "fish around" in order to see what it might uncover. Similarly, the Defendant argues that information from the Plaintiff's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

current employer might demonstrate that any emotional distress she is experiencing was not caused by the Defendant, but rather by "disciplinary, performance, attendance or other issues" in her current position. There does not appear to be any reason to believe that is the case, however, and, again, the Defendant simply is not entitled to amass a collection of documents in hopes of finding something useful. The same is true with regard to the Defendant's assertion that it is entitled to the discovery in question because it might lead to evidence that would support an after-acquired evidence defense.

Because the Defendant has failed to demonstrate that its subpoenas to the Plaintiff's past and current employers are based upon anything other than the Defendant's hope that the documents sought might prove useful in this case, the Plaintiff's motion to quash the subpoenas is **GRANTED.**

SO ORDERED.

S.D.Ind.,2008.
Woods v. Fresenius Medical Care Group of North America
Slip Copy, 2008 WL 151836 (S.D.Ind.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 1371441 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1371441 (N.D.Ill.))**

⚓

American Roller Co., LLC v. Foster-Adams Leasing, LLP
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern Division.
AMERICAN ROLLER COMPANY, LLC, Plaintiff/Counter-Defendant,
v.
FOSTER-ADAMS LEASING, LLP; Foster-Adams LLP; Russell M. Foster; and Larry H. Adams, Defendants/Counter-Plaintiffs.
**No. 05 C 3014.**

May 16, 2006.

Stephen Henley Locher, William Charles Meyers, Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, IL, for Plaintiff/Counter-Defendant.
Melissa M. Riahei, Anne Giddings Kimball, Wildman, Harrold, Allen & Dixon, Chicago, IL, Christopher B. Major, Thomas D. Myrick, Moore & Van Allen PLLC, Charlotte, NC, for Defendants/Counter-Plaintiffs.

### MEMORANDUM OPINION AND ORDER

NAN R. NOLAN, Magistrate Judge.
**\*1** Plaintiff American Roller Company, LLC ("American Roller") seeks a protective order barring discovery related to the transaction and settlement involving Pillar Industries and CM Acquisitions. For the reasons stated, American Roller's motion [57-1] is granted.

### BACKGROUND

This case arises out of a Purchase Agreement and Amended and Restated Subordinated Seller Notes ("Amended Notes") between American Roller and Defendants Russell M. Foster, Larry H. Adams, Foster-Adams Leasing, LLP, and Foster-Adams

LLP ("Defendants") entered into on October 2, 2003. Pursuant to the Purchase Agreement and Amended Notes, American Roller purchased from Defendants the stock and assets of Champion Roller, LLC ("Champion"), a company in the business of manufacturing and resurfacing roller for, among other things, the metal, converting and paper industries. American Roller alleges that Defendants made certain misrepresentations and breached certain warranties in the Purchase Agreement. Defendants deny any wrongdoing and have counterclaimed to recover payments allegedly due and owing under the Amended Notes.

Defendants seek discovery regarding a transaction, dispute, and settlement involving CM Acquisitions ("CM") and Pillar Industries, two non-parties to this case. CM is a private equity firm in the business of acquiring mid-market businesses. CM is one of approximately 35 investors in a company that owns American Roller. One of the two principals of CM, Charles J. Tasch, is also the President and Chief Executive Officer of American Roller. The Amended Notes were guaranteed by CM.

Pillar Industries is a manufacturer of heat induction and melting equipment. CM participated in the negotiation of, but was not a party to, a contract for the purchase of Pillar Industries by an entity called Pillar Induction Company, LLC ("Pillar Induction"). CM is one of many investors in Pillar Induction. CM and other investors acquired Pillar Induction in December 2002. Defendants claim that Charles Tasch "is the man behind the curtain at both CM Acquisitions and American Roller, and was behind both the transaction at issue in this case, and the transaction involving Pillar."Defs' Opp. at 6.

### DISCUSSION

Rule 26 of the Federal Rules of Civil Procedure governs the scope of discovery in federal civil

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1371441 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1371441 (N.D.Ill.))**

cases. Rule 26(b)(1) allows parties to discover information "regarding any matter, not privileged, that is relevant to the claim or defense of any party."Upon a showing of good cause, a court may order discovery of "any matter relevant to the subject matter involved in the action."Moreover, Rule 26(c) authorizes a court "for good cause shown" to issue a protective order barring or limiting discovery when "justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense...."

Defendants have indicated their intent to depose Mark Skiba, previously president of Pillar Industries, and also to seek documents related to Pillar Industries as part of the depositions of American Roller's witnesses. American Roller suspects that Defendants hope that, because a dispute arose and was settled after the Pillar Industries transaction, Mr. Skiba's testimony will raise an inference that American Roller planned all along to initiate litigation after the execution of the Purchase Agreement.

**\*2** American Roller argues that evidence of the transaction and settlement between CM and Pillar Industries has no relevance to this case. Champion, American Roller, and Defendants had no involvement in the Pillar Industries transaction. Neither Mr. Skiba nor Pillar Industries had any involvement in the negotiation and execution of the Purchase Agreement and Amended Notes. American Roller points out that Mr. Skiba has never been an employee or customer of Champion or American Roller, and Pillar Industries is not in the same line of business as Champion or American Roller. American Roller further explains that the only connection between Pillar Industries and this case is that: 1) CM is one of approximately 35 investors in an entity that owns American Roller; 2) CM is also one of many investors in an entity (Pillar Induction Company, LLC) that acquired Pillar Industries in December 2002; and 3) CM participated in the negotiations both in American Roller's acquisition of Champion and in the Pillar Industries transaction. American Roller concedes that evidence of other

negotiations involving American Roller in which CM participated are discoverable, and Defendants have taken discovery on three collateral deals in which both CM and American Roller were involved.

Defendants respond that "Mr. Skiba may have discoverable information relating to Plaintiff's business practices, and the intent, plan and motivation behind the assertion of Plaintiff's claims in this action."Defs' Supp. Rule 26(a)(1) Disclosure. Defendants believe that CM asserted similar claims against Pillar Induction with respect to representations made in the sale of Pillar Induction and that the claims asserted resulted in a settlement involving the renegotiation of outstanding amounts owed to Pillar on the deal. Defendants believe the current litigation was instituted in bad faith and they seek to discover whether the executives of American Roller have "previously engaged in a pattern and practice of acquiring companies and subsequently, under similar circumstances, threatening or instituting litigation to renegotiate the deal."Defs' Opp. at 4. Defendants conclude that such evidence is relevant and could conceivably lead to the assertion of additional claims against American Roller.

American Roller has demonstrated good cause for barring discovery related to the CM and Pillar Industries transaction on relevancy grounds.FN1 Even if discovery related to the actions of CM in the Pillar transaction would shed light on American Roller's "business practices" or its "intent, plan and motivation behind the assertion of [its] claims in this action," Defendants fail to explain how the business practices of American Roller and its plan, intent and motive for the assertion of its claims are relevant to the "claim or defense of any party."American Roller's claim is that Defendants breached certain representations and warranties in the Purchase Agreement. Defendants claim American Roller breached the Amended Notes. It is not apparent how American Roller's alleged plan to initiate litigation after the execution of the Purchase Agreement is at all relevant to a determination as to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 1371441 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1371441 (N.D.Ill.))**

Page 3

whether a breach of the Purchase Agreement or Amended Notes occurred. Defendants cite no authority for the position that American Roller's motive in asserting a breach of contract claim is relevant to the existence of a breach or any defense thereto. Defendants have not indicated that any language in the Purchase Agreement and Amended Notes arguably makes American Roller's motive an issue. In addition, no showing of good cause as required by Rule 26(b)(1) has been made to expand the scope of discovery to the broader "subject matter" standard. Even if a showing of good cause had been made, the broader "subject matter" standard would not seem to accommodate Defendants' discovery request. "Subject matter" would have to be construed as encompassing any transaction involving CM and its principals rather than facts relevant to the particular agreement in dispute. This appears to be too broad a construction upon which to base discovery.

> FN1. American Roller argues, among other things, that evidence of the transaction and subsequent settlement involving CM and Pillar Industries would not be admissible under Federal Rule of Evidence 408 even if it did have some relevance. Besides the fact that Rule 408 governs the admissibility of evidence at trial and not discovery and the trial court "has broad discretion to admit settlement evidence for a purpose other than proving liability," it is not clear that Rule 408 would bar this evidence. Rule 408 does not bar evidence regarding settlement of a claim different from the one litigated. See Zurich American Ins. Co. v. Watts Indust., Inc., 417 F.3d 682, 689 (7th Cir.2005) (stating "[i]n deciding whether Rule 408 should be applied to exclude evidence, courts must consider the spirit and purpose of the rule and decide whether the need for the settlement evidence outweighs the potentially chilling effect on future settlement negotiations. The balance is especially likely to tip in favor

of admitting evidence when the settlement communications at issue arise out of a dispute distinct from the one for which the evidence is being offered."). The Pillar Industries settlement does not involve the dispute that is the subject of this suit.

**\*3** Moreover, Defendants' attempt to discover evidence regarding the CM and Pillar Industries transaction for unasserted claims is improper. This Court "has the authority to confine discovery to the claims and defenses asserted in the pleadings."Advisory Committee Notes to 2000 Amendment to Rule 26(b)(1). This Court respectfully disagrees with the statements in Murata Mfg. Co., Ltd. v. Bel Fuse Inc., 2006 WL 687172, at \*8 (N.D.Ill. March 14, 2006) that "discovery is not even limited to issues raised by the pleadings, because discovery itself is designed to help define and clarify what the issues are. Nor is discovery limited to the merits of the case."Murata relies on authority that significantly predates the 2000 amendment to Rule 26(b)(1). See Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978). Under Rule 26(b)(1) at that time, parties were entitled to "obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action."The Supreme Court interpreted the phrase "relevant to the subject matter involved in the pending action" broadly to "encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."Id. The 2000 Amendment explicitly limited the scope of discovery to the "claim or defense of any party" identified in the pleadings without leave of court. The 2000 amendment to Rule 26(b)(1)"signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings."Advisory Committee Notes to 2000 Amendment to Rule 26(b)(1). To the extent that Murata suggests that the Federal Rules of Civil Procedure permit discovery on unasserted claims, it is inconsistent with the Advisory Committee Notes to the 2000 amendment to Rule 26(b)(1) and does

Not Reported in F.Supp.2d, 2006 WL 1371441 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 1371441 (N.D.Ill.))**

not control the decision in this case.

### *CONCLUSION*

For these reasons, Plaintiff American Roller's Motion for Protective Order Barring Discovery Related to the Transaction and Settlement Involving Pillar Industries and CM Acquisitions [57-1] is granted.

N.D.Ill.,2006.
American Roller Co., LLC v. Foster-Adams Leasing, LLP
Not Reported in F.Supp.2d, 2006 WL 1371441 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

LEXSEE 2005 U.S. DIST. LEXIS 13127

ROBERT E. MUZIKOWSKI, Plaintiff, vs. PARAMOUNT PICTURES
CORPORATION, SFX TOBBINS/ROBBINS, INC., and FIREWORKS PICTURES,
Defendants.

01 C 6721

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
ILLINOIS, EASTERN DIVISION

*2005 U.S. Dist. LEXIS 13127*

June 10, 2005, Decided
June 10, 2005, Filed

**SUBSEQUENT HISTORY:** Affirmed by *Muzikowski v. Paramount Pictures Corp., 2007 U.S. App. LEXIS 2784 (7th Cir. Ill., Feb. 8, 2007)*

**PRIOR HISTORY:** *Muzikowski v. Paramount Pictures Corp., 2004 U.S. Dist. LEXIS 15314 (N.D. Ill., Aug. 5, 2004)*

**COUNSEL:** [*1] For Robert E Muzikowski an individual, Plaintiff: Michael B. Roche, Camille B. Conway, Jin-Ho Chung, Lawrence Andrew Brehm, Michael T Roche, Schuyler, Roche & Zwirner, Chicago, IL.

For Paramount Pictures Corporation, SFX Tollin Robbins, Inc., Firewords Pictures, Defendants: Debbie L. Berman, David Mark Greenwald, Michael Allen Doornweerd, Jenner & Block, LLC, Chicago, IL.

For Northwestern Mutual Life Insurance Company, Intervenor: Michael Ross Phillips, McGuire Woods LLP, Chicago, IL.

**JUDGES:** CHARLES P. KOCORAS, Chief District Judge.

**OPINION BY:** Charles P. Kocoras

**OPINION**

**MEMORANDUM OPINION**

CHARLES P. KOCORAS, Chief District Judge:

This matter comes before the court for ruling on three disputed issues: objections by Plaintiff Robert Muzikowski to the February 25, 2005, report and recommendation of Magistrate Judge Levin and two motions by Defendants Paramount Pictures Corporation, SFX Tollin/Robbins, Inc., and Fireworks Pictures (collectively referred to herein as "Paramount"). Paramount's first motion seeks summary judgment in their favor on Muzikowski's complaint. The second is a motion to strike certain portions of Muzikowski's response to Paramount's statement of facts [*2] and his statement of additional facts for failure to comply with Local *Rule 56.1*. For the reasons set forth below, we overrule Muzikowski's objections, adopt Judge Levin's report and recommendation for imposition of sanctions in the amount of $ 50,915.25, deny Paramount's motion to strike, and grant its motion for summary judgment.

**BACKGROUND**

Muzikowski is a securities broker and insurance agent. For several years, he has been active in organizing and running baseball leagues for young boys in Chicago and New York. Because of his efforts, he has been recognized by various organizations and in several publications and broadcasts around the United States.

One of the publications in which Muzikowski has appeared is a nonfiction novel by Daniel Coyle, entitled *Hardball: A Season in the Projects.* In the book, Coyle describes the 1992 summer season of the Near North

Little League, one of the leagues Muzikowski founded with another man named Al Carter. The book focuses on a team called the Kikuyus, who are supervised by at least five volunteer coaches during that summer: Bill, Brad, Kevin, Cort, and Feets. The novel also gives brief synopses of the backgrounds of Muzikowski and [*3] Carter, including a specific event in each of their lives before they became involved with the league.

