**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MORTON GROVE PHARMACEUTICALS, INC. )<br><br>Plaintiff, )<br><br>v. )<br><br>THE NATIONAL PEDICULOSIS ASSOCIATION, INC. )<br><br>Defendants. ) | No: 08-CV-1384<br><br>Judge Bucklo<br>Magistrate Judge Mason |

**PLAINTIFF'S MOTION TO STRIKE ALLEGATIONS AND DEFENSES**
**IN DEFENDANT'S ANSWER AND COUNTERCLAIM**

**APPENDIX OF UNPUBLISHED CASES**

Tab 1     *Global Poly Inc. v. Fred's Inc.*, 2004 WL 532844 (N.D. Ill. Mar. 11, 2004)

Tab 2     *Invs., Inc. v. New York Futures Exch., Inc.*, 2004 WL 635743 (D.C.N.Y. Mar. 31, 2004)

Tab 3     *Cohn v. Taco Bell Corp.*, 1995 WL 247996 (N.D. Ill. Apr. 24, 1995)

Tab 4     *Rimac v. Nissan Motor Corp., U.S.A.*, 1985 WL 4868  (N.D. Ill. Dec. 18, 1985)

Tab 5     *Crawford v. Equifax Payment Servs., Inc.*, 1998 WL 704050 (N.D. Ill. 1998)

Tab 6     *Am. Top English v. Lexicon Mktg. (USA), Inc.,* 2004 WL 2271838 (N.D. Ill. Oct. 4, 2004)

Tab 7     *Otero v. Vito*, 2005 WL 1429755 (D.C. Ga. June 15, 2005)

Tab 8     *Trustmark Life Ins. Co. v. Univ. of Chicago Hosps.*, 1996 WL 68009 (N.D. Ill. Feb. 14, 1996)

Tab 9     *Duramed Pharms., Inc. v. Wyeth-Ayerst Labs., Inc.*, No. C-1-00-735 (S.D. Ohio, Aug. 1, 2001)

Tab 10    *Doe v. Brimfield Grade Sch.*, 2008 WL 1722225 (C.D. Ill. Apr. 10, 2008)

Tab 11        *Moore v. Morgan Stanley & Co.*, 2007 WL 4354987 (N.D. Ill. Dec. 6, 2007)

Tab 12        *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 2008 WL 582738 (E.D. Wis. Feb. 29, 2008)

# TAB 1

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 532844 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 532844 (N.D.Ill.))**

Page 1

H

Global Poly Inc. v. Fred's Inc.
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
GLOBAL POLY INC., an Illinois Corporation,
Plaintiff,
v.
FRED'S INC., a Tennessee Corporation, Defendant.
**No. 03 C 4561.**

March 11, 2004.

Michael P. Connelly, Cory D. Anderson, Connelly,
Roberts & McGivney, Chicago, IL, for plaintiff/
counter-defendant.
Barry G. Bollinger, James Edward Abbott,
Bollinger, Ruberry and Garvey, Chicago, IL, for
defendant/counter-claimant.

*MEMORANDUM OPINION AND ORDER*

SCHENKIER, Magistrate J.
**\*1** The plaintiff, Global Poly, Inc. ("Global Poly")
has filed a motion (a) to dismiss or, in the alternat-
ive, stay the defendant, Fred's, Inc. ("Fred's"),
counterclaims, and (b) to strike Fred's affirmative
defenses (doc. # 11). For the following reasons, the
motion to stay the counterclaims is granted; the mo-
tion to strike the affirmative defenses is granted in
part and denied in part.

I.

Global Poly has brought a two-count complaint
against Fred's in connection with a business rela-
tionship that existed between the two parties. In
Count I, Global Poly alleges a claim for an account
stated, based on three invoices for products
provided by Global Poly that Fred's has failed to
pay. In Count II, Global Poly alleges a breach of
contract as a result of Fred's alleged failure to pay
those same three invoices, as well as for an alleged

failure to pay for other goods ordered but not yet
shipped. This complaint was originally filed in the
Circuit Court of Cook County, Illinois and was then
removed to the Northern District of Illinois pursu-
ant to 28 U.S.C. § 1441(a), pursuant to this Court's
diversity jurisdiction. In its answer and counter-
claim, Fred's admits to withholding payment but
claims it did so for justifiable reasons. In addition,
Fred's raises five affirmative defenses: setoff,
waiver, laches, estoppel and unclean hands.

Fred's also asserts a three-count counterclaim
against Global Poly and Tom Wolf, individually, as
owner and president of Global Poly. Count I of the
counterclaim asserts a claim for breach of contract;
Count II asserts a breach of warranty claim; and
Count III asserts a claim for non-conforming goods.
Fred's counterclaims all are based on three purchase
orders issued by Fred's to Strategic Merchandising
Solutions ("SMS") in January, February and April
2002 (*see* Motion to Dismiss, Ex. B, Count I ¶¶
8-10), and SMS's alleged failure to perform on
those purchase orders (*Id.,* at Count I, ¶¶ 12-14;
Count II, ¶¶ 17-20; Count II, ¶¶ 17-18). Fred's
seeks to hold Global Poly and Mr. Wolf liable for
alleged conduct of SMS, another company al-
legedly owned by Wolf, under a "piercing the cor-
porate veil" theory.

SMS (not a party here) has filed a complaint against
Fred's that currently is pending in the Circuit Court
of Cook County. In that complaint, SMS asserts a
claim for account stated based on three invoices
that SMS issued to Fred's (different than those from
Global Poly that are at issue in this case), but that
Fred's allegedly has not paid. In the *SMS* suit,
Fred's has asserted a counterclaim against SMS that
sets forth the same three contract claims alleged in
Fred's counterclaims this case, based on the same
allegations Fred's has made in this case, and that
seeks the same monetary recovery that Fred's seek-
ing in this case (*see* Motion to Dismiss, Ex. D,
Count I, ¶¶ 4-6, 8-10; Count II, ¶¶ 12-15; Count III,
¶¶ 12-13). The only difference between Fred's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 532844 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2004 WL 532844 (N.D.Ill.))

counterclaims in the two cases is that here Fred's asserts a piercing the corporate veil theory to impose liability on Global Poly and Mr. Wolf along with SMS, but does not do so in the *SMS* case pending in state court.

## II.

**\*2** Global Poly argues that Fred's counterclaims should be dismissed based on 735 ILCS 5/2-619(a)(3), which states that an Illinois court may dismiss a pending action if "there is any other action pending between the same parties for the same cause."Fred's rejoinder is that Section 2-619(a)(3) does not apply to this case, based on *AXA Corporate Solutions v. Underwriters Reinsurance Corp.,* 347 F.3d 272 (7th Cir.2003). Fred's is right: In *AXA,* the Seventh Circuit held that Section 2-619(a)(3) is a procedural rule for Illinois courts to follow, and that under *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), federal courts may not dismiss a case arising under federal diversity jurisdiction on that basis. *AXA,* 347 F.3d at 276-78.

However, that determination does not end the matter, because Global Poly and Mr. Wolf argue in the alternative that the counterclaims should be dismissed or stayed under *Colorado River Water Conservation District v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). Under *Colorado River,*"a federal court may stay or dismiss a suit when there is a concurrent state court proceeding and the stay or dismissal would promote 'wise judicial administration.' " *AXA,* 347 F.3d at 278 (quoting *Colorado River,* 424 U.S. at 818). In deciding whether *Colorado River* abstention applies, a court first must consider whether two lawsuits are parallel, which means that " 'substantially the same parties are contemporaneously litigating substantially the same issues in another forum.' " *Id.* If that is so, then the court must consider ten factors in deciding whether to abstain. *Id.* "[T]he decision whether to defer to the state court is necessarily left to the discretion of the district court in the first in-

stance." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 19, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

Employing the analysis required under *Colorado River* and *AXA,* this Court finds that the underlying state court lawsuit and the case before us are parallel and that, on balance, the relevant factors weigh in favor of abstention.

## III.

We address first the question of whether Fred's counterclaims in the state court and in this Court are parallel. Suits are parallel when *substantially* the same parties are litigating *substantially* the same issues. *AXA,* 347 F.3d at 278. "[T]he mere presence of additional parties or issues in one of the cases will not necessarily preclude a finding that they are parallel."*AAR Int'l, Inc. v. Nimelias Enters. S.A.,* 250 F.3d 510, 518 (7th Cir.2001).

The underlying issues that are being litigated in Fred's counterclaims in both cases are substantially similar. The underlying facts involve purchase orders by Fred's to SMS for peg hooks and shopping carts on January 23, 2002, February 21, 2002, and April 2, 2002. In both cases, Fred's alleges that Fred's paid for these purchases, that the products supplied by SMS were defective, that Fred's notified SMS of the defects, but that SMS did not accept a return of the merchandise or repay Fred's.

**\*3** The only difference between Fred's counterclaims in the two cases is that Fred's has sued only SMS in the state court action, but in this Court seeks to impose liability for the same conduct on Global Poly and Mr. Wolf on a theory that the corporate veil should be pierced. Central to this theory is that Global Poly and SMS are "merely business conduits or alter egos of Tom Wolf" (Motion to Dismiss, Ex. B Count I, ¶ 15), which is tantamount to an admission by Fred's that it considers these parties to be "substantially similar." The fact that Global Poly and Mr. Wolf are not joined as parties

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 532844 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 532844 (N.D.Ill.))**

in the state court case on a piercing the veil theory (although Fred's surely could have done so) does not preclude a finding that the two cases are substantially similar. *See Nimelias,* 250 F.3d at 518. Fred's counterclaims are based on the same set of underlying facts and issues regarding the products sold by SMS. Therefore, this Court finds that the suits are parallel.

IV.

We now turn to the ten factors that, under *Colorado River,* we must consider when deciding whether to stay or dismiss this case:

(1) whether the state has assumed jurisdiction over property; (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which jurisdiction was obtained in the concurrent forums; (5) the source of governing law, state or federal; (6) the adequacy of state-court action to protect the federal plaintiff's rights; (7) the relative progress of state and federal proceedings; (8) the presence or absence of concurrent jurisdiction; (9) the availability of removal; and (10) the vexatious or contrived nature of the federal claim.

*AXA,* 347 F.3d at 278. When weighing these factors, we are mindful that abstention is only appropriate in "exceptional circumstances," *Colorado River,* 424 U.S. at 813, and that there is "a general presumption against abstention." *AXA,* 347 F.3d at 278.

In this case, the first and second *Colorado River* factors are irrelevant: the underlying claims do not involve property over which the state has assumed jurisdiction, and the state and federal courthouses are within a few blocks of each other. Likewise, the seventh and eighth factors do not affect the decision. Both cases are still in the initial stages, and both courts have jurisdiction over the respective claims (although the *SMS* case cannot be removed, since there does not appear to be diversity, Fred's

could have brought its piercing the corporate veil claim against Global Poly and Mr. Wolf in that state court action).

A number of the remaining factors weigh in favor of abstention. The third factor weighs heavily in favor of abstention: we see no good reason for two courts to adjudicate the same underlying contract claims. Fred's argues that a favorable resolution in state court would not dispose of the claims before this Court because SMS may become insolvent, and Fred's would be forced to pursue Mr. Wolf separately under the piercing the corporate veil doctrine. However, Fred's has not suggested a reason why it cannot include that theory in the claim in state court and therefore avoid a separate trial in this Court on that issue. The counterclaim against Global Poly and Mr. Wolf will not be prejudiced by this Court abstaining, and if Fred's is able to recover damages from SMS, then the counterclaim in this case will be unnecessary.

**\*4** The fourth factor weighs slightly in favor of abstention, at best: Fred's filed its counterclaim in the *SMS* case 10 days before filing its counterclaim in this case. The fifth factor weighs in favor of abstention, since state law governs all of the separate counts of the counterclaim. The sixth factor also weighs in favor of abstention. The state court proceeding will allow Fred's to enforce any rights against SMS that may exist under the contract, or to collect damages if they are awarded. Again, Fred's contention that SMS may become insolvent, even if true, does not explain why the piercing the corporate veil doctrine could not also be asserted against Global Poly and Mr. Wolf in state court-whether as an affirmative claim in that lawsuit, or in supplementing proceedings if Fred's obtains a judgment against SMS but has difficulty collecting it. Finally, the ninth factor weighs in favor of abstention. The *SMS* case cannot be removed, and thus the inefficiency of duplicative proceedings cannot be avoided through that device.

The tenth factor weighs against abstention, because there is no indication that the federal claim is vexa-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 532844 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 532844 (N.D.Ill.))**

tious. However, that consideration does not carry the day for Fred's. We are mindful that application of *Colorado River* requires is more than simply tallying up the ten factors, and basing a decision of whether more of them support or undermine abstention. But here, the weight of the factors favor abstention, which would avoid piecemeal and duplicative litigation without depriving Fred's of a convenient and fully adequate forum to address the underlying contract claims (or the corporate veil claims, if Fred's chooses to pursue them in *SMS* ). After carefully weighing the factors and considering the presumption against abstention, the Court finds that *Colorado River* factors weigh in favor of abstention, which would promote " '[w]ise judicial administration," *Colorado River,* 424 U.S. at 818, (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.,* 342 U.S. 180, 183, 72 S.Ct. 219, 96 L.Ed. 200 (1952)) by avoiding duplicative litigation.

The Seventh Circuit has consistently held that "a stay, not a dismissal, is the appropriate procedural mechanism for a district court to employ in deferring to a parallel state court proceeding under the *Colorado River* doctrine."*Selmon v. Portsmouth Drive Condo. Ass'n,* 89 F.3d 406, 409 (7th Cir.1996).*See also Rogers v. Desiderio,* 58 F.3d 299, 302 (7th Cir.1995); *LaDuke v. Burlington N. R.R. Co.,* 879 F.2d 1556, 1561-62 (7th Cir.1989); *Rosser v. Chrysler Corp.,* 864 F.2d 1299, 1308-09 (7th Cir.1988). The rationale for entry of a stay, rather than dismissal without prejudice, was articulated by the Seventh Circuit in the case of *Evans Transp. v. Scullin Steel Co.,* 693 F.2d 715, 717-18 (7th Cir.1982). This Circuit wishes to preserve a federal forum for the litigant who, but for the parallel state court proceeding, would be entitled to have its claims resolved here in the event that the state suit "wash[es] out"-even if the right to be in federal court is premised on diversity rather than federal subject matter jurisdiction. Although the case before us presents a slight wrinkle-here, we are asked to stay a counterclaim rather than an entire case-we believe the rationale of *Evans* controls disposition of this motion: "[e]ven when abstention is justified,

the federal suit should not be dismissed, ... if should be stayed."*Evans,* 693 F.2d at 717. Accordingly, the Court grants the motion to stay the counterclaims, but denies the motion to dismiss them.

V.

**\*5** A motion to strike under Federal Rule of Civil Procedure 12(f) is the primary procedure for objecting to an insufficient defense. *Van Schouwen v. Connaught Corp.,* 782 F.Supp. 1240, 1245 (N.D.Ill.1991). Motions to strike are generally disfavored, and "may be granted only if the defense is patently defective and could not succeed under any set of circumstances."*Carpenter v. Ford Motor Co.,* 761 F.Supp. 62, 65 (N.D.Ill.1991). An affirmative defense must notify the plaintiff of the nature of the defense. *Flasza v. TNT Holland Motor Exp., Inc.,* 155 F.R.D. 612, 613 (N.D.Ill.1994). If the affirmative defense is comprised of "no more than 'bare bones conclusory allegations," ' it should be stricken. *Id* at 614.A three-part test for examining an affirmative defense is outlined in *Bobbitt v. Victorian House, Inc.,* 532 F.Supp. 734, 737 (N.D.Ill.1982).

(1) Initially, the court will determine whether the matter is appropriately pleaded as an affirmative defense. Only matters that deserve a clear "no" answer will be stricken to make the pleadings more concise.

(2) If a matter may remain as an affirmative defense the Court will determine if it is adequately pleaded under the requirements of Rules 8 and 9. Any defense inadequately pleaded will be dismissed *without* prejudice to enable defendants to correct that technical deficiency.

(3) Any matter permitted to stand as an affirmative defense will be tested under a standard identical to Rule 12(b)(6). If it is impossible for defendants to prove a set of facts in support of the affirmative defense that would defeat the Complaint, the matter will be stricken as legally insufficient.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 532844 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 532844 (N.D.Ill.))**

*Id. Cf. Heller Fin., Inc. v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1294-95 (7th Cir.1989).

Using this test, this Court finds that a set of facts exists for the defense of setoff that would defeat the complaint, so it will not be stricken. However, the affirmative defenses of waiver, laches, estoppel, and unclean hands are not adequately pleaded, and will be dismissed.

### A.

"A 'setoff' is a 'counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim." ' *Minalga v. Fid. Invs. Institutional Operations Co., Inc.,* No. 01 C 4173, 2002 WL 31527251, at *2 (N.D.Ill. Nov.14, 2002) (quoting BLACK'S LAW DICT. 1376 (7th ed.1999). A defense of setoff should not be stricken if the counterclaim could serve as a setoff against a judgment in favor of the plaintiff. *See Brizendine v. U.S. Gypsum Co.,* No. 91 C 6794, 1992 WL 159449, at *2 (N.D.Ill. June 25, 1992). Fred's incorporated the allegations in the counterclaim into this defense by reference and alleged that SMS is liable for a setoff equal to the amount Fred's paid for defective goods. Fred's also alleges that Global Poly and SMS are so intertwined that they should be treated as the same party. The allegations put Global Poly on notice of the factual circumstances that allegedly give rise to a setoff. And, viewing the allegations in the light most favorable to Fred's, the allegations (if proven) could entitle Fred's to a setoff.

### B.

**\*6** Waiver, laches, and estoppel all are affirmative defenses enumerated under Rule 8(c). Waiver involves a "voluntary, intentional relinquishment of a known right."*Ocean Atlantic Woodward Corp. v. DRH Cambridge Homes, Inc.,* No. 02 C 2523, 2003 WL 1720073, at *8 (N.D.Ill. Mar.31, 2003) (quoting *Int'l Ins. Co. v. Peabody Int'l Corp.,* No. 87 C 464, 1991 WL 23630, at *3 (N.D.Ill. Jan. 23,

1991)). Laches "bars a party's rights when the party has unreasonably delayed their assertion so as to cause prejudice to the opposing party."*Hawxhurst v. Pettibone Corp.,* 40 F.3d 175, 181 (7th Cir.1994). To plead estoppel, a defendant must assert: (1) that a party acted; (2) another party reasonably relied on those acts; and (3) the latter party thereby changed its position for the worse. *See, e.g., Bobbitt,* 532 F.Supp. at 738. Fred's answer contains only the conclusory statement that Global Poly's case is barred under the doctrines of waiver, laches and estoppel (Def.'s Answer at 4). The pleading fails to put Fred's even on notice of the conduct allegedly constituting waiver, laches or estoppel. Therefore, those three affirmative defenses will be stricken.

### C.

Unclean hands is properly raised as an affirmative defense. *See Ocean Atlantic,* 2003 WL 1720073, at *5;*Tome Engenharia E Transporrtes, Ltd. v. Malki,* No. 94 C 7427, 1996 WL 172286, at *11 (N.D.Ill. Apr.11, 1996). To assert a defense of unclean hands, Fred's must plead that Global Poly acted in a way that amounts to fraud, misconduct or bad faith. *Ocean Atlantic,* 2003 WL 1720073, at *5. If Fred's suggests that fraud occurred, Rule 9(b) requires that any allegations of fraud include the particular circumstances such as the time, place, and contents of the representation or omission. *Carpenter,* 761 F.Supp. at 66. Fred's pleading contains only the conclusory statement that Global Poly's claim is barred by the doctrine of unclean hands (Def.'s Answer at 4). This allegation fails to provide the basic notice required by Rule 8(a); therefore, this affirmative defense will be stricken.

### CONCLUSION

For the reasons set forth above, Global Poly's motion to stay or dismiss Fred's counterclaim (doc. # 11) is granted as to all counts; and the motion to strike the affirmative defenses (doc. # 11) is granted without prejudice with respect to the defenses

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 532844 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 532844 (N.D.Ill.))**

of waiver, laches, estoppel and unclean hands, but
denied as to the defense of set-off.

N.D.Ill.,2004.
Global Poly Inc. v. Fred's Inc.
Not Reported in F.Supp.2d, 2004 WL 532844
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Not Reported in F.Supp.2d                                                                  Page 1
Not Reported in F.Supp.2d, 2004 WL 635743 (S.D.N.Y.), Comm. Fut. L. Rep. P 29,750
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 635743 (S.D.N.Y.))**

H

DGM Investments, Inc. v. New York Futures Exchange, Inc.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
DGM INVESTMENTS, INC., Plaintiff,
v.
NEW YORK FUTURES EXCHANGE, INC.,
Board of Trade of the City of New York, Inc., New
York Futures Exchange Settlement Committee and
its Members Being "Richard Roes" No. 1-10, the
New York Clearing Corporation, and "John Does"
No. 1-50, Individually, and as Agents and Repres-
entatives of the New York Futures Exchange, Inc.,
Board of Trade of the City of New York, Inc. and
the New York Clearing Corporation, Defendants.
**No. 01 Civ. 11602(RWS).**

March 31, 2004.

Lacher & Lovell-Taylor, New York, NY, By: Mi-
chael A. Lacher, Adam J. Rader, for Plaintiff, of
counsel.
Cadwalader, Wickersham & Taft, New York, NY,
By: Howard R. Hawkins, Jr., for NYBOT Defend-
ants, of counsel.

*OPINION*

SWEET, J.
**\*1** DGM Investments, Inc. ("DGM"), Triumph-
WEF Venture LLC ("Triumph-WEF"), DGM Trad-
ing Specialist Fund LLC ("DGM-TSF"), Triumph
Futures Fund Ltd. ("TFF"), Triumph Premier
Traders Ltd. ("TPT"), Triumph Investment Fund
Ltd. ("TIF"), and Triumph-MM Venture Ltd.
("T-MM") (collectively, the "Plaintiffs") have
moved pursuant to Rule 12(f), Fed.R.Civ.P., to
strike the Third, Fourth, Sixth, Seventh, Eighth, and
Twelfth Affirmative Defenses as set forth in the an-
swer of the defendants Board of Trade of the City
of New York, Inc. ("NYCBOT"), New York Fu-
tures Exchange, Inc. ("NYFE"), New York Clear-

ing Corporation ("NYCC"), and the New York Fu-
tures Exchange Settlement Committee and its mem-
bers except for Norman Eisler (the "Settlement
Committee") (collectively, the "NYBOT Defend-
ants"). For the reasons set forth below, the motion
is granted.

*Prior Proceedings*

This action was commenced in December 2001,
and the NYBOT Defendants moved to dismiss the
complaint. Their motion was granted on October
17, 2002. Another action was commenced, the two
actions were consolidated, and an amended com-
plaint was filed on December 20, 2002.

The NYBOT Defendants again moved to dismiss
on the grounds that the amended complaint failed to
allege adequately bad faith, standing, and fraud.
The motion was denied in an opinion of May 27,
2003, *DGM Investments, Inc. v. New York Futures
Exchange, Inc.,* 265 F.Supp.2d 254 (S.D.N.Y.2003)
(the "May 27 Opinion"), and the NYBOT Defend-
ants moved for reconsideration or interlocutory ap-
peal which motion was denied by an opinion of Oc-
tober 23, 2003, *DGM Investments, Inc. v. New York
Futures Exchange, Inc.,* 288 F.Supp.2d 519
(S.D.N.Y.2003) (the "October 23 Opinion").

The instant motion to strike the Third Affirmative
Defense of failure to allege bad faith, the Fourth
Affirmative Defense of lack of standing, the Sixth
Affirmative Defense of failure to allege fraud, the
Seventh Affirmative Defense of failure to comply
with Rule 9(b), Fed.R.Civ.P., the Eighth Affirmat-
ive Defense of failure to plead scienter, and the
Twelfth Affirmative Defense reserving a right to
add additional affirmative defenses and the
NYBOT Defendants' opposition were submitted on
January 28, 2004.

*Standard*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 635743 (S.D.N.Y.), Comm. Fut. L. Rep. P 29,750
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 635743 (S.D.N.Y.))**

Pursuant to Fed.R.Civ.P. 12(f), "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."It is well established in this Circuit that "[a] motion to strike an affirmative defense under Rule 12(f), Fed.R.Civ.P. for legal insufficiency is not favored."*William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp.,* 744 F.2d 935, 939 (2d Cir.1984), *vacated on other grounds,*478 U.S. 1015 (1986); *seealsoEstee Lauder, Inc. v. Fragrance Counter, Inc.,* 189 F.R.D. 269, 271 (S.D.N.Y.1999); *SEC v. Toomey,* 866 F.Supp. 719, 722 (S.D.N.Y.1992). Even so, such motions will be granted where "it appears to a certainty that plaintiff[ ] would succeed despite any state of the facts which could be proved in support of the defense."*William Z. Salcer, Panfeld, Edelman,* 744 F.2d at 939 (quotation marks and citations omitted)."Indeed, motions to strike 'serve a useful purpose by eliminating insufficient defenses and saving the time and expense which would otherwise be spent in litigating issues that would not affect the outcome of the case.' " *Simon v. Manufacturers Hanover Trust Co.,* 849 F.Supp. 880, 882 (S.D.N.Y.1994) (quoting *United States v. Union Gas Co.,* 743 F.Supp. 1144, 1150 (E.D.Pa.1990)).

**\*2** In order to prevail on a motion to strike an affirmative defense, the moving party must satisfy three prerequisites. "First, there may be no question of fact which might allow the defense to succeed.... Second, there may be no substantial question of law, a resolution of which could allow the defense to succeed.... Third, plaintiff must show that it is prejudiced by the inclusion of the defense."*Toomey,* 866 F.Supp. at 722. See*alsoCounty Vanlines Inc. v. Experian Info. Solutions, Inc.,* 205 F.R.D. 148, 153 (S.D.N.Y.2002); *Estee Lauder, Inc.,* 189 F.R.D. at 271-72.

*The Third, Fourth, Sixth, Seventh and Eighth Affirmative Defenses Are Stricken*

The adequacy of the amended complaint was determined in the May 27 and October 23 Opinions.

As to the issues raised by the affirmative defenses, Plaintiffs have the burden of proof by virtue of the NYBOT Defendants' general denial.

Plaintiffs would be prejudiced by the inclusion of the Third, Fourth, Sixth, Seventh, and Eighth Affirmative Defenses. The NYBOT Defendants' attempt to reargue those issues already considered will only serve to protract this litigation. "Increased time and expense of trial may constitute sufficient prejudice to warrant granting plaintiff's 12(f) motion."*Toomey,* 866 F.Supp. at 722. When a defense is insufficient as a matter of law, " 'the defense should be stricken to eliminate the delay and unnecessary expense from litigating the invalid claim." ' *Estee Lauder, Inc.,* 189 F.R.D. at 272 (quoting *FDIC v. Eckert Seamans Cherin & Mellott,* 754 F.Supp. 22, 23 (E.D.N.Y.1990)); *seealsoMetric Hosiery Co. v. Spartans Indus., Inc.,* 50 F.R.D. 50, 51-52 (S.D.N.Y.1970).

Of course, Plaintiffs must prove their pleaded allegations which have been found to be adequately pled.

*The Twelfth Affirmative Defense Is Stricken*

Defendants' Twelfth Affirmative Defense provides, "[t]he NYBOT Defendants assert all other affirmative defenses that may be revealed during the course of discovery."By the inclusion of this defense, NYBOT Defendants seek " 'to reserve the unilateral right to add new and different affirmative defenses as they become known to it at indeterminate times in the future, ... [which would violate,] inter alia, the fair notice requirement of [Fed.R.Civ.P. 8] and circumvent [Fed.R.Civ.P. 15]." ' *County Vanlines Inc.,* 205 F.R.D. at 158 (quoting *Boss Prods. Corp. v. Tapco Int'l Corp.,* No. 00 Civ. 0689, 2001 WL 135819 at \*3 (W.D.N.Y. Feb. 16, 2001)).

In the event additional affirmative defenses are warranted as a result of discovery, a Rule 15, Fed.R.Civ.P. motion is the appropriate remedy.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3
Not Reported in F.Supp.2d, 2004 WL 635743 (S.D.N.Y.), Comm. Fut. L. Rep. P 29,750
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 635743 (S.D.N.Y.))**

*Conclusion*

Plaintiffs' motion is granted and the Third, Fourth, Sixth, Seventh, Eighth and Twelfth Affirmative Defenses are stricken.

It is so ordered.

S.D.N.Y.,2004.
DGM Investments, Inc. v. New York Futures Exchange, Inc.
Not Reported in F.Supp.2d, 2004 WL 635743 (S.D.N.Y.), Comm. Fut. L. Rep. P 29,750

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.))**

H

Cohn v. Taco Bell Corp.
N.D.Ill. 1995
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Richard L. COHN and RLC Enterprises, Inc.,
Plaintiffs,
v.
TACO BELL CORPORATION, Defendant.
**No. 92 C 5852.**

April 24, 1995.

*MEMORANDUM OPINION AND ORDER*

NORDBERG, District Judge.
**\*1** On January 9, 1995, Defendant filed its Answer
to the Second Amended Complaint, As Amended,
and Counterclaims. Defendant's Answer raises sev-
en affirmative defenses and four counterclaims.
Plaintiff seeks to strike or dismiss six of the seven
affirmative defenses pursuant to Federal Rule of
Civil Procedure 12(f). Additionally, Plaintiff asserts
that Count III of Defendant's Counterclaim must be
dismissed under Rule 12(b)(6).

A motion to strike under Rule 12(f) is the appropri-
ate means of eliminating impertinent or redundant
matter in any pleading and of objecting to an insuf-
ficient defense. *Van Schouwen v. Connaught Corp.,*
782 F.Supp. 1240, 1245 (N.D. Ill. 1991) (citing
Charles Wright & Arthur Miller, 5A *Federal Prac-
tice and Procedure:* Civil § 1380 (2d ed. 1990)). In
*Bobbitt v. Victorian House Inc.,* 532 F.Supp. 734,
737 (N.D. Ill. 1982), the court outlined a three part
test for examining an affirmative defense subject to
a motion to strike:

(1) Initially, the court must determine whether the
matter is appropriately pled as an affirmative de-
fense. Only matters that deserve a clear "no" an-
swer will be stricken to make the pleadings more
concise.

(2) If a matter is appropriately pleaded as an affirm-
ative defense, the court must determine whether it
meets the pleading requirements of Federal Rules
of Civil Procedure 8 and 9. Any defense inad-
equately pleaded will be dismissed without preju-
dice to enable defendants to correct the technical
deficiency.

(3) Finally, any matter permitted to stand as an af-
firmative defense will be tested under a standard
identical to Rule 12(b)(6). If defendant can prove
no set of facts in support of the affirmative defense
that would defeat the complaint, the matter will be
stricken as legally insufficient.

*See also Van Schouwen,* 782 F.Supp. at 1245; *Heller
Financial, Inc. v. Midwhey Powder Co. Inc.,* 883
F.2d 1286, 1295 (7th Cir. 1989) (holding that where
defendant's affirmative defenses omitted a short and
plain statement of the facts and failed to totally al-
lege the necessary elements of the alleged claims,
the affirmative defenses were "nothing but bare
bones conclusory allegations" which should be
stricken).

Defendant is correct in its assertion that motions to
strike are generally disfavored because motions to
strike potentially serve only to delay the litigation.
*Id.* (citing *United States v. 416.81 Acres of Land,*
514 F.2d 627, 631 (7th Cir. 1975)). On the other
hand, where motions to strike remove unnecessary
clutter from the case, they serve to expedite, not
delay, the litigation. *Heller Financial, Inc.,* 883
F.2d at 1294.

Plaintiff makes a variety of objections to Defend-
ant's affirmative defenses including claims that: De-
fendant's affirmative defenses are not properly pled
as affirmative defenses and Defendant's affirmative
defenses are not set forth in a "short and plain"
statement as required by Rule 8. Additionally, with
regard to the Seventh Affirmative Defense and
Count III of the Counterclaim, Plaintiffs assert that
Defendant can prove no set of facts in support of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.))**

the defense which would defeat the Second Amended Complaint or which would entitle it to relief. *Id.;Bobbitt v. Victorian House, Inc.,* 532 F.Supp. 734, 736-37. The Court addresses Plaintiffs' objections below.

*First Affirmative Defense*

**\*2** In its First Affirmative Defense, Defendant asserts that "[t]he Complaint and each purported 'Count' therein, fails to state a claim against Taco Bell upon which relief can be granted."(Answer at 34.) Defendant's First Affirmative Defense targets Counts II, III, V and VI of Plaintiffs' Second Amended Complaint. Plaintiffs charge that Defendant's First Affirmative Defense is not an appropriate affirmative defense as it attacks the legal sufficiency of the pleading, rather than raising matter outside of the pleading.

