# Exhibit

# A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC. | ) ) ) | |
| Plaintiff, | ) ) | No: 08-CV-1384 |
| v. | ) ) | Judge Bucklo |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., | ) ) ) | Magistrate Judge Mason |
| Defendant. | ) ) ) ) | |

**MORTON GROVE PHARMACEUTICALS, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS
THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'S COUNTERCLAIM**

Dated: June 30, 2008

W. Gordon Dobie
William C. O'Neil
Cherish M. Keller
**WINSTON & STRAWN LLP**
35 West Wacker Drive
Chicago, Illinois 60601
P: (312) 558-5600
F: (312) 558-5700

*Attorneys for Morton Grove Pharmaceuticals, Inc.*

# TABLE OF CONTENTS

**PAGE**

INTRODUCTON.................................................................................................1

FACTUAL BACKGROUND...............................................................................2

I.      MORTON GROVE'S COMPLAINT .........................................................2

II.     THE NPA'S COUNTERCLAIM ..............................................................2

      A.      Letters from Morton Grove to Michigan Medical Organizations Regarding Michigan House Bill 4569 .....................................................................4

      B.      Sections of Morton Grove's Non-Promotion Lobbying Website, www.lindane.com .............................................................................5

      C.      Letters Written by Third-Party Medical Experts to the Michigan Legislature.....................................................................................6

LEGAL FRAMEWORK ....................................................................................6

ARGUMENT ....................................................................................................8

I.      THE NPA'S LANHAM ACT CLAIM MUST BE DISMISSED BECAUSE THE STATEMENTS AT ISSUE ARE NOT "COMMERCIAL ADVERTISEMENTS" .........8

      A.      Morton Grove's Lobbying Campaign Letters Are Not "Commercial Advertisements".................................................................................8

      B.      Morton Grove's Non-Promotional Lobbying Website Is Not a Commercial Advertisement ..................................................................................9

      C.      The Third-Party Scientific & Medical Opinions Posted on Morton Grove's Lobbying Website Are Also Not Commercial Advertisements ..........................11

II.     THE NPA'S LANHAM ACT CLAIM MUST BE DISMISSED BECAUSE IT IS IMPERMISSIBLY & UNCONSTITUTIONALLY BASED ON CORE POLITICAL SPEECH ...............................................................................12

      A.      The Lanham Act's Legislative History and Case Law Make Apparent That Its Reach Does Not Extend to Political Speech ....................................................12

      B.      The *Noerr-Pennington* Doctrine Is Further Evidence That Morton Grove's Political Speech Merits Protection.........................................................14

      C.      The Legislative Privilege Is Further Evidence That Morton Grove's Political Speech Merits Protection.........................................................15

i

III.   THE NPA'S LANHAM ACT CLAIM MUST BE DISMISSED TO THE
       EXTENT IT IS PREDICATED ON THE STATEMENTS OF THIRD-PARTY
       MEDICAL EXPERTS ...................................................................................16

IV.    THE NPA'S LANHAM ACT AND UDTPA CLAIMS MUST BE DISMISSED
       TO THE EXTENT THEY ARE PREDICATED ON MEDICAL AND
       SCIENTIFIC OPINIONS AS OPPOSED TO STATEMENTS OF FACT ...................17

V.     THE NPA'S UDTPA CLAIM MUST BE DISMISSED BECAUSE IT IS BASED
       ON THE SAME FACTUAL ALLEGATIONS AS THE NPA'S LANHAM ACT
       CLAIM.......................................................................................................19

VI.    THE NPA HAS FAILED TO PROPERLY PLEAD CAUSATION OR EVEN A
       CLAIM THAT PLAUSIBLY ENTITLES IT TO RELIEF...............................................21

       A.    The NPA's Claim for Relief Is Not Plausible.........................................21

       B.    The NPA Has Failed to Meet its Burden of Pleading Causation..........22

CONCLUSION.................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.*,
  820 F. Supp. 1072 (N.D. Ill. 1993) ........................................................................16

*Arlington Heights Nat. Bank v. Arlington Heights Federal Sav. & Loan Ass'n*,
  37 Ill. 2d 546, 229 N.E.2d 514 (Ill. 1967) ........................................................15, 16

*Bell Atl. Corp. v. Twombly*,
  127 S.Ct. 1955 (2007)....................................................................................21

*Best Vacuum, Inc. v. Ian Design, Inc.*,
  2005 WL 1185817 (N.D. Ill. Jan. 18, 2005) ..........................................................19

*Best Vacuum, Inc. v. Ian Design, Inc.*,
  2006 WL 3486879 (N.D. Ill. Nov. 29, 2006) ........................................................19

*Bosley Med. Inst., Inc. v. Kremer*,
  403 F.3d 672 (9th Cir. 2005) ............................................................................10

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*,
  447 U.S. 557 (1980)......................................................................................13

*Collins v. Snyner*,
  2002 WL 31749173 (N.D. Ill. Dec. 2, 2002) ..........................................................7

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961)......................................................................................14

*Eazypower Corp. v. Alden Corp.*,
  2003 WL 22859492 (N.D. Ill. Dec. 2, 2003) ........................................................15

*Euromarket Designs, Inc. v. Crate & Barrel Ltd.*,
  96 F. Supp. 2d 824 (N.D. Ill. 2000) ................................................................9, 10

*Fedders Corp. v. Elite Classics*,
  268 F. Supp. 2d 1051 (S.D. Ill. 2003)................................................................17

*First Health Group Corp. v. BCE Emergis Corp.*,
  269 F.3d 800 (7th Cir. 2001) ........................................................................8, 14

*Francorp, Inc. v. Siebert*,
  2002 WL 731170 (N.D. Ill. Apr. 24, 2002) ....................................................19-20

*Fries v. Helsper*,
    146 F.3d 452 (7th Cir. 1998) ..................................................................6

*Geick v. Kay*,
    177 Ill. Dec. 340, 603 N.E.2d 121 (Ill. 1992) ..........................................15

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)................................................................................17

*Gimix, Inc. v. JS & A Group, Inc.*,
    699 F.2d 901 (7th Cir. 1983) ..................................................................19

*Groden v. Random House, Inc.*,
    61 F.3d 1045 (2d Cir. 1995)....................................................................17

*Havoco of Am., Ltd. v. Hollobow*,
    702 F.2d 643 (7th Cir. 1983) ..................................................................15

*Henson v. CSC Credit Serv.*,
    29 F.3d 280 (7th Cir. 1994) ......................................................................7

*Hot Wax, Inc. v. Turtle Wax, Inc.*,
    191 F.3d 813 (7th Cir. 1999) .......................................................... passim

*Huntingdon Life Sciences, Inc. v. Rokke*,
    978 F. Supp. 662 (E.D. Va. 1997) ..........................................................13

*In the Matter of Wade*,
    969 F.2d 241 (7th Cir. 1992) ....................................................................7

*Kottle v. Nw. Kidney Ctrs.*,
    146 F.3d 1056 (9th Cir. 1998) ................................................................14

*Lucien v. Preiner*,
    967 F.2d 1166 (7th Cir. 1992) ..................................................................7

*Lynch Ford, Inc. v. Ford Motor Co., Inc.*,
    957 F. Supp. 142 (N.D. Ill. 1997) ..........................................................20

*MasterCard Int'l Inc. v. Nader 2000 Primary Comm, Inc.*,
    2004 WL 434404 (S.D.N.Y. Mar. 8, 2004) ......................................12, 13

*Matsushita v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................22

*McDonagh v. Bergan*,
    2003 WL 21798735 (N.D. Ill. July 25, 2003)........................................17

*McDonald v. Smith,*
　472 U.S. 479 (1985)...........................................................................................13

*Midwest Canvas Corp. v. Commonwealth Canvas, Inc.,*
　2008 WL 162757 (N.D. Ill. Jan. 16, 2008) ...............................................10, 11, 21

*Morse v. Frederick,*
　127 S. Ct. 2618 (2007)......................................................................................13

*Muzikowski v. Parmount Pictures Corp.,*
　2003 WL 22872117 (N.D. Ill. Dec. 3, 2003) .........................................................19

*Neitzke v. Williams,*
　490 U.S. 319 (1989)............................................................................................6

*New West, L.P. v. City of Joliet,*
　491 F.3d 717 (7th Cir. 2007) .............................................................................14

*Republic Tobacco, L.P. v. N. Atlantic Trading Co.,*
　254 F. Supp. 2d 985 (N.D. Ill. 2002) ...............................................................20, 21

*Richard Wolf Med. Instruments Corp. v. Dory,*
　723 F. Supp. 37 (N.D. Ill. 1989) ........................................................................21

*Rosenthal Collins Group, LLC v. Trading Techs. Int'l,*
　2005 WL 3557947 (N.D. Ill. Dec. 26, 2005) .........................................................17

*Ryan v. Mary Immaculate Queen Ctr.,*
　188 F.3d 857 (7th Cir. 1999) ..............................................................................6

*SB Designs v. Reebok Int'l, Ltd.,*
　338 F. Supp. 2d 904 (N.D. Ill. 2004) ...................................................................19

*Soderlund Bros. v. Carrier Corp.,*
　663 N.E.2d. 1 (Ill. Ct. App. 1995) .......................................................................18

*Spex, Inc. v. Joy of Spex, Inc.,*
　847 F. Supp. 567 (N.D Ill. 1994) ........................................................................19

*Taubman Co. v. Webfeats,*
　319 F.3d 770 (6th Cir. 2003) ..............................................................................10

*TMI, Inc. v. Maxwell,*
　368 F.3d 433 (5th Cir. 2004) ..............................................................................10

*United Mine Workers of Am. v. Pennington,*
　381 U.S. 657 (1965)...........................................................................................14

*Utah Lighthouse Ministry, Inc. v. Discovery Computing, Inc.*,
    506 F. Supp. 2d 889 (D. Utah 2007) ..................................................................10

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
    987 F.2d 429 (7th Cir. 1993) ..............................................................................7

*Virginia v. Black*,
    538 U.S. 343, 365 (2003) ...................................................................................13


STATUTES

15 U.S.C. § 1125(a) ......................................................................................................8

815 ILCS 510/2(a) ..................................................................................................8, 19


OTHER AUTHORITIES

134 Cong. Rec. H. 1297 (daily ed. April 13, 1989) ....................................................12

135 Cong. Rec. H. 1216-17 (daily ed. April 13, 1989) ...............................................12

2 Gilson LaLonde, Green & Gilson, *Trademark Protection & Practice* § 7.02[6][b][i][B] .........17

First Amendment .............................................................................................13, 14, 17

Michigan House Bill 4569 ..............................................................................................4

Rule 11 ....................................................................................................................22, 23

Rule 12(b)(6) ............................................................................................................6, 21

## **INTRODUCTION**

Having lost a motion to dismiss Morton Grove's complaint, having already removed from its commercial website two of the false statements at issue, and having seen its former co-Defendant, the Ecology Center, retract numerous and nearly identical false statements, the NPA still chose to swing back at Morton Grove with this counterclaim. The NPA misses the mark and badly.

Morton Grove and the NPA have been embroiled in a legislative battle over potential state-by-state restrictions on the use of Lindane medications for several years. In connection with this legislative debate, the NPA has made and continues to make false statements disparaging Morton Grove's Lindane medications. Morton Grove has never sought to make those falsehoods the subject of this litigation. In stark contrast, the NPA has collected letters sent by either Morton Grove or third parties in opposition to proposed legislation seeking to restrict the use Lindane medications, as well as excerpts from Morton Grove's non-promotional lobbying website, and attempted to mold this political speech into a false advertising and trade disparagement claim.

The NPA cannot sustain its counterclaim. The NPA's counterclaim must be dismissed because the eleven statements at issue are not "commercial advertisements." The NPA also cannot maintain its claim to the extent it relies on the scientific and medical opinions of third parties. On top of these defects, the NPA has not and cannot properly plead a plausible entitlement to relief or a causal connection between the statements at issue and its alleged loss of goodwill.

This litigation was born out of the NPA's *factually baseless* commercial advertisements regarding Lindane medications. The NPA's filing of this counterclaim marks the

NPA's unfortunate turn to *legally baseless* allegations as well.  The NPA's counterclaim cannot be supported by existing law or fact—it is frivolous and must be dismissed with prejudice.

## FACTUAL BACKGROUND

Morton Grove is a small, Illinois-based generic drug manufacturer that manufactures Lindane medications for the treatment of lice and scabies.  (Countercl. ¶ 1, 9.)  The NPA is the distributor of a competing product, the LiceMeister® Comb.  (*Id.* at ¶ 7.)  Both parties' products are used to treat individuals for lice.

## I.    MORTON GROVE'S COMPLAINT

This litigation initially began two years ago as a result of the NPA's attack campaign on Morton Grove's Lindane medications.  (*See generally* Complaint, Docket No. 1.)  The NPA's campaign included (1) false commercial advertisements on www.headlice.org aimed at increasing sales of the NPA's LiceMeister® Comb and reducing sales of Lindane medications, and (2) efforts to convince government agencies and state legislative bodies to ban FDA-approved Lindane medications.  Morton Grove predicated its claim for relief only on the former aspect of the NPA's campaign of misinformation, not any of the false statements that the NPA made in a political or legislative context.  Morton Grove focused its complaint solely on statements found on www.headlice.org, the NPA's commercial website, which is viewed up to 100,000 times per day and has generated more than $2 million in sales of the LiceMeister® Comb.

## II.   THE NPA'S COUNTERCLAIM

In response to Morton Grove's complaint, the NPA filed this counterclaim.  The NPA alleges that eleven statements made by Morton Grove in connection with its lobbying efforts to prevent a ban of Lindane medications in Michigan constitute false advertising and deceptive trade practices.  The eleven allegedly false statements are as follows:

(1)    "The fact is that tens of millions of prescriptions for lindane medications have been written in the 50+ years they have been on the U.S. market, yet relatively few adverse events have been reported."  (Countercl. at ¶ 48.)

(2)    "The great majority of those events, 85% were non-serious, and serious events most often resulted from product misuse—80% of cases (note that in 2003, lindane medications were limited to small, single-use 2 oz. bottle to minimize this risk)."  (*Id.* at ¶ 49.)

(3)    "From 1951 through 2002, only 3 deaths confirmed to be related to lindane medications were reported through the FDA AERS [Adverse Event Reporting System] database.  In each instance, these medications were misused (see claims #1 and #3)."  (*Id.* at ¶ 51.)

(4)    "The FDA has quantified serious adverse events (AEs) as <u>rare</u> when lindane pediculicides are used properly—an assessment that is based on more than 50 years of prescription use in tens of millions of patients.  The fact is that lindane pediculicides are generally safe and well tolerated.  The most common side effects are nonserious reactions of the skin, such as itching and dryness."  (*Id.* at ¶ 63.)

(5)    "Lindane is safe, effective, it is not toxic if used as directed" and "[m]y training in both pediatrics and dermatology allows me to judge this issue." (*Id.* at ¶ 68.)

(6)    "The University of Michigan Medical School taught the use of Lindane for scabies and lice during my training there.  The same was true of my pediatric residency at U of M."  (*Id.* at ¶ 69.)

(7)    "I have even used it on myself, my children and my pregnant wife."  And "[T]hat fetus exposed to Lindane when my wife used it, what happened to her?  She just finished her freshman year at Harvard with stellar grades in high-level courses.  Don't let these alarmist anti-Lindane advocates scare you into thinking Lindane is a dreadful neurotoxin.  It just isn't so."  (*Id.* at ¶ 70.)

(8)    "I have enclosed some photographs of a two-year-old girl who was previously treated for scabies with oral Ivermectin, one of the most potent medications on the market.  The patient failed Ivermectin therapy and was subsequently treated successfully with Lindane."  (*Id.* at ¶ 73.)

(9)    "As the current President of the Society for Pediatric Dermatology, I can strongly attest to the value of Lindane for pediatric patients who suffer from scabies and lice.  I have personally used this medication many times during my 21-year career in pediatric dermatology, and believe that it is

both safe and effective when used according to the package insert." (*Id.* at ¶ 74.)

(10)    "[S]tatements against the use of lindane medication in favor of nit combs must be closely scrutinized as these statements have been aggressively advanced by the National Pediculosis Association (NPA), a special interest group of non-healthcare professionals that directly profits from the sale of nit comb products." (*Id.* at ¶ 111.)

(11)    "[m]isleading [c]laim" that "[m]anual removal of lice and nits with special combs or other mechanical means is the best treatment for infestation and prevention of recurrence" is "often made by the National Pediculosis Association (NPA), which holds itself out as a nonprofit health organization but actually makes its money by marketing a competitive medical device to lindane shampoo without employing a single licensed healthcare professional." (*Id.* at ¶ 113.)

These eleven statements can be classified into three distinct categories: (1) letters from Morton Grove to Michigan medical organizations regarding Michigan House Bill 4569, (2) sections of Morton Grove's non-promotional lobbying website, www.lindane.com, and (3) letters written by third-party medical experts to the Michigan legislature. Each is described below.

## A.    Letters from Morton Grove to Michigan Medical Organizations Regarding Michigan House Bill 4569

The NPA predicates its false advertising and deceptive trade practices claim on five nearly identical informational letters written by Dr. Chang Lee, the former Vice President of Regulatory Affairs and Clinical Research at Morton Grove, to the (1) Wayne County Medical Society of Southeast Michigan (Countercl. Ex. B), (2) Children's Hospital of Michigan (Countercl. Ex. C), (3) Michigan Chapter of American Academy of Pediatrics (Countercl. Ex. D), (4) Michigan Nurses Association (Countercl. Ex. E), and (5) Michigan Counsel for Maternal and Child Health (Countercl. Ex. F). Each letter begins by specifically addressing pending legislation in Michigan:

> Representative Edward Gaffney has been kind enough to share with me your letter to him regarding lindane. I have also been made aware of a coalition that has been aggressively encouraging

healthcare providers, such as yourself, to endorse a bill to ban lindane medications in the state of Michigan . . . .

Each letter goes on to address and correct misinformation that has been disseminated during the legislative process, largely by the NPA, and concludes with a suggestion that the reader seek further information about lindane on Morton Grove's lobbying website, www.lindane.com.  In none of the letters does Dr. Lee mention the NPA or the LiceMeister® Comb, suggest that the reader use Lindane medications or contact their physician about obtaining a prescription for Lindane medications, or even provide a phone number or website where a commercial transaction for Lindane medications could occur.

**B.      Sections of Morton Grove's Non-Promotion Lobbying Website, www.lindane.com**

The NPA also predicates its counterclaim on sections of www.lindane.com, Morton Grove's non-promotional lobbying website.  The section of www.lindane.com that the NPA has alleged contains false advertisements is entitled "Lindane Information Fact Checker" and begins by noting that "[g]roups seeking to ban the medical use of lindane have done a disservice to the public by spreading misleading information, often presented out of context, in the news media, on the Internet, and elsewhere about the risks and benefits of lindane."  On its face, this is political language, on a website with a political purpose.

Lindane medications *cannot* be bought on www.lindane.com—in fact, Morton Grove maintains a separate and distinct promotional website, www.mgp-online.com, which the NPA has not mentioned.  Nowhere on www.lindane.com does Morton Grove suggest the reader use Lindane medications, suggest that the reader contact their physician about obtaining a prescription for Lindane medications, or provide a phone number or website where a commercial transaction for Lindane medications could take place.  Likewise, nowhere on www.lindane.com does Morton Grove mention the LiceMeister® Comb.

5

**C.    Letters Written by Third-Party Medical Experts to the Michigan Legislature**

The NPA also bases its counterclaim on two letters written by third parties to Michigan House Representative Rebekah Warren.  These letters (Countercl. Exs. H & I) were written by Dr. Tor Shwayder, Director of Pediatric Dermatology at Henry Ford Hospital in Detroit, Michigan, and Dr. Adelaide Hebert, Professor of Pediatric Dermatology, University of Texas Medical School.[1]  Like the other statements at issue, nowhere in either of these letters do Doctors Shwayder or Hebert suggest the reader use Lindane medications, propose that the reader contact a physician about obtaining a prescription for Lindane medications, or propose a commercial transaction for Lindane medications.  Neither do the letters mention the NPA or the LiceMeister® Comb at all.

## LEGAL FRAMEWORK

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint.  Fed R. Civ. P. 12(b)(6); *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998).  The purpose of such a motion is to "streamline litigation by dispensing with needless discovery and factfinding," *Neitzke v. Williams*, 490 U.S. 319, 326-27 (1989), and to allow the court to determine "at the outset of the litigation, before costly discovery is undertaken, whether the [counterclaimant] has any tenable theory or basis of suit, so that if he does not, the case can be got rid of immediately without clogging the court's docket and imposing needless expense on the defendant."  *Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 860 (7th Cir. 1999).

---

[1]    It bears noting that these two letters are just two of the many letters that can be found under the heading "Medical & Scientific Opinions" on www.lindane.com.  Similar supportive letters have been written and are posted on www.lindane.com by, for example, former U.S. Surgeon General, Dr. Jocelyn Elders and Northwestern Medical School Professor, Dr. Amy S. Paller.  Presumably, the NPA did not want to address head-on the similar opinions of these thought leaders in front of a Chicago jury.

In order to withstand a motion to dismiss, a claim must allege that each element of a cause of action exists. *Lucien v. Preiner*, 967 F.2d 1166, 1168 (7th Cir. 1992). A plaintiff "cannot satisfy federal pleading requirements merely by attaching bare legal conclusions to narrated facts which fail to outline the bases of their claims." *Collins v. Snyner*, 2002 WL 31749173, at *1 (N.D. Ill. Dec. 2, 2002) (App. Tab 1). Additionally, district courts may look to exhibits attached to the claim in deciding a motion to dismiss, and such exhibits control over contradictory allegations in the body of the claim. *In the Matter of Wade*, 969 F.2d 241, 249-250 (7th Cir. 1992). A court may also take judicial notice of public records, *see Henson v. CSC Credit Serv.*, 29 F.3d 280, 284 (7th Cir. 1994), especially where, as here, they are referenced in but not attached to the claim and are central to the claims at hand. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

Here, in order to prevail on its Lanham Act claim, the NPA has the burden of proving: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either with direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999), *quoted in* June 18, 2007 Opinion at 3, Case No. 06-CV-3815, Docket No. 86. To prevail on its UDTPA claim under sections (5) and (12), it must prove that Morton Grove "represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or

connection that he or she does not have" or "engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." 815 ILCS 510/2(a)(5), (12). Even viewing the facts in the light most favorable to the NPA, the NPA cannot meet its burdens of proof for the reasons detailed below.

## ARGUMENT

## I.     THE NPA'S LANHAM ACT CLAIM MUST BE DISMISSED BECAUSE THE STATEMENTS AT ISSUE ARE NOT "COMMERCIAL ADVERTISEMENTS"

To state its Lanham Act claim, the NPA must allege that Morton Grove made "a false statement of fact . . . *in a commercial advertisement* about its own or another's product." *Hot Wax*, 191 F.3d at 819 (emphasis supplied); *First Health Group Corp. v. BCE Emergis Corp.*, 269 F.3d 800, 803-04 (7th Cir. 2001) (quoting 15 U.S.C. § 1125(a)(1)(B)). An "essential ingredient" of any Lanham Act claim for false advertising is that the allegedly false statements occur in "'commercial advertising or promotion.'" *Id.* In this Circuit, "advertising" is defined as "a subset of persuasion" that "refers to dissemination of prefabricated promotional material," and is "a form of promotion to anonymous recipients." *Id.*

Here, however, none of the three types of statements that are the subject of the NPA's counterclaim were made to attract consumers. Instead, the statements at issue—on their face—have a blatant political purpose and message. As detailed below, none can be classified as commercial advertisement. The NPA's representation to the contrary lacks good faith.

## A.     Morton Grove's Lobbying Campaign Letters Are Not "Commercial Advertisements"

Dr. Chang Lee's informational letters to pediatricians and other health care professionals about pending Michigan legislation are not commercial advertisements. As an initial matter, those letters were targeted to specific individuals, not anonymous recipients. *See id.* (explaining that a "person-to-person pitch by an account executive" is not advertising). For

example, in *American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.*, the court held that a "letter privately addressed to a non-consuming licensor" did not constitute "commercial advertising and promotion" because it was an "isolated individualized written statement" that was "at the opposite pole of clearly definable media advertising containing specific verifiable or disprovable statements and given wide distribution in commerce."  820 F. Supp. 1072, 1077-78 (N.D. Ill. 1993).[2]  Like the letter in *American Needle & Novelty*, Morton Grove's letters were individualized lobbying pitches directed at providing accurate information about Lindane mediations, written to counter the misinformation promulgated by the NPA.  Second, Dr. Lee's letters do not propose or suggest a commercial transaction—they do not suggest anyone purchase or use Lindane medications, nor provide information on how Lindane medications can be obtained.  Morton Grove's informational letters are undoubtedly "at the opposite pole of clearly definable media advertising."

B.     **Morton Grove's Non-Promotional Lobbying Website Is Not a Commercial Advertisement**

Morton Grove's www.lindane.com website is purely informational, exists exclusively for lobbying purposes, and is not a promotional website.[3]  A website can be a form of commercial advertising, as the court suggested in *Euromarket Designs, Inc. v. Crate & Barrel Ltd.*, 96 F. Supp. 2d 824, 831 (N.D. Ill. 2000) (stating that defendant's "website is a form of commercial advertising or promotion").  Indeed, websites where visitors can purchase goods or

---

[2]     The court also explained that the words "advertising" and "promotion" contain a requirement of "publicity" and therefore § 43(a)(2) "requires more than an allegedly libelous, private letter delivered to a single entity."  *Id.* at 1078.

[3]     Morton Grove maintains a separate promotional website, www.mgp-online.com.

that provide a link to websites where goods can be purchased are often found commercial.  *See, e.g.*, *id.*

The converse is also true: websites where visitors cannot purchase goods and that contain no links to commercial sites are not commercial.  *See Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 678 (9th Cir. 2005) (finding that where a "website contains no commercial links, but rather contains links to a discussion group, which in turn contains advertising" is too attenuated to render the website commercial); *TMI, Inc. v. Maxwell*, 368 F.3d 433, 438 (5th Cir. 2004) (holding that the commercial use requirement is not satisfied where defendant's website itself contained neither advertising nor outside links); *Taubman Co. v. Webfeats*, 319 F.3d 770, 775 (6th Cir. 2003) (concluding that "[a]s long as [defendant] has no commercial links on . . . websites . . . we find no use 'in connection with the advertising' of goods and services" in the context of a trademark action under the Lanham Act); *Utah Lighthouse Ministry, Inc. v. Discovery Computing, Inc.*, 506 F. Supp. 2d 889, 896-7 (D. Utah 2007) (finding that website did not constitute a commercial use where it did not provide goods or services and had no direct links to any commercial sites).

Unlike the website in *Euromarket Designs*, Morton Grove does not sell or promote any products on www.lindane.com, let alone Lindane medications, and the website does not even provide a link to where lindane medications can be ordered.  The website simply lacks any indicia of commercial business.

In fact, www.lindane.com was motivated by significant non-commercial concerns.  Morton Grove's website is similar to the website in *Midwest Canvas Corp. v. Commonwealth Canvas, Inc.*, 2008 WL 162757 (N.D. Ill. Jan. 16, 2008) (App. Tab 2).  There, the court held that an independent, state-sponsored website that listed approved construction

materials was not a "commercial advertisement" because it did not induce the public to buy any products. *Id.* at \*5. The court explained that the proper inquiry for determining whether the website qualified as "commercial advertising" under the Lanham Act was "an analysis of whether the language is motivated primarily by commercial concerns, or whether there are sufficient non-commercial motivations." *Id.* The principal purpose of the listings was to "ensure that approved materials of sufficient quality" were used for construction projects. *Id.* Therefore, because the principal purpose of the listing was "informational," and "motivated by both quality assurance and public safety concerns," the court held that the website was not a commercial advertisement. *Id.* Likewise, www.lindane.com is motivated by non-commercial ***lobbying*** and informational concerns. *See* www.lindane.com/facts ("Groups seeking to ban the medical use of lindane have done a disservice to the public by spreading misleading information . . . ."). The website was specifically constructed and has been maintained as an informational response to the misleading and unfounded information about Lindane medications promulgated by NPA and others. It is a non-promotional website with an Advisory Board consisting of Dr. Shayne Gad, Professor of Toxicology at Duke University Medical Center, Dr. Adelaide Hebert, Professor of Dermatology and Pediatrics at University of Texas Medical School, and Dr. Amy Paller, Professor of Pediatrics, Northwestern University School of Medicine, all of whom may not have offered to participate in a commercial website.

C.    **The Third-Party Scientific & Medical Opinions Posted on Morton Grove's Lobbying Website Are Also Not Commercial Advertisements**

Dr. Shwayder and Dr. Herbert's letters are narrowly directed at legislation attempting to restrict the use of Lindane medications. These letters were written exclusively with a *lobbying* purpose and do not in any way advertise or promote the sale of Morton Grove's lindane products. These documents must be considered on their face on a motion to dismiss, and

11

on their face, they are not commercial speech.  Furthermore, posting these letters on www.lindane.com under "Medical and Scientific Opinions" does not magically transform them into promotional materials.  Posted alongside these letters in this same section of www.lindane.com are letters from the New York State Medical Society, the FDA, and the EPA, all discussing this important scientific issue.

## II.    THE NPA'S LANHAM ACT CLAIM MUST BE DISMISSED BECAUSE IT IS IMPERMISSIBLY & UNCONSTITUTIONALLY BASED ON CORE POLITICAL SPEECH

As detailed above for each distinct category of statements at issue, Morton Grove's statements were not commercially motivated but rather politically motivated.  Political speech such as this cannot form the predicate for Lanham Act liability.

### A.    The Lanham Act's Legislative History and Case Law Make Apparent That Its Reach Does Not Extend to Political Speech

The legislative history of the Lanham Act is crystal clear: the Act does not encompass political speech.  Congress has stated that the Act:

> uses the word "commercial" to describe advertising or promotion for business purposes, whether conducted by for-profit or non-profit organizations or individuals. ***Political advertising and promotion is political speech, and therefore not encompassed by the term "commercial."***

134 Cong. Rec. H. 1297 (daily ed. April 13, 1989) (emphasis added), *quoted in MasterCard Int'l Inc. v. Nader 2000 Primary Comm, Inc.*, 2004 WL 434404, at *7-8  (S.D.N.Y. Mar. 8, 2004) (App. Tab 3); *see also* 135 Cong. Rec. H. 1216-17 (daily ed. April 13, 1989) ("[T]he proposed change in section 43(a) should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material. . . .The section is narrowly drafted to encompass only clearly false and misleading commercial speech.").

Based on this legislative history, courts have rejected Lanham Act claims predicated on political speech. For example, the court in *MasterCard International, Inc.* noted that "political advertising and promotion are not meant to be covered by the term 'commercial'" and concluded that "the legislative history of the Lanham Act clearly indicates that Congress did not intend for the Act to chill political speech." 2004 WL 434404, at *7-8. In so doing, the Court dismissed a Lanham Act claim based upon an argument that Ralph Nader diluted MasterCard's trademarks when he used a similar structure and phrasing in a political commercial as MasterCard does in its commercials. *Id.* at *9. Likewise, in *Huntingdon Life Sciences, Inc. v. Rokke*, the court evaluated statements made by the group PETA in press releases, interviews, and a videotape. 978 F. Supp. 662 (E.D. Va. 1997). The court determined that this speech was more akin to political speech than commercial speech, particularly considering that none of the plaintiff's allegations specified an economic motive for PETA's actions. *Id.* at 666. Instead, "PETA's intent in publishing the information about [plaintiff's] New Jersey laboratory was to disseminate its political message of preventing alleged cruelty to animals." *Id.*

Reading the Lanham Act, as the NPA suggests, to encompass Morton Grove's political speech, would violate the First Amendment. The First Amendment right to petition "is cut from the same cloth as the other guarantees of that [First] Amendment, and is an assurance of a particular freedom of expression." *McDonald v. Smith*, 472 U.S. 479, 482 (1985). The right to petition and freedom of speech are intertwined, and as the Supreme Court noted recently, "[p]olitical speech, of course, is 'at the core of what the First Amendment is designed to protect.'" *Morse v. Frederick*, 127 S. Ct. 2618, 2626 (2007) (quoting *Virginia v. Black,* 538 U.S. 343, 365 (2003)). Commercial speech, on the other hand, is more subject to government regulation and is accorded a lower level of protection under the Constitution. *Cent. Hudson Gas*

13

*& Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557, 560-63 (1980).   The Lanham Act recognizes this, as one of the elements implicitly excludes political speech—a plaintiff must prove "a false statement of fact by the defendant in a ***commercial*** advertisement about its own or another's product."   *See Hot Wax, Inc.*, 191 F.3d at 819.   Along the same lines, the Seventh Circuit has recognized that the "language and structure of § 43(a)(1)(B) do not suggest a line between commercial and political speech, with the former completely covered and the latter not. They suggest a line between varieties of commercial speech." *First Health Group Corp.*, 269 F.3d at 803.   Constitutional concerns clearly exclude Morton Grove's political speech from Lanham Act liability.

### B.    The *Noerr-Pennington* Doctrine Is Further Evidence That Morton Grove's Political Speech Merits Protection

The *Noerr-Pennington* doctrine[4] was initially developed as a bar to antitrust liability predicated on lobbying activities, and today the doctrine has a broad scope.  *See Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1059 (9th Cir. 1998) ("The Noerr-Pennington doctrine sweeps broadly and is implicated by both state and federal antitrust claims that allege anticompetitive activity in the form of lobbying or advocacy before any branch of either federal or state government.").   The doctrine has been extended by the Seventh Circuit beyond antitrust case law.  *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) ("the *Noerr-Pennington* doctrine protects litigation, lobbying, and speech.  *Noerr-Pennington* has been extended beyond

---

[4]        *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) (rejecting conclusion that anti-competitive motives could strip First Amendment protection from entities' lobbying efforts and stating "[j]oint efforts to influence the public officials do not violate the antitrust laws even though intended to eliminate competition"); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961) (concluding that "no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws").

the antitrust laws, where it originated, and is today understood as an application of the first amendment's speech and petitioning clauses."); *Havoco of Am., Ltd. v. Hollobow*, 702 F.2d 643, 649-50 (7th Cir. 1983) (applying *Noerr-Pennington* doctrine to prevent petitions to Securities and Exchange Commission, that prompted investigation of company, from forming basis of claim for tortuous interference with business relationships).

The *Noerr-Pennington* doctrine may bar a Lanham Act claim under the appropriate factual scenario. *See Eazypower Corp. v. Alden Corp.*, 2003 WL 22859492, at *3 (N.D. Ill. Dec. 2, 2003) (although denying motion to dismiss, commenting that defendant "ultimately may be protected by the *Noerr-Pennington* doctrine" against plaintiff's claims, which included a Lanham Act claim and UDTPA claim) (App. Tab 4). At a minimum, the doctrine provides the precise policy rationale for why Morton Grove's statements are ***not*** commercial advertisements.

### C.    The Legislative Privilege Is Further Evidence That Morton Grove's Political Speech Merits Protection

Morton Grove's lobbying statements are privileged and cannot form the basis for civil liability. *See Geick v. Kay*, 177 Ill. Dec. 340, 348-49, 603 N.E.2d 121, 129-30 (Ill. 1992) (dismissing claim based on statements by board of trustees president because they were privileged, and noting that "[a]bsolute immunity has been applied to virtually every common-law tort, including, but not limited to, malicious prosecution, tortious interference with business, false arrest, blackmail, fraud, intimidation, and invasion of privacy claims"); *Arlington Heights Nat. Bank v. Arlington Heights Federal Sav. & Loan Ass'n*, 37 Ill. 2d 546, 551, 229 N.E.2d 514, 517-18 (Ill. 1967) (stating "We hold that a private citizen's acts pursuant to his right to petition a legislative body, be it local or otherwise, are conditionally privileged" and striking and

dismissing amended complaint that pled defendants intentionally induced a third party to break a

contract). As the Illinois court in *Arlington Heights National Bank* recognized:

> Traditionally, the members of legislative and judicial bodies have been accorded absolute privilege in the performance of their official acts and duties, and it is clear that an individual citizen is similarly privileged to some extent in his appearances and actions before these bodies. This is the only judicial posture that can be maintained and remain consistent with the constitutional guarantees of free speech and the right to petition for redress of grievances.

*Id.*, 37 Ill. 2d at 549, 229 N.E.2d at 517.

Here, the statements the NPA raises in its counterclaim were made during Morton

Grove's lobbying efforts. They are squarely part of the legislative process and therefore merit

protection under the privilege.

## III. THE NPA'S LANHAM ACT CLAIM MUST BE DISMISSED TO THE EXTENT IT IS PREDICATED ON THE STATEMENTS OF THIRD-PARTY MEDICAL EXPERTS

The very first element of a Lanham Act claim is: "a false statement of fact ***by the

defendant*** in a commercial advertisement about its own or anther's product." *Hot Wax, Inc.*, 191

F.3d 813 at (emphasis added). Quite simply, the opinions of third-party medical and scientific

leaders—Doctors Hebert and Shwayder—are not statements ***by Morton Grove***. The NPA will

surely argue these third-party opinions became Morton Grove's statements when Morton Grove

posted them on www.lindane.com. A basic examination of www.lindane.com, however, reveals

that these third-party letters are posted only under the heading "Medical & Scientific Opinions."

These letters were posted with full attribution and transparency to members of the legislature for

what they are—the medical and scientific opinions of thought leaders around the country. As

such, they are not statements by Morton Grove.

IV.    **THE NPA'S LANHAM ACT AND UDTPA CLAIMS MUST BE DISMISSED TO THE EXTENT THEY ARE PREDICATED ON MEDICAL AND SCIENTIFIC OPINIONS AS OPPOSED TO STATEMENTS OF FACT**

Expressions of opinion cannot form the basis of Lanham Act liability.  *See* 2 Gilson LaLonde, Green & Gilson, *Trademark Protection & Practice* § 7.02[6][b][i][B] (explaining that "[i]n the false advertising context, [an opinion] is an argument or a subjective assertion addressed to consumers, who can then make up their own minds about its persuasiveness"); *Groden v. Random House, Inc.*, 61 F.3d 1045, 1051 (2d Cir. 1995) ("[S]tatements of opinion are generally not the basis for Lanham Act liability.").  There is a constitutional right to express opinions, and any liability arising from exercise of this right would be unconstitutional.  *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 339-40 (1974) (noting that "[u]nder the First Amendment there is no such thing as a false idea"); *Fedders Corp. v. Elite Classics*, 268 F. Supp. 2d 1051, 1064 (S.D. Ill. 2003) (finding UDTPA claim under sections (8) and (12) not likely to succeed because claim based in part on statements that court determined were opinion, which could not be labeled true or false).