After purchasing the film rights for the book, Paramount produced and released the film *Hardball*. The film recounts the story of Conor O'Neill--an unemployed gambler who continually drives himself into substantial debt with bookies. He spends a great deal of time throughout the first portion of the film at a bar. He is pathetically self-destructive and self-absorbed at once, wallowing in the despair that results from his perpetual tendency to be his own worst enemy. He apparently has only one close friend, Ticky, who feeds O'Neill's unsavory habits and double-crosses him whenever it serves Ticky's ends. O'Neill is alienated from his religion, his family, and his community. He crashes through life aimlessly, with no direction and no goals. He trades on every angle he can find, from posing as his dead father to place bets to hitting up friends for thousands of dollars to pay off bookies from previous bad bets. He is depicted at various points as a liar and a quitter, sometimes bumbling and always negative. He is an extremely unlikely candidate for a role model.

O'Neill begins [*4] his involvement with a Little League team as part of another scheme to pay off a large gambling debt when faced with physical threats from his bookies. The team, which plays outside a Chicago housing project, is called the Kekambas. He assumes that he will be an assistant coach but ends up with sole responsibility for the team when the man who finagled his assistance takes off to New York. As the story progresses, O'Neill begins to open his eyes to situations outside of his own experience and the difference that he can make in others' lives, primarily the boys he coaches. He begins to grow into his new role and even starts to enjoy behaving in a respectable manner, in spite of his best efforts to pretend that the team means nothing to him.

Finally, O'Neill wins a bet that could allow him to settle all of his accounts. This forces him to make a choice: he can use the money to bet on another game or he can pay off his debts and take another direction. He

chooses the latter. Although he no longer needs the money that he receives from coaching, O'Neill realizes not just that the team needs him but that he needs them. As he embraces his roles as coach and responsible adult, the team evolves [*5] from a ragtag bunch of infighters into a cohesive unit capable of defeating their most challenging opponents. Meanwhile, the other missing parts of O'Neill's life begin to fall into place. In his own words, O'Neill becomes "interested in anything [he is] supposed to be interested in." His passion for life ignites, he starts to teach the Kekambas valuable lessons, and they begin to believe in themselves because he believes in them. He and his team test their limits and find that they are capable of more than they ever thought possible.

Then, in the face of the tragic death of one of the players, O'Neill is ready to give up again, give up the team's dream to go to the league championship, but his charges will not let him. He finally realizes the importance of "showing up" and living up to the expectations of the people who have come to depend on him.

Based on preliminary information about the content of the film, Muzikowski filed suit in California, claiming that the character of O'Neill was actually a portrayal of Muzikowski. The complaint sought damages for defamation per se and per quod, as well as false light invasion of privacy. He voluntarily dismissed the California suit and [*6] refiled in this court before the film was released.

In 2001, we dismissed Muzikowski's complaint for failing to state a claim upon which relief could be granted. *Muzikowski v. Paramount Pictures Corp., 2001 U.S. Dist. LEXIS 19397, 2001 WL 1519419 (N.D. Ill. Nov. 28, 2001)*. He appealed, and the Seventh Circuit reversed our decision with respect to his defamation per se and false light claims and remanded for further proceedings. *Muzikowski v. Paramount Pictures Corp., 322 F.3d 918 (7th Cir. 2003)*. After the remand, Muzikowski amended his complaint to add claims for false advertising, false endorsement, commercial disparagement, intentional infliction of emotional distress, and unjust enrichment.

During the course of discovery, disputes arose regarding Muzikowski's compliance with his obligations to respond to a contention interrogatory propounded by Paramount. In early June 2004, we granted a motion to compel his response. After several proceedings to address

Muzikowski's subsequent actions, we referred the matter to Magistrate Judge Levin, who concluded that Muzikowski had not complied with our earlier order in good faith. Ultimately, Muzikowski filed a satisfactory response, [*7] but not until 4 months after he was ordered to do so.

Thereafter, Paramount moved for sanctions under *Fed. R. Civ. Proc. 37(b)(2)*. We granted the motion and again referred the matter to Judge Levin for determination of an appropriate amount of sanctions. After obtaining additional briefing, he recommended a figure of $ 50,915.25. Muzikowski has filed objections [1] to Judge Levin's recommendation, which we also consider herein.

> 1    Although the objections were not lodged within 10 days of the issuance of the magistrate's decision, we accept Muzikowski's proffered reasons for his lack of timeliness and consider the merits of his objections despite their late filing.

After the dust settled from the dispute over the interrogatory response, the parties completed discovery, and Paramount now moves for summary judgment on the entirety of the complaint.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, [*8] reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. The moving party bears the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The burden then shifts to the nonmoving party to show through specific evidence that a triable issue of fact remains on issues on which the nonmovant bears the burden of proof at trial. Id. The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence. Id. The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co., 212 F.3d 969, 972 (7th Cir. 2000)*. A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Insolia v. Philip Morris, Inc., 216 F.3d 596, 599 (7th Cir. 2000)*; [*9] *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505, 2510 (1986)*. With these principles in mind, we turn the motions before us.

## DISCUSSION

### A. Objections to Magistrate Levin's Report and Recommendation

As stated, Magistrate Judge Levin recommended in February 2005 that a sanction of $ 50,915.25 was appropriate for willful noncompliance with our June 2005 order. This amount represents the amount of fees Paramount paid its attorneys to review the documents Muzikowski supplied in connection with his interrogatory response in June, July, and August 2004. Despite the general rule that each party pays its own attorneys' fees. *Fed. R. Civ. Proc. 37* allows a court to order that a party be reimbursed for fee expenditures necessitated by the willful misconduct of its opponent during discovery. See *Maynard v. Nygren, 332 F.3d 462, 471 (7th Cir. 2003)*; *Johnson v. Kakvand, 192 F.3d 656, 661 (7th Cir. 1999)*.

*Fed. R. Civ. Proc. 72(a)* specifies that a district court may modify or set aside a magistrate judge's order on a nondispositive [*10] matter, such as discovery sanctions, only if it is clearly erroneous or contrary to law. An order is clearly erroneous under this standard only if the district court, upon review, has a firm and definite conviction that the magistrate has made a mistake. *United States v. United States Gypsum Co., 333 U.S. 364, 395, 92 L. Ed. 746, 68 S. Ct. 525 (1948)*; *Weeks v. Samsung Heavy Industries Co., Inc., 126 F.3d 926, 943 (7th Cir. 1997)*.

When attorneys' fees are requested as a sanction or pursuant to a fee-shifting statute, a court must determine whether the amount requested reflects a reasonable hourly rate and a reasonable amount of time devoted to accomplishing a particular task. *Hensley v. Eckerhart, 461 U.S. 424, 437, 76 L. Ed. 2d 40, 103 S. Ct. 1933, 1939 (1983)*. The party requesting the fees bears the initial burden of showing reasonableness. See id. In support of its motion for sanctions, Paramount submitted the declaration of its lead counsel and a summary of fees incurred. According to the summary, Paramount's attorneys spent 179.75 hours reviewing the various noncompliant responses Muzikowski offered, which gave rise to a figure of $ 50,915.25 when applicable rates and [*11] discounts were applied. The declaration states that

Paramount was invoiced for that amount and that it paid the invoices in full. Judge Levin concluded that the rates employed and the hours worked were reasonable; Muzikowski challenges both conclusions.

### 1. Reasonableness of Rate Charged

First, Muzikowski argues that Paramount has not demonstrated that its rates are reasonable and reflective of the market value of its attorneys' services. The basis for his argument rests exclusively on the fact that the sole evidence proffered in support of the rate charged is the declaration of Paramount's lead counsel, Debbie Berman. Magistrate Levin relied upon its contents to determine the market rate. According to Muzikowski, the declaration is insufficient to establish market rate, the proper measure of the reasonableness of the rates employed. See *Missouri v. Jenkins, 491 U.S. 274, 283, 105 L. Ed. 2d 229, 109 S. Ct. 2463, 2469 (1989).* He believes that the cases upon which he relies require Paramount to supply information about rates charged by other law firms before we can make any determination of the reasonableness of the fees claimed here. *Blum v. Stenson, 465 U.S. 886, 895 n. 11, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984);* [*12] *Spegon v. Catholic Bishop of Chicago, 175 F.3d 544, 550 (7th Cir. 1999).* However, that type of exercise is necessary only where evidence of actual hourly rates is unavailable, which is not the situation here. See *People Who Care v. Rockford Bd. of Educ., 90 F.3d 1307, 1310 (7th Cir. 1996).*

Moreover, despite Muzikowski's characterization, Berman's declaration is not "self-serving" in the way that would preclude its use as reliable evidence of market rate. See *Visser v. Packer Engineering Assoc., Inc., 924 F.2d 655, 659 (7th Cir. 1991)* (en banc). This is not a case where an attorney submits a statement saying, in essence, "here is what I believe my work to be worth." Rather, Berman claims personal knowledge of two events: Paramount was billed a certain amount for the work performed by its attorneys, and it paid that amount. From an evidentiary standpoint, there is nothing deficient about her ability to attest to those facts. Muzikowski has offered no countervailing evidence to impede a finding that Paramount was in fact billed $ 50,915.25 and that it in fact paid the same to its attorneys. Thus, Berman's declaration establishes the [*13] market rate for the services rendered, and we find no basis to deviate from the hourly rates Magistrate Judge Levin employed in his calculations.

### 2. Reasonableness of Hours Claimed and Staff Used

Muzikowski's issues with the reasonableness of the hours claimed to have been worked are twofold. First, he argues that Judge Levin used an arbitrary number of pages to calculate the amount of work done. Second, he asserts that too many lawyers worked too many hours given the nature of the task involved.

With respect to the first point, Judge Levin was familiar with the discovery dispute at issue and the underlying activities of the parties. His acquaintance therewith was the reason why we referred the determination of an appropriate amount of sanctions to him in the first place. Muzikowski makes much of the fact that Judge Levin estimated the number of pages Paramount's attorneys reviewed rather than attempting to arrive at a precise measurement. We disagree with his underlying assumption that the absence of such a rhadamanthine exercise renders the decision clearly erroneous. The number of pages involved here has varied, at different points in the case, from 90,000 to 1000. Whether [*14] the judge knew the number of pages reviewed with exactitude has no effect on his ability to gauge a reasonable expenditure of attorney time to determine compliance with the order in question. He examined potential scenarios, assessed their respective merit, and settled upon one that reasonably fit within the spectrum of possibilities. This exercise concluded in a rational, nonarbitrary result, neither clearly erroneous nor contrary to law.

And so we turn to Muzikowski's second issue: the reasonableness of the staff used to perform the tasks for which Paramount was charged. The summary reveals that almost 75% of the review was done by associates, who bill at a lower rate than the partners who were involved. Moreover, the summary does not indicate, as Muzikowski asserts, that the partners were duplicating effort already expended by associates; otherwise the proportion of work performed would be divided more equally between the partners and associates. There is nothing unreasonable about initial review being done by more junior attorneys to separate the wheat needing partner consideration from the chaff that does not merit the attention of a more senior, and more expensive, attorney. [*15] By the same token, it is reasonable for the partners to spend some time in independent review of documents singled out by associates. Given the large number of documents involved and their importance to

the case as the foundation of Muzikowski's claims, we agree with Judge Levin that the amount of time spent by these attorneys was reasonable.

Furthermore, Muzikowski's contention that Judge Levin impermissibly shifted the burden of showing reasonableness from Paramount to him by considering the amount of time his own attorneys spent in reviewing the documents involved is incorrect. The opinion makes clear that Judge Levin considered Muzikowski's staffing decisions, but there is no indication that he expected Muzikowski to show that his own choices were unreasonable, thus indicating that Paramount's similar efforts unreasonable. The fact that both sides had similar staff resources dedicated to the task of reviewing the documents in question allows an inference that that level was necessary to perform the task at hand adequately and thus represented a reasonable staffing allocation.

In sum, we find nothing clearly erroneous or contrary to law in Magistrate Judge Levin's ultimate conclusion [*16] or his methodology in arriving at it. Consequently, Muzikowski's objections are overruled and we adopt the $ 50,915.25 sanction recommended. Because there appears to have been some confusion as to whether the sanction was to apply to Muzikowski personally, his counsel, or both, we explicitly clarify that the sanction applies solely to his counsel. There is no indication that Muzikowski directed his attorneys to take the course of action they pursued, and discovery decisions are not ones that would normally be made by a client rather than an attorney. Because it was counsels' judgment that led to the sanctionable conduct, it would be patently unfair to lay the consequences of that judgment at Muzikowski's personal doorstep. See *Roadway Express, Inc. v. Piper, 447 U.S. 752, 763-64, 65 L. Ed. 2d 488, 100 S.Ct. 2455, 2462-63 (1980).*

## B. Motion to Strike for Noncompliance with Local Rule 56.1

During the briefing of the pending motion for summary judgment, Paramount moved to strike portions of Muzikowski's response to its 56.1(a)(3) statement of material facts as well as his 56.1(b)(3)(B) statement of additional facts for failure to comply with Local Rule 56.1(b). This section [*17] of the rule provides that a party opposing a motion for summary judgment must concisely identify disagreements with the moving party's statement of material facts, with appropriate accompanying references to evidentiary materials. If a

nonmovant wishes to assert additional facts that would support the denial, they must be delineated in a statement of short paragraphs founded on specified submitted evidence. Failure to comply with these requirements can lead to admission of the corresponding statement of the movant or striking of the noncompliant statement. See, e.g., *Koszola v. Bd. of Educ. of City of Chicago, 385 F.3d 1104, 1107-08(7th Cir. 2004)*; *Ammons v. Aramark Unif. Servs., 368 F.3d 809, 817-18 (7th Cir. 2004).* Paramount argues that Muzikowski's submissions are deficient in several ways: inclusion of legal argument, insufficient or inadmissible evidence cited in support of a statement, impermissible addition of facts, and inadequate denials. In total, Paramount objects to 923 statements or parts thereof and 37 exhibits.