However, a number of courts in the Northern District of Illinois have refused to strike a failure-to-state-a-claim defense simply because it responds to matters in the pleadings as opposed to raising new matters. *General Electric Capital Corporation v. Munson Marine, Inc.,* 91 C 5090, 1992 WL 24067 at *2 (N.D. Ill. Jan. 29, 1992); *Mendrala v. Crown Mortgage Company,* No. 88 C 7386, 1990 WL 60705 at *3 (N.D.Ill. April 23, 1990). These courts note that the defense of failure to state a claim upon which relief may be granted is specifically set forth as a possible defense in Form 20 of the Appendix of Forms of the Federal Rules of Civil Procedure. *Id.* The use of these forms is explicitly authorized by Rule 84.[FN1] *Id.* In *Van Horn v. Chicago Roller Skate Company,* 15 F.R.D. 22, 23 (N.D.Ill. 1953), the court held that any affirmative defense presented as an example in Form 20 was "sufficient under the rules." The *Van Horn* court noted that the Supreme Court Advisory Committee on Rules had stated that the pleadings suggested in the Appendix of Forms were per se sufficient to withstand procedural attack. *Id.*

Other courts have not been willing to overlook

technical deficiencies. *See Instituto Nacional v. Continental Illinois National Bank,* 576 F.Supp. 985, 991 (N.D. Ill. 1983) (holding that failure-to-state-a-claim is not a proper affirmative defense, for a true affirmative defense raises matters outside the scope of plaintiff's prima facie case).

This Court need not decide whether it should overlook technical deficiencies and allow Defendant to plead failure-to-state-a-claim as an affirmative defense because striking the First Affirmative Defense is appropriate for an alternative reason. In response to Defendant's numerous previous motions to dismiss, this Court has already sustained Counts II, III (in part), V and VI. *See* Memorandum Opinion and Order issued January 10, 1994 refusing to strike Counts V and VI; Memorandum Opinion and Order issued August 25, 1994 denying Defendant's Motion to Dismiss Counts II, V and VI of Plaintiffs' Second Amended Complaint and granting Defendant's Motion to Dismiss Count III of Plaintiffs' Second Amended Complaint; and Memorandum Opinion and Order issued November 9, 1994 granting in part and denying in part Plaintiffs' Motion to Reconsider the Dismissal of Count III. Defendant does not suggest that its First Affirmative Defense raises any new matters which have not been previously addressed by this Court in its prior opinions. As this Court has had numerous occasions to consider and ultimately reject Defendant's assertion that Counts II, III, V and VI fail to state a claim on which relief can be granted and as Defendant has denied all of the substantive allegations relevant to these counts in its Answer, this Court concludes that Defendant's First Affirmative Defense does not bring any substance to the litigation. *See Imperial Construction Management Corporation v. Laborers' International Union of North America,* 818 F.Supp. 1179, 1186 (N.D. Ill. 1993). Accordingly, Plaintiffs' Motion to Strike Defendant's First Affirmative Defense is granted.

*Second Affirmative Defense*

**\*3** Defendant's Second Affirmative Defense attacks

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.))**

Counts III, V and VI of Plaintiffs Second Amended Complaint. Defendant asserts in its affirmative defense that the Letter Agreement offered Plaintiffs the opportunity to develop two additional Taco Bell restaurants *only* under certain terms and conditions and as Plaintiffs have not met those terms and conditions, they have no right to develop the two additional restaurants. (Answer at 34.) Thus, Defendant indicates that it is entitled to relief on Counts III, V and VI, all of which seek damages for Defendant's breach of an alleged promise to Plaintiffs that they could develop two additional Taco Bell restaurants.

Once again, Plaintiffs assert that this Court must strike Defendant's Second Affirmative Defense because it is not a proper affirmative defense. Federal Rule of Civil Procedure 8(c) sets forth nineteen defenses which must be pled affirmatively and then notes that a party shall also set forth affirmatively "any other matter constituting an avoidance or affirmative defense." Fed. R. Civ. P. 8(c).

As explained in *Instituto Nacional v. Continental Illinois National Bank,* 576 F.Supp. 985, 988 (N.D. Ill. 1983), what the Rule terms 'an avoidance'-- what the common law used to term a 'confession and avoidance' or 'shift and avoidance' -- is a more restrictive concept than what, in practice, parties are allowed to plead affirmatively. Basically, an affirmative defense is an admission of the facts alleged in the complaint coupled with an assertion of some other reason as to why defendant is not liable. *Id.;Bobbitt v. Victorian House, Inc.,* 532 F.Supp. 734, 736 (N.D. Ill. 1982). However, as parties often have difficulty determining whether a particular matter is put in issue by a general denial, courts have held that, if there is any real doubt about defendant's obligation to plead the matter affirmatively, the affirmative defense should not be stricken. *Instituto Nacional,* 576 F.Supp. at 988;*Bobbitt,* 532 F.Supp. at 736 (citing 5 Charles Wright & Arthur Miller, *Federal Practice and Procedure* § 278 (2d ed. 1990)).

As to the Second Affirmative Defense, the Court agrees with Plaintiffs that there is no real doubt that this defense attacks the elements of Plaintiffs' prima facie case, and thus is not properly pled as an affirmative defense. According to California law, which governs the franchise agreements and the Letter Agreement, plaintiff cannot recover under a contract, where contractual liability depends upon performance of one or more conditions precedent, unless plaintiff pleads and proves that he has satisfied all conditions precedent.*Careau & Co. v. Security Pacific Business Credit,* 272 Cal.Rptr. 387, 396 (Cal.App. 2 Dist. 1990). In its Answer, Defendant explicitly denies that it promised Plaintiffs two franchises, and states instead that it offered Plaintiffs the opportunity, *under and subject to certain terms and conditions,* to develop two additional Taco Bell restaurants. (Answer at 8, 10.)

**\*4** As satisfaction of all conditions precedent is an element of Plaintiffs' prima facie case and as Defendant's Answer already asserts that Plaintiff had to satisfy certain terms and conditions before developing two additional Taco Bell restaurants, Defendant's Second Affirmative Defense is not an appropriate affirmative defense and should be struck as surplusage.

*Third Affirmative Defense*

Defendant's Third Affirmative Defense states only that "[t]he second "Count" of the Complaint is barred by operation of laches."(Answer at 35.) Although Plaintiffs concede that laches is appropriately pled as an affirmative defense, they charge that the Court must strike Defendant's Third Affirmative Defense because it is not sufficiently pled under Rule 8(a).

In *Bobbitt,* the court observed that, even though an affirmative defense need only be a brief statement, it must provide plaintiff with adequate notice of the relevant elements. 532 F.Supp. at 737 (citing Form 20 in the Appendix of Forms of the Federal Rules of Civil Procedure). Laches acts as a bar upon the assertion of a party's rights when the party has unreasonably delayed in asserting its rights thus caus-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.))**

ing prejudice to the adverse party.*Lake Caryonah Improvement Ass'n v. Pulte Home Corp.,* 903 F.3d 505, 509 (7th Cir. 1990). In pleading the defense of laches, the defendant must allege unreasonable delay and resulting prejudice to the other party. *Bloomfield v. Chrysler Corporation,* No. 90 C 20129, 1991 WL 166983 at * 3 (N.D.Ill. Feb. 11, 1991) (citing *Smith v. City of Chicago,* 769 F.2d 408, 410 (7th Cir.1985)).

In *Bobbitt,* the court struck the defendant's seventh affirmative defense which stated, "[p]laintiff had full knowledge of the acts complained of at or prior to the time of their occurrence, and accordingly as to said acts Plaintiff's Complaint is barred by laches."532 F.Supp. at 732. The *Bobbitt* court reasoned that defendant had failed to allege one of the elements necessary to a laches defense - a detrimental change which made a grant of relief inequitable. *Id.* Similarly, in *Bloomfield,* the court granted plaintiff's motion to strike defendant's affirmative defense of laches because defendant failed to allege an unreasonable delay or resulting prejudice. 1991 WL 166983 at *3.

Analogous to *Bobbitt* and *Bloomfield,* Defendant's Third Affirmative Defense is devoid of any allegation that Plaintiffs' delay in filing their claim for promissory estoppel was unreasonable, or that Defendant suffered prejudice as a result of any delay. Defendant's assertion that Count II of Plaintiffs' Complaint is barred by operation of laches is a conclusory allegation, which does not meet even the liberal pleading requirements of Rule 8(a).*Heller Financial, Inc.,* 883 F.2d at 1295. Accordingly, as Defendant has failed to allege the necessary elements of laches, the Court will strike Defendant's third affirmative defense.

*Fourth Affirmative Defense*

**\*5** In its Fourth Affirmative Defense, Defendant alleges that Plaintiff Richard Cohn does not have standing to sue as to the Complaint and each purported count therein. (Answer at 35.)

Plaintiffs argue that Defendant's Fourth Affirmative Defense must be stricken because it is not an appropriate affirmative defense. The Court agrees with Plaintiffs that the issue of standing is not appropriately pled as an affirmative defense.

"In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of the particular issues. This inquiry involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise."*Indemnified Capital Investments v. R.J. O'Brien & Associates,* 12 F.3d 1406, 1408 (citing *Warth v. Seldin,* 422 U.S. 490, 498 (1975)). The Plaintiffs bear the burden of proving the required elements for standing: (1) an injury in fact which is concrete and particularized, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood, not speculation, that the injury will be redressed by a favorable decision. *Indemnified Capital Investments,* 12 F.3d at 1408-09 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 2136 (1992)).

Because Plaintiffs must plead standing, Defendant can challenge standing on a motion to dismiss. *See* Charles Wright & Arthur Miller, 13A *Federal Practice and Procedure* § 3531.15 (2d ed. 1984). Accordingly, standing is not a defense which admits the plaintiff's allegations, but asserts that relief should be denied for additional reasons. *Id.* Moreover, as the Court can raise the issue of standing sua sponte, *id.,* Defendant does not risk waiver by not pleading the issue as an affirmative defense.

Because lack of standing is not an appropriate affirmative defense, Plaintiffs' Motion to Strike Defendant's Fourth Affirmative Defense is granted.

*Sixth Affirmative Defense*

Defendant's Sixth Affirmative Defense charges that Plaintiffs are not entitled to recovery on Counts III, V and VI of their Second Amended Complaint be-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

cause they had an absolute duty to mitigate damages and have failed to make an adequate effort to do so. (Answer at 36.)

Plaintiffs charge that the Court must strike the Sixth Affirmative Defense as it fails to meet the second prong of the test set out in *Van Schouwen.*Like some of the other defenses, Plaintiffs claim that the Sixth Affirmative Defense does not satisfy the requirements of Rule 8(a) as Defendant has not pled any facts in support of its defense.

In *Sanchez v. La Rosa Del Monte Express, Inc.,* No. 94 C 3602, 1994 WL 603901 at *2 (N.D.Ill. Nov. 1, 1994), the court refused to strike defendant's affirmative defense of failure to mitigate damages. The *Sanchez* court rejected plaintiff's assertion that defendant's bare allegation that plaintiff failed to mitigate her damages did not include sufficient facts to meet the requirements of Rule 8. *Id.*The *Sanchez* court noted that, in requiring a "short and plain" statement, Rule 8 only demands that parties raising affirmative defenses provide enough facts to put their opponents on notice of the events on which their claims are based. *Id.;Mobley v. Kelly Kean Nissan, Inc.,* 864 F.Supp. 726, 732 (N.D.Ill. 1993); *Carpenter v. Ford Motor Co.,* 761 F.Supp. 62, 65 (N.D. Ill. 1991). In *Sanchez,* the court concluded that the defendant's affirmative defense sufficiently informed plaintiff that defendant intended to argue plaintiff failed to mitigate her damages after being terminated. 1994 WL 603901 at *2. In denying plaintiff's motion to strike defendant's affirmative defense, both the *Sanchez* and *Carpenter* courts emphasized the fact that the litigation was at an early stage, and thus it would be unreasonable for the defendant to have detailed information about plaintiff's post-termination conduct. 1994 WL 603901 at *2;761 F.Supp. at 65.

**\*6** Unlike *Sanchez* and *Carpenter,* this case is clearly not at an early stage. Moreover, Defendant does not suggest that it first pled this affirmative defense in its answer to Plaintiffs' original complaint filed on October 14, 1992. Given the extensive discovery which has occurred in this case, this

Court cannot hold that it would be unreasonable to expect Defendant to have knowledge of Plaintiffs' activities post-denial of the two additional Taco Bell restaurants allegedly promised Plaintiffs.

Although the federal system of notice pleading requires only that Defendant notify Plaintiffs of the nature of their defense, this Court finds that Defendant has not provided any, let alone enough, facts to put Plaintiffs on notice of the events on which it bases its claim of failure to mitigate damages. The Court agrees with Defendant that elaboration of the specifics of the defense is the precise purpose of discovery. Thus, Defendant should not misinterpret the Court's holding as requiring it to plead its defense with specificity. However, this Court does hold that Rule 8 obligates Defendant to provide enough facts to put Plaintiffs on notice of the course which Defendant contends Plaintiffs were legally required, but failed, to pursue.

Plaintiffs' Motion to Strike Defendant's Sixth Affirmative Defense is granted.

*Seventh Affirmative Defense/ Count III of the Counterclaim*

Finally, Plaintiffs ask this Court to strike Defendant's Seventh Affirmative Defense, which is identical to Count III of Defendant's Counterclaim, because Defendant can prove no facts which would entitle it to relief on such claim. In its Seventh Affirmative Defense, Defendant contends "Plaintiffs, in Count I of their Complaint, urged a construction of the Restaurant Franchise Agreements that was so clearly contradicted by the language of those Agreements and precluded by applicable rules of law that plaintiffs knew or should have known that it was meritless."(Answer at 36.)

In Count I of their original complaint, Plaintiff charged that Defendant had breached its implied covenant of good faith and fair dealing in the franchise agreements and the Letter Agreement. (Complaint at ¶ 9.) Plaintiff alleged that the implied

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.))**

covenant of good faith and fair dealing imposed a duty upon Defendant not to act to destroy the rights of the Plaintiffs under the agreements or coerce the Plaintiffs to terminate their franchise agreements on unfavorable terms. *Id.* According to Plaintiffs, Defendant breached its implied covenant by deciding to place the Vernon Hills restaurant so close to the Plaintiffs' Mundelein and Hawthorne restaurants so as to destroy the profitability of Plaintiffs' restaurants, and thus coerce the Plaintiffs into selling out to Defendant. *Id.* at 11, ¶ 44.In a Memorandum Opinion and Order issued January 10, 1994, this Court dismissed Count I holding that, under California law, a plaintiff cannot maintain an action for breach of an implied covenant of good faith for conduct which is explicitly permitted by the contract. (Memorandum Opinion and Order issued January 10, 1994 at 10-15.)

**\*7** According to Defendant, because Plaintiffs allegedly pled Count I in bad faith, they have breached the implied covenant of good faith and fair dealing in the Restaurant Franchise Agreements, and thus they are estopped from seeking enforcement of the Restaurant Franchise Agreements in Counts III, V and VI of the Second Amended Complaint. (Answer at 36.) In Count III of its Counterclaim, Defendant realleges the allegations asserted in the Seventh Affirmative Defense, and then charges that, as a result of Plaintiffs' breach of contract, it is entitled to recover damages in the amount of costs and attorneys' fees incurred in defending Count I of Plaintiffs' complaint. *Id.* at 39.

Plaintiffs assert that the Court must dismiss the Seventh Affirmative Defense and Count III of the Counterclaim because Plaintiffs' filing of Count I of its original complaint does not implicate the implied covenant of good faith and fair dealing in the Restaurant Franchise Agreements. Citing *Riveredge Associates v. Metropolitan Life Insurance Co., 774 F.Supp. 897 (D.N.J. 1991),* Defendant disputes Plaintiffs' assertion.

In *Riveredge Associates,* plaintiff sought to dismiss defendant's counterclaim which asserted that

plaintiff, by commencing and maintaining a lawsuit based on its bad faith interpretation of the partnership agreement, mortgage and note, breached the implied covenants of good faith and fair dealing contained in those agreements. *Id.* at 899.Analogous to the facts of the present case, the defendant in *Riveredge Associates* alleged that plaintiff instituted an action against defendant based on interpretations of the Mortgage, Note and Partnership Agreement that it knew were clearly contradicted by the express language of those agreements. *Id.* To remedy plaintiff's breach of the implied covenant of good faith and fair dealing, the defendant in *Riveredge Associates* sought the costs and attorneys' fees it incurred in defending against plaintiff's bad faith action.

In denying plaintiff's motion to dismiss, the *Riveredge Associates* court relied in part on § 205 of the *Restatement (Second) of Contracts* and the comments thereto. *Id.* Section 205 states, "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."*Restatement (Second) of Contracts § 205 (1981).* Comment e to Restatement § 205 states, "The obligation of good faith and fair dealing extends to the assertion, settlement and litigation of contract claims and defenses. The obligation is violated by dishonest conduct such as conjuring up a pretend dispute, asserting an interpretation contrary to one's own understanding or falsification of facts."*Restatement (Second) of Contracts § 205* comment e.

Based on § 205 of the *Restatement (Second) of Contracts* and New Jersey case law, the *Riveredge Associates* court held that defendant had alleged sufficient facts to state a claim. Specifically, the court in *Riveredge Associates* found defendant's allegation that plaintiff instituted its action with knowledge that it was not entitled under the agreements to the relief sought, if true, would constitute lack of good faith in the performance and enforcement of the agreements. *774 F.Supp. at 900.*

**\*8** Plaintiffs object to Defendant's reliance on

Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.))**

*Riveredge Associates* for a variety of reasons. First, Plaintiffs argue that Defendant has not alleged that Plaintiff asserted an interpretation of the Restaurant Franchise Agreements which was contrary to Plaintiffs' own understanding of the agreements, and thus Defendant has not alleged the bad faith necessary to state a claim for breach of contract under § 205 or *Riveredge Associates.*This Court disagrees. Defendant specifically alleged that Plaintiffs urged a construction of the franchise agreement that was so clearly contradicted by the language of the agreement that Plaintiffs knew that it was meritless. (Answer at 36.) This Court fails to see the difference between asserting an interpretation contrary to one's own understanding of the agreements and urging a construction so clearly contradicted by the language that Plaintiffs knew it was meritless. Both allegations suggest the bad faith necessary to state a claim for breach of contract under § 205 or *Riveredge Associates.*While this Court may ultimately determine that Plaintiffs, in Count I of their original complaint, did not urge a construction so clearly contrary to the language of the agreement that Plaintiffs knew such construction was meritless, all of the allegations in the Counterclaim must be accepted as true on a motion to dismiss.

Second, Plaintiffs claim that *Riveredge Associates* is inapposite as it premised its holding in part on New Jersey law and on what it predicted the Supreme Court of New Jersey would do. While *Riveredge Associates* did rely on New Jersey law, it also relied heavily on § 205 of the *Restatement (Second) of Contracts.*Both *Carma Developers v. Marathon Development California, Inc.,* 6 Cal.Rptr.2d 467, 483 (Cal. 1992) and *Careau & Co. v. Security Pacific Business Credit, Inc.,* 272 Cal.Rptr. 387, 398 (Cal.App. 2d Dist. 1990) indicate that California courts have adopted § 205 of the *Restatement (Second) of Contracts.*Given California courts' adoption of § 205 of the *Restatement (Second) of Contracts* and the language of comment e, this Court does not find that the Supreme Court of California would automatically reject a claim

that plaintiff breached an implied covenant of good faith and fair dealing by instituting an action against defendant even though it knew that under the agreements, it was not entitled to the relief it sought.

Finally, Plaintiffs assert that, even if *Riveredge* indicates that Defendant can bring a claim for breach of an implied covenant of good faith and fair dealing and seek damages in the amount of attorneys' fees and costs expended, *Riveredge* does not support Defendant's Seventh Affirmative Defense which charges that Plaintiffs' breach of the implied covenant of good faith and fair dealing prevents Plaintiffs from pursuing the claims in Counts III, V and VI of the Second Amended Complaint.

Clearly, *Riveredge* addressed only attorneys' fees and costs as the appropriate remedy for a breach of an implied covenant of good faith and fair dealing caused by the initiation of a suit in bad faith. However, Defendant cites *Goldstein v. Lustig,* 507 N.E.2d 164, 167-68 (1st Dist. 1987) in support of its contention that the filing of Count I constitutes a material breach of the franchise agreements, and thus excuses Defendant's alleged contractual breaches for which Plaintiffs seek relief in Counts III, V and VI. In *Goldstein,* the court held that "[a] party who materially breaches a contract cannot take advantage of the terms of the contract which benefit him, nor can he recover damages from the other party to the contract."*Id.* Accordingly, the *Goldstein* court found that, as plaintiff's use of the corporate books and records to further an insurance fraud constituted a material breach, plaintiff was not entitled to enforce the contract against his employer to receive resignation benefits. *Id.* at 168.

**\*9** The problem with Defendant's reliance on *Goldstein* is that it addresses Illinois law and the franchise agreements in the present case are governed by California law. Additionally, even if *Goldstein* was applicable, Defendant does not allege in its Answer or Counterclaim that Plaintiffs' filing of Count I constituted a material breach of the terms of the franchise agreements such that Plaintiffs are pre-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.))**

cluded from enforcing the terms of the agreements which benefit them.

Section 205 of the *Restatement (Second) of Contracts* may entitle Defendant to attorneys' fees and costs expended in defending Count I assuming Defendant can prove that Plaintiffs brought Count I even though they knew the relief they sought was contrary to the terms of the franchise agreements. However, Defendant has not alleged sufficient facts which would indicate that, if it proves Plaintiffs brought Count I in bad faith, Defendant is entitled, under California law, to bar Plaintiffs, from obtaining any relief on Counts III, V and VI of its Second Amended Complaint.

CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Strike Defendants' Affirmative Defenses is granted. Defendants' Third and Sixth Affirmative Defenses are dismissed without prejudice. Plaintiffs' Motion to Dismiss Count III of Defendant's Counterclaim is denied.

> FN1.Federal Rule of Civil Procedure 84 states:
>
>> The forms contained in the Appendix of Forms are sufficient under the rules and are intended to indicate the simplicity and brevity of [the] statement which the rules contemplate.
>
> Fed. R. Civ. P. 84.

N.D.Ill. 1995
Cohn v. Taco Bell Corp.
Not Reported in F.Supp., 1995 WL 247996 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1985 WL 4868 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1985 WL 4868 (N.D.Ill.))**

**H**

James P. RIMAC, Plaintiff, v. NISSAN MOTOR CORPORATION in U.S.A., a corporation and Nissan Motor Co., Ltd., Defendants.

D.C.Ill.,1985.

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois, Eastern Division.

James P. RIMAC, Plaintiff,

v.

NISSAN MOTOR CORPORATION in U.S.A., a corporation and Nissan Motor Co., Ltd., Defendants.

**No. 81 C 6822.**

Dec. 18, 1985.

*MEMORANDUM OPINION*

ABRAHAM LINCOLN MAROVITZ, District Judge.

*Motion to Strike Affirmative Defenses*

**\*1** Plaintiff has filed a motion to strike defendants' affirmative defenses to plaintiff's third amended complaint pursuant to Rule 12(f) of the Federal Rules of Civil Procedure. Motions to strike affirmative defenses under Rule 12(f) are viewed with disfavor. *Lirtzman v. Spiegal, Inc.,* 493 F.Supp. 1029, 1031 (N.D.Ill.1980) (Bua, J.). If the defense is sufficient as a matter of law or fact then such a motion will generally be denied. *Id.*

In this diversity case the substantive law of Illinois applies. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64 (1938). Illinois law has

recognized that, in strict products liability actions, there can be no comparison of negligence or fault because the cause of action is not based on negligence. The manufacturer is liable without regard to negligence, and consequently no comparison can be made insofar as liability is concerned between the

conduct of the manufacturer and that of the injured party.

*Auton v. Logan Landfill, Inc.,* 105 Ill.2d 537, 546 (1985). However, aspects of a plaintiff's conduct may be considered as a damages reducing factor on a comparative fault basis. *Coney v. J.L.G. Industries, Inc.* 97 Ill.2d 104 (1983).

The pleading of affirmative defenses is a procedural matter. Therefore, the Federal Rules of Civil Procedure govern the pleading of affirmative defenses. *Amelio v. Yazoo Mfg. Co.,* 98 F.R.D. 691, 693 (N.D.Ill.1983) (Shadur, J.). Under federal pleading rules an affirmative defense admits the factual allegations in the complaint but nevertheless states new facts that would defeat recovery. *Id.* (citations omitted).

Under Illinois law, neither defendants' first affirmative defense (assumption of the risk), third affirmative defense (comparative negligence), nor fourth affirmative defense (misuse) would bar recovery. To the extent that these defenses, as pleaded, are viable under Illinois law, they merely go to the issue of allocation of damages on a comparative fault basis. Accordingly, the Court strikes each of defendants' first, third, and fourth affirmative defenses.

Defendants' second affirmative defense (plaintiff's careless conduct was the sole proximate cause of his injuries) and fifth affirmative defense (material alteration) imply total fault on the part of the plaintiff. These are not federal affirmative defenses because they do not admit the allegations of the third amended complaint. *Id.* Accordingly, the Court strikes each of defendants' second and fifth affirmative defenses.

The striking of these five "affirmative defenses" is essentially a matter of formalism. *Id.* To the extent that it is consistent with the Court's other rulings in this action, evidence raising these issues may be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1985 WL 4868 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1985 WL 4868 (N.D.Ill.))**

presented to the jury at the appropriate stage of the bifurcated trial of this case.

Plaintiff also seeks to strike the sixth affirmative defense (lack of personal or subject matter jurisdiction) of defendant Nissan Motor Co., Ltd. ("Nissan Ltd."). In an earlier opinion the Court denied Nissan Ltd.'s motion to quash service of summons. The denial of the motion to quash service does not necessarily mean that plaintiff is entitled to an order striking the sixth affirmative defense. *See Durham Industries, Inc. v. North River Ins. Co.,* 482 F.Supp. 910, 913 (W.D.Mo.1979).

**\*2** Nissan Ltd. argues that a court is bound to reconsider its rulings during the course of the litigation if it becomes apparent that the prior ruling was in error. Accordingly, Nissan Ltd. argues that it may reassert its objection to this Court's jurisdiction as an affirmative defense.

The Court does not believe that its prior ruling denying Nissan Ltd.'s motion to quash service of summons was in error. Therefore, plaintiff's motion to strike Nissan Ltd.'s sixth affirmative defense is granted. *See Ohmer Corp. v. Duncan Meter Corp.,* 8 F.R.D. 582, 583 (N.D.Ill.1948) (where the issues presented in the affirmative defenses had already been ruled upon by the court on a preliminary motion, record in the case would preserve defendant's rights).

In summation, plaintiff's motion to strike defendants' affirmative defenses numbered 1 through 5 is granted. In addition, plaintiff's motion to strike defendant Nissan Ltd.'s sixth affirmative defense is granted.

D.C.Ill.,1985.
Rimac v. Nissan Motor Corp., U.S.A.
Not Reported in F.Supp., 1985 WL 4868 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.))**

Crawford v. Equifax Payment Services Inc.
N.D.Ill.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
Lawrence CRAWFORD, on behalf of himself and
all others similarly situated, Plaintiff,

v.

EQUIFAX PAYMENT SERVICES, INC., and
Equifax Check Services, Inc., Defendants.
**No. 97 C 4240.**

Sept. 30, 1998.

*MEMORANDUM OPINION AND ORDER*

ANDERSEN, J.
**\*1** Plaintiff, Lawrence Crawford, ("plaintiff")
brings this putative class action against defendants
Equifax Payment Services, Inc. ("EPS") and
Equifax Check Services, Inc. ("ESC") alleging vi-
olations of the Fair Debt Collection Practices Act,
15 U.S.C. § 1692, *et. seq.* ("FDCPA"). Plaintiff al-
leges that a series of letters which ECS sent to him
in an effort to collect on a dishonored check viol-
ated several different provisions of the FDCPA.
Plaintiff brings parallel allegations on behalf of a
class of consumers which allegedly have received
similar letters from ECS. The court has not certified
this class yet. Defendant ECS has filed a counter-
claim against plaintiff individually seeking payment
of the underlying debts as well as a counterclaim
against members of the putative class requesting
similar relief.

Plaintiff has moved to dismiss ECS' counterclaims
contending that the court should not exercise juris-
diction over this state law claim in the context of an
FDCPA lawsuit. Plaintiff also has moved to strike
ECS' affirmative defenses pursuant to Fed.R.Civ.P.
12(f). Defendant EPS originally moved to dismiss
plaintiff's allegations against it for failure to state a
claim upon which relief can be granted pursuant to

Fed.R.Civ.P. 12(b)(6). However, both parties
agreed to submit evidentiary material in connection
with that motion and Magistrate Judge Rebecca R.
Pallmeyer converted the motion to a motion for
summary judgment.

On September 1, 1998, the Magistrate Judge filed
and served upon the parties her Report and Recom-
mendation which denied plaintiff's motion to dis-
miss ECS' counterclaim, granted plaintiff's motion
to strike certain of defendant's affirmative defenses
and denied his motion to strike others, and granted
EPS' motion for summary judgment. After careful
consideration of the motions before the court, the
applicable memorandum of law, other relevant
pleadings, the Magistrate Judge's Report and Re-
commendation, plaintiff's objections to this report
and the defendants' response thereto, this court
hereby declines to adopt the Magistrate Judge's Re-
port and Recommendation concerning the pending
motion to dismiss, adopts the Report and Recom-
mendation concerning the motion for summary
judgment, and adopts in part the Report and Re-
commendation concerning the motion to strike af-
firmative defenses.

BACKGROUND

Plaintiff Lawrence Crawford is a citizen of Illinois
who resides in Chicago. (Plaintiff's Complaint
("Compl.") at ¶ 4.) Defendant ECS allegedly is a
debt-collector that purchases "bad debt" from oth-
ers and attempts to collect that debt. Plaintiff fur-
ther alleges that defendant EPS also is a debt-
collector within the meaning of FDCPA because it
controls and operates ECS' collection of debts. Both
ECS and EPS are wholly-owned subsidiaries of
Equifax, Inc. and are headquartered in Atlanta,
Georgia. (*Id.* at ¶¶ 6-9.)

Plaintiff's Complaint centers on a series of collec-
tion letters which he received from ECS after he al-
legedly wrote a bad check in the amount of $75.00

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.))**

to Hollywood Casino in Aurora, Illinois. (*Id.* at ¶ 11.)According to the Complaint, plaintiff received a total of seven letters from ECS from September 6, 1996 and October 18, 1996. Plaintiff alleges that each of these letters "upon information and belief" is a "computer generated form letter which is sent to hundreds of persons."(*Id.* at ¶¶ 13, 14, 15, 16, 17, 18, and 19.)In the first letter, dated September 6, 1996, ECS informed plaintiff that he was required promptly "to make full restitution" of not only the $75.00 allegedly owed, but also of an additional $25.00 "service charge," and suggested that plaintiff use an express mail or other "same day service" to expedite payment. ECS informed plaintiff on the back of this letter that he had thirty days from the date that he received the letter to dispute the validity of the debt. (Compl., Ex. B-1 and Ex. B-2.)

**\*2** ECS' second letter to plaintiff, dated September 20, 1996, warned Plaintiff that ECS would determine whether the check should be assigned to an investigator or to a collection agency should plaintiff fail to pay the debt. (Compl., Ex. C.) This letter also warned plaintiff in boldfaced type that "continued refusal to honor [the] returned check w[ould] result in [his] credit file being impacted with a negative reference which may impact future credit granting decisions."(*Id.*) Plaintiff further was told that he could stop the collection effort by sending payment in full plus the service charge to ECS.(*Id.*) Plaintiff's third letter from ECS was dated October 4, 1998 and informed plaintiff that ECS had begun an investigation to determine whether civil litigation was possible on the dishonored check. (Compl., Ex. D.) The letter told plaintiff to contact an unnamed investigator though an identified phone number and warned plaintiff that a check writer who wrote a bad check and did not pay the check could be subject to civil litigation and further (and in boldfaced type) that an ensuing bad judgment against the check writer could result in "possible damages of $25 or all costs incurred in collecting the check including reasonable attorneys' fees, interest, and court expenses" or "full restitu-

tion." (*Id.*)

ECS sent plaintiff a fourth letter which was dated October 4, 1996. According to plaintiff's complaint, ECS intended this letter to resemble a telegram or other high priority message because it was printed on yellow paper and sent in a corresponding yellow envelope with the label "ECS MESSAGE SERVICE." (Compl. at Par. 5; Ex. F-1 and Ex. F-2.) The amount of the debt listed in this letter, however, was $100.00, not the $75.00 referred to in previous correspondence. Except for these differences, this letter was identical to ECS' second letter to plaintiff. (ECS stated in its Answer to plaintiff's Complaint that this letter actually was written to obtain payment on another bad check which plaintiff allegedly had written to Hollywood Casino in this amount This court need not make any findings on this issue to resolve the motions before it.)