Likewise, subjective statements are not actionable under the Lanham Act.  *See Rosenthal Collins Group, LLC v. Trading Techs. Int'l*, 2005 WL 3557947, at *10 (N.D. Ill. Dec. 26, 2005) (App. Tab 5).  Actionable statements, in contrast, include those that address "specific or absolute characteristics of a product capable of testing." *Id.* at *10.  Rigorous political debate among medical professionals about important public health concerns should be fostered by the courts.  *McDonagh v. Bergan*, 2003 WL 21798735, at *3 (N.D. Ill. July 25, 2003)

("[D]isagreements of this type amongst medical professionals should be settled by discussion and research in the medical community, not by the courts.") (App. Tab 6).[5]

Statements of medical opinion are also not actionable as trade disparagement or under the UDTPA, as the NPA has argued to this Court.  *See Soderlund Bros., Inc. v. Carrier Corp.*, 663 N.E.2d. 1, 10-11 (Ill. Ct. App. 1995); NPA's Mot. to Dismiss (Case No. 06-CV-3815, Dkt. No. 59 at p. 13).  Here, the statements at issue are explicitly opinion:

- **Exhibit H (Dr. Shwayder's Letter)** – "Lindane is safe, effective, it is not toxic if used as directed" and "[m]y training in both pediatrics and dermatology allows me to judge this issue."  (Countercl. at ¶ 68.) "The University of Michigan Medical School taught the use of Lindane for scabies and lice during my training there.  The same was true of my pediatric residency at U of M."  (*Id.* at ¶ 69.)

- **Exhibit I (Dr. Hebert's Letter)** – "As the current President of the Society for Pediatric Dermatology, I can strongly attest to the value of Lindane for pediatric patients who suffer from scabies and lice.  I have personally used this medication many times during my 21-year career in pediatric dermatology, and believe that it is both safe and effective when used according to the package insert."  (*Id.* at ¶ 74.).

It is hard to fathom that these statements could be classified as anything other than expressions of opinion, particularly given that they were prepared as a substitute for live testimony in a legislative debate.  The NPA's inclusion of Dr. Hebert and Dr. Shwayder—two of the nation's mostly highly decorated and scholarly pediatric dermatologists—is particularly egregious, but unfortunately is entirely consistent with the manner in which the NPA has litigated this action.  At best, the NPA hopes this counterclaim chills Dr. Hebert and Dr. Shwayder's future political speech in favor of Lindane medications; at worst, the NPA hopes to

---

[5]    This argument is one the NPA is all too familiar with—in its brief seeking to dismiss Morton Grove's lawsuit (Case No. 06-CV-3815, Dkt No. 59), the NPA cited this very same case and argued that statements disagreeing about medical treatments are protected and not actionable.

inflict a black mark on these physicians' previously pristine résumés.  In either case, the NPA and its lawyers should be embarrassed by such a hollow attempt at "creative lawyering."

## V.    THE NPA'S UDTPA CLAIM MUST BE DISMISSED BECAUSE IT IS BASED ON THE SAME FACTUAL ALLEGATIONS AS THE NPA'S LANHAM ACT CLAIM

Because the NPA's Lanham Act claim must be dismissed, its UDTPA claim must be dismissed as well.  As multiple courts have noted, "[c]laims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act."  *E.g.*, *Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 579 (N.D Ill. 1994) (citing *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir. 1983)).  Courts have applied this principle in various contexts.  *See, e.g.*, *SB Designs v. Reebok Int'l, Ltd.*, 338 F. Supp. 2d 904, 914 (N.D. Ill. 2004) (in trademark infringement case, stating: "Where a plaintiff's factual allegations under the Illinois Uniform Deceptive Trade Practices Act also form the basis for plaintiff's claim under the Lanham Act, the legal inquiry is the same under both statutes."); *Muzikowski v. Parmount Pictures Corp.*, 2003 WL 22872117, at *5-6 (N.D. Ill. Dec. 3, 2003) (stating "legal inquiry is the same" for Lanham Act and UDTPA claims concerning false endorsement and false advertising) (App. Tab 7).

This principal has been applied to the specific sections of the UDTPA under which the NPA brings its claim.  For example, in *Best Vacuum, Inc. v. Ian Design, Inc.*, the court evaluated plaintiff's Lanham Act claim that primarily revolved around website domain names, then stated that its conclusions extended to the plaintiff's UDTPA claims under 815 ILCS 510/2(a)(1)-(3), (5), and (12) as well.  2005 WL 1185817, at *13 (N.D. Ill. Jan. 18, 2005) (App. Tab 8), *noted adopted in* 2006 WL 3486879, at *1 (N.D. Ill. Nov. 29, 2006) (App. Tab 9). Likewise, in *Francorp, Inc. v. Siebert*, the court granted summary judgment on the plaintiff's UDTPA claim after so doing for the plaintiff's Lanham Act claim, because the "state claims are

based on the same wrong alleged in the federal claim, namely that the [defendant] represented that it had sponsorship, approval, affiliation or connections, which they do not have." 2002 WL 731170, at *3 (N.D. Ill. Apr. 24, 2002) (App. Tab 10).

Here, as discussed above, the NPA's Lanham Act claim fails. The NPA's UDTPA claim is based on the same factual allegations—both counts of its Counterclaim incorporate its paragraphs 1 through 128. Because the NPA's UDTPA claim is subject to the same analysis and outcome, it must also be dismissed.

In addition, several of the statements at issue (statements 1-9 on pgs. 3-4 *supra*) in the NPA's UDTPA claim are not in fact actionable because they are not about goods or services:

> Implicit (if not explicit) within the twelve enumerated subsections of § 2 of the UDTPA is that for a violation to occur, the defendant must make some form of a representation (or do something) to the public (or a potential buyer) regarding a good or service. *See* 815 ILCS 510/2(1)-(12).

*Lynch Ford, Inc. v. Ford Motor Co., Inc.*, 957 F. Supp. 142, 147 (N.D. Ill. 1997) (dismissing UDTPA claim predicated on defendant holding out car dealerships as independent when they were owned and controlled by Ford). Neither of the statements that mention the NPA (in paragraphs 111 and 113) are about Morton Grove's goods or services, and thus they must be dismissed. Likewise, none of the statements made by doctors about their personal experiences (in paragraphs 68-70 and 73-74) can convincingly be interpreted as being about Morton Grove's goods or services.

Along the same general lines, statements that merely "impute a want of integrity are not actionable under the UDTPA." *Republic Tobacco, L.P. v. N. Atlantic Trading Co.*, 254 F. Supp. 2d 985, 998 (N.D. Ill. 2002). Instead, in order for a statement to be actionable under the UDTPA, it must be "disparaging to the quality of a business's products." *Id.*; *see Richard Wolf*

20

*Med. Instruments Corp. v. Dory*, 723 F. Supp. 37, 40-41 (N.D. Ill. 1989) (granting judgment on the pleadings for UDTPA counterclaim where "[n]one of the false statements . . . touched upon the quality of [counterclaimant's] products . . . . Rather, the letter accuses [counter-defendant] of being a vexatious litigator and a patent infringer.  The court cannot infer from these attacks that [the counterclaimant's] products are poor.").  Here, none of Morton Grove's statements disparage the NPA's goods (i.e., the LiceMeister® Comb).  In fact, all but two of Morton Grove's statements fail to mention the NPA or its competitive product.  The NPA's UDTPA claim must be dismissed.

## VI.    THE NPA HAS FAILED TO PROPERLY PLEAD CAUSATION OR EVEN A CLAIM THAT PLAUSIBLY ENTITLES IT TO RELIEF

If the frivolous nature of the NPA's counterclaim was not apparent from its failure to meet basic elements of its claims, it is indeed apparent from its causation and damage allegations, which are poor and illogical at best.  As explained in detail below, the NPA has failed to properly plead causation, and its claim that it has been damaged makes no logical or economic sense.  For these additional reasons, the NPA's counterclaim must be dismissed.

### A.    The NPA's Claim for Relief Is Not Plausible

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a claim must allege "a plausible entitlement to relief."  *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1967, 1974 (2007) (explaining that a plaintiff must plead enough to "nudge [] their claims across the line from conceivable to plausible").  This means that the factual allegations in the counterclaim "must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court."  *Midwest Canvas Corp.*, 2008 WL 162757, at *2 (applying *Twombly* in dismissing a false advertising claim under the Lanham Act).  The NPA's counterclaim falls well short of crossing the line from

conceivable to plausible.  Under penalty of Rule 11, the NPA has sworn to this Court that a letter written by a physician in Detroit to the Chair of a Michigan legislative committee (not a Lindane or LiceMeister® Comb consumer) has diverted sales from the NPA's LiceMeister® Comb to Morton Grove's Lindane medications, even though no mention is made in the letter to the NPA or the LiceMeister® Comb.  (Countercl. Ex. H.)  Such an allegation is neither conceivable or plausible—it is, however, frivolous.  For the same reason, the NPA's counterclaim makes no economic sense.  *See also Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[I]f the factual context renders [the plaintiff's] claim implausible-if the claim is one that simply makes no economic sense-[a plaintiff] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary.").

### B.    The NPA Has Failed to Meet its Burden of Pleading Causation.

For a deceptive advertising claim under § 43(a) of the Lanham Act, a claimant must prove, among other things, "the [claimant] has been or is likely to be injured *as a result of the false statement*, either with direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Hot Wax, Inc.*, 191 F.3d at 819 (emphasis supplied).  The NPA's counterclaim is a sham and it has not pled how it "is likely to be injured" *by the statements at issue*.  *Id.*

In its counterclaim, the NPA utterly fails to causally connect Morton Grove's statements to its amorphous allegations of a loss of goodwill. (Countercl. ¶ 120.)  Indeed, suggesting that statements such as "The University of Michigan Medical School taught the use of Lindane for scabies and lice during my training there.  The same was true of my pediatric residency at U of M" (Countercl. ¶ 69) have caused the NPA injury is specious and sanctionable—obviously, the counterclaim makes no economic sense and is not plausible on its face.

The baseless nature of the NPA's counterclaim is further evinced by the fact that all of the exhibits to the NPA's counterclaim containing the allegedly false statements— statements which the NPA plead caused them a loss of goodwill—bear Morton Grove's bates numbers and were produced in this litigation.

## **<u>CONCLUSION</u>**

WHEREFORE, for the foregoing reasons, Morton Grove respectfully requests that this Court dismiss with prejudice the NPA's counterclaim. The Court should further consider Rule 11(c)(3) and order the NPA and its counsel to show cause why its conduct has not violated Rule 11(b).

Dated: June 30, 2008                    Respectfully Submitted,

                                        **MORTON GROVE PHARMACEUTICALS, INC.**

                                        By: _/s/ W. Gordon Dobie___
                                              One of its Attorneys

W. Gordon Dobie (wdobie@winston.com)
William C. O'Neil (woneil@winston.com)
Cherish M. Keller (ckeller@winston.com)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
T: (312) 558-5600

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of June 2008, I caused a copy of **Morton Grove Pharmaceuticals, Inc.'s Memorandum of Law in Support of Its Motion to Dismiss the National Pediculosis Association, Inc.'s Counterclaim** to be served on counsel of record via ECF electronic filing:

> Debbie L. Berman
> Amanda S. Amert
> Wade A. Thomson
> April A. Otterberg
> JENNER & BLOCK LLP
> 330 North Wabash Avenue
> Chicago, Illinois 60611
> T: (312) 222-9350
> F: (312) 527-0484

        /s/ William C. O'Neil

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC. | ) ) ) | |
| Plaintiff, | ) ) ) | No: 08-CV-1384 |
| v. | ) ) | Judge Bucklo |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC. | ) ) ) | Magistrate Judge Mason |
| Defendants. | ) ) ) ) | |

**MORTON GROVE PHARMACEUTICALS, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS
THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'S COUNTERCLAIM**

**APPENDIX OF UNPUBLISHED CASES**

Tab 1        *Collins v. Snyner*, 2002 WL 31749173 (N.D. Ill. Dec. 2, 2002)

Tab 2        *Midwest Canvas Corp. v. Commonwealth Canvas, Inc.*, 2008 WL 162757 (N.D. Ill. Jan. 16, 2008)

Tab 3        *MasterCard Int'l Inc. v. Nader 2000 Primary Comm, Inc.*, 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004)

Tab 4        *Eazypower Corp. v. Alden Corp.*, 2003 WL 22859492 (N.D. Ill. Dec. 2, 2003)

Tab 5        *Rosenthal Collins Group, LLC v. Trading Techs. Int'l*, 2005 WL 3557947 (N.D. Ill. Dec. 26, 2005)

Tab 6        *McDonagh v. Bergan*, 2003 WL 21798735 (N.D. Ill. July 25, 2003)

Tab 7        *Muzikowski v. Parmount Pictures Corp.*, 2003 WL 22872117 (N.D. Ill. Dec. 3, 2003)

Tab 8        *Best Vacuum, Inc. v. Ian Design, Inc.*, 2005 WL 1185817 (N.D. Ill. Jan. 18, 2005)

Tab 9        *Best Vacuum, Inc. v. Ian Design, Inc.*, 2006 WL 3486879 (N.D. Ill. Nov. 29, 2006)

Tab 10      *Francorp, Inc. v. Siebert*, 2002 WL 731170 (N.D. Ill. Mar. 24, 2002)

# TAB 1

Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2002 WL 31749173 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31749173 (N.D.Ill.))**

**H**

Collins v. Snyder
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Denise COLLINS, individually and as personal representative of the Estate of Ricky Collins, deceased,
Plaintiff,
v.
Donald SNYDER, et al., Defendants.
**No. 02 C 4493.**

Dec. 2, 2002.

*MEMORANDUM OPINION*

KOCORAS, Chief J.
**\*1** This matter is before the court on Defendant Donald Snyder's ("Snyder") motion to dismiss. For the reasons stated below we grant the motion.

BACKGROUND

Ricky Collins ("Collins") was an inmate at the Sheridan Correctional Center. Plaintiffs claim that while incarcerated Collins underwent psychiatric treatment, received counseling, and took psychotropic medications. According to Plaintiffs, Collins was diagnosed with major depression as recently as May 19, 2000. Collins also allegedly slashed his wrists with his own glasses and was eventually separated from other prisoners. Plaintiffs claim that on September 27, 2000, Collins was seen siting on the edge of his bed shaking back and forth and that he told a guard that he felt suicidal and wanted to talk to a counselor. The guard allegedly told Collins that a counselor was not available at that time and instructed other guards that Collins was on suicide watch. The Illinois Department of Corrections ("IDOC") and Sheridan facility policy requires guards to make a "suicide check" every 15-20 minutes. Later on September 27 guards responded

to cries from prisoners near Collins' cell and found Collins hanging by his neck from a bed sheet. Snyder is the head of the IDOC. Plaintiffs bring a four count complaint against Snyder in his official capacity and in his individual capacity. Counts I and II are brought pursuant to 42 U.S.C. § 1983. Count III is brought pursuant to the Survival Act. 755 ILCS 5/27-6. Count IV is brought pursuant to the Family Expense Act. 740 ILCS § 1015.

LEGAL STANDARD

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of a complaint. *Triad Associates, Inc. v. Chicago Hous. Auth.,* 892 F.2d 583, 586 (7th Cir.1989). In ruling on a motion to dismiss, the court must draw all reasonable inferences that favor the plaintiff, construe the allegations of the complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint.*Thompson v. Illinois Dep't of Prof'l Regulation,* 300 F.3d 750, 753 (7th Cir.2002); *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir.1991). The allegations of a complaint should not be dismissed for a failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege the "operative facts" upon which each claim is based. *Kyle v. Morton High School,* 144 F.3d 448, 444-45 (7th Cir.1998); *Lucien v. Preiner,* 967 F.2d 1166, 1168 (7th Cir.1992). The plaintiff need not allege all of the facts involved in the claim and can plead conclusions.*Higgs v. Carter,* 286 F.3d 437, 439 (7th Cir.2002); *Kyle v. Morton High School,* 144 F.3d 448, 455 (7th Cir.1998). However, any conclusions pled must "provide the defendant with at least minimal notice of the claim,"*id.,* and the plaintiff cannot satisfy federal pleading requirements merely "by attaching bare legal conclusions to narrated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 2
Not Reported in F.Supp.2d, 2002 WL 31749173 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 31749173 (N.D.Ill.))**

facts which fail to outline the bases of their claims."*Perkins,* 939 F.2d at 466-67.

### DISCUSSION

**\*2** Plaintiffs brought state claims under the Survival Act, 755 ILCS 5/27-6, and the Family Expense Act, 740 ILCS § 1015. Snyder asserts that the Illinois Court of Claims Act, 705 ILCS 505/8, provides that the Court of Claims shall have exclusive jurisdiction to hear and determine all claims against the State for damages sounding in tort. Plaintiffs agree and we grant the motion to dismiss Counts III and IV. Plaintiffs also sue Snyder in his official capacity as head of the IDOC. A suit against an official in his official capacity is a suit against the governmental unit that he represents.*Sanville v. McCaughtry,* 266 F.3d 724, 732 (7th Cir.2001). Snyder represents the State of Illinois and § 1983 does not authorize suits against the states. *Id.* Therefore we grant the motion to dismiss all claims against Snyder in his official capacity.

Plaintiffs also bring suit against Snyder in his individual capacity. The doctrine of *respondeat superior* is not applicable in § 1983 actions. *Id.* at 740.However, a supervisor can be liable in a § 1983 action for the conduct of his subordinates if the supervisor was "personally involved" in the conduct that violated the plaintiff's constitutional right. *Chavez v. Illinois State Police,* 251 F.3d 612, 651 (7th Cir.2001). To have such personal involvement the supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see."*Id.* In this case Plaintiffs do not allege that Snyder actively participated in the events leading up to Collins' suicide or that Snyder had knowledge of the circumstances leading up to the suicide. Therefore, we grant the motion to dismiss the claims against Snyder in his individual capacity.

### CONCLUSION

Based on the foregoing analysis we grant the motion to dismiss Counts III and IV against Defendant Snyder. We also grant the motion to dismiss Counts I and II against Defendant Snyder in his individual and official capacity.

N.D.Ill.,2002.
Collins v. Snyder
Not Reported in F.Supp.2d, 2002 WL 31749173 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Slip Copy
Slip Copy, 2008 WL 162757 (N.D.Ill.)
(Cite as: Slip Copy, 2008 WL 162757)

Page 1

Midwest Canvas Corp. v. Commonwealth Canvas, Inc.

N.D.Ill.,2008.

Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern Division.
MIDWEST CANVAS CORP., an Illinois Corporation, Plaintiff,
v.
COMMONWEALTH CANVAS, INC., a Massachusetts Corp., et al., Defendants.
No. 07 C 0085.

Jan. 16, 2008.

Jennifer Ann Esposito, Kantor & Apter, Ltd., David G. Rosenbaum, John Peter Paredes, Rosenbaum And Associates, P.C., Northbrook, IL, for Plaintiff. Jan M. Michaels, John A. Lee, Steven Schulwolf, Michaels & May, P.C., Robert A. Habib, Attorney at Law, Peter Carl Nabhani, Law Office of Peter Nabhani, Stephen Andrew Skardon, Chicago, IL, for Defendants.

### MEMORANDUM OPINION AND ORDER

JOAN B. GOTTSCHALL, District Judge.
*1 Plaintiff Midwest Canvas Corp. ("Midwest") has filed suit against defendants Commonwealth Canvas, Inc. ("Commonwealth"), Raw Equipment Corporation ("Raw"), and Constructioncomplete.com ("CC.com") alleging, *inter alia,* violations by Commonwealth and Raw of the Lanham Act, 15 U.S.C. § 1125(a) (Count V); the Uniform Trade Deceptive Practices Act, 815 ILCS 510/1 (Count VI); and state common law unfair competition (Count VII); and violation by Commonwealth and CC.com of the Lanham Act (Count VIII); the Uniform Trade Deceptive Practices Act (Count IX); and state common law unfair competition (Count X). Before the court is Commonwealth's motion to dismiss Counts V-X and Raw's motion to dismiss Counts V-VII. For the reasons set forth below, Commonwealth's

and Raw's motions to dismiss are granted.

### I. BACKGROUND

Midwest and Commonwealth are competing corporations engaged in the manufacture of, among other items, concrete curing blankets. Pl .'s First Amended Compl. ¶¶ 1-2. Concrete curing blankets are employed to cover freshly poured concrete. The blanket protects the surface of the concrete and its insulating qualities trap the heat released as the concrete cures and thus accelerates the hardening process; this is particularly important during construction in cold weather. Raw is a corporation engaged in the marketing and distribution of Commonwealth's products, including its curing blankets. Pl.'s First Amended Compl. ¶¶ 3-4.

One of Commonwealth's curing blankets, with the trade name "Cure-All," is listed on the website of the New York Department of Transportation ("NYDOT") on the page presenting the "Technical Services-Materials-Approved List" of form insulation materials for winter concreting (Form 711-07). Pl.'s First Amended Compl. ¶¶ 40-41; *see also* h ttps://www.nysdot.gov/portal/                    page/portal/divi-
sions/engineer-
ing/technicalser-
vices/technic-
al-services-repository/alme/pages/310-1.html   (last visited Jan. 8, 2008). Commonwealth's blanket is one of seventeen curing blankets manufactured by eleven different corporations (including two of Midwest's "Insul-Tarp" products) that are listed as approved for use in NYDOT construction projects. *Id.;* Pl.'s First Amended Comp. Exh. C. The NYDOT website lists the Commonwealth "Cure-All" blanket as having a thickness of 25 mm (1 ). Pl.'s First Amended Compl. ¶ 42. No pricing or direct ordering information are listed on the website. Pl.'s First Amended Comp. Exh. C.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

In April 2007, after the initial complaint in this suit was filed [FN1], Tim Dunphy ("Dunphy"), who was employed as a sales manager by Midwest, placed an order with Raw for a 25 mm "Cure-All" curing blanket, the same as listed on the NYDOT website. Pl.'s First Amended Compl. ¶ ¶ 43-44. Raw duly delivered a curing blanket, together with an invoice describing it as a "CLOSED CELL 1 NYSDOT CURING BLANKETS (sic) 6'x 25'."Pl.'s First Amended Compl. ¶¶ 45-46, Exh. D. Midwest claims that Dunphy, upon inspecting the curing blanket received from Raw, discovered that it was not 25 mm in thickness. Pl.'s First Amended Compl. ¶¶ 47-48.

> FN1. The initial complaint in this suit was filed on January 8, 2007. Midwest filed its amended complaint on June 28, 2007.

*2 Previously, in February 2007, Dunphy had likewise ordered a 1/2 (CC2) and 1 ("CC4") curing blankets from CC.com, which advertises and sells Commonwealth curing blankets. Pl.'s First Amended Compl. ¶¶ 62-65, Exh. E. The order was confirmed via email and, later, two curing blankets, together with a work order describing the blankets as being "CC2 6x25 2 LAYER FOAM CONCRETE CURING BLANKET" and "MISC CC-2 4 LAYER FOAM CONCRETE CURING BLANKET," were received by Midwest. Pl.'s First Amended Compl. ¶¶ 66-68, Exhs. F-G. Midwest claims that the received blankets were not 1/2 and 1 respectively in thickness. Pl.'s First Amended Compl. ¶ 69.

Count V of Midwest's first amended complaint claims that the invoice accompanying the curing blanket received from Raw constitutes commercial advertising as defined by the Lanham Act, 15 U.S.C. § 1125(a), and that Raw's provision of a curing blanket that was not 25 mm in thickness thereby constituted materially false and misleading representations about the nature and quality of the curing blanket. Counts VI and VII are pendant state and common law claims that Raw's actions respectively constituted a violation of the Illinois Uniform Trade

Practices Act, 815 ILCS 510/1 et seq. and "New York and other state common law unfair competition."

Similarly, Count VIII of Midwest's amended complaint claims that the work order received with the blankets from CC.com constitutes false advertising in violation of the Lanham Act and that Commonwealth and CC.com's actions in selling the blankets are misleading and false. Counts IX and X claim respectively violations of the Illinois Uniform Trade Practices Act, 815 ILCS 510/1 et seq., and unfair competition under Illinois common law. Commonwealth has filed a motion to dismiss Counts V-X under Federal Rule of Civil Procedure 12(b)(6) and Raw has filed a motion to dismiss Counts V-VII on the same theory. Raw has also moved to dismiss the amended complaint under Federal Rule of Civil Procedure 9(b), alleging that Midwest has failed to plead fraud with the required particularity. Because the issues in both motions are essentially identical, the court considers both of these motions together.

## II. ANALYSIS

To survive a motion to dismiss under 12(b)(6), "the complaint need only contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " *Equal Opportunity Comm'n v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir.2007) (quoting Fed.R.Civ.P. 8(a)(2)). The complaint "must describe the claim in sufficient detail to give the defendant 'fair notice of what the ... claim is and the grounds upon which it rests' ... [and] its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *Concentra,* 496 F.3d at 776 (quoting *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1964, 1973 n. 14, 167 L.Ed.2d 929 (2007)).

### A. Midwest's Counts V-VII

*3 Count V claims specifically that the invoice ac-

Slip Copy
Slip Copy, 2008 WL 162757 (N.D.Ill.)
(Cite as: Slip Copy, 2008 WL 162757)

companying Raw's shipment of the blanket to Midwest constituted advertising under the Lanham Act, and that Commonwealth and Raw's collective actions of selling blankets that are purported to be 1 thick but are not constitute material false and misleading misrepresentations about the nature of Commonwealth's products.

The Lanham Act (§ 43(a)) provides in relevant part that any person who: "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act."15 U .S.C. § 1125(a)(1)(B). To establish a claim under the false or deceptive advertising prong of § 43(a) of the Lanham Act, a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 819 (7th Cir.1999); *The Monotype Corp. v. Simon & Schuster, Inc.,* No. 99 C 4128, 2000 WL 1852907, at *6 (N.D.Ill. Sept.8, 2000).

Midwest specifically claims that the invoice accompanying the allegedly misrepresented curing blanket constitutes false commercial advertising under the Lanham Act. For a statement to amount to "commercial advertising or promotion" the statements must be (1) commercial speech (2) by a defendant who is in commercial competition with the plaintiff (3) for the purpose of inducing consumers to buy defendant's goods or services (4) disseminated sufficiently to the relevant purchasing public.

*Health Care Compare Corp. v. United Payors and United Providers, Inc.,* No. 96 C 2518, 1998 WL 122900 at *3 (N.D.Ill. Mar.13, 1998).

The court finds that Midwest's argument that the invoice accompanying Raw's delivered curing blanket constitutes advertising fails to meet these criteria. An invoice sent to an individual customer and accompanying an order can hardly be construed to have been "disseminated sufficiently to the relevant purchasing public" because it lacks the element of publicity required by the Lanham Act.*American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,* 820 F.Supp. 1072, 1078 (N.D.Ill.1993) (Lanham Act's use of the terms "advertising" or "promotion" have requisite element of publicity); *see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). An invoice accompanying an order shipped to an individual customer lacks the requisite element of publicity. It is true, as Midwest points out correctly, that the required level of circulation establishing publicity will vary according to the specifics of each industry and can be so small as to comprise a single party. *Seven-up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1385 (5th Cir.1996). Nevertheless, even if a presentation to a single individual could possibly be considered public enough to satisfy publicity requirement of the statute, an invoice cannot be advertising because it is not an inducement to buy, but rather reflects an agreed-upon transaction.

*4 Specifically, an invoice accompanying an order shipped to a client is not sent for the "purpose of inducing consumers to buy defendant's goods or services"; the goods accompanying a shipment have already been ordered by the consumer who needs no further inducement to buy them. In sum, a single private communication from one party to another that is not an inducement to buy does not constitute

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

commercial advertising sufficient to establish liability under the Lanham Act. *See American Needle,* 820 F.Supp. at 1078.

In its response to Commonwealth's and Raw's motions to dismiss, Midwest argues that the fourth prong is also satisfied because Commonwealth caused its products to become listed by NYDOT on NYDOT's website, and also because Commonwealth allegedly employed distributors who disseminated the "defendant's" (presumably Commonwealth's) statements over the internet in connection with promoting the sale of 1 NYDOT approved concrete curing blankets. The specifics of this claim are not clearly alleged in Midwest's complaint, but the court will assume, *arguendo,* that this argument falls under the rubric of Midwest's allegations, stated in its complaint, that Commonwealth's and Raw's "misrepresentations constituting false advertising" resulted from their "actions of selling concrete curing blankets that are purported to be 1 blankets when they are not ...." Pl.'s First Amended Compl. ¶¶ 50-52

To begin with, Midwest's claims on this point fall far short of the particularity required by Federal Rule of Civil Procedure 9(b) for pleadings alleging fraud. When alleging claims of fraud or mistake, the plaintiff is required to plead with specificity the who, the what, the where, and the when of the alleged fraud. FED. R. CIV. P. 9(b); *Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins.,* 412 F.3d 745, 749 (7th Cir.2005). In Count V, Midwest vaguely alleges that the listing of the Commonwealth blanket on the NYDOT site, and Commonwealth's and Raw's alleged misrepresentations, are somehow connected in such a way as to create a fraudulent advertisement in violation of the Lanham Act. But Midwest fails to allege with particularity just what, if any, the connection between the NYDOT website and Raw is. Not does it aver with any particularity what allegedly false statements have been made by Commonwealth or Raw other than the invoice; and the court has already determined that the invoice is not a commercial ad-

vertisement. Moreover, it does not allege with sufficient particularity a causal connection between Commonwealth's listing of its product on the NYDOT website and any direct or indirect misrepresentation whatever by Commonwealth to Midwest.

Even placing the issue of particularity aside, the listing of Commonwealth's (and Midwest's) curing blankets on the NYDOT website cannot be construed as a commercial advertisement by Commonwealth because the actual maker of the statement, NYDOT, a state government entity, is not in direct commercial competition with any of the companies whose curing blankets are listed on its Website, including Commonwealth and Midwest. Therefore, the listing cannot be a commercial advertisement or promotion by which liability can be established under § 43(a) of the Lanham Act. *Health Care Compare,* 1998 WL 122900 at *3.

**\*5** Furthermore, the NYDOT website listing of approved construction materials, including curing blankets, is not an inducement to the public to buy Commonwealth's (or any of the other manufacturer's) products. The listing of approved materials on the NYDOT website is presented as part of a "quality assurance program for materials incorporated into [NYDOT] projects ...."*See* https://www.nysdot.gov/porta    l/
page/
portal/divi-
sions/engineer-
ing/technicalser-
vices/materials-bureau/materials-and-equipment
(last visited Jan. 8, 2008). In short, the website lists materials approved for use by NYDOT and its contractors in carrying out NYDOT projects. It is just possible, arguably, that such a listing could have mixed commercial and non-commercial components-identifying blankets suitable for NYDOT purposes as well as supporting preferred vendors. The key to determining whether such a listing might qualify as commercial advertising for Lanham Act purposes is an analysis of whether the language is

motivated primarily by commercial concerns, or whether there are sufficient non-commercial motivations. *Monotype*, 2000 WL 1852907, at *7:*Oxycal Lab., Inc. v. Jeffers*, 909 F.Supp. 719, 725 (S.D.Cal.1995). Under this analysis, the listing of approved materials cannot be construed as commercial advertising: its principal purpose is to ensure that approved materials of sufficient quality are employed by NYDOT and its contractors in its construction projects. Such a purpose is most reasonably interpreted as being motivated by both quality assurance and public safety concerns. Because the principal purpose of the listing is informational, rather than commercial, it is not commercial advertising, and Midwest's claim fails. *Monotype*, 2000 WL 1852907, at *7.

Finally, Counts VI and VII allege the same factual elements as Count V. The same analysis employed in determining whether a claim for false or deceptive advertising exists under the Lanham Act is employed for Illinois false advertising claims. *Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir.2007); *Peaceable Planet, Inc. v. Ty. Inc.*, 362 F.3d 986, 990 (7th Cir.2004). Therefore, for the same reasons presented above, Counts VI and VII also fail to state a claim upon which relief can be granted under the Illinois Uniform Trade Practices Act, 815 ILCS 510/1 et seq., and state common law unfair competition.[FN2] Midwest's Counts V through VII against Commonwealth and Raw are consequently dismissed.

> FN2. Count VII alleges violations by Raw of "New York and other state common law unfair competition," whereas Count X alleges "unfair competition, deceptive advertising and unfair trade practices under Illinois common law. (Confusingly, Counts VI and IX allege violation of the Illinois Uniform Trade Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*). Federal courts sitting in Illinois employ Illinois state choice of law rules. *Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 572 (7th

Cir.1995). However, the choice of law issue confronting the court is moot in this instance, because the elements of both New York and Illinois unfair competition common law are very similar or identical to the Lanham Act and the legal analysis is substantially the same. *See, e.g., Paco Sport, Ltd. v. Paco Rabanne Perfumes*, 234 F.3d 1262, 1262 (2d Cir.2000); *Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir.2007). Under either Illinois or New York unfair competition common law, Midwest's Count VIII must be dismissed.

*B. Midwest's Counts VIII-X*

Midwest's Counts VIII through X against Commonwealth and CC.com have the same weaknesses as do Counts V through VII of their amended complaint against Commonwealth and Raw. Midwest's argument that the "work order" accompanying its order of two curing blankets from CC .com fails because a work order cannot be construed as commercial advertising by the court for the same reason that an invoice cannot be: it fails to meet the required elements of inducement of the public to buy and publicity. *See American Needle*, 820 F.Supp. at 1078. Midwest's implied claim that Commonwealth is somehow responsible for the representations on CC.com's website (which are presented as exhibits but not alleged as constituting false advertising in Counts VIII-X complaint) is not made with sufficient particularity to satisfy the requirements of Federal Rule of Civil Procedure 9(b).[FN3] Moreover, for the same reasons as listed above, because Count VIII fails to state a claim upon which relief can be granted under the Lanham Act, the Illinois statutory and common law claims of Counts IX and X also fail and Commonwealth's motion to dismiss these Counts is also granted.

> FN3. Defendant CC.com has not yet filed an answer to Midwest's complaint and so this order will not consider CC.com's role in this suit.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 162757 (N.D.Ill.)
**(Cite as: Slip Copy, 2008 WL 162757)**

Page 6

### III. CONCLUSION

**\*6** For the reasons listed above, Commonwealth's motion to dismiss Counts V-X and Raw's motion to dismiss Counts V-VII of Midwest's first amended complaint are granted.

N.D.Ill.,2008.
Midwest Canvas Corp. v. Commonwealth Canvas, Inc.
Slip Copy, 2008 WL 162757 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

C

MasterCard Intern. Inc. v. Nader 2000 Primary
Committee, Inc.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
MASTERCARD INTERNATIONAL INCORPOR-
ATED Plaintiffs,
v.
NADER 2000 PRIMARY COMMITTEE, INC.,
Nader 2000 General Committee, Inc., and Ralph
Nader, Defendants.
**No. 00 Civ.6068(GBD).**

March 8, 2004.

**Background:** Financial services company that had
commissioned authorship of advertisements using
phrase "THERE ARE SOME THINGS MONEY
CAN'T BUY. FOR EVERYTHING ELSE
THERE'S MASTERCARD," and "PRICELESS,"
sued presidential candidate and his political com-
mittee for use of slogans similar to its service
marks, alleging claims for unfair competition, mis-
appropriation, trademark infringement, trademark
dilution under the Federal Trademark Act and state
and common law, as well as copyright infringement
under the Copyright Act. Defendants moved for
summary judgment.

**Holdings:** The District Court, Daniels, J., held that:
(1) plaintiff failed to establish likelihood of confu-
sion, as required to support trademark infringement
claims;
(2) state claims for unfair competition and misap-
propriation were preempted by the Copyright Act;
(3) lack of likelihood of consumer confusion de-
feated palming off claim under New York law;
(4) there was no evidence of trademark dilution;
(5) defendants' use of plaintiff's copyrighted works
was fair use, and thus, not an infringement; and
(6) defendants' use of plaintiff's copyrighted works
was not a material deceptive act or practice directed
to consumers that caused actual harm, as would

support deceptive acts or practices claim.

Motion granted.

West Headnotes

**[1] Trademarks 382T ⟶1092**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood
of Confusion
        382Tk1090 Nature of Marks
            382Tk1092 k. Strength or Fame of Marks;
Degree of Distinctiveness. Most Cited Cases
    (Formerly 382k350.1)
For purposes of determining likelihood of confu-
sion to public in trademark infringement action
based on presidential candidate and his political
committee's use of slogans similar to financial ser-
vices company's service marks "THERE ARE
SOME THINGS MONEY CAN'T BUY. FOR
EVERYTHING ELSE THERE'S MASTERCARD,"
and "PRICELESS," marks were strong enough to
have become a part of present-day American popu-
lar culture, and thus had acquired secondary mean-
ing. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15
U.S.C.A. §§ 1114(1), 1125(a).