A *Rule 56.1* statement of facts is intended to elucidate facts material to the decision the court is asked to make. When [*18] properly done, it streamlines resolution of the sole issue that must be decided: whether any facts that are outcome determinative are genuinely disputed by the parties. *Waldridge v. American Hoechst Corp., 24 F.3d 918, 922 (7th Cir. 1994).* In this case, both sides have provided far more information than is necessary to decide the relevant issues, thus failing to fulfill their obligation to identify with specificity only the evidence that would facilitate our assessment of the motion at hand. See *id. at 920.* Instead, they have attempted to conduct a paper trial, which is precisely what summary judgment is not. See id. Many of the statements that Paramount asks be stricken are either tangentially relevant ones by Muzikowski or responses to the same sort of statement within Paramount's submissions. These types of disputes have no bearing on the motion or its outcome. *Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.* Accordingly, we decline to engage in the needless and wasteful exercise of examining nearly one thousand statements to resolve disputes unnecessary to our decision. See *Bordelon v. Chicago Sch. Reform Bd. of Trustees, 233 F.3d 524, 528-29 (7th Cir. 2000).* [*19]

That being said, two aspects of Paramount's motion deserve further attention. The first involves Muzikowski's response to P 48 of Paramount's statement of facts. Paramount contends that this response, which takes up 13 pages of text (complete with headings to delineate the various subsections) is an egregious violation of the local rule, in no small part because P 48 consists of a single sentence. While we certainly agree that, at first blush, the respective lengths of the passages alone seem to justify

the requested relief, a close look at the content of P 48 goes a long way toward explaining the apparent discrepancy. It reads: "O'Neill is inspired by [the screenwriter's] own life and experiences." This assertion, which itself borders on impermissible argument, would defeat nearly all of Muzikowski's claims if not properly controverted. It is singularly unrealistic for Paramount to expect Muzikowski not to vehemently challenge such a statement. Though we agree that the response is not a model of professionally appropriate restraint, neither is it so uncalled-for that it deserves whole-scale deletion.

That leaves Paramount's objections to the affidavits of James J. Doyle, Tobias [*20] Eng, James Milonas, William F. Seitz Jr., and James Tyler. Pl.'s Exhs. 73, 75, 77, 80, 82. The first objection goes to the affiants' competence to offer the factual assertions contained within the affidavits. According to Paramount, to be able to offer admissible testimony regarding the impressions they formed about the O'Neill character upon seeing the film, the affiants must have had actual knowledge of Muzikowski's past exploits that they could draw upon when concluding that O'Neill was Muzikowski in disguise. We disagree that such a basis is necessary under the circumstances of this case. What is at issue is not whether Muzikowski actually experienced the events or possessed the traits that the affiants believed he did. Instead, the significant inquiry is whether these viewers took O'Neill for Muzikowski based on the things they believed to be true about Muzikowski or, in Tyler's case, a real-life equivalent of O'Neill. Thus, the affidavits are not inadmissible for lack of foundation.

Paramount also asserts that some of the affidavits should be stricken because the affiants were not identified during discovery. Apparently relying upon *Fed. R. Civ. Proc. 37(c)(1)* [*21] , Paramount insists that the statements cannot be relied upon as evidence supporting denial of summary judgment. The rule provides that evidence not disclosed according to the rules governing discovery cannot be used in conjunction with a motion unless the failure to disclose is harmless. *Commonwealth Ins. Co. v. Titan Tire Corp., 398 F.3d 879, 888 (7th Cir. 2004).* The burden of showing that the failure was harmless falls on Muzikowski, the party advancing the evidence. *Finley v. Marathon Oil Co., 75 F.3d 1225, 1230 (7th Cir. 1996).* Muzikowski was not invited to respond to the motion to strike, and he has not requested to be allowed to do so. Because he has not had full opportunity to controvert the claimed nondisclosure,

justify it, or show that it works no harm on Paramount, we hesitate to impose the harsh sanction of exclusion. Indeed, as explained below, the affidavits are not sufficient to have an impact on the outcome of Paramount's motion, so whether they are included or not is ultimately of no moment. Thus, we deny the motion to strike in its entirety and turn our attention to Paramount's motion for summary judgment.

## C. Motion for Summary [*22] Judgment

### 1. Defamation Per Se and False Light Claims

In Counts I-IV of his complaint, Muzikowski alleges that the character of Conor O'Neill is a portrayal of Muzikowski. He bases his assertions on certain similarities between the character and the man. As a result of these shared attributes, he claims, reasonable viewers will perceive the aspects of O'Neill that he does not share to be truthful statements about Muzikowski. According to him, the transferred attributes, such as posing as a broker and scalping tickets, are so inherently harmful to his reputation that they are defamatory per se. In addition, he contends that the impressions of viewers who mistake him for O'Neill have put him in a false light. These claims are founded in Illinois state law, which provides the substantive rules that guide our analysis. *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938).*

In Illinois, claims of defamation per se and false light invasion of privacy require that the statements in question pertain to the plaintiff. *Chapski v. Copley Press, 92 Ill. 2d 344, 442 N.E.2d 195, 199, 65 Ill. Dec. 884 (Ill. 1982).* The reason for this is apparent; a statement that is not about a particular person [*23] cannot harm that person's reputation. If statements can reasonably be construed to pertain to someone other than the plaintiff, they are said to be subject to an innocent construction. Id. Statements that can be innocently construed as not pertaining to the plaintiff cannot form the basis of claims of defamation per se or false light. *Bryson v. News America Publications, Inc., 174 Ill. 2d 77, 672 N.E.2d 1207, 1215, 220 Ill. Dec. 195 (Ill. 1996)*(defamation per se); *Schaffer v. Zekman, 196 Ill. App. 3d 727, 554 N.E.2d 988, 993, 143 Ill. Dec. 916 (Ill. App. Ct. 1990)*(false light). [2] The innocent construction need not be the only way to interpret the statement; if the statement is reasonably capable of being construed in a defamatory way and an innocent way, the innocent construction will prevail. *Dubinsky v. United Airlines Master Exec. Council, 303*

*Ill. App. 3d 317, 708 N.E.2d 441, 447, 236 Ill. Dec. 855 (Ill. App. Ct. 1999)*. There is no balancing of which construction is more plausible. Id. Whether a statement is susceptible to an innocent construction is a question of law in the first instance. See *Anderson v. Vanden Dorpel, 172 Ill. 2d 399, 667 N.E.2d 1296, 1302, 217 Ill. Dec. 720 (Ill. 1996)*. Only if the court concludes that the allegedly defamatory statement [*24] cannot be innocently construed will a jury be called upon to determine whether the statement in fact defamed the plaintiff. *Chapski, 442 N.E.2d at 199*.

2    The continued vitality of the innocent construction rule as a part of Illinois defamation law was affirmed in an opinion of the First District Appellate Court issued just days before our decision. *Tuite v. Corbitt, 358 Ill. App. 3d 889, 830 N.E.2d 779, 294 Ill. Dec. 367, 2005 Ill. App. LEXIS 566, 2005 WL 1335806 (Ill. App. Ct. 2005)*. The case involved underlying allegations of conduct much more egregious than those advanced by Muzikowski. In it, defendants wrote and published a nonfiction book describing historical events surrounding the trial of a prominent organized crime figure. According to the plaintiff, a well-respected attorney who represented the criminal defendants in the trial, the book accused him of taking $ 1 million in illegal funds that would be used for bribes or other tampering with the trial. The trial court granted a motion to dismiss, finding that the statements in question were capable of an innocent construction. The appellate court affirmed, agreeing with the trial court's application of the rule.

[*25] The innocent construction rule mandates that we give the allegedly defamatory statement its "natural and obvious meaning" and interpret it as it was used, according to the ideas that were intended to be communicated to the viewers. See *Stratman v. Brent, 291 Ill. App. 3d 123, 683 N.E.2d 951, 959, 225 Ill. Dec. 448 (Ill. App. Ct. 1997)*. A statement cannot be properly assessed in a vacuum; rather it must be considered in light of the context in which it arose. See *Anderson, 667 N.E.2d at 1303*.

Though not completely dispositive, the fact that the context for the O'Neill character is a blockbuster movie, starring actors of worldwide fame and using many devices typical of a fictional story is very significant. It is settled that simply calling a statement fiction does not necessarily make it so. See, e.g., *Bryson, 672 N.E.2d at 1219*. However, in this instance, there is nothing to indicate that the film is a documentary, a biography, or even a dramatized account of actual events, thus undermining Muzikowski's contention that the film is not fictional. See *Flip Side, Inc. v. Chicago Tribune Co., 206 Ill. App. 3d 641, 564 N.E.2d 1244, 1252-54, 151 Ill. Dec. 582 (Ill. App. Ct. 1990)*. It would be unrealistic [*26] to presume that viewers of the film would be unfamiliar with these genres and their respective attributes in digesting the contents of the film. See id. Rather, reasonable viewers taking in the film as a whole would recognize the hallmarks of Hollywood make-believe and not mistake the characters depicted as historical reenactments of real stories of real people.

Moreover, several undisputed aspects of the film and the O'Neill character support the reasonableness of a conclusion that O'Neill is not Muzikowski in disguise. The character does not share Muzikowski's name, nor is his name reminiscent of Muzikowski's. O'Neill's gambling habit is best described as a self-destructive addiction, which Muzikowski admits that he does not share. O'Neill drinks heavily at times in the film and frequents bars and taverns; Muzikowski kicked his drinking habit years before he became involved with the Little Leagues. Unlike Muzikowski, O'Neill is single with no children. O'Neill begins coaching to pay off a threatening bookie; Muzikowski became involved with boys' baseball for altruistic reasons. O'Neill only coaches, and that for a single team; Muzikowski co-founded and ran more than one league [*27] in addition to coaching his teams. Finally, O'Neill has no steady employment aside from his coaching; Muzikowski has been a securities broker and insurance salesman for many years. These dissimilarities, particularly in combination with the fact that the character appears in a film displaying many unmistakable features of a fictional account, indicate that O'Neill can reasonably be construed not to be Muzikowski, thus implicating the innocent construction rule.

To be sure, there are similarities between O'Neill and Muzikowski. They both coach Little League teams in Chicago that are named after African tribes or languages. Both have been injured in bar brawls. Both use station wagons to transport their teams. Both have lost their fathers. Both have some connection to the securities

industry and use of illegal drugs. Both eulogize players killed by gang-related violence. Both have been to bars named Duffy's, owned by men named Duffy. However, far from negating the effect of the differences detailed above in establishing an innocent construction of the film, these shared characteristics demonstrate only that reasonable viewers could see the connection Muzikowski detects between himself [*28] and the film's protagonist, not that they must. The same is true of the affidavits Muzikowski offers from persons who claim that they shared his conclusion. These statements may support the idea that Muzikowski's construction of the film is tenable, but they fall far short of indicating that it is the only reasonable construction, as is required to defeat a motion predicated on the innocent construction rule. [3] *Muzikowski, 322 F.3d at 927.*

> [3]   In addition, it is questionable whether the majority of these affidavits can be used as representative of reasonable viewers, since the affiants claim that they conclude that any reference to a white man coaching African-American children in inner-city Chicago must refer to Muzikowski and no one else. See Pl.'s Exhs. 64, P 7a; P 73, P 6a; 74, P 6a; 75, P 6a; 76, P 5a; 77, P 5a; 78, P 5a; 79, P 5a; 80, P 5a; 81, P 5a; 84, P 5a; 85, P 6a; 88, P 5a.

Furthermore, we note that Muzikowski's contention that viewers will inevitably associate him with O'Neill [*29] is seriously undermined by contentions he made during the course of the suit filed in California. In conjunction with his complaint, Muzikowski filed a document entitled "Notification of Identifying Material in Script Which Is Further Evidence that Film *Hardball* Is 'Of and Concerning' Plaintiff Robert Muzikowski." In it, Muzikowski claims that no fewer than three of the characters in the film could be construed to be him: Conor O'Neill, James Fleming (the broker-sponsor who first enlists O'Neill's participation in coaching), and Matt Hyland (the coach of the BuaWas, a team against whom the Kekambas play two games). According to the notification, no matter which of these characters viewers believe is Muzikowski, he will come off as "a bad person." Although these statements were made based on a script that does not match line for line the finished film, all three characters remain in the movie, and the resemblances Muzikowski relied upon are in the final product. Thus, even Muzikowski's own impressions of the film do not support the position that he and O'Neill

are essentially mirror images of each other; rather, it appears that Muzikowski is bound and determined that people will [*30] see him in the film, no matter where they look or what they know about him.

As stated, if a statement can be innocently construed, the nondefamatory construction must be accepted even if the statement can also reasonably be construed defamatorily. When viewed in context, the character of O'Neill is easily and naturally construed to represent a collection of a set of experiences and attributes that are the creation of the screenwriter's imagination, with particular events occurring to further the larger story told by the film as a whole. The allegedly defamatory portrayal can be construed as not referring to Muzikowski or to any real person at all. Consequently, the claims made in Counts I through IV are subject to the innocent construction rule; the film is not defamatory per se nor does it cast Muzikowski in a false light under Illinois law. [4] Because the rule applies, no issues remain for a jury to decide with respect to these claims, and Paramount is entitled to summary judgment on them.

> [4]   This conclusion obviates any examination of Paramount's alternative arguments regarding Muzikowski's ability to demonstrate actual malice.

[*31]   2. *False Advertising Claims*

The complaint next takes aim at the advertisements and promotional materials Paramount disseminated that described the film as being based on or inspired by a true story. According to Muzikowski, these descriptions constituted false advertising in violation of the *Lanham Act*, the *Illinois Uniform Deceptive Trade Practices Act*, and the *Illinois Consumer Fraud and Deceptive Business Practices Act*. A claim of false advertising has several elements. First, the defendant must make a false statement of fact, or a statement that is literally true but that conveys a false impression, in a commercial advertisement about a product. See *Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 819-20 (7th Cir. 1999).* [5] Second, the statement must either tend to or actually deceive a substantial portion of consumers viewing the ad. See id. Third, the deception must be material to the purchasing decision of a substantial portion of the consuming public. See id. Fourth, the plaintiff must show that injury resulted either via diversion of sales from the plaintiff to the defendant or loss of goodwill in connection with the product in question. [*32]  See id.

5    Although Hot Wax did not involve alleged violations of state statutes, the legal inquiries required to assess a Lanham Act claim are identical to those pertinent to the state law causes of action contained in Muzikowski's complaint. See *SB Designs v. Reebok Int'l. Ltd., 338 F. Supp. 2d 904, 914 (N.D. Ill. 2004)*.

This case is before us on a request for summary judgment. Paramount has demonstrated that no issue of material fact exists whether the statement "based on a true story" or "inspired by a true story" is literally true; neither party disputes that the film is based on a true story. The fight rages over what true story is referenced. Paramount insists that the statement refers to the story of the Kikuyus, the team featured in Coyle's book. Muzikowski contends that the ads lead viewers to believe that the story is his, but that the events of his life are so altered that the story told can no longer be classified as true, thus rendering the initial impression misleading. [*33] For this argument to defeat Paramount's motion, Muzikowski must put forth evidence that a reasonable factfinder could conclude that the statement misled viewers in such a way. *Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003)* (calling summary judgment the "put up or shut up" moment for a plaintiff).