Two letters, both dated October 17, 1996, again referred to the amount of the check as $100.00, but in all other respects were identical to the third letter dated October 4, 1998. (Compl., Ex. E and Ex. G.) ECS' seventh and final letter to plaintiff, dated October 18, 1998, informed plaintiff that "the law provides that a check writer who writes a check with an intent to defraud or prior knowledge that the check will be dishonored can be criminally prosecuted [.]" (Compl., Ex. H.) This letter also contained, again in boldfaced type, a list of potential criminal penalties which might follow such a prosecution including probation, imprisonment and/or fines, and full restitution. (*Id.*) Plaintiff furthers states in his Complaint that despite these "threats," ECS has not been subject to any criminal prosecution concerning the $75.00 check. (Compl. at ¶ 20.)

**\*3** Plaintiff's class action names five putative classes of consumer debtors identified as Classes A, B, C, D and E:

*Class A*

Plaintiff alleges that Class A consists of all con-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.))**

sumer debtors in the United States who wrote a bad check and received a letter from ECS which assessed a "service charge" over and above the amount of the check. As to this class, plaintiff charges that ECS violated Section 1692(e)(2) and Section 1692(f)(1) of the FDCPA. (*Id.* at ¶¶ 22, 33 and 34.)Specifically, plaintiff alleges that the "service charge" effectively misrepresented the "amount due" and also sought to collect an amount of money not authorized by the original agreement.

*Class B*

As to Class B, alleged to consist of all consumers who wrote a bad check and to whom ECS wrote and implied that such an action might result in criminal prosecution, plaintiff alleges that ECS violated Sections 1692(e)(7) and 1692(e)(5) of the FDCPA respectively by creating the false impression that the consumer committed a crime and threatening legal action that ECS did not intend to take. (*Id.* at ¶¶ 24, 35 and 36.)

*Class C*

Plaintiff alleges that Class C consists of all Illinois residents who wrote a bad check and then received a letter from ECS which resembled a "high priority communication." (*Id.* at ¶ 25.)As to Class C, plaintiff alleges that ECS violated both the preface to Section 1692(e) and Section 1692(e)(10) because this type of communication allegedly misrepresented the urgency of the debt and, therefore, attempted to deceive and mislead consumers. (*Id.* at ¶ 37.)

*Class D*

Class D allegedly consists of all Illinois residents who wrote a bad check and then received a letter containing language which informed consumers that they had thirty days in which to dispute the debt, but also contained language similar to that in Ex. B to the Complaint which demanded immediate payment. (*Id.* at ¶

26.)Plaintiff alleges that this type of language violates Section 1692(g) because it overshadows a consumer's validation right. (*Id.* at ¶ 37.)

*Class E*

Finally, plaintiff alleges that Class E consists of all Illinois residents who wrote a bad check and were sent communications following an initial demand letter which "effectively overshadowed the congressionally mandated validation notice."Plaintiff alleges that these communications violated Section 1692(g).(*Id.* at ¶ 39.)

Defendant ECS answered plaintiff's complaint on August 29, 1997 and included in its answer two counterclaims. In one of these counterclaims, ECS seeks to recover from plaintiff $175.00 for several bad checks which plaintiff allegedly wrote to Hollywood Casino. (ECS Answer at p. 16) In the other counterclaim, ECS seeks to recover the underlying debts owed to it by all of the putative classes of consumers. ECS also raised five affirmative defenses against plaintiff individually: (1) plaintiff has failed to state a claim upon which relief can be granted; (2) subject matter is lacking in this case because the defendants are not "debt collectors" within the meaning of the FDCPA; (3) subject matter jurisdiction is lacking in this case because plaintiff's bad checks were used for gambling purposes and not for personal, family or household uses as required by the FDCPA; (4) plaintiff has not suffered any damages; and (5) plaintiff's claim is barred, in whole or in part, by a set-off equaling the amount of several dishonored checks that were never paid to ECS.(*Id.* at p. 15).

**\*4** Plaintiff moved to dismiss the two counterclaims on October 16, 1997 and to strike the affirmative defenses. For its part, defendant EPS moved to dismiss plaintiff's complaint against it contending that plaintiff had not made sufficient allegations against it to warrant its inclusion in the lawsuit. On October 17, 1997, the court referred the case to Magistrate Judge Pallmeyer pursuant to Local General Rule

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.))**

2.41(b) to conduct the necessary proceedings and to enter an appropriate report and recommendation on these motions. Both parties agreed to submit evidentiary materials concerning EPS' motion to dismiss and, therefore, the Magistrate Judge converted that motion to a motion for summary judgment. On September 1, 1998, the Magistrate Judge issued her Report and Recommendation on the pending motions, denying plaintiff's motion to dismiss ECS' counterclaims, granting his motion to strike ECS' affirmative defenses in part, and denying it in part and granting ECS' motion for summary judgment. Plaintiff filed objections to that part of the Report and Recommendation which denied his motion to dismiss ECS' counterclaim and granted ECS' motion for summary judgment.

## DISCUSSION

In reviewing a magistrate judge's report and recommendation, the district court generally must "make a de novo determination upon the record, or after additional evidence, of any portion of the magistrate judge's disposition to which a specific written objection has been made."Fed.R.Civ.P. 72(b).

I. *Plaintiff's Motion to Dismiss ECS' Counterclaim*

The court should dismiss ECS's counterclaim if it finds no set of facts consistent with the allegations which would support a claim for relief.*Cushing v. City of Chicago,* 3 F.3d 1156, 1159 (7th Cir.1993)(quoting *Hishon v. King and Spaulding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Defendant's counterclaims are state law claims. The first seeks recovery on three allegedly bad checks which plaintiff tendered to Hollywood Casino. The second seeks similar relief against all putative class members. Although diversity of citizenship probably exists between the parties, plaintiff contends that the court does not have subject matter jurisdiction over defendant's counterclaim because the amount in controversy does not exceed the jurisdictional minimum of $75,000. The

issue before the court is whether we should exercise supplemental jurisdiction over ECS's counterclaims in a federal lawsuit alleging violations of the FDCPA. The court may do so if it finds that ECS' counterclaims are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."28 U.S.C. § 1367(a); *Baer v. First Options of Chicago, Inc.,* 72 F.3d 1294, 1298 (7th Cir.1995).

Relying on a long line of cases in which courts have declined to exercise jurisdiction over similar counterclaims in FDCPA cases, plaintiff argues that the court should not exercise supplemental jurisdiction here. Plaintiff contends that ECS' counterclaims, which turn on the validity of the underlying debts, are not part of the same case or controversy as his FDCPA claims which turn on the fairness of ECS' collection practices and procedures. (Plaintiff's Memorandum in Support of His Motion to Dismiss Counterclaims Brought by Defendant ECS ("Pl.Mem.") at 2-3.) Defendant responds that the two counterclaims bear enough of a "loose factual connection" to the underlying FDCPA claims to warrant their presentation in this lawsuit, citing the Seventh Circuit's decision in *Channell v. Citicorp Nat'l Servs., Inc.,* 89 F.3d 379 (7th Cir.1996)

**\*5** Relying on *Channell,* the Magistrate Judge declined to dismiss ECS' counterclaim against plaintiff individually, and ruled that there is enough of a "loose factual connection" between the class FDCPA claims and ECS' counterclaim for the debt to warrant the exercise the jurisdiction, although she conceded that this connection "is not a terribly strong one."(Report and Recommendation at 12.) The Magistrate Judge further found that the motion to dismiss the counterclaims against the putative class was premature because the class has not been certified.

As the Magistrate Judge correctly noted, until the promulgation of 28 U.S.C. § 1367(a) in 1990, the court had to find that a counterclaim grounded in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.))**

state law was compulsory to exercise jurisdiction over that counterclaim in the federal case. (Report and Recommendation at 14.) That is, the counterclaim had to arise out of the same transaction or occurrence that is the subject matter of the opposing party's claim. Fed.R.Civ.P. 13(a). If the counterclaim was instead a permissive counterclaim, the court needed an independent basis for the exercise of jurisdiction. See *Channell v. Citicorp. Nat'l Servs., Inc.,* 89 F.3d 379, 384 (7th Cir.1996) (citing *Baker v. Gold Seal Liquors,* 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974)). However, as the *Channell* court found, the distinction between permissive and compulsory counterclaims is no longer meaningful. Section 1367(a) extends the scope of supplemental jurisdiction to the limits of Article III of the Constitution requiring only a "loose factual connection" between the claims. *Channell,* 89 F.3d at 384, citing *Baker v. First Options of Chicago, Inc.,* 72 F.3d 1294, 1298-1301 (7th Cir.1995).

In *Channell,* the district court faced a class action premised on alleged violations under the Consumer Leasing Act, 15 U.S.C. §§ 1667-1667e. 89 F.3d at 380. The court in *Channell* interpreted an early termination clause in an automobile lease to determine whether it complied with the Act's requirements. Defendant Citicorp, which as a result of the class action found itself with a class of lessees which terminated leases early, filed a counterclaim seeking judgment for the contractual termination payments. *Id.* at 383.Like the federal question presented in the class action complaint, the counterclaim also turned on the language in the automobile lease. The Seventh Circuit, therefore, reversed the district court's holding that it could not exercise jurisdiction over what it had deemed a permissive counterclaim and held that supplemental jurisdiction could be exercised. *Id.* at 385.The court found that although the acts which created the claims were different, one arose from the signing of the lease, the other arose from the early termination of the lease, "the parties, the lease, the clause, and even the terminations are constants", noting further that the identical clause

of the automobile lease was at issue in both actions. *Id.*

**\*6** Applying the liberal interpretation of § 1367(a) recognized in *Channell,* we agree with the Magistrate Judge that we may exercise supplemental jurisdiction here. The counterclaim in *Channell* and the underlying federal question both turned on the interpretation of the same automobile lease-albeit for different issues. *Id.* For this reason, the Seventh Circuit found that these claims were at least loosely factually connected. The counterclaim here involves the validity of the underlying debt. Although the evidence which would establish or defeat the debt is different from that which the plaintiff must adduce to prove his FDCPA case, *Whitaker v. Ameritech,* 129 F.3d 952, 957-58 (7th Cir.1998), plaintiff must prove the existence of a debt as that term is defined in the FDCPA to prevail here.*Kang v. Eisenstein,* 962 F.Supp. 112, 114 (N.D.Ill.1997). The existence of a debt is relevant to both claims Under the *Channell* court's reasoning, this slight factual overlap satisfies the requirement that the two actions must be "loosely factually connected" before the court may exercise jurisdiction.

It is true as plaintiff argues that several courts have refused to exercise jurisdiction because they have reasoned that the underlying debt has no relevance to the fairness of the collection procedures. See*Berrios v. Sprint Corp.,* No. CV-97-0081, 1998 WL 199842, 9 (E.D.N.Y. March 16, 1998); *Hart v. Clayton-Parker and Assocs. Inc.,* 869 F.Supp. 774, 777-78 (D. Arizona 1994); *Ayres v. Nat'l Credit Management Corp.,* No. Civ. A. 90-5535, 1991 WL 66845, at *1-4 (E.D.Penn. April 25, 1991); *Gutshall v. Bailey & Assocs.,* No. 90 C 20182, 1991 WL 166963, at *2 (N.D.Ill. February 11, 1991); *Leatherwood v. Universal Bus. Serv. Co.,* 115 F.R.D. 48, 49-50 (W.D.N.Y.1987); *Peterson v. United Accounts, Inc.,* 638 F.2d 1134, 1137 (8th Cir.1981). However, as the Magistrate Judge pointed out, these courts focused unnecessarily on whether the counterclaim was compulsory or permissive, a distinction no longer relevant after the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.))**

promulgation of Section 1367(a) and one that the *Channell* court expressly rejected. Surprisingly, this focus remains in decisions which post-date the promulgation of Section 1367(a). Their analysis is therefore based on a different inquiry than the one that *Channell* adopted. Similarly, those cases cited by plaintiff in which courts have refused to bar as *res judicata* FDCPA actions following a state court action to collect the debt are factually inapposite. A *res judicata* analysis focuses on whether the two claims rise from the same transaction. See*Blakemore v. Pekay,* 895 F.Supp. 972, 983 (N.D.Ill.1995); *Azar v. Hayter,* 874 F.Supp. 1314, 1317 (N.D.Fla.), *aff'd,*66 F.3d 342 (11th Cir.1995), *cert. denied,*516 U.S. 1048, 116 S.Ct. 712, 133 L.Ed.2d 666 (1996).*Channell* clearly requires much less of a factual connection for jurisdictional purposes.

However, the court's conclusion that we may exercise supplemental jurisdiction does not end our inquiry. Section 1367(c) empowers district courts to decline to exercise jurisdiction over a claim in four situations:

**\*7** (1) the claim raises a novel or complex issue of state law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Plaintiff argues that permitting the counterclaim to proceed would contravene the public policy embodied by the FDCPA, relying on § 1367(c)(4). (Pl. Mem. at 4.) In *Leatherwood v. Universal Business Service Co.,* the court observed just that:

[T]o allow a debt collector defendant to seek to collect the debt in the federal action to enforce the FDCPA might well have a chilling effect on persons who otherwise might and should bring suits such as this....Given the remedial nature of the FDCPA and the broad public policy it serves, federal courts should be loath to become immersed in the debt collection suits [brought by] the target of the very legislation under which a FDCPA plaintiff states a cause of action.

115 F.D.R. at 50. The Magistrate Judge declined to follow the *Leatherwood* reasoning because she concluded that "the FDCPA was enacted to eliminate abusive debt collection practices, not to permit debtors to shirk their financial obligations."(Report and Recommendation at 17.) However, dismissing the counterclaim here does not allow the debtor to shirk his alleged debt; it simply does not grant the debt collector a federal forum in which to pursue the counterclaim. This especially makes sense because the debt collector may pursue the claim easily in state court. Therefore, any chilling effect on the bringing of actions under FDCPA is avoided, while still enabling the debt collector to pursue his just remedies in state court. Under *Channell,* the court's decision not to exercise supplemental jurisdiction over ECS' counterclaims is clearly within its discretion. 89 F.3d at 386. Therefore, we will decline to exercise jurisdiction over the counterclaim against plaintiff.

The court also is concerned that should the class be certified and such counterclaims against the debtor classes proceed, the court would be overwhelmed with claims which will predominate the underlying federal claim. Under § 1367(c)(2), this is another reason to decline to exercise jurisdiction. Although the Magistrate Judge did not reach plaintiff's motion to dismiss the counterclaim as to the putative class members, she recognized that should the class be certified, an "adjudication of ECS' class counterclaims against a class might generate a large administrative burden."(Report and Recommendation at 17, n. 11 citing *Channell,* 89 F.3d at 386-87.) Moreover, federal courts are ill-equipped to handle such state collection claims while "our sister state courts have set up special small claims courts that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.))**

have streamlined and cost-effective procedures designed to handle these types of small individual contract actions." Channell v. Citicorp Nat'l Servs. Inc., No. 91 C 3428, 1996 WL 563536, at *2 (N.D.Ill.1996). For this reason, too, we decline to exercise supplemental jurisdiction over the counterclaim asserted against the putative classes.

II. *Defendant EPS' Motion For Summary Judgment*

**\*8** Defendant EPS originally moved to dismiss itself from this lawsuit arguing that the plaintiff had failed to make any allegations against it directly under the FDCPA. The parties agreed to take discovery on this motion and submitted evidentiary material to the Magistrate Judge who then converted it to a motion for summary judgment.

The court should grant summary judgment if EPS demonstrates that the pleadings, depositions and other evidentiary materials fail to raise a "genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must accept as true all facts set forth by the non-movant and draw all justifiable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the burden of demonstrating the absence of evidence to support the position of the nonmoving party. *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir.1994).

Plaintiff made no direct allegations against EPS in its Complaint. Its case for liability instead rests on its allegation that EPS, "as the entity that controls and operates defendant ECS, it is indirectly involved in the collection of debts."(Compl. at ¶ 8.) The evidence submitted by the parties on this point consists of the depositions of Ronnie Garmon, Vice-President of Operations for ECS and Stephen Cook, in-house counsel for EPS. Garmon testified that ECS has two sets of collection letters from ECS which it sends to consumers depending on the circumstances. (Deposition of Ronnie Garmon

("Garmon Dep.") at 23.) Cook, together with ECS personnel, determines the "content" of each of these two sets of letters. (*Id.* at 26.) According to Garmon, Cook also is involved in the timing of the letters, again working with ECS collection personnel. ((*Id.* at 27.) Garmon finally testified that Cook participates in the drafting of the letters to a limited degree because he reviews the drafts and decides on "final and appropriate verbiage" consistent with the appropriate laws. (*Id.* at 29-30.) Cook himself also stated that he provides legal services to ECS, for which ECS is billed, and that those services include "consultation with the collection team when a change is considered to the language of a collection letter."(Affidavit of Stephen Cook ("Cook Aff.") at ¶ 3.) Cook further stated that he reviews ECS' draft letters for compliance with applicable laws which sometimes entails making changes to the letters. (*Id.*) He disclaimed any day-to-day involvement with ECS' collection efforts, stated that he is not consulted on which letters to send a particular consumer or what particular strategy is pursued in the collection of the check and further stated that "his only involvement in the policies of ECS relate to insuring compliance with the applicable laws, including the FDCPA."(*Id.*) According to both Garmon and Cook, then, Cook's involvement is limited to reviewing ECS' draft letters and making changes to comply with applicable laws. Garmon additionally stated that Cook had something to do with the "timing" of the letters, although neither party explained exactly what that was. However, this slight difference in the evidence is not dispositive for purposes of this motion.

**\*9** The evidence presented demonstrates that EPS had no direct contact with plaintiff. The parties agree that EPS' only involvement was its lawyer's limited review of the draft collection letters. Nevertheless, plaintiff argues that EPS is an indirect debt collector under § 1692(a)(6). We agree with the Magistrate Judge that plaintiff misinterprets the language of the statute to impute liability to a subsidiary, EPS, without first demonstrating the special circumstances which demonstrate that the direct

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.))**

collector of the debt, ECS, and EPS should be deemed a single economic enterprise. *See United States v. ACB Sales & Servs., Inc.,* 590 F.Supp. 561, 574 (D.Az.1984).

As the Magistrate Judge correctly found, plaintiff's reliance on a series of cases involving the actions of corporate personnel in the activities of the debt collector is misplaced. In each of these cases, the allegations of indirect involvement were aimed at personnel who were employed by the entity which was directly collecting the debt from plaintiff. In *West v. Costen,* 558 F.Supp. 564, 584 (W.D.1983), the allegations of indirect involvement were aimed at the president of the debt collection agency who personally "obtained new collection accounts" and received a commission on those accounts. Similarly, in *Teng v. Metropolitan Retail Recovery, Inc.,* 851 F.Supp. 61, 67 (E.D.N.Y.1994), the president and manager of the collection agency were held to be indirect debt collectors because both men personally called and harassed plaintiff to pay his debt. In *Drennan v. Van Ru Credit Corp.,* 950 F.Supp. 858, 861 (N.D.Ill.1996), the principal sued created the debt collection letters himself.

We agree with the Magistrate Judge that Judge Kocoras' opinion in *Pope v. Vogel,* No. 97 C 1835, 1998 WL 111576 (N.D.Ill. March 5, 1998), also is distinguishable from this case. The court in that case held that the president of the debt collection agency was an "indirect debt collector" because the complaint alleged that the president "directed, authorized, controlled, and participated in" the debt collection agency's activities even though he did not have any direct contact with the plaintiff. *Pope,* 1998 WL 111576, at *5. However, the court in *Pope* stressed the fact that the president was the only employee of one of two entities which had contacted the plaintiff about the debt and one of two employees of the other entity. *Id.* Although *Pope* can be read to define "indirectly" as denoting a degree of involvement short of but equally as culpable as direct involvement, that definition is confined by the facts in *Pope* to the activities of a

principal of the debt collector which has the direct contact with plaintiff. Nothing in *Pope* suggests this court should impute liability to another corporate entity which did not have direct involvement with the plaintiff without evidence that the two corporations are in fact a single entity. The undisputed facts presented here, which demonstrate only the limited involvement of EPS' general counsel, certainly do not suggest that EPS and ECS are a single entity.

**\*10** The cases cited in plaintiff's Objections to the Report and Recommendation ("Objections" ') are equally inapposite. (Objections at 7-10.) In each of these cases, plaintiff sued an officer or principal of the debt collection agency which was responsible for collecting the debt under an indirect theory of liability because that officer or principal had direct contact with plaintiff in an effort to collect the debt. *See Pikes v. Riddle,* No. 98 C 568, 1998 WL 483601 (N.D.Ill. Aug.12, 1998) (holding sole equity owner who approved collection letter sent to plaintiff by debt collector could be personally liable under FDCPA if personally involved in the debt collection practices); *Egli v. Bass,* No. 98 C 2001, 1998 WL 560270 (N.D.Ill. August 26, 1998) (holding principal of debt collector could be liable if involved in debt collection practices); *Calabrales v. Dymacol,* No. 98 C 2109 (N.D. Ill. June 17, 1998) (order denying motion to dismiss sole owners of debt collector could be personally liable if they personally directed the unauthorized mailing).

Courts consistently have held that when two corporate entities are involved, only one of which directly attempted to collect the alleged debt, the plaintiff must allege facts sufficient if proved to pierce the corporate veil to prevail. *See Stepney v. Outsourcing Solutions,* No. 97 C 5288, 1997 WL 722972 (N.D.Ill. November 13, 1997); *Jenkins v. Union Corp.,* 999 F.Supp. 1120 (N.D.Ill.1998); *Harrison v. NBD Inc.,* 968 F.Supp. 837 (E.D.N.Y.1997) In other words, plaintiff must show that EPS and ECS "share an interdependence that renders them a 'single economic enterprise." ' *Jen-*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.))**

kins, 999 F.Supp. at 1142,*citing*Harrison, 968 F.Supp. at 845. We agree with the Magistrate Judge that proof that corporate counsel of one entity reviewed the form of letters sent by the other does not meet this standard.

In his Objections, plaintiff makes other arguments concerning statutory construction which are unpersuasive. These arguments were not presented to the Magistrate Judge, but we can consider them as part of our *de novo* review. He argues that an interpretation of "indirectly" which would require plaintiff allege facts showing vicarious liability to impute liability to a corporate entity which does not have direct contact with the debtor is contrary to the plain meaning of the statute. (Objections at 10-12.) We disagree. As the cases cited by plaintiff himself demonstrate, it is clear that those individuals who are employed by the entity can be liable under an indirect theory of liability if they have personal contact with the debtor or play some critical role in directing that entity's debt collection activities. Plaintiff's argument that this interpretation is inconsistent with the broad remedial purpose of the act also is unconvincing. (Objections at 12-13.) Plaintiff erroneously suggests that this interpretation will restrict unduly liability to the corporate vehicle which is actually collecting the debt. On the contrary, it is clear that different corporations which are actually a single entity as well as corporate officers who are personally involved with debt collection practices are covered within this interpretation.

**\*11** Accordingly, we agree that summary judgment be entered in EPS' favor and that EPS be dismissed from the case.

### III. *Plaintiff's Motion to Strike Affirmative Defenses*

Defendant ECS originally filed six affirmative defenses. ECS has since dismissed its fourth affirmative defense. Plaintiff has moved to strike all five of ECS' remaining affirmative defenses pursuant to Fed.R.Civ.P. 12(f).Rule 12(f) allows district courts

to strike "any insufficient defense" from any pleading. Motions to strike are disfavored and should be granted where the affirmative defenses are "patently defective and could not succeed under any circumstances."Mobley v. Kelly Kean Nissan, Inc., 864 F.Supp. 726, 732 (N.D.Ill.1993). A defense is affirmative only if (1) it is specifically listed in Fed.R.Civ.P. 8(c) or (2) it raises factual or legal issues outside of the plaintiff's prima facie case so the defense cannot be raised though a simple denial in the answer. *Bobbitt v. Victorian House, Inc.,* 532 F.Supp. 734, 736 (N.D.Ill.1982).

### A. ECS' First Affirmative Defense

ECS's first affirmative defense to the FDCPA claim is that plaintiff has failed to state a claim upon relief can be granted. (ECS' Answer at 15.) We agree with the Magistrate Judge that the Federal Rules permits a defendant to raise the defense of failure to state a claim in any pleading, including the answer. Fed.R.Civ.P. 12(h)(2). We also agree with the Magistrate Judge that the word "affirmative" be stricken from this defense because failure to state a claim is more properly viewed as a negative rather than affirmative defense. *See*Swanson v. American Express, Inc., No. 89 C 2148, 1989 WL 36227, at **\*** 1 (N.D. Ill. April 12, 1989); *Instituto Nacional de Comercializacion Agricola (Indeca) v. Continental Illinois Nat'l Bank and Trust Co.,* 576 F.Supp. 985, 991 (N.D.Ill.1983). We further agree with the Magistrate Judge that defendant has pleaded this defense adequately.

### B. ECS' Second Affirmative Defense

ECS' second affirmative defense is that subject matter jurisdiction is lacking because ECS is not a "debt collector" within the meaning of the FDCPA. (ECS' Answer at 15.) We agree with the Magistrate Judge that this defense be stricken as an affirmative defense because it can be raised as a simple denial. Plaintiff must prove that ECS is a debt collector to prevail. *Whitaker,* 129 F.3d at 958. ECS has denied

this. (ECS Answer at 2.) Therefore, defendant already has pleaded this defense.

### C. ECS' Third Affirmative Defense

ECS' third affirmative defense is that subject matter jurisdiction is lacking because the plaintiff used the alleged bad checks in question for gambling purposes and not for the personal, family or household used which the Act requires. (ECS' Answer at 15.) We agree with the Magistrate Judge that this is not an affirmative defense because it raises no issues outside of plaintiff's prima facie case. Plaintiff must prove that his obligation to pay constitutes a debt within the meaning of the FDCPA. *Kang v. Eisenstein,* 962 F.Supp. 112, 114 (N.D.Ill.1997). Defendant has denied that the check in question is a debt and, therefore, has raised this defense.

### D. ECS' Fifth Affirmative Defense

*\*12* ECS' fifth affirmative defense is that plaintiff has suffered no damages. (ECS' Answer at 15.) We agree with the Magistrate Judge that this affirmative defense should be stricken with prejudice. An FDCPA plaintiff does not have to prove actual damages to establish a right to recovery. *Keele v. Wexler,* 149 F.3d 589, 593 (7th Cir.1998). Proof of a violation is sufficient to trigger the FDCPA's statutory damages provisions. 15 U.S.C. § 1692k(2)(A). Therefore, even assuming that plaintiff suffered no actual damages, plaintiff can still state a claim for relief under the FDCPA.

ECS' response is that a court can consider the dearth of actual damages in its determination of the appropriate statutory damages, citing *Emanuel v. American Credit Exchange,* 870 F.2d 805, 808 (2d Cir.1989) (Defendant's Response In Opposition to Plaintiff's Motion to Strike Affirmative Defenses at 6.) We agree with the Magistrate Judge that even if this is true, lack of actual damages does not constitute an affirmative defense because it does not call the plaintiff's "right of recovery" into question. *Bobbitt,* 532 F.Supp. at 736 (quoting 5 Wright & Miller, Federal Practice and Procedure § 1270 at 292.)

### E. ECS' Sixth Affirmative Defense

ECS also has filed an affirmative defense which asserts a set-off of the alleged unpaid debt against damages which plaintiff may recover under the FDCPA. Because the Magistrate Judge allowed the counterclaim to proceed, she granted plaintiff's motion to strike this affirmative defense.

The difference between a counterclaim and a set-off is that a "counterclaim is broader and more comprehensive ... While a defendant who has asserted a counterclaim is entitled to an affirmative judgment ... a defendant who had pleaded a set-off is not entitled to recover the excess of his claim over the plaintiff's demand."*O'Connor v. Insurance Co. of North America,* 622 F.Supp. 611, 617 (N.D.Ill.1985) (quoting *Schenck v. Coordinated Coverage Corp.,* 50 A.D.2d 50, 376 N.Y.S.2d 131, 134 (1975)), aff'd sub nom.,*Stamp v. Insurance Co. of North America,* 908 F.2d 1375 (7th Cir.1990). Therefore, if plaintiff recovers nothing in this action or recovers less than the amount of the alleged set-off, ECS will not recover its entire debt in this action. In addition, if plaintiff's case does not proceed to judgment in his favor, ECS' set-off claim ceases to exist.

Courts have allowed defensive set-offs in similar circumstances. In actions under the analogous Consumer Leasing Act, 15 U.S.C. Section 1667a(11), part of the larger Truth In Lending Act ("TILA"), courts in this circuit have allowed set-offs for underlying debts to be alleged as affirmative defenses. In *Kedziora v. Citicorp Nat'l Servs., Inc,* Judge Castillo allowed such a set-off to stand even though he earlier had disallowed a counterclaim for the debt. 901 F.Supp. 1321, 1331-32 (N.D.Ill.1995). He reasoned that allowing the set-off in a case involving the TILA, where the damage award is intended to penalize and deter future violations, does not undermine the goals of the Act simply because

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.))**

defendant may be allowed to reduce his damages by the amount of the set-off. *Id.* at 1332. Similarly, in *Olevares v. Viking Dodge, Inc.,* another TILA case, Judge Grady rejected the defendant's attempt to set off the amount it claimed that plaintiff owed under the installment contract after judgment because it "could have raised its claim as a set-off to plaintiff's TILA claim in the course of our adjudication." 626 F.Supp. 114, 116 (N.D.Ill.1985).

**\*13** Given the similar remedial purposes of the TILA and the FDCPA, this court is persuaded that allowing the set-off to be asserted here would not contravene the public policy of the FDCPA or have a chilling effect on potential claims under the Act. Therefore, we will permit ECS to assert the amount of the debt owed as a defensive set-off.

### CONCLUSION

For all of the foregoing reasons, we hereby decline to adopt that part of the Magistrate's Report and Recommendation concerning the motion to dismiss ECS' counterclaims and order the counterclaims dismissed. We further adopt the Report and Recommendation concerning the motion for summary judgment as to defendant EPS and order summary judgment in favor of EPS on the complaint. Finally, we adopt in part the Report and Recommendation concerning ECS' affirmative defenses and order that ECS' Second, Third and Fifth Affirmative Defenses be stricken and allowing ECS' First and Sixth Affirmative Defenses to stand.

N.D.Ill.,1998.
Crawford v. Equifax Payment Services, Inc.
Not Reported in F.Supp.2d, 1998 WL 704050 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 6

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.))**

▷

American Top English v. Lexicon Marketing (USA), Inc.

N.D.Ill.,2004.

Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois, Eastern Division.

AMERICAN TOP ENGLISH, Plaintiff,

v.

LEXICON MARKETING (USA), INC., Defendant.

**No. 03 C 7021.**

Oct. 4, 2004.

Christopher W. Carmichael, Holland & Knight LLC, Chicago, IL, Alejandro Brito, Zarco & Pardo, P.A., Robert Zarco, Zarco & Associates, Miami, FL, for Plaintiff.

*MEMORANDUM OPINION AND ORDER*

CONLON, J.

**\*1** American Top English ("American") sues Lexicon Marketing (USA), Inc. ("Lexicon") for breaching the parties' contract by selling video courses in the State of Illinois. Lexicon counterclaims American breached the parties' contract by failing to pay invoices. Lexicon moves for summary judgment on its counterclaim and American's breach of contract claim under Fed.R.Civ.P. 56. Lexicon also moves to strike American's affirmative defenses under Fed.R.Civ.P. 12(f). American moves for summary judgment on Lexicon's counterclaim under Fed.R.Civ.P. 56.

BACKGROUND

A. The 1990 Agreement

All facts are undisputed unless otherwise noted.FN1Lexicon produces, markets and sells *Ingles Sin Barreras,* a twelve-volume instructional video course that teaches English to native Spanish

speakers. Lexicon Facts ¶ 3. Lexicon contends it markets and sells numerous products under the brand name *Ingles Sin Barreras,* including *Ingles Sin Barreras Compacto,* a six-volume product, and *Ingles Sin Barreras* for Institutions. *Id.* at ¶¶ 4-7. American contends Lexicon markets and sells only one product under the brand name *Ingles Sin Barreras,* but through different versions. American Resp. to Lexicon Facts at ¶¶ 4, 6. American asserts these versions have identical content but different tools. *Id.* at ¶ 7.