**[2] Trademarks 382T ⟶1097**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood
of Confusion
        382Tk1093 Relationship Between Marks
            382Tk1097 k. Examination and Compar-
ison; Construction as Entirety. Most Cited Cases
    (Formerly 382k350.1)

**Trademarks 382T ⟶1098**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood
of Confusion
        382Tk1093 Relationship Between Marks
            382Tk1098 k. Appearance, Sound, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

Meaning. Most Cited Cases
(Formerly 382k350.1)
Presidential candidate and his political committee's use of word "priceless" and phrase "there are some things money can't buy" in same look, sound, and commercial impression as employed by financial services company established sufficient degree of similarity to company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," as to support finding of likelihood of confusion to public, for purposes of company's trademark infringement action against candidate and committee. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[3] Trademarks 382T ⬤➞1104**

382T Trademarks
382TIII Similarity Between Marks; Likelihood of Confusion
382Tk1100 Relationship Between Goods or Services Underlying Marks
382Tk1104 k. Markets and Territories; Competition. Most Cited Cases
(Formerly 382k350.1)
For purposes of determining likelihood of confusion to public in trademark infringement action based on presidential candidate and his political committee's use of slogans similar to financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," plaintiff failed to show proximity between services and political candidacy, or likelihood that defendants would "bridge the gap" into its product or service line, or that it would have any direct involvement in supporting a candidate in a political presidential campaign. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[4] Trademarks 382T ⬤➞1086**

382T Trademarks
382TIII Similarity Between Marks; Likelihood

of Confusion
382Tk1083 Nature of Confusion
382Tk1086 k. Actual Confusion. Most Cited Cases
(Formerly 382k350.1)
Presidential candidate and his political committee's use of word "priceless" and phrase "there are some things money can't buy" in same look, sound, and commercial impression as employed by financial services company did not create actual confusion with respect to company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," as would support finding of likelihood of confusion to public, for purposes of company's trademark infringement action against candidate and committee. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[5] Trademarks 382T ⬤➞1111**

382T Trademarks
382TIII Similarity Between Marks; Likelihood of Confusion
382Tk1111 k. Intent; Knowledge of Confusion or Similarity. Most Cited Cases
(Formerly 382k350.1)
Presidential candidate and his political committee's use of word "priceless" and phrase "there are some things money can't buy" in same look, sound, and commercial impression as financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," was not intended to confuse public, as would support finding of likelihood of confusion to public, for purposes of company's trademark infringement action against candidate and committee. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[6] Trademarks 382T ⬤➞1105**

382T Trademarks
382TIII Similarity Between Marks; Likelihood of Confusion

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

382Tk1100 Relationship Between Goods or Services Underlying Marks

382Tk1105 k. Relative Quality. Most Cited Cases

(Formerly 382k350.1)

For purposes of determining likelihood of confusion to public in trademark infringement action based on presidential candidate and his political committee's use of slogans similar to financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," there was no reasonable comparison to be made between quality of plaintiff's products and services and value of defendants' politics. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[7] Trademarks 382T ☞1112**

382T Trademarks

382TIII Similarity Between Marks; Likelihood of Confusion

382Tk1112 k. Persons Confused; Circumstances of Sale. Most Cited Cases

(Formerly 382k350.1)

For purposes of determining likelihood of confusion to public in trademark infringement action based on presidential candidate and his political committee's use of slogans similar to financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," plaintiff's customers were generally sophisticated enough to decipher between plaintiff's commercial purposes and defendants' political agenda. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[8] States 360 ☞18.84**

360 States

360I Political Status and Relations

360I(B) Federal Supremacy; Preemption

360k18.83 Trade Regulation; Monopolies

360k18.84 k. In General. Most Cited

Cases

**Antitrust and Trade Regulation 29T ☞14**

29T Antitrust and Trade Regulation

29TII Unfair Competition

29TII(A) In General

29Tk14 k. Preemption. Most Cited Cases

(Formerly 382k423.1 Trade Regulation)

Financial services company's state law claims for unfair competition and misappropriation against presidential candidate and his political committee, based on their alleged use of advertisement derived from company's copyrighted advertising, were preempted by the Copyright Act; advertisements fell within subject matter of the Act, and unfair competition and misappropriation claims were grounded solely in defendants' copying of copyrighted expression. 17 U.S.C.A. § 301(a), (b)(1).

**[9] Trademarks 382T ☞1428(1)**

382T Trademarks

382TVIII Violations of Rights

382TVIII(A) In General

382Tk1423 Particular Cases, Practices, or Conduct

382Tk1428 Passing Off or Palming Off

382Tk1428(1) k. In General. Most Cited Cases

(Formerly 382k404)

Under New York law, presidential candidate and his political committee's use of slogans similar to financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," did not create likelihood of consumer confusion, as would support palming off claim.

**[10] Trademarks 382T ☞1469**

382T Trademarks

382TVIII Violations of Rights

382TVIII(B) Dilution

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 4
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

382Tk1469 k. Nature of Defendant's Use;
Use in Commerce. Most Cited Cases
(Formerly 382k366)

**Trademarks 382T ⟜1524(1)**

382T Trademarks
  382TVIII Violations of Rights
    382TVIII(D) Defenses, Excuses, and Justific-
ations
      382Tk1521 Justified or Permissible Uses
        382Tk1524 Expressive Use; Com-
mentary
        382Tk1524(1) k. In General. Most
Cited Cases
  (Formerly 382k366)
Presidential candidate and his political committee's
use of financial services company's trademarks,
"THERE ARE SOME THINGS MONEY CAN'T
BUY. FOR EVERYTHING ELSE THERE'S MAS-
TERCARD," and "PRICELESS," was not commer-
cial, but rather political in nature, and therefore was
exempted from coverage by the Federal Trademark
Dilution Act. 15 U.S.C.A. § 1125(c)(4)(B).

**[11] Trademarks 382T ⟜1464**

382T Trademarks
  382TVIII Violations of Rights
    382TVIII(B) Dilution
      382Tk1462 Reduction of Mark's Capacity
to Identify; Blurring
        382Tk1464 k. Particular Cases. Most
Cited Cases
  (Formerly 382k366)
Even if presidential candidate and his political
committee's use of financial services company's
trademarks, "THERE ARE SOME THINGS
MONEY CAN'T BUY. FOR EVERYTHING ELSE
THERE'S MASTERCARD," and "PRICELESS,"
was commercial, rather than political in nature,
such use did not dilute distinctiveness of company's
marks in violation of the Federal Trademark Dilu-
tion Act; plaintiff failed to show that defendants'
use of its marks lessened their value or capacity to
identify and distinguish its goods or services. 15

U.S.C.A. § 1125(c).

**[12] Trademarks 382T ⟜1464**

382T Trademarks
  382TVIII Violations of Rights
    382TVIII(B) Dilution
      382Tk1462 Reduction of Mark's Capacity
to Identify; Blurring
        382Tk1464 k. Particular Cases. Most
Cited Cases
  (Formerly 382k366)
Presidential candidate and his political committee's
use of financial services company's trademarks,
"THERE ARE SOME THINGS MONEY CAN'T
BUY. FOR EVERYTHING ELSE THERE'S MAS-
TERCARD," did not create even a likelihood of di-
lution of company's marks in violation of the New
York anti-dilution law; plaintiff failed to show that
defendants' limited and political use of its marks
could weaken their ability to serve as a unique
identifier of its goods or services. McKinney's Gen-
eral Business Law § 360-1.

**[13] Copyrights and Intellectual Property 99
⟜67.3**

99 Copyrights and Intellectual Property
  99I Copyrights
    99I(J) Infringement
      99I(J)1 What Constitutes Infringement
        99k67.3 k. Other Works. Most Cited
Cases
Presidential candidate and his political committee's
use of financial services company's copyrighted
service marks, "THERE ARE SOME THINGS
MONEY CAN'T BUY. FOR EVERYTHING ELSE
THERE'S MASTERCARD," was fair use, and thus,
not an infringement in violation of the Copyright
Act, where allegedly infringing political advertise-
ment was a parody, substance of defendants' mes-
sage was different from message of plaintiff's ad-
vertisements, and use of allegedly infringing ad-
vertisement did not harm potential market for or
value of copyrighted work. 17 U.S.C.A. § 107(2).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046

**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

Page 5

[14] Trademarks 382T ⬗1427

382T Trademarks
    382TVIII Violations of Rights
        382TVIII(A) In General
            382Tk1423 Particular Cases, Practices, or Conduct
                382Tk1427 k. Advertising or Marketing. Most Cited Cases
    (Formerly 92Hk7 Consumer Protection)
Under New York law, presidential candidate and his political committee's use of financial services company's trademarks, "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," was not a material deceptive act or practice directed to consumers that caused actual harm, as would support deceptive acts or practices claim, where political advertisement was not used in connection with sale or promotion of a product or service, nor in the conduct of business, trade, or commerce. McKinney's General Business Law § 349.

**Trademarks 382T ⬗1800**

382T Trademarks
    382TXI Trademarks and Trade Names Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited Cases
    (Formerly 382k736)
PRICELESS.

**Trademarks 382T ⬗1800**

382T Trademarks
    382TXI Trademarks and Trade Names Adjudicated
        382Tk1800 k. Alphabetical Listing. Most Cited Cases
    (Formerly 382k736)
THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD.

*MEMORANDUM OPINION AND ORDER*

DANIELS, J.

*1 Plaintiff MasterCard filed an action against defendants Ralph Nader and his political committee, alleging unfair competition, misappropriation, trademark infringement and dilution of MasterCard's trademarks under the Federal Trademark Act and state and common law. Plaintiff also alleged infringement of plaintiff's copyright under the Copyright Act of 1976. Defendants filed a motion for summary judgment. Defendants' motion for summary judgment is hereby GRANTED in its entirety.

*BACKGROUND*

MasterCard, a Delaware corporation with its principle place of business in New York, is a large financial institution that engages in the interchange of funds by credit and debit payment cards through over 23,000 banks and other foreign and domestic member financial institutions. Since Fall of 1997, MasterCard has commissioned the authorship of a series of advertisements that have come to be known as the "Priceless Advertisements." These advertisements feature the names and images of several goods and services purchased by individuals which, with voice overs and visual displays, convey to the viewer the price of each of these items. At the end of each of the Priceless Advertisements a phrase identifying some priceless intangible that cannot be purchased (such as "a day where all you have to do is breathe") is followed by the words or voice over: "Priceless. There are some things money can't buy, for everything else there's MasterCard."

In August 2000, MasterCard became aware that Ralph Nader and his presidential committee were broadcasting an allegedly similar advertisement on television that promoted the presidential candidacy of Ralph Nader in the 2000 presidential election. That political ad included a sequential display of a series of items showing the price of each ("grilled tenderloin for fund-raiser; $1,000 a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

plate;""campaign ads filled with half-truths: $10 million;""promises to special interest groups: over $100 billion"). The advertisement ends with a phrase identifying a priceless intangible that cannot be purchased ("finding out the truth: priceless. There are some things that money can't buy"). The resulting ad (the "Nader ad") was shown on television during a two week period from August 6-17, during the 2000 presidential campaign, and also appeared on the defendants' web site throughout that campaign. Plaintiff sent defendants a letter explaining its concern over the similarity of the commercials, and suggested that defendants broadcast a more "original" advertisement. When plaintiff contacted representatives of defendants a few days later, plaintiff MasterCard advised defendants to cease broadcasting their political advertisement due to its similarity with MasterCard's own commercial advertisement and resulting infringement liability.

When the parties could not come to an agreement, on August 16, 2000, MasterCard filed a complaint alleging the following counts against Ralph Nader and his presidential committee; trademark infringement and false designation of origin in violation of Section 43(a) of the Lanham Act; infringement of a registered trademark in violation of Section 32(1) of the Lanham Act; dilution in violation of Section 43(c) of the Lanham Act; copyright infringement in violation of the Copyright Act; unfair competition; misappropriation; infringement of New York Common Law Trademark Rights; dilution under New York law; and deceptive trade practices. Plaintiff sought a preliminary injunction during the 2000 presidential campaign which was denied by this Court. Thereafter, defendants moved for summary judgment on all nine of plaintiff's counts.

## DISCUSSION

**\*2** Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as

a matter of law."Fed.R.Civ.P. 56(c); *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993). The burden of demonstrating that no factual dispute exists is on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial ."Fed.R.Civ.P. 56(e). In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91L.3d.2d202 (1986). Summary judgment should be granted only when no reasonable trier of fact could find in favor of the nonmoving party. *Gallo v. Prudential Residential Services, Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994).

### 1. *Trademark Infringement*

MasterCard's first count is based on Section 43(a) of the Trademark Act, 15 U.S.C. Section 1125(a). Plaintiff claims that defendants have used two of MasterCard's service marks-"THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS" to misrepresent that the 2000 presidential candidacy of Ralph Nader for the office of President of the United States was endorsed by MasterCard. (Complaint ¶ 23). Plaintiff's second count also pleads a claim for trademark infringement due to defendants' use of the two federally registered trademarks, ("THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS"), pursuant to Section 32(1) of the Trademark Act, 15 U.S.C. Section 1114(1).

In trademark infringement cases, the Court must apply the undisputed facts to the balancing test outlined in *Polaroid Corp. v. Polarad Elecs., Corp.,* 287 F.2d 492, 495 (2d Cir.1961), and may grant summary judgment where it finds, as a matter of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 7
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

law, that there is no likelihood of confusion to the public. See *Lois Sportswear, USA, Inc. v. Levi Strauss & Co.,* 799 F.2d 867 (2d Cir.1986); *Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 580 (2d Cir.1991). In determining whether there is a likelihood of confusion between MasterCard's Priceless Advertisements and Ralph Nader's Political Ad, the Court weighs eight factors, as articulated in *Polaroid,* 287 F.2d at 495:(1) strength of the Plaintiff's mark; (2) degree of similarity between the two marks; (3) proximity of the products or services; (4) likelihood that the prior owner will "bridge the gap" into the newcomer's product or service line; (5) evidence of actual confusion between the marks; (6) whether the defendant adopted the mark in good faith; (7) the quality of defendants' products or services; and (8) sophistication of the parties' consumers. See *Time, Inc. v. Petersen Publishing Co.,* 173 F.3d 113, 117 (2d Cir.1999); See also *Morningside Capital Group,* 182 F.3d 133, 137 (2d Cir.1999).

*3 [1] In demonstrating the strength of the trademark, the plaintiff must establish either that the mark is inherently distinctive or alternatively, that the mark has acquired secondary meaning. See *McGregor-Doniger Inc. -v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). MasterCard's marks, "priceless" and "there are some things money can't buy, for everything else there's MasterCard," are registered. MasterCard asserts that their marks have attained secondary meaning. Defendants concede that MasterCard's Priceless Advertisements are strong enough to have become a part of present-day American popular culture. (Def.'s Mem. in Supp. of Mot. for Summ. J., p. 19). The strength of MasterCard's trademarks is indisputable.

[2] In determining the second factor, the similarity of the marks in issue, a court must consider whether the marks create the same overall commercial impression when viewed separately. See *Nikkon, Inc. v. Ikon Corp.,* 803 F.Supp. 901, 926 (S.D.N.Y.1992). A court may rely upon its own visual inspection in making this determination.

e.g., *Venetianaire Corp. v. A & P Import Co.,* 429 F.2d 1079, 1081 (2d Cir.1970). In this instance, it is not necessary for the Court to do so, because once again, defendants do not dispute that the Nader Ad employs the word "priceless" in the same manner used by MasterCard in its television advertisements. (Zopoth Aff. ¶¶ 304, Exs. 9 and 10). The Nader Ad also employs the phrase "there are some things money can't buy," which is part of a MasterCard statement. Defendants do not dispute that they employ that phrase in the same look, sound and commercial impression as employed by MasterCard. *Id.*

[3] The third and fourth factors, the proximity of the products or services and the likelihood that the prior user will bridge the gap, respectively, weigh in favor of defendants. There is little similarity between MasterCard's credit and debit card business and Ralph Nader's political candidacy. There is little likelihood and no evidence that MasterCard, a financial services company, would have any direct involvement in supporting a candidate in a political presidential campaign. Similarly, neither Ralph Nader nor his political campaign committee have expressed any desire or intent to enter the credit card business or offer the public any direct financial services. (Def's Mem. in Supp. of Summ. J., p. 20).

[4] Evidence of actual confusion, the fifth factor, also weighs in favor of defendants. This factor is perhaps the most significant when considering the overall likelihood of confusion by the public. "The best evidence of likelihood of confusion is the occurrence of actual confusion and mistakes." *Lambda Electronics Corporation, et al. v. Lambda Technology, Inc.,* 515 F.Supp. 915, 926 (S.D.N.Y.1981). While it is not essential for a finding of trademark infringement to demonstrate actual confusion, "there can be no more positive proof of likelihood of confusion than evidence of actual confusion." *Id.,* at 926-27 (citing *Grotrian, et al. v. Steinway & Sons,* 365 F.Supp. 707, 715-16 (S.D.N.Y.1973), *aff'd,* 523 F.2d 1331 (2d Cir.1975)). In *Lang v. Re-*

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

*tirement Living Publishing Co.,* 949 F.2d 576 (2d Cir.1991), the Second Circuit affirmed the trial court's grant of summary judgment to the defendants on the ground that plaintiff had failed to raise a genuine issue of fact on likelihood of confusion. In that case, where the plaintiff, whose trade name was similar to that of defendants, received 400 phone calls and several letters from third parties attempting to reach the defendant, the Court explained that the Lanham Act seeks to prevent consumer confusion that enables a seller to pass off his goods as the goods of another, not to protect against confusion generally. *Id.,* at 583.As evident by the present record, out of 452 e-mails to MasterCard regarding the Nader Ad, only two are relied upon as possibly reflecting confusion. (Grossman Aff. ¶ 9, Exs. 4). This is certainly not enough to show actual confusion or that such confusion inflicted commercial injury to MasterCard. In support of its argument that actual confusion exists, MasterCard also relies on the written transcript of a broadcast of CNN's *Late Edition,* during which Connecticut Senator Christopher Dodd stated that he thought the Nader Advertisement was a credit card ad. A viewing of a tape of that program shows Senator Dodd laughing at his own joke, while speaking the words on which MasterCard relies to establish actual confusion. It is little or no evidence of actual confusion. Even if Senator Dodd had actually been confused, a few isolated instances of actual confusion are not sufficient to defeat a motion for summary judgment. *SeeBrockmeyer v. The Hearst Corporation, et al.,* 428, F.Supp.2d 281, 298 (S.D.N.Y.2003) ("one anecdotal instance of purported actual confusion is at best de minimis, indeed infinitesimal, and insufficient;" a survey revealing a less than 3% rate of confusion was insufficient to show a likelihood of confusion .); *SeealsoCumberland Packing Corp. v. Monsanto Co.,* 140 F.Supp.2d 241, 254 (E.D.N.Y.2001) (a survey showing a 7.84% confusion rate found to be insufficient to raise a material fact as to the likelihood of confusion). The plaintiff should be able to demonstrate a reasonable likelihood that reasonable people will be confused.

*\*4 [5]* The sixth factor regarding good faith adoption of the mark also favors defendants. The relevant intent in this inquiry is whether the alleged infringer intended "to palm off his products as those of another."*SeeMiss Universe, Inc. v. Patricelli,* 408 F.2d 506, 509 (2d Cir.1969); *SeealsoMaternally Yours, Inc. v. your Maternity Shop, Inc.,* 234 F.2d 538, 542 (2d Cir.1956). In the present case, there is no evidence that defendants intended to confuse the public. There is no basis to argue that the Ralph Nader political ad which has the clear intent to criticize other political candidates who accept money from wealthy contributors, at the same time, attempts or intends to imply that he is a political candidate endorsed by MasterCard. There is uncontradicted testimony that neither Ralph Nader, nor his committees, had any such intent. (Nader Aff. ¶ 21; Zopoth Aff. ¶ 7, Ex. 16).

[6] The seventh factor, the quality of defendants' products or services, is of insignificant weight in this case. There is no reasonable comparison to be made between the quality of the products and services provided by MasterCard and the value of defendants' politics. MasterCard provides a quality of financial services which can readily be compared to its commercial competitors. However, it is purely the public's subjective opinion of the appeal and attractiveness of a political candidate's ideas and record which determines whether the public will buy the politics any candidate for office is selling.

[7] The eighth and final factor to be weighed is the level of consumer sophistication in either of the relevant markets for credit card services or for political candidates. Unless otherwise demonstrated, it is reasonable to conclude that the general American public is sophisticated enough to distinguish a Political Ad from a commercial advertisement. Rarely, if ever, is there a realistic opportunity to confuse the two. Indeed, as previously discussed, out of the 452 e-mails received by MasterCard regarding Ralph Nader's Political Ad, only 2-3 questioned MasterCard's involvement with Ralph Nader's campaign. This sampling of American con-

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))

sumers, which is the only proof offered on the record, is a sufficient indication that consumers are generally sophisticated enough to decipher between MasterCard's commercial purposes and Ralph Nader's political agenda.

When balancing the eight *Polaroid* factors, no one factor can determine the ultimate issue of likelihood of confusion to the consumer. *See W.W. Pharm. Co. v. The Gillette Co.,* 808 F.Supp. 1013, 1022 (S.D.N.Y.1992), *aff'd,* 984 F.2d 567 (2d Cir.1993). To properly weigh these factors requires the court to view each factor in light of the totality of the evidence. *Id.* Thus, after balancing the *Polaroid* factors, this Court finds that there is no genuine issue of material fact with regard to any likelihood of confusion between MasterCard's Priceless Advertisements and Ralph Nader's Political Ad which could constitute a violation of the Trademark Act. Defendants' summary judgment motion to dismiss Counts One and Two of plaintiff's complaint is therefore granted.

*5 MasterCard also alleges a state law claim under New York common law for trademark infringement in Count Seven of the complaint. Under New York common law, as is required under federal law, a plaintiff must show a likelihood of confusion between the two products in order to prevail. *See Nabisco v. Warner-Lambert Co. .,* 32 F.Supp.2d 690, 701 (S.D.N.Y.1999). As with plaintiff's federal Lanham Act claims, there is no likelihood of confusion between MasterCard's Priceless Ads and Ralph Nader's Political Ad. As a matter of law, plaintiff has failed to show a genuine issue of material fact as to the existence of a likelihood of confusion between MasterCard's financial services and Ralph Nader's 2000 presidential political campaign. Therefore, defendants are granted summary judgment on plaintiff's New York common law trademark infringement claim in Count Seven of the complaint.

2. *Unfair Competition and Misappropriation*

[8] In its fifth and sixth counts, MasterCard alleges state law claims under New York common law for unfair competition and misappropriation. Under Section 301(a) of the Copyright Act, 17 U.S.C. § 301(a), all legal or equitable state rights that are equivalent to any of the exclusive rights granted within the general scope and subject matter of the Copyright Act are preempted by the Copyright Act. Courts have used a two-part test to determine whether a state cause of action will be preempted by the Copyright Act: (1) what is the nature of the work in question; and (2) what are the rights claimed in that work under state law. *See Harper & Row, Publishers, Inc. v. Nations Enters.,* 501 F.Supp. 848, 850 (S.D.N.Y.1980), *aff'd,* 723 F.2d 195 (2d Cir.1983), *rev'd on other grounds,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *See also Mayer v. Josiah Wedgwood & Sons, Ltd.,* 601 F.Supp. 1523, 1532 (S.D.N.Y.1985).

The first prong for preemption is met when the nature of the work protected comes within the subject matter of copyright as defined by § § 102 and 103 of the Copyright Act. *See* § 301(b)(1). Because MasterCard owns copyright registrations for several of its "Priceless" television advertisements, and because "advertisements are generally capable of receiving copyright protection," *Raffoler, Ltd. v. Peabody & Wright, Ltd.,* 671 F.Supp. 947, 950 (E.D.N.Y.1987), MasterCard's advertisements clearly fall within the subject matter of the Copyright Act.

The second prong for preemption is met when the right granted under state law is "equivalent to any of the exclusive rights within the general scope of copyright as specified in Section 106." 17 U.S.C. § 301(a). *See also Harper,* 501 F.Supp. at 850; *Mayer,* 601 F.Supp. at 1532. The federal rights granted by the Copyright Act include the right "to prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106. As evident in the Complaint, MasterCard claims that the Nader Ad violated MasterCard's rights because it was derived form MasterCard's "Priceless" advertising.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 10
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

(Compl.¶ 50). The Second Circuit Court of Appeals has held that misappropriation and unfair competition claims "grounded solely in the copying of plaintiff's protected expression are deemed preempted by Section 301."*Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 717 (2d Cir.1992) (citations omitted); *SeealsoAmerican Movie Calssics Co. v. Turner Entm't Co.,* 922 F.Supp. 926, 933 (S.D.N.Y.1996). Thus, Counts Five and Six are dismissed on defendants' motion for summary judgment as those claims are preempted by federal copyright law.

**\*6** [9] In pleading its sixth count, along with its misappropriation claim, MasterCard also alleges the state law violation of "palming off" by defendants. (Compl.¶ 62). "Palming off" or passing off, "occurs when a producer misrepresents his own goods or services as someone else's."*Dastar Corporation v. Twentieth Century Fox Film Corporation, et al.,* 539 U.S. 23, 123 S.Ct. 2041, 2045, n. 1, 156 L.Ed.2d 18 (2003). Lack of likely consumer confusion is independently sufficient to defeat a claim of palming off. *SeeTowle Mfg. Co. v. Godinger Silver Art Co., Ltd.,* 612 F.Supp. 986, 995-96 (S.D.N.Y.1985). Therefore, this claim also fails for the same reason MasterCard's trademark infringement claim fails: there is no likelihood of confusion as a matter of law. Dismissal of Count Six is therefore warranted on this basis as well.

### 3. Dilution

Counts Three and Eight of plaintiff's complaint allege against defendants federal and state dilution of plaintiff's trademarks. The Federal Trademark Dilution Act, 15 U.S.C. § 1125(c) and the New York anti-dilution law, New York Gen. Bus. Law § 360-1, protect against the unauthorized use of marks that impairs the goodwill and value of plaintiff's mark. "Dilution" is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of

confusion, mistake, or deception."15 U.S.C. § 1127. Section 1125(c) provides that the owner of a famous mark is entitled to an injunction against another person's "commercial use in commerce of a mark if such use begins after the mark or trade name has become famous and causes dilution of the distinctive quality of the mark."Under federal law, the elements for a claim of dilution are that "1) plaintiff's mark is famous; 2) it is inherently distinctive; 3) defendant's use of the junior mark is a commercial use in commerce; 4) defendant's use began after plaintiff's mark became famous; and 5) defendant's use of the junior mark causes dilution of the distinctive quality of the plaintiff's mark."*Playtex Products, Inc. v. Georgia-Pacific, Inc., et al.,* 2003 WL 21939706, 8 (S.D.N.Y.2003). Moreover, a plaintiff must show "actual dilution, rather than a likelihood of dilution."*Moseley, et al. v. V Secret Catalogue, Inc., et al.,* 537 U.S. 418, 433, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003). Under both federal and New York law, dilution can involve either blurring or tarnishment.*New York Stock Exchange, Inc., v. New York, New York Hotel, LLC,* 293 F.3d 550, 557 (2d Cir.2002); *SeealsoPerkins School for the Blind v. Maxi-Aids, Inc., et al.,* 274 F.Supp.2d 319, 325 (E.D.N.Y.2003); *World Wrestling Federation Entertainment, Inc. v. Bozelli,* 142 F.Supp.2d 514, 529 (S.D.N.Y.2001).

Blurring has typically involved "the whittling away of an established trademark's selling power through its unauthorized use by others upon dissimilar products."*Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1031 (2d Cir.1989) (describing such " 'hypothetical anomalies' as 'Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth' ") (quoting legislative history of section 368-d) (citation omitted). That is, trademark dilution statutes are designed to cover those situations where the public knows that the defendant is not connected to or sponsored by the plaintiff, but the ability of the plaintiff's mark to serve as a unique identifier of the plaintiff's goods or services is weakened because the relevant public now also as-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 11
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))

sociates that designation with a new and different source. See *Federal Express Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 174 (2d Cir.2000) (quoting *Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d at 965-66 (discussing New York law) (internal quotation marks and brackets omitted).

*7 In *New York Stock Exchange,* the Second Circuit held that blurring occurs when " 'the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods or services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product. To determine the likelihood of blurring, [courts] have looked to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark."*New York Stock Exchange, Inc., v. New York, New York Hotel, LLC,* 293 F.3d 550, 558 (2d Cir.2002) (citing *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 43 (2d Cir.1994)); *See also Katz, et al. v. Modiri, et al.,* 283 F.Supp.2d 883, 901 (S.D.N.Y.2003).

Tarnishment occurs when the plaintiff's mark is " 'linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context,' with the end result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." ' *Id.* "The sine qua non of tarnishment is a finding that the plaintiff's mark will suffer negative associations through defendant's use." *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 507 (2d Cir.1996).

The Federal Trademark Dilution Act specifically exempts noncommercial uses of a mark from its coverage. Section 1125(c)(4) provides that "[t]he following shall not be actionable under this section: ... (B) Noncommercial use of a mark."Therefore, prior to even addressing whether defendants have actually diluted plaintiff's marks under the federal

law, the Court must first determine whether defendants' use of the marks is "commercial," and thereby, whether that use is even covered by the statute.[FN1]

> FN1. Black's Law Dictionary defines 'commercial' as "Relates to or is connected with trade and traffic or commerce in general; is occupied with business and commerce. Generic term for most all aspects of buying and selling."

> The Lanham Act defines 'use in commerce' as the "use of a mark in the ordinary course of trade ... For purposes of this chapter, a mark shall be deemed to be in use in commerce-(1) on goods when-(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce, and (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services."15 U.S.C. § 1127.

[10] Plaintiff argues that Ralph Nader's Political Ad is commercial in nature even though it neither sells products or services, is not designed to entice consumers to buy products or services, and does not propose any kind of commercial transaction. MasterCard asserts that contributions to the Nader 2000 General Committee "increased from $5125 before the Ad ran to $818,000 in August 2000, after the Ad ran through the "DONATE ON-LINE" icon *or otherwise. "*(Pl's. Mem. in Opp. to Summ. J. 26) (emphasis added). Although the Nader Ad ran before a large sum of contributions were made to his

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 12
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

campaign, plaintiff offers no evidence of a causal connection between the Ad and the contributions. There is nothing in the record other than the inference to be drawn from the proximity in time that advances the notion that the contributions Ralph Nader and his political committee received were a direct result of the Ad.

Even assuming the Nader Ad caused greater contributions to be made to his political campaign, this would not be enough to deem Ralph Nader's Ad "commercial." If so, then presumably, as suggested by defendants, all political campaign speech would also be "commercial speech" since all political candidates collect contributions. Ralph Nader's Political Ad attempts to communicate that other presidential candidates can be bought, but that the "truth," represented by himself, cannot. The Nader Ad is a strong political message which expresses his personal opinion on presidential campaigning. The legislative history of the Lanham Act clearly indicates that Congress did not intend for the Act to chill political speech. In speaking about the amendments to Section 43(a) that expanded what was actionable as deceptive advertisements, one of the new law's sponsors, United States Representative Robert Kastenmeier, pointed out that political advertising and promotion are not meant to be covered by the term "commercial." He stated that the statute

*8 uses the word "commercial" to describe advertising or promotion for business purposes, whether conducted by for-profit or non-profit organizations or individuals. *Political advertising and promotion is political speech, and therefore not encompassed by the term "commercial."*This is true whether what is being promoted is an individual candidacy for public office, or a particular political issue or point of view ...

134 Cong. Rec. H. 1297 (daily ed. April 13, 1989) (statement of Wisconsin Rep. Kastenmeier) (emphasis added).

Plaintiff MasterCard urges the Court to rely on *United We Stand America, Inc. v. United We Stand,*

*America New York, Inc.,* 128 F.3d 86 (2d Cir.1997) to conclude that Ralph Nader's activities are "commercial" in nature. That case is not instructive in determining whether or not MasterCard has a basis to bring a claim against defendants under the Federal Trademark Dilution Act. In *United We Stand,* the Court was determining whether a certain political activity fell under the scope and the meaning of the word "services" and "use in commerce" of the Lanham Trademark Act, § 32(1)(a), 15 U.S.C.A. § 1114(1)(a).[FN2] That particular section of the Lanham Act does not have a commercial activity requirement, nor does it exempt from liability noncommercial use of a mark. *SeePlanned Parenthood Federation of America Inc. v. U.S. District Court Southern District of New York,* 42 U.S.P.Q.2d 1430, 1434 (S.D.N.Y.1997). However, the Federal Trademark Dilution Act, 15 U.S.C.A. § 1125(c), specifically exempts from the scope of all provisions of Section 1125 the "noncommercial use of a mark." *Seeid.,* at 1433.

> FN2."Any person who shall, without the consent of the registrant use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered trademark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided ."15 U.S.C.A. § 1114(1)(a).

Though not binding, this Court finds the analysis in *American Family Life Insurance Company v. Hagan, et al.,* 266 F.Supp.2d 682 (N.D.Ohio 2002), to be relevant and persuasive. In that case, similar to the case at hand, the plaintiff, American Family Life Insurance Company, or AFLAC, ran well-known "AFLAC Duck" commercials which featured a white duck quacking the company's name "AFLAC." *Id.,* at 684.One of the defendants was a candidate for Governor of the State of Ohio running

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 13
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

against the incumbent Governor Robert Taft. The candidate and his Campaign, developed internet commercials that " 'borrow[ed]' from AFLAC's commercials. Specifically, the internet commercials include[d] a crudely animated character made up of the incumbent Governor's head sitting on the body of a white cartoon duck; the duck quacks 'TaftQuack' several times during each commercial," which defendants ran on their website, www.taftquack.com. *Id.*Defendants' website also contained a link which visitors could use to make campaign contributions. *Id.* at 686-87.Among other claims, plaintiff sued defendants for federal trademark dilution and moved for a preliminary injunction.

In denying the plaintiff's motion for a preliminary injunction, and finding that the plaintiff was not likely to prevail on its dilution claim, the court also found that defendants' speech was political, rather than commercial. Specifically, the court stated that the candidate was "using a quacking cartoon character, which admittedly brings to mind AFLAC's marks, *as part of his communicative message,* in the context of expressing political speech."*Id.,* at 700 (emphasis in original). The court added that though "the consuming public may associate the AFLAC Duck and the TaftQuack character-a proposition the Court accepts-[this] is an insufficient predicate to support injunctive relief of political speech."*Id.,* at 701.The court further noted that though defendants included in their website a mechanism for visitors to make campaign contributions, "it is arguable whether [the candidate's] speech proposes a commercial transaction at all."*Id .,* at 697.The court stated that defendants' solicitation of contributions, and the resulting making of contributions, "is much more than merely a commercial transaction. Indeed, this exchange is properly classified not as a commercial transaction at all, but completely noncommercial, political speech."*Id.*

**\*9** [11] This Court finds that Ralph Nader's use of plaintiff's trademarks is not commercial, but instead

political in nature and that therefore, it is exempted from coverage by the Federal Trademark Dilution Act. However, even if Ralph Nader's use of plaintiff's trademarks could be deemed commercial in nature, such use did not dilute plaintiff's marks. Defendants do not dispute that plaintiff's marks are famous, distinctive, or that they used plaintiff's marks after such marks became famous. However, there is no evidence in the record that defendants' use of plaintiff's marks actually caused dilution of the distinctiveness of plaintiff's marks. Plaintiff does not offer evidence that defendants' limited use of the Priceless marks lessened its value or the capacity of these marks to identify and distinguish plaintiff's goods or services. Further, plaintiff does not claim, nor is there any evidence in the record, that due to defendant's use of plaintiff's marks, plaintiff altered or lessened its use of the marks to identify MasterCard's products or services.

Count Three of plaintiff's complaint alleging dilution of plaintiff's trademarks is dismissed on defendants' motion for summary judgment. Ralph Nader's use of plaintiff's trademarks is political in nature, not within a commercial context, and is therefore exempted from coverage by the Federal Trademark Dilution Act. Furthermore, there is no evidence on the record that Ralph Nader's use of plaintiff's trademarks diluted plaintiff's trademarks.

[12] Count Eight, alleging dilution of MasterCard's trademarks under state law, is based on N.Y.G.B.L. § 360-1. Section 360-1 provides that "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."In order to show state trademark dilution under section 360-1, MasterCard must demonstrate that it's "trademark is of truly distinctive quality or has acquired secondary meaning, and, second, that there is a 'likelihood of dilution.' " *Brennan's, Inc.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 14
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

*v. Brennan's Restaurant, LLC, et al.,* 2003 WL 1338681, 6 (S.D.N.Y.2003) (citing *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 42 (2d Cir.1994)).

Again, it is not in dispute that plaintiff's marks are of a distinctive quality, and have acquired secondary meaning. Yet, there is no evidence on the record that defendants' use of plaintiff's marks created even a likelihood of dilution of such marks. There is no evidence that defendants' limited and political use of plaintiff's marks could weaken those marks' ability to serve as a unique identifier of plaintiff's goods or services. Therefore, there is no evidence of possible dilution by "blurring." Further, there is no evidence that plaintiff's marks could be tarnished or suffer from negative associations in the eyes of the public due to defendants' use of those marks. Therefore, there is no evidence of dilution of plaintiff's marks by tarnishment. As with plaintiff's federal dilution claim, summary judgment for defendants on plaintiff's Count Eight alleging state law dilution of plaintiff's trademarks is hereby granted.

### 4. Copyright Infringment

**\*10** [13] In Count Four, plaintiff alleges copyright infringement of its Priceless Advertisements. In response, defendants argue the Nader Ad is a fair use of the Priceless Advertisements because it is a parody of the Priceless Advertisements.

"From the infancy of copyright protection," the fair use doctrine "has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts." ' *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 575, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (quoting U.S. Const., art. I, § 8, cl. 8). In *Campbell,* defendants Luther R. Campbell, Christopher Wongwon, Mark Ross, and David Hobbs, collectively known as 2 Live Crew, a rap music group, created a song entitled "Pretty Woman" that parodied Roy Orbison's copyrighted song, "Oh, Pretty Woman." *Id.,* at 571-72.Plaintiff Acuff-Rose Music, Inc., who owned the rights to Orbison's song, sued defendants for copyright infringement. *Id.,* at 573.The District Court for the Middle District of Tennessee granted summary judgment in favor of defendants, finding that 2 Live Crew's song was a fair use parody of the Orbison song and that the commercial purpose of 2 Live Crew's song was not a bar to a finding of fair use. *Id.* The Court of Appeals for the Sixth Circuit reversed, holding that a finding of fair use was barred by the song's commercial character and excessive borrowing of the Orbison song. *Id.,* at 573-74.In reversing the Court of Appeals' decision, the United States Supreme Court held that a parody's commercial nature is not a bar to a finding of fair use and is in fact only one element to be considered in a fair use analysis. It held that the Court of Appeals gave insufficient consideration to the nature of a parody in assessing the degree to which a parody copies. *Id.,* at 572, 594.

As noted in *Campbell,* "in truth, in literature, in science and art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before."*Id.* (quotation marks omitted). Until the 1976 Copyright Act, the doctrine of fair use grew exclusively out of the common law. *See Id.,* at 576;*Folsom v. Marsh,* 9 F.Cas 342, 348 (C.D.Mass.1900) (CCD Mass. 1841) (Story, J.) (Stating fair use test). With the Copyright Act, Congress restated the common law tradition of fair use. The statute provides that the use or reproduction of a copyrighted work is "not an infringement of copyright" if it is used "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."17 U.S.C.A. § 107. In determining whether the work has been used for such a purpose, the statute lists four nonexclusive factors to consider: 1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; 2) the nature of the copyrighted work; 3) the amount and substantiality

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 15
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

of the portion used; and 4) the effect of the use upon the potential market for, or value of, the copyrighted work. 17 U.S.C. § 107(1)-(4). It has been found that "once a work is determined to be a parody, the second, third, and fourth factors are unlikely to militate against a finding of fair use."*Abilene Music, Inc., et al. v. Sony Music Entertainment, Inc., et al.,* 2003 WL 21415311, 4 (S.D.N.Y.2003).