Muzikowski attempts to satisfy his obligation through sixteen affidavits. Pl.'s Exhs. 64, 65, 73-84, 86-88. The parties have not submitted any measurements of how many people have seen the film, but it is undisputed that it grossed more than $ 40 million in the United States alone. Based on that figure, the sixteen affiants Muzikowski offers cannot constitute a substantial segment of the viewing audience. Thus, Muzikowski's proffered evidence falls far short of demonstrating a triable issue of fact on the second element.

Looking to the third element, we note that none of the affiants save James Tyler claims that the representation of the movie as being based on a true story was a material factor in the decision to watch the film. Pl.'s Exh. 82. Needless to say, this single affidavit does not establish a triable issue of fact on the issue of whether [*34] the alleged misrepresentation swayed a substantial number of potential audience members to view the film when they otherwise would not have. Paramount is accordingly entitled to summary judgment on Muzikowski's claims of false advertising.

3. *False Endorsement Claims*

Paramount next requests summary judgment on Muzikowski's claims that the film and its promotional and advertising materials were likely to confuse moviegoers that he sponsored, endorsed, or approved of the film and its contents. Because the allegedly tortious acts occurred within the context of a work of creative expression, Paramount asserted the *First Amendment* as a defense to all of them and argued the point in connection with earlier motions to dismiss.

The merits of an affirmative defense, which presuppose the existence of a legally viable cause of action, are typically not pertinent to consideration of a motion to dismiss for failure to state a claim. See *U.S. Gypsum Co. v. Indiana Gas Co., 350 F.3d 623, 626 (7th Cir. 2003)*. In recognition of this fact, we declined to entertain Paramount's arguments when they were previously presented. Now, however, the parties are at issue and have fully [*35] developed the record. The rationale for our deferral of these issues is no longer present, despite Muzikowski's mistaken belief that we had concluded that they must be presented only to a jury.

Muzikowski also argues that a case such as this one can be resolved on summary judgment only if the title of the work at issue is the sole reference to the plaintiff. Unfortunately, he both misreads the cases on which he relies and misunderstands the principles they advance. *ETW Corp. v. Jireh Publishing, Inc., 332 F.3d 915, 926-38 (6th Cir. 2003)*; *Parks v. LaFace Records, 329 F.3d 437, 450-59 (6th Cir. 2003)*; *Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 901-02 (9th Cir. 2002)*. These cases stand for the proposition that, when a plaintiff's name or mark appears in the title of a work, consumers will expect that the work itself will also reference, as part of the expression, ideas conveyed by the name or mark. If the body of the work is devoid of such reference, there is a significant likelihood that potential consumers will be misled or confused by the appearance in the title. In such a circumstance, the *First Amendment* interest in protecting [*36] free expression is not strong enough to outweigh the Lanham Act interest in preventing consumer confusion since the artist's ability to express ideas is minimally impacted by a requirement that the title not include the name or mark. *Parks, 329 F.3d at 452-53*; *American Dairy Queen Corp. v. New Line Productions, Inc., 35 F. Supp. 2d 727 (D. Minn. 1998)*. On the flip side, when the use of the plaintiff's persona or mark is artistically relevant to the expressive work, *First Amendment* concerns trump Lanham Act

protections. See, e.g., *Rogers v. Grimaldi, 875 F.2d 994, 999-1000 (2d Cir. 1989)*. These matters of law are perfectly appropriate to resolve on summary judgment.

In support of his contention that the Lanham Act should triumph here, Muzikowski analogizes himself to the successful plaintiffs in White v. Samsung Electronics America and Allen v. National Video. He argues that he has developed a "unique and positive public image" over which he should exercise sole dominion. According to Muzikowski, Paramount has appropriated this image in the character of O'Neill and capitalized on the association of that image with the film. [*37] In White, Vanna White of "Wheel of Fortune" fame sued Samsung for using a robot that was intended to resemble her in a print advertisement for VCRs. *971 F.2d 1395, 1396 (9th Cir. 1992)*. In Allen, film icon Woody Allen sued a video rental company over a magazine ad that featured an actor who was a look-alike of Allen as well as videocassettes of some of Allen's films. *610 F. Supp. 612, 617-18 (S.D.N.Y. 1985)*.

Muzikowski ignores the fact that these cases differ from the one at hand in a fundamental way: the speech in question was commercial advertising, intended solely to produce a profit through sale of a commercial good or service. See *White, 971 F.2d at 1401 n.3; Allen, 610 F. Supp. at 618*. Paramount's film is creative expression, not commercial expression, despite the fact that viewers paid to see the film. *Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501-02, 96 L. Ed. 1098, 72 S. Ct. 777, 780-81 (1952)*. It is beyond any debate that films are works of artistic expression and thus fully safeguarded by the *First Amendment*. See, e.g., *Schad v. Borough of Mount Ephraim, 452 U.S. 61, 65, 68 L. Ed. 2d 671, 101 S. Ct. 2176, 2181 (1981)*. [*38] Although the protections of the amendment are by no means absolute, many legally cognizable interests must sometimes yield when their enforcement would stifle the ability of an another to express an idea or communicate a thought. See, e.g., *17 U.S.C. § 107* (codifying fair use exception to copyright infringement); *Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 99 L. Ed. 2d 41, 108 S. Ct. 876 (1988)* (holding that *First Amendment* precluded advanced claims for invasion of privacy and intentional infliction of emotional distress); *New York Times Co. v. Sullivan, 376 U.S. 254, 269, 11 L. Ed. 2d 686, 84 S. Ct. 710, 720 (1964)* (noting applicability of *First Amendment* protections to causes of action such as defamation, insurrection, contempt, and obscenity). Thus, White and Allen are inapposite here.

For situations where the Lanham Act and the *First Amendment* lock horns, the line of cases originating with Rogers v. Grimaldi supplies the prevalent [6] analytical framework. *695 F. Supp. 112 (S.D.N.Y. 1988)* ("Rogers I"), aff'd, *875 F.2d 994 (2d Cir. 1989)* ("Rogers II"). [7]

> 6   The parties have not cited, and our research has not revealed, any Seventh Circuit cases addressing a situation such as this one. Having considered cases arising in other circuits, we are persuaded that *Rogers* supplies the most appropriate mechanism to address the issues presented here.

[*39]

> 7   Subsequent cases considering similar situations applying the Rogers reasoning include *ETW, 332 F.3d at 926-38* (holding that *First Amendment* barred Lanham Act false endorsement claim predicated on lithograph containing Tiger Woods' likeness); *Parks, 329 F.3d at 450-59* (allowing false endorsement claim of civil rights activist Rosa Parks to proceed where Outkast song title using her name had no connection to the content of the song); and *Mattel, 296 F.3d at 901-02* (concluding, based on Rogers, that *First Amendment* trumped Lanham Act confusion concerns over use of trademark "Barbie" in the title and lyrics of a song).

After the release of a film by Federico Fellini entitled "Ginger and Fred," actress and dancer Ginger Rogers brought a Lanham Act claim against the producing studio, contending that the film unlawfully implied that she had endorsed or sponsored its content. *Rogers II, 875 F.2d at 996*. The film's main characters, two Italian cabaret performers, were nicknamed "Ginger" and "Fred" during the height of their [*40] careers. The nicknames undisputedly alluded to Rogers and her partner Fred Astaire. *Id. at 996-97*. She claimed that the film and its title misled potential viewers into believing that the film either was about her or that she had endorsed the story it contained. *Id. at 997*. The district court concluded that because the film was a work of artistic expression, its contents and its title were subject to the full protection of the *First Amendment*, which defeated Rogers' claims as a matter of law. *Rogers I, 695 F. Supp. at 124*.

The Second Circuit affirmed the district court's grant of summary judgment in its entirety but elaborated on the application of *First Amendment* protections to the titles of

artistic works. See *Rogers II, 875 F.2d at 997.* The appellate court opined that, to accommodate the tension between consumers' interest in receiving artistic expression and in not being misled by the isolated information conveyed by a title, the *First Amendment* would trump the Lanham Act unless the title was explicitly misleading or had no artistic relevance to the underlying work. *Id. at 999, 1000.*

Like the [*41] claims in*Rogers,* Muzikowski's contentions illustrate the significant tension created by an attempt to control the ability of another to use certain life events or possessed attributes as a metaphor for an abstract concept or a vehicle to communicate an idea. When a writer develops a character, it will almost of necessity share some characteristics with living people. As the California Supreme Court trenchantly observed in considering a case involving a film incorporating a character reminiscent of silent film star Rudolph Valentino, "no author should be forced into creating mythological worlds or characters wholly divorced from reality." *Guglielmi v. Spelling-Goldberg Productions, 25 Cal.3d 860, 869, 160 Cal. Rptr. 352, 603 P.2d 454 (Cal. 1979).* No matter how valuable Muzikowski's persona may be, it cannot outweigh society's interest in access to the imagery used within the film, such as coaches as role models, finding inspiration in unlikely places, and the tenacity of the human spirit in the face of adversity. Even if we consider Muzikowski's contention to be that the combination of the similarities between him and O'Neill is unique to him and therefore he should be able to recover for their [*42] use in defining a character, we would cross an impermissible line of limiting artistic expression. Whatever slight chance that consumers would be misled into thinking that Muzikowski has endorsed any character that bears some resemblance to him pales by comparison to the importance of the ability to relate a story of emotional growth and development through involvement in one's community, the vital importance of believing in others, and the message that negative spawns negative and positive begets positive. The Rogers courts, in a similar situation to that presented in this case, declined to allow Ginger Rogers to monopolize the use of her ability to symbolize a particular entertainment era and genre, even when her name and persona were specifically invoked in the process. Here, there is even less to commend the claim of right, since the film makes no reference specific and unique to Muzikowski or his life, and, as Muzikowski himself acknowledged in the notification filed in the California case, he shares features

with more than one character. If we were to allow Muzikowski to exercise exclusive dominion over the aspects of his life that O'Neill shares, we would remove significant [*43] metaphorical vehicles from the lexicon of the artist and society as a whole would be the worse for Muzikowski's sole benefit. The *First Amendment* does not permit such a result. *Hustler, 485 U.S. at 50-51, 108 S. Ct. at 879* (calling protection of the free flow of expressive ideas "fundamentally important").

In light of these considerations, we conclude that the undisputed evidence in this case demonstrates that Paramount's right to engage in expressive activities and society's interest in access to artistic ideas outweigh Muzikowski's countervailing concerns. As a result, summary judgment is warranted in Paramount's favor on Counts V, VI, and IX.

### 4. Commercial Disparagement and Intentional Infliction of Emotional Distress

Muzikowski's complaint also contends that the film's depiction of O'Neill disparaged the services that he (Muzikowski) provides as an insurance and securities broker and intentionally inflicted emotional distress on him. Despite the fact that these claims are stated in terms of causes of action other than defamation, their content makes it clear that each pertains to either Muzikowski's reputation or state of mind, thus implicating *First Amendment* [*44] considerations under the facts here. See, e.g., *Cohen v. Cowles Media Co., 501 U.S. 663, 671, 115 L. Ed. 2d 586, 111 S. Ct. 2513, 2519 (1991)*; *Hustler, 485 U.S. at 56, 108 S. Ct. at 882*; *Desnick v. American Broadcasting Companies, Inc., 44 F.3d 1345, 1355 (7th Cir. 1995)*; *Unelko Corp. v. Rooney, 912 F.2d 1049, 1057-58 (9th Cir. 1990)* (commercial disparagement). The above analysis regarding the *First Amendment* implications at play in this case thus apply with equal force and identical effect to these causes of action. Accordingly, Paramount's requested relief is similarly warranted on Counts VII, VIII, and X.

### 5. Unjust Enrichment

Lastly, Muzikowski avers that Paramount was unjustly enriched by the details of the stories that he told Coyle that he claims formed the basis of aspects of O'Neill's character. Muzikowski's only viable claim for unjust enrichment lies in showing that he has a better claim to the control over access to the details of his life than Paramount does. This argument simply cannot stand

2005 U.S. Dist. LEXIS 13127, *44

in the face of the *First Amendment* considerations at play. To allow Muzikowski to assert a legally [*45] superior claim to the details of his life in a situation such as this, where Paramount at worst uses those tidbits in assembling a composite character to communicate ideas and images that have nothing to do with Muzikowski, would enrich him at the expense of society as a whole. That, not the injury Muzikowski claims, would be the greater injustice. As Muzikowski has not demonstrated that Paramount benefitted in any other way than to be able to construct a character who bore passing resemblance to him, summary judgment is warranted for Paramount on Count XI.

**CONCLUSION**

Based on the foregoing, we adopt Judge Levin's report and recommendation and order Muzikowski's counsel to reimburse Paramount for attorneys' fees in the amount of $ 50,915.25. Paramount's motion to strike is denied and its motion for summary judgment is granted.

Charles P. Kocoras

Chief Judge

United States District Court

Dated: June 10, 2005

# TAB 5

Not Reported in F.Supp.2d                                                                            Page 1

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

C

MasterCard Intern. Inc. v. Nader 2000 Primary
Committee, Inc.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
MASTERCARD INTERNATIONAL INCORPOR-
ATED Plaintiffs,
v.
NADER 2000 PRIMARY COMMITTEE, INC.,
Nader 2000 General Committee, Inc., and Ralph
Nader, Defendants.
**No. 00 Civ.6068(GBD).**

March 8, 2004.

**Background:** Financial services company that had
commissioned authorship of advertisements using
phrase "THERE ARE SOME THINGS MONEY
CAN'T BUY. FOR EVERYTHING ELSE
THERE'S MASTERCARD," and "PRICELESS,"
sued presidential candidate and his political com-
mittee for use of slogans similar to its service
marks, alleging claims for unfair competition, mis-
appropriation, trademark infringement, trademark
dilution under the Federal Trademark Act and state
and common law, as well as copyright infringement
under the Copyright Act. Defendants moved for
summary judgment.

**Holdings:** The District Court, Daniels, J., held that:
(1) plaintiff failed to establish likelihood of confu-
sion, as required to support trademark infringement
claims;
(2) state claims for unfair competition and misap-
propriation were preempted by the Copyright Act;
(3) lack of likelihood of consumer confusion de-
feated palming off claim under New York law;
(4) there was no evidence of trademark dilution;
(5) defendants' use of plaintiff's copyrighted works
was fair use, and thus, not an infringement; and
(6) defendants' use of plaintiff's copyrighted works
was not a material deceptive act or practice directed
to consumers that caused actual harm, as would

support deceptive acts or practices claim.

Motion granted.