> FN1. Lexicon filed a reply to American's response to Lexicon's statement of undisputed material facts. This response is not authorized by Local Rule 56.1 and is disregarded.

On May 2, 1990, American entered into a distribution agreement ("the 1990 agreement") with one of Lexicon's predecessors, Hispanic-American Educational Materials, Inc. ("HAEM").*Id.* at ¶ 14. The parties contest whether the 1990 agreement limits American's distribution rights to one specific product. Lexicon contends American has rights to distribute and market "an English Language Course consisting of twelve (12) videocassette volumes and accompanying material to be used in the instruction of the English language to the Hispanic market," which means only the *Ingles Sin Barreras* complete product. *Id.* at ¶¶ 16-17. American contends the 1990 agreement does not limit distribution rights to the complete product and that it is entitled to sell all products under the *Ingles Sin Barreras* brand name. American Resp. to Lexicon Facts at ¶ 16. Either way, the 1990 agreement grants American sole and exclusive rights to distribute the product in the State of Illinois and in specific territories: (a) area codes 312 and 708, on an exclusive basis; and (b) the remainder of Illinois, on an exclusive basis, provided and so long as American purchased at least 75 video courses per month from Lexicon for Illinois' sales. Lexicon Facts at ¶¶ 18-19.

Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.))**

Section 15 of the 1990 agreement provides:

If either party is in default under this Agreement and the default continues for not less than twenty (20) days after receipt of certified written notice from the non-defaulting party, the non-defaulting party shall have the full right, power and authority to terminate this Agreement, or any portions or paragraphs of this Agreement as the non-defaulting party may elect.

**\*2** Lexicon Facts at ¶ 27. The 1990 agreement also states "in any arbitration or litigation relating to this Agreement, the prevailing party shall be entitled to recover its costs and reasonable attorneys' fees."Lexicon Add'l Facts at ¶ 29. "Any waiver by either party of any breach of any kind ... shall not be construed as a continuing waiver, or consent to, any subsequent breach ..."*Id.* at ¶ 30. The 1990 agreement contains an integration provision that the agreement constitutes the entire agreement between the parties and could be modified or amended "only by a writing signed by the parties and making specific reference that this Agreement is intended to be modified thereby."Lexicon Facts at ¶ 28.

The parties completed an addendum to the 1990 agreement. *Id.* at ¶ 15. The addendum grants American rights to purchase sales leads generated by Lexicon's national advertising. *Id.* at ¶ 29. Section 11 of the addendum provides:

[Lexicon] will not advertise in the specified exclusive area of [American]. Sales leads generated by [Lexicon's] national advertising which spills over into [American's] territory, will be received by [Lexicon] and retransmitted to [American] at [Lexicon's] cost of advertising and toll calls as follows: using AT & T's Executive Summary for [Lexicon's] 800 telephone line, [American] will be charged that percentage of the bill that corresponds to [its] area's percentage of calls. [American] understands that said Executive Summary does not include calls from the State of California, which will not be figured into the above computation. This same percentage will then be applied to [Lexicon's]

advertising bill that applies to [American].

American Add'l Facts at ¶ 115. On a monthly basis, Lexicon sends invoices to American reflecting the number of leads Lexicon provided to American for the previous month and the cost of those leads. *Id.* at ¶ 116. American's bill for the sales leads is determined by a formula prescribed by the addendum. Lexicon Facts at ¶ 30. The addendum requires American to notify Lexicon in writing if American does not wish to purchase the forwarded leads; American has never refused any of the offered sales leads. Lexicon Facts at ¶¶ 31-32. The addendum further provides "[i]f [American] purchases seventy-five (75) Video Courses per month, [American] will have the Exclusive Distributorship for the entire State of Illinois."American Facts at ¶ 11. Neither the 1990 agreement nor the addendum expressly state "time is of the essence." *Id.* at ¶ 15. The 1990 agreement is to be construed in accordance with the laws of the State of California. *Id.* ¶ 9; Lexicon Facts at ¶ 33.

B. The 1997 Agreement

On June 25, 1997, Lexicon and American entered into an agreement:

In consideration for the promises made in this Agreement and for other good and valuable consideration, [American] hereby releases, remises, and forever discharges [Lexicon] from any and all claims, actions, causes of action, and/or rights of set-off arising out of performance or non-performance of the Distribution Agreements between the dates of May 2, 1990 through January 1, 1997.

**\*3** Lexicon Facts at ¶ 38. In addition, the parties amended the 1990 agreement to include the following ninety-day contractual period of limitation:
The Distribution Agreements and each of them are amended in the following respects only to add the following: In the event that [American] learns of an unauthorized sale of [Lexicon] product in the sales

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.))**

territories of [American], [American] shall notify [Lexicon] in writing within two weeks of the finding. In such event and upon confirmation of the unauthorized sale, [Lexicon] shall pay the salesperson's commission for each such sale to [American]. In no event shall [American] seek compensation from [Lexicon] for unauthorized sales more than ninety [90] days after any such sale by [Lexicon].

*Id.* at ¶ 40. The 1997 Agreement is to be construed in accordance with the laws of the State of California. *Id.* at ¶ 41.

C. American's Payments for Sales Leads and Telephonic Services

In October 2003, the parties disputed the accuracy of advertising amounts reflected on Lexicon's invoices. American Add'l Facts at ¶ 125. American contends since 1990, Lexicon's sales leads and telephonic services invoices have enclosed various information including, beginning in 2001, data regarding the number of calls received per area code in all territories. *Id.* at ¶ 121. American contends it relied on this back-up data to verify the accuracy of Lexicon's invoices. *Id.* at ¶ 124; American Facts at ¶¶ 19-20. In October 2003, however, Lexicon stopped including the back-up data with the invoices. American Facts at ¶¶ 21-22. American asserts it could not verify the invoices' accuracy without knowing what states were included in the total number of sales leads. American Add'l Facts at ¶ 127. Lexicon contends the back-up information was provided as a courtesy and was unnecessary to verify the invoices' accuracy. *Id.;* Lexicon Facts at ¶ 97. Further, Lexicon contends there was no contractual obligation to provide American with the confidential and proprietary information. *Id.* at ¶ 26; ¶¶ 94-95.

On October 13, 2003, Lexicon sent American a written demand for payment of $632,658.71 in outstanding invoices for sales leads. Lexicon Facts at ¶ 105. The October 13th letter stated: (1) on September 25th, American had been notified of its de-

faults; (2) the period to cure expired twenty days later on October 15th; and (3) Lexicon was entitled to terminate American's distribution agreement after the cure period expired. *Id.* at ¶ 106. The next day, American sent Lexicon a check for $632,658.11, sixty cents less the amount due, but stated it was paying the amount "under protest." Lexicon Facts at ¶ 107.

The dispute over back-up data did not end in October 2003. In December 2003, and between January and March 2004, American and Lexicon exchanged e-mails relating to the production of back-up data. American Facts at ¶¶ 23-25, 27. American contends Lexicon agreed in a December 12, 2003 e-mail to provide the requested data before requiring payment, a representation upon which American relied. *Id.;* American Add'l Facts at ¶ 129. Lexicon disputes it agreed to provide the data. Lexicon Resp. to American Add'l Facts at ¶ 129.

**\*4** In the meantime, Lexicon invoiced American for sales leads as follows: (1) $55,939.45 on December 28, 2003 (January 15, 2004 due date); (2) $50,495.15 on January 20, 2004 (February 15, 2004 due date); (3) $32,788.70 on February 13, 2004 (March 15, 2004 due date); (4) $32,483.50 on March 18, 2004 (April 15, 2004 due date); (5) $59,083.09 on April 15, 2004 (May 15, 2004 due date); and (6) $53,914.03 on May 13, 2004 (June 15, 2004 due date).*Id.* at ¶¶ 68-73. Lexicon contends $7,679.70 remains unpaid on the February invoice, $46,152.27 remains unpaid on the March invoice, $37,201.10 remains unpaid on the April invoice, and $31,286.14 remains unpaid on the May invoice. *Id.* at ¶¶ 70-73. Lexicon contends all other invoices remain unpaid in full. *Id.* at ¶¶ 68-69. Further, Lexicon contends American owes $21,000.00 in unpaid invoices for telephonic services. *Id.* at ¶¶ 80-91.

On March 17, 2004, Lexicon notified American by letter that it would be in default of the 1990 agreement if all outstanding invoices were not paid within twenty days. Lexicon Facts at ¶ 92. The letter also stated "while it may be true that you were re-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.))**

ceiving the full reports until October 2003, a review of our internal accounting practices indicated that the information being disclosed to you is proprietary confidential company data. As a result, Lexicon will no longer disclose the information you were previously receiving in the reports."American Add'l Facts at ¶ 133. American tendered a $25,000.00 payment to Lexicon on March 5, 2004; the memo portion of the check stated "[g]ood faith payment for January 2004 advertising."American Facts at ¶ 28. American also tendered a $50,000.00 payment to Lexicon. *Id.* at ¶ 29. Lexicon accepted and applied these payments to American's account. Lexicon Resp. to American Facts at ¶¶ 28-29. On March 31, 2004, American responded to Lexicon's March 17th letter, requested explanation for Lexicon's position that back-up data was unnecessary to verify the invoices, and responded that: (1) it had not refused to remit amounts owed and had paid $75,000.00; (2) it was not in default; (3) it needed back-up information; and (4) intended to pay appropriate bills. American Facts, Ex. V.

On April 2, 2004, Lexicon sent another letter to American indicating: (1) American's account was delinquent; (2) American was in default of the 1990 agreement; and (3) Lexicon reserved each of its rights and remedies for the default. Lexicon Facts at ¶¶ 98-99. By letters dated April 12, 2004 and May 4, 2004, American again requested explanation for Lexicon's position that back-up data was unnecessary to verify the invoices. American Facts at ¶ 22. American asserts Lexicon never responded to these requests. *Id.* at ¶ 33. Lexicon contends it responded American was not contractually entitled to the information, the information was confidential and proprietary, and Lexicon would not provide the information to American. Lexicon Resp. to American Facts at ¶ 34. On May 4, 2004, American informed Lexicon it had decided to place the amounts alleged to be owed in escrow until the invoices were verified, at which point the sum in escrow would be delivered to Lexicon. American Facts at ¶ 38, Ex. X. On June 16, 2004, both parties acknowledged that errors did exist in the invoices' totals.

American Facts at ¶¶ 137-138; Lexicon Resp. to American Facts at ¶¶ 137-138. Nonetheless, on June 30, 2004, Lexicon sent American written notice it was terminating the 1990 agreement and that such termination would take effect on the earliest date this court deems proper. Lexicon Facts at ¶ 102.

**\*5** American contends all invoices have been paid in full. American Resp. to Lexicon Facts at ¶¶ 67-73, 80-91. American asserts it delivered full payment to Lexicon of all invoices claimed to be due and owing on August 9, 2004. American Facts at ¶ 43, 45. Lexicon responds it received two overnight mail pouches, six checks and six letters from American on August 10, 2004, but American did not tender payment for any amount of interest on the overdue invoices, nor did it pay any amount for the costs and reasonable attorneys' fees Lexicon incurred to litigate its counterclaims. Lexicon Resp. to American Facts at ¶ 45. Lexicon contends its expert has opined that through July 23, 2004, the amount of interest due on the disputed sales leads invoices was $13,286.40 and on disputed telephonic services invoices, $1,281.66. *Id.* Lexicon therefore contends American has not paid monthly invoices since January 2004 and owes more than $250,000.00 for sales leads and $21,000.00 for telephonic services. Lexicon Facts at ¶¶ 67, 80.

### E. Unauthorized Sales by Lexicon in Illinois

Lexicon asserts it has made the following video course sales in Illinois: (1) between 1990 and 1997, fewer than 30 sales; (2) from 1997-2002, fewer than 100 sales; (3) 2002-present, no sales of the complete version of *Ingles Sin Barreras* that have not already been transferred to American or credited to American's account; (4) since January 1, 2002, less than 50 sales of *Ingles Sin Barreras* Institutional; and (5) since January 16, 2004, it has sold only *Ingles Sin Barreras* Institutional. Lexicon Facts at ¶¶ 59-64. American disputes these numbers and contends it had exclusive rights to sell all versions of the video course, including *Ingles Sin Bar-*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.))**

*reras* Institutional. American Resp. to Lexicon Facts at ¶¶ 59-64. It is uncontested American complained of unauthorized sales two to three times per year over the parties' fourteen-year relationship, and that it possessed some knowledge and notice of unauthorized sales in its territory. Lexicon Facts at ¶ 65. Further, it is uncontested American did not seek compensation in writing from Lexicon for alleged unauthorized sales until April 16, 2004, the date American filed its first amended complaint. *Id.* at ¶ 66.

DISCUSSION

I. Motions for Summary Judgment

On cross-motions for summary judgment, each movant must satisfy the requirements of Rule 56. *EEOC v. Admiral Maint. Serv., L.P.,* No. 97 C 2034, 1998 WL 102748, at *6 (N.D.Ill. Feb.26, 1998). Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once a moving party meets its burden, the non-moving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Silk v. City of Chicago,* 194 F.3d 788, 798 (7th Cir.1999). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the party opposing the motion. *Bay v. Cassens Transport Co.,* 212 F.3d 969, 972 (7th Cir.2000). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A. Lexicon's Motion on American's Remaining Claim

*6 Lexicon moves for summary judgment on American's claim that Lexicon is liable for unauthorized sales of the video course in Illinois. Lexicon argues any unauthorized sales that occurred more than ninety days prior to American's April 16, 2004 lawsuit are barred by the 1997 Agreement, which provides *"in no event* shall [American] seek compensation from [Lexicon] for unauthorized sales more than ninety [90] days after any such sale by [Lexicon]" (emphasis added). Lexicon further contends the only sales it made in Illinois after January 16, 2004, were of the institutional version of the video course which American does not have exclusive rights to sell. Lexicon argues American only has rights to distribute and market "an English Language Course consisting of twelve (12) videocassette volumes and accompanying material to be used in the instruction of the English language to the Hispanic market."Finally, Lexicon argues American has not produced any competent evidence of its lost profits and cannot establish damages from any unauthorized sales.

In response, American argues the 90-day contractual limitations period is unreasonable and unlawful because California law allows contracting parties to shorten California's four-year statute of limitations only if the shortened period is reasonable. Further, because the 1997 agreement states "[i]n the event [American] learns of an unauthorized sale ...," American relies on a "discovery rule" that limits the application of a statute of limitations "where it is manifestly unjust to deprive plaintiffs of a cause of action before they are aware they have been injured."*Armando v. Moreno,* 106 Cal.App.4th 1415, 1423, 131 Cal.Rptr.2d 684 (Cal.Ct.App.2003) ("a cause of action under the discovery rule accrues when the plaintiff discovers or should have discovered all facts essential to his cause of action ... when plaintiff either (1) actually discovered his injury and its negligent cause or (2) could have discovered injury and cause through the exercise of reasonable diligence").*Id.* Thus, American contends the issue of American's knowledge of Lexicon's unauthorized sales and the facts of those sales are

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

peoples

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.))**

questions of facts for a jury. American contends no agreement between the parties distinguishes between the institutional version of the courses and any other version. In any event, whether the materials Lexicon sold are substantially different from what American sells, or whether American is precluded from selling the institutional version, are material issues of fact precluding summary judgment. Finally, American argues uncertainty regarding the amount of damages to be recovered is not a basis of summary judgment.

The 1997 agreement provides:

The Distribution Agreements and each of them are amended in the following respects only to add the following: In the event that [American] learns of an unauthorized sale of [Lexicon] product in the sales territories of [American], [American] shall notify [Lexicon] in writing within two weeks of the finding. In such event and upon confirmation of the unauthorized sale, [Lexicon] shall pay the salesperson's commission for each such sale to [American]. In no event shall [American] seek compensation from [Lexicon] for unauthorized sales more than ninety [90] days after any such sale by [Lexicon].

**\*7** On April 16, 2004, American filed its first amended complaint seeking compensation from Lexicon for alleged unauthorized sales. California's four-year statute of limitations period for breach of contract clearly bars recovery for any unauthorized sales made before April 16, 2000. Cal.Code Civ. P. § 337(1); *Mortkowitz v. Texaco Inc.,* 842 F.Supp. 1232, 1236-37 (N.D.Cal.1994). Therefore, the only alleged unauthorized sales at issue are those occurring after April 16, 2000.

American's reliance on *Armando v. Moreno,* 106 Cal.App.4th 1415, 1423, 131 Cal.Rptr.2d 684 (Cal.Ct.App.2003), is misplaced. Generally, a plaintiff seeking to enforce the discovery rule, an exception typically applied in tort cases, must plead specific facts establishing: (1) the time and manner of discovery; and (2) an inability to have made earlier discovery despite reasonable diligence.

*Mortkowitz,* 842 F.Supp. at 1238. *Armando* also reinforces the general rule that a cause of action accrues when the wrongful act occurs, not when plaintiff discovers the act. *Id.* at 1423, 131 Cal.Rptr.2d 684. Although *Armando* lists several situations when the discovery rule may apply as an exception to the general rule, it further holds the exception is appropriate when the parties have a relationship of special trust, such as a fiduciary, confidential or privileged relationship. *Id.* at 1423-24.*Armando* applies the discovery rule to a home inspection contract for public policy reasons; the only other breach of contract situation mentioned in *Armando* is a contract breach committed in secret. *Id.*

The discovery rule exception in not appropriate here. American has not pleaded specific facts regarding the time and manner of discovery or an inability to have made earlier discovery. Nor does American provide evidence establishing the parties have a relationship of special trust or that Lexicon's alleged breaches occurred in secret. Indeed, it is uncontested American complained of unauthorized sales two to three times per year over the parties' fourteen-year relationship, indicating it possessed some knowledge and notice of unauthorized sales in its territory. American also filed its original complaint on October 3, 2003 alleging a claim for breach of American's distribution rights. However, American admits it did not seek compensation in writing from Lexicon for alleged unauthorized sales until April 16, 2004. Therefore, even if American did not discover the alleged breaches until as late as October 3, 2003, it did not seek compensation from Lexicon within two weeks, let alone 90 days, of discovery pursuant to the parties' agreement. Further, the court disagrees with American's assertion that the language "[i]n the event [American] learns of an unauthorized sale ...," means the discovery rule applies instead of the 90-day contractual limitation period. The express contract language states *"in no event* shall [American] seek compensation from [Lexicon] for unauthorized sales more than ninety [90] days after any such sale by [Lexicon]."

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.))**

The 90-day limitations period is applicable. American cannot recover for unauthorized sales that occurred more than 90 days prior to April 16, 2004.

**\*8** Unauthorized sales that occurred between January 16, 2004 and April 16, 2004 remain. The evidence demonstrates the only sales Lexicon made in Illinois after January 16, 2004 were of the institutional version of the video course. Assuming the contract provides American with exclusive rights to sell the institutional version of the video course in Illinois, a fact that is highly contested, an unauthorized sale by Lexicon is not a *per se* breach of contract. The contract contemplates American will notify Lexicon in writing within two weeks of learning about an unauthorized sale and, upon confirmation of the unauthorized sale, Lexicon will pay American the commission from the sale. American's window of recovery is therefore narrowed yet again, as the contract requires written notice within two weeks of the finding. American cannot recover for unauthorized sales that it learned of more than two weeks prior to April 16, 2004.

Material issues of facts exist as to whether the contract provides American with exclusive rights to sell the institutional version of the video course, so that Lexicon's sale of the institutional version in Illinois breached the contract. If the contract provides American exclusive rights to sell the institutional version in Illinois, there are questions of fact regarding the sales that occurred within two weeks of American's April 16, 2004 written notice and the damages incurred as a result of the unauthorized sales. Summary judgment must be denied.

B. Cross-Motions on Lexicon's Counterclaim

Both parties move for summary judgment on Lexicon's counterclaim. Lexicon's counterclaim seeks a judgment: (A) declaring (i) Lexicon is entitled to terminate the parties' distribution agreements and (ii) such agreements are terminated effective the earliest date the court deems proper; (B) awarding damages to Lexicon for American's breach; and (C)

awarding prevailing party attorneys' fees and costs.

Lexicon contends it is entitled to a judgment declaring it is contractually entitled to terminate the parties' non-Arizona distribution agreements. Lexicon argues it is undisputed that American failed and refused to pay approximately $250,000.00 in outstanding and overdue invoices, notwithstanding Lexicon's written notices demanding payment. Because American failed to cure its defaults within 20 days of receiving Lexicon's notices, Lexicon contends it is entitled to terminate the distribution agreement pursuant to § 15 of the parties' 1990 agreement. Lexicon further contends it is entitled to summary judgment on its counterclaim for damages, since American failed to meet its contractual obligations to pay for services Lexicon provided. Accordingly, Lexicon contends it is entitled to an award of $264,431.87, plus interest accruing subsequent to July 23, 2004 and prior to the date of payment. Finally, Lexicon asserts it is entitled to costs and reasonable attorneys' fees under the 1990 agreement, should it prevail on its claims. Because the amounts are not currently known and must be the subject of post-judgment proceedings, Lexicon does not seek summary judgment on that portion of its declaratory judgment and breach of contract claims.

**\*9** American contends Lexicon is not entitled to terminate the contract and American is entitled to summary judgment on Lexicon's counterclaim. Citing California Civil Code § 3275, American argues it was clearly not in breach, let alone material breach, of the 1990 agreement. American contends neither the 1990 agreement or addendum state that time is of the essence or specify when payment from American is due. Further, American argues it regularly communicated with Lexicon regarding Lexicon's failure to provide back-up data, it tendered two good faith payments in the amount of $75,000, and it put the remainder of the amount due in escrow. American contends Lexicon accepted the $75,000 tendered in good faith. American argues Lexicon's failure to provide the back-up data neces-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.))**

sary to verify the accuracy of Lexicon's invoices, and American's reliance on Lexicon's representation the data would be provided, justified the delay in payment. Further, American argues Lexicon's claims for declaratory relief and breach of contract are moot because on August 9, 2004, it tendered full payment to Lexicon of all invoices claimed to be due and owing. Finally, American contends Lexicon's claim for attorneys' fees and costs is premature because Lexicon has not prevailed on its counterclaims or the claims asserted by American, and because the suit must be oppressive to justify an award of attorneys' fees and costs.

The court reviews the parties' cross-summary judgment motions drawing all facts and inferences in favor of the non-movant. Neither party is entitled to summary judgment on defendant's counterclaim. The record contains several material issues of fact regarding whether American breached the contract. For instance, the parties vigorously dispute a key fact: whether payment in full has been rendered. Further, there are material questions of fact regarding whether American was in breach when it tendered two good faith payments in the amount of $75,000, communicated with Lexicon regarding Lexicon's failure to provide back-up data, and tendered payment for the amount owed and due on August 9, 2004. Even if American were not contractually entitled to all back-up data sought, which is disputed, whether delayed payments of Lexicon's invoices constituted a breach of the parties' contract is a question of fact given the parties dispute regarding the contract's silence on payment requirements.

In addition, even if the contract were breached, California courts only allow termination of a contract if the breach is material, substantial or total.*Superior Motels, Inc. v. Rinn Motor Hotels, Inc.,* 195 Cal.App.3d 1032, 1051, 241 Cal.Rptr. 487 (Cal.Ct.App.1987).“Whether a breach is so material as to constitute cause for the injured party to terminate a contract is ordinarily a question for the trier of fact.”*Id., citing Whitney Inv. Co. v. Westview*

*Dev. Co.,* 273 Cal.App.2d 594, 601, 78 Cal.Rptr. 302 (Cal.Ct.App.1969). Lexicon argues delayed payment is clearly a material breach justifying termination of the contract and that materiality is irrelevant anyway because § 15 only requires a default, thereby dispensing of the common-law materiality requirement. Lexicon provides no law governing the contract to support this assertion. Summary judgment is inappropriate. Both parties' motions for summary judgment on defendant's counterclaim are denied.

II. Motion to Strike Affirmative Defenses

**\*10** A court may strike “any insufficient defense or any redundant, immaterial, impertinent or scandalous matter.”Fed.R.Civ.P. 12(f). As a rule, motions to strike are disfavored because they may serve only to cause delay. *Renalds v. S.R.G. Restaurant Group,* 119 F.Supp.2d 800, 801 (N.D.Ill.2000). However, where motions to strike “remove unnecessary clutter from the case, they serve to expedite, not delay.”*Heller v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1294 (7th Cir.1989). Affirmative defenses are pleadings, and thus must set forth a “short plain statement of the claim showing that the pleader is entitled to relief.”Fed.R.Civ.P. 8(a).“An allegation must include either direct or inferential allegations respecting all material elements of the claim asserted.”*Man Roland v. Quantum Color Corp.,* 57 F.Supp.2d 576, 579 (N.D.Ill.1999). Affirmative defenses that are simply “bare bones conclusory allegations” do not meet this standard and must be stricken. *Heller,* 883 F.2d at 1295. In evaluating whether an affirmative defense should be stricken, the court must determine: “(1) whether the matter is appropriately pleaded as an affirmative defense; (2) whether it is adequately pleaded; and (3) whether it is legally sufficient to state a claim under the Rule 12(b)(6) standard.”*Gen. Elec. Capital Corp. v. Munson Marine, Inc.,* No. 91 C 5090, 1992 U.S. Dist. LEXIS 877, \*2 (N.D.Ill. Jan. 27, 1992). On the third prong, if the defendant could prove no set of facts in support of the affirmative defense that would defeat the complaint, the de-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.))**

Page 9

fense must be stricken as legally inadequate. *Surface Shields, Inc. v. Poly-Tak Prot. Sys.,* 213 F.R.D. 307, 308 (N.D.Ill.2003).

**A. First Affirmative Defense**

American's first affirmative defense states "the counterclaim fails to state a cause of action."A defense for failure to state a claim merely rephrases the standard for evaluating a motion to dismiss under Fed.R.Civ.P. 12(b)(6)."This type of allegation is not an affirmative defense which adds substance to the litigation; it is clutter."*Surface Shields,* 213 F.R.D. at 308;*see also Imperial Constr. Mgmt. Corp. v. Laborers' Int'l Union,* 818 F.Supp. 1179 (N.D.Ill.1993). American argues the affirmative defense should not be stricken because courts may grant summary judgment for failure to state a claim. But where the affirmative defense is merely listed without a short statement to explain the basis for the defense, it is properly stricken.*Anicom, Inc. v. Netwolves Corp.,* No. 00 C 2088, 2000 U.S. Dist. LEXIS 16547, 7-8 (N.D.Ill. Oct.25, 2000) (striking failure to state a claim defense where defense merely listed without explanation of its basis)."Even those courts that have allowed a party to assert a defense of failure to state a claim, however, have not read the Federal Rules so liberally as to allow the bare recitation of the legal standard ("failure to state a claim") without a short and plain statement of the basis for the defense, as is required by Rule 8(a)."*Builders Bank v. First Bank & Trust Co.,* No. 03 C 4959, 2004 U.S. Dist. LEXIS 5016, *9 (N.D.Ill. Mar. 24, 2004). The motion to strike the defense of failure to state a claim must be granted.

**B. Second Affirmative Defense**

**\*11** American's second affirmative defense states "counterclaim-plaintiff has failed to perform conditions precedent and is thus not entitled to bring this lawsuit."This conclusory allegation is not properly pleaded. "A denial of performance or occurrence

shall be made specifically and with particularity."Fed.R.Civ.P. 9(c). American fails to set forth any specific facts to support this claim. "Bare bones conclusory allegations" should be stricken. *Heller,* 883 F.2d at 1295. The motion to strike the defense of failure to perform conditions precedent must be granted.

**C. Third Affirmative Defense**

American's third affirmative defense states "counterclaim-plaintiff is barred from recovery due to its prior material breaches of contract."An affirmative defense must include "either direct or inferential allegations respecting all material elements of the claim asserted."*Man Roland v. Quantum Color Corp.,* 57 F.Supp.2d 576, 579 (N.D.Ill.1999). American does not identify the contract Lexicon materially breached or how prior breaches bar Lexicon's counterclaims. Where the affirmative defense is merely listed without a short statement to explain the basis for the defense, it is properly stricken. *Anicom,* 2000 U.S. Dist. LEXIS 16547 at *7-8. American asserts Lexicon is fully aware of the contracts American claims were breached because American sued Lexicon for breach of contract. Even if true, American misses the mark. The affirmative defense must be properly pled to survive the motion to strike. This is true regardless of other circumstances in the litigation. The motion to strike the affirmative defense based on prior material breaches must be granted.

**D. Fourth Affirmative Defense**

American's fourth affirmative defense states "counterclaim-plaintiff is estopped from raising its claims because of its wrongful conduct and/or 'unclean-hands.' " Lexicon argues the unclean hands defense is insufficiently pled and is unavailable in this action at law. American's responds the unclean hands defense is entirely appropriate. The court need not decide whether the defense is available because it is improperly pled. Unclean hands is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

an equitable defense that must be pled with the specific elements required to establish the defense. *Yash Raj Films (USA) Inc., v. Atlantic Video,* No. 03 C 7069, 2004 U.S. Dist. LEXIS 9739, *9 (N.D.Ill. May 27, 2004). American must plead Lexicon acted in a way that amounts to fraud, misconduct or bad faith.*Global Poly, Inc. v. Fred's Inc.,* No. 03 C 4561, 2004 U.S. Dist. LEXIS 3880, *17 (N.D.Ill. Mar.11, 2004), *citing Ocean Atlantic Woodward Corp. v. DRH Cambridge Homes, Inc.,* No. 02 C 2523, 2003 U.S. Dist. LEXIS 4964, at *8 (N.D.Ill. Mar. 31, 2003). If American suggests Lexicon committed fraud, the conclusory allegation that Lexicon acted with unclean hands fails to meet the particularity requirements of Fed.R.Civ.P. 9(b).*Global Poly,* 2004 U.S. Dist. LEXIS 3880 at *17. In any event, the basic allegation Lexicon acted with unclean hands fails to meet the notice requirement of Fed.R.Civ.P. 8(a).*Id.* Where the affirmative defense is merely listed without a short statement to explain the basis for the defense, it is properly stricken. *Anicom,* 2000 U.S. Dist. LEXIS 16547 at *7-8 (striking unclean hands defense where defense merely listed without explanation of its basis). The motion to strike the defense of unclean hands must be granted.

### E. Fifth Affirmative Defense

**\*12** American's fifth affirmative defense states "counterclaim-plaintiff has knowingly and intentionally acquiesced in the alleged acts complained of and thus waived any right to now object or otherwise seek redress."Waiver is an affirmative defense enumerated under Fed.R.Civ.P. 8(c). Waiver involves voluntary, intentional relinquishment of a known right. *Global Poly,* 2004 U.S. Dist. LEXIS 3880 at *15-16, *citing Ocean Atlantic,* 2003 U.S. Dist. LEXIS 4964 at *8; *Int'l Ins. Co. v. Peabody Int'l Corp.,* No. 87 C 464, 1991 U.S. Dist. LEXIS 1959, at *3 (N.D.Ill. Jan. 23, 1991). Lexicon argues the defense fails to put it on notice of the conduct allegedly constituting waiver. However, the defense states Lexicon "acquiesced" in the "acts complained of." Lexicon is presumably aware of the ac-

tions alleged in its counterclaim. Construing the pleadings liberally, American could prove facts in support of the affirmative defense to defeat the counterclaim. The motion to strike the waiver defense must be denied.

### F. Sixth Affirmative Defense

American's sixth affirmative defense states "counterclaim-plaintiff's causes of action have been waived, released or discharged, or counterclaim-plaintiff has otherwise ratified the acts of which it now complains."This catalogue of defenses is inappropriate. "Court have held time and time again that stringing together a long list of affirmative defenses is not sufficient to satisfy Rule 8(a)'s short and plain statement requirement." *Builders Bank,* 2004 U.S. Dist. LEXIS 5016 at *9; *see also Yash Raj Films (USA) Inc.,* 2004 U.S. Dist. LEXIS 9739 at *9. In addition, the waiver defense is redundant since American pleads waiver as its fifth affirmative defense. Fed.R.Civ.P. 12(f). American has not pled any facts that may support the claim that Lexicon released or discharged American from an existing obligation or ratified an act American performed. Ratification is an equitable defense that must be pled with the specific elements required to establish the defense. *Yash Raj Films (USA) Inc.,* 2004 U.S. Dist. LEXIS 9739 at *9. Affirmative defenses that are simply "bare bones conclusory allegations" must be stricken. *Heller,* 883 F.2d at 1295. The motion to strike the sixth affirmative defense must be granted.