**\*11** This section of the Copyright Act "intended that courts continue the common law tradition of fair use adjudication" and "permits and requires courts to avoid rigid application of the copyright statute, when, on occasion, it would stifle the very creativity which that law is designed to foster."*Campbell,* 510 U.S. at 577 (quotation marks omitted). Fair use analysis, therefore, always "calls for case-by-case analysis." *Id.* The fair use examples provided in § 107 are "illustrative and not limitative" and "provide only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses."*Id.;SeeNimmer* § 13.05 [A], at 13-153 ("[T]he factors contained in Section 107 are merely by way of example, and are not an exhaustive enumeration."). The ultimate test of fair use, therefore, is whether the copyright law's goal of "promot[ing] the Progress of Science and useful Arts,"U.S. Const., art. I, § 8, cl., 8, "would be better served by allowing the use than by preventing it."*Arica Inst., Inc. v. Palmer,* 970 F.2d 1067, 1077 (2d Cir.1992) (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 589 (2d Cir.1960) (L.Hand, J.)). The burden of proof is on the defendants to demonstrate fair use.*Infinity Broadcast Corp. v. Kirkwood,* 150 F.3d 104, 107 (2d Cir.1998). Though recognizing that fair use is a "mixed question of law and fact," courts regularly resolve fair use issues at the summary judgment stage where there are no genuine issues of material fact. *Castle Rock Entertainment, Inc. v.Carol Publishing Group, Inc.* 150 F.3d 132, 136 (2d Cir.1998).

Before considering these factors in detail, it is im-portant to note the difference between an advertisement that promotes a parody of a copyrighted work and an advertisement that itself actually infringes a copyright. An advertisement which uses elements of a copyrighted work "does not necessarily ... [infringe] the copyright, if the product that it advertises constitutes a fair use of the copyrighted work."*Steinberg v. Columbia-Delphi Productions,* 663 F.Supp. 706, 714 (S.D.N.Y.1987) (citing *Warner Bros. v. American Broadcasting Cos.,* 720 F.2d 231, 242-44 (2d. Cir.1983) (finding that promotional broadcasts for a television series legally parodying the Superman comic strip character did not infringe copyright in Superman character)). On the other hand, an advertisement infringes a copyright when what is being advertised "bears no relationship to the copyrighted work."*Steinberg,* 663 F.Supp. at 714. In such a case, "[n]o matter how well known a copyrighted phrase becomes, its author is entitled to guard against its appropriation to promote the sale of commercial products."*Id.* (citing *Warner Bros.,* 720 F.2d at 242). However, even a wholly commercial advertisement may itself constitute a fair use. *Leibovitz v. Paramount Pictures Corp.,* 137 F.3d 109 (2d Cir.1998) (finding a poster of a pregnant Leslie Nielson, used to advertise "Naked Gun 33 1/3," to be a fair use of the photograph of Demi Moore it parodied).

**\*12** The first fair use factor to consider is "the purpose and character of the [allegedly infringing] use, including whether such use is of a commercial nature or is for nonprofit educational purposes."17 U.S.C. § 107(1). As this Court has already discussed, the Ralph Nader Political Ad's use is not commercial. The stated purpose of the defendants' advertisement was to raise public awareness of Ralph Nader's desire to be included in the upcoming, televised Presidential candidate debates. (Nader Aff. ¶ 14; Amato Aff. ¶ 11; Exs. 12-15). The Nader Ad depicted that the two major party candidates were beholden to special interests, which was the reason that Ralph Nader, who was not so beholden, should be included in the debates. (Defs.' Mem. in Supp. of Summ. J. 26).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 16
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

The more important question under the first factor, and in fair use analysis generally, is whether the allegedly infringing work "merely supersedes" the original work "or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message,"*Campbell,* 510 U .S. at 579, in other words "whether and to what extent the new work is 'transformative." ' *Id.,* at 579 (quoting Leval, *Toward a Fair Use Standard,* 103 Harv.L.Rev. 1105, 1111 (1990)). If "the secondary use adds value to the original-if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings-this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Id.* As stated in *Campbell,* the goal of copyright "is generally furthered by the creation of transformative works." *Id.,* at 579.

One such transformative use that is typically found to be fair use is a parody. Defendants' argument that Ralph Nader's Political Ad is transformative of MasterCard's Priceless Advertisements is as follows: Defendants believe that the MasterCard commercials' underlying message is "that MasterCard is the best way to pay for everything that matters."(Defs' Mem in Supp. for Summ. J. 27). The Nader Ad, on the other hand, portrays the cold, big-money arena of Presidential politics and contrasts Ralph Nader's "truth" as the remedy for the bought and paid-for positions of others. Through this message, defendants claim that the Nader Ad "lays bare the artifice of the original, which cloaks its materialistic message in warm, sugar-coated imagery that purports to elevate intangible values over the monetary values it in fact hawks" through parody (Defs' Mem. in Supp. of Summ. J. 27).

Parody has an obvious claim to transformative value. *SeeCampbell,* 510 U.S. at 577. A parody is characterized by an attempt to mimic an original, expressive, and usually famous work. *SeeId.,* at 586 ("parodies invariably copy publicly known, ex-

pressive works"). Focusing particularly on the fair use protection to which parodies are entitled, the Court in *Campbell* initially noted that "parody may or may not be fair use,"*Id.,* at 581, and "like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law,"*Id.*The Court went on to say, "[T]he heart of any parodist's claim to quote from existing material is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works."*Id.,* at 580.The comment must have some "critical bearing on the substance or style of the original composition."*Id.* The relevant inquiry is "whether a parodic character *may reasonably be perceived."Id.* (emphasis added).

*13 Plaintiff claims that because there is nothing in the Nader Ad which "comments on or refers to MasterCard or its Priceless Ads" (Pl.'s Mem. in Opp'n to Summ. J. 11), it cannot be classified as a parody. However, the Supreme Court in *Campbell* stated "[p]arody serves its goals whether labeled or not, and there is no reason to require parody to state the obvious (or even the reasonably perceived)."*Id.,* n. 17. The Court also added, "[w]hile we might not assign a high rank to the parodic element here, we think it fair to say that [defendant's] song reasonably could be perceived as commenting on the original or criticizing it, to some degree."*Id.,* at 583.In fact, the Court declined to evaluate the parody, stating that "[t]he threshold question when fair use is raised in defense of parody is whether the parodic character may reasonably be perceived. Whether, going beyond that, parody is in good taste or bad does not and should not matter to fair use."*Id.,* at 582.In finding a parodic element in defendant's infringement of plaintiff's song, the Court also commented that the defendants in that case would have even more easily met the requirement had there been less risk of "market substitution" of the parody for the original:

A parody that more loosely targets an original than the parody presented here may still be sufficiently

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 17
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))

aimed at an original work to come within our ana-lysis of parody. If a parody whose wide dissemina-tion in the market runs the risk of serving as a sub-stitute for the original ..., it is more incumbent on one claiming fair use to establish the extent of transformation and the parody's critical relationship to the original. By contrast, when there is little or no risk of market substitution, whether because of the large extent of transformation of the earlier work, the new work's minimal distribution in the market, the small extent to which it borrows from the original, or other factors, taking parodic aim at an original is a less critical factor in the analysis, and looser forms of parody may be found to be fair use ...

*Campbell,* 510 U.S. at 580, n. 14.

Where, as here, the parody really has no demon-strative capacity to divert sales from the original, as was stated in *Campbell,* a showing of "the parody's critical relationship to the original" is less vital in the fair use analysis.

The Nader Ad does add something new and quali-fies as a "transformative" work. Whether it "comments" on the original is the issue in question. MasterCard's message depicted in its Priceless Ad-vertisements is very plain and straightforward. In a series of advertisements, MasterCard presents vari-ous intangible moments that are highly valuable, yet unable to be "purchased" or are "priceless." Hence, "there are some things that money can't buy."[FN3] This idea is followed by the message, that the viewer-consumer can purchase everything else with their MasterCard credit card-"for everything else, there's MasterCard." Ralph Nader's Political Ad attempts to show various ways different Presid-ential candidates can be bought in the "big-money arena of Presidential politics" (Def's Mem. in Supp. Summ. J. 27) and contrasts the "priceless" truth represented by Ralph Nader as the remedy for the bought and paid for positions of others. Through this depiction, Ralph Nader argues that he not only sends across his own message, but that he wittingly comments on the craft of the original, "which

cloaks its materialistic message in warm, sugar-coated imagery that purports to elevate intangible values over the monetary values it in fact hawks."*Id.* This commentary "may reasonably be perceived." The message need not be popular nor agreed with. It may be subtle rather than obvious. It need only be reasonably perceived. Ralph Nader's Political Ad is sufficiently a parody for the pur-poses of a fair use analysis, and consequently, is transformative.

> FN3. It should be noted that with regard to the phrase "there are some things that money can't buy," not even MasterCard claims that phrase is its original creation.

*14 The second statutory factor, "the nature of the copyrighted work,"§ 107(2), relates to whether the original work is " 'creative' as opposed to 'factual,' as well as to whether the work has been previously published."*Feiner v. H.R. Industries,* 10 F .Supp.2d 310, 314 (S.D.N.Y.1998). Original works that are creative in nature will generally receive greater copyright protection. *Seee.g.Ringgold v. Black En-tertainment Television, Inc.,* 126 F.3d 70, 80 (2d Cir.1997). A previously published work available to the general public will receive less protection un-der the fair use doctrine than an unpublished work which has not yet been released to the general pub-lic by its author. *Feiner,* 10 F.Supp.2d at 314;*Arica Institute, Inc. v. Palmer,* 970 F.2d 1067, 1078 (2d Cir.1992).

The creative nature of plaintiff's Priceless Advert-isements places these advertisements in the "core of intended copyright protection." *Campbell,* 510 U.S. at 586. Although this seems to favor plaintiff, courts have recognized that "this factor may be of less (or even of no) importance when assessed in the context of certain transformative uses."*Castle Rock Entertainment, Inc. v. Carol Publishing Group, Inc.,* 150 F.3d 132, 144 (2d Cir.1998); *SeealsoLeibovitz v. Paramount Pictures Corpora-tion,* 2000 WL 1010830, 4 (S.D.N.Y.2000) ("It is well established that the second factor-the nature of the copyrighted work-is not very important to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 18
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

fair use analysis."); *Abilene Music, Inc., et al. v. Sony Music Entertainment, Inc., et al.,* 2003 WL 21415311, 4 (S.D.N.Y.2003) ("the second factor, the nature of the original work, is not heavily weighted in cases involving parodies"). In particular, giving this factor undue weight in a fair use analysis would prevent findings of fair uses which advance science and art through criticism or commentary. *See e.g.Campbell,* 510 U.S. at 586 (finding second factor unlikely to "help in separating the fair use sheep from the infringing goats in a parody case since parodies almost invariably copy publicly known, expressive works."). This factor is without much force in most cases, and its relevance here is slight.

In assessing the third factor, the Court must focus on only the protected phrases of the Priceless Advertisements. Further, the amount and substantiality of the portion used in relation to the copyrighted work as a whole must be examined in context to determine whether the extent of the copying is consistent with or more than necessary to further the purpose and character of the use. *SeeCampbell,* 510 U.S. at 586-587. In the parody context, this concerns "what else the parodist did besides go to the heart of the original."*Liebowitz v. Paramount Pictures Corp.,* 137 F.3d 109 (2d Cir.1998) (quoting *Campbell,* 510 U.S. at 589). Although the Ralph Nader Political Ad copied the word "priceless" and the phrase "there are some things money can't buy" and used them in a similar manner, the greater part of the Nader Ad is original-the narration, the super-titles, and the film imagery is rather different from the MasterCard film commercials. The substance of the message is different from the message communicated by the advertisement it copies. In order for the Ralph Nader Political Ad to be considered a legitimate parody of the Priceless Advertisement, it necessarily must take enough from MasterCard's advertisement to assure that the viewer will be reminded of the ad that it borrows from.

*15 As outlined in *Leibovitz,* 137 F.3d at 113, the Court in *Campbell* made three important points

concerning the third-factor. First, consideration must be given not only to the quantity of the materials taken but also to "their quality and importance" to the original work. *Campbell,* 510 U.S. at 587. Second, "the parody must be able to 'conjure up' at least enough of the original to make the object of its critical wit recognizable."*Id.,* at 588.Third, the court explained that "[o]nce enough has been taken to assure identification, how much more is reasonable will depend, say, on the extent to which the [copying work's] overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original."*Id.* Thus, as the Court in *Campbell* noted, the third factor "enquiry will harken back to the first of the statutory factors,"*Id.,* at 586, with the consideration of the purpose and character of the copying, as well as look to the fourth statutory factor in addressing the potential for market substitution. *Id.,* at 587."That approach leaves the third factor with little, if any, weight against fair use so long as the first and fourth factors favor the parodist."*Liebowitz,* 137 F.3d at 116. As this Court has already found, the first factor is in favor of the defendants in that defendants' use of the Priceless Advertisements is not commercial in nature and is a transformative parody of those advertisements.

The fourth factor looks at "the effect of the use upon the potential market for or value of the copyrighted work."*Campbell,* 510 U.S. at 588. As the *Campbell* opinion explained, if the secondary work harms the market for the original through criticism or parody, rather than by offering a market substitute for the original that supersedes it, it does not produce a harm cognizable under the Copyright Act." *Id.,* at 592.If the secondary copied use offers itself as a market substitute and in that way harms the market value of the original, this factor argues strongly against a finding of fair use. *SeeOn Davis v. The Gap, Inc.,* 246 F.2d 152, 175 (2nd Cir.2001). In this case, the Nader Ad is sufficiently transformative of MasterCard's Priceless Advertisements. The Ralph Nader Political Ad may serve a general

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                           Page 19
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.))**

overlapping market, the viewing public. However, it serves an entirely different purpose than the Priceless Advertisements, a political non-commercial purpose. For this reason, the fourth factor also weighs heavily in the defendant's favor for a finding of fair use.

There is no genuine issue of material fact after weighing the factors pertinent to a finding of fair use. The Nader Ad is a non-infringing fair use parody of MasterCard's Priceless Advertisements under Section 107 of the Copyright Act. Accordingly, defendants' motion for summary judgment dismissing Count Four of MasterCard's complaint is granted.[FN4]

> FN4. Defendants also argue that they are entitled to summary judgment on plaintiff's Count Four because the Nader Ad did not copy any "protected expression" from the Priceless Advertisements. Since this Court finds the Nader Ad to be a non-infringing fair use parody of MasterCard's Priceless Advertisements under Section 107 and grants summary judgment in favor of defendants on this basis, it is not necessary for the Court to address this argument.

5. *Deceptive Trade Practices*

**\*16** [14] In Count Nine, plaintiff claims that through defendants' use of plaintiff's marks in the Nader Ad, defendants intentionally deceived and misled the public in violation of N.Y. Gen. Bus. Law § 349. Defendants argue that plaintiff's Count Nine should be dismissed again because the Nader Ad is political, rather than commercial in nature. Defendants also contend that the requirements of the statute are not met, in that the defendants did not intend to deceive and there is no evidence of actual deception.

Section 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service." N.Y. Gen. Bus. Law § 349(a). In order to establish a claim under

Section 349, it must be shown that the defendant committed "a material deceptive act or practice directed to consumers that caused actual harm." *Boule, et al. v. Hutton, et al.*, 328 F.3d 84, 93-94 (2d Cir.2003) (citing *Marcus v. AT & T Corp.*, 138 F.3d 46, 63 (2d Cir.1998)). An act is considered deceptive within the meaning of Section 349 only if it is of such a nature to mislead a reasonable consumer. *Id.* at 94 (citing *Marcus*, 138 F.3d at 64.). Further, in order to prevail on a Section 349 claim, it must be shown that the defendant intentionally deceived consumers. *Eastern American Trio Products, Inc. v. Tang Electronic Corporation, et al.*, 97 F.Supp.2d 295, 423 (S.D.N.Y.2000); *SeealsoSamara Bros., Inc. v. Wal-Mart Stores, Inc. .,* 165 F.3d 120, 131 (2d Cir.1998), *rev'd on other grounds,* 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

In the present case, as previously discussed, defendants' use of plaintiff's marks in the Nader Ad is political, not commercial, in nature. The Ad was not being used in connection with the sale or promotion of a product or service, nor in the conduct of business, trade or commerce. There is no evidence the defendants intended to deceive, nor any evidence of actual consumer deception. Both are required showings under Section 349. Therefore, MasterCard's Count Nine is dismissed and defendants' motion for summary judgment on this count is granted.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is hereby GRANTED in its entirety.

S.D.N.Y.,2004.
MasterCard Intern. Inc. v. Nader 2000 Primary Committee, Inc.
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2003 WL 22859492 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22859492 (N.D.Ill.))**

**H**
Eazypower Corp. v. Alden Corp.
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
EAZYPOWER CORPORATION, an Illinois cor-
poration, Plaintiff,
v.
ALDEN CORPORATION, a Connecticut corpora-
tion, Defendant.
No. 03 C 3164.

Dec. 2, 2003.

Robert B. Breisblatt, Kara Eve Foster Cenar,
Joseph Eben Cwik, Philip Dale Segrest, Jr., Welsh
& Katz, Ltd., Lee F. Grossman, Eric P Martin,
Grossman & Flight, LLC, Chicago, IL, for Plaintiff.
Jeffrey Edward Schiller, Michael Daehyun Lee,
Schuyler, Roche & Zwirner, Chicago, IL, Wm
Tucker Griffith, John C Linderman, McCormick,
Paulding & Huber, LLP, Hartford, CT, for Defend-
ant.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.
*1 This case is before the Court on Alden Corpora-
tion's motion to dismiss Eazypower's complaint.
For the following reasons, the motion to dismiss is
denied.

BACKGROUND

Eazypower Corporation is a manufacturing com-
pany that sells screwdriver tips and related power
tool accessories. One of its products is a broken
screw remover set (the "Screw Remover Set"),
which is used to remove broken or worn out screws.
On or about April 4, 2000, Alden Corporation filed
a patent application with the United States Patent
and Trademark Office (the "Patent Office") for a
screwdriver bit, which is used to remove damaged

screws. Alden's patent application was published on
October 4, 2001, and the Patent Office allowed the
patent on March 19, 2003. At that time, Alden
began to send notice letters to potential infringers.
However, Alden's patent did not issue until July 22,
2003.

On or about April 4, 2003, Alden sent a letter to
Eazypower which stated that Alden had a pending
patent that had been "allowed" by the Patent Office
and that the soon-to-be-issued patent "will be in-
fringed by, or contributorily infringed by" Eazypo-
wer's Screw Remover Set. About ten days later on
April 14, 2003, Eazypower received a second letter
from Alden that reiterated the infringement allega-
tions and referenced the patent application as num-
ber 20010026737.

Eazypower responded to Alden's letter on or about
April 23, 2003, in which Eazypower denied the al-
leged infringement and asserted that the allegations
appeared to be baseless, made in bad faith and viol-
ated unfair competition law. Despite Alden's assur-
ances that it would not contact any of Eazypower's
customers, Ace Hardware, one of Eazypower's cus-
tomers, did in fact receive a similar cease and desist
letter from Alden. As a result, Eazypower corres-
ponded with Alden again on or about April 30,
2003 and demanded that Alden cease writing letters
to Eazypower's customers, alleging that Eazypo-
wer's Screw Remover Set infringes or contributor-
ily infringes Alden's not-yet-issued patent. At that
time, Eazypower also requested information from
Alden about the patent claims and how Eazypo-
wer's Screw Remover Set allegedly infringed the
patent. Alden responded that it needed Eazypower's
production drawings in order to determine how the
Screw Remover Set infringed Alden's anticipated
patent.

On May 12, 2003, Eazypower filed a five-count
complaint against Alden, including allegations of
unfair competition and patent-related violations,
resulting from Alden's infringement notice letters

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and soon-to-be issued patent. Specifically, the complaint contained the following claims: (1) Count I alleges a violation of section 43(a) of the Lanham Act for alleged false and/or misleading statements made to prospective customers of Eazypower; (2) Count II alleges a violation of Illinois' Uniform Deceptive Trade Practices Act; (3) Count III asserts a claim for tortious interference with prospective business relationships; (4) Count V alleges unclean hands; and (5) Count VI sought a declaratory judgment that Alden's soon-to-be-issued patent is invalid and/or not infringed by Eazypower's product. Noticeably, Eazypower did not include a Count IV in its original complaint.

*2 Alden then filed a motion to dismiss the complaint pursuant to Federal Rule 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim. Alden argues that Counts I, II, III, and V should be dismissed because its actions are immunized under the *Noerr-Pennington* doctrine. Alden also asserts that Count VI for non-infringement should be dismissed because its patent, at that time, had not issued and no actual justiciable controversy exists, and that Eazypower is simply seeking an advisory opinion.

On July 22, 2003, the day that the patent issued, Alden filed a patent infringement suit in the United States District Court for the District of Connecticut. That same day, Eazypower filed an amended complaint to include Count IV seeking declaratory judgment of non-infringement of Alden's now issued patent and amended Count IV seeking declaratory judgment of no provisional remedy. The other claims alleged in Eazypower's first complaint remain the same in the amended complaint.

Notwithstanding the filing of the amended complaint, the parties continued to brief the motion to dismiss that was filed before Eazypower amended its complaint. Although, Eazypower filed an amended complaint without leave from the Court, this Court would have granted leave. Therefore, the original complaint is moot, and we are considering this motion as a the motion to dismiss to the amended complaint.

## DISCUSSION

In ruling on a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Szumny v. Am. Gen. Fin., Inc. .,* 246 F.3d 1065, 1067 (7th Cir.2001). The purpose of a motion to dismiss is not to decide the merits of the challenged claims but to test the sufficiency of the complaint.*Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524 n. 1 (7th Cir.1996). A court will grant a motion to dismiss only if it is impossible for the plaintiff to prevail under any set of facts that could be proven consistent with the allegations. *Forseth v. Village of Sussex,* 199 F.3d 363, 368 (7th Cir.2000).

### I. Counts I, II, III and V of Eazypower's Amended Complaint State Claims for Relief

Alden contends that Counts I, II, III and V of Eazypower's amended complaint should be dismissed pursuant to Federal Rule 12(b)(6) for failure to state a claim on which relief could be granted. Counts I, II, III and V allege violations of the Lanham Act and Illinois Deceptive Trade Practices Act, tortious interference with prospective trade practices and unclean hands. These allegations are based on Alden's correspondence with Eazypower and its customers relating to the issuance of Alden's patent and allegations that Eazypower's Screw Remover Set would infringe the anticipated patent. Alden argues that the *Noerr-Pennington* doctrine immunizes its conduct from suit.

The *Noerr-Pennington* doctrine is based on Sherman Act considerations as well as the First Amendment right to petition the government. *Tarpley v. Keistler,* 188 F.3d 788, 794 (7th Cir.1999) ("[P]arties may petition the government for official action favorable to their interests without fear of suit, even if the result of the petition, if granted might harm the interests of others."). Originally, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

doctrine was limited to antitrust actions, but has been extended to protect acts reasonably related to the petitioning process, including the sending of cease and desist letters to alleged infringers. *See e.g., Versatile Plastics v. Sknowbest, Inc.,* 247 F.Supp.2d 1098, 1103 (E.D.Wis.2003); *Thermos Co. v. Igloo Products Corp.,* 1995 WL 842002, at *4-5 (N.D.Ill. Sept.27, 1995).

**\*3** In *Versatile Plastics,* the plaintiffs filed an action seeking a declaratory judgment of non-infringement and also asserted claims of tortious interference, trade libel, antitrust and conspiracy resulting from infringement notice letters sent on behalf of the defendants. 247 F.Supp.2d at 1099. The court discussed the *Noerr-Pennington* doctrine and its transition from the antitrust arena into protecting acts "reasonably related to the petitioning litigation process," specifically the sending of cease and desist letters to alleged patent infringers. *Id.* at 1103-04. The court recognized that patent laws explicitly sanction and require notice letters to be sent to potential infringers in certain situations in order for the patent owner to recover damages. *Id.* at 1104. More importantly, the court acknowledged that the Federal Circuit, which has exclusive jurisdiction over patent appeals, has held that a patent owner "has the right to ... enforce its patent, and that includes threatening alleged infringers with suit." *Id.* at 1105 (quoting *Zenith Electronics Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1353 (Fed.Cir.1999)). Ultimately, the court concluded that a patent holder who sends a cease and desist letter to persons believed to be infringing is entitled to some protection from liability for damages. *Id.* at 1105.

We agree. However, the protection afforded to patent owners under the *Noerr-Pennington* doctrine is not unlimited. In *Zenith Electronics Corp. v. Exzec, Inc.,* the Federal Circuit held that a patentee was not shielded from liability for unfair competition under the Lanham Act for statements made in the marketplace about potential infringement if such statements were made in bad faith. 182 F.3d 1340,

1353 (Fed.Cir.1999). Thus, *Noerr-Pennington* immunity may not extend to Alden's infringement notice letters if its correspondence with Eazypower and/or its customers was conducted in bad faith or without a reasonable belief that Eazypower's Screw Remover Set, in fact, would infringe Alden's patent.

Specifically, Eazypower has alleged that Alden's allegations of infringement were made in bad faith and without any knowledge that Eazypower's Screw Remover Set did, in fact, infringe Alden's soon-to-be-issued patent. Eazypower also argues that, although Alden stated that it would not contact any of Eazypower's customers, Alden, in fact, did correspond with some of Eazypower's customers about potential infringement. Eazypower also claims that Alden did not comply with the actual notice provisions of the relevant patent laws.

Even though Alden ultimately may be protected by the *Noerr-Pennington* doctrine, we believe that Eazypower has alleged sufficient facts of bad faith to withstand a motion to dismiss. Thus, the motion to dismiss Counts I, II, III and V is denied.

II. The Filing of the Amended Complaint Cures Count IV's Jurisdictional Defect

In Count IV of the amended complaint, Eazypower seeks a declaratory judgment of infringement and/or invalidity with respect to Alden's patent, which had not been issued at the time Eazypower filed its original complaint. Alden argues this Court lacks subject matter jurisdiction to consider this claim as there is no actual justiciable controversy as required by the Declaratory Judgment Act.

**\*4** Eazypower contends that the jurisdictional defect was cured by the filing of its amended complaint after Alden's patent issued. However, Alden argues that Eazypower did not seek leave from this Court to supplement its pleading as required by Federal Rule 15(d). Regardless, this Court would have granted leave to amend. Thus, the filing of the amended complaint did cure the jurisdictional de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fect relating to Count IV, and Alden's motion to dismiss Count IV of the amended complaint is denied. Finally, the motion to dismiss does not address Count VI, which seeks a declaration of no provisional remedy under 35 U.S.C. 154(d). For this reason, Count VI withstands this motion to dismiss.

## CONCLUSION

For the foregoing reasons, Alden's motion to dismiss is denied.

N.D.Ill.,2003.
Eazypower Corp. v. Alden Corp.
Not Reported in F.Supp.2d, 2003 WL 22859492 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 5

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

**H**

Rosenthal Collins Group, LLC v. Trading Techno-
logies Intern., Inc.
N.D.Ill.,2005.

United States District Court,N.D. Illinois, Eastern
Division.
ROSENTHAL COLLINS GROUP, LLC, an Illinois
Limited Liability Co., Plaintiff,
v.
TRADING TECHNOLOGIES INTERNATIONAL,
INC., a Delaware corporation, Defendant.
**No. 05 C 4088.**

Dec. 26, 2005.

Stephen Lesavich, Lesavich High-Tech Law Group,
P.C., Jeffrey A. Schulman, Wolin and Rosen,
Chicago, IL, Anthony E. Dowell, Dowell Baker,
Lafayette, IN, Geoffrey Andrew Baker, Dowell
Baker, Oak Park, IL, for Plaintiff.
Michael M. Conway, Foley & Lardner, Dennis
David Crouch, George I. Lee, Jennifer M. Kurcz,
Leif R. Sigmond, Jr., Matthew J. Sampson, Paul H.
Berghoff, Stephen Richard Carden, McDonnell,
Boehnen, Hulbert & Berghoff, Ltd., Chicago, IL,
Steven F. Borsand, Trading Technologies Interna-
tional, Inc., Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

MORAN, Senior J.
**\*1** Plaintiff Rosenthal Collins Group, LLC (RCG),
brought an action against Trading Technologies In-
ternational, Inc. (TT), requesting a declaratory
judgment of patent invalidity, and non-infringement
and patent misuse by defendant. In the same action
plaintiff alleged attempt to monopolize and illegal
contract, combination or conspiracy in restraint of
trade in violation of the Sherman Act, 15 U.S.C. §§
1, 2, unfair competition in violation of the Lanham
Act, 15 U.S.C. § 1125, and deceptive business prac-
tices and unfair competition in violation of state
laws and common law. Defendant moves to dismiss

all claims (except for the declaratory judgment ac-
tion for non-infringement) for failure to state a
claim upon which relief can be granted. For the
reasons set forth below, we grant in part and deny
in part defendant's motion to dismiss.

*BACKGROUND*

In reviewing a motion to dismiss under FED. R.
CIV. P. 12(b)(6), we must accept the complaint's
well-pleaded factual allegations as true, including
the inferences reasonably drawn from them. *Gibson
v. City of Chicago*, 910 F.2d 1510, 1520 (7th
Cir.1990). Under Rule12(b)(6) analysis, we will not
look beyond the four corners of the complaint in
determining whether plaintiff has stated a claim.
*Palda v. General Dynamics Corp.*, 47 F.3d 872,
875 (7th Cir.1995). Documents attached to a de-
fendant's pleadings cannot be considered without
converting the motion to dismiss into a motion for
summary judgment, except for documents referred
to in plaintiff's complaint and central to his
claim.*Wright v. Associated Ins. Companies Inc.*, 29
F.3d 1244, 1248 (7th Cir.1994). Therefore, we take
the following facts from the plaintiff's complaint
and accompanying exhibits.

Defendant currently holds two U.S. patents, nos.
6,766,304 ('304) and 6,772,132 ('132), both of
which relate to computer software used for elec-
tronic trading in the futures market. Plaintiff alleges
that "[s]ince obtaining these patents, TT has em-
barked on an anticompetitive campaign to mono-
polize the electronic futures trading market and
control order flow and market internalization of
these markets" (cplt., ¶ 9). Plaintiff brings this suit
as its response to defendant's actions and proposed
actions regarding these patents.

Plaintiff claims that defendant currently controls 50
to 70 per cent of the electronic volume share in the
largest four futures trading exchanges. Through ag-
gressive and allegedly illegal techniques of enfor-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

cing its current patents and the filing of more than eighty additional patent applications to interface with the current technology, plaintiff alleges that defendant "intends to control 100% of the market order flow" (cplt., ¶ 17). Plaintiff has identified several specific instances, which taken together, allegedly show illegal conduct in defendant's use of its patents.

First, in a press release entitled, "TT's Open Letter to the Futures Industry" (open letter) defendant proposed a royalty payment system for the use of defendant's patented technology in electronic futures trading. In exchange for unlimited access to defendant's technology for any participating trading exchange and defendant's forfeiture of its right to bring patent infringement suits, defendant proposed a 2.5 cents per side charge for every future and future option transaction that occurs in the participating exchange permanently (cplt., ex.1, p.) (2.5 cent proposal). Plaintiff asserts that this proposal is evidence of an intent to monopolize, in violation of the Sherman Act, § 2 (cplt., ¶ 11) ("TT's demand of a 2.5-cent royalty for every electronic trade would have increased the costs of futures trading for all exchange members. The flat rate royalty for all trades would also preclude competition and discourage innovation because exchange members would be paying a fee regardless of whether they used TT's patented software, thus discouraging the use of alternative software which would require an additional fee"). Additionally, in the same press release defendant stated, "By making a premier order-entry system commercially available, TT has truly leveled the playing field among market participants through our innovative technology" (cplt., ex.1, p. 1). Plaintiff contends that this statement, viewed in light of the allegation that defendant has not introduced its technology or proposal to level the playing field, but rather to slant the playing field to its advantage, violates the false advertising section of the Lanham Act.

**\*2** Second, plaintiff points to the various patent infringement lawsuits defendant has brought to pro-

tect its patented technology. Plaintiff claims that although the targeted futures exchanges rejected defendant's 2.5 cent proposal, "TT sought another avenue to pressure the major exchanges to pay the flat rate fee on every trade and prevent customers from having a choice regarding electronic futures trading software," namely, patent infringement suits, threatened suits, and unfair settlement proposals (cplt., ¶¶ 12-14). According to plaintiff's complaint, defendant is also leveraging its existing license agreements to pressure firms into supporting the 2.5 cent proposal (cplt., ¶¶ 20-18). Plaintiff states that, upon approaching plaintiff claiming that plaintiff was infringing defendant's patented software, defendant proposed an unfair settlement agreement and threatened suit (cplt., ¶¶ 29-42). Thus, plaintiff brings its declaratory judgment action for noninfringement and patent misuse.

Finally, plaintiff claims that defendant entered into an illegal contract with Patsystems, a business partner of plaintiff's who provides essential services to plaintiff, requiring Patsystems to "terminate any customers that TT claims is using software that infringes TT patents" (cplt., ¶¶ 68-69). Plaintiff alleges, relying on "information and belief," that defendant intends to direct Patsystems to terminate customers, including plaintiff, regardless of whether that party uses infringing software. Plaintiff further alleges that "[o]n information and belief, TT intends to and will attempt to coerce customers of Patsystems such as RCG into accepting unfavorable settlement terms out of the fear of being terminated by Patsystems" (cplt., ¶ 71). Therefore, plaintiff asserts that defendant's contract with Patsystems is illegal and in restraint of trade, in violation of the Sherman Act, § 1.

## DISCUSSION

As noted above, under Rule 12(b)(6) we must accept the complaint's well-pleaded factual allegations as true, including the inferences reasonably drawn from them. Because FED. R. CIV. P. 8(a)(2) requires only that a complaint must contain a "short

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))

and plain statement of the claim showing that the pleader is entitled to relief," the complaint should be dismissed only if the plaintiff "failed to allege any set of facts upon which relief may be granted."*Gibson,* 910 F.2d at 1521. *See also Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Plaintiff expends a significant amount of energy and time arguing that federal notice pleading requires only that plaintiff set forth facts to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests" (plf's response at 3) (*citing Conley,* 355 U.S. at 47). Throughout its response to defendant's motion to dismiss, plaintiff reasserts the notice pleading standard and suggests that its complaint sufficiently put defendant on notice of its claims (plf's response at 5, 13, 16). We recognize that the notice pleading requirements set forth in the Federal Rules of Civil Procedure are quite liberal, and we do not require specific fact pleading in the federal district court. Neither complex antitrust nor patent claims are an exception to this rule. *Hammes v. AAMCO Transmissions, Inc.,* 33 F.3d 774, 782 (7th Cir.1994).*See also Leatherman v. Tarrant County,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (holding that the Federal Rules of Civil Procedure do not require heightened pleading requirements for § 1983 claims, or any other claims, with the exception of those set forth in FED. R. CIV. P. 9(b)).[FN1] Plaintiff's claim cannot proceed, however, unless it contains allegations upon which a legal theory can succeed. *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984) ("In practice, 'a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under *some* viable legal theory' ") (*citing Sutliff, Inc. v. Donovan Cos.,* 727 F.2d 648, 654 (7th Cir.1984)). The *Car Carriers* court went on to note, "[t]he pleader may not evade these requirements by merely alleging a bare legal conclusion; if the facts 'do not at least outline or adumbrate' a violation of the Sherman Act, the plaintiffs 'will get nowhere merely by dressing

them up in the language of antitrust.'"*Id.*

> FN1. Plaintiff's federal claims do not fall within the ambit of the heightened pleading requirements contained in Rule 9(b). Plaintiff's state law fraud claims, however, do fall within Rule 9(b), and must be pled with particularity.

*Antitrust Claims*

*3 In Count III, plaintiff alleges that defendant has violated the Sherman Act, § 2, which makes it a penalty to monopolize, or attempt to monopolize, any part of interstate trade or commerce. Relying chiefly on defendant's open letter, but also on defendant's aggressive patent infringement litigation and actions around settlement and licensing, plaintiff alleges that defendant's various actions and proposals comprise an attempted monopolization in violation of the Sherman Act. First, plaintiff alleges, "TT has attempted and is attempting to restrain competition in the relevant market by requiring the major futures exchanges to pay 2.5 cents per trade on all trades, regardless of whether the trades are or could be covered by a TT patent" (cplt., ¶ 62). Plaintiff also states, "TT has attempted and is attempting to restrain competition in the relevant market by requiring that RCG pay, as a condition of settlement, fees on products that are not covered by a TT patent" (cplt., ¶ 63). In response, defendant contends that Count III must be dismissed because, as plaintiff has not suffered nor is significantly threatened by an antitrust injury, plaintiff lacks standing to bring an antitrust action. Alternatively, defendant argues that plaintiff's claims must fail because it has failed to allege the basic elements of a Sherman Act, § 2 claim.

In Count IV, plaintiff contends that defendant has also violated the Sherman Act, § 1, which prohibits a contract, combination, or conspiracy in restraint of trade. Specifically, plaintiff alleges that defendant entered into an agreement with Patsystems, an essential partner of plaintiff's, requiring Patsystems to terminate any customers defendant claims is us-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 4
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))

ing software infringing upon defendant's patents. Plaintiff suggests that defendant will direct Patsystems to terminate its contract with plaintiff, regardless of whether plaintiff is actually infringing upon defendant's patents, and will use such an agreement to pressure plaintiff into accepting unfavorable settlement terms or supporting the 2.5 cent proposal. As in its response to allegations of § 2 violations, defendant contends that Count IV must be dismissed because plaintiff has failed to plead any antitrust injury or threat of future injury. Specifically, defendant argues, "RCG's mere assertion of its 'belief' that TT 'intends' to get a third party to terminate RCG at some unspecified point is far too attenuated for standing" (def's mem., pp. 12-13). As in its response to Count III, defendant argues, alternatively, that plaintiff has failed to adequately plead the essential elements of a Sherman Act, § 1 claim.