West Headnotes

**[1] Trademarks 382T ⇌1092**

382T Trademarks
   382TIII Similarity Between Marks; Likelihood
of Confusion
      382Tk1090 Nature of Marks
         382Tk1092 k. Strength or Fame of Marks;
Degree of Distinctiveness. Most Cited Cases
   (Formerly 382k350.1)
For purposes of determining likelihood of confu-
sion to public in trademark infringement action
based on presidential candidate and his political
committee's use of slogans similar to financial ser-
vices company's service marks "THERE ARE
SOME THINGS MONEY CAN'T BUY. FOR
EVERYTHING ELSE THERE'S MASTERCARD,"
and "PRICELESS," marks were strong enough to
have become a part of present-day American popu-
lar culture, and thus had acquired secondary mean-
ing. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15
U.S.C.A. §§ 1114(1), 1125(a).

**[2] Trademarks 382T ⇌1097**

382T Trademarks
   382TIII Similarity Between Marks; Likelihood
of Confusion
      382Tk1093 Relationship Between Marks
         382Tk1097 k. Examination and Compar-
ison; Construction as Entirety. Most Cited Cases
   (Formerly 382k350.1)

**Trademarks 382T ⇌1098**

382T Trademarks
   382TIII Similarity Between Marks; Likelihood
of Confusion
      382Tk1093 Relationship Between Marks
         382Tk1098 k. Appearance, Sound, and

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

Meaning. Most Cited Cases
(Formerly 382k350.1)
Presidential candidate and his political committee's use of word "priceless" and phrase "there are some things money can't buy" in same look, sound, and commercial impression as employed by financial services company established sufficient degree of similarity to company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," as to support finding of likelihood of confusion to public, for purposes of company's trademark infringement action against candidate and committee. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[3] Trademarks 382T ☞1104**

382T Trademarks
382TIII Similarity Between Marks; Likelihood of Confusion
382Tk1100 Relationship Between Goods or Services Underlying Marks
382Tk1104 k. Markets and Territories; Competition. Most Cited Cases
(Formerly 382k350.1)
For purposes of determining likelihood of confusion to public in trademark infringement action based on presidential candidate and his political committee's use of slogans similar to financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," plaintiff failed to show proximity between services and political candidacy, or likelihood that defendants would "bridge the gap" into its product or service line, or that it would have any direct involvement in supporting a candidate in a political presidential campaign. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[4] Trademarks 382T ☞1086**

382T Trademarks
382TIII Similarity Between Marks; Likelihood of Confusion

of Confusion
382Tk1083 Nature of Confusion
382Tk1086 k. Actual Confusion. Most Cited Cases
(Formerly 382k350.1)
Presidential candidate and his political committee's use of word "priceless" and phrase "there are some things money can't buy" in same look, sound, and commercial impression as employed by financial services company did not create actual confusion with respect to company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," as would support finding of likelihood of confusion to public, for purposes of company's trademark infringement action against candidate and committee. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[5] Trademarks 382T ☞1111**

382T Trademarks
382TIII Similarity Between Marks; Likelihood of Confusion
382Tk1111 k. Intent; Knowledge of Confusion or Similarity. Most Cited Cases
(Formerly 382k350.1)
Presidential candidate and his political committee's use of word "priceless" and phrase "there are some things money can't buy" in same look, sound, and commercial impression as financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," was not intended to confuse public, as would support finding of likelihood of confusion to public, for purposes of company's trademark infringement action against candidate and committee. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[6] Trademarks 382T ☞1105**

382T Trademarks
382TIII Similarity Between Marks; Likelihood of Confusion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

382Tk1100 Relationship Between Goods or Services Underlying Marks

382Tk1105 k. Relative Quality. Most Cited Cases

(Formerly 382k350.1)

For purposes of determining likelihood of confusion to public in trademark infringement action based on presidential candidate and his political committee's use of slogans similar to financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," there was no reasonable comparison to be made between quality of plaintiff's products and services and value of defendants' politics. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[7] Trademarks 382T ☞1112**

382T Trademarks

382TIII Similarity Between Marks; Likelihood of Confusion

382Tk1112 k. Persons Confused; Circumstances of Sale. Most Cited Cases

(Formerly 382k350.1)

For purposes of determining likelihood of confusion to public in trademark infringement action based on presidential candidate and his political committee's use of slogans similar to financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," plaintiff's customers were generally sophisticated enough to decipher between plaintiff's commercial purposes and defendants' political agenda. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[8] States 360 ☞18.84**

360 States

360I Political Status and Relations

360I(B) Federal Supremacy; Preemption

360k18.83 Trade Regulation; Monopolies

360k18.84 k. In General. Most Cited Cases

Antitrust and Trade Regulation 29T ☞14

29T Antitrust and Trade Regulation

29TII Unfair Competition

29TII(A) In General

29Tk14 k. Preemption. Most Cited Cases

(Formerly 382k423.1 Trade Regulation)

Financial services company's state law claims for unfair competition and misappropriation against presidential candidate and his political committee, based on their alleged use of advertisement derived from company's copyrighted advertising, were preempted by the Copyright Act; advertisements fell within subject matter of the Act, and unfair competition and misappropriation claims were grounded solely in defendants' copying of copyrighted expression. 17 U.S.C.A. § 301(a), (b)(1).

**[9] Trademarks 382T ☞1428(1)**

382T Trademarks

382TVIII Violations of Rights

382TVIII(A) In General

382Tk1423 Particular Cases, Practices, or Conduct

382Tk1428 Passing Off or Palming Off

382Tk1428(1) k. In General. Most Cited Cases

(Formerly 382k404)

Under New York law, presidential candidate and his political committee's use of slogans similar to financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," did not create likelihood of consumer confusion, as would support palming off claim.

**[10] Trademarks 382T ☞1469**

382T Trademarks

382TVIII Violations of Rights

382TVIII(B) Dilution

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

382Tk1469 k. Nature of Defendant's Use; Use in Commerce. Most Cited Cases

(Formerly 382k366)

**Trademarks 382T ⟨⟩1524(1)**

382T Trademarks
   382TVIII Violations of Rights
      382TVIII(D) Defenses, Excuses, and Justifications
         382Tk1521 Justified or Permissible Uses
           382Tk1524 Expressive Use; Commentary
              382Tk1524(1) k. In General. Most Cited Cases

(Formerly 382k366)

Presidential candidate and his political committee's use of financial services company's trademarks, "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," was not commercial, but rather political in nature, and therefore was exempted from coverage by the Federal Trademark Dilution Act. 15 U.S.C.A. § 1125(c)(4)(B).

**[11] Trademarks 382T ⟨⟩1464**

382T Trademarks
   382TVIII Violations of Rights
      382TVIII(B) Dilution
         382Tk1462 Reduction of Mark's Capacity to Identify; Blurring
           382Tk1464 k. Particular Cases. Most Cited Cases

(Formerly 382k366)

Even if presidential candidate and his political committee's use of financial services company's trademarks, "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," was commercial, rather than political in nature, such use did not dilute distinctiveness of company's marks in violation of the Federal Trademark Dilution Act; plaintiff failed to show that defendants' use of its marks lessened their value or capacity to identify and distinguish its goods or services. 15

U.S.C.A. § 1125(c).

**[12] Trademarks 382T ⟨⟩1464**

382T Trademarks
   382TVIII Violations of Rights
      382TVIII(B) Dilution
         382Tk1462 Reduction of Mark's Capacity to Identify; Blurring
           382Tk1464 k. Particular Cases. Most Cited Cases

(Formerly 382k366)

Presidential candidate and his political committee's use of financial services company's trademarks, "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," did not create even a likelihood of dilution of company's marks in violation of the New York anti-dilution law; plaintiff failed to show that defendants' limited and political use of its marks could weaken their ability to serve as a unique identifier of its goods or services. McKinney's General Business Law § 360-l.

**[13] Copyrights and Intellectual Property 99 ⟨⟩67.3**

99 Copyrights and Intellectual Property
   99I Copyrights
      99I(J) Infringement
         99I(J)1 What Constitutes Infringement
           99k67.3 k. Other Works. Most Cited Cases

Presidential candidate and his political committee's use of financial services company's copyrighted service marks, "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," was fair use, and thus, not an infringement in violation of the Copyright Act, where allegedly infringing political advertisement was a parody, substance of defendants' message was different from message of plaintiff's advertisements, and use of allegedly infringing advertisement did not harm potential market for or value of copyrighted work. 17 U.S.C.A. § 107(2).

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046

**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

**[14] Trademarks 382T ☞1427**

382T Trademarks
    382TVIII Violations of Rights
        382TVIII(A) In General
            382Tk1423 Particular Cases, Practices, or Conduct
                382Tk1427 k. Advertising or Marketing. Most Cited Cases
                (Formerly 92Hk7 Consumer Protection)

Under New York law, presidential candidate and his political committee's use of financial services company's trademarks, "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," was not a material deceptive act or practice directed to consumers that caused actual harm, as would support deceptive acts or practices claim, where political advertisement was not used in connection with sale or promotion of a product or service, nor in the conduct of business, trade, or commerce. McKinney's General Business Law § 349.

**Trademarks 382T ☞1800**

382T Trademarks
    382TXI Trademarks and Trade Names Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited Cases
        (Formerly 382k736)
PRICELESS.

**Trademarks 382T ☞1800**

382T Trademarks
    382TXI Trademarks and Trade Names Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited Cases
        (Formerly 382k736)
THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD.

*MEMORANDUM OPINION AND ORDER*

DANIELS, J.

**\*1** Plaintiff MasterCard filed an action against defendants Ralph Nader and his political committee, alleging unfair competition, misappropriation, trademark infringement and dilution of MasterCard's trademarks under the Federal Trademark Act and state and common law. Plaintiff also alleged infringement of plaintiff's copyright under the Copyright Act of 1976. Defendants filed a motion for summary judgment. Defendants' motion for summary judgment is hereby GRANTED in its entirety.

*BACKGROUND*

MasterCard, a Delaware corporation with its principle place of business in New York, is a large financial institution that engages in the interchange of funds by credit and debit payment cards through over 23,000 banks and other foreign and domestic member financial institutions. Since Fall of 1997, MasterCard has commissioned the authorship of a series of advertisements that have come to be known as the "Priceless Advertisements." These advertisements feature the names and images of several goods and services purchased by individuals which, with voice overs and visual displays, convey to the viewer the price of each of these items. At the end of each of the Priceless Advertisements a phrase identifying some priceless intangible that cannot be purchased (such as "a day where all you have to do is breathe") is followed by the words or voice over: "Priceless. There are some things money can't buy, for everything else there's MasterCard."

In August 2000, MasterCard became aware that Ralph Nader and his presidential committee were broadcasting an allegedly similar advertisement on television that promoted the presidential candidacy of Ralph Nader in the 2000 presidential election. That political ad included a sequential display of a series of items showing the price of each ("grilled tenderloin for fund-raiser; $1,000 a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

plate;""campaign ads filled with half-truths: $10 million;""promises to special interest groups: over $100 billion"). The advertisement ends with a phrase identifying a priceless intangible that cannot be purchased ("finding out the truth: priceless. There are some things that money can't buy"). The resulting ad (the "Nader ad") was shown on television during a two week period from August 6-17, during the 2000 presidential campaign, and also appeared on the defendants' web site throughout that campaign. Plaintiff sent defendants a letter explaining its concern over the similarity of the commercials, and suggested that defendants broadcast a more "original" advertisement. When plaintiff contacted representatives of defendants a few days later, plaintiff MasterCard advised defendants to cease broadcasting their political advertisement due to its similarity with MasterCard's own commercial advertisement and resulting infringement liability.

When the parties could not come to an agreement, on August 16, 2000, MasterCard filed a complaint alleging the following counts against Ralph Nader and his presidential committee; trademark infringement and false designation of origin in violation of Section 43(a) of the Lanham Act; infringement of a registered trademark in violation of Section 32(1) of the Lanham Act; dilution in violation of Section 43(c) of the Lanham Act; copyright infringement in violation of the Copyright Act; unfair competition; misappropriation; infringement of New York Common Law Trademark Rights; dilution under New York law; and deceptive trade practices. Plaintiff sought a preliminary injunction during the 2000 presidential campaign which was denied by this Court. Thereafter, defendants moved for summary judgment on all nine of plaintiff's counts.

## DISCUSSION

**\*2** Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as

a matter of law."Fed.R.Civ.P. 56(c); *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993). The burden of demonstrating that no factual dispute exists is on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial ."Fed.R.Civ.P. 56(e). In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91L.3d.2d202 (1986). Summary judgment should be granted only when no reasonable trier of fact could find in favor of the nonmoving party. *Gallo v. Prudential Residential Services, Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994).

### 1. *Trademark Infringement*

MasterCard's first count is based on Section 43(a) of the Trademark Act, 15 U.S.C. Section 1125(a). Plaintiff claims that defendants have used two of MasterCard's service marks-"THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS" to misrepresent that the 2000 presidential candidacy of Ralph Nader for the office of President of the United States was endorsed by MasterCard. (Complaint ¶ 23). Plaintiff's second count also pleads a claim for trademark infringement due to defendants' use of the two federally registered trademarks, ("THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS"), pursuant to Section 32(1) of the Trademark Act, 15 U.S.C. Section 1114(1).

In trademark infringement cases, the Court must apply the undisputed facts to the balancing test outlined in *Polaroid Corp. v. Polarad Elecs., Corp.,* 287 F.2d 492, 495 (2d Cir.1961), and may grant summary judgment where it finds, as a matter of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 7
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

law, that there is no likelihood of confusion to the public. *SeeLois Sportswear, USA, Inc. v. Levi Strauss & Co.,* 799 F.2d 867 (2d Cir.1986); *Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 580 (2d Cir.1991). In determining whether there is a likelihood of confusion between MasterCard's Priceless Advertisements and Ralph Nader's Political Ad, the Court weighs eight factors, as articulated in *Polaroid,* 287 F.2d at 495:(1) strength of the Plaintiff's mark; (2) degree of similarity between the two marks; (3) proximity of the products or services; (4) likelihood that the prior owner will "bridge the gap" into the newcomer's product or service line; (5) evidence of actual confusion between the marks; (6) whether the defendant adopted the mark in good faith; (7) the quality of defendants' products or services; and (8) sophistication of the parties' consumers. *SeeTime, Inc. v. Petersen Publishing Co.,* 173 F.3d 113, 117 (2d Cir.1999); *Seealso Morningside Capital Group,* 182 F.3d 133, 137 (2d Cir.1999).