### G. Seventh Affirmative Defense

American's seventh affirmative defense states "counterclaim-plaintiff has failed to mitigate any damages that it may have suffered."Lexicon admits the standard for pleading mitigation is generally liberal. Lexicon Mot. at 6, n. 2. American has sufficiently pled the mitigation defense. *See e.g., Wausau Ins. Co. v. Woods Equip. Co.,* No. 01 C 8009, 2002 U.S. Dist. LEXIS 4171, *6-7 (N.D.Ill.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mar. 14, 2002) (denying motion to strike failure to mitigate defense); *Tome Engenharia E Tranportes v. Malki,* No. 94 C 7427, 1996 U.S. Dist. LEXIS 4585, *29-30 (N.D. Ill.)(denying motion to strike affirmative defense "plaintiff has failed to mitigate its damages"). The motion to strike the mitigation defense must be denied.

## H. Eighth Affirmative Defense

**\*13** American's last affirmative defense states "counterclaim-defendant is entitled to an offset of an amount equal to or greater than any amounts claimed by counterclaim-plaintiff due to counter-claim-plaintiff [sic] wrongful conduct in its performance of contractual and other obligations."Offset is not an affirmative defense because it does not destroy the counterclaim-plaintiff's right of action. *Cipa Mfg. Corp. v. Allied Golf Corp.,* No. 94 C 6574, 1995 U.S. Dist. LEXIS 7604, *4-5 (N.D.Ill. May 24, 1995). American provides no authority to the contrary. The motion to strike the off-set defense must be granted.

## I. American's Request to Amend Affirmative Defenses

American contends it should be granted leave to file amended affirmative defenses. "Defenses are pleadings, and as such, leave to amend is freely granted as justice requires."*Heller, 883 F.2d at 1294.* Even if American can correct some of the technical problems with its affirmative defenses, the defenses must be dismissed with prejudice. Discovery closed on August 9, 2004, and all dispositive motions were due and filed on that date. There is no justification for allowing American to amend its affirmative defenses when Lexicon would not have an opportunity to respond or conduct discovery. *Anicom, Inc. v. NetWolves Corp.,* 2000 U.S. Dist. LEXIS 16547, 7-8 (N.D.Ill.2000).

## CONCLUSION

Defendant's motion for summary judgment is denied. Plaintiff's cross-motion for summary judgment on defendant's counterclaim is denied. Defendant's motion to strike plaintiff's affirmative defenses is granted in part and denied in part.

N.D.Ill.,2004.
American Top English v. Lexicon Marketing (USA), Inc.
Not Reported in F.Supp.2d, 2004 WL 2271838 (N.D.Ill.)

END OF DOCUMENT

# TAB 7

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2005 WL 1429755 (M.D.Ga.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1429755 (M.D.Ga.))**

H

Otero v. Vito
M.D.Ga.,2005.
Only the Westlaw citation is currently available.
United States District Court,M.D. Georgia, Macon
Division.
Jay OTERO, Plaintiff,
v.
George VITO, D.P.M., Foot & Leg Centers of
Georgia, P.C., Surgical Centers of Georgia, and
Middle Georgia Hospital, LLC, Defendants.
**No. 5:04CV211DF.**

June 15, 2005.

Mark Ashley Inman, Prescott L. Nottingham, At-
lanta, GA, for Plaintiff.

Edward L. Long, Jr., John C. Edwards, R. Lars An-
derson, Macon, GA, Brynda Rodriguez Insley,
Chloe E. Dallaire, John K. Train, IV, Deborah A.
Ausburn, Atlanta, GA, for Defendants.

*ORDER*

FITZPATRICK, J.

**\*1** Defendant Middle Georgia Hospital ("MGH")
has filed a Motion to Strike (tab 49) paragraph 185
and portions of paragraphs 198 and 199 of
Plaintiff's Amended Complaint (tab 46). Pursuant to
Rule 12(f), the Court may strike "any insufficient
defense or any redundant, immaterial, impertinent,
or scandalous matter."*See*Fed.R.Civ.P. 12(f) (West
2005). Defendant asserts that the paragraphs at is-
sue contain impertinent and scandalous informa-
tion.

Because it is a drastic remedy, "a motion to strike is
... disfavored by the courts."*Agan v. Katzman &
Korr, P.A.,* 328 F.Supp.2d 1363, 1367
(S.D.Fla.2004) (citing *Thompson v. Kindred Nurs-
ing Centers East, LLC,* 211 F.Supp.2d 1345, 1348
(M.D.Fla.2002). To avoid the imposition of a
drastic remedy, "[m]otions to strike are usually
denied unless the allegations have no possible rela-

tion to the controversy and may cause prejudice to
one of the parties."*Id.* at 1367 (internal citations
omitted). Motions to strike have long been dis-
favored by courts, and are equally disliked by this
Court. *See United States v. S. Motorcarriers Rate
Conference, et al.,* 439 F.Supp. 29, 39
(N.D.Ga.1977); *see also Poston v. Am. President
Lines, Ltd.,* 452 F.Supp. 568, 570-71
(S.D.Fla.1978).

Defendant asks the Court to strike paragraph 185,
which reads: "Before the surgery on Plaintiff Otero,
Defendant Hospital and Defendant Vito were rep-
resented by the same law firm in the action filed by
Sabih Kalidy."Then, in paragraphs 198 and 199,
Defendant asks the Court to strike the phrase "by
and through its agents and counsel."According to
MGH, the inference from paragraph 185 and the
phrase in paragraphs 198 and 199 is that trial coun-
sel for Defendants Vito and MGH in the Kalidy ac-
tion shared with each other, and their respective cli-
ents, information sufficient to establish liability
against MGH in this action. MGH disputes the sug-
gestion of improper communications between trial
counsel who work in the same law firm and the im-
putation of knowledge to their clients from these
improper communications.

The presence of an earlier medical malpractice ac-
tion is relevant to establishing MGH's negligence in
credentialing Dr. Vito to perform the leg-
lengthening procedure on Plaintiff Otero. *See
Candler Gen. Hosp. v. Persaud, et al.,* 212 Ga.App.
762, 442 S.E.2d 775, 778 (Ga.Ct.App.1994)
(stating that hospitals owe an independent duty to
patients to ensure physicians are qualified for the
privileges they are granted and that hospital's
knowledge of prior malpractice claims is evidence
of negligence). Thus, the existence of the Kalidy
action is pertinent to this suit brought by Otero.
Plaintiff has introduced the fact that defense coun-
sel in the Kalidy action work in the same law firm
to imply that MGH, through counsel, was made
privy to Dr. Vito's thoughts, impressions, and un-

Not Reported in F.Supp.2d, 2005 WL 1429755 (M.D.Ga.)

**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1429755 (M.D.Ga.))**

derstandings. Imputing Dr. Vito's knowledge to MGH would no doubt aid Otero in establishing his claim for negligent credentialing against MGH. But, the thoughts, impressions, and information Dr. Vito communicated to his counsel in defending against the Kalidy action are protected by the attorney-client privilege and therefore are not subject to being presented to the Court. *See Cox v. Adm'r U.S. Steel & Carnegie,* 17 F.3d 1386, 1414 (11th Cir.1994) (stating that attorney-client privilege protects client's disclosures to attorney that are made to secure legal advice or assistance). Consequently, who represented Defendants Vito and MGH in the Kalidy action should be struck from the amended complaint as impertinent since any information resulting from the representation of Defendants Vito and MGH in the Kalidy action is protected by the attorney-client privilege and not able to be discovered or presented at trial. *See*5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1382 (1990); *see also* 2 James Wm. Moore, et al., Moore's Federal Practice, § 12.37[3] (Matthew Bender 3d ed.2004) (defining impertinent as irrelevant and non-responsive).

**\*2** Additionally, the phrase "by and through its agent and counsel" that is found in paragraphs 198 and 199 is also impertinent. Paragraphs 198 and 199 allege MGH's level of awareness prior to Otero's surgery, and suggest that MGH was made aware of Dr. Vito's actions because the parties were co-defendants in the Kalidy action. Otero may prove MGH's knowledge and awareness of this matter, but he cannot discover or prove what information was shared with MGH by counsel during or as a result of the Kalidy action. *See United States v. Almeida,* 341 F.3d 1318, 1323 (11th Cir.2003) ("confidential communications made during joint defense strategy sessions are privileged") (citing *Wilson P. Abraham Const. Corp. v. Armco Steel Corp.,* 559 F.2d 250, 253 (5th Cir.1977)).

Furthermore, paragraph 185 and the contested phrase in paragraph 198 and 199 can also be characterized as scandalous. Matter is characterized as scandalous when it casts someone in a derogatory light. *See*Wright & Miller § 1382. Plaintiff implies that Kalidy trial counsel violated ethical obligations to their clients-namely that Dr. Vito's counsel divulged confidences he shared with counsel to trial counsel for MGH. *See* Georgia Rules of Prof'l Conduct R. 1.6 (2001) (highlighting that lawyer owes duty of confidentiality to client with few exceptions). A statement insinuating an ethical violation is derogatory and must be struck.

According to the foregoing reasoning, Defendant MGH's Motion to Strike is GRANTED and paragraph 185 of Plaintiff's Amended Complaint is ordered struck and the phrase "by and through its agents and counsel" is ordered struck from paragraphs 198 and 199 of Plaintiff's Amended Complaint. Plaintiff is directed to file a revised Amended Complaint that complies with the Court's instructions contained within this Order. Pursuant to the entry of this Order, Defendant MGH's Motion for Oral Argument (tab 77) is rendered MOOT.

SO ORDERED.

M.D.Ga.,2005.
Otero v. Vito
Not Reported in F.Supp.2d, 2005 WL 1429755 (M.D.Ga.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 8

Not Reported in F.Supp.                                                                 Page 1
Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.))**

Trustmark Life Ins. Co. v. University of Chicago
Hospitals
N.D.Ill.,1996.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
TRUSTMARK LIFE INS. CO., Plaintiff,
v.
The UNIVERSITY OF CHICAGO HOSPITALS,
Defendant.
**No. 94 C 4692.**

Feb. 14, 1996.

*MEMORANDUM OPINION AND ORDER*

COAR, District Judge.
*1 Before the court are (1) Defendant University of
Chicago Hospitals' ("UCH") motion to strike para-
graphs 8, 11, and 13 of Plaintiff Trustmark Life In-
surance Company's ("Trustmark") amended com-
plaint, as well as counts IV and V of the same
amended complaint; (2) Trustmark's motion to
strike UCH's jury demand; and (3) Trustmark's mo-
tion to compel discovery.

The amended complaint arises out of UCH's fur-
nishing of an experimental breast cancer treatment
to a Trustmark insured, Mrs. Grace Fuja. Mrs. Fuja
sued Trustmark to obtain coverage for the treat-
ment. *See Fuja v. Benefit Trust Life Ins. Co., 809
F.Supp. 1333 (N.D.Ill.1992)*. In the previous case,
the district court ordered Trustmark to pay UCH for
the services UCH rendered in treating Mrs. Fuja's
cancer. However, the Court of Appeals for the Sev-
enth Circuit reversed that order on appeal. *Fuja v.
Benefit Trust Life Insurance Co., 18 F.3d 1405 (7th
Cir. March 18, 1994)*. This suit is Trustmark's at-
tempt to recover the funds it paid UCH for Mrs.
Fuja's treatment.

This court entered a memorandum opinion and or-
der regarding UCH's motion to dismiss Trustmark's

original complaint on February 22, 1995. *See Trust-
mark v. University of Chicago,* 94 C 4692, slip op.
at -- (N.D.Ill. Feb. 25, 1995). The order stated that
this court had subject matter jurisdiction to hear the
case, and then went to the merits of the motion to
dismiss, which was denied in part and granted in
part. *Id.*

The court granted leave to file an amended com-
plaint on May 26, 1995, and UCH moved to strike
portions thereof on June 27, 1995.

I. Motion to Strike

In order for the court to grant a motion to
strike,FN1 the movant must show the allegations
being challenged are so unrelated to plaintiff's
claims as to be void of merit and unworthy of any
consideration. *Robinson v. The Midlane Club, Inc
et al., 1994 WL 577219 *2 (N.D.Ill. Oct. 19, 1994)*.
Further, the movant must establish that the presence
of the references sought to be stricken from the
pleading will be prejudicial to the movant. *Pelech
v. Klaff-Joss, L.P., 828 F.Supp. 525, 536-37
(N.D.Ill.1993)* (acknowledging the seriousness im-
plied in any poorly supported allegations, but deny-
ing motion to strike where argument at issue was
not devoid of merit). *Tektel, Inc. v. Maier, 813
F.Supp. 1331, 1334 (N.D.Ill.1992)* (although the
defendant's extensive responses to the complaint
may have repeated allegations more appropriately
placed in defendant's counterclaim, the statements
were not irrelevant to issues in the case or prejudi-
cial to plaintiff and therefore not stricken). Even if
the movant can make such a showing, the court will
strike only the clearly irrelevant, redundant, imper-
tinent and prejudicial paragraphs. *See Robinson,
1994 WL 577219 *2 (N.D.Ill. Oct. 19, 1994)*;
Charles Alan Wright, Arthur R. Miller & Mary Kay
Kane, Federal Practice and Procedure § 1380, at
647 (1990).

UCH has moved to strike paragraphs 8,FN2 11,FN3

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.))**

and 13[FN4] of the Amended Complaint. UCH argues that these paragraphs assert facts that support legal claims and defenses that Trustmark allegedly has against UCH in its personal capacity. UCH argues that because this court dismissed all of Trustmark's claims against UCH individually, and only allowed it to proceed against UCH as Mrs. Fuja's assignee, the allegations against UCH individually are improper and inflammatory. Trustmark claims that because they have alleged a claim for "unjust enrichment and restitution" against UCH, the paragraphs are proper because they allege "that UCH participated in and benefited from the underlying action."Response pp. 1-2.

**\*2** In order to dispose of the motion to strike, this court needs to address an issue it intentionally avoided in its previous order. A short explanation of the previous opinion is therefore called for.

UCH initially challenged this court's subject matter jurisdiction over this case, and, if the court found that it had subject matter jurisdiction, UCH moved to dismiss the complaint for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). The determining issue as to this court's jurisdiction was whether Trustmark's prosecution of this case, as a fiduciary, "enjoin[ed] any act or practice which violate[d ERISA] or the terms of the plan, or ... to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan; ..."29 U.S.C. § 1132(a).See Trustmark v. University of Chicago, 94 C 4692, slip op. at -- (N.D.Ill. Feb. 25, 1995). If so, the court had jurisdiction based on a federal question, the enforcement of ERISA. The court reluctantly concluded it had subject matter jurisdiction over the case based on this paragraph. Id. at 7.[FN5] The court was then faced with the merits of UCH's motion to dismiss. After noting that courts are divided regarding whether a plaintiff-insurer may recover past payments, this court concluded that there was authority for recovery because, at a minimum, UCH is alleged to be Mrs. Fuja's assignee and the Court of Appeals for the Seventh Circuit previously concluded that Fuja's treatments were not covered by her Plan. *Fuja v. Benefit Trust Life Insurance Co.,* No. 93-1150, slip op. (7th Cir. March 18, 1994). However, this court specifically did not address: (1) whether Trustmark could recover the funds directly from UCH pursuant to ERISA, 29 U.S.C. § 1132; (2) whether Trustmark's relief against UCH directly may sound in unjust enrichment or restitution; or (3) whether Trustmark's sole avenue of relief involved recouping the funds through the alleged Fuja-UCH assignee relationship.

This court must now decide the three issues outlined above because if Trustmark may recover directly from UCH only based on ERISA, the three paragraphs are irrelevant to the case. In that circumstance, the only relevant issue is whether Trustmark paid UCH for treatment of Mrs. Fuja that was not covered by the plan, and the payment therefor "violated the terms of the plan."See29 U.S.C. § 1132(a). If Trustmark can prove that it made the payments requested by UCH for the treatment, Trustmark could recover because the Seventh Circuit has already stated that Trustmark was not obligated, pursuant to the Plan, to pay for Mrs. Fuja's HDC/ABMT treatments.

However, if the sole issue in this case was unjust enrichment, the paragraphs at issue should remain in the complaint because they are relevant to whether UCH was unjustly enriched by Trustmark's payments.

Finally, if Trustmark is barred from asserting an unjust enrichment claim against UCH, or if the only avenue for relief is through the Fuja-UCH assignee relationship, the paragraphs at issue are irrelevant because they deal with how *UCH* either assisted Fuja in prosecuting her case against Trustmark or how *UCH* benefitted from Fuja's participation in the HDC/ABMT study. If Trustmark could not assert an unjust enrichment claim against UCH, Trustmark's allegations in the paragraphs at issue would be useless, and should be stricken.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.))**

A. Recovery Under ERISA

**\*3** As mentioned above, the deciding issue concerning whether Trustmark's may recover the funds given to UCH on Mrs. Fuja's behalf from UCH is whether, Trustmark's prosecution of this action as a fiduciary "enjoin[s] any act or practice which violate[s ERISA] or the terms of the plan, or ... to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan; ..."29 U.S.C. § 1132(a)(3).See Trustmark v. University of Chicago, 94 C 4692, slip op. at -- (N.D.Ill. Feb. 25, 1995). Several courts have grappled with the question of whether a fiduciary's suit against a third party provider to recover funds paid in error to the provider for services rendered to plan beneficiaries fall within the ambit of 29 U.S.C. § 1132(a)(3).See, e.g., Blue Cross & Blue Shield of Ala. v. Weitz, 913 F.2d 1544 (11th Cir.1990) (Fund whose suit sought to recover funds paid to third-party provider for treatment of a beneficiary was within 29 U.S.C. § 1132(a)(3) because it sought to redress a violation of the terms of the plan); Provident Life & Acc. Ins. Co v. Waller, 906 F.2d 985, 988 n.5 (4th Cir.).cert. denied,498 U.S. 982, 111 S.Ct. 512 (1990) (hereinafter "Waller") (Plaintiff fund could have brought action under section 1132(a)(3) to recover monies advanced on behalf of plan beneficiary who was injured in a car accident but did not sign an agreement to repay the plan from any judgment she received); Central States, Southeast and Southwest Areas Health and Welfare Fund v. Comprehensive Care Corp., 864 F.Supp. 831 (N.D.Ill.1994) (hereinafter "CompCare") (Fund properly sued third party health care provider pursuant to 29 U.S.C. § 1132(a)(3) to recover monies mistakenly paid for a person who was no longer party to the Fund's plan); Northern Cal. Food Employers & Retail Clerks Unions Benefit Fund v. Dianda's Italian-American Pastry Co., Inc., 645 F.Supp. 160 (N.D.Cal.1986) (hereinafter "Dianda's Pastry") (Fund was able to sue third party employer pursuant to 29 U.S.C. § 1132 to recover monies mistakenly paid to ineligible employee based on em-

ployer's inaccurate accounting of the employee's hours because the suit "redress[ed] plan violations").But compare with Waller, 906 F.2d at 988 (Fund allowed to use federal common law unjust enrichment theory to recover monies from plan beneficiary because the court concluded that the Fund could not sue under 29 U.S.C. § 1132(a)(1)(B)); Hercules Inc. v. Pages, 814 F.Supp. 79 (M.D.Fla.1993) (Fund was allowed to sue third-party provider under federal common law unjust enrichment theory to recover monies for treatment of a plan beneficiary which were supposed to be returned to the fund where claim under 29 U.S.C. § 1132 was not raised); National Benefit Administration Inc. v. Miss. Methodist Hosp. and Rehabilitation Center, Inc., 748 F.Supp. 459, 464 (S.D.Miss.1990) ( "[I]n enacting ERISA, Congress did not intend to address the question of whether or under what circumstances a health care provider, having extended medical services to a patient and having received payment from the plan, may be made to return those payments to the plan once it is discovered that the patient was not covered."). This has been a difficult issue, and one which this court was reticent to address in its earlier opinion.

**\*4** In the interim, the Court of Appeals for the Seventh Circuit addressed this very issue in Central States, Southeast and Southwest Areas Health and Welfare Fund v. Neurobehavioral Assocs., P.A., 53 F.3d 172 (7th Cir. Apr. 18, 1995) (hereinafter "Neurobehavioral Assocs."). In Neurobehavioral Assocs. the Seventh Circuit decided the question whether an action seeking to recover an overpayment of benefits to a third-party provider was within the ambit of 29 U.S.C. § 1132(a)(3). The Plaintiff Fund sought to recover $9,900.00 from Neurobehavioral because although Neurobehavioural had billed the Fund for $100.00, a clerical error at Central States processed the bill as being for $10,000.00. The Plaintiff made the $10,000.00 payment. After the error was discovered, Neurobehavioral refused to return the $9,900.00 excess payment. The court relied on its recent decision in Health Cost Controls v. Skinner, 44 F.3d 535 (7th

Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.))**

Cir. 1995), and the Eleventh Circuit's decision in *Weitz, supra,* 913 F.2d at 1549, to conclude that "ERISA's civil enforcement scheme authorizes [the plaintiff]'s claim." *Neurobehavioral Assocs.,* 53 F.3d at 172. The *Neurobehavioral Assocs.* court gave great weight to the *Weitz* court's conclusion that "an equitable action to recover benefits erroneously paid ... falls within the clear grant of jurisdiction contained in 29 U.S.C. § 1132(a)(3)."*Neurobehavioral Assocs.,* 53 F.3d at 175 (quoting *Weitz,* 913 F.2d at 1549). This court is bound by the Seventh Circuit's decision in *Neurobehavioral Assocs.,* which recognizes Trustmark's right to recover its erroneous payments for Mrs. Fuja's treatment under 29 U.S.C. § 1132(a)(3).

Thus, this court concludes that Trustmark's prosecution of this case falls within 29 U.S.C. § 1132(a)(3) because Trustmark seeks to "redress a violation of the plan."*See Neurobehavioral Assocs.,* 53 F.3d at 172;*CompCare,* 864 F.Supp. at 832-33;*Dianda's Pastry,* 645 F.Supp. 160. In this case, the violation of the plan was that Trustmark paid for a treatment that was "experimental" according to the terms of the plan. *Fuja v. Benefit Trust Life Ins. Co.,* 18 F.3d at 1411. This court must next address whether, in light of this conclusion, Trustmark has a right to recover based on a federal common law claim of unjust enrichment.

### B. Unjust Enrichment

This court's task in deciding whether to allow Trustmark to proceed under an unjust enrichment theory has also been eased considerably by the Seventh Circuit's decision in *Neurobehavioral Assocs..* That court concluded that a *state law* claim for restitution would be preempted by ERISA. *Neurobehavioral Assocs.,* 53 F.3d at 175;*see*29 U.S.C. § 1144(a). Other courts have similarly concluded that there is no need for the creation of a *federal* common law claim for unjust enrichment or restitution because 29 U.S.C. § 1132(a)(3) covers the situation. *See, e.g., CompCare,* 864 F.Supp. at 835 (Having concluded that 29 U.S.C. § 1132(a)(3)

provided for recovery of alleged overpayments, court concluded plaintiffs had an adequate statutory remedy and there was no need to create a federal common law of restitution.); *Morales v. Pan American Life Ins. Co.,* 718 F.Supp. 1297 (E.D.La.1989), *aff'd,*914 F.2d 83 (5th Cir. 1990) (Suit by participants in employer's retirement benefit plan sued insurance company for alleged underpayments. The court concluded "no statutory purpose would be served by creation of a federal common law of unjust enrichment and third party beneficiary claims.").

**\*5** Courts are allowed to create federal common law to enforce ERISA, but only where there are "gaps or interstices in this comprehensive and labyrinth statute."*CompCare,* 864 F.Supp. at 835 (quoting *UIU Severance Pay Trust Fund v. Local Union No. 18-U, United Steelworkers of America,* 998 F.2d 509 (7th Cir. 1993)). There simply is no gap here for this court to fill. 29 U.S.C. § 1132(a)(3) provides for recovery in this situation, and thus, there is simply no need to create a claim for unjust enrichment in this area.[FN6]

Moreover, even if this court allowed the expansion of the federal common law to encompass a claim for unjust enrichment here, Trustmark would be seeking recovery from the wrong party. As the Court of Appeals for the Seventh Circuit recently observed,

A provider of medical care is not unjustly enriched by being paid the market fee for its services. The beneficiaries of the Fund's erroneous payments are the Fund's own participants, which avoided any need to compensate [the plaintiff Fund] for its services; yet the Fund has not sought restitution from *them.*

*Central States, Southeast and Southwest Areas Health and Welfare Fund v. Pathology Laboratories of Arkansas,* 71 F.3d 1251, 1254 (7th Cir. Dec. 1. 1995).

In sum, no claim for unjust enrichment will lie

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.)
(Cite as: Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.))

against UCH in this case.

### C. Application to Motion to Strike

This court must now return to the matter at hand, the motion to strike. UCH has moved to strike paragraphs 8, 11, and 13. Paragraph 8 states that UCH affirmatively assisted Mrs. Fuja prosecute her case against Trustmark. Paragraph 11 states that *UCH* received some benefits as a result of Mrs. Fuja's participation in the study. Paragraph 13 states that UCH was aware that Trustmark intended to appeal the district court's decision. It is clear from this explanation (and Trustmark admits) that paragraphs 8, 11, and 13 are relevant only to whether UCH was *unjustly enriched* by Trustmark's payments on Mrs. Fuja's behalf. These paragraphs will be therefore be stricken because this court will not allow Trustmark to bring a claim for unjust enrichment against UCH.

In light of this court's conclusions based on the state of the law in this circuit, which has changed since its February 21, 1995 opinion because of *Neurobehavioral Assocs.,* this court will also reexamine the other counts of the complaint. *Moser v. Universal Engineer Corp.,* 11 F.3d 720, 723 (7th Cir.1994) (A district court may examine a complaint *sua sponte* within its right to control its docket). Without paragraphs 8, 11, and 13, count I states a claim under 29 U.S.C. § 1132(a)(3) to "redress a violation of the plan" that occurred because Trustmark followed the district court order in *Fuja v. Benefit Trust Life Insurance Co.* and therefore is properly pled. Counts II and III were dismissed by this court on June 27, 1995.

Count IV states a claim pursuant to 29 U.S.C. § 1132(a)(3) to "redress a violation of the plan" that occurred because Trustmark paid UCH for all of Mrs. Fuja's treatment even though UCH had written Mrs. Fuja's treatment off. Because Mrs. Fuja was not legally obligated to pay for her treatment after UCH wrote it off, and because there is a provision in the Plan that disallows payment for all services which the patient would not be obligated to pay,

Trustmark seeks to recoup the monies it paid for Mrs. Fuja's treatments after UCH wrote off her treatment.[FN7] Thus, count IV states a claim. Count V, however, states a claim for unjust enrichment, and must be dismissed, consistent with this memorandum opinion.

*6 The court now turns to the other motions pending before the court.

### II. Motion to Strike Jury Demand

Trustmark has moved to strike UCH's jury demand because, Trustmark argues, trials by jury are not allowed in the ERISA context. UCH contends that it is entitled to a trial by jury, and that this action is not an ERISA action. The second argument is negated by this court's decision here--this is an ERISA action, as the court has explained above.

The right to a jury trial is determined by the nature of the plaintiff's cause of action, and is governed by the Seventh Amendment. *Brown v. Retirement Comm. of the Briggs & Stratton Retirement Plan,* 797 F.2d 521, 526 (7th Cir.), *cert. denied,*479 U.S. 1094. 107 S.Ct. (1986). The Seventh Amendment provides:

In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, other than according to the rules of the common law.

U.S.Const. amend VII. "The Seventh Amendment does apply to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates *legal rights and remedies,* enforceable in an action for damages in the ordinary courts of law."*Curtis v. Loether,* 415 U.S. 189, 194, 94 S.Ct. 1005, 1008 (1974) (emphasis added).

The Court of Appeals for the Seventh Circuit's dispositive opinion on this matter is *Wardle v. Central States, Southeast and Southwest Areas Pension*

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.))**

*Fund,* 627 F.2d 820 (7th Cir.1980), *cert. denied,*449 U.S. 1112, 101 S.Ct. 922 (1981), which disallowed a jury trial for a plaintiff who sought to obtain contingently available future retirement benefits pursuant to 29 U.S.C. § 1132(a)(1)(b).*See also* Research Institute of America, *Pension Coordinator* Vol. 5 ¶ 76,801 (1995) ("Although the Supreme Court has not ruled on this issue, the overwhelming weight of authority is that there is no right to a jury trial in ERISA cases."(citing *Wardle*)).

However, in *Wardle,* the Court of Appeals examined the statutory scheme and the legislative history of ERISA and stated in dictum that actions under 1132(a)(3) are *equitable* in nature. *Wardle,* 627 F.2d at 629. *See Bugher v. Feightner,* 722 F.2d 1356, 1360 (7th Cir.1983), *cert. denied,*469 U.S. 822, 105 S.Ct. 98 (1984).*Ovitz v. Jeffries & Co., Inc.,* 553 F.Supp. 300 (N.D.Ill.1982)(Shadur, J.), cited by UCH, also causes this court to pause before disallowing a jury in this case. The *Ovitz* court concluded that Ovitz could have a jury trial on his claim that his former employer did not pay him interest on his profit-sharing account and his pro-rata share of his contributions when he was terminated. Judge Shadur distinguished *Wardle* by observing that Wardle sued because his application for future retirement benefits was disallowed. *Ovitz,* 553 F.Supp. at 301. The Seventh Circuit concluded that Wardle's situation was analogous to the law of trusts, "which provides a beneficiary with a legal remedy only with respect to money the trustee is under a duty to pay *unconditionally and immediately* to the beneficiary."*Wardle,* 627 F.2d at 829 (emphasis added). By contrast, the moment Ovitz was terminated, his alleged rights to the interest and pro-rata share of his contributions *unconditionally and immediately* arose. *Ovitz,* 553 F.Supp. at 301.

**\*7** This court agrees with Judge Shadur's analysis of *Wardle,* and will follow that analysis in allowing UCH's jury demand to stand. Just as in *Ovitz,* the moment that the Court of Appeals issued its opinion and order in *Fuja v. Benefit Trust Life Insurance Co.,* No. 93-1150, slip op. (7th Cir. March 18,

1994), Trustmark's right to recover the funds it had expended on Mrs. Fuja's behalf arose "immediately and unconditionally." Thus, UCH's demand for a jury trial in this case will stand.

### III. Motion to Compel

Trustmark has moved to compel production of certain documents from UCH pursuant to Trustmark's First Request to Produce. Motion to Compel, Ex. 1. UCH has objected to several of the requests.

The court notes preliminarily that Trustmark has accepted UCH's response to request 7.

The heart of the disagreement surrounds requests 2[FN8] and 3[FN9] which ask for all documentation of the charges for Mrs. Fuja's treatment and the underlying treatments themselves. Trustmark argues that these requests properly seek to determine whether Mrs. Fuja would have been personally obligated to pay for her HDC/ABMT treatment. Moreover, Trustmark contends that some of the bills it received were not the result of actual treatments, but were merely bills generated to increase UCH's remuneration.

The court concludes that requests 2 and 3 concern matters either relevant to count IV or reasonably calculated to produce evidence relevant to count IV. Count IV assumes that Trustmark should be able to recover those monies which Trustmark paid for services which Mrs. Fuja would not have been legally obligated to pay, either because no treatment was actually given, or because UCH had "written off" the treatments. Therefore Trustmark's motion to compel will be granted as to these requests. *See*Fed.R.Civ.P.26(b)(1).

Request 1 is also at issue. Request 1 seeks:

All documents, files, and records relating to or in any manner touching upon treatment which UCH ever provided to Grace Rodella Fuja, including but not limited to admission and discharge summaries, physicians' notes, nurses' notes, laboratory examin-

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.))**

Page 7

ations and test, charts, correspondence, memoranda, notes, and the like.

UCH objected to this request because it was "overly broad, unduly burdensome, oppressive, designed to annoy and/or harass, and is not reasonably calculated to lead to the discovery of admissible evidence."UCH Response to Request to Produce p. 1, Ex. 2 to Motion to Compel. Nonetheless, UCH added, "[s]ubject to these objections, see documents produced."*Id.* Trustmark wants a further explanation of why UCH is withholding documents and a privilege list identifying those documents that are being withheld as a result of those objections. Discovery may be limited by this court if it concludes that:
(i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive ...