In order to bring a civil suit for violation of antitrust laws, plaintiff must first satisfy the standing requirements of the Clayton Act. *Indiana Grocery, Inc. v. Super Valu Stores, Inc.,* 864 F.2d 1409, 1419 (7th Cir.1989) (stating that "the mere presence of a substantive Sherman Act ... violation ... does not by itself bestow on any plaintiff a private right of action for damages. That is the gift of section 4 of the Clayton Act, which 'defines the class of persons who may maintain private damage actions under the antitrust laws' "). Section 4 of the Clayton Act, 15 U.S.C.A. § 15, provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained."Alternatively, section 16 of the Clayton Act, 15 U.S.C.A. § 26, provides injunctive relief "against threatened loss or damage by a violation of the antitrust laws...." Therefore, in order to recover damages for an antitrust violation, in addition to showing that plaintiff violated an antitrust law, plaintiff must plead and prove (1) that he is a person within the meaning of the Clayton Act; (2) that he suffered an injury to his business or property by those conditions within the market af-

fected by defendant's conduct; and (3) that the injury is of the type the antitrust laws were meant to recompense. *Brunswick Corp. v. Pueblo Bowl-O-Mat. Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Warner Mgmt. Consultants, Inc. v. Data Gen. Corp.,* 545 F.Supp. 956, 962-963 (N.D.Ill.1982). For injunctive relief, instead of pleading and proving an injury to business or property, plaintiff must only plead and prove a significant threat of injury. *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 122, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Lake Hill Motors, Inc. v. Jim Bennett Yacht Sales, Inc.,* 246 F.3d 752, 755 (5th Cir.2001). The injury, however, must also be of the kind the antitrust laws were designed to guard against. *Cargill, Inc.,* 479 U.S. at 122. Defendant argues that because plaintiff does not satisfy the injury or threat of injury requirement necessary for achieving standing under the Clayton Act, plaintiff's Sherman Act claims cannot proceed.

*Attempt to Monopolize*

*4 With regard to its Sherman Act, § 2 claim, plaintiff alleges that it has suffered and will continue to suffer damages if defendant's attempted monopolization is not curbed, specifically pointing to the proposed 2.5 cent royalty on futures trading and unfair proposed settlement conditions (cplt., ¶¶ 60-66). Defendant argues that plaintiff has sufficiently pled neither (1) an actual or significant threat of injury, nor (2) the requisite kind of antitrust injury, and therefore, its Sherman Act, § 2 claim must be dismissed.

We begin by inquiring as to whether plaintiff has alleged an injury in its business or property. *Warner Mgmt. Consultants, Inc.,* 545 F.Supp. at 961, n4. First, we ask whether plaintiff has pled an actual injury sufficient to satisfy the requirement of Clayton Act, § 4. Plaintiff's alleged injuries stem from two proposals that have not been effectuated-the 2.5 cent proposal and the proposed settlement. Therefore, we agree with defendant that plaintiff has not pled an actual injury and thus cannot main-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))

tain a claim for damages for violation of the Sherman Act, § 2.

Next, we ask whether plaintiff has alleged a significant threat of injury to maintain an action for injunctive relief under the Clayton Act, § 16. Regarding the attempt-to-monopolize claim, the threat of injury will come to fruition if (1) the futures trading exchanges accept defendant's 2.5 cent proposal, or (2) plaintiff is coerced into accepting the terms of an unfair settlement. Plaintiff argues that "[i]t is precisely because competitors should not be forced to wait until they are forced out of the market illegally that Congress enacted § 16 of the Clayton Act" for injunctive relief (plf's response at 11). The language of the statute, however, nevertheless requires "threatened loss or damage," and has been interpreted to require plaintiff to "demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur."*Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 130, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969).*See also*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.,* 585 F.2d 821, 844 (7th Cir.1978); *South Austin Coalition Cmty. Council v. SBC Communications Inc.,* 2001 WL 1250101, *13 (N.D.Ill.2001). Defendant argues, and we agree, that plaintiff's threatened injuries are speculative and remote, and thus do not sufficiently allege a significant threat from an impending violation.

Regarding the 2.5 cent proposal, the major futures exchanges have rejected defendant's proposal (cplt., ¶ 12) and plaintiff does not allege that they are considering changing their minds in the future. Plaintiff contends that this court "sum[med] up the essence of RCG's injury," in its statement, "if a trader has to pay an override regardless, he has every incentive to use plaintiff's software rather than pay plaintiff and also someone else to use that person's software."*Trading Tech. v. eSpeed,* 2005 WL 2139404 (N.D.Ill.2005). Plaintiff takes such dicta out of context. That order denied a motion to reassign defendant's many cases to this court and simply made a

passing comment on REFCO's (a defendant in one of defendant's many patent infringement suits) counterclaims involving the 2.5 cent proposal. The court did not make a determination on whether REFCO, or the current plaintiff, suffered the significant threat of injury necessary to proceed with an antitrust claim. Although plaintiff is correct that "competitors may be able to prove antitrust injury before they actually are driven out of the market and competition is thereby lessened" (plf's response at 11) (*citing*Blue Shield of Va. v. McCready,* 465 U.S. 477, 482 (1982)), that statement does not suggest that courts should entertain antitrust actions where injury has neither occurred nor has a probable likelihood of occurring in the future. Acceptance or probable acceptance of the 2.5 cent proposal must occur before plaintiff has standing to pursue an antitrust violation based on the proposal. Therefore, defendant's 2.5 cent proposal cannot be the basis either for damages under the Clayton Act, § 4, or for injunctive relief under the Clayton Act, § 16.

*5 Similarly, the proposed settlement agreement cannot be the basis of plaintiff's antitrust allegation, as the plaintiff has not alleged that it has accepted the terms of the settlement, intends to accept the terms of the settlement, or currently is in a position that leaves it no choice but to accept the settlement or suffer serious financial harm. Plaintiff does claim that "[o]n information and belief, based on TT's public statements and course of conduct with REFCO, TT intends to terminate and will terminate RCG's Software License Agreement if RCG does not capitulate to TT's settlement terms" (cplt., ¶ 40). While defendant does not suggest that it intends to terminate its licenses with plaintiff, it does argue that harm to plaintiff from termination would not be an antitrust injury. Defendant is correct that, generally, licenses and contracts are not subject to antitrust liability because we recognize a private party's ability to determine with whom it will deal. As a matter of law, " '[i]n the absence of any purpose to create or maintain a monopoly, the [Sherman] act does not restrict the long recognized right of a trader or manufacturer engaged in an en-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 6
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

tirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.' *"Intergraph Corp. v. Intel Corp.,* 195 F.3d 1346, 1358 (Fed.Cir.1999). Plaintiff has, however, pled that defendant's purpose is to create a monopoly. Although plaintiff's claim does not fail due to a right to license, it does fail because plaintiff does not sufficiently plead that such a harm is imminent or likely in the foreseeable future, as plaintiff has not pled that defendant threatened, or even proposed, such an action. *Lake Hill Motors,* 246 F.3d 752 (affirming dismissal of plaintiff's antitrust claims where a threat of injury made two years prior was never acted upon because such remote and speculative injury "can not be said to be a genuine threat sufficient to justify injunctive relief under § 16"). Plaintiff has not sufficiently alleged either an actual injury or a significant threat of an impending violation, and therefore cannot sustain a Sherman Act, § 2 claim.

### Illegal Contract, Combination or Conspiracy in Restraint of Trade

With regard to its Sherman Act, § 1 claim, plaintiff alleges that as a condition of its contract with Patsystems, defendant will direct Patsystems to terminate its relationship with "customers such as RCG" and "will attempt to coerce customers of Patsystems such as RCG into accepting unfavorable settlement terms out of the fear of being terminated by Patsystems."(*Id.* at 68-72). Such an allegation fails for the same reason plaintiff's Sherman Act, § 2 claim failed-plaintiff's complaint lacks an allegation of actual injury necessary for standing under the Clayton Act, § 4, or a significant threat of injury necessary for standing under the Clayton Act, § 16.

The injury alleged is a prospective injury that will come to fruition only if Patsystems terminates its relationship with plaintiff. There is no actual injury and therefore there is no successful claim for damages. Additionally, while plaintiff's allegations, liberally construed, state a potential injury, we do not read the allegations to state an impending violation.

Plaintiff makes no allegation that Patsystems has terminated its contract with plaintiff, that Patsystems threatened to terminate the contract, or even that Patsystems intends to terminate the contract. It is unclear whether or when defendant's agreement with Patsystems will actually affect or injure plaintiff. Therefore, we hold that plaintiff's claim for injunctive relief cannot continue where the threat of injury is merely speculative. *SeeUnited States v. W.T. Grant,* 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953) (injunction can issue without a showing of past wrongs, but the moving party must satisfy the court that relief is needed by showing that some cognizable danger of a violation exists).*See alsoMahaffey v. Detroit Newspaper Agency,* 1998 WL 739902, *3 (6th Cir.1998) (Clayton Act, § 16 claim cannot proceed because a threat of antitrust injury "is not satisfied by suggesting that the defendants might injure the plaintiffs at some indefinite time in the future ...."). Unless and until defendant requires Patsystems to terminate its relationship with plaintiff, or Patsystems makes a move to do so, we do not think there is a significant threat of antitrust injury as required under *Zenith Radio.*Thus, we find that plaintiff does not have standing under either Clayton Act, § 4 or § 16, to proceed with its Sherman Act, § 1 claim.

**\*6** Because we find that plaintiff lacks standing to progress with its Sherman Act claims at this stage, we will not address the merits of the claims under the Sherman Act.

### Patent Misuse

In Count II, plaintiff seeks a declaratory judgment of patent misuse on the part of defendant. Specifically, plaintiff asserts that defendant has impermissibly broadened the physical scope of its patent grant with anticompetitive effect by (1) demanding that plaintiff make fee payments on products defendant knows are not covered by patents, and (2) demanding that futures exchanges pay royalties to defendant on trades not covered by defendant's patents, after the patents' expirations, and on activities and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 7
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))

conduct not covered by defendant's patents. The first allegation of misuse stems from defendant's licensing and settlement proposals to plaintiff. The second allegation of misuse stems from defendant's 2.5 cent proposal to the futures exchanges that would require royalty fees on all trades into perpetuity.

At the outset, we note that patent misuse is generally an affirmative defense which "requires that the alleged infringer show that the patentee has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect."*Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1001 (Fed.Cir.1986). The doctrine of patent misuse originates from the equitable doctrine of unclean hands (*B.Braun Medical, Inc. v. Abbott Lab.,* 124 F.3d 1419, 1427 (Fed.Cir.1997)), and "arose to restrain practices that [do] not in themselves violate any law, but that [draw] anticompetitive strength from the patent right, and thus [are] deemed to be contrary to public policy."*Mallinckrodt, Inc. v. Medipart, Inc.,* 976 F.2d 700, 704 (Fed.Cir.1992).

Defendant asserts that "the patent misuse counterclaim should be dismissed to the extent it is seeking an affirmative claim for relief" (def's mem. at 19). Defendant is correct to the extent that the patent-misuse doctrine cannot be asserted for monetary relief. *SeeB. Braun,* 124 F.3d at 1427 (holding that a successful patent misuse argument will result in "rendering the patent unenforceable until the misuse is purged ... [but will not] result in an award of damages to the accused infringer"). Although other courts have read *B. Braun* to require dismissal of a patent misuse counterclaim (*seePSN Illinois, Inc. v. Ivoclar Vivadent, Inc.,* 2005 WL 2347209, *3 (N.D.Ill.2005); *Bernhardt L.L.C. v. Collezione Europa USA, Inc.,* 2002 WL 1602447, *2 (M.D.N.C.2002)), we read *B. Braun* to allow a patent misuse declaratory judgment claim, but allow it solely to enjoin defendant from asserting a patent infringement claim against plaintiff. *SeeInamed Corp.,* 275 F.Supp.2d at 1124 (allowing plaintiff to raise patent misuse defense by way of an action for

declaratory relief). We also note, however, that any injunction issued must limit its effect to rendering the patent unenforceable only until the misuse is purged. *SeeB. Braun,* 124 F.3d at 1427.

*7 As in this case, patent misuse allegations often arise alongside allegations of antitrust violations. Although a finding of an antitrust violation requires a finding of patent misuse, the same is not true in the reverse. Patent misuse is considered a broader wrong than antitrust violation and a patent misuse claim is easier to prove than an antitrust violation. *SeeInamed Corp. v. Kuzmak,* 275 F.Supp.2d 1100, 1125 (C.D.Cal.2002); *Motorola, Inc. v. Kimball Intern., Inc.,* 601 F.Supp. 62, 65 (N.D.Ill.1984); 6 Donald S. Chisum, CHISUM ON PATENTS, § 19.04 (2001). This is because the party asserting patent misuse need not prove anticompetitive effects or individual harm. *Transitron Elec. Corp. v. Hughes Aircraft Co.,* 487 F.Supp. 885, 892 (DMUS.1980).

In order to show patent misuse, plaintiff must plead and prove that defendant impermissibly broadened the "physical or temporal scope" of the patent grant with anticompetitive effect. If defendant's restrictions do not exceed the scope of its patents, then there can be no patent misuse. *SeeB. Braun,* 124 F.3d at 1426. If, however, defendant's restrictions do exceed the scope of the patent, a court can find patent misuse either where (1) the Supreme Court has deemed the action per se anticompetitive; or (2) a factual determination reveals that the "overall effect of the license tends to restrain competition unlawfully in an appropriately defined relevant market."*Windsurfing Int'l,* 782 F.2d at 1001-02.

Unlike the earlier antitrust analysis, plaintiff need not plead specific injury due to defendant's misuse of its patents. The Supreme Court explained: "It is a principle of general application that courts ... may appropriately withhold their aid where the [patentee] is using the right asserted contrary to the public interest....'It is the adverse effect upon the public interest of a successful infringement suit in conjunction with the patentee's course of conduct

Not Reported in F.Supp.2d                                                                                  Page 8
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

which disqualifies him to maintain the suit, regardless of whether the particular defendant has suffered from the misuse of the patent.'"*Morton Salt Co. v. GS Sappier Co.,* 315 U.S. 488, 493-94 (1942). Therefore, "[patent misuse may be shown from the totality of a licensor's conduct and business practices."*Transitron Elec. Corp.,* 487 F.Supp. at 892.

In this case, plaintiff has adequately pled patent misuse. In *Brailed v. This Company,* 379 U.S. 29, 32, 85 S.Ct. 176, 13 L.Ed.2d 99 (1965), the Supreme Court held that "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se."[FN2] *See also U.S. Philips Corp. v. Int'l Trade Com'n,* 424 F.3d 1179, 1184 (Fed.Cir.2005) ("the doctrine of patent misuse bars a patentee from using the 'patent's leverage' to 'extend the monopoly of his patent to derive a benefit not attributable to the use of the patent's teachings,' such as requiring a licensee to pay a royalty on products that do not use the teaching of the patent"). This is arguably what defendant proposed to the futures exchanges. And because plaintiff does not have to plead injury from that proposal, the patent misuse claim cannot be dismissed on the same grounds on which we dismiss the antitrust claims. Even if the 2.5 cent proposal is not considered per se anticompetitive, we find that the plaintiff has sufficiently alleged actions by defendant that could be deemed anticompetitive under the rule of reason balancing test employed where the conduct is not per se anticompetitive.

> FN2. The Seventh Circuit, in *Scheiber v. Dolby Lab., Inc.,* 293 F.3d 1014 (7th Cir.2002), questioned the wisdom of the holding in *Brulotte* that any contract extending royalties beyond the temporal limit of the patent was per se misuse. The court also noted, however, that *Brulotte* is still good law, and maintains its precedential import.

*8 Additionally, plaintiff alleges that defendant has committed patent misuse by proposing a settlement agreement that would force plaintiff to make fee payments on products not covered by defendant's patent. Defendant argues that patent misuse cannot stand where patentee simply seeks to enforce his patent rights against infringement or contributory infringement (def's mem. at 19). Although defendant is correct that "[a] patentee that has a good faith belief that its patents are being infringed violates no protected right when it so notifies infringer"(*Mallinckdrodt,* 967 F.2d at 709), plaintiff alleges that defendant was aware that its demands on plaintiff and futures exchanges are for payments on actions not covered by its patents (cplt., ¶¶ 50-51). Because we view all facts and draw reasonable inferences in favor of the plaintiff in a motion for dismissal on the pleadings, we find that plaintiff sufficiently alleged bad faith on the part of defendant.

We note, however, that plaintiff's claim that the proposed settlement agreement is "unfair" is meaningless if the agreement solely protects actually patented technology. Patent misuse will arise only if the proposed settlement agreement requires royalties, fees or protection beyond the physical or temporal scope of defendant's patented technology. Because it is unclear from the draft settlement agreement whether defendant is attempting to broaden the scope of its patent, we will not venture any opinion as to the alleged overreaching at this stage in the litigation. Because we leave it for another day, we deny's defendant's motion to dismiss the patent misuse claim.

*Lanham Act Claim*

In Count V, plaintiff alleges that defendant violated the Lanham Act, § 42(a)(1)(B),[FN3] which states:

> FN3. In its complaint, plaintiff incorrectly stated an alleged violation of § 43(a)(1)(A). Defendant recognized the mistake and responded to allegations as if they arose under § 43(a)(1)(B). Therefore, we will treat the complaint as alleging vi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 9
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

olation of § 43(a)(1)(B).

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (B) in commercial advertising or promotion, misrepresents the nature characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125. Specifically, plaintiff asserts that defendant's claim that "TT has truly leveled the playing field among market participants through" its "innovative technology" contained in its open letter violates the Lanham Act (cplt., ¶ 80). Plaintiff contends that because defendant controls a large part of the order-flow of the market and information embedded in that order-flow, defendant has "unfairly taken advantage of market information to the disadvantage of public market participants, including RCG" (cplt., ¶ 76). Plaintiff states that due to the control of order-flow, market information, and current and future patented technology, defendant will be able to create a "super exchange," thereby eliminating the need for other electronic exchanges, which is ultimately not in the best interest of the public (cplt., ¶¶ 78-80). Thus, plaintiff asks this court to enjoin defendant's unfair business practices under the auspices of the Lanham Act.

**\*9** In order to maintain a successful claim under the Lanham Act, a plaintiff must show that defendant (1) made a false factual statement in a commercial advertisement about its own or another's product; (2) the statement actually deceived or is likely to deceive a substantial segment of its audience; (3) the deception is material to a purchasing decision; (4) the statement is about goods entering interstate commerce; and (5) the plaintiff has been injured or injury is probable as a result of the false statement,

either by direct diversion of sales from itself to defendant or by a loss of good will associated with its products. *Hot Wax, Inc. v. Turtle Wax, Inc.,* 191 F.3d 813, 819 (7th Cir.1999) (*citing B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.,* 168 F.3d 967, 971 (7th Cir.1999)). As plaintiff only makes a claim for injunctive relief, we do not require plaintiff to allege the additional actual injury and causation elements necessary to make out a claim for monetary damages. *Id.,* at 819-20. Defendant asserts that plaintiff's claim for relief under the Lanham Act should be dismissed because (1) it does not adequately plead a false statement of fact, (2) plaintiff has not been and is not likely to be injured by defendant's statement, and (3) defendant's press release is not a commercial advertisement or promotion.

The false statement element of a Lanham Act claim includes either (1) commercial claims that are literally false, or (2) literally true or ambiguous claims that convey a false impression or are misleading and likely to deceive consumers. *Id.,* at 820. Plaintiff argues that "[a]t this stage in the litigation, RCG need only show that under some set of circumstances, TT's comments can be seen as false" (plf's response at 14). Although this is true, plaintiff also needs to show that under some set of circumstances, defendant's comments can be construed as factual. We do not believe that plaintiff has made any such allegation.

It is somewhat unclear what plaintiff suggests is the false statement of fact upon which its Lanham Act claim is based. Plaintiff points to a statement in defendant's press release that reads: "By making a premier order-entry system commercially available, TT has truly leveled the playing field among market participation through our innovative technologies." We read plaintiff's complaint to essentially argue that defendant made a false claim of its intention or rationale for making its technology available to the public through the 2.5 cent proposal. Plaintiff seemingly contends that defendant's press release was a deceptive tactic by which it attempted to trick

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 10
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

the futures trading exchanges into accepting its proposal or purchasing its software by stating that its intent was to level the playing field and its software was innovative, when, in fact, its intent was to unfairly compete with its competitors (plf's response at 14-15). Defendant apparently understands plaintiff's allegations differently, that plaintiff claims that defendant made false statements of fact in stating both that its technology is "innovative" and that the technology will "level[ ] the playing field." As we are unsure which contention plaintiff relies upon, we will address each in turn.

*10 If we correctly read plaintiff's claim to be that defendant's false claim of intent and purpose as to its reasoning behind the 2.5 cent proposal violates the Lanham Act, we must disagree. Such a claim cannot be maintained in this action because the allegedly false statement is a subjective statement not actionable under the Lanham Act. *See Lutheran Ass'n of Missionaries and Pilots, Inc. v. Lutheran Ass'n of Missionaries and Pilots, Inc.,* 2005 WL 629605 (D.Minn.2005) (dismissing Lanham Act claim where statements reflected opinion of circumstances surrounding the parties' disaffiliation and intentions to operate in the future). Defendant's intention in proposing the 2.5 cent solution is neither specific nor measurable. *See Coastal Abstract Service, Inc. v. First American Title Ins. Co.,* 173 F.3d 725 (9th Cir.1999) (dismissing Lanham Act action where defendants' assertion that plaintiff was too small to handle a certain amount of business was vague and subjective, and, therefore, not actionable); *Groden v. Random House, Inc.,* 32 U.S.P.Q.2d 1266, 1271 (S.D.N.Y.1994) ("Subjective claims about products, which cannot be proven either true or false, are not actionable under the Lanham Act"). Defendant's intention in proposing the 2.5 cent proposal was the defendant's opinion, directed at a sophisticated trade audience, and was part of a larger persuasive argument to accept the proposal. Therefore, it is not actionable under the Lanham Act. *See Glenn v. Advertising Publications, Inc.,* 251 F.Supp. 889, 904 (S.D.N.Y.1966) (finding no Lanham Act violation

where the "whole subject is essentially a matter of argument ... [t]he advertiser to whom the argument was addressed was free to make up his own mind as to its validity").

If defendant correctly reads plaintiff's allegation to be that defendant's statements of "innovative" and "leveling the playing field" are false factual statements, we also disagree. This claim cannot be maintained because the allegedly false statements are mere puffery and, therefore, not actionable under the Lanham Act. Puffery is "exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely and is not actionable under § 43(a)" *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1145 (9th Cir.1997) (*citing* 3 J. Thomas McCarthy, MCCARTHY ON TRADE-MARKS AND UNFAIR COMPETITION § 27.04[4][d] at 27-52 (3d ed.1994)). Actionable false statements are generally differentiated from unactionable puffing by determining whether the claims are specific or absolute characteristics of a product capable of testing-such objective claims are not puffery and may be actionable under the Lanham Act. *Id.* In this case, "innovative" and "leveling the playing field" are not specific, not concrete, not measurable, and therefore puffery. *See Clorox Co. Puerto Rico v. Proctor & Gamble Commercial Co.,* 228 F.3d 24 (1st Cir.2000) (the statement, "Whiter is not possible," is non-actionable puffing); *August Storck K.G. v. Nabisco, Inc.,* 59 F.3d 616 (7th Cir.1995) (finding that "comparison" to a mystery rival is only puffery and therefore not actionable); *Malaco Leaf, AB v. Promotion In Motion, Inc.,* 287 F.Supp.2d 355 (S.D.N.Y.2003) (using the words "original" and "famous" on packaging constituted mere puffery); *Bose Corp. v. Linear Design Labs, Inc.,* 467 F.3d 304 (2d Cir.1972) (defendant's claim of "countless hours of research" leading to superior quality is puffing); *Data Cash Systems, Inc. v. Js & a Group, Inc.,* 223 U.S.P.Q. 865, 867 (N.D.Ill.1984) ("Frequently, newness claims are only puffing, especially when they are made in the context of promotional literature"). Additionally, as the press release at issue was directed at a specific

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 11
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))

sophisticated trade audience, no reasonable consumer would rely on such statement to determine whether to accept defendant's proposal. In fact, since the four major futures exchanges targeted by the press release declined the proposal (cplt., ¶ 12), we can say with certainty that they were not "duped" by the defendant's statements. Therefore, plaintiff's Lanham Act claims cannot proceed.

### State Law Claims

*11 Finally, plaintiff alleges various violations of state unfair competition claims. In Count VI, plaintiff alleges violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/1 et seq., Count VII alleges violation of the Illinois Uniform Deceptive Trade Practices Act (UDTPA), 815 ILCS 510/1 et seq., and Count VIII alleges violation of common law unfair competition. Defendant argues that such state law unfair competition claims fail for the same reason the Lanham Act claim fails. Alternatively, defendant claims that Count VI must be dismissed for plaintiff's failure to allege its deception and Count VII must be dismissed because plaintiff has failed to allege that it is "likely to be damaged" by defendant's allegedly deceptive trade practices. Plaintiff responds by reasserting its Lanham Act arguments, and restating that "TT controls order flow, led RCG and others to use its software that allows for embedded market information to be used by TT and used that embedded market information to the detriment of RCG and others similarly situated" (plf's response at 19). Neither party devotes much time or effort to arguments regarding these claims, and each relies primarily on its arguments regarding the Lanham Act claims.

Defendant suggests that claims under both ICFA FN4 and UDTPA should be resolved by analyzing them under the principles of the Lanham Act (def's mem. at 25) (citing AT & T Corp. v. Synet, Inc., 45 U.S.P.Q.2d 1656, 1660 (N.D.Ill.1997)). Plaintiff does not dispute such a contention. We agree that in this case the fatal flaw in plaintiff's Lanham Act

claim also bars plaintiff's state law unfair competition claims.

> FN4. We also note that, with certain exceptions, Illinois courts have held that Rule 9(b), requiring a claimant to plead the circumstances constituting fraud or mistake with particularity, applies to claims under ICFA. See Jacobson v. Ford Motor Co., 1999 WL 966432, *4 (N.D.Ill.1999) (citing Gallagher Corp. v. Massachusetts Mut. Life Ins. Co., 940 F.Supp. 176, 180 (N.D.Ill.1996)); Swift v. First USA Bank, 1999 WL 350847, *5 (N.D.Ill.1999). In Eromon v. Gran Auto Sales, Inc., 351 F.Supp.2d 825, 827 (N.D.Ill.2004), we also required a claimant to plead claims under the ICFA with particularity. In this case plaintiff has not pled its fraud claims with particularity; it has not pled the circumstances, "the who, what, when, where, and how," in detail, as required under the Seventh Circuit's interpretation of Rule 9(b). See DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir.1990).

The ICFA prohibits "unfair methods of competition and unfair or deceptive acts or practices, including ... the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission or such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Practices Act' ... in the conduct of any trade or commerce...."815 ILCS 505/2. Although the ICFA was originally designed to protect consumers, it also protects competitors from fraud and unfair competition. See Gold v. Golden G.T., LLC, 2005 WL 2465815, *4 (N.D.Ill.2005). Here, plaintiff is both a consumer and competitor of plaintiff's product.

To state a claim under the ICFA, plaintiff must plead that (1) defendant perpetrated a deceptive act;

Not Reported in F.Supp.2d                                                                Page 12
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.))**

(2) the defendant intended for consumers to rely on that deception; and (3) deception took place in trade or commerce. *See id.;Jacobson v. Ford Motor Co.,* 1999 WL 966432, *4 (N.D.Ill.1999). Plaintiff's ICFA claim fails for the same reasons that its Lanham Act claim failed. Opinions and puffery are not actionable under the ICFA. *Thacker v. Menard, Inc.,* 105 F.3d 382, 386 (7th Cir.1997).*See alsoTylka v. Gerber Products Co.,* 1999 WL 495126 (N.D.Ill.1999) (finding that defendant's statements that its baby food products have "optimum nutrition," and "[are the] most wholesome nutritious safe foods you can buy anywhere in the world," among other statements, were non-actionable sales pitches).

*\*12* The UDTPA was "designed to address conduct involving either misleading trade identification or false and deceptive advertising."*Menasha Corp. v. News America Marketing In-Store, Inc.,* 238 F.Supp.2d 1024, 1035 (N.D.Ill.2003). The statute prohibits deceptive trade practices and sets forth twelve specific practices declared illegal under the Act, including "(5) represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have, or that a person has a sponsorship, approval, status, affiliation or connection that he or she does not have; (6) represent[ing] that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand; (11) mak [ing] false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; (12) engag[ing] in any other conduct which similarly creates a likelihood of confusion or misunderstanding. 815 ILCS 510/2.

In Count VII, plaintiff claims "TT's conduct, as well as that of its officers and/or principals creates a likelihood of misunderstanding and therefore violates the Illinois Uniform Deceptive Trade Practices Act" (cplt., ¶ 87). As plaintiff's brief points to its Lanham Act arguments to support its UDTPA claim, we can only assume that plaintiff intends to reassert its false advertising claim based on the statement that "TT has truly leveled the playing field among market participation through our innovative technologies."Although at first glance it appears that plaintiff might have a viable claim for violation of the UDTPA, the claim fails because the allegedly false statement contained in defendant's press release does not appear to be material to plaintiff's claimed injury. Plaintiff does not allege or present facts that it would have acted differently had it known that plaintiff was proposing its 2.5 cent proposal in order to slant the playing field to plaintiff's advantage, rather than to level the playing field. *SeeKellerman v. Mar-Rue Realty and Builders, Inc.,* 132 Ill.App.3d 300, 87 Ill.Dec. 267, 476 N.E.2d 1259, 1264 (Ill.App.Ct.1985) (finding no violation of ICFA or UDTPA, where plaintiff did not allege that it would have done anything differently had it known of a fact omitted from defendant's advertisement). Additionally, plaintiff does not allege that it acted in reliance on such a statement-there is no allegation that plaintiff purchased more of defendant's software or encouraged the trading exchanges to adopt defendant's proposal in reliance on defendant's statement that it was proposing the 2.5 cent proposal in order to level the playing field. Therefore, plaintiff's UTDPA cannot proceed.

## CONCLUSION

For the reasons set forth above, we grant defendant's motion to dismiss with respect to Counts III through VIII: the Sherman Act, §§ 1 and 2 claims, the Lanham Act claim, and the state and common law claims. We deny defendant's motion to dismiss with respect to Count II, the declaratory judgment patent misuse claim.

N.D.Ill.,2005.
Rosenthal Collins Group, LLC v. Trading Technologies Intern., Inc.
Not Reported in F.Supp.2d, 2005 WL 3557947 (N.D.Ill.), 2005-2 Trade Cases P 75,073

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **TAB 6**

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.))**

Page 1

**C**
McDonagh v. Bergan
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Dr. Brian MCDONAGH, individually, and Illinois
Phlebology Associates, an Illinois professional cor-
poration, Plaintiffs,
v.
John BERGAN, Defendant.
**No. 03 C 1465.**

July 25, 2003.

*MEMORANDUM OPINION AND ORDER*

MORAN, Senior J.
**\*1** Plaintiffs Brian McDonagh and Illinois Phle-
bology Associates brought this action against de-
fendant John Bergan alleging defamation, tortious
interference with economic advantage, unfair com-
petition and civil conspiracy arising from state-
ments that Bergan allegedly made about a medical
process developed by the plaintiffs. Defendant filed
a motion to dismiss the complaint in its entirety for
failure to state a claim pursuant to Fed.R.Civ.P.
12(b)(6). For the following reasons, defendant's
motion is granted.

*BACKGROUND*

Plaintiffs are physicians who specialize in the treat-
ment of varicose veins using a procedure known as
sclerotherapy, whereby a solution is injected into
the veins to sclerose them. In 1992, plaintiff Brian
McDonagh developed a method of sclerotherapy
now known as COMPASS, which he presented to
the World Congress of Phlebology in 1995. This
method, which uses ultrasound technology to guide
the injections, is allegedly less invasive and less ex-
pensive than traditional surgical treatment. Defend-
ant John Bergan is a well-known vascular surgeon

who is allegedly financially involved in a surgical
method of treating varicose veins which is known
as VNUS Closure.

Plaintiffs allege that Bergan is frequently consulted
by numerous individuals and entities, including in-
surance companies, regarding varicose vein treat-
ments. They claim that Bergan, along with other
unnamed parties who have a financial stake in
VNUS Closure, engaged in a scheme to disparage
COMPASS in an effort to advance VNUS Closure.
In furtherance of this scheme defendant allegedly
told various medical societies and insurance carri-
ers that sclerotherapy was "not good medicine" and
that the costs of sclerotherapy should not be
covered by health insurance providers.

Plaintiffs specifically allege that defendant, in con-
nection with insurance policy reviews, has stated:

"a. that a recent article finding COMPASS more ef-
fective than surgical alternatives, peer reviewed by
surgeons and published in the leading publication in
this field, the Journal "Phlebology," is baseless and
false;

b. that the editors of "Phlebology" "must have been
too busy" and let the referenced article through for
publication "by mistake" (in fact, Bergan is himself
a member of the Editorial Advisory Board of
"Phlebology" and the article was reviewed for ap-
proximately nine months before publication);

c. that the COMPASS protocol could not close the
sapheno-femoral junction and the greater saphenous
vein and therefore was not a viable treatment al-
ternative;

d. that the accessory branches of veins, feeders and
below knee greater saphenousvein (which are
treated by the COMPASS protocol but not by
VNUS Closure) are "irrelevant" or should be
treated by procedures not covered by insurance;

e. that the complete regeneration of the varicose or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 2
Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.))**

accessory vein after surgical treatment does not constitute a failure of the treatment;

f. that an information Table (regarding the failure rate of surgical procedures) attached to the referenced COMPASS article was invalid because "most of the studies referenced" in the Table "were for high ligation and not for stripping";

**\*2** g. that the COMPASS treatment protocol is not an advisable or effective method to treat most varicose vein cases; and

h. that the VNUS Closure protocol for the treatment of varicose vein disease is superior to COMPASS and a more advisable protocol in most if not all cases." (Complaint, ¶ 11).[FN1]

> FN1. It is unclear whether any of those representations were made within the applicable statute of limitations.

As a result of these alleged statements, plaintiffs claim that insurers have denied coverage for sclerotherapy and many patients therefore choose not to undergo the treatment.

### DISCUSSION

In deciding a Rule 12(b)(6) motion to dismiss or strike a pleading we must assume the truth of all well-pleaded factual allegations, making all inferences in the non-movant's favor. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 420 (7th Cir.1994). The court should dismiss a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

### Count I-Defamation

In order to state a claim for defamation, plaintiffs must allege facts showing that the defendant made a false statement of fact concerning the plaintiff, that there was an unprivileged communication of the statement to a third party, and that plaintiffs were damaged by the publication. *Myers v. The Telegraph,* 332 Ill.App.3d 917, 922, 773 N.E.2d 192, 197 (5th Dist.2002).

A statement of opinion about matters of public concern that does not contain fully provable factual elements is entirely protected by the Constitution.*Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20 (1990). This protection applies to all statements that cannot be reasonably construed as factual statements about an individual. *Id .* Under Illinois law, such a statement is not actionable if it is an opinion relating to an individual's acts rather than the individual, the listener can perceive a factual basis for the statements and draw his or her own conclusions, and the statement relates to a matter of public concern. *Lancaster Foundation v. Skolrich,* 1992 WL 211063, \*3 (N.D.Ill.1992). More importantly, the Illinois courts give heightened protection to statements about medical science, a matter of public concern where widely varied approaches and opinions exist. *Aroonsakul v. Shannon,* 279 Ill.App.3d 345, 353, 664 N.E.2d 1094, 1100 (2nd Dist.1996), *citingSpelson v. CBS, Inc.,* 581 F.Supp. 1195, 1202 (N.D.Ill.1984).[FN2]

> FN2. We note that this differs from a privileged communication of a factual statement. Generally, when a physician communicates facts to an insurance carrier regarding the advisability of coverage, such a statement is protected by a qualified privilege. *SeeRodriguez-Erdmann v. Ravenswood Hospital Medical Center,* 190 Ill.App.3d 24, 32, 545 N.E.2d 979, 984 (1st Dist.1989). Such a privilege can be overcome by a showing that the defendant acted with an intent to harm the plaintiffs, as plaintiffs clearly allege here. *Id.* Expressions of opinion however are protected by the First Amendment and are never actionable, regardless of intent, because they cannot be proven true or false. *Spelson,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 3
Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.))**

581 F. Supp at 1202.

In *Aroonsakul,* defendant allegedly attacked plaintiff's treatment of numerous incurable diseases, stating that the plaintiff had no research to substantiate her claims. 279 Ill.App.3d at 348, 664 N.E.2d at 1097. She stated that the plaintiff's method was "just as outrageous as saying that toenail polish cures Parkinson's Disease, to me."*Id.* The court found that these statements were about plaintiff's treatment methods rather than defamatory statements about plaintiff individually. 279 Ill.App.3d at 353-54, 664 N.E.2d at 1100. As a result, the statements were constitutionally protected opinions. *Id.*

**\*3** This is not to say that all defendants are immune from suit for defamation when speaking about other physicians. Statements that impugn the character or qualifications of a physician are clearly actionable. *Barakat v. Matz,* 271 Ill.App.3d 662, 648 N.E.2d 1033 (1st Dist.1995); *Erickson v. Aetna Life & Casualty Co.,* 127 Ill.App.3d 753, 469 N.E.2d 679 (2nd Dist.1984). In *Barakat,* a doctor who was reviewing the claims of another told a workers' compensation insurer that plaintiff's "practice was a joke" and that the plaintiff was "not any good as a doctor."271 Ill.App.3d at 672, 648 N.E.2d at 1042. Because these were not expressions of disagreement over medical treatments, but rather statements about the professional conduct and character of the plaintiff, the court held that they were actionable. *Id.*

The statements allegedly made by Bergan closely resemble those in *Aroonsakul.*If plaintiffs' allegations are true, defendant criticized their method of treating varicose veins and their research in support of this method. The alleged statements are not capable of being proven true or false. Moreover, as in *Lancaster Foundation,* the statements provided third parties who heard them a factual basis with which they could draw their own conclusions about sclerotherapy and the research in support of it. 1992 WL 211063 at *3. According to Illinois law, disagreements of this type amongst medical professionals should be settled by discussion and research in the medical community, not by the courts. While

courts certainly do not sanction the abuse of a position of trust by a physician, there is no actionable claim for defamation unless defendant makes *factually* misleading statements.

Plaintiffs also fail to allege that defendant's statements concerned them, as is required for a defamation claim. As stated above, the alleged statements concerned COMPASS, sclerotherapy or the research supporting plaintiffs' methods. While it is true that a defamatory statement may be actionable even if it does not mention plaintiffs by name, third parties must be able to reasonably understand that the statement refers to the plaintiffs. *Beresky v. Teschner,* 64 Ill.App.3d 848, 851, 381 N.E.2d 979, 981 (2nd Dist.1978). Defendant never actually referred to a *person* in any of the alleged statements, but rather to a *process.*Plaintiffs do not allege that the insurance carriers knew that they were involved in the development of COMPASS or that any third parties understood the statements to be about them as individuals.