**\*3** [1] In demonstrating the strength of the trademark, the plaintiff must establish either that the mark is inherently distinctive or alternatively, that the mark has acquired secondary meaning. *SeeMc-Gregor-Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). MasterCard's marks, "priceless" and "there are some things money can't buy, for everything else there's MasterCard," are registered. MasterCard asserts that their marks have attained secondary meaning. Defendants concede that MasterCard's Priceless Advertisements are strong enough to have become a part of present-day American popular culture. (Def.'s Mem. in Supp. of Mot. for Summ. J., p. 19). The strength of Master-Card's trademarks is indisputable.

[2] In determining the second factor, the similarity of the marks in issue, a court must consider whether the marks create the same overall commercial impression when viewed separately. *SeeNikkon, Inc. v. Ikon Corp.,* 803 F.Supp. 901, 926 (S.D.N.Y.1992). A court may rely upon its own visual inspection in making this determination. *See,*

*e.g.,Venetianaire Corp. v. A & P Import Co.,* 429 F.2d 1079, 1081 (2d Cir.1970). In this instance, it is not necessary for the Court to do so, because once again, defendants do not dispute that the Nader Ad employs the word "priceless" in the same manner used by MasterCard in its television advertisements. (Zopoth Aff. ¶¶ 304, Exs. 9 and 10). The Nader Ad also employs the phrase "there are some things money can't buy," which is part of a Master-Card trademark. Defendants do not dispute that they employ that phrase in the same look, sound and commercial impression as employed by MasterCard. *Id.*

[3] The third and fourth factors, the proximity of the products or services and the likelihood that the prior user will bridge the gap, respectively, weigh in favor of defendants. There is little similarity between MasterCard's credit and debit card business and Ralph Nader's political candidacy. There is little likelihood and no evidence that MasterCard, a financial services company, would have any direct involvement in supporting a candidate in a political presidential campaign. Similarly, neither Ralph Nader nor his political campaign committee have expressed any desire or intent to enter the credit card business or offer the public any direct financial services. (Def's Mem. in Supp. of Summ. J., p. 20).

[4] Evidence of actual confusion, the fifth factor, also weighs in favor of defendants. This factor is perhaps the most significant when considering the overall likelihood of confusion by the public. "The best evidence of likelihood of confusion is the occurrence of actual confusion and mistakes." *Lambda Electronics Corporation, et al. v. Lambda Technology, Inc.,* 515 F.Supp. 915, 926 (S.D.N.Y.1981). While it is not essential for a finding of trademark infringement to demonstrate actual confusion, "there can be no more positive proof of likelihood of confusion than evidence of actual confusion." *Id.,* at 926-27 (citing *Grotrian, et al. v. Steinway & Sons,* 365 F.Supp. 707, 715-16 (S.D.N.Y.1973), *aff'd,* 523 F.2d 1331 (2d Cir.1975)). In *Lang v. Re-*

Not Reported in F.Supp.2d                                                                                                          Page 8
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

*tirement Living Publishing Co.,* 949 F.2d 576 (2d Cir.1991), the Second Circuit affirmed the trial court's grant of summary judgment to the defendants on the ground that plaintiff had failed to raise a genuine issue of fact on likelihood of confusion. In that case, where the plaintiff, whose trade name was similar to that of defendants, received 400 phone calls and several letters from third parties attempting to reach the defendant, the Court explained that the Lanham Act seeks to prevent consumer confusion that enables a seller to pass off his goods as the goods of another, not to protect against confusion generally. *Id.,* at 583.As evident by the present record, out of 452 e-mails to MasterCard regarding the Nader Ad, only two are relied upon as possibly reflecting confusion. (Grossman Aff. ¶ 9, Exs. 4). This is certainly not enough to show actual confusion or that such confusion inflicted commercial injury to MasterCard. In support of its argument that actual confusion exists, MasterCard also relies on the written transcript of a broadcast of CNN's *Late Edition,* during which Connecticut Senator Christopher Dodd stated that he thought the Nader Advertisement was a credit card ad. A viewing of a tape of that program shows Senator Dodd laughing at his own joke, while speaking the words on which MasterCard relies to establish actual confusion. It is little or no evidence of actual confusion. Even if Senator Dodd had actually been confused, a few isolated instances of actual confusion are not sufficient to defeat a motion for summary judgment. *See* *Brockmeyer v. The Hearst Corporation, et al.,* 428, F.Supp.2d 281, 298 (S.D.N.Y.2003) ("one anecdotal instance of purported actual confusion is at best de minimis, indeed infinitesimal, and insufficient;" a survey revealing a less than 3% rate of confusion was insufficient to show a likelihood of confusion .); *See* *also* *Cumberland Packing Corp. v. Monsanto Co.,* 140 F.Supp.2d 241, 254 (E.D.N.Y.2001) (a survey showing a 7.84% confusion rate found to be insufficient to raise a material fact as to the likelihood of confusion). The plaintiff should be able to demonstrate a reasonable likelihood that reasonable people will be confused.

**\*4** [5] The sixth factor regarding good faith adoption of the mark also favors defendants. The relevant intent in this inquiry is whether the alleged infringer intended "to palm off his products as those of another." *See* *Miss Universe, Inc. v. Patricelli,* 408 F.2d 506, 509 (2d Cir.1969); *See* *also* *Maternally Yours, Inc. v. your Maternity Shop, Inc.,* 234 F.2d 538, 542 (2d Cir.1956). In the present case, there is no evidence that defendants intended to confuse the public. There is no basis to argue that the Ralph Nader political ad which has the clear intent to criticize other political candidates who accept money from wealthy contributors, at the same time, attempts or intends to imply that he is a political candidate endorsed by MasterCard. There is uncontradicted testimony that neither Ralph Nader, nor his committees, had any such intent. (Nader Aff. ¶ 21; Zopoth Aff. ¶ 7, Ex. 16).

[6] The seventh factor, the quality of defendants' products or services, is of insignificant weight in this case. There is no reasonable comparison to be made between the quality of the products and services provided by MasterCard and the value of defendants' politics. MasterCard provides a quality of financial services which can readily be compared to its commercial competitors. However, it is purely the public's subjective opinion of the appeal and attractiveness of a political candidate's ideas and record which determines whether the public will buy the politics any candidate for office is selling.

[7] The eighth and final factor to be weighed is the level of consumer sophistication in either of the relevant markets for credit card services or for political candidates. Unless otherwise demonstrated, it is reasonable to conclude that the general American public is sophisticated enough to distinguish a Political Ad from a commercial advertisement. Rarely, if ever, is there a realistic opportunity to confuse the two. Indeed, as previously discussed, out of the 452 e-mails received by MasterCard regarding Ralph Nader's Political Ad, only 2-3 questioned MasterCard's involvement with Ralph Nader's campaign. This sampling of American con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

sumers, which is the only proof offered on the re-
cord, is a sufficient indication that consumers are
generally sophisticated enough to decipher between
MasterCard's commercial purposes and Ralph
Nader's political agenda.

When balancing the eight *Polaroid* factors, no one
factor can determine the ultimate issue of likeli-
hood of confusion to the consumer. *SeeW.W.
Pharm. Co. v. The Gillette Co.,* 808 F.Supp. 1013,
1022 (S.D.N.Y.1992), *aff'd,*984 F.2d 567 (2d
Cir.1993). To properly weigh these factors requires
the court to view each factor in light of the totality
of the evidence. *Id.* Thus, after balancing the *Polar-
oid* factors, this Court finds that there is no genuine
issue of material fact with regard to any likelihood
of confusion between MasterCard's Priceless Ad-
vertisements and Ralph Nader's Political Ad which
could constitute a violation of the Trademark Act.
Defendants' summary judgment motion to dismiss
Counts One and Two of plaintiff's complaint is
therefore granted.

**\*5** MasterCard also alleges a state law claim under
New York common law for trademark infringement
in Count Seven of the complaint. Under New York
common law, as is required under federal law, a
plaintiff must show a likelihood of confusion
between the two products in order to prevail.
*SeeNabisco v. Warner-Lambert Co. .,* 32 F.Supp.2d
690, 701 (S.D.N.Y.1999). As with plaintiff's federal
Lanham Act claims, there is no likelihood of confu-
sion between MasterCard's Priceless Ads and Ralph
Nader's Political Ad. As a matter of law, plaintiff
has failed to show a genuine issue of material fact
as to the existence of a likelihood of confusion
between MasterCard's financial services and Ralph
Nader's 2000 presidential political campaign.
Therefore, defendants are granted summary judg-
ment on plaintiff's New York common law trade-
mark infringement claim in Count Seven of the
complaint.

## 2. *Unfair Competition and Misappropriation*

[8] In its fifth and sixth counts, MasterCard alleges
state law claims under New York common law for
unfair competition and misappropriation. Under
Section 301(a) of the Copyright Act, 17 U.S.C. §
301(a), all legal or equitable state rights that are
equivalent to any of the exclusive rights granted
within the general scope and subject matter of the
Copyright Act are preempted by the Copyright Act.
Courts have used a two-part test to determine
whether a state cause of action will be preempted
by the Copyright Act: (1) what is the nature of the
work in question; and (2) what are the rights
claimed in that work under state law. *SeeHarper &
Row, Publishers, Inc. v. Nations Enters.,* 501
F.Supp. 848, 850 (S.D.N.Y.1980), *aff'd.*723 F.2d
195 (2d Cir.1983), *rev'd on other grounds,*471 U.S.
539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985);
*SeealsoMayer v. Josiah Wedgwood & Sons, Ltd.,*
601 F.Supp. 1523, 1532 (S.D.N.Y.1985).

The first prong for preemption is met when the
nature of the work protected comes within the sub-
ject matter of copyright as defined by § § 102 and
103 of the Copyright Act. *See*§ 301(b)(1). Because
MasterCard owns copyright registrations for several
of its "Priceless" television advertisements, and be-
cause "advertisements are generally capable of re-
ceiving copyright protection,"*Raffoler, Ltd. v. Pe-
abody & Wright, Ltd.,* 671 F.Supp. 947, 950
(E.D.N.Y.1987), MasterCard's advertisements
clearly fall within the subject matter of the Copy-
right Act.

The second prong for preemption is met when the
right granted under state law is "equivalent to any
of the exclusive rights within the general scope of
copyright as specified in Section 106."17 U.S.C. §
301(a).*SeealsoHarper,* 501 F.Supp. at 850;*Mayer,*
601 F.Supp. at 1532. The federal rights granted by
the Copyright Act include the right "to prepare de-
rivative works based upon the copyrighted
work."17 U.S.C. § 106. As evident in the Com-
plaint, MasterCard claims that the Nader Ad viol-
ated MasterCard's rights because it was derived
form MasterCard's "Priceless" advertising.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

(Compl.¶ 50). The Second Circuit Court of Appeals has held that misappropriation and unfair competition claims "grounded solely in the copying of plaintiff's protected expression are deemed preempted by Section 301." *Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 717 (2d Cir.1992)* (citations omitted); *See also American Movie Calssics Co. v. Turner Entm't Co., 922 F.Supp. 926, 933 (S.D.N.Y.1996).* Thus, Counts Five and Six are dismissed on defendants' motion for summary judgment as those claims are preempted by federal copyright law.

**\*6** [9] In pleading its sixth count, along with its misappropriation claim, MasterCard also alleges the state law violation of "palming off" by defendants. (Compl.¶ 62). "Palming off" or passing off, "occurs when a producer misrepresents his own goods or services as someone else's." *Dastar Corporation v. Twentieth Century Fox Film Corporation, et al., 539 U.S. 23, 123 S.Ct. 2041, 2045, n. 1, 156 L.Ed.2d 18 (2003).* Lack of likely consumer confusion is independently sufficient to defeat a claim of palming off. *See Towle Mfg. Co. v. Godinger Silver Art Co., Ltd., 612 F.Supp. 986, 995-96 (S.D.N.Y.1985).* Therefore, this claim also fails for the same reason MasterCard's trademark infringement claim fails: there is no likelihood of confusion as a matter of law. Dismissal of Count Six is therefore warranted on this basis as well.

### 3. Dilution

Counts Three and Eight of plaintiff's complaint allege against defendants federal and state dilution of plaintiff's trademarks. The Federal Trademark Dilution Act, 15 U.S.C. § 1125(c) and the New York anti-dilution law, New York Gen. Bus. Law § 360-1, protect against the unauthorized use of marks that impairs the goodwill and value of plaintiff's mark. "Dilution" is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of

confusion, mistake, or deception." 15 U.S.C. § 1127. Section 1125(c) provides that the owner of a famous mark is entitled to an injunction against another person's "commercial use in commerce of a mark if such use begins after the mark or trade name has become famous and causes dilution of the distinctive quality of the mark."Under federal law, the elements for a claim of dilution are that "1) plaintiff's mark is famous; 2) it is inherently distinctive; 3) defendant's use of the junior mark is a commercial use in commerce; 4) defendant's use began after plaintiff's mark became famous; and 5) defendant's use of the junior mark causes dilution of the distinctive quality of the plaintiff's mark." *Playtex Products, Inc. v. Georgia-Pacific, Inc., et al., 2003 WL 21939706, 8 (S.D.N.Y.2003).* Moreover, a plaintiff must show "actual dilution, rather than a likelihood of dilution." *Moseley, et al. v. V Secret Catalogue, Inc., et al., 537 U.S. 418, 433, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003).* Under both federal and New York law, dilution can involve either blurring or tarnishment. *New York Stock Exchange, Inc., v. New York, New York Hotel, LLC, 293 F.3d 550, 557 (2d Cir.2002); See also Perkins School for the Blind v. Maxi-Aids, Inc., et al., 274 F.Supp.2d 319, 325 (E.D.N.Y.2003); World Wrestling Federation Entertainment, Inc. v. Bozelli, 142 F.Supp.2d 514, 529 (S.D.N.Y.2001).*

Blurring has typically involved "the whittling away of an established trademark's selling power through its unauthorized use by others upon dissimilar products." *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1031 (2d Cir.1989)* (describing such " 'hypothetical anomalies' as 'Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth' ") (quoting legislative history of section 368-d) (citation omitted). That is, trademark dilution statutes are designed to cover those situations where the public knows that the defendant is not connected to or sponsored by the plaintiff, but the ability of the plaintiff's mark to serve as a unique identifier of the plaintiff's goods or services is weakened because the relevant public now also as-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

sociates that designation with a new and different source. See*Federal Express Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 174 (2d Cir.2000) (quoting *Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d at 965-66 (discussing New York law) (internal quotation marks and brackets omitted).