**\*8** Fed.R.Civ.P. 26(b)(2). Although UCH has stated that request 1 is "overly broad, unduly burdensome, oppressive, designed to annoy and/or harass, and is not reasonably calculated to lead to the discovery of admissible evidence," this explanation merely tracks the language of Fed.R.Civ.P. 26(b)(2). UCH has not given any factually-based explanation for its conclusion that request 1 is improper. Discovery battles are distasteful and wasteful in general, but they are especially so when the parties have not made a good-faith effort to resolve the dispute among themselves. The request is not patently unreasonable, but there may be alternative requests which will provide the same information in a more efficient manner. This court orders UCH to explain to Trustmark why it objects to request 1, and both parties to seek to resolve this dispute. For now the motion to compel is denied without prejudice to the right of Trustmark to renew it after the parties have had an opportunity to talk.

*CONCLUSION*

WHEREFORE, for the reasons stated in this

memorandum opinion,

1. UCH's motion to strike paragraphs 8, 11, and 13 from the Amended Complaint [[[docket 41] is GRANTED.

2. Trustmark's motion to strike UCH's jury demand [docket 37] is DENIED.

3. Trustmark's motion to compel [docket 39] is DENIED in part and GRANTED in part. Trustmark's motion is GRANTED as to requests 2 and 3. The motion is DENIED without prejudice as to request 1.

4. Count V of the Amended Complaint is DISMISSED.

FN1. Motions to strike are governed by Rule 12(f) of the Federal Rules of Civil Procedure. Rule12(f) states:

Upon motion made by a party before responding to a pleading, or, if no responsive pleading is permitted by these rules, upon motion made by a party within 20 days after the service of the pleading upon the party or upon the court's own initiative at any time, the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter.

FN2. Paragraph 8 of the Amended Complaint states:

With the help and affirmative affidavit and trial testimony of the defendant's medical and administrative personnel, Mrs. Fuja thereupon brought and prosecuted her suit against TRUSTMARK in the United States District Court for the Northern District of Illinois, under Case No. 92 C 7542, seeking injunctive relief compelling TRUSTMARK to pay for the HDC/ABMT treatment.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**FN3.** Paragraph 11 of the Amended Complaint states:

The defendant further benefitted from the judgment by accruing another human subject (Mrs. Fuja) for the research project under which the experimental HDC/ABMT treatment was given.

**FN4.** Paragraph 13 of the Amended Complaint states:

The defendant was aware of TRUST-MARK's intent to appeal, and of the appeal, and of the fact that TRUST-MARK's payment to it for Mrs. Fuja's HDC/ABMT treatment was under objection and protest.

**FN5.** The Court of Appeals for the Seventh Circuit has subsequently concluded that subject matter does indeed exist for suits by a plan's fiduciary to recover wrongfully paid benefits. *Central States, Southeast and Southwest Areas Health and Welfare Fund v. Neurobehavioral Assocs. P.A.,* 53 F.3d 172 (7th Cir. Apr. 18, 1995).

**FN6.** This court's previous order of February 21, 1995 may be ambiguous in this regard. However, in light of *Neurobehavioral Associates,* which was decided on April 18, 1995 (after this court's February 21 opinion), this court is required to revisit its previous conclusion that Trustmark could state a claim because UCH was alleged to be Mrs. Fuja's assignee.

**FN7.** Count IV has its own problems. Notwithstanding the fact that the Seventh Circuit ultimately concluded that Trustmark did not have to pay for the HDC/ABMT treatments because they were experimental, Trustmark would have been liable for treatments that Mrs. Fuja would have been liable for. In count IV, Trustmark claims

that at a certain point, UCH decided to provide treatment to Mrs. Fuja without demanding payment from her. However, on its face, Count IV does not differentiate between the costs for Mrs. Fuja's treatments *before* UCH allegedly wrote them off and *after* the hospital decided to write them off.

**FN8.** Request No. 2 seeks:

Any and all documents, files, and records relating to or in any manner touching upon charges, and the payment of charges, for services which UCH ever provided to Grace Rodella Fuja, including but not limited to bills, summaries of bills, explanations of benefits, checks, correspondence, memoranda, notes, and the like.

**FN9.** Request No. 3 seeks:

Any and all documents, files, and records relating to or in any manner touching upon communication of any type which UCH has ever had with TRUST-MARK concerning any treatment, or the payment of charges for the treatment, provided or potentially to have been provided to Grace Rodella Fuja.

N.D.Ill.,1996.
Trustmark Life Ins. Co. v. University of Chicago Hospitals
Not Reported in F.Supp., 1996 WL 68009 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Duramed Pharmaceuticals,      )
Inc.,                         )
                              )    Case No. C-1-00-735
              Plaintiff,      )
                              )
     vs.                      )
                              )
Wyeth-Ayerst                  )
Laboratories, Inc.,           )
                              )
              Defendants.     )

                    O R D E R

     This matter is before the Court on Defendant Wyeth

Ayerst-Laboratories, Inc.'s Motion to Dismiss and/or Strike (Doc.

No. 11).  For the reasons set forth below, Defendant's motion is

**GRANTED IN PART AND DENIED IN PART.**

                  I. Background

     The Plaintiff in this case is Duramed Pharmaceuticals,

Inc. ("Duramed").  Duramed is a Cincinnati-based company which

develops, manufactures, and markets prescription and over-the-

counter drug products.  Complaint ¶ 1.  Defendant Wyeth-Ayerst

Laboratories, Inc. ("Wyeth") is also a manufacturer and developer

of pharmaceutical products.  Id. ¶ 2.  The parties are

competitors in the business of selling conjugated estrogens for

use in treatment of vasomotor symptoms (hot flashes and night

sweats) in menopausal women.

     Wyeth is the predominant manufacturer of conjugated

estrogens in the United States.  Wyeth has been manufacturing and

marketing its conjugated estrogen, Premarin, since 1942.  The

name "Premarin" is derived from its primary ingredient - pregnant

mare's urine.  See Complaint ¶ 13.  Premarin is also indicated
and FDA-approved for use in the treatment of osteoporosis.  Id.
According to the Complaint, Premarin is the most widely used
prescription drug in America and enjoys a market share of 99% and
annual sales of over $800 million.  Id. ¶¶ 6, 16.

     Duramed sought to develop its own conjugated estrogen
product.  Duramed's conjugated estrogen is a plant-based
alternative, derived from soy and yam plants.  Id. ¶ 17.  Duramed
first sought FDA approval of its product as an unbranded generic
alternative to Premarin.  Wyeth successfully petitioned the FDA
against approval of Duramed's product as a generic.  This forced
Duramed to go through a more costly and time-consuming process to
have its product approved as a brand name drug.  Wyeth also
petitioned the FDA to disapprove Duramed's application for a
brand name conjugated estrogen.  This time, however, Wyeth was
unsuccessful and Duramed began marketing its conjugated estrogen,
Cenestin, in March 1999.  See id. ¶¶ 7-8.  Although the Court
will not go into the details here, Duramed claims that Wyeth
engaged in a campaign of providing the FDA with false and
misleading information in opposing Duramed's applications for
approval of its conjugated estrogen as a generic, and later a
brand name, prescription drug.  See id. ¶¶ 7-8, 19-49.

     Having failed to prevent the introduction of Duramed's
conjugated estrogen through administrative channels, the
Complaint alleges that Wyeth engaged in certain anti-competitive
conduct in order to maintain a monopoly position in the market.

2

Specifically, the Complaint alleges that Wyeth has entered into contracts with managed care organizations, employers, and other entities offering health plans which prevent or limit these providers from making Cenestin available to their members. See Complaint ¶ 52. According to the Complaint, health plans control costs by implementing drug product formularies. A drug product formulary is a list of required, preferred, or recommended drugs for health plan members. Id. ¶ 53.

The Complaint states that over 70% of all Americans purchase their prescription drugs through formularies, and, because of that, successful marketing requires placement of the drug on as many formularies as possible. Id. ¶ 56. The Complaint further alleges that Wyeth holds contracts with most of the health plans and pharmacy benefits managers representing a majority of the covered lives in the country. These contracts, the Complaint says, provide that Premarin shall be the sole and exclusive conjugated estrogen on the formulary. The purpose and effect of these contracts, Duramed claims, is to prevent Cenestin from being dispensed to patients. Id. ¶ 58. The Complaint alleges that Wyeth has offered rebates, discounts, and other benefits to health plans and pharmacy benefits managers conditioned on Premarin being the sole and exclusive conjugated estrogen on the formulary. The rebates and discounts are based on the dollar or unit volume of sales of Premarin to plan members. Id. ¶ 59. The Complaint alleges that because of Premarin's huge market share, health plans would suffer enormous

3

financial losses if these incentives were denied.  Therefore, health plans are faced with an imposing financial obstacle if they wish to offer Cenestin to their members.  Id.

In addition to these overt exclusive contracts, the Complaint alleges that Wyeth has entered into "disguised" exclusive contracts which offer rebates or discounts if a health plan's use of Premarin is equal to or greater than Premarin's national market share.  These same contracts also provide for financial penalties if Premarin sales drop below the national average.  The Complaint also alleges that Wyeth advises health plans and pharmacy benefits managers that they will lose  rebates and administrative fees if they add Cenestin to their formularies.  Id. ¶¶ 60-61.  Finally, the Complaint alleges that Wyeth has misrepresented the characteristics and therapeutic value of both Premarin and Cenestin in order to enhance the sales of Premarin and to maintain its monopoly power.  Id. ¶ 62.  In sum, the Complaint alleges that Wyeth's use of exclusive contracts prevents Duramed from competing effectively with Premarin in the market place and allows Wyeth to maintain a monopoly in the conjugated estrogens market.  Id. ¶ 64.

On September 5, 2000, Duramed filed a four count antitrust Complaint (Doc. No. 1) against Wyeth under the Sherman Act, 15 U.S.C. § 1, et seq., and the Clayton Act, 15 U.S.C. § 12, et seq.  Count I of the Complaint alleges that Wyeth has violated

Section 2 of the Sherman Act, 15 U.S.C. § 2,[1] by engaging in monopolization. Count I alleges that Wyeth is a monopolist because it has excluded competition in the relevant market through the behavior outlined above and has raised the price of Premarin above competitive levels. Count II of the Complaint also alleges that Wyeth has violated Section 2 of the Sherman Act by attempting to monopolize the relevant market. Count III of the Complaint alleges that Wyeth has violated Section 1 of the Sherman Act, 15 U.S.C. § 1,[2] because its exclusive contracts have resulted in unreasonable restraints on trade and competition.

---

[1]    Section 2 of the Sherman Act provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2.

[2]    Section 1 of the Sherman Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $10,000,000 if a corporation, or, if any other person, $350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1.

Finally, Count IV of the Complaint alleges that Wyeth has violated Section 3 of the Clayton Act, 15 U.S.C. § 14,[3] because it conditions rebates, discounts and other incentives on the requirement that health care providers not use, deal in, or purchase Cenestin and the effect of such conduct substantially lessens competition and tends to create a monopoly in the relevant market.

Duramed seeks a declaration that Wyeth's conduct violates the antitrust laws cited, an award of actual and treble damages caused by Wyeth's alleged illegal conduct, an injunction prohibiting Wyeth from engaging in anti-competitive and exclusionary conduct, an award of attorney's fees, an award of the costs of the suit, and interest on damages.

---

[3]     Section 3 of the Clayton Act provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

On October 26, 2000, Wyeth filed a motion to strike and/or to dismiss the Complaint. See Doc. No. 11. In its motion, Wyeth moves the Court to strike those allegations in the Complaint relating to Wyeth's activities petitioning the FDA against Cenestin on the grounds that recovery on the basis of that conduct is barred by the Noerr-Pennington doctrine. In addition, Wyeth argues that Duramed has failed to state antitrust claims based on exclusive dealing because the contracts at issue are of short duration and are easily terminable, and, therefore, do not foreclose the market to competition.[4] Alternatively, Wyeth argues that because Duramed's claims are based on conduct that lowers the price of Premarin, Duramed must allege that Wyeth has engaged in predatory pricing. Duramed, however, has not alleged that Wyeth has engaged in predatory pricing. Therefore, Wyeth argues, Duramed has failed to state antitrust claims based on the exclusive contracts.

In response, Duramed seems to admit that recovery based on Wyeth's FDA petitioning activities is precluded, but argues that evidence of such activity would be admissible in order to show Wyeth's monopolistic intent. Therefore, Duramed argues, these allegations are properly included in the Complaint. With respect to Wyeth's other arguments, Duramed contends that whether

---

[4]     The contracts themselves were not attached to the Complaint. Wyeth argues, however, that the Court may review the contracts on a Rule 12(b)(6) motion because the claims in the Complaint are based largely, if not exclusively, on those contracts. Nevertheless, Wyeth has not submitted any of these contracts with its moving papers.

an exclusive contract is of short duration and is easily
terminable is but one factor, and not dispositive, on the issue
of whether an exclusive contract violates the antitrust laws.  In
any event, Duramed argues that the Court may not review Wyeth's
contracts without converting the present Rule 12(b)(6) motion
into one for summary judgment.  Finally, Duramed contends that it
need not allege that Wyeth engaged in predatory pricing to prove
a violation based on rebate and discount programs.

Wyeth's motion to strike and/or to dismiss has been
fully briefed and is now ripe for disposition.

## II. Rule 12(b)(6) Standard of Review

A motion to dismiss pursuant to Rule 12(b)(6) operates
to test the sufficiency of the complaint.  In its consideration
of a motion to dismiss under Rule 12(b)(6), the court is required
to construe the complaint in the light most favorable to the
Plaintiff and accept all well-pleaded factual allegations in the
complaint as true.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)
and Roth Steel Products v. Sharon Steel Corp., 705 F.2d 134, 155
(6th Cir. 1983).  A court, however, will not accept conclusions
of law or unwarranted inferences which are presented as factual
allegations.  Blackburn v. Fisk University, 443 F.2d 121, 124
(6th Cir. 1974).  A court will, though, accept all reasonable
inferences that might be drawn from the complaint.  Fitzke v.
Shappell, 468 F.2d 1072, 1076-77 n.6 (6th Cir. 1972).

When considering the sufficiency of a complaint
pursuant to a Rule 12(b)(6) motion, this Court recognizes that "a

8

complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-6 (1957).

### III. Analysis

The Court starts the analysis by addressing Wyeth's contention that certain allegations in the Complaint should be stricken under the Noerr-Pennington Doctrine before turning to the alleged insufficiency of Duramed's antitrust claims.

### A.  Noerr-Pennington Doctrine

As indicated, approximately thirty-three paragraphs of the Complaint deal with Wyeth's allegedly deceptive and misleading efforts before the FDA to prevent Duramed from introducing its own conjugated estrogen to the market.  Wyeth contends that recovery based on these allegations is barred by the Noerr-Pennington doctrine while Duramed argues that the allegations are relevant in proving Wyeth's monopolistic intent.

The Noerr-Pennington Doctrine is derived from the Supreme Court cases Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961) and United Mine Workers v. Pennington, 381 U.S. 657 (1965).  In Potter's Medical Center v. City Hospital Ass'n, 800 F.2d 568 (6th Cir. 1986), the Sixth Circuit explained the doctrine as follows:

> In Noerr and Pennington, the Supreme Court held that attempts to influence the legislative process, even if prompted by an anticompetitive intent, are immune from antitrust liability. This doctrine rests on two

grounds: the First Amendment's protection of the right to petition the government, and the recognition that a representative democracy, such as ours, depends upon the ability of the people to make known their views and wishes to the government. <u>Noerr</u>, 365 U.S. at 137-38, 81 S.Ct. at 529-30. In <u>California Motor Transport Co. v. Trucking Unlimited</u>, 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972), the Supreme Court extended the protection of the <u>Noerr-Pennington</u> doctrine to efforts to influence administrative agencies and the courts. <u>California Motor Transport</u> also elaborated on the sham exception first alluded to in <u>Noerr</u> that some activity, ostensibly directed toward influencing governmental action, may be merely a "sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor," so as to justify application of the Sherman Act. <u>Noerr</u>, 365 U.S. at 144, 81 S.Ct. at 533. <u>California Motor Transport</u> recognized that "unethical conduct in the setting of the adjudicatory process" or the pursuit of "a pattern of baseless, repetitive claims" is unprotected by the <u>Noerr-Pennington</u> doctrine; such conduct "constitutes an abuse of [governmental] processes . . . effectively barring a competitor's meaningful access to the courts or agencies." 404 U.S. at 512-13, 92 S.Ct. at 612-13; <u>accord</u> <u>Otter Tail Power Co. v. United States</u>, 410 U.S. 366, 380, 93 S.Ct. 1022, 1030, 35 L.Ed.2d 359 (1973).

<u>Id.</u> at 578.  The Court observes that Duramed does not claim that

Wyeth's petitioning activities fall within the sham exception to

the <u>Noerr-Pennington</u> Doctrine (even though Duramed characterizes

Wyeth's conduct as deceptive and misleading).  And, as the Court

has noted, Duramed apparently concedes that it may not recover

antitrust damages from Wyeth based on this conduct.

Nevertheless, Duramed argues that the challenged

allegations are properly includable in the Complaint because they

are relevant to showing Wyeth's alleged monopolistic intent.  The

Court disagrees.  The Sixth Circuit addressed substantially the

same argument in <u>City of Cleveland v. Cleveland Elec.</u>

<u>Illuminating Co.</u>, 734 F.2d 1157 (6th Cir. 1984).  In that case,

the trial court, based on the <u>Noerr-Pennington</u> Doctrine,
prohibited the plaintiff from admitting into evidence information
about Cleveland Electric's secret sponsorship of a lawsuit
challenging an order issued by the Federal Power Commission
requiring Cleveland Electric to interconnect with a competitor,
Muny Light.  <u>See id.</u> at 1161.  The Court of Appeals stated that:

> The City's effort to introduce the evidence was to show
> the anticompetitive character and nature of Cleveland
> Electric's conduct in this episode as a part of the
> alleged broader pattern of conduct condemned by the
> Sherman Act, and to cast appellee and its counsel in
> the role of deceivers. <u>This is not an admissible basis
> for its introduction in our view.</u>

<u>Id.</u> at 1163 (emphasis added).  The Court further held that such
evidence was also properly excludable under Federal Rule of
Evidence 403.  <u>See id.</u>; Fed. R. Evid. 403 ("Although relevant,
evidence may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations of undue
delay, waste of time, or needless presentation of cumulative
evidence.").  Indeed, this holding makes eminent sense given that
<u>Noerr-Pennington</u> provides immunity even where the defendant
invokes the legislative process with monopolistic intent.
Allowing an antitrust plaintiff to introduce evidence of the
defendant's prior legislative petitioning as evidence of
monopolistic intent is simply an end-around the doctrine.

In this case, Duramed asserts precisely the same
grounds for the relevancy and admission of the challenged
allegations as the Sixth Circuit rejected in <u>Cleveland Electric</u>.

<u>See</u> Doc. No. 14, at 19 ("Because of their relevance to Duramed's antitrust claims - to show Wyeth's intent to monopolize and the nature of its anticompetitive and exclusionary conduct - Wyeth's conduct alleged in paragraphs 7-8 and 19-49 of the Complaint cannot be stricken."). The Court finds that this case falls squarely within <u>Cleveland Electric</u>'s proscription against admitting conduct protected by the <u>Noerr-Pennington</u> Doctrine as evidence of monopolistic intent. Accordingly, Wyeth's motion to strike is well-taken and is **GRANTED**. Paragraphs 7-8 and 19-49 are deemed **STRICKEN** from the Complaint.

B.  <u>Failure to State a Claim</u>

As indicated, Wyeth argues that Duramed has failed to state antitrust claims because it has failed to allege that Wyeth has engaged in predatory pricing and because the exclusive contracts at issue are of short duration and easily terminable. Counsel for Wyeth states that most of its contracts are terminable at will in under 90 days. Duramed contends that the duration of the contract and its ease of termination are not dispositive of the issue and that it need not allege predatory pricing to state a claim based on exclusive dealing. The Court agrees with Duramed on both counts.

As an initial matter, the Court observes that even if it were to accept Wyeth's argument that exclusive contracts which are of short duration and easily are terminable are presumptively

legal,[5] the contracts have not been made a part of the record. Therefore, the Court has nothing but counsel's assurances that the contracts are what they are purported to be.  Obviously, the Court cannot accept counsel's word on an issue potentially dispositive of the entire case.  That alone would be enough to foreclose Wyeth's first argument.

Exclusive dealing contracts are not illegal per se. See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961).  Rather, the question is whether performance of the contract will foreclose competition in a substantial share of the line of commerce affected.  Id.  In making this determination, the Court outlined several factors for consideration.  First, the line of commerce, i.e., the goods, involved must be determined. Second, the area of effective competition must be ascertained by determining the seller's marketing area.  And, third, the court must find that the competition foreclosed is a substantial share of the relevant market, i.e., that opportunities for other traders to enter into or remain in the market must be significantly limited.  Id. at 628.  To determine substantiality the court must weigh the probable effect of the contract on competition in the relevant market area, the relative strength of the parties, the proportion of commerce involved compared to the total volume of commerce in the relevant market area, and the probable effects which preemption of that share of the market

_____

[5]    This, of course, also assumes that the Court could properly review the contracts on a Rule 12(b)(6) motion.

13

might have on competition within the market. Id. at 329. In
that particular case, the Court found that the exclusive contract
was legal, even though it had a duration of 20 years, because the
contract involved an insignificant proportion of the total volume
of coal in the relevant market. See id. at 330-34.

The only case the Court has found that has explicitly
adopted Wyeth's position is Roland Machinery Co. v. Dresser Ind.,
Inc., 749 F.2d 380 (7th Cir. 1984), in which Judge Posner held
that "[e]xclusive dealing contracts terminable in less than one
year are presumptively lawful[.]" See id. at 395. Other than
Roland Machinery, the Court's review of the cases tends to
indicate that the duration of the contract is but one factor for
consideration. See, e.g., Concord Boat Corp. v. Brunswick Corp.,
207 F.3d 1039, 1058-1060 (8th Cir. 2000); Omega Environmental,
Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1162-65 (9th Cir. 1997);
Balaklaw v. Lovell, 14 F.3d 793, 798-800 (2nd Cir. 1994); U.S.
Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 595-97 (1st
Cir. 1993). Therefore, the Court holds that the duration of the
contract and whether it is easily terminable are merely factors
for considering whether competition is substantially foreclosed.

Wyeth's next contention is that Duramed has failed to
allege that its discount and rebate programs have resulted in
predatory pricing. Therefore, Wyeth contends, Duramed has failed
to allege any antitrust injury. Predatory pricing occurs when a
single firm, having a dominant share in the relevant market, cuts
prices in order to force competitors out of the market or to

14

perhaps deter future competitors from coming in.  See Matsushita
Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 584 n.8
(1986).  The Supreme Court has cautioned that predatory pricing
claims are rarely successful because lowering prices usually
stimulates, and not inhibits, competition.  Brooke Group, Ltd. v.
Brown & Williamson Tobacco Corp., 509 U.S. 209, 226 (1993).  The
Court agrees with Wyeth that Duramed has not alleged that Wyeth's
discounts and rebates resulted in predatory pricing.  The Court,
however, does not view Duramed's Complaint as asserting pure
predatory pricing schemes.  Rather, it appears that Duramed
alleges that Wyeth has offered discounts and rebates in order to
entice health plans into entering into overt exclusive dealing
contracts or that the discount programs themselves are de facto,
or "disguised" exclusive dealing contracts because the incentives
are too attractive, or in the alternative, too punitive,
financially to pass up.  See Complaint ¶¶ 59-60.  The alleged
result of the discounts is not predatory pricing but rather
foreclosure of the market.  Therefore, although Duramed's theory
of the case may require further explication, the Court believes
that Duramed has sufficiently stated a claim for relief without
alleging that Wyeth has practiced predatory pricing.

     Furthermore, the Court agrees with Duramed that it has
sufficiently pled foreclosure of the market.  The Court observes
that Duramed alleges that Wyeth possesses 99% of the relevant
market share, that most if not all of the outlets for Duramed's
product are tied up by Wyeth's exclusive contracts, and that

there are significant barriers to entry in the relevant market, such as obtaining FDA approval, outstanding patents on other branded drugs and accessing formularies.  <u>See</u> Complaint ¶ 71. The Court also assumes that research and development costs present a significant barrier to entry. <u>Concord Boat</u>, 207 F.3d at 1059 (considering barriers to entry in market foreclosure analysis). Therefore, the Court finds that Duramed has sufficiently stated claims for antitrust violations.

     Accordingly, Wyeth's motion to dismiss Duramed's claims is not well-taken and is **DENIED**.

**IT IS SO ORDERED**

Date _____8-1-01_____

_____
Sandra S. Beckwith
United States District Judge

# TAB 10

--- F.Supp.2d ----                                                                    Page 1
--- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.))**

Doe v. Brimfield Grade School
C.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court, C.D. Illinois.
Jane DOE, Plaintiff,
v.
BRIMFIELD GRADE SCHOOL, Drimbiefl School
District # 309, Abby Able, Betty Baker, Barry
Baker, Connie Charlie, Chester Charlie, Donald
Dog, Edward Easy, Ellen Easy, and Francine Fox,
Defendants.
**No. 07-cv-1205.**

April 10, 2008.

**Background:** In action brought by parents of grade
school student against school, school district, other
students, and parents of other students, alleging stu-
dent-on-student sexual harassment, defendants
moved to dismiss and strike various portions of the
complaint.

**Holdings:** The District Court, Joe Billy McDade,
J., adopted the opinion of Byron G. Cudmore,
United States Magistrate Judge, which held that:
(1) attorney fees and costs were not recoverable in
connection with state law claims for battery and
joint enterprise;
(2) complaint seeking damages for battery and joint
enterprise and under state Parental Responsibility
Law was sufficiently specific;
(3) allegations were sufficient to support claim
against school under Title IX for gender stereotyp-
ing; and
(4) complaint described behavior rising to level of
harassment so severe, pervasive and objectively of-
fensive that student was denied equal access to his
education.

Ordered accordingly.

**[1] Costs 102 ⟨⟩194.16**

102 Costs

102VIII Attorney Fees
102k194.16 k. American Rule; Necessity of
Contractual or Statutory Authorization or Grounds
in Equity. Most Cited Cases
Attorney fees and costs were not recoverable in
connection with state law claims for battery and
joint enterprise, in which punitive damages were
sought, absent any statutory basis for recovery
thereof.

**[2] Parent and Child 285 ⟨⟩13.5(5)**

285 Parent and Child
285k13.5 Torts
285k13.5(5) k. Proceedings. Most Cited
Cases
Attorney fees and costs were recoverable by minor
and his parents in connection with claims under
state Parental Responsibility Law, as statute spe-
cifically allowed recovery of reasonable attorney
fees by plaintiffs which were not governmental
units. S.H.A. 740 ILCS 115/3.

**[3] Federal Civil Procedure 170A ⟨⟩843**

170A Federal Civil Procedure
170AVII Pleadings and Motions
170AVII(E) Amendments
170Ak839 Complaint
170Ak843 k. Nature and Extent of Re-
lief Sought. Most Cited Cases
Amendment of complaint under Parental Respons-
ibility Law which sought "actual damages" and
"fair and reasonable damages" to exclude such ref-
erences was not required, where prayer for relief
expressly limited recovery to that allowed by stat-
ute. S.H.A. 740 ILCS 115/5.

**[4] Parent and Child 285 ⟨⟩13.5(5)**

285 Parent and Child
285k13.5 Torts
285k13.5(5) k. Proceedings. Most Cited
Cases
Complaint seeking damages for battery and joint

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

enterprise and under state Parental Responsibility Law was sufficiently specific to permit drafting of responsive pleading, as it pertained to one set of defendants, and more definite statement was not required, despite failure to state exact dates on which defendant student allegedly struck plaintiff student, where all defendant students were alleged to have participated in alleged verbal and physical abuse of plaintiff student over one-year period, including at least one enumerated incident in which plaintiff student was allegedly struck in the testicles. S.H.A. 740 ILCS 115/3.

**[5] Civil Rights 78 ☞1067(3)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1059 Education
           78k1067 Sex Discrimination
                78k1067(3) k. Sexual Harassment; Sexually Hostile Environment. Most Cited Cases
Claims of same-sex harassment are viable under Title IX. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq. (Title IX).

**[6] Civil Rights 78 ☞1067(4)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1059 Education
           78k1067 Sex Discrimination
                78k1067(4) k. Discrimination Against Males. Most Cited Cases
Allegations that male grade school student was repeatedly stuck in the testicles by other male students were sufficient to support claim against school under Title IX for gender stereotyping, where school failed to explain how "sac stabbing" did not amount to differential treatment of males and females, and student and his parents asserted that school "essentially told [student] to toughen up and stop acting like a little girl[]" and to "stick up for himself[,]" and argued that harassment continued and was allowed to continue based on stereo-

typical perception that student was "not man enough,", presumably to either take abuse without complaint or to stop abuse by himself. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq. (Title IX).

**[7] Civil Rights 78 ☞1067(4)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1059 Education
           78k1067 Sex Discrimination
                78k1067(4) k. Discrimination Against Males. Most Cited Cases
Allegations in complaint under Title IX described behavior rising to level of harassment so "severe, pervasive and objectively offensive" that student was denied equal access to his education; complaint alleged that despite repeated and persistent notice, school did not take reasonable action to protect male grade school student from ongoing assaults on his testicles by other male students, and that as result of such assaults, student suffered repeated swelling and pain in his testicles, endured surgery on his left testicle and split incision after surgery, and ultimately was forced to choose between continued testicular pain and damage or leaving school. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq. (Title IX).

**[8] Civil Rights 78 ☞1067(4)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1059 Education
           78k1067 Sex Discrimination
                78k1067(4) k. Discrimination Against Males. Most Cited Cases
School's unsupported assertion that repeated assaults by male students on testicles of another male student was "traditionally ... recognized as rough-housing or horseplay[]" did not warrant dismissal of assaulted student's complaint under Title IX as failing to state claim upon which relief could be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                    Page 3
--- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.))**

granted. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq. (Title IX); Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[9] Civil Rights 78 ☞1067(3)**

78 Civil Rights
    78I Rights Protected and Discrimination Prohibited in General
        78k1059 Education
            78k1067 Sex Discrimination
                78k1067(3) k. Sexual Harassment; Sexually Hostile Environment. Most Cited Cases
School's alleged failure to promulgate and publicize effective policy and grievance procedure for sexual harassment as required by Department of Education regulations did not establish requisite actual notice and deliberate indifference required to maintain cause of action under Title IX, and did not itself constitute discrimination in violation of Title IX. Education Amendments of 1972, § 901 et seq., 20 U.S.C.A. § 1681 et seq. (Title IX).

Katrina M. Taraska, M. Michael Waters, Vonachen Lawless Trager & Slevin, Peoria, IL, for Plaintiff. David B. Mueller, John E. Cassidy, III, Cassidy & Mueller, Richard L. Steagall, Nicoara & Steagall, John P. Fleming, Fleming & Umland, Julie L. Galassi, Hasselberg Rock Bell & Kuppler, Gerald W. Brady, Jr., Brady & Donahue, David A. Perkins, Heyl Royster Voelker & Allen, Peoria, IL, for Defendants.

### *ORDER*

JOE BILLY McDADE, District Judge.
**\*1** Before the court is Magistrate Judge Cudmore's Report and Recommendation [Doc. 53] on various motions to strike and dismiss:

  1. First Motion to Dismiss Attorney's Fees Prayers from Counts IV and V filed by Defendants, Betty and Barry Baker, on October 16, 2007 [Doc. 11];

  2. First Motion to Dismiss or Strike Count VI filed by Defendant Bakers on October 16, 2007

[Doc. 12];

  3. Motion to Strike Counts IV, V, and VI of the Complaint filed by Defendants, Edward and Ellen Easy, on October 25, 2007 [Doc. 19];

  4. Motion for a More Definite Statement filed by Defendants, Connie and Chester Charlie, on November 20, 2007 [Doc. 27];

  5. Motion to Strike or Dismiss Counts IV, V and VI filed by all Defendants on November 20, 2007 [Doc. 28];

  6. Motion to Strike Count VI filed by Defendant, Doug Dog, on November 21, 2007 [Doc. 31];

  7. Motion to Strike Attorney Fees from Counts IV and V filed by Defendant Dog on November 21, 2007 [Doc. 32]; and

  8. Motion to Dismiss filed by Defendants, Brimfield Grad School and Brimfield School District # 309, on December 10, 2007 [Doc. 44].

In these Motions, Defendants sought to strike the prayer for attorney fees related to Plaintiff's state law battery, joint enterprise, and parental responsibility claims, Plaintiff's prayer for "actual damages" and "fair and reasonable damages" related to Plaintiff's Parental Responsibility Act claim, and Plaintiff's allegations that the school failed to comply with federal regulations regarding sexual harassment (paragraphs 16-17, 20-21, 23, and 86-88). The Charlie Defendants also sought a more definite statement with respect to the type of misconduct alleged. Finally, the Brimfield Defendants sought dismissal of Plaintiff's Title IX sexual harassment and discrimination claims.