*Count II-Tortious Interference*

To state a claim for tortious interference with economic advantage, plaintiffs must allege a reasonable expectation of a business relationship, the defendant's knowledge of that relationship, and purposeful interference in the relationship that leads to damages. *Fellhauer v. City of Geneva,* 142 Ill.2d 495, 511, 568 N.E.2d 870, 878 (Ill.1991). In addition, plaintiffs must allege that defendant has committed some impropriety while interfering. *Dowd & Dowd, Ltd. v. Gleason,* 181 Ill.2d 460, 485, 693 N.E.2d 358, 371 (Ill.1998).

**\*4** Plaintiffs do not sufficiently allege purposeful interference by the defendant in their business relationships. They admit that the defendant did not contact the insurance carriers, but rather the carriers asked him to serve as a consultant. In fact, in the only specific example of interference alleged in the complaint, defendant was not even involved until the appeals process, weeks after the coverage for

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 4
Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.))

sclerotherapy was denied. Plaintiffs simply allege that defendant recommended to insurance carriers that they not cover costs for sclerotherapy-not enough to state a claim for tortious interference. Public policy dictates that the right of the defendant to render his opinion overcomes the plaintiff's property right in the economic advantage. *Turner v. Fletcher,* 302 Ill.App.3d 1051, 1058, 706 N.E.2d 514, 519 (4th Dist.1999).

*Count III-Unfair Competition*

The tort of unfair competition in Illinois has been largely codified by the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510 *et seq.* (UDTPA). The UDTPA allows plaintiffs to seek injunctive relief, but not damages, upon a showing that they have been harmed by a competitor's business practices. 815 ILCS 510/3; *Smith v. Prime Cable of Chicago,* 276 Ill.App.3d 843, 860, 658 N.E.2d 1325, 1337 (1st Dist.1995). While the plaintiffs do not cite to the statute in their complaint, their specific allegations have been codified by the UDTPA, which states that it is a deceptive trade practice when a defendant "disparages the goods, services or business of another by false or misleading representation of fact."815 ILCS 510/2(8). While the UDTPA does not entirely preempt the common law of deceptive trade practices, plaintiff does not allege a separate common law tort that would be the basis for relief other than that provided by the UDTPA. See*Custom Business Systems, Inc. v. Boise Cascade Corp.,* 68 Ill.App.3d 50, 52-53, 385 N.E.2d 942, 944 (2nd Dist.1979).

In any case, in order to state a claim for relief plaintiffs need to allege that defendant made false representations of fact about plaintiffs' services. As stated above, the alleged statements are defendant's medical opinions about the effectiveness of sclerotherapy and COMPASS specifically. Again, we treat statements about medical science differently from statements in other areas because of the importance of encouraging public debate for the benefit of patients. *Aroonsakul,* 279 Ill.App. at 353, 664

N.E.2d at 1100.

Medical statements are not entirely immune from characterization as false statements. Plaintiffs cite to *Mead Johnson & Co. v. Abbott Laboratories,* 201 F.3d 883 (7th Cir.2000) and *Abbott Laboratories v. Watson Pharmaceuticals, Inc.,* 2001 WL 826870 (N.D.Ill.2001), as support for their claim that statements about medical science are frequently actionable in Illinois. Both, however, are easily distinguishable. Both *Mead Johnson* and *Abbott Laboratories* involved claims for false advertising under Section 43 of the Lanham Act, 15 U.S.C. § 1125. In *Mead Johnson,* defendants claimed that their infant formula was the "1st choice of doctors," despite the fact that survey evidence did not entirely support this claim. 281 F.2d at 883-84. Likewise, in *Abbott Laboratories,* the defendant made clear misrepresentations as to the FDA approval of its competitor, claiming that because plaintiff's application with the FDA was still pending, the product was unsafe. 2001 WL 826870 at *2. In this case, no such representation was made. Further, those cases do not involve a defendant doctor opining about the efficacy of a medical procedure. While plaintiffs disagree with defendant's characterization of their process and their research, they cannot say that he was factually mistaken when giving his opinion.

*Count IV-Civil Conspiracy*

*5 Under Illinois law, a civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means. *Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 62-63, 645 N.E.2d 888, 894 (Ill.1994). The function of the claim is to extend tort liability beyond the active wrongdoer. *Id.* In order to state a claim for civil conspiracy a plaintiff must allege both an agreement between two or more parties and an act in furtherance of the agreement. *Id.* The alleged act in furtherance must itself be tortious or unlawful in character.*Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 5
Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.))**

While plaintiffs allege that defendant reached agreement with multiple unnamed parties to denounce sclerotherapy, they fail to sufficiently allege any tortious acts in furtherance of the agreement. Because the agreement itself is not enough, they fail to state a claim for civil conspiracy.

### *CONCLUSION*

For the foregoing reasons, defendant's motion to dismiss the complaint is granted.

N.D.Ill.,2003.
McDonagh v. Bergan
Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# **TAB 7**

Westlaw.

Not Reported in F.Supp.2d                                                                                   Page 1
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

**H**
Muzikowski v. Parmount Pictures Corp.
N.D.Ill.,2003.

United States District Court,N.D. Illinois, Eastern
Division.
Robert E. MUZIKOWSKI, an individual, Plaintiff,
v.
PARAMOUNT PICTURES CORPORATION; SFX
Tollin/Robbins, Inc.; and Fireworks Pictures, De-
fendants.
**No. 01 C 6721.**

Dec. 3, 2003.

Marian Conroy Haney, Donald William Rupert,
Mayer, Brown, Rowe & Maw LLP, Michael B.
Roche, Lawrence Andrew Brehm, Michael T.
Roche, Schuyler, Roche & Zwirner, Chicago, IL,
for Plaintiffs.
David Mark Greenwald, Debbie L. Berman, Mi-
chael Allen Doornweerd, Jenner & Block, LLC,
Chicago, IL, for Defendants.

*MEMORANDUM OPINION*

KOCORAS, Chief J.
*1 This matter comes before the court on the mo-
tion of Defendants Paramount Pictures Corporation;
SFX Tollin/Robbins, Inc. and Fireworks Pictures
(collectively referred to herein as "Paramount") to
dismiss Counts II, III, and V through XI of the
Second Amended Complaint filed by Plaintiff
Robert Muzikowski ("Muzikowski") pursuant to
Fed. R. Civ. Proc. 12(b)(6). For the reasons set
forth below, the motion is granted in part and
denied in part.

BACKGROUND

Muzikowski is a securities broker and insurance
agent. For the last ten years, he has been active in
organizing and running baseball leagues for young
boys in Chicago and New York. Muzikowski has

founded several leagues, among them the Near
North Little League ("NNLL") and Near West
Little League ("NWLL"). He has also been in-
volved with a not-for-profit charitable organization
called the Chicago Hope Academy. Because of his
efforts, Muzikowski has been recognized by Little
League, Inc., the governing body of all Little
League programs, and he has been featured in sev-
eral publications and broadcasts around the United
States.

In 1994, an assistant coach in the NNLL named
Daniel Coyle authored a nonfiction account of his
coaching experience entitled *Hardball: A Season in
the Projects.* The book mentions Muzikowski sever-
al times and discusses his life, background, and his
work with the NNLL teams. Paramount purchased
the film rights to the book, and in September 2001
released the film *Hardball.* The film recounts the
story of Conor O'Neill ("O'Neill"), a hard-drinking
gambling addict who coaches an inner-city baseball
team of young boys to pay off a debt owed to a
bookie. O'Neill is portrayed as violent and self-
centered, as well as engaging in illegal activities
such as ticket scalping.

Based on preliminary reviews of the film,
Muzikowski filed suit first in the Central District of
California. He voluntarily dismissed that action and
refiled it in this Court. He sought an injunction of
the film's release and $11,000,000 in damages for
defamation and false light invasion of privacy. The
motion for a preliminary injunction was denied and
the film hit theaters on September 14, 2001.

On November 28, 2001, this Court dismissed
Muzikowski's defamation per se claims on the basis
that the film could be innocently construed.
*Muzikowski v. Paramount Pictures Corp.,* 2001 WL
1519419 (N.D.Ill.2001). The false light claims were
dismissed on similar grounds. *Id.* The per quod
claims were dismissed for failure to plead special
damages with sufficient specificity.*Id.* The dis-
missal was expressly without prejudice, and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

Muzikowski appealed, and the Seventh Circuit reversed our decision on the per se and false light claims, holding that, because of the different standards of pleading in the Illinois state and federal courts, the innocent construction rule cannot be applied on a motion to dismiss. *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918 (7th Cir.2003). Muzikowski has since amended his complaint to include nine new claims. Paramount now launches a 12(b)(6) challenge to Counts II, III, and V through XI.

### LEGAL STANDARD

*2 Rule 12(b)(6) motion to dismiss is used to test the legal sufficiency of a complaint. *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir.1990). In ruling on a motion to dismiss, a court must draw all reasonable inferences in favor of the plaintiff, construe allegations of a complaint in the light most favorable to the plaintiff, and accept as true all well-pleaded facts and allegations in the complaint. *Bontkowski v. First Natl. Bank of Cicero,* 998 F.2d 459, 461 (7th Cir.1993); *Perkins v. Silverstein,* 939 F.2d 463, 466 (7th Cir.1991). The allegations of a complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege the "operative facts" upon which each claim is based. *Kyle v. Morton High Sch.,* 144 F.3d 448, 454-55 (7th Cir.1998). The plaintiff need not allege all of facts involved in the claim and can plead conclusions. *Higgs v. Carter,* 286 F.3d 437, 439 (7th Cir.2002); *Kyle,* 144 F.3d at 455. However, any conclusions pled must "provide the defendant with at least minimal notice of the claim."*Id.* Further, the plaintiff cannot satisfy federal pleading requirements merely "by attaching bare legal conclusions to narrated facts which fail to outline the basis" of the claim. *Perkins,* 939 F.2d at 466-67. With these principles in mind, we turn to the motion at hand.

### DISCUSSION

After the parties filed their initial submissions on this motion, we requested further briefing on the application of Fed. R. Civ. Proc. 41(a)(1) and the Illinois single-filing rule, 735 ILCS § 5/13-217. The parties have briefed the additional question, and we have carefully considered their arguments.

In essence, Muzikowski contends that neither of these rules apply to his case. In his view, the case has been voluntarily dismissed only once, when he dismissed the action filed in the Central District of California. In his view, the only other dismissal that occurred was our order granting Paramount's motion to dismiss. While it is true that our order was an involuntary dismissal, Muzikowski ignores a crucial chapter in the procedural history of this case. As stated earlier, our dismissal was expressly without prejudice. While the decision with regard to the per se claims did not hinge on a defect that could be cured with an amended pleading, the defamation per quod claims certainly did. Thus, at the time that Muzikowski elected to stand on his complaint and pursue appeal, the judgment was not final with respect to all claims, precluding appellate jurisdiction under 28 U.S.C. § 1291. Perhaps because Muzikowski was no longer represented by counsel, the appellate court did not decline to hear the case on the grounds that it had no jurisdiction until all claims were dismissed with prejudice. *SeeWest v. Macht,* 197 F.3d 1185, 1189-90 (7th Cir.1999). Rather than holding Muzikowski to strict compliance with this requirement, the appellate court interpreted his actions in pursuing an immediate appeal as "akin to a voluntary dismissal," thus providing the finality necessary for an appeal to proceed.[FN1] *Muzikowski,* 322 F.3d at 923-24. Muzikowski places great emphasis on the phrase "akin to" and contends that he never asked for any voluntary dismissal, so he cannot be held responsible for the fallout of the procedural vehicle chosen by the appellate court to allow his case to be heard and decided there. This argument singularly misses the point. Muzikowski voluntarily pursued his ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 3
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

peal of a decision that was not a final judgment. The only way for him to receive the relief he sought was to voluntarily dismiss the claims that he could have continued to pursue in the district court with an amended complaint. The appellate court overlooked the procedural improprieties in Muzikowski's presentation, and he accordingly received the benefit of an expedited appeal. It is difficult to grasp how he can now argue that he should be exempt from the consequences of the Seventh Circuit's magnanimous treatment of his unfamiliarity with rules of procedure.

> FN1. The appellate court also concluded that finality was present because the one-year statute of limitations had expired by the time the appeal was argued, thus precluding any refiling of a new complaint. It is unclear why the court used this as a jurisdictional basis. In each of the cases cited by the court in support of its reasoning, the statute of limitations expired during the pendency of proceedings in the district court. *SeeLarkin v. Galloway,* 266 F.3d 718, 721 (7th Cir.2001); *Elmore v. Henderson,* 227 F.3d 1009, 1011 (7th Cir.2000). In this case, by contrast, less than three months of the one year had elapsed at the time of the dismissal; Muzikowski had almost thrice that amount of time left in which to refile in a timely manner. In addition, as is clear from the new claims in the amended complaint, Muzikowski could have included claims that were not couched in terms of defamation, obviating any application of the innocent construction rule.

**\*3** Paramount acknowledges that the particular situation presented in this case has never been directly addressed in case law discussing Rule 41(a)(1) or the Illinois single-filing rule. Our research has likewise revealed no authority directly on point. Paramount advances compelling arguments rooted in the policies behind the two rules. In short, the reas-

oning goes like this: After our dismissal order, Muzikowski was faced with a choice to amend his complaint with claims that did not suffer from the deficiencies enumerated in the order or to pursue immediate appeal of the decision on his defamation per se and false light claims. He freely chose the latter, and the price of that choice is permanent forfeiture of the former. This argument as well as fundamental fairness strongly support a conclusion that Muzikowski should be limited to pursuing the claims that were considered and upheld by the appellate court. However, as noted earlier, the case law is not clear on whether the claims advanced in the amended complaint should be considered a third filing, and we are mindful of the Seventh Circuit's admonition that the scope of the narrow exception embodied in the "two-dismissal" rule should not be expanded when the underlying purpose of the exception would not be served. *Sutton Place Development Co. v. Abacus Mortgage Inv. Co.,* 826 F.2d 637, 640 (7th Cir.1987). The facts of this case present a very close call as to whether the purpose of the exception would or would not be served; as Paramount points out, Muzikowski's actions in this case border on prejudice to the defendants. However, as Muzikowski points out, Paramount has not expressly raised this issue at any point in the litigation, even on appeal. If we were starting from a clean slate, we are not convinced that Muzikowski's argument would carry the day, but given that Muzikowski has been allowed to amend the complaint twice since the case was remanded, it would not be appropriate to create new law at this point that would have drastic consequences for a case already in progress. We therefore conclude that the new complaint is not barred by either the Illinois single-filing rule or Fed. R. Civ. Proc. 41.

Paramount also argues that the new defamation claims are barred by the law of the case doctrine. They base this contention on the combination of two things: first, the new claims were not included in the initial complaint; and second, the Seventh Circuit expressly stated that "any new [defamation] claim would be barred by the statute of limita-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

tions."*Muzikowski,* 322 F.3d at 923. While this accurately quotes the appellate court, it clearly applies only to defamation per quod claims; any defamation per se claims would have been barred by our decision regarding the application of the innocent construction rule. Thus, we cannot agree that the law of the case bars the specific claims embodied in Counts II and III. Both of these claims are claims for defamation per se, not defamation per quod. Any amendment of the complaint to allege a different defamation per se claims (as opposed to per quod claims) would have been futile, regardless of whether the statutory limitation period had expired. It follows that the statement of the appellate court does not apply to these new claims.

*\*4* Along the same vein, Paramount contends that Counts II and III are time-barred. Muzikowski responds that because his original complaint included a claim of defamation against Paramount based on the same facts that underlie the new allegations of defamation per se, the relation back doctrine allows him to take advantage of his original filing date. If Muzikowski is correct, his new claims would not be time-barred.

Under Federal Rule of Civil Procedure 15(c)(2), an amended complaint is not barred by the statute of limitations when it relates back to the date of the original pleading. *Bularz v. Prudential Ins. Co. of Am.,* 93 F.3d 372, 379 (7th Cir.1996). In order to relate back to the date of the original pleading, the new claim brought in the amended complaint must "[arise] out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading," even if the new claim involves a different substantive legal theory. *Id.* Here, Counts II and III stem from the same conduct, transaction, or occurrence that was at issue in the original complaint. Accordingly, the relation back doctrine applies to the newly alleged defamation claims, and they are not time-barred. We now turn to the substantive challenges to the new claims.

A. Count II

Count II of the Second Amended Complaint alleges that the film is defamatory per se toward Muzikowski in that it prejudices him in his profession as a Little League coach and fundraiser for the NWLL and the Chicago Hope Academy. A statement is defamatory per se if it wrongfully prejudices a party in her trade, profession, or business or falsely indicates that the party has committed a criminal offense, is infected with a venereal disease, is unable to perform or lacks integrity in the discharge of duties of public office, or has committed fornication or adultery. *Bryson v. News Am. Publications,* 174 Ill.2d 77, 220 Ill.Dec. 195, 672 N.E.2d 1207, 1214-15 (Ill.1996).

Paramount's sole challenge to this count is that because Muzikowski is a volunteer in the NWLL and the Chicago Hope Academy, his work with them cannot be considered his profession. Rather, they insist, his only profession is that of securities and insurance broker. While this argument presents some initial appeal, it is insufficient to warrant dismissal of this count. Paramount has presented no authority that would indicate that, for the purposes of a defamation per se claim, a person can have only one business, trade, or profession. *Cf.Campbell v. Morris,* 224 Ill.App. 569 (Ill.App.Ct.1922) (allowing defamation plaintiff to allege injury to plaintiff's simultaneous occupations of surgeon and banker). Moreover, nothing in the case law indicates that payment for one's services is necessary for an activity to be considered a party's business or profession for the purpose of stating a legally cognizable defamation per se claim.

The parties' arguments on this point, while interesting, do little to illuminate the issue. Muzikowski's assertion that the Illinois courts have adopted the portions of § 573(b) of the Restatement (Second) of Torts, which states that holders of honorary or private offices in organizations such as fraternities and clubs can bring defamation per se claims for statements pertaining to their offices, is shaky at best. The two cases to which he refers do not support such a broad statement. In the first case, the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))

Seventh Circuit addressed only §§ 559 and 566 of the Restatement (Second).*Pope v. Chronicle Publishing Co.,* 95 F.3d 607 (7th Cir.1996). The second case cites § 573(b) for the proposition that defamation in Illinois includes statements regarding the integrity of one who holds a public office, not an honorary or private one.*Cooper v. Rockford Newspapers, Inc.,* 50 Ill.App.3d 247, 8 Ill.Dec. 506, 365 N.E.2d 744 (Ill.App.Ct.1977). While these two cases may indicate that Illinois courts may eventually adopt § 573(b) in its entirety, the affirmative representation that they already have overstates the case.

**\*5** With regard to Paramount's position, *King v. Armstrong* does not stand for the proposition that volunteer work cannot be a person's profession. 623 F.Supp. 487, 492 (N.D.Ill.1985). Rather, the court in *King* specifically based its decision on the conclusion that the plaintiff's activities were not her profession or employment. The contents of the instant complaint, by contrast, could support the inference that Muzikowski's volunteer efforts comprise a second profession. The other case cited by Paramount does not address the question of whether unpaid activities can ever constitute a person's profession; that case concluded that only public officeholders could bring suit under the category of defamation per se discussed in *Cooper.Spelson v. CBS, Inc.,* 582 F. Supp 1195 (N.D.Ill.1984).

Accordingly, we cannot say as a matter of law that Muzikowski's volunteer activities cannot be his profession for the purposes of a defamation per se claim, and Paramount's motion to dismiss Count II must be denied.

### B. Count III

Count III also involves a defamation per se claim, but this time it is premised on Muzikowski's occupation in the securities field. The gist of this claim is that the film depicts O'Neill engaging in activities that would prompt reporting responsibilities and possible disciplinary action by regulatory agencies.

In other words, if the entities responsible for policing the securities industries believed that the real-life Muzikowski engaged in the same activities as the character O'Neill, he could face discipline either for not reporting these activities, for engaging in them at all, or both. Paramount argues that these statements cannot form the basis of a defamation per se claim in that they require extrinsic facts to explain their defamatory meaning. We disagree. As the Illinois Supreme Court noted in *Owen v. Carr,* statements imputing a violation of the regulations of one's profession can be defamatory per se. 113 Ill.2d 273, 100 Ill.Dec. 783, 497 N.E.2d 1145, 1149 (Ill.1986).[FN2] As that allegation is the basis of Count III, and Paramount advances no other deficiencies, Count III withstands the motion to dismiss. Paramount's challenge to the complaint's false light claims premised on the defamatory statements alleged in Counts II and III correspondingly survive.

> FN2. Despite this statement, the Court in *Owen* affirmed the trial court's grant of the defendant's motion to dismiss by applying the innocent construction rule. *Owen,* 100 Ill.Dec. 783, 497 N.E.2d at 1149. However, in light of the Seventh Circuit's earlier decision in the case at bar, that rule cannot affect the outcome of the instant motion.

### C. Counts V, VI, and IX

These counts allege false advertising and endorsement in violation of the Lanham Act, the Illinois Uniform Deceptive Trade Practices Act, and the Illinois Consumer Fraud and Deceptive Business Practice Act. As Paramount notes, for claims of deceptive trade practices such as these, the legal inquiry is the same under the Lanham Act as it is under the two state statutes. *See,e.g .,Spex. Inc. v. Joy of Spex. Inc.,* 847 F.Supp. 567, 578 (N.D.Ill.1994), citing *Gimix, Inc. v. JS & A Group, Inc.,* 699 F.2d 901, 908 (7th Cir.1983). Accordingly, the following analysis applies to all three counts.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 6
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

*1. False Endorsement*

**\*6** The gist of Muzikowski's false endorsement claims is that the use of a character similar to him in the movie gives the false impression that he sponsored or endorsed the film. In support of his argument, he looks to case law that stands for the proposition that endorsements can be implied through use of identifiers other than name or likeness. *See,e.g.,White v. Samsung Electronics America,* 971 F.2d 1395, 1400 (9th Cir.1992). The cases give this quality the necessarily amorphous moniker "persona." Although neither the parties' briefs nor our own research has revealed any Illinois cases involving this issue, the recently passed Illinois Right of Publicity Act defines a person's "identity" broadly, as "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener" and includes a nonexhaustive list of examples. 765 ILCS § 1075/5. While the term "persona" is not contained in the list of examples, the breadth of this new statute supports the conclusion that Illinois courts would use an expansive approach in determining what kinds of attributes are protected under the statute.[FN3] In essence, Muzikowski alleges that the character O'Neill reflects his persona, thereby falsely implying that the real-life Muzikowski has endorsed the story Paramount's film tells.

> FN3. However, several cases support the conclusion that the amalgamation of events transpiring during a person's life is not a protectible interest (even when a person's actual name and likeness are used and particularly when fictionalized elements are included) and therefore does not amount to a "persona." *See,e.g.,Matthews v. Wozencraft,* 15 F.3d 432, 437 (5th Cir.1994); *Ruffin-Steinback v. dePasse,* 82 F.Supp.2d 723, 731 (E.D.Mich.2000); *Seale v. Gramercy Pictures,* 949 F.Supp. 331, 337 (E.D.Pa.1996); *Hicks v. Casablanca Records,* 464 F.Supp. 426, 433 (S.D.N.Y.1978).*See also White v. Samsung*

*Electronics America, Inc.,* 989 F.2d 1512 (9th Cir.1993) (dissent from denial of petition for rehearing) (expressing grave First Amendment implications of overprotection of celebrities' right of publicity and related rights).

In response, Paramount raises the fact that, because this case involves speech (and artistic expression at that), it has a significant First Amendment component. While that is certainly the case, the protections of the Amendment are not so absolute that they automatically bar Muzikowski from bringing his claims under the Lanham Act and similar state statutes. To properly assess Paramount's contention, we would be required to balance public interest in the free flow of ideas and creativity against Muzikowski's ability to control marketing of his claimed celebrity value. The time for such an inquiry has not yet come in this case. For purposes of the present motion, we look only to the legal sufficiency of Muzikowski's allegations in isolation. So viewed, they are sufficient to withstand the motion to dismiss.

*2. False Advertising*

Paramount avers that Muzikowski cannot bring a false advertisement claim because he has not alleged that he is a competitor of Paramount, because he has not alleged a misrepresentation within the advertisements or promotional material, and because he has not alleged actual consumer reliance, a necessary predicate of a claim for damages. *L.S. Heath & Son v. At & T Info. Sys., Inc.,* 9 F.3d 561, 575 (7th Cir.1993).

On the first and second points, we cannot agree with Paramount's contention that the Second Amended Complaint does not contain sufficient allegations that the two parties are competitors. Rather, it is apparent from the face of the complaint that Muzikowski claims that he and Paramount are competitors in marketing the goodwill he has accumulated with his philanthropic efforts. Furthermore,

read with all reasonable inferences in favor of the plaintiff, the complaint alleges that the representation of the film as "based on" a true story, though not outright false, was misleading. *SeeHot Wax, Inc. v. Turtle Wax. Inc.,* 191 F.3d 813, 820 (7th Cir.1999) (stating that claims that are literally true but that implicitly convey a false impression can form the basis of a false advertising claim). Whether Muzikowski will ultimately be able to prove these two propositions is another question, but not one that need be resolved for the purposes of this motion.

*7 As for the final contention, Muzikowski does not contest and therefore concedes Paramount's point that he has not alleged actual consumer reliance. Def.'s Resp. at 8. Instead, he points out that he seeks relief other than money damages, which do not necessarily require allegations of actual reliance to be adequately pled. Accordingly, the portions of his complaint seeking money damages for false advertising are dismissed. The remainder of the relief he has requested survives the instant motion.

D. Counts VII and VIII

These two counts are in essence claims for commercial disparagement. Here, Paramount's quarrel centers on the premise that the alleged characterizations (i.e., that Muzikowski is a thief, a liar, a felon, and a person incapable or unworthy of trust and responsibility) disparage Muzikowski only as an individual. It is true that commercial disparagement cannot be used as a vehicle to compensate a victim of unwarranted attacks that do not involve that person's goods, services, or business. *Allcare, Inc. v. Bork,* 176 Ill.App.3d 993, 126 Ill.Dec. 406, 531 N.E.2d 1033, 1037-38 (Ill.App.Ct.1988); *Am. Pet Motels, Inc. v. Chicago Veterinary Med. Ass'n,* 106 Ill.App.3d 626, 62 Ill.Dec. 325, 435 N.E.2d 1297, 1303 (Ill.App.Ct.1982). However, the complaint in this case alleges that honesty and trustworthiness are part and parcel of the services that Muzikowski offers as a securities broker and insurance sales-

man. As such, his pleading of these causes of action cannot be said to be fatally deficient.

E. Count X

Count X purports to state a claim for intentional infliction of emotional distress. Paramount's sole argument in support of its dismissal for this count is that it cannot stand because of the First Amendment implications of this case. As stated earlier, this may very well be the case, but this defense does not address the issue of whether this count states a legally cognizable claim. The First Amendment, while powerful, does not provide an absolute bar to prohibitions of speech such that any request for injunctive relief in a case involving speech must be thrown out at the pleading stage.[FN4] Because Paramount does not argue any other inadequacies, the motion to dismiss this count is denied.

> FN4. Paramount's motion to strike all requests for injunctive relief follows a similar line of argument. Simply put, it is too early in this litigation to weigh all of the considerations that would be involved in resolving the propriety of injunctive relief.

F. Count XI

Count XI is a claim premised on unjust enrichment. Muzikowski alleges that he and Coyle had an implied contract that Muzikowski would cooperate with the author's efforts, including giving him special access to the details of Muzikowski's life and the inner workings of the NNLL. In return, Coyle would use the information only in a nonfiction book that accurately reflected (in Muzikowski's opinion), the stories he related to Coyle. Muzikowski argues that by not complying with the terms of this implied agreement in making the film, Paramount was unjustly enriched at his expense. The fact that Paramount was not a party to the alleged agreement is not dispositive; Illinois courts recognize unjust enrichment claims in which the benefit plaintiff seeks has been transferred to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 8
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.))**

defendant by a third party. *HPI Health Services, Inc. v. Mt. Vernon Hospital, Inc.,* 131 Ill.2d 145, 161, 137 Ill.Dec. 19, 545 N.E.2d 672 (Ill.1989). However, *HPI* limits the recovery of an unjust enrichment derived from third parties to three situations: "(1) where the benefit should have been given to the plaintiff but the third party mistakenly gave it to the defendant instead, (2) where the defendant procured the benefit from the third party through some type of wrongful conduct, or (3) where the plaintiff for some other reason had a better claim to the benefit than the defendant."*Id.* at 162, 137 Ill.Dec. 19, 545 N.E.2d 672 (citations omitted); *see also Wolff v. Ampacet Corp.* 284 Ill.App.3d 824, 830-31, 220 Ill.Dec. 601, 673 N.E.2d 745 (Ill.App.1996) (overruled on other grounds by *Morris B. Chapman & Assocs. v. Kitzman,* 193 Ill.2d 560, 575, 251 Ill.Dec. 141, 739 N.E.2d 1263 (Ill.2000)).

**\*8** It is clear that Muzikowski's claim does not fall into the first two categories. However, the third situation arguably applies. Paramount argues that the claim is insufficient, characterizing the benefit in question as the ability to tell a story incorporating aspects of Muzikowski's life. Because a person does not own his or her life story, they argue, there can be no implied contract involving the right to tell that story. This argument is correct as far as it goes, but Muzikowski's allegations of benefit to Coyle and correspondingly to Paramount go beyond just the telling of his story. Muzikowski also alleges that he provided Coyle with access to details that only he could provide. While this may not prove ultimately to be the case, for the purposes of a motion to dismiss, Muzikowski states a cognizable claim under Illinois law.

## CONCLUSION

Based on the foregoing analysis, Paramount's motion to dismiss portions of the Second Amended Complaint is granted in part and denied in part.

N.D.Ill.,2003.

Muzikowski v. Parmount Pictures Corp.
Not Reported in F.Supp.2d, 2003 WL 22872117 (N.D.Ill.), 31 Media L. Rep. 2601

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 8

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.))

**H**

Best Vacuum, Inc. v. Ian Design, Inc.
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
BEST VACUUM, INC., Plaintiff,
v.
IAN DESIGN, INC., Defendant.
**No. 04 C 2249.**

Jan. 18, 2005.

David M. Adler, David M. Adler, Esq. & Assoc.
PC, Chicago, IL, for Best Vacuum Inc. an Illinois
Corporation.
Charles Lee Mudd, Jr., Law Offices of Charles Lee
Mudd Jr., Chicago, IL, for Ian Design Inc. a New
Jersey corporation.

*REPORT AND RECOMMENDATION*

ASHMAN, Magistrate J.
**\*1** Plaintiff, Best Vacuum, Inc., filed a complaint
accusing Defendant, Ian Design, Inc., of trademark
infringement, trademark dilution and unfair com-
petition arising under 15 U.S.C. §§ 1114(1),
1125(c), 1125(a), and of deceptive trade practices
arising under the Illinois Uniform Deceptive Trade
Practices Act, 815 ILCS 510/2. Plaintiff now moves
the Court to grant a preliminary injunction barring
Defendant from using the internet domain names
"bestvacuumcleaner.com"                       and
"bestchoicevacuums.com." This matter comes be-
fore this Court pursuant to 28 U.S.C. §
636(b)(1)(B) and Local Rule 72.1 for a Report and
Recommendation.

*I. Background*

Plaintiff is an Illinois corporation with its principal
place of business in Chicago, Illinois. Plaintiff has
done business under the name "Best Vacuum" since
1983, (Pl.'s Compl. at 5), and registered its internet

domain name "bestvacuum.com" in May 1996.
(Pl.'s Compl. at 2.) Plaintiff sells vacuum cleaners,
air purifiers, air conditioners, dehumidifiers, hu-
midifiers, lamps, lighting, dust bags, filters, ac-
cessories and related products through its retail
stores and its internet web site. Plaintiff currently
sells eight different brands of vacuum cleaner, in-
cluding Miele and Dyson brand vacuum cleaners.

Defendant is a New Jersey corporation. Like
Plaintiff, Defendant sells vacuum cleaners and re-
lated products, including Miele and Dyson brand
vacuum cleaners. Like Plaintiff, Defendant sells va-
cuum cleaners and related products on and through
the internet. (Def.'s Mem. Supp. Mot. Dismiss at 1.)

On November 6, 2003, Defendant registered the in-
ternet domain name "bestvacuumcleaner.com."
(Pl.'s Compl. at 6.) According to Plaintiff, in Febru-
ary 2004, Plaintiff demanded that Defendant stop
using the "bestvacuumcleaner.com" domain name
because    it    was    confusingly    similar    to
"bestvacuum.com." (Pl.'s Mem. Supp. Mot. at 2.)
Defendant did not stop using its domain name and,
on February 14, 2004, Defendant registered the do-
main    name    "bestchoicevacuums.com."
(Id.)Defendant actively promotes both of its domain
names through advertising and actively solicits
sales and invites potential customers to engage in a
variety of interactive exchanges at its website.

On March 26, 2004, Plaintiff filed its Complaint ac-
cusing Defendant of trademark infringement, trade-
mark dilution and unfair competition arising under
15 U.S.C. §§ 1114(1), 1125(c), 1125(a), and of de-
ceptive trade practices arising under the Illinois
Uniform Deceptive Trade Practices Act, 815 ILCS
510/2. On August 13, 2004, Plaintiff filed its
memorandum in support of its motion for prelimin-
ary injunction. The parties have agreed orally in
open court that the decision on the motion for pre-
liminary injunction be based on the papers submit-
ted. Neither party submitted oral testimony.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.))**

## II. *Discussion*

Plaintiff seeks a preliminary injunction to enjoin and prohibit Defendant from (a) using the internet domain names "bestvacuumcleaner.com" and "bestchoicevacuums.com," or any version thereof in connection with the description, marketing, promotion, advertising, or sale of vacuum cleaners or other similar products, (b) infringing Plaintiff's trademark, and (c) diluting Plaintiff's trademark. A preliminary injunction is a very serious remedy and should not be used except in a case clearly demanding it. *Barbecue Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041, 1044 (7th Cir.2000). Plaintiff's motion for a preliminary injunction should be granted only if Plaintiff demonstrates a greater than negligible likelihood of success on the merits,[FN1] that Plaintiff has no adequate remedy at law, and that Plaintiff will suffer irreparable harm if preliminary relief is denied. *Barbecue Marx, Inc.,* 235 F.3d at 1043;*Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 461 (7th Cir.2000). If Plaintiff can pass this threshold, the Court will then consider any irreparable harm a preliminary injunction would cause to Defendant, as well as the consequences to the public of granting or denying the requested relief. *Eli Lilly & Co.,* 233 F.3d at 461. Then, sitting as would a court of equity, the Court weighs all of these factors on a sliding scale; the more likely that Plaintiff will succeed on the merits, the less the balance of harms need favor Plaintiff. *Id.*

> FN1. The Seventh Circuit has utilized more than one standard for determining a Plaintiff's likelihood of success on the merits. *See* Morton Denlow, *The Motion for a Preliminary Injunction: Time for a Uniform Federal Standard,* 22 Rev. Litig. 495, 531 (2003). While the Seventh Circuit required a "likelihood of success on the merits" in *Eli Lilly & Co. v. Natural Answers, Inc.,* 233 F.3d 456, 461 (7th Cir.2000), in *Barbecue Marx, Inc.,* the panel required that plaintiff show a "greater than negligible chance of prevailing on the merits of

the underlying infringement claim."235 F.3d at 1043. *See also Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1084 (7th Cir.1988). In this Report and Recommendation, the Court applies the less demanding standard of *Barbecue Marx, Inc.*

### A. Likelihood of Success on the Merits

**\*2** The Court considers Plaintiff's likelihood of success on the merits with regard to each of Plaintiff's four counts and finds that Plaintiff has no likelihood of success with any of them.

*1. Plaintiff cannot demonstrate a greater than negligible chance of prevailing on the merits under Section 32 of the Lanham Act because Plaintiff does not have a registered mark.*

In order for Plaintiff to prevail in its action under Section 32 of the Lanham Act, Plaintiff must establish that Defendant is using in commerce any copy, reproduction, counterfeit, or colorable imitation of a registered mark without permission of the registrant. 15 U.S.C. § 1114(1)(a). Unlike some sections of the Lanham Act, Section 32 explicitly protects against infringement of a "registered mark." *See Brennan's, Inc. v. Brennan's Rest.. L.L.C.,* 360 F.3d 125, 129-30 (2d Cir.2004); *Virgin Enters. Ltd. v. Nawab,* 335 F.3d 141, 146 (2d Cir.2003); *Dakota Indus., Inc. v. Dakota Sportswear, Inc.,* 946 F.2d 1384, 1388 n. 1 (8th Cir.1991); *Maier Brewing Co. v. Fleischmann Distilling Corp.,* 390 F.2d 117, 119 (9th Cir.1968); *S Indus., Inc. v. Diamond Multimedia Sys., Inc.,* 991 F.Supp. 1012, 1017 (N.D.Ill.1998). Plaintiff does not have a registered mark. On July 28, 2003, Plaintiff applied for registration of its "Best Vacuum" trademark to the United States Patent and Trademark Office. (Pl.'s Compl. at 5.) That application was initially refused and is currently pending with the United States Patent & Trademark Office. (Decl. James Kole at Ex. A.) Because Plaintiff does not have a registered mark, and because Section 32 of the Lanham Act protects only registered marks. Plaintiff's action un-

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.))**

der Section 32 of the Lanham Act has no likelihood of success.