**\*7** In *New York Stock Exchange,* the Second Circuit held that blurring occurs when " 'the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods or services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product. To determine the likelihood of blurring, [courts] have looked to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark."*New York Stock Exchange, Inc., v. New York New York Hotel, LLC,* 293 F.3d 550, 558 (2d Cir.2002) (citing *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 43 (2d Cir.1994)); Seealso*Katz, et al. v. Modiri, et al.,* 283 F.Supp.2d 883, 901 (S.D.N.Y.2003).

Tarnishment occurs when the plaintiff's mark is " 'linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context,' with the end result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." ' *Id.* "The sine qua non of tarnishment is a finding that the plaintiff's mark will suffer negative associations through defendant's use." *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 507 (2d Cir.1996).

The Federal Trademark Dilution Act specifically exempts noncommercial uses of a mark from its coverage. Section 1125(c)(4) provides that "[t]he following shall not be actionable under this section: ... (B) Noncommercial use of a mark."Therefore, prior to even addressing whether defendants have actually diluted plaintiff's marks under the federal

law, the Court must first determine whether defendants' use of the marks is "commercial," and thereby, whether that use is even covered by the statute.[FN1]

> FN1. Black's Law Dictionary defines 'commercial' as "Relates to or is connected with trade and traffic or commerce in general; is occupied with business and commerce. Generic term for most all aspects of buying and selling."
>
> The Lanham Act defines 'use in commerce' as the "use of a mark in the ordinary course of trade ... For purposes of this chapter, a mark shall be deemed to be in use in commerce-(1) on goods when-(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce, and (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services."15 U.S.C. § 1127.

[10] Plaintiff argues that Ralph Nader's Political Ad is commercial in nature even though it neither sells products or services, is not designed to entice consumers to buy products or services, and does not propose any kind of commercial transaction. MasterCard asserts that contributions to the Nader 2000 General Committee "increased from $5125 before the Ad ran to $818,000 in August 2000, after the Ad ran through the "DONATE ON-LINE" icon orotherwise."(Pl's. Mem. in Opp. to Summ. J. 26) (emphasis added). Although the Nader Ad ran before a large sum of contributions were made to his

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

campaign, plaintiff offers no evidence of a causal connection between the Ad and the contributions. There is nothing in the record other than the inference to be drawn from the proximity in time that advances the notion that the contributions Ralph Nader and his political committee received were a direct result of the Ad.

Even assuming the Nader Ad caused greater contributions to be made to his political campaign, this would not be enough to deem Ralph Nader's Ad "commercial." If so, then presumably, as suggested by defendants, all political campaign speech would also be "commercial speech" since all political candidates collect contributions. Ralph Nader's Political Ad attempts to communicate that other presidential candidates can be bought, but that the "truth," represented by himself, cannot. The Nader Ad is a strong political message which expresses his personal opinion on presidential campaigning. The legislative history of the Lanham Act clearly indicates that Congress did not intend for the Act to chill political speech. In speaking about the amendments to Section 43(a) that expanded what was actionable as deceptive advertisements, one of the new law's sponsors, United States Representative Robert Kastenmeier, pointed out that political advertising and promotion are not meant to be covered by the term "commercial." He stated that the statute

**\*8** uses the word "commercial" to describe advertising or promotion for business purposes, whether conducted by for-profit or non-profit organizations or individuals. *Political advertising and promotion is political speech, and therefore not encompassed by the term "commercial."* This is true whether what is being promoted is an individual candidacy for public office, or a particular political issue or point of view ...

134 Cong. Rec. H. 1297 (daily ed. April 13, 1989) (statement of Wisconsin Rep. Kastenmeier) (emphasis added).

Plaintiff MasterCard urges the Court to rely on *United We Stand America, Inc. v. United We Stand,*

*America New York, Inc.,* 128 F.3d 86 (2d Cir.1997) to conclude that Ralph Nader's activities are "commercial" in nature. That case is not instructive in determining whether or not MasterCard has a basis to bring a claim against defendants under the Federal Trademark Dilution Act. In *United We Stand,* the Court was determining whether a certain political activity fell under the scope and the meaning of the word "services" and "use in commerce" of the Lanham Trademark Act, § 32(1)(a), 15 U.S.C.A. § 1114(1)(a).[FN2] That particular section of the Lanham Act does not have a commercial activity requirement, nor does it exempt from liability noncommercial use of a mark. *SeePlanned Parenthood Federation of America Inc. v. U.S. District Court Southern District of New York,* 42 U.S.P.Q.2d 1430, 1434 (S.D.N.Y.1997). However, the Federal Trademark Dilution Act, 15 U.S.C.A. § 1125(c), specifically exempts from the scope of all provisions of Section 1125 the "noncommercial use of a mark." *SeeId., at* 1433.

> [FN2.]"Any person who shall, without the consent of the registrant use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered trademark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided ."15 U.S.C.A. § 1114(1)(a).

Though not binding, this Court finds the analysis in *American Family Life Insurance Company v. Hagan, et al.,* 266 F.Supp.2d 682 (N.D.Ohio 2002), to be relevant and persuasive. In that case, similar to the case at hand, the plaintiff, American Family Life Insurance Company, or AFLAC, ran well-known "AFLAC Duck" commercials which featured a white duck quacking the company's name "AFLAC." *Id., at* 684.One of the defendants was a candidate for Governor of the State of Ohio running

Not Reported in F.Supp.2d                                                    Page 13
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

against the incumbent Governor Robert Taft. The candidate and his Campaign, developed internet commercials that " 'borrow[ed]' from AFLAC's commercials. Specifically, the internet commercials include[d] a crudely animated character made up of the incumbent Governor's head sitting on the body of a white cartoon duck; the duck quacks 'TaftQuack' several times during each commercial," which defendants ran on their website, www.taftquack.com. *Id.*Defendants' website also contained a link which visitors could use to make campaign contributions. *Id.* at 686-87.Among other claims, plaintiff sued defendants for federal trademark dilution and moved for a preliminary injunction.

In denying the plaintiff's motion for a preliminary injunction, and finding that the plaintiff was not likely to prevail on its dilution claim, the court also found that defendants' speech was political, rather than commercial. Specifically, the court stated that the candidate was "using a quacking cartoon character, which admittedly brings to mind AFLAC's marks, *as part of his communicative message,* in the context of expressing political speech."*Id.,* at 700 (emphasis in original). The court added that though "the consuming public may associate the AFLAC Duck and the TaftQuack character-a proposition the Court accepts-[this] is an insufficient predicate to support injunctive relief of political speech."*Id.,* at 701.The court further noted that though defendants included in their website a mechanism for visitors to make campaign contributions, "it is arguable whether [the candidate's] speech proposes a commercial transaction at all."*Id .,* at 697.The court stated that defendants' solicitation of contributions, and the resulting making of contributions, "is much more than merely a commercial transaction. Indeed, this exchange is properly classified not as a commercial transaction at all, but completely noncommercial, political speech."*Id.*

**\*9** [11] This Court finds that Ralph Nader's use of plaintiff's trademarks is not commercial, but instead

political in nature and that therefore, it is exempted from coverage by the Federal Trademark Dilution Act. However, even if Ralph Nader's use of plaintiff's trademarks could be deemed commercial in nature, such use did not dilute plaintiff's marks. Defendants do not dispute that plaintiff's marks are famous, distinctive, or that they used plaintiff's marks after such marks became famous. However, there is no evidence in the record that defendants' use of plaintiff's marks actually caused dilution of the distinctiveness of plaintiff's marks. Plaintiff does not offer evidence that defendants' limited use of the Priceless marks lessened its value or the capacity of these marks to identify and distinguish plaintiff's goods or services. Further, plaintiff does not claim, nor is there any evidence in the record, that due to defendant's use of plaintiff's marks, plaintiff altered or lessened its use of the marks to identify MasterCard's products or services.

Count Three of plaintiff's complaint alleging dilution of plaintiff's trademarks is dismissed on defendants' motion for summary judgment. Ralph Nader's use of plaintiff's trademarks is political in nature, not within a commercial context, and is therefore exempted from coverage by the Federal Trademark Dilution Act. Furthermore, there is no evidence on the record that Ralph Nader's use of plaintiff's trademarks diluted plaintiff's trademarks.

[12] Count Eight, alleging dilution of MasterCard's trademarks under state law, is based on N.Y.G.B.L. § 360-1. Section 360-1 provides that "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."In order to show state trademark dilution under section 360-1, MasterCard must demonstrate that it's "trademark is of truly distinctive quality or has acquired secondary meaning, and, second, that there is a 'likelihood of dilution.' " *Brennan's, Inc.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

*v. Brennan's Restaurant, LLC, et al.,* 2003 WL 1338681, 6 (S.D.N.Y.2003) (citing *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 42 (2d Cir.1994)).

Again, it is not in dispute that plaintiff's marks are of a distinctive quality, and have acquired secondary meaning. Yet, there is no evidence on the record that defendants' use of plaintiff's marks created even a likelihood of dilution of such marks. There is no evidence that defendants' limited and political use of plaintiff's marks could weaken those marks' ability to serve as a unique identifier of plaintiff's goods or services. Therefore, there is no evidence of possible dilution by "blurring." Further, there is no evidence that plaintiff's marks could be tarnished or suffer from negative associations in the eyes of the public due to defendants' use of those marks. Therefore, there is no evidence of dilution of plaintiff's marks by tarnishment. As with plaintiff's federal dilution claim, summary judgment for defendants on plaintiff's Count Eight alleging state law dilution of plaintiff's trademarks is hereby granted.

### 4. *Copyright Infringment*

**\*10** [13] In Count Four, plaintiff alleges copyright infringement of its Priceless Advertisements. In response, defendants argue the Nader Ad is a fair use of the Priceless Advertisements because it is a parody of the Priceless Advertisements.

"From the infancy of copyright protection," the fair use doctrine "has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts." ' *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 575, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (quoting U.S. Const., art. I, § 8, cl. 8). In *Campbell,* defendants Luther R. Campbell, Christopher Wongwon, Mark Ross, and David Hobbs, collectively known as 2 Live Crew, a rap music group, created a song entitled "Pretty Woman" that parodied Roy Orbison's copyrighted song, "Oh, Pretty Woman." *Id.,* at 571-72.Plaintiff Acuff-Rose Music, Inc., who

owned the rights to Orbison's song, sued defendants for copyright infringement. *Id.,* at 573.The District Court for the Middle District of Tennessee granted summary judgment in favor of defendants, finding that 2 Live Crew's song was a fair use parody of the Orbison song and that the commercial purpose of 2 Live Crew's song was not a bar to a finding of fair use. *Id.* The Court of Appeals for the Sixth Circuit reversed, holding that a finding of fair use was barred by the song's commercial character and excessive borrowing of the Orbison song. *Id.,* at 573-74.In reversing the Court of Appeals' decision, the United States Supreme Court held that a parody's commercial nature is not a bar to a finding of fair use and is in fact only one element to be considered in a fair use analysis. It held that the Court of Appeals gave insufficient consideration to the nature of a parody in assessing the degree to which a parody copies. *Id.,* at 572, 594.

As noted in *Campbell,* "in truth, in literature, in science and art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before."*Id.* (quotation marks omitted). Until the 1976 Copyright Act, the doctrine of fair use grew exclusively out of the common law. *See Id.,* at 576;*Folsom v. Marsh,* 9 F.Cas 342, 348 (C.D.Mass.1900) (CCD Mass. 1841) (Story, J.) (Stating fair use test). With the Copyright Act, Congress restated the common law tradition of fair use. The statute provides that the use or reproduction of a copyrighted work is "not an infringement of copyright" if it is used "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."17 U.S.C.A. § 107. In determining whether the work has been used for such a purpose, the statute lists four nonexclusive factors to consider: 1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; 2) the nature of the copyrighted work; 3) the amount and substantiality

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 15
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

of the portion used; and 4) the effect of the use upon the potential market for, or value of, the copyrighted work. 17 U.S.C. § 107(1)-(4). It has been found that "once a work is determined to be a parody, the second, third, and fourth factors are unlikely to militate against a finding of fair use."*Abilene Music, Inc., et al. v. Sony Music Entertainment, Inc., et al.,* 2003 WL 21415311, 4 (S.D.N.Y.2003).

**\*11** This section of the Copyright Act "intended that courts continue the common law tradition of fair use adjudication" and "permits and requires courts to avoid rigid application of the copyright statute, when, on occasion, it would stifle the very creativity which that law is designed to foster."*Campbell,* 510 U.S. at 577 (quotation marks omitted). Fair use analysis, therefore, always "calls for case-by-case analysis." *Id.* The fair use examples provided in § 107 are "illustrative and not limitative" and "provide only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses."*Id.;SeeNimmer* § 13.05 [A], at 13-153 ("[T]he factors contained in Section 107 are merely by way of example, and are not an exhaustive enumeration."). The ultimate test of fair use, therefore, is whether the copyright law's goal of "promot[ing] the Progress of Science and useful Arts,"U.S. Const., art. I, § 8, cl., 8, "would be better served by allowing the use than by preventing it."*Arica Inst., Inc. v. Palmer,* 970 F.2d 1067, 1077 (2d Cir.1992) (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 589 (2d Cir.1960) (L.Hand, J.)). The burden of proof is on the defendants to demonstrate fair use.*Infinity Broadcast Corp. v. Kirkwood,* 150 F.3d 104, 107 (2d Cir.1998). Though recognizing that fair use is a "mixed question of law and fact," courts regularly resolve fair use issues at the summary judgment stage where there are no genuine issues of material fact. *Castle Rock Entertainment, Inc. v.Carol Publishing Group, Inc.* 150 F.3d 132, 136 (2d Cir.1998).

Before considering these factors in detail, it is important to note the difference between an advertisement that promotes a parody of a copyrighted work and an advertisement that itself actually infringes a copyright. An advertisement which uses elements of a copyrighted work "does not necessarily ... [infringe] the copyright, if the product that it advertises constitutes a fair use of the copyrighted work."*Steinberg v. Columbia-Delphi Productions,* 663 F.Supp. 706, 714 (S.D.N.Y.1987) (citing *Warner Bros. v. American Broadcasting Cos.,* 720 F.2d 231, 242-44 (2d Cir.1983) (finding that promotional broadcasts for a television series legally parodying the Superman comic strip character did not infringe copyright in Superman character)). On the other hand, an advertisement infringes a copyright when what is being advertised "bears no relationship to the copyrighted work."*Steinberg,* 663 F.Supp. at 714. In such a case, "[n]o matter how well known a copyrighted phrase becomes, its author is entitled to guard against its appropriation to promote the sale of commercial products."*Id.* (citing *Warner Bros.,* 720 F.2d at 242). However, even a wholly commercial advertisement may itself constitute a fair use. *Leibovitz v. Paramount Pictures Corp.,* 137 F.3d 109 (2d Cir.1998) (finding a poster of a pregnant Leslie Nielson, used to advertise "Naked Gun 33 1/3," to be a fair use of the photograph of Demi Moore it parodied).