Judge Cudmore recommended that only the prayer for attorney fees with respect to Counts IV and V, and the paragraph related to Defendants' alleged violation of federal regulations, be stricken. In all other respects, Judge Cudmore recommended that the Motions be denied.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.))**

The parties have not filed any objections within the ten (10) working days allotted by 28 U.S.C. § 636(b)(1). Failure to timely object constitutes a waiver of any objections. *See Johnson v. Zema Sys. Corp.,* 170 F.3d 734, 739 (7th Cir.1999); *Video Views, Inc. v. Studio 21 Ltd.,* 797 F.2d 538 (7th Cir.1986). Accordingly, this Court ADOPTS the Report and Recommendation of the Magistrate Judge.

IT IS THEREFORE ORDERED THAT

1. The First Motion to Dismiss Attorney's Fees Prayers from Counts IV and V [Doc. 11] is GRANTED;

2. The First Motion to Dismiss or Strike Count VI [Doc. 12] is DENIED;

3. The Motion to Strike Counts IV, V, and VI of the Complaint [Doc. 19] is GRANTED IN PART and DENIED IN PART;

4. The Motion for a More Definite Statement [Doc. 27] is DENIED;

5. The Motion to Strike or Dismiss Counts IV, V and VI [Doc. 28] is GRANTED IN PART and DENIED IN PART;

**\*2** 6. The Motion to Strike Count VI [Doc. 31] is DENIED;

7. The Motion to Strike Attorney Fees from Counts IV and V [Doc. 32] is GRANTED; and

8. The Motion to Dismiss [Doc. 44] is DENIED.

Accordingly, the prayer for attorney fees with respect to Counts IV and V are STRICKEN and paragraphs 16-17, 20-21, 23, and 86-87 are also STRICKEN.

### *REPORT AND RECOMMENDATION*

BYRON G. CUDMORE, United States Magistrate Judge.

This case is before the Court for a Report and Recommendation on several motions to dismiss and strike by Defendants (d/e's 11, 12, 19, 27, 28, 31, 32, 44). For the reasons below, the Court recommends that the attorney's fees sought in the state law claims for battery and joint enterprise be stricken (Counts IV and V). The Court further recommends that certain paragraphs in the Complaint regarding the failure to comply with federal regulations be stricken. The Court otherwise recommends that the motions be denied.

### Standard

To state a claim under federal notice pleading standards, all the Complaint must do is set forth a "short and plain statement of the claim showing that the pleader is entitled to relief...."Fed.R.Civ.P. 8(a)(2). Factual allegations are accepted as true and need only give " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *EEOC v. Concentra Health Serv., Inc.,* 496 F.3d 773, 776-77 (7th Cir.2007), *quoting Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007)(other citation omitted). The "allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'...." *Id., quoting Bell Atlantic,* 127 S.Ct. at 1965, 1973 n. 14. "Although this does 'not require heightened fact pleading of specifics,' it does require the complaint to contain 'enough facts to state a claim to relief that is plausible on its face.' " *Killingsworth v. HSBC Bank Nevada,* 507 F.3d 614, 618 (7th Cir.2007), *quoting Bell Atlantic Corp. v. Twombly,* 127 S.Ct. at 1974.

### Allegations

Plaintiff "Jane Doe" alleges that her minor son "John" was sexually harassed at school by six other male students.[FN1] The harassment was both verbal and physical, with the physical "sexual misconduct consist[ing] predominantly of grabbing, twisting, and hitting" John's testicles repeatedly beginning in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.))**

Case 1:08-cv-01384    Document 65-3    Filed 06/30/2008    Page 84 of 104 Page 5

November 2004 [FN2] and continuing to November 2005. (Complaint ¶ 6, 85). The school's principal was "aware of the ongoing practice of male students hitting each other in the testicles, also known as "sac stabbing." (Complaint ¶ 60). John and his parents repeatedly objected to this abuse, trying to impress the seriousness of the situation on school officials, but the school failed to take reasonable steps to prevent the abuse or the retaliation suffered by John for having objected to the abuse. (Complaint ¶ 24). As a result of the repeated trauma, John suffered significant swelling and pain in his testicles.

*3 In January 2005, John's father "specifically addressed the students on the boy's basketball team and told them that he was aware of the boys repeatedly hitting John in the testicles and their actions were serious and caused significant swelling and pain in John's testicles."(Complaint ¶ 46). The basketball coach did nothing in response to the mocking that occurred after this speech by one of the defendant students ("Brian") in the presence of other students, the coach and John's father. Despite continued notice of the ongoing assaults, the school still failed to reasonably respond and the abuse continued.

In September 2005, John's parents filed a police report against the defendant students. John's father met with the school principal and informed him that the abuse had aggravated John's existing varicocele to the point where surgery on John's testicle was required. (Complaint, ¶ 59). John had the surgery in September 2005, the surgical report indicating " 'painful varicocele made worse by repeat scrotal trauma.' " (Complaint ¶ 62). John's parents continued to object and try to persuade the school to take reasonable action to prevent the abuse, again to no avail.

On his return to school after the surgery, John was teased about his surgery, and, intentionally struck in the testicles again. His stitches popped and his surgical incision broke open. (Complaint ¶ 73). The school's principal still did nothing to correct the

situation. (Complaint ¶ 74). Instead, John was reprimanded by his coach for complaining, advising John that he needed to "stick up for himself." (Complaint ¶ 82). Further, John's mother, a teacher at the school, was retaliated against for voicing objections, through false accusations of unprofessional conduct and challenges to her competence as a teacher. (Complaint ¶ 273). Because of the school's repeated refusal to take reasonable steps to protect John, his parents removed him from the school in December 2005. (Complaint ¶ 85).

Plaintiffs filed this complaint in August 2007. Plaintiffs pursue claims for sexual harassment and retaliation in violation of Title IX against the school and school district. (Complaint, Counts I-III). Plaintiffs also pursue state claims of battery and joint enterprise against the students responsible for the alleged harassment, as well as a state claim against their parents under the Illinois Parental Responsibility Law. (Complaint, Counts IV-VI).

**Analysis**

**I. Attorneys fees sought in state law counts (Counts IV-VI) (battery, joint enterprise and parental responsibility)**

[1] Illinois common law follows the "American Rule": attorney's fees and costs are generally not recoverable by prevailing parties, unless provided for by statute or contract. *Morris B. Chapman & Associates, Ltd. v. Kitzman,* 193 Ill.2d 560, 572, 251 Ill.Dec. 141, 739 N.E.2d 1263 (2000). Plaintiffs assert that attorney's fees may be considered when awarding punitive damages, citing *International Union of Operating Engineers, Local 150 v. Lower Excavating Co.,* 225 Ill.2d 456, 312 Ill.Dec. 238, 870 N.E.2d 303 (2006). However, consideration of attorney's fees in fixing a punitive damage award does not support the conclusion that attorney's fees are recoverable themselves.*International,* 225 Ill.2d at 491, 312 Ill.Dec. 238, 870 N.E.2d 303 ("While attorney fees can be considered

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.))**

when awarding punitive damages, it is not within the purview of this court to award such fees outright, nor should they be awarded under the guise of a punitive damages award."). Plaintiff identifies no statutory or other basis for recovering attorney's fees on Counts IV and V, the battery and joint enterprise claims. Accordingly, the Court will recommend the prayer for attorney's fees in Counts IV and V be stricken.

*4 [2] The "Charlie" and "Easy" defendants also move to strike the attorney's fees sought under Count VI, the Parental Responsibility Law. However, 740 ILCS 115/5 of that law expressly allows the recovery of reasonable attorney's fees "to a plaintiff that is not a governmental unit."Accordingly, the Court will recommend the denial the motions to the extent they seek to strike the attorney's fees from Count VI.

## II. Damages Sought in Count VI (Parental Responsibility Law)

[3] Plaintiffs allege "[t]hat pursuant to 740 ILCS 115/3, the Parental Responsibility Law, the parent and/or legal guardians of the respective Defendant male students, are liable for the actual damages for the willful and malicious acts of such minor which causes injury to a person, including the payment of reasonable attorney's fees."(Complaint ¶ 573). They seek a judgment "not to exceed the limitations on damages as set forth in 740 ILCS 115/5, for an amount that a jury would find to be fair and reasonable to compensate [the minor] for his injuries, and for reasonable attorneys fees and costs associated with this claim."(Complaint p. 17).

Defendants contend that recovery of damages in Count VI is limited to the medical and hospital bills incurred. 740 ILCS 115/5. Plaintiffs concede this, but argue that "Defendants' semantical arguments ought to more properly be reserved for the jury instruction."(d/e 39, p. 3). Defendants' problem appears to be with Plaintiffs' request for "actual damages" and "fair and reasonable damages."

The Court believes it unnecessary to strike the phrases "actual damages" or "fair and reasonable damages" because the prayer for relief in Count VI already expressly limits recovery to that allowed by 740 ILCS 115/5, a limit which Plaintiffs concede. The Court will accordingly recommend denial of the motions to this extent.

## III. Motion for a More Definite Statement

The "Charlie" defendants move for a more definite statement on the state claims. (d/e 27). They argue that the allegations are too imprecise to draft a responsive pleading. In particular, they assert that, "As far as Defendant can tell, Plaintiff may only be alleging that he committed verbal misconduct .... " (d/e 27, ¶ 4).

[4] The Court does not believe that the allegations are too imprecise to draft an affirmative defense. Federal notice pleading standards apply to the state claims in this case. *Beanstalk Group, Inc. v. AM General Corp.,* 283 F.3d 856, 863 (7th Cir.2002).*All* of the defendant students are alleged to have participate in the alleged verbal *and* physical abuse from November 2004 to November 2005, including the "sac stabbing." John does not have to allege the exact dates that Charlie struck him in order to survive a motion to dismiss. The Charlie defendants may seek more specific information from Plaintiffs in discovery.

## IV. Motion to Dismiss by School and School District

The school and school district (collectively, the "school") assert that Plaintiffs fail to state a claim under Title IX.

*5 Title IX provides:

No person ... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Fed-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.))**

eral financial assistance, ...

20 U.S.C. § 1681(a); *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 173, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005)("... Title IX, ..., broadly prohibits a funding recipient from subjecting any person to 'discrimination' 'on the basis of sex.' "). Title IX covers student-on-student sexual harassment:

> The Supreme Court has held that a school district receiving federal funding may be liable for damages under title IX when one student sexually harasses another. *Davis v. Monroe County Bd. of Education,* 526 U.S. 629, 633, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999). The court established in *Davis* that liability may exist "where [funding recipients] are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."

*Gabrielle M. v. Park Forest-Chicago Heights, Illinois School Dist.,* 315 F.3d 817, 821 (7th Cir.2003), quoting *Davis,* 526 U .S. at 650. "Once school officials have actual notice of sexual harassment, *Davis* imposes a duty to act."*Gabrielle,* 315 F.3d at 824. School administrators are " 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."*Davis,* 526 U.S. at 649.

"[A] plaintiff must establish sexual harassment ... that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities."*Davis,* 526 U.S. at 651. "Damages are not available for simple acts of teasing and name-calling among school children, however, even where these comments target difference in gender. Rather, in the context of student-on-student harassment, damages

are available only where the behavior is so severe, pervasive, and objectively offensive that it denies its victims the equal access to education that Title IX is designed to protect."*Davis,* 526 U.S. at 652.

[5] The school seems to argue that Title IX may not cover same-sex harassment, noting that the Supreme Court has not specifically held so. (d/e 45, p. 11). However, the Supreme Court held in *Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), that same-sex harassment is covered under Title VII. Title VII cases have been relied on to support rulings under Title IX. *See Franklin v. Gwinnett County Pub. Schools,* 503 U.S. 60, 75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992)(Title VII hostile environment case (*Meritor* ) cited to support sexual harassment claim under Title IX); *Jackson,* 544 U.S. at 175 (Title IX more broadly written than Title VII); *Doe v. Univ. of Illinois,* 138 F.3d 653, 665 (7th Cir.1998)(applying Title VII cases to hostile environment claim under Title IX), *vacated on other grounds,*526 U.S. 1142, 119 S.Ct. 2016, 143 L.Ed.2d 1028 (1999); *Howell v. North Central College,* 320 F.Supp.2d 717, 720 (N.D.Ill.2004)("federal courts have looked to title VII precedent to inform their analyses of sexual discrimination claims under Title IX."). The school concedes that "[t]he lower federal courts have generally concluded that same-sex claims are viable under Title IX as they are under Title VII."(d/e 45, p. 11). The Court believes the precedent above supports that conclusion.

**\*6** [6] The school also contends that "sac stabbing" is not discrimination "based on sex" and is therefore is not actionable under Title IX. (d/e 45, pp. 8-9). The school advances that "sac stabbing" is not "engaged in for sexual self-stimulation or involved homosexual or effeminate behavior but rather was simply roughhousing or horseplay."(d/e 45, p. 9). Citing *Oncale,* the school asserts that same sex harassment is actionable if: 1) motivated by sexual desire; 2) motivated by hostility toward the presence of a specific gender; or 3) demonstrates differential

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.))**

treatment of males and females. (d/e 45, p. 12).

Oncale's examples are not exclusive, however. *Sheperd v. Slater Steels Corp.,* 168 F.3d 998, 1009 (7th Cir.1999)(Title VII)("*Oncale* also demonstrates that there is no singular means of establishing the discriminatory aspect of sexual harassment. So long as the plaintiff demonstrates in some manner that he would not have been treated in the same way had he been a woman, he has proven sex discrimination."); *Howell,* 320 F.Supp.2d at 721-22 ("the *Oncale* Court's list of actionable same-sex harassment was instructive rather than exhaustive.").

The school does not address the viability of a "gender stereotyping" claim, which has been recognized as a possibility by the Seventh Circuit in a Title VII case. *Doe v. City of Belleville,* 119 F.3d 563, 580-81 (7th Cir.1997)(harassment because plaintiff did not conform to stereotypical expectations of masculinity was actionable discrimination because of sex), *vacated and remanded on other grounds in light of Oncale,*523 U.S. 1001, 118 S.Ct. 1183, 140 L.Ed.2d 313;*Hamm v. Weyawega Milk Products, Inc.,* 332 F.3d 1058, 1064 (7th Cir.2003)(recognizing sex stereotyping claim under Title VII but holding that evidence did not support claim). Discrimination because one's behavior does not "conform to stereotypical ideas" of one's gender can amount to actionable discrimination "based on sex." *Howell,* 320 F.Supp.2d at 722;*Theno v. Tonganozie Unified School Dist.,* 377 F.Supp.2d 952, 964 (D. Kansas 2005)(discussing gender stereotyping cases).

The Court believes the allegations herein arguably give rise to such a claim. Plaintiff assert that the school "essentially told [John] to toughen up and stop acting like a little girl," to "stick up for himself." (d/e 49, p. 17). They argue that the harassment continued and was allowed to continue based on the stereotypical perception that John was " 'not man enough,' " (d/e 49, p. 17), presumably to either take the abuse without complaint or to stop the abuse by himself. In any event, the Court does not believe the school has adequately explained how "sac stabbing" falls outside *Oncale's* third example actionable harassment-differential treatment of males and females.

[7] The school next asserts that the allegations do not rise to the level of harassment so "severe, pervasive and objectively offensive" that John was denied equal access to his education. Yet that determination " 'depends on a constellation of surrounding circumstances, expectations, and relationships, ....,' " facts that are not in the record at this point.*Davis,* 526 U.S. at 651,*quoting Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). At this point the Court looks only to the allegations, accepting them as true. According to those allegations, despite repeated and persistent notice, the school did not take reasonable action to protect John from ongoing assaults on his testicles. As a result, John suffered repeated swelling and pain in his testicles, endured surgery on his left testicle and a split incision after the surgery, and ultimately was forced to choose between continued testicular pain and damage or leaving school. In the Court's opinion, these allegations meet the kind of "severe, pervasive and objectively offensive conduct" envisioned by *Davis.*

**\*7** [8] The school cites no case to support its assertion that the kind of misconduct alleged here "has traditionally been recognized as roughhousing or horseplay."(d/e 45, p. 11). The two cases that are cited by the school in which a Title IX complaint was dismissed on a rule 12(b)(6) motion are from outside the Seventh Circuit. *Frazier v. Fairhaven School Committee,* 276 F.3d 52 (1st Cir.2002) involved one incident where the school's matron, responsible for maintaining discipline, allegedly "peered into the stall through a crack between the door and the wall" at the plaintiff. 276 F.3d at 65. The First Circuit in *Frazier* concluded that the plaintiff had not stated a claim because no inference existed that the matron had discriminated against the plaintiff because of the plaintiff's sex rather than simply "ensur[ing] that nothing was

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.)
**(Cite as: --- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.))**

276 F.3d at 67. This Court wonders whether the Seventh Circuit Court of Appeals would agree with drawing that inference on a motion to dismiss, but in any event *Frazier* did not involve the kind of repeated assaults alleged here.

The second case, *Seamons v. Snow,* 84 F.3d 1226, 1232 (10th Cir.1996), involved a school's response to a football team's hazing of the plaintiff by taping him to towel bar naked and bringing a female student into view. The plaintiff in *Seamons* argued that the school's lack of response and the students' continued hostility constituted sexual harassment based on gender stereotyping. 84 F.3d at 1230. The Tenth Circuit affirmed dismissal for failure to state a claim, concluding that the plaintiff had "fail[ed] to allege any facts that would suggest he was subjected to unwelcome sexual advances or requests for sexual favors, or that sex was used to contribute to a hostile environment for him."84 F.3d at 1233. *Seamons* predates the Supreme Court's *Oncale* decision, which held that same-sex harassment is actionable under Title VII and demonstrated that "there is no singular means of establishing the discriminatory aspect of sexual harassment."*Sheperd v. Slater Steels Corp.,* 168 F.3d 998, 1009 (7th Cir.1999)(Title VII).*Seamons* also predates the Seventh Circuit's discussion of gender stereotyping in *Doe v. City of Belleville,* 119 F.3d 563 (7th Cir.1997)(*vacated and remanded on other grounds* ).FN3

The Court accordingly concludes that the allegations are sufficient to survive a motion to dismiss in this Circuit. The Court gives no opinion on the ultimate merit of the claims. The school's arguments may carry the day at summary judgment on a fully developed factual record. The Court concludes only that Plaintiffs have alleged enough facts to give notice of their claims and to raise their right to relief above a speculative level. That is all they need to do at this stage.

Lastly, the school asks to strike the allegations in paragraphs 16-17, 20-21, 23 and 86-88 of the Complaint, which allege violations of the federal regula-

tions with which the school was required to comply. The school argues that no private cause of action exists for a violation of these federal regulations, citing *Gebser v. Lago Vista Independent School Dist.,* 524 U.S. 274, 291-92, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998). Plaintiff counters that

> **\*8** If [the school] is stating that failing to promulgate the required policies and procedures for addressing sexual harassment in schools is not in and of itself discrimination, Plaintiff agrees. However, the Defendants also move to have the allegations related to the failure to promulgate policies and procedures for sexual harassment stricken as irrelevant. This is absurd. What is and what is not relevant is a matter of admissibility, not pleading.

Rule 12(f) states that "the court may strike from a pleading any ... redundant, immaterial, impertinent, or scandalous matter."

> Motions under Rule 12(f) are generally disfavored, although they may be granted if they remove unnecessary clutter from the case and serve to expedite, not delay. *See Heller Fin., Inc. v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1294 (7th Cir.1989). Courts generally do not grant motions to strike unless the defect in the pleading causes some prejudice to the party bringing the motion. See *Affiliated Capital Corp. v. Buck,* No. 94 C 1497, 1994 WL 691189, at \*4 (N.D.Ill.Dec.2, 1994).

*Rivertree Landing LLC v. Murphy,* 246 F.R.D. 667 (N.D.Ill.2007)." 'Immaterial matter is defined as that which has no relationship to the cause of action pled.' " *Burke v. Chicago School Reform Bd. of Trustees,* 169 F.Supp.2d 843, 846 (N.D.Ill.2001)(quoted cite omitted). " 'Prejudice results when the matter complained of has the effect of confusing the issue or where it is so lengthy and complex that it places an undue burden on the responding party.' " *Id., quoting*5 Wright & Miller, *Federal Practice and Procedure,* § 1382.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.)
(Cite as: --- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.))

Page 10

[9] The Court agrees with the school's reading of *Gebser,* which Plaintiffs appear to concede. *Gebser* specifically addressed the claim that the school had "fail[ed] to promulgate and publicize an effective policy and grievance procedure for sexual harassment" as required by Department of Education regulations. 524 U.S. at 292. The *Gebser* Court held that the "failure to comply with the regulations, however, does not establish the requisite actual notice and deliberate indifference. And ....does not itself constitute 'discrimination' under Title IX." 524 U.S. at 292.

Paragraphs 16-17, 20-21, 23 and 86-87, do, in the Court's view, imply that the Title IX claim is based in part on the school's failure to follow the federal regulations. FN4 Although the Court cannot conclude at this stage that these paragraphs are completely immaterial, the Court does believe they are confusing and prejudicial since Count I cannot be based on the regulations under *Gebser.* Accordingly, the Court will recommend these paragraphs be stricken. This does not mean the information in the allegations is non-discoverable, irrelevant or inadmissible for any purpose. Those determinations are better made during discovery, summary judgment or trial.

WHEREFORE, the Court makes the following recommendations:

1) The Court recommends that the motion to dismiss by the school and school district (d/e 44) be granted only to the extent it seeks to strike paragraphs 16-17, 20-21, 23, 86-87 from the Complaint. The Court otherwise recommends that the motion (d/e 44) be denied.

*9 2) The Court recommends that the motion for a more definite statement by the "Charlie" defendants be denied (d/e 27).

3) The Court recommends that the motions to strike or dismiss Count VI by the "Dog" and "Baker" defendants be denied (d/e's 12, 31).

4) The Court recommends that the requests to strike the attorney's fees sought in Counts IV and V of the Complaint be granted. Accordingly, the Court recommends that motions 11 and 32 by the "Baker" and "Dog" defendants be granted in full, because that is the only request sought in those motions (d/e's 11, 32). The Court recommends that the motions by the "Charlie" and "Easy" defendants by granted in part and denied in part (d/e 19, 28): granted to the extent they seek dismissal of attorney's fees in Counts IV and V and denied as to Count VI.

Any objections to this Report and Recommendation must be filed in writing with the Clerk of the Court within ten working days after service of a copy of this Report and Recommendation. *See* 28 U.S .C. § 636(b)(1). Failure to timely object will constitute a waiver of objections on appeal. *Video Views, Inc. v. Studio 21, Ltd.,* 797 F.2d 538, 539 (7th Cir.1986). See also Local Rule 72.2.

> FN1. Pseudonyms are used to protect the identities of the minors.
>
> FN2. John was 12 years old in November 2004. (Complaint para. 1, Count 1).
>
> FN3. It is not clear the extent to which the Tenth Circuit would allow a same-sex gender stereotyping claim. *See Etsitty v. Utah Transit Authority,* 502 F.3d 1215, 1224 (10th Cir.2007)(declining to decide whether discrimination based on failure to conform to sex stereotypes "always constitutes discrimination"); *Medina v. Income Support Div., New Mexico,* 413 F.3d 1131, 1135 (10th Cir.2005)(recognizing other circuit cases that allow gender-stereotyping claims under Title VII).
>
> FN4. Paragraph 88 of the Complaint does not appear based primarily on a violation of federal regulations; it appears instead to be generalized allegations of the injuries John suffered.

C.D.Ill.,2008.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.)

**(Cite as: --- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.))**

Page 11

Doe v. Brimfield Grade School
--- F.Supp.2d ----, 2008 WL 1722225 (C.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 11

Slip Copy                                                                                                          Page 1
Slip Copy, 2007 WL 4354987 (N.D.Ill.)
**(Cite as: 2007 WL 4354987 (N.D.Ill.))**

**C**
Moore v. Morgan Stanley & Co., Inc.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
Ronald MOORE, Morris Allen, Jr., Michael
Barnett, Anthony Bell, Patrick Carter, Martin Dix-
on, Ernest Dorsey, Mary Evans, Janice Grant,
Justin Harris, Mark Lewers, Maurice Mabon, Brian
Roy, Marion Tucker, on behalf of themselves and
all others similarly situated, Plaintiffs,
v.
MORGAN STANLEY & CO., INC., Defendant.
**Civil Action No. 07 C 5606.**

Dec. 6, 2007.

Linda Debra Friedman, Mary Stowell, Suzanne E.
Bish, Stowell & Friedman, Ltd., Chicago, IL, for
Plaintiffs.
Arthur James Rooney, Barry A. Hartstein, Nina G.
Stillman, Morgan, Lewis & Boccius, LLP, Chicago,
IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

SUZANNE B. CONLON, District Judge.
**\*1** Ronald Moore and thirteen other named
plaintiffs sue Morgan Stanley & Co., Inc. ("Morgan
Stanley") under 42 U.S.C. § 1981, purporting to
bring an action as individuals and "on behalf of a
class of past and present African American applic-
ants, Financial Advisor Trainees, Financial Ad-
visors, and managers of Defendant in the United
States who have been subjected to discrimination
by Defendant due to their race and have been sub-
jected to retaliation due to their opposition to dis-
crimination."Compl. ¶ 57, 66-67. Morgan Stanley
moves to dismiss or, in the alternative, to stay and
strike portions of the complaint because of a duplic-
ative case, *Jaffe, et al. v. Morgan Stanley & Co.,
Inc.,* No. 06 C 3903(TEH)*("Jaffe"* ), pending in the
Northern District of California.

### I. BACKGROUND

When plaintiffs filed their complaint on October 3,
2007, *Jaffe* was pending in the United States Dis-
trict Court for the Northern District of
California.*Jaffe* began as a gender discrimination
class action against Morgan Stanley on June 22,
2006. On August 17, 2007, a second amended com-
plaint was filed in *Jaffe,* alleging a nationwide class
action under 42 U.S.C. § 1981 and Title VII of the
Civil Rights Act of 1964, as amended, on behalf of
classes of "all African American and all minority
Financial Advisors and Registered Financial Ad-
visor Trainees employed by Morgan Stanley in the
United States at any time from October 12, 2002 to
the present."*Jaffe* Sec. Am. Compl ¶ 19, Cts. III-IV.

The same day the second amended complaint was
filed, the *Jaffe* parties reached a settlement on the
class race claims. The proposed settlement class is
defined as:

All African Americans and Latinos who were em-
ployed as Financial Advisors or Registered Finan-
cial Advisors Trainees in the Global Wealth Man-
agement Group of Morgan Stanley & Co. Incorpor-
ated or its predecessor, Morgan Stanley DW Inc. at
any time between October 12, 2002 through [the
date of preliminary approval].

The settlement is now pending preliminary approv-
al by the Northern District of California. The
*Moore* plaintiffs have filed objections to the pro-
posed settlement as inadequate and unfair to the
class. Morgan Stanley and the *Jaffe* plaintiffs' coun-
sel have filed responses to the *Moore* plaintiffs' ob-
jections.

All but two of the fourteen named plaintiffs in
*Moore* would be class members in the *Jaffe* settle-
ment class. The two exceptions are Justin Harris,
who purports to bring an action on behalf of Afric-
an American applicants not hired by Morgan Stan-
ley, and Mary Evans, who was employed as an as-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sistant branch manager (rather than a financial advisor) during the class period.

## II. ANALYSIS

### A. Motion to Dismiss or Stay the Proceeding

A federal suit may be dismissed for reasons of wise judicial administration whenever it is duplicative of a parallel action already pending in another federal court. *Serlin v. Arthur Anderson & Co.,* 3 F.3d 221, 223 (7th Cir.1993) (citations omitted). The court is accorded a great deal of latitude and discretion in determining whether one action is duplicative of another, but generally a suit is duplicative if the "claims, parties, and available relief do not significantly differ between the two actions."*Id.* (citing *Ridge Gold Standard Liquors v. Joseph E. Seagram & Sons, Inc.,* 572 F.Supp. 1210, 1213 (N.D.Ill.1983). When mirror-image suits are filed in two federal districts, the first case filed takes priority. *See Caccamo v. Greenmarine Holdings LLC,* No. 01 C 0899, 2001 WL 668929, at *1 (N.D.Ill. Jun.14, 2001) (Darrah, J.). However, the Seventh Circuit does not espouse a rigid "first-to-file" rule. *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.,* 819 F.2d 746, 750 (7th Cir.1987). There is a rebuttable presumption the first case that establishes jurisdiction should be allowed to proceed, and the second case be dismissed. *Asset Allocation & Management Co. v. Wesern Employers Ins. Co.,* 892 F.2d 566, 573 (7th Cir.1989); *Northwest Airlines, Inc. v. American Airlines, Inc.,* 989 F.2d 1002, 1004 (8th Cir.1993). The *Moore* plaintiffs bear the burden of showing compelling circumstances or an imbalance of convenience to overcome the presumption that the *Jaffe* suit should proceed. *Caccamo,* 2001 WL 668929, at *1.

### 1. Duplicative Litigation

**\*2** Morgan Stanley argues this case warrants dismissal because the claims, parties, and available relief do not significantly differ between this case and the previously filed *Jaffe* case. The complaint in

*Moore* and the second amended complaint in *Jaffe* assert similar race-based legal theories over similar class periods against Morgan Stanley, including: disparate treatment, disparate impact, hostile work environment and retaliation. *See* Compl. ¶¶ 35, 48; *Jaffe* Sec. Am. Compl. ¶¶ 77-97. Both cases seek the same remedies: injunctive relief, equitable remedies, compensatory damages, punitive damages and attorneys' fees. *See* Compl. ¶ 71; *Jaffe Sec. Am. Compl.* ¶¶ 130-36. However, plaintiffs argue this case is not duplicative of *Jaffe,* as the *Moore* complaint includes a proposed class of Morgan Stanley managers and financial adviser applicants, as well as additional allegations that Morgan Stanley refused to hire or promote African Americans on account of their race.

These differences are not central to the class claims in both cases. *Moore* and *Jaffe* focus heavily on discriminatory treatment of financial advisors. And although the proposed class in *Jaffe* would not include named plaintiffs Harris and Evans, it is readily apparent that twelve of the fourteen named plaintiffs here are members of the proposed class in *Jaffe.See, e.g., Mackey v. Board of Educ. for Arlington Central School Dist.,* 112 Fed.Appx. 89 (2d Cir.2004) (class members' subsequent action duplicative even though unnamed in previous class action); *Peak v. Green Tree Fin. Servicing Corp.,* No. 00 C 0953, 2000 WL 973685, at*4 (N.D.Cal. July 7, 2000). The settlement in the *Jaffe* class action may have a material impact on this case, as it may dispose of virtually all class claims pertaining to financial advisors. Simultaneous litigation in both venues would expend significant judicial and litigant resources.

Harris and Evans have different claims from other named plaintiffs. This situation militates in favor of a stay, so they are not prejudiced by dismissal. *See Central States, Southeast and Southwest Areas Pension Fund v. Paramount Liquor Co.,* 203 F.3d 442, 445 (7th Cir.2000) (where parallel proceeding given "priority," the action before the district court "should be stayed, rather than dismissed, unless it is

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2007 WL 4354987 (N.D.Ill.)
**(Cite as: 2007 WL 4354987 (N.D.Ill.))**

absolutely clear that dismissal cannot adversely affect any litigant's interests"). Plaintiffs' request to allow individual claims to proceed is premature. Plaintiffs' assertion they intend to opt out of the *Jaffe* settlement is mere conjecture at this point.

**2. Priority of Filing**

Plaintiffs additionally argue this case cannot be duplicative of *Jaffe* because it preceded *Jaffe.*They contend the first-filed rule should not be applied because of Morgan Stanley's bad faith in shopping for a plaintiff in *Jaffe* who was willing to agree to bind the class on inadequate and unfair terms. Plaintiffs assert they originally sought to negotiate their claims with Morgan Stanley in good faith, only to have Morgan Stanley secretly collude with the *Jaffe* plaintiffs to construct a race-based class on the eve of settlement. Morgan Stanley vigorously contests this, stating that they engaged in good faith negotiations and mediation with the *Jaffe* and *Moore* plaintiffs. After reviewing the memoranda, chronology, declarations, and exhibits, it is inconclusive whether bad faith was present in negotiating the *Jaffe* race-based settlement. Plaintiffs have not satisfied their burden in rebutting the presumption that the first-filed rule should be followed. This case will yield to *Jaffe* in order to avoid expensive and duplicative litigation of virtually the same claims in two federal courts. *See, e.g., Applexion S.A., v. The Amalgamated Sugar Co.,* No. 95 C 858, 1995 WL 404843 (N.D.Ill. July 7, 1995) (Conlon, J.) (first-filed rule instructs one case to yield). A stay is granted until the final *Jaffe* settlement is approved or some other event in *Jaffe* warrants vacating the stay. *See, e.g., Jaffe v. Morgan Stanley DW, Inc.,* No. C06-3903, 2007 WL 163196 (N.D.Cal. Jan. 19, 2007).