*2. Plaintiff cannot demonstrate a greater than negligible chance of prevailing on the merits under Section 43(a) of the Lanham Act nor under Illinois Deceptive Trade Practices Act because Plaintiff's mark is not protectable and Defendant's mark is not likely to cause confusion among consumers.*

In order for Plaintiff to prevail in its actions under Section 43(a) of the Lanham Act and 815 ILCS 510/2, Plaintiff must establish: (1) that it has a protectable trademark, and (2) the junior mark is likely to cause confusion among consumers as to the origin of the defendant's product. *Eli Lilly & Co.*, 233 F.3d at 461;*Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 908 (7th Cir.1983) (claims for unfair competition and deceptive business practices brought under Illinois Statutes are to be resolved according to the principles set forth under the Lanham Act); *Spex, Inc. v. Joy of Spex, Inc.*, 847 F.Supp. 567, 579 (N.D.Ill.1994); *Thompson v. Spring-Green Lawn Care Corp.*, 126 Ill.App.3d 99, 81 Ill.Dec. 202, 466 N.E.2d 1004, 1010 (Ill.App.Ct.1984) (Illinois courts look to federal case law and apply the same analysis to state infringement claims). Defendant argues that Plaintiff cannot show either element necessary for winning a preliminary injunction.

a. Protectability of Plaintiff's mark

*3 The first step in determining whether an unregistered mark or name is protectable under trademark laws is to categorize the name according to the nature of the term itself. *Int'l Kennel Club of Chicago*, 846 F.2d at 1085. Trademarks may be characterized as fanciful, arbitrary, suggestive, descriptive, or generic. Trademarks that are fanciful, arbitrary or suggestive are fully protected, while descriptive words may be trademarked only if they have acquired secondary meaning. *Id.* A mark acquires secondary meaning when most consumers

associate it with the producer rather than the product. *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 907 (7th Cir.1986). Trademarks that are categorized as generic may never receive trademark protection. *Technical Publ'g Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir.1984). Plaintiff concedes that "Best Vacuum" is an unregistered mark that is not fanciful or arbitrary. (Pl.'s Reply at 2-3.) Plaintiff contends that "Best Vacuum" is either a suggestive mark or a descriptive mark that has acquired secondary meaning. (Pl.'s Resp. Def's Mot. Dismiss at 3.) Defendant argues that "Best Vacuum" is either a generic mark or a descriptive mark that has not acquired secondary meaning. (Def.'s Mem. Opp. Pl.'s Mot. at 6.)

Plaintiff's mark, "Best Vacuum," is not a generic term. A generic term is a term commonly used as the name or description of a kind of goods. *A.J. Canfield Co.*, 796 F.2d at 906. In other words, a generic term denotes the product rather than any of the brands of the product. *Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 171 (7th Cir.1996). Contrary to Defendant's argument, "Best Vacuum" incorporates descriptive language and does more than merely refer to the product "vacuum." Accordingly, the mark "Best Vacuum" is not a generic term.

"Best Vacuum" is a descriptive term. A term is merely descriptive when it specifically describes a characteristic or an ingredient of a product. *A.J. Canfield Co.*, 796 F.2d at 906-07. Both parties recognize that "Best" has a pre-existing or primary meaning and serves to describe the goods, i.e., vacuums, associated with the mark. (Def.'s Mem. Opp. Pl.'s Mot. at 6; Pl.'s Reply at 3.) Plaintiff argues that "Best Vacuum" is suggestive because the phrase "Best Vacuum" is suggestive of the idea that "whichever vacuum a buyer chooses, it will be superlative in all qualities that relate to vacuum cleaners."(Pl.'s Resp. Def.'s Mot. Dismiss at 3.) Plaintiff further argues that, given the numerous factors that go into the buying decision for any given consumer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 4
Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.))

of vacuum cleaners, the Court must recognize that "best" means something different to each individual consumer. (Pl.'s Resp. Def.'s Mot. Dismiss at 3-4.) The Court disagrees. "Self-laudatory or puffing marks are regarded as a condensed form of describing the character or quality of the goods."*In re The Boston Beer Company Ltd. P'ship,* 198 F.3d 1370, 1373 (Fed.Cir.1999). "Best" is a laudatory or puffing term, *id.,* and Plaintiff conceded as much at oral argument. Thus, "Best Vacuum" is not a suggestive term, but a descriptive term.

*4 Plaintiff's descriptive term "Best Vacuum" is only entitled to trademark protection if it has acquired secondary meaning. When determining whether a mark has acquired secondary meaning, the Seventh Circuit considers several factors: (1) direct consumer testimony; (2) consumer surveys; (3) exclusivity, length, and manner of use; (4) amount and manner of advertising; (5) amount of sales and number of customers; (6) established place in the market; and (7) proof of intentional copying. *Echo Travel, Inc. v. Travel Assocs., Inc.,* 870 F.2d 1264, 1267 (7th Cir.1989). In support of its secondary meaning argument, Plaintiff submits consumer reviews of "Best Vacuum," evidence of length of use, and amount and manner of advertising.

Because of the following, the Court is immediately skeptical that "Best Vacuum" can ever acquire secondary meaning. In *In re The Boston Beer Company,* the Court of Appeals for the Federal Circuit upheld the U.S. Patent and Trademark Office's refusal to register The Boston Beer Company's mark "the best beer in America" because the mark was a common, laudatory advertising phrase that had been used by competitors. 198 F.3d at 1373. The Boston Beer Company submitted evidence of advertising expenditures, an affidavit from its co-president, and evidence that its competitors had only used the slogan in a descriptive manner and never as a trademark. *Id.* The Court rejected The Boston Beer Company's arguments and found that "the best beer in America" "is so highly laudatory

and descriptive of the qualities of its product that the slogan does not and could not function as a trademark to distinguish Boston Beer's goods and serve as an indication of origin."*Id.* at 1373-74.This Court sees very strong similarities between "the best beer in America" and "Best Vacuum."

The Court now turns to Plaintiff's evidence of secondary meaning. Direct consumer testimony is relevant to the secondary meaning inquiry. *Echo Travel,* 870 F.2d at 1267. "In order to indicate secondary meaning, consumer surveys must prove more than a relatively small amount of people associate the mark with the source of the product."*Ty, Inc. v. Jones Group, Inc.,* 98 F.Supp.2d 988, 998 (N.D.Ill.2000) (*"Jones Group I"* ). Plaintiff submitted twelve Epinions.com consumer reviews of "Best Vacuum" and fifteen of the six hundred and twenty-six Epinions.com consumer surveys of "Best Vacuum." [FN2] (Pl.'s Reply at Ex. A.) The Epinions.com reviews and surveys ask customers who have just consummated a purchase at Plaintiff's web site to evaluate the customer service and experience of shopping at the web site. The reviews and surveys presented to the Court are overwhelmingly positive and most comment on Plaintiff's fine customer service, efficiency and price. (Pl.'s Reply at Ex. A.)

> FN2. Epinion.com reviews and surveys can be found at http:// www.epinions.com.

Plaintiff's reviews and surveys may constitute evidence of satisfied customers but they do not appear to constitute evidence of acquired secondary meaning. Plaintiff's surveys target a select constituency already familiar with, and recent consumers of, Plaintiff's product. Surveys that target a party's core constituency and/or display the trademark in question may not be reliable indicators of secondary meaning. *A.J. Canfield Co.,* 796 F.2d at 907-08 (finding consumer survey on Canfield's fudge unreliable because survey was conducted in Chicago, the heart of Plaintiff's market, and because the pollees were given both the source name and trademark term on the same can, thus lessening the asso-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 5
Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.))**

ciative response). Furthermore, the information obtained by Plaintiff's consumer surveys is vague and unhelpful. Of the reviews and surveys submitted by Plaintiff in this case, the strongest statement associating the "Best Vacuum" mark with Plaintiff's company, and the one Plaintiff highlights in its brief, is a consumer review entitled, "Their name says it all." (Pl.'s Reply at 3.) However, the text of that review reads, "Based on an Epinions review, and the fact that they were an authorized dealer for the brand I wanted, I ordered a vacuum from Best Vacuum in September (2002)." (Pl.'s Reply at Ex. A.) The review goes on to compliment Plaintiff on its price, efficiency, and customer service. (Id.) The review does not suggest that Plaintiff's "Best Vacuum" mark has acquired secondary meaning. *Compare to Echo Travel,* 870 F.2d at 1267 (direct consumer testimony included affidavits stating, "I am familiar with the ECHO TRAVEL posters used for the Spring break Florida trip" and "I directly associate the picture on that poster ... with the ECHO TRAVEL tour to Daytona Beach and no other tour."). Rather, it suggests that Plaintiff is operating as a vendor of popular brands of vacuum cleaners and that at least one satisfied customer thinks that Plaintiff is "the best."

**\*5** Evidence of amount and manner of advertising is relevant to the secondary meaning inquiry. *Echo Travel,* 870 F.2d at 1269. Plaintiff submitted an affidavit from Mr. Paul Teven, president of Plaintiff Best Vacuum, Inc. Mr. Teven states that Plaintiff has made substantially exclusive and continuous use of the trade name and trademark "Best Vacuum" in commerce since 1983 and directly to consumers via the internet since 1996. (Pl.'s Compl. at Ex. B.) Mr. Teven states that Plaintiff has spent more than one million dollars promoting the mark "Best Vacuum" and the web site "bestvacuum.com" in print, radio, television and internet advertising. (Id.) According to Mr. Teven, Plaintiff currently spends approximately sixty thousand dollars per month on Plaintiff's web site and on internet advertising, including advertising in the most heavily used internet search engines (namely Google.com

and Overture.com).(Id.) While evidence of amount and manner of advertising is relevant to the secondary meaning inquiry, this information cannot be evaluated in a vacuum. *Echo Travel,* 870 F.2d at 1269. In *Echo Travel,* the court could not evaluate the amount and manner of advertising without information on the number of potential customers or the geographical areas involved. *Id.* Furthermore, that court could not determine whether poster advertising-as opposed to word of mouth, cost, location, peer pressure, etc.-was a particularly successful or noticed form of advertising. *Id.* at 1269-70.And *in Keystone Camera Prods. Corp. v. Ansco Photo-Optical Prods. Corp.,* the court found plaintiff's evidence of $3.4 million on advertising and marketing, resulting in over five hundred thousand cameras sold and a sales volume of ten million dollars, to be unpersuasive due to lack of context and plaintiff's virtual monopoly in the relevant camera market. 667 F.Supp. 1221, 1231 (N.D.Ill.1987). Similarly, this Court cannot determine in a vacuum whether Plaintiff's rather general advertising expenditures were effective in establishing secondary meaning.

In *Int'l Kennel Club of Chicago,* the Seventh Circuit found secondary meaning where plaintiff, among other things, spent more than twenty-five percent of its total revenues on advertising. 846 F.2d at 1086. The plaintiff in *Int'l Kennel Club of Chicago:* (1) advertised extensively in continent-wide publications of interest to dog fanciers and in regional publications in areas where plaintiff's dog shows were held, (2) mailed out as many as fifteen thousand "premium lists" to persons on its mailing list, and (3) employed a full-time public relations professional. *Id.* Furthermore, the plaintiff in *Int'l Kennel Club of Chicago* received free publicity, including feature articles accompanied by special advertising supplements, which the court viewed as evidence of successful advertising. *Id.* Such extensive advertising (including free advertising), targeting a specific consumer group and specific geographic regions is more significant to secondary meaning than Plaintiff's approximate figures for general expendit-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                      Page 6
Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.))

ures on internet advertising.

**\*6** Absent consumer testimony regarding Plaintiff's name recognition, evidence of a successful advertising campaign, or more information about how and why consumers chose to buy vacuum cleaners from Plaintiff, the advertising information before the Court cannot be meaningfully evaluated. Similarly, the length of Plaintiff's exclusive and continuous use of the "Best Vacuum" trade name cannot be meaningfully evaluated in a vacuum. The mere fact that Plaintiff has been using the name "Best Vacuum" for over twenty years does not mean that it has acquired secondary meaning. *Id.* at 1086-87 (finding secondary meaning where plaintiff used its name for fifty years, produced evidence of successful and extensive advertising campaigns, and provided evidence of actual confusion).

Amount of sales and number of customers is relevant to the secondary meaning inquiry. *Echo Travel,* 870 F.2d at 1267. On March 24, 2004, Mr. Teven stated that, "Last year [Plaintiff's] gross sales through its Internet Web site were approximately \$3.75 million dollars."(Pl.'s Compl. at Ex. B.) While the volume of sales and number of customers are relevant to the secondary meaning inquiry, the Court cannot meaningfully assess Plaintiff's gross sales in a vacuum.*Echo Travel,* 870 F.2d at 1270;*Keystone Camera Prods..* 667 F.Supp. at 1231 (evidence of ten million dollars in sales not persuasive without context). The Court does not have any information on the size of Plaintiff's sales, the number of customers or individual sales made by Plaintiff,^FN3 nor Plaintiff's competitors' gross sales, so the Court does not give this factor much weight.

> FN3. Plaintiff's Motion for Preliminary Injunction includes the claim that, "Plaintiff has sold its vacuum cleaner products to over fifty thousand (50,000) customers. (See Affidavit of Paul S. Teven.)"(Pl.'s Mem. Supp. Mot. at 6.) This claim does not appear in Mr. Teven's affidavit. (Pl.'s Compl. at Ex. B.)

Established place in the market is relevant to the secondary meaning inquiry.*Echo Travel,* 870 F.2d at 1267. Mr. Teven states that Plaintiff is currently a leading sales representative in the United States for Miele brand vacuum cleaners. (Pl.'s Compl. at Ex. B.) This is a vague statement and the Court does not give it much weight. The Court does not know what "a leading sales representative" means with regard to Plaintiff's place in the market. Specifically, the Court does not know the number of Miele representatives in the United States, the volume of their business, the size of their market, or where Plaintiff ranks among them.

Proof of intentional copying is relevant to the secondary meaning inquiry.*Echo Travel,* 870 F.2d at 1267. Plaintiff argues that, given Plaintiff's long standing use and extensive marketing efforts, and given that Defendant and Plaintiff are direct competitors, it is highly unlikely that Defendant registered the domain name "bestvacuumcleaner.com" without knowledge of Plaintiff's use of the name. (Pl.'s Mem. Supp. Mot. at 6.) Plaintiff further argues that Defendant is expert at marketing over the internet and therefore knows that most consumers enter keywords into internet search engines in order to find and purchase products such as vacuum cleaners. (Pl.'s Mem. Supp. Mot. at 7.) Due to consumers' use of internet search engines, Plaintiff advertises heavily on the most popular search engines. (Id.) Plaintiff argues that Defendant deliberately uses "bestvacuumcleaner.com" in order to attract customers using keywords in internet search engines. Plaintiff finds additional proof of Defenant's intent to copy in the fact that Defendant registered the site "bestchoicevacuum.com" after receiving notice of Plaintiff's claim of trademark rights in the "Best Vacuum" mark. (Id.)

**\*7** Search engines play an important role in internet commerce as they help consumers navigate the internet and locate web sites relevant to their search. When generating and ranking search results, search engines consider a variety of factors, including

keywords. Competing businesses may devise strategies to improve their standing or ranking in the results generated by internet search engines in the hope of growing their business. When a business's strategy includes using a competitor's name in order to divert or confuse potential customers, infringement or dilution or other unfair trade practices may be occurring. Where a competitor's strategy is to use generic and descriptive terms to market its products, wrongdoing is less likely. In this case, Plaintiff suggests that Defendant engages in unfair competition when it promotes its product as the best vacuum. The Court disagrees and does not consider this to be proof of intentional copying. There are a limited number of words in the English language available to Defendant for promoting its goods. As discussed above, "best" is a common laudatory and descriptive term. "Vacuum" is a generic term for a type of indoor cleaning tool. Plaintiff, a vacuum cleaner vendor, may not claim these terms for itself, nor cry foul when other vacuum cleaner vendors seek to use them. To place restrictions on the use of these words would unfairly inhibit competition.

The Court's decision against restricting use of "best vacuum" is supported by the evidence. When the keywords "best vacuum" are entered into the internet search engine Yahoo.com more than three million results are generated, with Plaintiff's web site ranked number one. (Def.'s Mem. Supp. Mot. Dismiss at Ex. A.) The same search with Google.com produces more than three million results with Plaintiff's web site appearing sixth on the list. (Def.'s Mem. Supp. Mot. Dismiss at Ex. B.) And when the "best vacuum" search was conducted on Overture.com, Plaintiff's web site was ranked number forty-one on the list generated. At oral argument, the parties debated the significance of internet search engine rankings, but agreed that a variety of constantly changing factors and algorithms are used.[FN4] Regardless of the significance of the rankings, the Court agrees with Defendant that a wide variety of entities use the term "best vacuum" to identify the products they sell. (Def.'s Mem. Opp.

Pl.'s Mot. at Exs. A, B, C, D.) As Defendant points out, various business entities use the term "best vacuum" to praise their vacuums in the text of their web sites, in the visible portion of their web sites, in the metatags of their web sites, and as "adwords" in order to bring their web sites to the attention of people searching for vacuums. (Def.'s Mem. Opp. Pl.'s Mot. at 8, Exs. A, B, C, D.) In light of these facts, the Court does not find Defendant's use of common descriptive words to promote its product on the internet to be evidence of intent to copy.

> FN4. Because the parties admit that rankings can be manipulated and that internet search engines constantly change the factors and algorithms used for ranking sites, the Court does not consider the rankings to necessarily be substantial evidence of a party's established place in the market.

*8 Plaintiff has chosen a common descriptive and laudatory phrase for its company name. Such a name is only protectable when it has acquired secondary meaning. The record does not contain sufficient meaningful direct or indirect evidence to support Plaintiff's claim of secondary meaning. This Court concludes that Plaintiff's mark "Best Vacuum" is not protectable and is not entitled to preliminary injunctive relief. Accordingly, this Court recommends that Plaintiff's motion for preliminary injunction be denied.

b. Likelihood of confusion

In order to prevail in a cause of action brought under the Lanham Act, Plaintiff must establish both that its mark "Best Vacuum" is protectable and that Defendant's mark is likely to cause confusion among consumers. In assessing the likelihood of consumer confusion, the Seventh Circuit considers seven factors: (1) the similarity between the marks in appearance and suggestion, (2) the similarity of the products, (3) the area and manner of concurrent use, (4) the degree of care likely to be exercised by consumers, (5) the strength of Plaintiff's mark, (6)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

any evidence of actual confusion, and (7) Defend-ant's intent (or lack thereof) to palm off its products as those of Plaintiff. *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 897 (7th Cir.2001) ( *"Jones Group II"* ); *Eli Lilly & Co.,* 233 F.3d at 461-62. While the proper weight given to each factor varies from case to case, the similarity of the marks, the intent of Defendant, and evidence of actual confusion are the most important considerations. *Jones Group II,* 237 F.3d at 898;*Eli Lilly & Co.,* 233 F.3d at 462. At this preliminary stage in the proceeding, Plaintiff must establish that its chances of demonstrating likeli-hood of confusion are better than negligible. *Int'l Kennel Club of Chicago,* 846 F.2d at 1087.

Similarity between the marks in appearance and suggestion is relevant to the likelihood of confusion analysis. *Jones Group II,* 237 F.3d at 897;*Eli Lilly & Co.,* 233 F.3d at 461. When determining if two marks are similar, the Court considers the sound, sight, and overall impression of the two marks. *See Eli Lilly & Co.,* 233 F.3d at 462-63. It is inappro-priate to focus on minor stylistic differences to de-termine if confusion is likely if the public does not encounter the two marks together. *Jones Group II,* 237 F.3d at 898. Rather, in such a case the compar-ison should be made in light of what happens in the marketplace and not merely by looking at the two marks side-by-side.*Id.* (citing *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.,* 128 F.3d 1111, 1115 (7th Cir.1997)).

Plaintiff argues that the appearance, sound and meaning of Plaintiff's "Best Vacuum" mark is strik-ingly similar to Defendant's domain names "bestchoicevacuums.com" and "bestvacuumcleaner.com." (Pl.'s Mem. Supp. Mot. at 4.) Plaintiff argues that the similarities between the marks are especially important in internet com-merce since the domain names function as web site locators. (Id.) Finally, Plaintiff argues that, given the similarity in sound, appearance and meaning, it is unlikely that consumers will easily distinguish between Plaintiff's mark and Defendant's domain names. (Id.)

*9 The Court focuses on "bestchoicevacuum" and "bestvacuumcleaner" only, as the ".com" suffix is not important to the likelihood of confusion analys-is.*Trans Union L.L.C. v. Credit Research, Inc.,* 142 F.Supp.2d 1029, 1042 (N.D.Ill.2001). The Court finds Defendant's domain name "bestchoicevacuum" significantly different from Plaintiff's "Best Vacuum" mark. While there is only a one word difference between the two marks, the addition of the word "choice" between "best" and "vacuum" changes the nature of the domain name from a potential source identifier to a more open-ended search for a generic product. In other words, with the inclusion of the word "choice," Defend-ant's domain name "bestchoicevacuum" takes on distinctive significance and makes it less likely to be considered a source indicator at all. *See id.*(adding "creditresearch" to "transunion.com" suggests that defendant's web site is in the credit re-search industry but not necessarily associated with plaintiff's "transunion" mark). As the differences between Defendant's domain names and Plaintiff's trade name become more noticeable, the similarities between the names are likely to appear to con-sumers as more reflective of the fact that both are being used to designate something having to do with vacuums rather than indicating a common source. *See id.*(quoting *TCPIP Holding Co., Inc. v. Haar Communications Inc.,* 244 F.3d 88, 101-02 (2d Cir.2001).) While the difference here is not great, the Court finds it to be significant.

Defendant's domain name "bestvacuumcleaner" is nearly identical to Plaintiff's "bestvacuum" mark. The Court finds that there is no meaningful differ-ence between "Best Vacuum" and "bestvacuumcleaner," as internet domain names do not permit spaces between words and "vacuumcleaner" is merely the full name for the "vacuum" cleaning tool that Defendant and Plaintiff are selling. *See id.*(finding one word dif-ference between Defendant's domain name "credittransunion" and Plaintiff's trade name "Trans Union" takes on little distinctive significance where Plaintiff Trans Union is in the credit business). It is

entirely conceivable that a consumer searching for "Best Vacuum" would enter "bestvacuumcleaner" in the web address line of their home page instead of using an internet search engine.

Ordinarily, similarity of the marks is considered a significant factor in the likelihood of confusion analysis. In this case, however, "vacuum" is a generic term and "best" is merely descriptive. Because "Best Vacuum" is not fanciful, arbitrary or suggestive, "Best Vacuum" is not entitled to the highest protection and even slight variations in the domain name may be sufficient to create meaningful distinctions between Plaintiff's and Defendant's names. *Compare to Eli Lilly & Co.,* 233 F.3d at 462 (finding that slight variations in spelling or arrangement of letters are often insufficient to prevent consumer confusion between fanciful marks).[FN5] Furthermore, as with "bestchoicevacuum" above, the similarities between Plaintiff's and Defendant's domain names may appear to consumers as more reflective of the fact that both are being used to designate something having to do with vacuums rather than indicating a common source.

> FN5. "Best Vacuum" would be entitled to some protection if Plaintiff establishes secondary meaning. For the reasons discussed above, Plaintiff fails to do so.

**\*10** The Court concludes that the similarity between the marks factor favors Defendant with regard to the "bestchoicevacuum" domain name, and slightly (if at all) favors Plaintiff with regard to the "bestvacuumcleaner" domain name.

The similarity of Plaintiff's and Defendant's products is relevant to the likelihood of confusion analysis. *Jones Group II,* 237 F.3d at 897;*Eli Lilly & Co.,* 233 F.3d at 461. The Court must consider whether Plaintiff and Defendant's products and services are related in the minds of the public.*Eli Lilly & Co.,* 233 F.3d at 463;*Trans Union,* 142 F.Supp.2d at 1042. Plaintiff and Defendant both operate as third party vendors, selling and advertising many of the same brands and models of vacuum

cleaners and accessories, including Miele and Dyson brand vacuum cleaners. For all intents and purposes, Plaintiff and Defendant offer identical products to the market, so this factor favors Plaintiff.

Area and manner of concurrent use affects the likelihood of confusion.*Jones Group II,* 237 F.3d at 897;*Eli Lilly & Co.,* 233 F.3d at 461. The area and manner of concurrent use factor requires the Court to consider whether there is a relationship in use, promotion, distribution or sales between the goods or services of the two parties. *Forum Corp. of N. Am. v. Forum Ltd.,* 903 F.2d 434, 442 (7th Cir.1990). Plaintiff and Defendant both operate as third party vendors, selling and advertising many of the same brands and models of vacuum cleaners and accessories on and through the internet, so this factor favors Plaintiff.

When determining the likelihood of confusion, the Court considers the degree of care likely to be exercised by consumers. *Jones Group II,* 237 F.3d at 897;*Eli Lilly & Co.,* 233 F.3d at 461. Confusion is less likely where consumers are sophisticated and deliberative buyers. *Rust Env't & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1217 (7th Cir.1997). The more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases. *CAE, Inc. v. Clean Air Eng'g, Inc.,* 267 F.3d 660, 683 (7th Cir.2001). The name-brand vacuum cleaners sold on Plaintiff's and Defendant's web sites range in price from approximately two hundred dollars (without accessories) to thirteen hundred dollars (without accessories).*See* www.best-vacuum.com. Consumer goods that cost over two hundred dollars are not inexpensive products so the Court assumes that the relevant consumers will exercise a fairly high degree of care.

Plaintiff alleges initial interest confusion. Initial interest confusion occurs when a consumer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods be-

fore the sale is consummated. *Promatek Indus. ., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir.2002). Initial interest confusion is actionable even where the customer confusion is very brief. *Id.;Forum Corp. of N. Am.*, 903 F.2d at 442 n. 2. What is important is not the duration of the confusion but the appropriation of Plaintiff's goodwill. *Promatek Indus.*, 300 F.3d at 812-13.

*11 Plaintiff believes that customers who would have no difficulty differentiating Plaintiff and Defendant's companies in the "offline world" may get confused in the "online world." Plaintiff states that, "An internet user looking for vacuum cleaners using the 'Best Vacuum' mark, after arriving at 'bestvacuumcleaner.com' and 'bestchoicevacuum.com,' may be perfectly content with the information offered by Defendant."(Pl.'s Mem. Supp. Mot. at 5.) Plaintiff contends that this would be an illegal appropriation of its goodwill.

The Court has not been presented with any actual evidence of initial interest confusion. For the reasons discussed above, the Court finds that Defendant's "bestchoicevacuum" domain name is significantly different from Plaintiff's mark and is unlikely to create this type of confusion. Defendant's "bestvacuumcleaner" domain name, however, is very similar to Plaintiff's "Best Vacuum" and may indeed lure away Plaintiff's potential customers. Given the generic and descriptive nature of the terms involved in this case, however, the Court is hesitant to find appropriation of goodwill. Plaintiff deliberately chose a trademark that is likely to be used by potential customers searching for high quality vacuum cleaners. While Defendant's use of similar words may cost Plaintiff some business, Plaintiff is as likely to gain business by using generic and descriptive terms to cast a wide advertising net. Thus, to whatever extent initial interest confusion exists in this case, the Court finds that it does not necessarily favor Plaintiff. And because the vacuum cleaners involved in this case are high end, high quality consumer goods, the degree of care factor, overall, favors Defendant.

The Court must determine the strength of Plaintiff's mark when assessing the likelihood of confusion. *Jones Group II*, 237 F.3d at 897;*Eli Lilly & Co.*, 233 F.3d at 461-62. Strength of a mark refers to its distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source. *CAE, Inc.*, 267 F.3d at 684. Marks may be strengthened by extensive advertising, length of time in business, public recognition, and uniqueness. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir.1988).

Plaintiff points to its twenty-one years of using the mark "Best Vacuum," over one million dollars spent on advertising, and over sixty thousand dollars per month spent on internet advertising and Plaintiff's web page. Plaintiff also presents Epinion.com reviews and surveys as evidence of a strong mark. Plaintiff is essentially restating its secondary meaning arguments, which the Court did not find persuasive. More importantly, the Court found that Plaintiff's mark was merely descriptive, which makes it less likely to be a strong mark. *See Century 21 Real Estate Corp.*, 846 F.2d at 1179. Thus, the Court finds that Plaintiff does not have a strong mark and this factor favors Defendant.

*12 Actual confusion is very important to establishing likelihood of confusion. *Jones Group II*, 237 F.3d at 898;*Eli Lilly & Co.*, 233 F.3d at 462. Evidence of actual confusion, however, is not essential to a finding of likelihood of confusion. *Eli Lilly & Co.*, 233 F.3d at 465. In cases like the one at bar, where Defendant used its domain names only for a few months before Plaintiff filed suit, there is unlikely to be evidence of actual confusion and the absence of such evidence is not dispositive. *Id.* at 464-65;*Trans Union*, 142 F.Supp.2d at 1043. Accordingly, this factor neither favors nor disfavors Plaintiff.

Determining Defendant's intent (or lack thereof) to palm off its products as those of Plaintiff is critically important when assessing the likelihood of confusion. *Jones Group II*, 237 F.3d at 897-98;*Eli Lilly & Co.*, 233 F.3d at 462. In the internet con-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

text, intentional registration of a domain name knowing that it is another company's valuable trademark weighs in favor of likelihood of confusion. *See Brookfield Communications, Inc. v. W. Coast Entm't Corp.,* 174 F.3d 1036, 1059 (9th Cir.1999); *Trans Union,* 142 F.Supp.2d at 1044. Plaintiff argues that Defendant must have known about Plaintiff's mark because Defendant is an expert in internet marketing and Plaintiff advertises extensively on the internet. Furthermore, Plaintiff alleges that Defendant decided to register "bestchoicevacuum.com" after Plaintiff complained about Defendant's use of "bestvacuumcleaner.com."

Plaintiff fails to show that Defendant's intent is to palm off its products as those Plaintiff. Nothing on Defendant's web site suggests that Defendant is trying to palm off Plaintiff's products or make use of Plaintiff's "Best Vacuum" name. More importantly, Defendant does not use Plaintiff's logo anywhere on the web sites. *Compare to Trans Union,* 142 F.Supp.2d at 1044. Rather, Defendant uses generic and descriptive words to market its products. Accordingly, the Court rejects Plaintiff's suggestion that Defendant's use of the generic and descriptive words "best" and "vacuum" is a bad faith attempt to use key words to confuse potential customers searching for Plaintiff. Finally, as "Best Vacuum" has not acquired secondary meaning, there can be no intentional registration of another company's valuable mark, nor intentional registration of a trademark owned by another company. *Compare to Brookfield,* 174 F.3d at 1059. The Court will not infer from Defendant's domain names alone that Defendant intends to palm off Plaintiff's products as its own, and there is no other evidence suggesting that Defendant is deliberately copying Plaintiff. Accordingly, the Court does not find palming off in this case.

Plaintiff has not shown a likelihood of confusion. As discussed above, the Court finds that the similarity of products and the area and manner of concurrent use factors strongly favor Plaintiff. The Court finds that the degree of care, strength of

Plaintiff's mark, and Defendant's lack of intent to palm off products strongly favor Defendant. Evidence of actual confusion does not favor either party. The similarity between the marks strongly favors Defendant with regard to "bestchoicevacuum" and slightly (if at all) favors Plaintiff with regard to "bestvacuumcleaner." Given the above factors, the Court finds Plaintiff has no chance of showing likelihood of confusion with regard to Defendant's domain name "bestchoicevacuum" and a negligible chance of showing likelihood of confusion with regard to Defendant's domain name "bestvacuumcleaner."

c. No likelihood of success on the merits

**13** Plaintiff has no likelihood of success on the merits. Plaintiff's "Best Vacuum" mark has not acquired secondary meaning so it is not entitled to trademark protection under the Lanham Act and an injunction should not be issued. Furthermore, even if a Court found that Plaintiff's mark had acquired secondary meaning, Plaintiff has no likelihood of success on the merits against Defendant's use of the "bestchoicevacuum" domain name and a negligible likelihood of success on the merits against "bestvacuumcleaner." Accordingly, to the extent Plaintiff relies on Section 43(a) of the Lanham Act, the Court recommends denying Plaintiff's motion for preliminary injunction.

This recommendation extends to Plaintiff's 815 ILCS 510/2 claim as well. The relevant claims under 815 ILCS 510/2 include (1) passing off goods or services as those of another, (2) causing likelihood of confusion or misunderstanding as to the source of goods, (3) causing likelihood of confusion or misunderstanding as to affiliation, connection or association by another, (4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, or benefits that they do not have, and (5) any other conduct which similarly creates a likelihood of confusion or misunderstanding. 815 ILCS 510/2(a)(1)-(3), (5), (12). These issues are discussed above and are subject to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

same analysis and outcome. *Gimix,* 699 F.2d at 908;*Spex, Inc.,* 847 F.Supp. at 579;*Thompson,* 81 Ill.Dec. 202, 466 N.E.2d at 1010. Accordingly, to the extent Plaintiff relies on 815 ILCS 510/2, this Court recommends denying Plaintiff's motion for preliminary injunction.

3. *Plaintiff cannot demonstrate a greater than negligible chance of prevailing on the merits under Section 43(c) of the Lanham Act 43(c) because Plaintiff cannot show that its mark is famous nor that Defendant's mark will dilute Plaintiff's mark.*

Plaintiff brings a dilution claim under the Federal Trademark Dilution Act of 1995, which "opens an alternative avenue of relief for the owners of famous marks."*Eli Lilly & Co.,* 233 F.3d at 466. The Act provides:

The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125(c)(1). The Seventh Circuit recognizes three types of dilution: tarnishing, blurring, and free-riding. *Ty Inc. v. Perryman,* 306 F.3d 509, 511-12 (7th Cir.2002)(*"Perryman"* ). Dilution by tarnishing occurs when a junior mark's similarity to a famous mark causes consumers mistakenly to associate the senior mark with the defendant's offensive or inferior product.*Eli Lilly & Co. .,* 233 F.3d at 466. Dilution by blurring, which is the principal dilution claim before the Court, occurs where a mark becomes associated with a variety of unrelated products, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product. *Id.* Dilution by free-riding occurs where the holder of a junior mark essentially appropriates the goodwill and/or aura of a senior

mark and free rides on the investment of the senior mark's owner. *Perryman,* 306 F.3d at 512. Ultimately, likelihood of dilution is proven by reference to the marks' similarity and the strength of the senior mark. *Eli Lilly & Co.,* 233 F.3d at 468. As in the other sections of the Lanham Act, "[t]he strongest protection is reserved for fanciful marks that are purely the product of imagination and have no logical association with the product."*Id.* at 466.

**\*14** To demonstrate dilution, Plaintiff must show that its mark is famous, that Defendant adopted its domain names after Plaintiff's mark became famous, that Defendant's marks cause dilution of Plaintiff's mark, and that Defendant's use of its domain names is commercial and in commerce. 15 U.S.C. § 1125(c)(1); *Eli Lilly & Co. .,* 233 F.3d at 466. There is no dispute that Defendant's use of its domain names is commercial and in commerce. Furthermore, Defendant's use of its domain names followed Plaintiff's use of its mark. Accordingly, the Court focuses its inquiry on the fame of Plaintiff's mark and whether Defendant's marks cause actual dilution. To determine whether Plaintiff's mark is famous, courts use the following eight factor test: (1) the degree of inherent or acquired distinctiveness of the mark; (2) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (3) the duration and extent of advertising and publicity of the mark; (4) the geographical extent of the trading area in which the mark is used; (5) the channels of trade for the goods or services with which the mark is used; (6) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought; (7) the nature and extent of use of the same or similar marks by third parties; and (8) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register. 15 U.S.C. § 1125(c)(1)(A)-(H). Finally, to successfully bring a dilution claim, Plaintiff must show actual dilution. *Moseley v. v. Secret Catalogue, Inc.,* 537 U.S. 418, 433-34, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003); *Sul-*

Not Reported in F.Supp.2d                                                                                           Page 13
Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.))**

*livan v. CBS Corp.,* 385 F.3d 772, 779 (7th Cir.2004).

### a. Fame of Plaintiff's mark

The Court first assesses the degree of inherent or acquired distinctiveness of the mark. 15 U.S.C. § 1125(c)(1)(A). In this case, Plaintiff's "Best Vacuum" mark lacks inherent or acquired distinctiveness. As discussed above, Plaintiff's mark is comprised of, at best, highly descriptive terms and is not inherently distinctive. Furthermore, the mark has not acquired secondary meaning.

The Court considers the duration and extent of use of the "Best Vacuum" mark in connection with Plaintiff's goods and services. 15 U.S.C. § 1125(c)(1)(B). Plaintiff has done business under the name "Best Vacuum" for twenty-one years. (Pl.'s Compl. at Ex. B.) Plaintiff has done business on and through the internet under the name "Best Vacuum" for approximately eight years. (Id.)

Courts consider the duration and extent of advertising and publicity of the mark when assessing the threat of dilution. 15 U.S.C. § 1125(c)(1)(C). Plaintiff claims to have spent over one million dollars on advertising for its mark. (Id.) Plaintiff claims to spend approximately sixty thousand dollars per month on internet advertising and maintaining its web site. (Id.) Plaintiff claims that its gross sales were approximately $3.75 million last year. (Id.)

**\*15** The geographical extent of the trading area in which the mark is used is relevant to the dilution inquiry. 15 U.S.C. § 1125(c)(1)(D). Plaintiff operates on the internet, thereby reaching geographical and trading areas around the world. In particular, Plaintiff claims to have significant business dealings in North America and Europe. (Id.)

Courts consider the channels of trade for the goods or services with which the mark is used. 15 U.S.C. § 1125(c)(1)(E). In this case, Plaintiff uses its "Best Vacuum" mark on the internet and through its retail stores.

The degree of recognition of the "Best Vacuum" mark in the trading areas and channels of trade used by Plaintiff and Defendant is relevant to the dilution inquiry. 15 U.S.C. § 1125(c)(1)(F). As discussed above, Plaintiff and Defendant both occupy the same trading areas and channels of trade, as both market their goods on and through the internet. The Court has not seen any evidence regarding the degree of recognition of Plaintiff's mark, except in the context of secondary meaning. Again, as discussed above, the evidence that has been presented to the Court does not suggest that Plaintiff's mark has a high degree of recognition, nor that Plaintiff's mark has acquired secondary meaning.

Courts look to the nature and extent of use of the same or similar marks by third parties when assessing dilution. 15 U.S.C. § 1125(c)(1)(G). Plaintiff argues that there is no other similar federally registered mark and that there can be only one "bestvacuum.com" domain name. Plaintiff claims that it aggressively attempts to stop any entity or individual that uses the term "best vacuum." The parties dispute whether there are other domain names making use of the words "best" and "vacuum" and whether Plaintiff is aggressively attempting to stop those uses. Plaintiff has not presented specific examples of legal action or negotiations or challenges brought by Plaintiff against third parties using marks similar to Plaintiffs. Defendant has presented evidence of such a web site, namely "bestvacuumstore.com" (Decl. Charles Lee Mudd Jr. at Ex. C.) Defendant also presented evidence of third parties using the phrase "best vacuum" in the text of their web sites to promote their products and services or to answer questions about vacuum cleaners. (Id.)