**\*12** The first fair use factor to consider is "the purpose and character of the [allegedly infringing] use, including whether such use is of a commercial nature or is for nonprofit educational purposes."17 U.S.C. § 107(1). As this Court has already discussed, the Ralph Nader Political Ad's use is not commercial. The stated purpose of the defendants' advertisement was to raise public awareness of Ralph Nader's desire to be included in the upcoming, televised Presidential candidate debates. (Nader Aff. ¶ 14; Amato Aff. ¶ 11; Exs. 12-15). The Nader Ad depicted that the two major party candidates were beholden to special interests, which was the reason that Ralph Nader, who was not so beholden, should be included in the debates. (Defs.' Mem. in Supp. of Summ. J. 26).

Not Reported in F.Supp.2d                                                              Page 16
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

The more important question under the first factor, and in fair use analysis generally, is whether the allegedly infringing work "merely supersedes" the original work "or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message," *Campbell,* 510 U .S. at 579, in other words "whether and to what extent the new work is 'transformative.' ' *Id.,* at 579 (quoting Leval, *Toward a Fair Use Standard,* 103 Harv.L.Rev. 1105, 1111 (1990)). If "the secondary use adds value to the original-if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings-this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Id.* As stated in *Campbell,* the goal of copyright "is generally furthered by the creation of transformative works." *Id.,* at 579.

One such transformative use that is typically found to be fair use is a parody. Defendants' argument that Ralph Nader's Political Ad is transformative of MasterCard's Priceless Advertisements is as follows: Defendants believe that the MasterCard commercials' underlying message is "that MasterCard is the best way to pay for everything that matters."(Defs' Mem in Supp. for Summ. J. 27). The Nader Ad, on the other hand, portrays the cold, big-money arena of Presidential polities and contrasts Ralph Nader's "truth" as the remedy for the bought and paid-for positions of others. Through this message, defendants claim that the Nader Ad "lays bare the artifice of the original, which cloaks its materialistic message in warm, sugar-coated imagery that purports to elevate intangible values over the monetary values it in fact hawks" through parody (Defs' Mem. in Supp. of Summ. J. 27).

Parody has an obvious claim to transformative value. *SeeCampbell,* 510 U.S. at 577. A parody is characterized by an attempt to mimic an original, expressive, and usually famous work. *SeeId.,* at 586 ("parodies invariably copy publicly known, ex-

pressive works"). Focusing particularly on the fair use protection to which parodies are entitled, the Court in *Campbell* initially noted that "parody may or may not be fair use,"*Id.,* at 581, and "like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law,"*Id.*The Court went on to say, "[T]he heart of any parodist's claim to quote from existing material is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works."*Id.,* at 580.The comment must have some "critical bearing on the substance or style of the original composition."*Id.* The relevant inquiry is "whether a parodic character *may reasonably be perceived."Id.* (emphasis added).

**\*13** Plaintiff claims that because there is nothing in the Nader Ad which "comments on or refers to MasterCard or its Priceless Ads" (Pl.'s Mem. in Opp'n to Summ. J. 11), it cannot be classified as a parody. However, the Supreme Court in *Campbell* stated "[p]arody serves its goals whether labeled or not, and there is no reason to require parody to state the obvious (or even the reasonably perceived)."*Id.,* n. 17. The Court also added, "[w]hile we might not assign a high rank to the parodic element here, we think it fair to say that [defendant's] song reasonably could be perceived as commenting on the original or criticizing it, to some degree."*Id.,* at 583.In fact, the Court declined to evaluate the parody, stating that "[t]he threshold question when fair use is raised in defense of parody is whether the parodic character may reasonably be perceived. Whether, going beyond that, parody is in good taste or bad does not and should not matter to fair use."*Id.,* at 582.In finding a parodic element in defendant's infringement of plaintiff's song, the Court also commented that the defendants in that case would have even more easily met the requirement had there been less risk of "market substitution" of the parody for the original:

A parody that more loosely targets an original than the parody presented here may still be sufficiently

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046

**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

aimed at an original work to come within our analysis of parody. If a parody whose wide dissemination in the market runs the risk of serving as a substitute for the original ..., it is more incumbent on one claiming fair use to establish the extent of transformation and the parody's critical relationship to the original. By contrast, when there is little or no risk of market substitution, whether because of the large extent of transformation of the earlier work, the new work's minimal distribution in the market, the small extent to which it borrows from the original, or other factors, taking parodic aim at an original is a less critical factor in the analysis, and looser forms of parody may be found to be fair use ...

*Campbell,* 510 U.S. at 580, n. 14.

Where, as here, the parody really has no demonstrative capacity to divert sales from the original, as was stated in *Campbell,* a showing of "the parody's critical relationship to the original" is less vital in the fair use analysis.

The Nader Ad does add something new and qualifies as a "transformative" work. Whether it "comments" on the original is the issue in question. MasterCard's message depicted in its Priceless Advertisements is very plain and straightforward. In a series of advertisements, MasterCard presents various intangible moments that are highly valuable, yet unable to be "purchased" or are "priceless." Hence, "there are some things that money can't buy."[FN3] This idea is followed by the message, that the viewer-consumer can purchase everything else with their MasterCard credit card-"for everything else, there's MasterCard." Ralph Nader's Political Ad attempts to show various ways different Presidential candidates can be bought in the "big-money arena of Presidential politics" (Def's Mem. in Supp. Summ. J. 27) and contrasts the "priceless" truth represented by Ralph Nader as the remedy for the bought and paid for positions of others. Through this depiction, Ralph Nader argues that he not only sends across his own message, but that he wittingly comments on the craft of the original, "which

cloaks its materialistic message in warm, sugar-coated imagery that purports to elevate intangible values over the monetary values it in fact hawks."*Id.* This commentary "may reasonably be perceived." The message need not be popular nor agreed with. It may be subtle rather than obvious. It need only be reasonably perceived. Ralph Nader's Political Ad is sufficiently a parody for the purposes of a fair use analysis, and consequently, is transformative.

> FN3. It should be noted that with regard to the phrase "there are some things that money can't buy," not even MasterCard claims that phrase is its original creation.

**\*14** The second statutory factor, "the nature of the copyrighted work,"§ 107(2), relates to whether the original work is " 'creative' as opposed to 'factual,' as well as to whether the work has been previously published."*Feiner v. H.R. Industries,* 10 F .Supp.2d 310, 314 (S.D.N.Y.1998). Original works that are creative in nature will generally receive greater copyright protection. *Seee.g.Ringgold v. Black Entertainment Television, Inc.,* 126 F.3d 70, 80 (2d Cir.1997). A previously published work available to the general public will receive less protection under the fair use doctrine than an unpublished work which has not yet been released to the general public by its author. *Feiner,* 10 F.Supp.2d at 314;*Arica Institute, Inc. v. Palmer,* 970 F.2d 1067, 1078 (2d Cir.1992).

The creative nature of plaintiff's Priceless Advertisements places these advertisements in the "core of intended copyright protection." *Campbell,* 510 U.S. at 586. Although this seems to favor plaintiff, courts have recognized that "this factor may be of less (or even of no) importance when assessed in the context of certain transformative uses."*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.,* 150 F.3d 132, 144 (2d Cir.1998); *Seealso Leibovitz v. Paramount Pictures Corporation,* 2000 WL 1010830, 4 (S.D.N.Y.2000) ("It is well established that the second factor-the nature of the copyrighted work-is not very important to the

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

fair use analysis."); *Abilene Music, Inc., et al. v. Sony Music Entertainment, Inc., et al.,* 2003 WL 21415311, 4 (S.D.N.Y.2003)* ("the second factor, the nature of the original work, is not heavily weighted in cases involving parodies"). In particular, giving this factor undue weight in a fair use analysis would prevent findings of fair uses which advance science and art through criticism or commentary. *See e.g. Campbell,* 510 U.S. at 586 (finding second factor unlikely to "help in separating the fair use sheep from the infringing goats in a parody case since parodies almost invariably copy publicly known, expressive works."). This factor is without much force in most cases, and its relevance here is slight.

In assessing the third factor, the Court must focus on only the protected phrases of the Priceless Advertisements. Further, the amount and substantiality of the portion used in relation to the copyrighted work as a whole must be examined in context to determine whether the extent of the copying is consistent with or more than necessary to further the purpose and character of the use. *See Campbell,* 510 U.S. at 586-587. In the parody context, this concerns "what else the parodist did besides go to the heart of the original." *Liebovitz v. Paramount Pictures Corp.,* 137 F.3d 109 (2d Cir.1998) (quoting *Campbell,* 510 U.S. at 589). Although the Ralph Nader Political Ad copied the word "priceless" and the phrase "there are some things money can't buy" and used them in a similar manner, the greater part of the Nader Ad is original-the narration, the supertitles, and the film imagery is rather different from the MasterCard commercials. The substance of the message is different from the message communicated by the advertisement it copies. In order for the Ralph Nader Political Ad to be considered a legitimate parody of the Priceless Advertisement, it necessarily must take enough from MasterCard's advertisement to assure that the viewer will be reminded of the ad that it borrows from.

**\*15** As outlined in *Leibovitz,* 137 F.3d at 113, the Court in *Campbell* made three important points

concerning the third-factor. First, consideration must be given not only to the quantity of the materials taken but also to "their quality and importance" to the original work. *Campbell,* 510 U.S. at 587. Second, "the parody must be able to 'conjure up' at least enough of the original to make the object of its critical wit recognizable." *Id., at 588.* Third, the court explained that "[o]nce enough has been taken to assure identification, how much more is reasonable will depend, say, on the extent to which the [copying work's] overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original." *Id.* Thus, as the Court in *Campbell* noted, the third factor "enquiry will harken back to the first of the statutory factors," *Id.,* at 586, with the consideration of the purpose and character of the copying, as well as look to the fourth statutory factor in addressing the potential for market substitution. *Id.,* at 587. "That approach leaves the third factor with little, if any, weight against fair use so long as the first and fourth factors favor the parodist." *Liebowitz,* 137 F.3d at 116. As this Court has already found, the first factor is in favor of the defendants in that defendants' use of the Priceless Advertisements is not commercial in nature and is a transformative parody of those advertisements.

The fourth factor looks at "the effect of the use upon the potential market for or value of the copyrighted work." *Campbell,* 510 U.S. at 588. As the *Campbell* opinion explained, if the secondary work harms the market for the original through criticism or parody, rather than by offering a market substitute for the original that supersedes it, it does not produce a harm cognizable under the Copyright Act." *Id.,* at 592. If the secondary copied use offers itself as a market substitute and in that way harms the market value of the original, this factor argues strongly against a finding of fair use. *See On Davis v. The Gap, Inc.,* 246 F.2d 152, 175 (2nd Cir.2001). In this case, the Nader Ad is sufficiently transformative of MasterCard's Priceless Advertisements. The Ralph Nader Political Ad may serve a general

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

overlapping market, the viewing public. However, it serves an entirely different purpose than the Priceless Advertisements, a political non-commercial purpose. For this reason, the fourth factor also weighs heavily in the defendant's favor for a finding of fair use.

There is no genuine issue of material fact after weighing the factors pertinent to a finding of fair use. The Nader Ad is a non-infringing fair use parody of MasterCard's Priceless Advertisements under Section 107 of the Copyright Act. Accordingly, defendants' motion for summary judgment dismissing Count Four of MasterCard's complaint is granted.[FN4]

> [FN4]. Defendants also argue that they are entitled to summary judgment on plaintiff's Count Four because the Nader Ad did not copy any "protected expression" from the Priceless Advertisements. Since this Court finds the Nader Ad to be a non-infringing fair use parody of MasterCard's Priceless Advertisements under Section 107 and grants summary judgment in favor of defendants on this basis, it is not necessary for the Court to address this argument.

**5. *Deceptive Trade Practices***

**\*16** [14] In Count Nine, plaintiff claims that through defendants' use of plaintiff's marks in the Nader Ad, defendants intentionally deceived and misled the public in violation of N.Y. Gen. Bus. Law § 349. Defendants argue that plaintiff's Count Nine should be dismissed again because the Nader Ad is political, rather than commercial in nature. Defendants also contend that the requirements of the statute are not met, in that the defendants did not intend to deceive and there is no evidence of actual deception.

Section 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."N.Y. Gen. Bus. Law § 349(a). In order to establish a claim under

Section 349, it must be shown that the defendant committed "a material deceptive act or practice directed to consumers that caused actual harm."*Boule, et al. v. Hutton, et al.,* 328 F.3d 84, 93-94 (2d Cir.2003) (citing *Marcus v. AT & T Corp.,* 138 F.3d 46, 63 (2d Cir.1998)). An act is considered deceptive within the meaning of Section 349 only if it is of such a nature to mislead a reasonable consumer. *Id.* at 94 (citing *Marcus,* 138 F.3d at 64.). Further, in order to prevail on a Section 349 claim, it must be shown that the defendant intentionally deceived consumers. *Eastern American Trio Products, Inc. v. Tang Electronic Corporation, et al.,* 97 F.Supp.2d 295, 423 (S.D.N.Y.2000); *Seealso Samara Bros., Inc. v. Wal-Mart Stores, Inc. .,* 165 F.3d 120, 131 (2d Cir.1998), *rev'd on other grounds,*529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

In the present case, as previously discussed, defendants' use of plaintiff's marks in the Nader Ad is political, not commercial, in nature. The Ad was not being used in connection with the sale or promotion of a product or service, nor in the conduct of business, trade or commerce. There is no evidence the defendants intended to deceive, nor any evidence of actual consumer deception. Both are required showings under Section 349. Therefore, MasterCard's Count Nine is dismissed and defendants' motion for summary judgment on this count is granted.

### *CONCLUSION*

For the foregoing reasons, defendants' motion for summary judgment is hereby GRANTED in its entirety.

S.D.N.Y.,2004.
MasterCard Intern. Inc. v. Nader 2000 Primary Committee, Inc.
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.