**B. Motion to Strike**

**\*3** Morgan Stanley requests the court to strike paragraphs 4, 5, 27, 28, 29 and 30 of the complaint pursuant to Fed.R.Civ.P. 12(f). These paragraphs refer

to plaintiffs' attempts to settle their claims with Morgan Stanley, Morgan Stanley's purportedly improper conduct, and the fairness of the proposed settlement agreements in *Jaffe.*

The court may strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter."Fed. R. Civ. P 12(f). Motions to strike are a disfavored, drastic remedy. *See, e.g., Custom Vehicles, Inc. v. Forest River, Inc.,* 464 F.3d 725, 726-28 (7th Cir.2006); *Robinson v. Midlane Club, Inc.,* No. 94 C 1459, 1994 WL 577219, at *2 (N.D.Ill. Oct.18, 1994) (collecting cases). Morgan Stanley is required to show the allegations in the complaint are "so unrelated to plaintiffs claims as to be void of merit and unworthy of any consideration."*Robinson,* 1994 WL 577219, at *2.

Morgan Stanley argues it would be prejudiced by allegations of improper conduct during the *Jaffe* settlement, as the allegations only serve to tarnish Morgan Stanley and its counsel. The allegations have the potential of confusing the issues with respect to plaintiffs' racial discrimination claims. Paragraphs 5, 27, 28, 29 and 30 are stricken from the complaint.

**III. CONCLUSION**

Because this case is substantially similar to *Jaffe,* it will be stayed until the final *Jaffe* settlement is approved or some other event in *Jaffe* warrants vacating the stay. Paragraphs 5, 27, 28, 29 and 30 of the complaint are stricken pursuant to Fed.R.Civ.P. 12(f).

N.D.Ill.,2007.
Moore v. Morgan Stanley & Co., Inc.
Slip Copy, 2007 WL 4354987 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 12

547 F.Supp.2d 939                                                                 Page 1
547 F.Supp.2d 939, 2008-1 Trade Cases P 76,090
**(Cite as: 547 F.Supp.2d 939)**

**C**

Schering-Plough Healthcare Products, Inc. v.
Schwarz Pharma, Inc.
E.D.Wis.,2008.

United States District Court,E.D. Wisconsin.
SCHERING-PLOUGH HEALTHCARE
PRODUCTS, INC., Plaintiff,
v.
SCHWARZ PHARMA, INC., Kremers Urban,
LLC, Breckenridge Pharmaceuticals, Inc., Paddock
Laboratories, Inc., Defendants.
**No. 07-CV-642.**

Feb. 29, 2008.

**Background:** Drug marketer brought action against
competitors asserting false advertising claims under
the Lanham Act. Drug marketer moved for partial
summary judgment and competitors moved to dis-
miss.

**Holdings:** The District Court, J.P. Stadtmueller, J.,
held that:
(1) genuine issue of material fact as to whether "Rx
only" and "prescription only" statements on
product labels were literally false precluded sum-
mary judgment, and
(2) Food and Drug Administration (FDA) letters
did not constitute a final determination as to wheth-
er labels were false or misleading, warranting dis-
missal of Lanham Act claim.

Plaintiff's motion denied; defendants' motion gran-
ted.

**[1] Antitrust and Trade Regulation 29T ⬤⟿22**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(A) In General
            29Tk21 Advertising, Marketing, and Pro-
motion
                29Tk22 k. In General. Most Cited
Cases

A false statement that constitutes a violation of the
Lanham Act generally falls into one of two categor-
ies: (1) commercial claims that are literally false as
a factual matter; or (2) claims that may be literally
true or ambiguous, but which implicitly convey a
false impression, are misleading in context, or
likely to deceive consumers. Lanham Act, §
43(a)(2), 15 U.S.C.A. § 1125(a)(2).

**[2] Antitrust and Trade Regulation 29T ⬤⟿22**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(A) In General
            29Tk21 Advertising, Marketing, and Pro-
motion
                29Tk22 k. In General. Most Cited
Cases

When the statement in question is actually false, the
plaintiff need not show that the statement either ac-
tually deceived customers or was likely to do so in
order to show a violation of the Lanham Act. Lan-
ham Act, § 43(a)(2), 15 U.S.C.A. § 1125(a)(2).

**[3] Federal Civil Procedure 170A ⬤⟿2493**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2493 k. Copyright, Trademark,
and Unfair Competition Cases. Most Cited Cases
Genuine issue of material fact existed as to whether
"Rx only" and "prescription only" statements on
competitors' product labels were literally false, pre-
cluding summary judgment in drug marketer's false
advertising claim brought under the Lanham Act.
Lanham Act, § 43(a)(2), 15 U.S.C.A. § 1125(a)(2).

**[4] Antitrust and Trade Regulation 29T ⬤⟿22**

29T Antitrust and Trade Regulation
    29TII Unfair Competition
        29TII(A) In General
            29Tk21 Advertising, Marketing, and Pro-

motion

29Tk22 k. In General. Most Cited Cases

In reviewing allegedly false and misleading statements, courts are to read the statements in their entirety and in context to determine whether they are actionable; in addition, the specific audience is part of the context that must be considered in deciding whether a statement is literally false.

**[5] Antitrust and Trade Regulation 29T** 🔑**22**

29T Antitrust and Trade Regulation
　29TII Unfair Competition
　　29TII(A) In General
　　　29Tk21 Advertising, Marketing, and Promotion
　　　　29Tk22 k. In General. Most Cited Cases

In reviewing allegedly false and misleading statements, context can often be important in discerning the message conveyed and this is particularly true where the target of the advertising is not the consuming public but a more well informed and sophisticated audience.

**[6] Antitrust and Trade Regulation 29T** 🔑**62**

29T Antitrust and Trade Regulation
　29TII Unfair Competition
　　29TII(B) Actions and Proceedings
　　　29Tk62 k. Exclusive and Concurrent Remedies. Most Cited Cases

**Health 198H** 🔑**314**

198H Health
　198HI Regulation in General
　　198HI(E) Drugs; Medical Devices and Instruments
　　　198Hk309 Labeling Requirements
　　　　198Hk314 k. Misbranding. Most Cited Cases

**Health 198H** 🔑**323**

198H Health

　198HI Regulation in General
　　198HI(E) Drugs; Medical Devices and Instruments
　　　198Hk323 k. Judicial Review or Intervention. Most Cited Cases

Food and Drug Administration (FDA) letters allegedly demonstrating that drug marketer's competitors' products were misbranded did not constitute a final determination as to whether labels were false or misleading, and therefore a ruling on merits of drug marketer's false advertising claims under the Lanham Act would have required court to usurp FDA's responsibility for interpreting and enforcing agency's regulations under the Federal Food, Drug, and Cosmetic Act (FDCA), warranting dismissal of Lanham Act claim; while letters indicated that, in the opinions of FDA officials who wrote the letters, competitors' products were misbranded, they did not provide competitors an opportunity for a hearing, as required by FDA regulations. Federal Food, Drug, and Cosmetic Act, § 1 et seq., 505(e), 21 U.S.C.A. § 301 et seq., 355(e).

**[7] Antitrust and Trade Regulation 29T** 🔑**62**

29T Antitrust and Trade Regulation
　29TII Unfair Competition
　　29TII(B) Actions and Proceedings
　　　29Tk62 k. Exclusive and Concurrent Remedies. Most Cited Cases

**Health 198H** 🔑**323**

198H Health
　198HI Regulation in General
　　198HI(E) Drugs; Medical Devices and Instruments
　　　198Hk323 k. Judicial Review or Intervention. Most Cited Cases

When and if a false advertising claim strays too close to the exclusive enforcement domain of the Food and Drug Administration (FDA), it cannot stand; such claims would allow a private litigant to interfere with the FDA's own investigatory time-table and prosecutorial decision-making.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

547 F.Supp.2d 939, 2008-1 Trade Cases P 76,090
**(Cite as: 547 F.Supp.2d 939)**

Bingham B. Leverich, Emily Johnson Henn, Emily A. Su-LanR. Porter, Neil K. Roman, Covington & Burling, Washington, DC, Brian D. Baird, Borgelt Powell Peterson & Frauen SC, Milwaukee, WI, for Plaintiff.

Anthony S. Baish, Andrew S. Oettinger, Godfrey & Kahn SC, Kenneth R. Nowakowski, Nathan A. Fishbach, Lisa M. Arent, Whyte Hirschboeck Dudek SC, Ted A. Wisnefski, Michael Best & Friedman LLP, Milwaukee, WI, John R. Fleder, Kurt R. Karst, Robert A. Dormer, Hyman Phelps & McNamara PC, Washington, DC, C. Randolph Ross, Buchanan Ingersoll & Rooney PC, Philadelphia, PA, Charles R. Bruton, Buchanan Ingersoll & Rooney PC, Alexandria, VA, David S. Saenz, Richard A. Edlin, Greenberg Traurig LLP, New York, NY, for Defendants.

### ORDER

J.P. STADTMUELLER, District Judge.

Plaintiff Schering-Plough HealthCare Products, Inc. ("Schering-Plough") filed its complaint on July 12, 2007, alleging claims brought pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) and Wisconsin state law against defendants Schwarz Pharma Manufacturing, Inc. ("Schwarz"), Kremers Urban, LLC, Breckenridge Pharmaceutical, Inc., and Paddock Laboratories, Inc. Schering-Plough claims that the defendants made false and misleading statements in connection with the marketing and sale of Polyethylene Glycol 3350 Powder for Oral Solution laxative drugs ("Polyethylene Glycol 3350"). On August 13, 2007, Schering-Plough moved for partial summary judgment as to liability on its claim of false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The defendants have filed separate motions to dismiss. For the reasons set forth below, the court will deny Schering-Plough's motion for partial summary judgment and grant the defendants' motions to dismiss this action.

### BACKGROUND

The material facts are not in dispute. All the parties in this action market drugs approved by the United States Food and Drug Administration ("FDA") pursuant to a comprehensive drug approval and regulatory scheme under the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301-399. Under the FDCA, a "new drug" cannot be sold unless it is first approved by the FDA. See21 U.S.C. § 355(a). Approval is obtained either through a New Drug Application ("NDA"), see21 U.S.C. § 355(b), 21 C.F.R. § 314.50, or an Abbreviated New Drug Application ("ANDA"). A product similar to an NDA approved drug may be approved and marketed based on an ANDA. See21 U.S.C. § 355(j). An ANDA requires the manufacturer of the similar drug to demonstrate that the two drugs are therapeutically equivalent, that is pharmaceutically equivalent and bioequivalent. Id. at § 355(j)(2)(A)(i)-(viii). An ANDA also requires the manufacturer of the similar drug to demonstrate that the "labeling proposed for the new drug is the same as the labeling approved for the listed drug...."Id. at § 355(j)(2)(A)(v).

On February 18, 1999, the FDA approved Braintree Laboratories, Inc.'s ("Braintree") NDA to market Polyethylene Glycol 3350 as a prescription-only drug under 21 U.S.C. § 355(b). (O'Mullane Decl. ¶¶ 7-8.) On October 6, 2006, the FDA approved Braintree's NDA to market Polyethylene Glycol 3350 as an over-the-counter drug. (Id. at ¶ 12.)The FDA also granted Braintree three-year exclusivity to market Polyethylene Glycol 3350 as an over-the-counter drug, beginning October 6, 2006. (Id. at ¶ 13.)In August 2006, Braintree granted Schering-Plough an exclusive right to market over-the-counter Polyethylene Glycol 3350, and on February 19, 2007, Schering Plough began marketing its Polyethylene Glycol 3350 over-the-counter product, Mira LAX. (Id. at ¶ 14.)The polyethylene glycol 3350 molecule is the only ingredient in each of the parties' Polyethylene Glycol 3350 products; there are no inactive ingredients. (Id. at ¶ 15.)

Between 2004 and 2006, the defendants filed AN-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

547 F.Supp.2d 939
547 F.Supp.2d 939, 2008-1 Trade Cases P 76,090
(Cite as: 547 F.Supp.2d 939)

DA's in order to obtain FDA approval to market generic equivalent Polyethylene Glycol 3350. These ANDA's were based upon the approved NDA filed by Braintree which allowed for the marketing of Polyethylene Glycol 3350 as a prescription-only drug. (Compl. ¶¶ 18-21.) Before the FDA approved Braintree's NDA to market Polyethylene Glycol 3350 as an over-the-counter drug, the FDA approved the defendants' ANDA's, permitting the defendants to market Polyethylene Glycol 3350 as a prescription-only drug. (*Id.*) Because the FDA granted Braintree three-year exclusivity to market Polyethylene Glycol 3350 as an over-the-counter drug, the FDA currently cannot approve any ANDA's for over-the-counter Polyethylene Glycol 3350.

After the defendants' ANDA's were approved, the defendants began marketing and selling their Polyethylene Glycol 3350 products as "Rx only" or "prescription only" laxatives. (Howard Decl. ¶¶ 12-20, Exs. 1-8.) Schering-Plough asserts that the defendants' use of these "prescription only" statements on their labels constitutes false advertising in violation of the Lanham Act because Polyethylene Glycol 3350 is available from Schering-Plough without a prescription. The defendants contend that because their ANDA's were based upon the approved NDA which allowed for the marketing of Polyethylene Glycol 3350 as a "prescription only" drug, their products' labels are required by the FDA and FDCA to indicate that the products are available only by prescription.

## ANALYSIS

Because the court is able to rule on Schering-Plough's motion for partial summary judgment without the need to preemptively interpret and enforce FDA regulations, the court will address that motion first. Summary judgment is appropriate where the moving party establishes that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477

U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Material facts" are those facts which "might affect the outcome of the suit," and a dispute about a material fact is "genuine" if a reasonable finder of fact could find in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment is appropriate where a party has failed to make "a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322-23, 106 S.Ct. 2548. A party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). In determining whether a genuine issue of material fact exists, the court construes all facts and reasonable inferences in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

[1][2] Section 43(a)(2) of the Lanham Act "prohibits the use of false or misleading statements or representations of fact in commercial advertising, and establishes a private remedy for any violation thereof." *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 13 (7th Cir.1992). A false statement that constitutes a violation of the Act "generally falls into one of two categories: (1) commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers." *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 820 (7th Cir.1999). "When the statement in question is actually false, the plaintiff need not show that the statement either actually deceived customers or was likely to do so." *Id.*

[3] Here, it is undisputed that Polyethylene Glycol 3350 is available from Schering-Plough without a prescription, but is only available from the defendants with a prescription. Schering-Plough asserts that the defendants' commercial use of the state-

ments "Rx only" and "a prescription only laxative" on their labels constitutes literally false statements, and as a result, no other evidence is necessary to prove their false advertising claim. Therefore, Schering-Plough argues, the undisputed facts demonstrate that the defendants made literally false statements in their commercial interstate advertising, and, thus, Schering-Plough is entitled to summary judgment on its claims that the defendants violated Section 43(a) of the Lanham Act.

[4][5] In reviewing allegedly false and misleading statements, courts are to read the statements in their entirety and in context to determine whether they are actionable. *See, e.g., Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1139 (9th Cir.1997) ("When evaluating whether an advertising claim is literally false, the claim must always be analyzed in its full context."); *Castrol, Inc. v. Pennzoil Co.,* 987 F.2d 939, 946 (3rd Cir.1993) ("in assessing whether an advertisement is literally false, a court must analyze the message conveyed in full context."); *Schwarz Pharma, Inc. v. Breckenridge Pharm., Inc.,* 388 F.Supp.2d 967, 976 (E.D.Wis.2005) ("To determine whether a particular representation is literally false, it must be analyzed with its full context."). In addition, the specific audience is part of the context that must be considered in deciding whether a statement is literally false. "[C]ontext can often be important in discerning the message conveyed and this is particularly true where, as here, the target of the advertising is not the consuming public but a more well informed and sophisticated audience."*Sandoz Pharmaceuticals Corp. v. Richardson-Vicks, Inc.,* 902 F.2d 222, 229 (3d Cir.1990) (citation and internal quotation marks omitted).

Schering-Plough argues that according to the "Rx only" and "prescription only" statements on the defendants' products' labels, the defendants communicate the false message that *all* Polyethylene Glycol 3350 is only available with a prescription. However, the defendants' use of the "Rx only" and "prescription only" statements must be considered

in the context of the full bottle label. *See Schwarz Pharma, Inc.,* 388 F.Supp.2d at 976.The context of the defendants' product label is particularly relevant here because the target audience for the defendants' products predominantly consists of licensed pharmacists, buyers who are trained as pharmacists, and other individuals with significant experience in the pharmaceutical industry. (Lapila Decl. ¶ 2.) Analyzing the "Rx only" and "prescription only" statements on the defendants' products' labels in their full context, a reasonable finder of fact could reasonably conclude that the statements only refer to the specific products on which the statements appear. Indeed, the defendants' products' labels contain unique trade names, manufacturer names, and logos. Each of the defendants' products' labels also contains a unique National Drug Code ("NDC") that identifies the manufacturer of each product, the specific product, and the packaging type. *See*21 C.F.R. § 207.35(b). In addition, given that pharmacists who purchase the defendants' products have "special knowledge of a class of products," it is less likely that the defendants' use of the statements "Rx only" and "prescription only" would be interpreted to convey the message that all Polyethylene Glycol 3350 products are only available with a prescription. *See Sandoz,* 902 F.2d at 229-30.Thus, viewing the facts in the light most favorable to the defendants, as the court must, a reasonable finder of fact could conclude that the "Rx only" and "prescription only" statements refer to the specific products on which they appear. And given that Polyethylene Glycol 3350 is available from the defendants on a prescription only basis, a reasonable finder of fact could conclude that these statements are not literally false. Furthermore, Schering-Plough does not allege that the statements are ambiguous or literally true, and Schering-Plough has not presented evidence of actual consumer confusion to suggest that the statements are misleading in context. *See, e.g., B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 168 F.3d 967, 971-72 (7th Cir.1999) ("where the statement is literally true or ambiguous, then the plaintiff is obliged to prove that the statement is misleading in context, as demonstrated by actual

547 F.Supp.2d 939, 2008-1 Trade Cases P 76,090
**(Cite as: 547 F.Supp.2d 939)**

consumer confusion."). In light of the foregoing, the court is obliged to deny Schering-Plough's motion for partial summary judgment.

[6] Turning now to the defendants' motions to dismiss, they assert that Schering-Plough's Lanham Act claim should be dismissed because the claim requires the court to interpret and apply the FDCA before the FDA has had a chance to do so. Enforcement of the FDCA is permitted exclusively "by and in the name of the United States" or, in certain circumstances, by a state. 21 U.S.C. § 337. Courts have held that it is not proper "for a court in a Lanham Act case to determine preemptively how a federal administrative agency will interpret and enforce its own regulations."*Sandoz,* 902 F.2d at 231.This is both because such intervention by a court would be tantamount to allowing a private right of action under the FDCA, which the statute does not permit, *id.,* and because it would violate the directive of the Supreme Court that "[b]ecause 'agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise.'"*Id.* (quoting *McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)).

[7] When and if a false advertising claim strays "too close to the exclusive enforcement domain of the FDA," it cannot stand. *Schwarz Pharma, Inc.,* 388 F.Supp.2d at 974 (quoting *Summit Tech. v. High-Line Medical Instruments Co.,* 922 F.Supp. 299, 306 (C.D.Cal.1996)). Such claims would "allow a private litigant to interfere with the FDA's own investigatory time-table and prosecutorial decision-making."*Id.* However, courts have also held that false statements are actionable under the Lanham Act, even if their truth may be generally within the purview of the FDA. *See, e.g., Mylan Labs., Inc. v. Matkari,* 7 F.3d 1130, 1138 (4th Cir.1993).

Here, the defendants assert that the plaintiff's Lanham Act claim should be dismissed because the issue of whether the defendants' products are mislabeled under FDA standards is an issue within the exclusive purview of the FDCA, and thus not properly decided in a Lanham Act case. Pursuant to the FDCA, an ANDA applicant is required "to show that the labeling proposed for the [generic] drug is the same as the labeling approved for the listed drug."21 U.S.C. § 355(j)(2)(A)(v). In addition, the label of any approved prescription drug must contain the information that it is available only by prescription; such a drug "shall be deemed to be misbranded if at any time prior to dispensing the label of the drug fails to bear, at a minimum, the symbol 'Rx only'."21 U.S.C. § 353(b)(4)(A). According to the FDCA, a drug is mislabeled "if its labeling is false or misleading in any particular."21 U.S.C. § 352(a).

It is undisputed that the defendants' products are approved for sale on a prescription-only basis. The defendants state that because their ANDA's were based upon the approved NDA which allowed for the marketing of Polyethylene Glycol 3350 as a prescription-only drug, the defendants' products labels are required by the FDA and FDCA to indicate that the products are available only by prescription. *See*21 U.S.C. § 355(j)(2)(A)(v). Given that the FDA and FDCA require the "prescription only" statements on the defendants' products' labels, the defendants argue that any challenges to their labeling must be addressed by the FDA, not the court. *See*71 Fed.Reg. 3922, 3934 (Jan. 24 2006) ("the determination whether labeling revisions are necessary is, in the end, squarely and solely FDA's, under the [FDCA].").

Schering-Plough contends that the FDA has already addressed the labeling issue in this case, and "[b]ecause the Agency has already spoken, there is no concern of judicial interference."(Pl.'s Resp. Br. 15-16.) Therefore, Schering-Plough asserts, the court should be permitted to rule on its Lanham Act claim. In support of this position, Schering-Plough cites to letters sent on or about April 20, 2007, from Gary J. Buehler ("Buehler"), Director of the Office of Generic Drugs within the FDA's Center for Drug Evaluation and Research, to the defendants. (Arent

547 F.Supp.2d 939, 2008-1 Trade Cases P 76,090
**(Cite as: 547 F.Supp.2d 939)**

Decl. Ex. 1; Ellison Decl. Ex. 1; Freathy Decl. Ex. 2 (collectively the "FDA letters")).[FN1] The FDA letters state that each of the defendants' "Rx product, which bears the 'Rx only' symbol, is misbranded and may not be legally marketed."(*Id.*) Defendant Schwarz responded to this letter by sending a letter to the FDA indicating that Schwarz disagreed with the position taken by Buehler, and, notwithstanding that disagreement, Schwarz was prepared to withdraw its Polyethylene Glycol 3350 product, GlycoLax, from the market "provided that FDA agrees to exercise its enforcement discretion to permit [Schwarz] to sell off the existing GLYCOLAX inventory for 6 months from the date of this letter."(Ellison Decl. Ex. 2.) In a letter dated July 19, 2007, another FDA employee, Michael M. Levy, who is the Director of the Division of New Drugs and Labeling Compliance within FDA's Center for Drug Evaluation and Research, stated: "we do not agree with the arguments" set forth in the June 25, 2007 letter, and, notwithstanding that disagreement, "we are prepared to grant your request for enforcement discretion to market prescription GlycoLax until December 25, 2007."(*Id.* at Ex. 3.) Schering-Plough argues that the FDA letters demonstrate that its Lanham Act claim does not raise undecided issues under the FDCA; rather, the FDA has determined that the "Rx only" statements on the defendants' products' labels refer to Polyethylene Glycol 3350 generally, not to each defendants' individual products. Schering-Plough also argues that the FDA letters demonstrate that, according to the FDA, the defendants' products' labels violate the FDCA because "a drug to which [prescription requirements do not apply] shall be deemed to be misbranded if at any time prior to dispensing the label of the drug bears the [Rx only] symbol...."21 U.S.C. § 353(b)(4)(B).

In support of its position that the FDA letters express official FDA determinations, Schering-Plough cites to *Mylan Laboratories, Inc. v. Thompson,* 389 F.3d 1272 (D.C.Cir.2004), where the D.C. Circuit deferred to agency letters to private parties. However, the letter at issue in *Mylan* was substantially different from the FDA letters cited by Schering-Plough. Specifically, the letter at issue in *Mylan* had legal consequences; it effectively revoked a final approval of Mylan's ANDA for a generic drug by changing it to "tentative approval," and had the immediate legal consequence that Mylan could not market its generic drug at that time. *Id.* at 1281-82.Here, the FDA letters cited by Schering-Plough did not revoke any approvals of the defendants' products or otherwise purport to mandate any immediate legal consequences. *Cf. See Western Illinois Home Health Care v. Herman,* 150 F.3d 659, 663 (7th Cir.1998) (holding that a letter from the Department of Labor was final and reviewable, whereas the opinions and letters in other cases were not final and reviewable because of "the absence there of immediate legal consequences for the regulated party."). In addition, as opposed to the FDA letters cited by Schering-Plough, the *Mylan* letter did not address withdrawal of approval of a drug product for one of the reasons specified in 21 U.S.C. § 355(e).*Mylan,* 389 F.3d at 1281-82.Thus, unlike here, in *Mylan* there was no explicit statutory mechanism for the FDA to utilize in effecting that withdrawal of approval. *Id.*

Schering-Plough also submitted *Axcan Scandipharm Inc. v. Ethex Corp.,* 2007 WL 3095367 (D.Minn. Oct. 19, 2007) as supplemental authority. The court in *Axcan* acknowledged that "where a claim requires interpretation of a matter that is exclusively within the jurisdiction and expertise of the FDA and FDCA, plaintiffs cannot use the Lanham Act as a backdoor to private enforcement."*Id.* at *4. However, the court in *Axcan* concluded that because it was required to interpret the "*generally understood meanings* of the terms 'generic equivalence' and 'substitute,' and not the FDA's definition of 'equivalence' " the case did not stray into the FDA's domain. *Id.* at *5 (emphasis in original). In the instant case, unlike the plaintiff's claims in *Axcan,* Schering-Plough's Lanham Act claim requires the court to infringe upon the FDA's right to determine how the defendants' approved Polyethylene Glycol 3350 products should be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

547 F.Supp.2d 939, 2008-1 Trade Cases P 76,090
**(Cite as: 547 F.Supp.2d 939)**

labeled.

In considering the defendants' motions to dismiss, the court must accept Schering-Plough's complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in Schering-Plough's favor. *See Transit Express, Inc. v. Ettinger,* 246 F.3d 1018, 1023 (7th Cir.2001). Even assuming Schering-Plough's factual allegations are true, a ruling on the merits of Schering-Plough's Lanham Act claim would require the court to usurp the FDA's responsibility for interpreting and enforcing the agency's regulations. Jurisdiction for the regulation of prescription-only and over-the-counter drug marketing is vested jointly and exhaustively in the FDA and the FTC, and is divided between them by agreement. *Sandoz,* 902 F.2d at 231.Here, the FDA letters cited by Schering-Plough indicate that, in the opinions of the FDA officials who wrote the letters, the defendants' products are misbranded. However, pursuant to the FDA's own regulations, the FDA has not yet taken any official position concerning the labeling of the defendants' products to which the court can defer.

Congress has established a specific procedure that the FDA must follow in order to withdraw its approval of a drug product based on false or misleading labeling. Specifically, 21 U.S.C. § 355(e) governs the withdrawal of approval for a drug on the basis that "the labeling of such drug ... is false or misleading."*Id.* Under this statute, the FDA "may ... after due notice and opportunity for hearing to the applicant, withdraw the approval of an application ... if the Secretary finds ... the labeling of such drug, based on a fair evaluation of all material facts, is false or misleading."*Id.* The FDA letters cited by Schering-Plough did not provide the defendants the opportunity for a hearing regarding the labeling of their products or the withdrawal of FDA approval for their products. Therefore, even if the FDA had purported to make an agency determination through the letters that it had withdrawn its approval of the defendants' products, because such a

determination would not have been in compliance with the explicit statutory requirements, the determination could not be considered an official agency determination to be afforded deference.

Indeed, several courts have recognized that letters such as those cited here do not constitute an official agency determination. *See Herman,* 150 F.3d at 662 ("An agency action is not final if it is only 'the ruling of a subordinate official,' or 'tentative.' The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.") (quoting *Franklin v. Massachusetts,* 505 U.S. 788, 796-97, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992)); *see also Dietary Supplemental Coalition, Inc. v. Sullivan,* 978 F.2d 560, 562-63 (9th Cir.1992) (" '[T]he type of informal letter issued by the FDA ... does not constitute ... formal or final agency action ....' ") (quoting *Biotics Research Corp. v. Heckler,* 710 F.2d 1375, 1377 (9th Cir.1983)), *cert. denied,*508 U.S. 906, 113 S.Ct. 2333, 124 L.Ed.2d 245 (1993); *Genendo Pharmaceutical N.V. v. Thompson,* 308 F.Supp.2d 881, 885 (N.D.Ill.2003) (statements of agency officials below the Commissioner "do not rise to the level of final agency action-even when they are contained in warning letters or other official regulatory correspondence."); *Summit Tech. Inc.,* 922 F.Supp. at 306 ("regardless of any warning letters that the FDA may have sent to defendants, it is clear that the FDA has not completed this investigation."). Furthermore, pursuant to 21 C.F.R. § 10.85(k), "[a] statement or advice given by an FDA employee ... is an informal communication that represents the best judgment of that employee at that time but does not constitute an advisory opinion, does not necessarily represent the formal position of FDA, and does not bind or otherwise obligate or commit the agency to the views expressed."*Id.*

As noted above, pursuant to the defendants' ANDA's and the FDCA, the defendants' Polyethylene Glycol 3350 products' labels were required by the FDA to indicate that the products were available

547 F.Supp.2d 939, 2008-1 Trade Cases P 76,090
(Cite as: 547 F.Supp.2d 939)

only by prescription. *See* 21 U.S.C. §§ 353(b)(4)(A) and 355(j)(2)(A)(v). A review of the FDA letters cited by Schering-Plough and the FDA's own regulations reveals that the FDA letters did not constitute an agency "determination" and that the marketing and labeling of the defendants' Polyethylene Glycol 3350 products is still an open question. By requesting the court to determine whether the defendants can continue to market their prescription-only Polyethylene Glycol 3350 products, Schering-Plough is in effect asking the court to step into the shoes of the FDA. The simultaneous marketing of the defendants' prescription-only Polyethylene Glycol 3350 products and Schering-Plough's over-the-counter Polyethylene Glycol 3350 product, in addition to the labeling of those products, raises questions properly addressed by the FDA, not the court. *See Sandoz,* 902 F.2d at 231;*see also* 71 Fed.Reg. 3922, 3934 ("the determination whether labeling revisions are necessary is, in the end, squarely and solely FDA's, under the [FDCA].").  Accordingly, because the FDA has not yet made a final determination regarding these marketing and labeling issues, and because Schering-Plough's Lanham Act claim would require this court to "determine preemptively how a federal agency will interpret and enforce its own regulations," the court is obliged to dismiss Schering-Plough's Lanham Act claim. *Sandoz,* 902 F.2d at 231.Schering-Plough is free to petition the FDA to resolve the alleged labeling violations. *See, e.g., id.* at n. 10.

Although Schering-Plough did not address some of the arguments raised against its state law claims, because the court is obliged to dismiss Schering-Plough's sole federal claim, the court will relinquish jurisdiction over the remaining state claims under 28 U.S.C. § 1367(c)(3).*See Williams v. Rodriguez,* 509 F.3d 392, 404 (7th Cir.2007); *Groce v. Eli Lilly & Co.,* 193 F.3d 496, 501 (7th Cir.1999) ("it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

Accordingly,

**IT IS ORDERED** that the plaintiff's motion for partial summary judgment (Docket # 19) be and the same is hereby **DENIED;**

**IT IS FURTHER ORDERED** that the defendants' motions to dismiss (Docket # 's 52, 53, 59) be and the same are hereby **GRANTED;** Count I of the plaintiff's complaint be and the same is hereby DISMISSED with prejudice; the plaintiff's remaining state claims, Counts II-IV, be and the same are hereby **DISMISSED** without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

The clerk of court is directed to enter judgment accordingly.

> FN1. The court may take judicial notice of the FDA letters submitted by the parties. *See Fornalik v. Perryman,* 223 F.3d 523, 529 (7th Cir.2000).

E.D.Wis.,2008.
Schering-Plough Healthcare Products, Inc. v. Schwarz Pharma, Inc.
547 F.Supp.2d 939, 2008-1 Trade Cases P 76,090

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.