Finally, when assessing the fame of Plaintiff's mark, the Court considers whether Plaintiff's mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register. 15 U.S.C. § 1125(c)(1)(H). Plaintiff's mark is not registered under the Act of March 3, 1881,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Act of February 20, 1905, or on the principal register. To date, Plaintiff's attempts to register its mark have been denied. (Decl. James Kole at Ex. A.)

Based on the eight part test, the Court concludes that Plaintiff's mark is not famous. While Plaintiff clearly invested time and money into its business, Plaintiff's mark is not distinct and has not acquired secondary meaning, there is no clear evidence of the mark's degree of recognition, and it appears that some third parties are using terms similar and/or identical to Plaintiff's mark. Plaintiff improperly analogizes this case to *Intermatic Inc. v. Toeppen,* 947 F.Supp. 1227 (N.D.Ill.1996). In *Intermatic,* defendant diluted the federally registered fanciful mark "intermatic" when he registered the domain name "intermatic.com." *Id.* at 1240.That court found that the defendant was a cyber-squatter whose use of "intermatic.com" was deceptive, confusing, and lessened the capacity of the Intermatic mark to identify and distinguish goods and services on the internet. *Id.* Unlike Intermatic, Plaintiff's mark is not famous, fanciful or federally registered. Unlike Intermatic, Defendant did not register a domain name identical to Plaintiff's mark. As close as "bestvacuum" and "bestvacuumcleaner" may be, they are not identical.

**b. Actual dilution**

**\*16** "In order to state a claim of dilution, proof of actual dilution is required, either through survey, financial, or circumstantial evidence."*Sullivan,* 385 F.3d at 779 (citing *Moseley,* 537 U.S. at 434). While such trial-like evidence of actual dilution must be produced before Plaintiff can win permanent relief and/or damages, evidence of actual dilution cannot be required at the preliminary injunction stage, *see Ty Inc. v. Softbelly's, Inc.,* 353 F.3d 528, (7th Cir.2003) (citing *Moseley,* 537 U.S. at 434);*Eli Lilly & Co.,* 233 F.3d at 468-69, so its absence in this case does not bar Plaintiff's dilution claim.

**c. No likelihood of success on the merits**

Plaintiff has not shown that its mark is famous, nor that actual dilution has occurred. The Court concludes that Plaintiff cannot show a likelihood of success with regard to its Section 43(c) blurring dilution claim. Furthermore, because Plaintiff has not shown that its mark is famous, nor that Defendant is intentionally using Plaintiff's mark, the Court rejects Plaintiff's suggestion that Defendant is free riding on Plaintiff's investment in its mark. (Pl.'s Compl. at 3.)

**B. Adequate Remedy at Law and Irreparable Harm**

An injunction will not issue if Plaintiff has an adequate remedy at law. There is a well-established presumption that injuries arising from Lanham Act violations are irreparable, even absent a showing of business loss. *Promatek Indus.,* 300 F.3d at 813;*Jones Group II,* 237 F.3d at 902;*Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 16 (7th Cir.1992). This presumption is based upon the judgment that it may be impossible to determine the precise economic consequences of intangible harms, such as loss of goodwill and damage to reputation, caused by Lanham Act violations. *Jones Group II,* 237 F.3d at 902 (citing *Abbott Labs.,* 971 F.2d at 16).

Defendant argues that Plaintiff's inaction in defending its name suggests that Plaintiff will not suffer irreparable harm. Defendant points out that Plaintiff waited twenty years before seeking federal registration of its mark, and Defendant asserts that Plaintiff has not filed suit against any of the "multitude of web sites and entities using the term 'best vacuum' on the internet."(Def.'s Mem. Opp. Pl.'s Mot. at 13.) While delay in and of itself does not preclude a finding of irreparable harm, where a plaintiff delays bringing a temporary injunction, such that the defendant was lulled into a false sense of security or acted in reliance on the plaintiff's delay, the presumption of irreparable harm may cease to exist. *Jones Group II,* 237 F.3d at 903. The Court rejects

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendant's argument that Plaintiff delayed seeking relief. In this case, Plaintiff immediately challenged Defendant's use of the domain names at issue and Defendant admits that Plaintiff did not delay in moving for a preliminary injunction. (Def.'s Mem. Opp. Pl.'s Mot. at 12.) Plaintiff's delay in registering its mark is relevant to the protectability of the mark but is not the delay contemplated by the irreparable harm analysis. Accordingly, the Court presumes no adequate remedy at law and irreparable harm to Plaintiff.

C. Balance of Harms and Public Interest

*17 In the event that Plaintiff establishes likelihood of success on the merits and inadequate remedy at law and irreparable harm, the Court considers the balance of harms and the public interest in granting or denying a preliminary injunction.

1. *Balance of harms*

The Court considers the irreparable harm to Defendant if Plaintiff's preliminary injunction is granted, balancing that harm against the irreparable harm to Plaintiff if the preliminary injunction is denied. *Abbott Labs.,* 971 F.2d at 11-12. Plaintiff does business under the name "Best Vacuum." Plaintiff has invested twenty-one years and over one million dollars in its business. Plaintiff has maintained its web site and has conducted business on and through its web site for approximately eight years.

Defendant does business under the name "Ian Design, Inc." Unlike Plaintiff's web sites, Defendant's domain names appear to function solely as internet addresses and not as source identifiers. Defendant registered its "bestvacuumcleaner.com" domain name in November 2003. Then, despite Plaintiff's objections, Defendant registered its "bestchoicevacuums.com" domain name in March 2004. The timing here is significant because Defendant knowingly assumed the risk of litigation when it registered the "bestchoicevacuums.com"

domain name. Next, the Court has not seen any significant evidence of reputation or goodwill in Defendant's business. And with regard to either "bestchoicevacuum.com" or "bestvacuumcleaner.com," the Court finds that any goodwill Defendant may have accumulated since November 2003 is negligible compared to Plaintiff's goodwill.

Defendant argues that enjoining it from using the terms "best and "vacuum" in association with its vacuum business would place it at an unreasonable and unsupportable disadvantage to all other vacuum businesses using such terms. The Court agrees that the "Best Vacuum" mark is, at best, highly descriptive and that placing limitations on use of the words "best" and "vacuum" causes significant harm to competitors' ability to advertise and compete in the vacuum cleaner industry. However, the Court recognizes that Defendant can make extensive use of the words "best" and "vacuum" on its web sites without placing the words in its domain name. Through key words and internet search engines, Defendant can mitigate some of the harm it would suffer if the domain names "bestchoicevacuums.com" and "bestvacuumcleaner.com" are off-limits. Thus, the Court finds that the balance of harms favors Plaintiff.

2. *Public interest*

The public interest factor takes into account the effect that granting or denying an injunction would have on nonparties. *Meridian Mut. Ins. Co.,* 128 F.3d at 1121. Enforcement of trademark law serves the public interest by reducing consumer confusion. *Eli Lilly & Co.,* 233 F.3d at 469;*Int'l Kennel Club of Chicago,* 846 F.2d at 1092 n. 8. However, trademark protection should not interfere with the traditional policies of a competitive market, and courts have generally recognized that the public substantially benefits from competition. *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,* 149 F.3d 722, 726 (7th Cir.1998). An essential compon-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ent of competition is availability of words for advertising, promoting, and informing the public.

**\*18** Public interest in preventing confusion is minimal in this case. Both parties in this case sell brand name vacuum cleaners. To the extent that Defendant's domain names might cause consumer confusion, it is initial interest confusion regarding the vendor of the vacuum cleaner not the products themselves. While it is possible that initial interest confusion may cause a small degree of public confusion, the real harm in this case appears to be to Plaintiff, with the public experiencing negligible harm only. A consumer who arrives at Defendant's web site by accident may choose to purchase his vacuum cleaner from Defendant instead of Plaintiff, but the Court is confident that he makes that purchase knowing that he is not doing business with Plaintiff. The Court finds that, in this case, this degree of confusion is acceptable and does not weigh heavily in favor of granting Plaintiff's injunction.

Public interest in preserving competition is significant. Plaintiff has selected the highly descriptive term "Best Vacuum" for its company name. Just as a consumer looking for Plaintiff's company may find himself at Defendant's web site, so too might a consumer searching for the best vacuum cleaner on the market find himself at Plaintiff's web site. In short, as discussed above, Plaintiff chose a highly descriptive term for its company name in an attempt to capture valuable words in the vacuum cleaner market for its exclusive use. The Court finds the term "Best Vacuum" is descriptive and therefore valuable to the marketplace and to competition. Public interest will be significantly injured if basic words are removed from the vacuum industry's lexicon.

Because granting Plaintiff's preliminary injunction will restrict competition and cause greater harm to the public than would denying Plaintiff's injunction, the Court finds that the public interest favors denying Plaintiff's injunction.

D. Sliding Scale: Plaintiff has not satisfied its burden.

To secure a preliminary injunction, Plaintiff must show that its mark is entitled to trademark protection and that Plaintiff's action has a greater than negligible chance of prevailing on the merits. If Plaintiff succeeds in showing both protectability and likelihood of success, the Court then balances the harm that granting or denying an injunction will cause each party, as well as the harm caused to the public. *Eli Lilly & Co.*, 233 F.3d at 461. When assessing the balance of harms to the parties and to the public the Court should try to minimize the costs of being mistaken. *Jones Group II*, 237 F.3d at 902. Thus, where Plaintiff's likelihood of success on the merits is slight, Plaintiff must make a proportionately stronger showing that the balance of harms is in its favor. *Id.* at 903-04.

In this case, the Court finds that Plaintiff's mark is not entitled to trademark protection, as "Best Vacuum" is merely descriptive and has not acquired secondary meaning. The Court also finds that Plaintiff has no likelihood of success on the merits with regard to its infringement or dilution claims. In the event that Plaintiff establishes both a greater than negligible chance of prevailing on the merits and irreparable harm with no adequate legal remedy, the Court finds that the balance of harms factor favors Plaintiff while the public interest factor favors Defendant. Because the balance of harms and public interest do not strongly favor Plaintiff, and because Plaintiff has, at best, a negligible chance of succeeding on the merits, the sliding scale evaluation suggests that Plaintiff has not carried its burden and is not entitled to a preliminary injunction. Accordingly, this Court recommends denying Plaintiff's motion for preliminary injunction.

### III. *Conclusion*

**\*19** For the foregoing reasons, the Court recommends denying Plaintiff's motion for preliminary injunction.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2005 WL 1185817 (N.D.Ill.))**

N.D.Ill.,2005.
Best Vacuum, Inc. v. Ian Design, Inc.
Not Reported in F.Supp.2d, 2005 WL 1185817
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 9

Westlaw.

Slip Copy

Slip Copy, 2006 WL 3486879 (N.D.Ill.)

**(Cite as: 2006 WL 3486879 (N.D.Ill.))**

**H**

Best Vacuum, Inc. v. Ian Design, Inc.

N.D.Ill.,2006.

Only the Westlaw citation is currently available.

United States District Court,N.D. Illinois, Eastern Division.

BEST VACUUM, INC., Plaintiff,

v.

IAN DESIGN, INC., a New Jersey corporation, Defendant.

**No. 04 C 2249.**

Nov. 29, 2006.

David M. Adler, David M. Adler, Esq. & Assoc. PC, Chicago, IL, for Plaintiff.

Charles Lee Mudd, Jr., Law Offices of Charles Lee Mudd Jr., Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

HORT, J.

**\*1** This case presents the question: Is the word best (a laudatory or puffing term), when combined with the word vacuum (which describes a product), entitled to trademark protection prohibiting defendant from using as an internet domain name www.bestchoicevacuums.com? Plaintiff Best Vacuum, Inc. is a retailer based in Illinois that sells vacuum cleaners and related products under the name Best Vacuum. Plaintiff began as a retail store in 1983 and began selling on a website, www.bestvacuum.com, in 1996. Plaintiff currently sells eight brands of vacuum cleaners, including Dyson brand products. In November 2003, defendant Ian Design, Inc., which is based in New Jersey, began as an internet retailer selling vacuum cleaners. The only brand that defendant sells is Dyson. Initially, defendant used the domain name www.bestvacuumcleaners.com. In early 2004, after receiving complaints from plaintiff, defendant stopped using that domain name and switched to www.bestchoicevacuums.com, which it continues to use. Plaintiff thereafter brought this lawsuit seek-

ing to enjoin plaintiff from using either domain name and from using "best vacuum" on its website or in its advertising. Plaintiff also sought damages.

Plaintiff's trademark infringement claim under 15 U.S.C. § 1114 was previously dismissed because plaintiff has no registered trademark. *See* Docket Entry [36] (adopting magistrate judge's report and recommendation regarding complaint [37] (*"Recommendation II"* ) at 4-5). Adopting a separate report and recommendation of the magistrate judge, plaintiff's motion for preliminary injunction was also denied. *See*Best Vacuum, Inc. v. Ian Design, Inc., 2005 WL 1185817 (N.D.Ill. Jan.18, 2005) (*"Best Vacuum I"* ) (adopted by Docket Entry [36] ). Still pending are plaintiff's Count II Lanham Act § 43(c) (15 U.S.C. § 1125(c)) claim for trademark dilution; Count III Lanham Act § 43(a) (15 U.S.C. § 1125(a)) claim for unfair competition (trademark infringement); and the Count IV state law claim for violation of various aspects of the Illinois Deceptive Trade Practices Act, 815 ILCS 510/2.[FN1] Pending before the court are plaintiff's partial motion for summary judgment for liability on Count III [FN2] and defendant's motion for summary judgment dismissing the three remaining counts. Defendant's motion will be considered first.

> FN1. For a delineation of the various aspects of Count IV, see *Recommendation II* at 10-12.

> FN2. Although plaintiff's motion refers to Count II, plaintiff is moving for summary judgment on its § 43(a) claim, which is Count III.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Eiencorp, Inc. v. Rocky Mountain Radar, Inc.,* 398 F.3d 962, 965 (7th Cir.2005); *Estate of Moreland v. Dieter,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                    Page 2
Slip Copy, 2006 WL 3486879 (N.D.Ill.)
**(Cite as: 2006 WL 3486879 (N.D.Ill.))**

395 F.3d 747, 758 (7th Cir.), *cert. denied,*545 U.S. 1115, 125 S.Ct. 2915, 162 L.Ed.2d 296 (2005); *Hall v. Bennett,* 379 F.3d 462, 464 (7th Cir.2004); *Hudson v. Chicago Transit Authority,* 375 F.3d 552, 558 (7th Cir.2004). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Outlaw v. Newkirk,* 259 F.3d 833, 837 (7th Cir.2001); *Wollin v. Gondert,* 192 F.3d 616, 621-22 (7th Cir.1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Binz v. Brandt Construction Co.,* 301 F.3d 529, 532 (7th Cir.2002); *Traylor v. Brown,* 295 F.3d 783, 790 (7th Cir.2002). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. *Celotex,* 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *See Yasak v. Retirement Board of Policemen's Annuity & Benefit Fund of Chicago,* 357 F.3d 677, 679 (7th Cir.2004); *NLFC, Inc. v. Devcom Mid-America, Inc.,* 45 F.3d 231, 236 (7th Cir.), *cert. denied,*515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995); *Covalt v. Carey Canada, Inc.,* 950 F.2d 481, 485 (7th Cir.1991); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 476-77 (7th Cir.), *cert. denied,*488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988); *Shyman v. UNUM Life Insurance Co. of America,* 2004 WL 609280 *2 (N.D.Ill. March 25, 2004), *aff'd,*427 F.3d 452 (7th Cir.2005). As the Seventh Circuit has summarized:

**\*2** The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."*Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 978 (7th Cir.1996) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citation and internal quotation

omitted)). The moving party may discharge this burden by " 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548, 91 L.Ed.2d 265. Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material." ' *Logan,* 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute ." *Id.* (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *McGinn v. Burlington Northern R.R. Co.,* 102 F.3d 295, 298 (7th Cir.1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party....' " *Logan,* 96 F.3d at 978 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

*Outlaw,* 259 F.3d at 837.

Local Rule 56.1(a)(3) requires that the moving party file a statement of facts setting forth all facts it contends are undisputed and citing support thereof. The opposing party is required to respond to each factual statement setting forth any disagreements and citing support for any disagreements.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

N.D. Ill. Loc. R. 56.1(b)(3)(B). If no response is filed or no disagreement stated, facts set forth in the moving party's Rule 56.1(a)(3) statement may be deemed to be true for purposes of ruling on summary judgment. *Id.* 56.1(b)(3)(C);*F.T.C. v. Bay Area Business Council, Inc.,* 423 F.3d 627, 633-34 (7th Cir.2005). In response to the motion for summary judgment, the responding party may also set forth a statement of additional facts. N.D. Ill. Loc. R. 56.1(b)(3)(C). The moving party may reply to the Rule 56.1(b)(3)(C) statement of additional facts and any facts contained in the Rule 56.1(b)(3)(C) statement will be deemed to be true for purposes of summary judgment if not controverted by the moving party. *Id.* 56 .1(a) (last paragraph); *Apex Oil Co. v. Metropolitan Water Reclamation District of Greater Chicago,* 2006 WL 566451 *1 n. 1 (N.D.Ill. March 3, 2006). It is within the district court's discretion as to how strictly to enforce the requirements of Local Rule 56.1.*Stanciel v. Gramley,* 267 F.3d 575, 579 (7th Cir.2001); *Etheridge v. United States Army,* 2005 WL 88970 *2 (N.D.Ill. Jan.11, 2005).

*3 The present case is in a somewhat unusual posture. Plaintiff moved for summary judgment. Consistent with Local Rule 56.1(a)(3), plaintiff filed its statement of facts. A briefing schedule was set which included a reply from plaintiff. Both parties' summary judgment motions were to be briefed on one schedule. *See* Nov. 9, 2005 Tr. at 4. Defendant answered plaintiff's summary judgment motion and filed its own cross motion for summary judgment. Defendant filed its Rule 56.1(b)(3)(B) response and also a Rule 56.1(b)(3)(C) statement of additional facts. Defendant designated its two statements as also being statements in support of its cross motion for summary judgment. Plaintiff did not file any reply. Thus, plaintiff did not respond to defendant's Rule 56.1 statements nor to the cross-motion arguments contained in defendant's brief.

For purposes of plaintiff's summary judgment motion, defendant's statement of additional facts is deemed to be true. Since plaintiff provided no ex-

press response to defendant's summary judgment motion, the facts contained in defendant's Rule 56.1 statements could be deemed true for purposes of defendant's summary judgment motion as well. Defendant, however, did not provide a separately delineated statement of facts for its summary judgment motion. It would be awkward to treat defendant's response to plaintiff's facts as an affirmative delineation of facts supporting defendant's summary judgment motion. It would be straightforward to treat defendant's statement of additional facts as its facts in support of its own summary judgment motion. However, it should not be ignored that plaintiff did file its own factual assertions and that it provided evidentiary support for those assertions. Factual assertions that are made by defendant, but not addressed in plaintiff's factual statement, will be deemed admitted for purposes of defendant's summary judgment motion. To the extent, however, that defendant's factual assertions are addressed in plaintiff's Rule 56.1(a)(3) statement, the assertions made by plaintiff and the supporting evidence submitted by plaintiff will be considered in determining whether a genuine factual dispute exists.

The parties agree that the Count IV state law claim need not be expressly considered. If plaintiff is successful on its Count III claim, it represents that it is unnecessary to further pursue Count IV. Plaintiff does not dispute that Count IV should also be dismissed if Counts II and III are subject to dismissal. *Cf.Best Vacuum I,* 2005 WL 1185817 at *13.

Since plaintiff does not have a registered trademark, it cannot succeed on its Count III § 43(a) claim unless it has a protectable mark. *CAE, Inc. v. Clean Air Engineering, Inc.,* 267 F.3d 660, 673-74 (7th Cir.2001); *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.,* 846 F.2d 1079, 1084 (7th Cir.1988); *Best Vacuum I,* 2005 WL 1185817 at *2. The parties agree that Best Vacuum is a descriptive mark. *See id.* at *3. To be protectable under § 43(a), a descriptive mark generally must acquire secondary meaning. *See*15 U.S.C. §§ 1052(e), (f); *Peaceable Planet, Inc. v. Ty, Inc.,* 362 F.3d

Slip Copy
Slip Copy, 2006 WL 3486879 (N.D.Ill.)
(Cite as: 2006 WL 3486879 (N.D.Ill.))

986, 988 (7th Cir.), *cert. denied,*543 U.S. 869, 125 S.Ct. 275, 160 L.Ed.2d 116 (2004); *Bliss Salon Day Spa v. Bliss World LLC,* 268 F.3d 494, 496-97 (7th Cir.2001); *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 641-42 (7th Cir.2001); *Best Vacuum I,* 2005 WL 1185817 at *4. In this case, the parties agree that plaintiff cannot succeed on Count III unless it can show secondary meaning.

*\*4* "A mark acquires secondary meaning when it has been used so long and so exclusively by one company in association with its products or services in that particular industry that the 'word, term, name, symbol, or device' has come to mean that those products or services are the company's trademark."*Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.,* 149 F.3d 722, 728 (7th Cir.1998) (quoting 15 U.S.C. § 1125(a)(1))."[S]econdary meaning can be established through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market, and evidence of intentional copying."*Packman,* 267 F.3d at 641;*Best Vacuum I,* 2005 WL 1185817 at *4. The burden is on plaintiff to show secondary meaning. *Ty Inc. v. Softbelly's Inc.,* 353 F.3d 528, 530 (7th Cir.2003); *Platinum,* 149 F.3d at 727;*Custom Vehicles, Inc. v. Forest River, Inc.,* 2005 WL 3299499 *4 (N.D.Ind. Dec.2, 2005).

Defendant commissioned an online survey of 300 random Internet consumers. Only 5 (1.67%) had heard of plaintiff's website and only 6(2%) had heard of plaintiff's retail store. When given only four choices as to what the term "best vacuum" meant to the respondent, only 14 (4.67%) chose "A retail store named 'Best Vacuum.' " 82.33% instead chose "A descriptive term used to describe the best vacuum cleaner." [FN3] The only survey-type evidence submitted by plaintiff are six selected responses to questionnaires that were handed out to customers at its retail store. In response to how long they had been aware of the store, responses ranged from one month to "forever." Plaintiff also points

to selected epinions.com responses from customers who used its website, all of which compliment the company and most of which specifically refer to the name "Best Vacuum." These selective responses from a targeted audience are of little or no probative value. *SeeBest Vacuum I,* 2005 WL 1185817 at *4. The survey evidence submitted by defendant goes against finding secondary meaning.

> FN3. The other two choices were: "The Dyson brand of vacuum cleaner" (11.33%) and "A musical group" (1.67%).

It is undisputed that plaintiff has had a retail store using the Best Vacuum name since 1983 and that it has used its domain name since 1996. Defendant, though, points to undisputed evidence that the term "best vacuum" is used extensively on the internet. Many entities claim to sell the best vacuums. The term appears in the visible portion of websites, in metatags, and as adwords. Yahoo and Google searches of the term "best vacuum" produce more than 3,000,000 web page results. Plaintiff has had lengthy use of the name, but not exclusive use.

There is no evidence of intentional copying. It is undisputed that defendant's principal had no knowledge of plaintiff at the time defendant obtained its domain name.

Since 1983, a period of more than 20 years, plaintiff has spent more than $1,000,000 promoting its Best Vacuum mark and its website. As of March 2004, plaintiff was spending approximately $60,000 per month on Internet advertising. Plaintiff also has advertised in the Chicago Tribune and Chicago Magazine, and on radio and television.[FN4]In 2003, plaintiff's gross sales through its website were approximately $3,750,000. In his affidavit, plaintiff's president conclusorily states that plaintiff is "A leading sales representative in the United States for Miele brand vacuum cleaners."There is no evidence to support plaintiff's national position in the vacuum cleaner sales market as a whole. The evidence does not support that plaintiff is dominant in the market. The evidence of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

advertising, which is lacking in detail and context, is insufficient to provide any significant support for secondary meaning. *See Best Vacuum I,* 2005 WL 1185817 at *5.

> FN4. The affidavit provided to support this fact does not establish when the print, radio, and television advertising occurred.

**\*5** The evidence presented on summary judgment would be insufficient for a reasonable jury to find that plaintiff has established secondary meaning, an essential element of its Count III claim. Therefore, defendant is entitled to summary judgment dismissing Count III.

As to the Count II § 43(c) dilution claim, defendant contends secondary meaning is also an essential element of that claim. Since plaintiff did not respond to defendant's cross motion for summary judgment (and did not address the dilution claim in its own motion), plaintiff makes no contention to the contrary. Secondary meaning is not directly an element of a dilution claim. In the present type of situation, though, failure to raise a genuine factual dispute as to the existence of secondary meaning dooms plaintiff's dilution claim.

An essential element of a dilution claim is that the mark is famous. 15 U.S.C. § 1125(c)(1); *AM General Corp. v. DaimlerChrysler Corp.,* 311 F.3d 796, 811 (7th Cir.2002); *Best Vacuum I,* 2005 WL 1185817 at *14. The statute expressly provides that a claim under § 43(c) requires that the "distinctive quality" of the mark be diluted. 15 U.S.C. § 1125(c)(1) (2005). It also refers to the mark being "distinctive and famous." *Id.* The degree of distinctiveness is also listed as a factor to consider in determining whether a mark is famous. *Id.* § 1125(c)(1)(A); *Am General,* 311 F.3d at 812.[FN5] The distinctiveness may be either inherent or acquired through secondary meaning, *see id.* at 804, but there must be at least some degree of distinctiveness for the mark to qualify as famous. *See id.* at 811-12; *ITC Ltd. v. Punchgini, Inc.,* 373 F.Supp.2d 275, 288 (S.D.N.Y.2005); *Washington Speakers*

*Bureau, Inc. v. Leading Authorities, Inc.,* 33 F.Supp.2d 488, 502 (E.D.Va.1999), *aff'd by unpublished order,* 217 F.3d 843 (4th Cir.2000). Since plaintiff's mark is descriptive, it does not have inherent distinctiveness. *Wal-Mart Stores, Inc. v. Samara Brothers, Inc.,* 529 U.S. 205, 213, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000). Plaintiff's mark can only have distinctiveness if it has secondary meaning. As previously discussed, plaintiff's mark does not have secondary meaning. Therefore, it has no distinctiveness and cannot support a dilution claim. Defendant is entitled to summary judgment dismissing count II.

> FN5. Effective October 6, 2006, § 43(c) (15 U.S.C. § 1125(c)) was amended. Any relevant changes would probably not apply to plaintiff's claim for damages incurred prior to that date, but the changes would apply to any subsequent damages and prospective injunctive relief. The amendment makes more clear that being distinctive is a necessary element of a mark being famous. Section 1125(c)(1) now provides for relief based on "a famous mark that is distinctive" and also makes clear that a dilution claim can be based on acquired distinctiveness. The degree of distinctiveness is no longer expressly listed as a factor to consider "[i]n determining whether a mark possesses the requisite degree of recognition." 15 U.S.C. § 1125(c)(2)(A) (2006).

Since defendant is entitled to summary judgment, it is unnecessary to separately consider plaintiff's summary judgment motion. Plaintiff's summary judgment motion will be denied.

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment [52] is denied. Defendant's motion for summary judgment [56] is granted. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff dismissing plaintiff's cause of action with prejudice.

N.D.Ill.,2006.

Slip Copy                                                                                                          Page 6
Slip Copy, 2006 WL 3486879 (N.D.Ill.)
**(Cite as: 2006 WL 3486879 (N.D.Ill.))**

Best Vacuum, Inc. v. Ian Design, Inc.
Slip Copy, 2006 WL 3486879 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 10

Westlaw.

Not Reported in F.Supp.2d                                                                                      Page 1
Not Reported in F.Supp.2d, 2002 WL 731170 (N.D.Ill.), 2002-2 Trade Cases P 73,724
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 731170 (N.D.Ill.))**

**H**

Francorp, Inc. v. Siebert
N.D.Ill.,2002.

United States District Court, N.D. Illinois, Eastern
Division.
FRANCORP, INC., Plaintiff
v.
Mark SIEBERT, Mark Siebert & Associates, Inc.,
also doing business as Siebert & Associates, Inc.
and as The iFranchise Group, Inc., Tommy D.
Payne, Dan Levy, Laurie Ludes and Judy Janusz,
Defendants.
**No. 00 C 1248.**

April 24, 2002.

*MEMORANDUM OPINION AND ORDER*

MORAN, Senior J.
*1 Plaintiff Francorp, Inc.(Francorp) brings this ac-
tion against Mark Siebert (Siebert), Mark Siebert &
Associates, Inc. (MSA), Tommy D. Payne, Dan
Levy, Laurie Ludes and Judy Janusz. Defendants
Siebert and M.S.A. § (defendants) move for partial
summary judgment on counts II (Illinois Consumer
Fraud Act), III (Illinois Deceptive Trade Practices
Act) and XIV (Lanham Act) of plaintiff's com-
plaint. For the following reasons, defendants' mo-
tion is granted.

*BACKGROUND*

The facts of this case have been laid out by this
court in the various opinions that precede this mo-
tion. *SeeFancorp, Inc. v.. Siebert,* 126 F.Supp. 543
(2000); 2000 WL 1741918 (2000); 2001 WL
1159224 (2001); 2001 WL 1448533 (2001); slip
opinion 00 C 1248 (3/27/2002). To summarize,
Siebert was the president of Francorp. Francorp
began experiencing problems in 1997, and in 1998
Siebert left Francorp to form MSA. Since then, sev-
eral other Francorp officers and employees left the

company and have worked with M.S.A. § in one ca-
pacity or another.

Relevant to this motion, M.S.A. § (which also does
business as The iFranchise Group) established a
website containing promotional materials for the
company. Francorp claims that the contentin MSA's
website and promotionalbrochure constitute false
advertising and unfair and deceptive business prac-
tices. We have already dismissed certain defendants
from these unfair business claims since they were
not sufficiently connected to the production of
these materials to incur liability. *See*2001 WL
1159224, (9/28/2001). We now address the sub-
stance of these claims and determine if the evidence
presented provides enough of a foundation for the
claims in counts II, III and XIV to go forward.[FN1]

> FN1. We have already granted summary
> judgment for Siebert and M.S.A. § on
> count I of Francorp's complaint, which
> contested some of the same materials un-
> der a theory of copyright infringement.
> *See*2001 WL 144533 (11/15/2001).

*DISCUSSION*

Summary judgment is appropriate only if there are
no genuine issues of material fact and the moving
party is entitled to judgment as a matter of
law.*Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23
(1986). We draw all inferences and view all ad-
missible evidence in the light most favorable to the
non-moving party. *Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 255 (1986). This does not mean there
must be no evidence supporting the non-moving
party, but, rather, it is not enough to support a reas-
onable jury verdict. *Id* at 248.

*The Lanham Act Claim (Count XIV)*

Francorp alleges that defendants' website and pro-
motional materials contain false and misleading ad-
vertising in violation of 15 U.S.C. § 1125(a)(1)(A).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                   Page 2
Not Reported in F.Supp.2d, 2002 WL 731170 (N.D.Ill.), 2002-2 Trade Cases P 73,724
(Cite as: Not Reported in F.Supp.2d, 2002 WL 731170 (N.D.Ill.))

To obtain relief under section 43(a) of the Lanham Act, a plaintiff must prove (1) that the defendant used a false designation of origin or false description or representation in connection with goods or services; (2) that such goods or services entered interstate commerce; and (3) that the plaintiff is a person who believes he is likely to be damaged as a result of the misrepresentation. 15 U.S.C. 1125(a); *Kennedy v. National Juvenile Detention Association,* 187 F.3d 690, 695 (7th Cir.1999). The third element is satisfied when the plaintiff shows that there is a likelihood of consumer confusion as a result of the false representation. *The Monotype Corp. v. Simon & Schuster, Inc.,* 2000 WL 1852907, *3 (N.D.Ill.) citing *Web Printing Controls Co ., Inc. v. Oxy-Dry Corp.,* 906 F.2d 1202, 1204 (7th Cir.1990). Defendants argue that Francorp has failed to offer evidence to satisfy both the false designation of origin and the likelihood of confusion elements of this claim.

**\*2** Generally, allegations of false designation of origin are either "passing-off" claims or "reverse passing-off" claims. *Web Printing,* 905 F.2d at 1203, n. 1. Passing-off involves selling goods or services of one's own creation under someone else's name or mark. *Id.* In contrast, Francorp alleges a reverse passing-off claim, namely that defendants have removed Francorp's name from services created by Francorp and then advertised these services as their own. See*Kennedy,* 187 F.3d at 696citing*Smith v.. Montoro,* 648 F.2d 602 (9th Cir.1981).

A reverse passing-off claim is based on the theory that the originator of a product is involuntarily deprived of the advertising value of its name and the goodwill that would come from the public knowing the true source of the satisfactory product. *Goes Lithography Co. v. Banta Corp.,* 26 F.Supp.2d 1042, 1046 (N.D.Ill.1998)citing*Smith,* 648 F.2d at 607. Courts have cast a wide net in determining what can be protected as a "product" in reverse passing-off claims brought under the Lanham Act. *See e.g.Gannett Satellite Information Network, Inc.*

*v. Rock Valley Community Press, Inc.,* 1994 WL 606171, *4 (N.D.Ill.1994) (quotes and portions of newspaper articles that were the original work of plaintiff reprinted under defendant's byline were appropriate subjects of a false designation of origin claim). At the same time, services or goods must be more than an idea to be protected, they must be a manifestation of that idea. *Hoopla Sports and Entertainment, Inc. v. Nike Inc., et al.,* 947 F.Supp. 347, 352 (N.D.Ill.1996). In *Hoopla,* plaintiff claims that defendants promoted a basketball game nearly identical to its tournament, but having identified a "good" or "service" within the scope of 43(a) it had only protection over a specific tournament, not any game that was based on the same idea.

As a threshold issue, then, we must determine if the materials identified by Francorp are protected by the Lanham Act. Francorp has noted various areas of MSA's materials that allegedly constitute false advertising and false designation of origin. The highlighted areas divide roughly into three categories of alleged wrongdoing: sections that misappropriated Francorp's business and experience; materials developed by Francorp falsely designated as MSA's products; and a false statement that the iFranchise Group is "the only franchise consulting firm in the world that offers a complete line of services for the established franchisor."

Francorp asserted that defendants misappropriated its experience when it published a client list under the heading "Companies We've Helped" and stated that "the iFranchise Group ... [has] worked with many of the nation's most successful franchisors."The experience listed belongs to former Francorp employees who were associated with the iFranchise Group at the time of the posting, and there is no dispute that the experience was gathered, and the listed clients were served, while the former employees were working at Francorp. The extent of that experience is in dispute.

**\*3** While the list of clients on the website is titled "Companies We've Helped," the next line of the page, above the listing of clients, is "Members of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 731170 (N.D.Ill.), 2002-2 Trade Cases P 73,724
**(Cite as: Not Reported in F.Supp.2d, 2002 WL 731170 (N.D.Ill.))**

the iFranchise Group have assisted companies of all sizes ... including...." This makes clear that the clients listed were clients of the individual members of the iFranchise Group. Even assuming that some of the statements exaggerate the individual's experience and are not clear about when that experience was gathered, former employees' business experience and lists of clients with whom they worked are not goods and services as contemplated by this statute. As a result, they are not protected by section 43(a) of the Lanham Act.

Francorp also claims that defendants' website contains "features and ideas" developed at Francorp (Stmt of Add. Facts, ¶ 4). As noted above, ideas are not protected under the Lanham Act. The features of the website identified in Francorp's complaint consist mostly of headings, definitions, and general statements regarding franchising, which are allegedly misappropriated from Francorp's seminar brochure and promotional publications.[FN2] There are clearly similarities between the materials of the two companies. It is also undisputed that Siebert was still at Francorp during the idea and development stage of Francorp's materials, and it is more than likely that Siebert applied what he learned at Francorp in developing MSA's website. However, goods or services created from an idea generated by a competing company are not the same as a misappropriation of the other company's product. *See Hoopla Sports, infra.* The disputed definitions, terms, and other identified materials come from the general business of franchise consultation, and do not constitute a mislabeling of goods or services unique to Francorp.[FN3]

> FN2. While not entirely clear, it appears that the contested website materials are those which are laid out in Francorp's Complaint at ¶ 14:
>
> > (a) The headings from the section entitled "Franchising Defined ..."
> >
> > (b) The section entitled "The Next Step ..."
> >
> > (c) The section entitled "Is Your Business Franchisable ..."
> >
> > (d) The section entitled "Advantages of Franchising ..."
> >
> > (e) The section entitled "The Process of Franchising ..."
> >
> > (f) The section on "international Expansion Services ..."
> >
> > (g) The reference to experience in dealer conversion in the section entitled "Franchising as an Alternate Channel ..."
> >
> > (h) The "Franchise Audit Service ..."
> >
> > (i) The website's "acid test"....
>
> FN3. For further discussion on idea versus product of idea, see our granting of summary judgment on the copyright claim in count I., 2001 WL 1448533, *4-5.

We treat MSA's statement that it is "the only franchise consulting firm in the world that offers a complete line of services for the established franchisor" separately, since this statement does not fit under the umbrella of reverse passing-off claims. Rather, Francorp alleges that this a false statement that will mislead potential clients because Francorp has been offering the same services for over 25 years. We are unpersuaded by Francorp's argument. The parties agree that they do not offer the exact same line of services, and that each offers some services that are distinctive. Either company can claim that their services are the most "complete" without violating the Lanham Act. Francorp has failed to show that it had a good or service protected by the Lanham Act that was appropriated by the defendants, and summary judgment is granted as to count XIV.

*State Claims*

Relying on the same factual allegations as those

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

identified in the Lanham Act claim, Francorp claims violations of the Illinois Consumer Fraud Act and the Uniform Deceptive Practices Act. The state claims are based on the same wrong alleged in the federal claim, namely that the iFranchise group represented that it had sponsorship, approval, affiliation or connections, which they do not have. "Claims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act." *Spex, Inc. v. Joy of Spex, Inc.,* 847 F.Supp 567, 578 (N.D.Ill.1994)*citingGimix Inc. v. JS & A Group, Inc.,* 699 F,2d 901, 908 (7th Cir.1983). Since we have granted summary judgment on the Lanham Act claim, we grant summary judgment on the state claims in counts II and III as well.

## CONCLUSION

*\*4* For the above reasons, defendants' motion for partial summary judgment as to counts II, III, and XIV is granted.

N.D.Ill.,2002.
Francorp, Inc. v. Siebert
Not Reported in F.Supp.2d, 2002 WL 731170 (N.D.Ill.), 2002-2 Trade Cases P 73,724

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.