**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 08-CV-1384 |
| vs. | ) ) ) | Judge Bucklo Magistrate Judge Mason |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT THE NATIONAL PEDICULOSIS
ASSOCIATION, INC.'S MOTION TO COMPEL THE PRODUCTION OF
DOCUMENTS AND DEPOSITION OF NON-PARTY DR. AMY S. PALLER**

## INDEX OF EXHIBITS

Exhibit 1    Morton Grove Pharmaceuticals, Inc.'s Response to Defendant The National Pediculosis Association, Inc.'s First Set of Interrogatories

Exhibit 2    Morton Grove Pharmaceuticals, Inc.'s Third Supplemental and Amended Response to Defendant The National Pediculosis Association, Inc.'s First Set of Interrogatories

Exhibit 3    Declaration of Wade Thomson (and accompanying exhibits)

Exhibit A    June 9, 2008 letter from W. Thomson to W. O'Neil

Exhibit B    June 16, 2008 email from W. O'Neil to W. Thomson

Exhibit C    June 17, 2008 letter from W. Thomson to W. O'Neil

Exhibit D    June 20, 2008 letter from W. O'Neil to W. Thomson

Exhibit E    Subpoena and Subpoena Duces Tecum Issued to Amy S. Paller, with attached rider

Exhibit F    June 23, 2008 letter from A. Otterberg to W. O'Neil

Exhibit G    June 23, 2008 email from W. O'Neil to A. Otterberg

Exhibit H    June 26, 2008 letter from W. Thomson to W. O'Neil

Exhibit I  June 27, 2008 letter from W. O'Neil to W. Thomson

Exhibit J  July 3, 2008 letter from W. O'Neil to W. Thomson

Exhibit K  July 7, 2008 letter from W. Thomson to W. O'Neil

Exhibit L  July 7, 2008 email from W. O'Neil to W. Thomson, and attached Objections and Responses to Subpoena Issued to Dr. Amy Paller

Exhibit M  July 8, 2008 letter from W. Thomson to W. O'Neil

Exhibit N  Email correspondence beginning on July 14, 2008

Exhibit O  July 16, 2008 email from W. Thomson to W. O'Neil

Exhibit 4  Objections and Responses to Subpoena Issued to Dr. Amy Paller

Exhibit 5  Excerpts from www.lindane.com and www.lindanetruth.com

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC. | ) ) ) | |
| Plaintiff, | ) ) | No:  06-CV-3815 |
| v. | ) ) | Judge Bucklo |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., ECOLOGY CENTER, INC., WILLIAM WEIL, M.D., | ) ) ) ) | Magistrate Judge Mason **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

**MORTON GROVE PHARMACEUTICALS, INC.'S RESPONSE TO
DEFENDANT THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'S
FIRST SET OF INTERROGATORIES**

Plaintiff Morton Grove Pharmaceuticals, Inc. ("Morton Grove"), by and through its attorneys Winston & Strawn LLP, hereby responds to Defendant the National Pediculosis Association, Inc.'s ("NPA's") First Set of Interrogatories as follows:

**PRELIMINARY STATEMENT**

In responding to the NPA's interrogatories, Morton Grove does not concede the relevancy, materiality, or admissibility of the interrogatories or the subject(s) to which the interrogatories refer.  Morton Grove's responses are made subject to, and without in any way waiving or intending to waive, any objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence or for any other purpose, of any of the documents produced or referred to, or of any of the responses given herein, or of the subject matter thereof, in any proceeding.  Such responses are made specifically subject to the right to object to any discovery proceeding involving or relating to the subject matter of the interrogatories.

The responses made at this time are based solely upon such information as is presently known by or available to Morton Grove. Further discovery or investigation may reveal information not presently known to Morton Grove. Therefore, the following responses and objections are given without prejudice to Morton Grove's right to later provide or introduce evidence of any subsequently discovered facts.

## **GENERAL OBJECTIONS**

Each of these objections is incorporated into each and every one of Morton Grove's Responses as if fully set forth therein, and is in addition to any specific objections stated in response to a particular Request.

1.     Morton Grove objects to these interrogatories to the extent that they seek disclosure of any protected or privileged information, including attorney-client communications and/or attorney work product. The inadvertent disclosure of such information is not intended to be, and shall not be deemed to be, a waiver of any applicable protection or privilege.

2.     Morton Grove objects to these interrogatories to the extent they attempt to alter the scope of discovery under the Federal Rules of Civil Procedure, the Local Rules of this Court, and/or any applicable Standing Order.

3.     Morton Grove objects to these interrogatories to the extent they are premature, overly broad, unduly burdensome, and/or calculated to harass, and to the extent they are not reasonably calculated to lead to the discovery of admissible evidence.

4.     Morton Grove objects to these interrogatories to the extent they require Morton Grove to obtain information from, or with respect to, persons or entities over whom it has no control.

5.     Morton Grove objects to these interrogatories to the extent they are vague and ambiguous and call for speculation outside the personal knowledge of Morton Grove representatives.

6.     Morton Grove objects to these interrogatories to the extent they seek legal conclusions and/or would require Morton Grove to reach a legal conclusion in order to prepare a response.

7.     Morton Grove objects to these interrogatories to the extent they seek information that is in the public domain and, therefore, equally as accessible to the NPA.

8.     Morton Grove's response to any of these interrogatories does not constitute acquiescence or agreement to any definition proposed by the NPA and is made without waiver of Morton Grove's right to object to such definition(s).

9.     To the extent that Morton Grove provides, at the appropriate time, a response to any interrogatory, in whole or in part, by reference to documents that will be made available for inspection, Morton Grove incorporates by reference its objections to the NPA's First Set of Requests for Production of Documents and Things as if fully set forth herein.

10.     Morton Grove expressly reserves the right to supplement its responses to these interrogatories with additional objections or information as such information becomes available to it in the course of the litigation.

## INTERROGATORIES

## INTERROGATORY NO. 1:

Identify all Persons who may have personal knowledge of any fact alleged in the Complaint (including knowledge as to the truth or falsity of any such fact), and state the general subject matter of the knowledge that may be possessed by each such person.

## RESPONSE:

Morton Grove objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, and requires Morton Grove to speculate on what other persons or entities, including those with no contacts with or relation to Morton Grove, may or may not know. Subject to the foregoing objections, Morton Grove hereby states:

| Name and Business Information | General Knowledge |
|---|---|
| Mr. Richard O'Hara<br>Vice President, Sales & Marketing<br>Morton Grove Pharmaceuticals, Inc. | Morton Grove's sales and marketing efforts regarding Lindane |
| Dr. Chang Lee<br>Vice President, Regulatory<br>Morton Grove Pharmaceuticals, Inc. | Lindane's safety profile and FDA and other regulatory matters regarding Lindane |
| Dr. Kastoob Gastar<br>Vice President, Quality Systems<br>Morton Grove Pharmaceuticals, Inc. | Lindane's safety profile and FDA and other regulatory matters regarding Lindane |
| Dr. Pat McGrath<br>Vice President, Research & Development<br>Morton Grove Pharmaceuticals, Inc. | Lindane's safety profile and FDA and other regulatory matters regarding Lindane |
| Mr. Bill Goldberg<br>President<br>Morton Grove Pharmaceuticals, Inc. | Morton Grove's sales and marketing efforts regarding Lindane |
| Mr. Rick Lopatin<br>Chief Financial Officer<br>Morton Grove Pharmaceuticals, Inc. | Morton Grove's sales and profits from Lindane |
| Mr. Brian Tambi<br>former CEO<br>Morton Grove Pharmaceuticals, Inc. | Morton Grove's sales and marketing efforts regarding Lindane |

4

| | |
|---|---|
| Dr. Tor Shwayder, M.D.<br>Department of Dermatology<br>Henry Forth Medical Center<br>3031 West Grand Boulevard, Suite 800<br>Detroit, MI 48202 | The falsity of Defendants' statements |
| Dr. Adelaide A. Herbert, M.D.<br>Professor of Pediatrics and Dermatology<br>University of Texas Medical School<br>Department of Dermatology<br>6655 Travis, Suite 980<br>Houston, TX 77030 | The falsity of Defendants' statements |
| Dr. Amy S. Paller, M.D.<br>Chair, Department of Dermatology<br>Northwestern University School of Medicine<br>676 N. St. Clair, Suite 1600<br>Chicago, IL 60611 | The falsity of Defendants' statements |
| Dr. Shayne Gad, PhD, DABT, ATS<br>Principal, Gad Consulting<br>Adjunct Prof. of Toxicology<br>Duke University Medical Center<br>Durham, NC 27706 | The falsity of Defendants' statements |
| Dr. William Weil | His own and the Ecology Center's statements |
| Ms. Lauren Zajac<br>former employee of The Ecology Center, Inc.<br>("Ecology Center") | Ecology Center's statements |
| Dr. Jonathan Fliegel | Ecology Center's statements |
| Ms. Tracey Easthope<br>The Ecology Center, Inc. | Ecology Center's statements |
| Ms. Genevieve Howe<br>The Ecology Center, Inc. | Ecology Center's statements |
| Mr. Michael Garfield<br>The Ecology Center, Inc. | Ecology Center's statements |
| Ms. Stephanie Feldstein<br>The Ecology Center, Inc. | Ecology Center's statements |

| | |
|---|---|
| Mr. Chris Kolb<br>Former member of Michigan State House of Representatives | Ecology Center's statements |
| Ms. Deborah Altschuler<br>The National Pediculosis Association, Inc. | NPA's statements |
| Ms. Bethezda Cervantes<br>The National Pediculosis Association, Inc. | NPA's statements |
| Ms. Jane Cotter<br>The National Pediculosis Association, Inc. | NPA's statements |
| Mr. Dan Sheridan<br>The National Pediculosis Association, Inc. | NPA's statements |
| Mr. Eric Phan<br>CIRE Consulting | NPA's statements |

## INTERROGATORY NO. 2:

State the basis for Morton Grove's allegation that NPA's Statements are false. For each NPA Statement, please identify:

(a)     all facts upon which you base your allegations(s) of falsity;

(b)     all persons with knowledge or information regarding your allegation(s) of falsity;

(c)     all communications among or between Morton Grove employees, directors, attorneys or agents, regarding the truth or falsity of NPA's Statements; and

(d)     all documents relating to the facts and contentions in this response.

## RESPONSE:

Morton Grove objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, and calculated to harass. Morton Grove objects to subsection (b) in that it requires Morton Grove to speculate as to the knowledge of third parties outside the control of Morton Grove. Morton Grove objects to subsection (c) on the ground that it seeks documents and communications protected by the attorney-client privilege and the attorney work product

doctrine.  Morton Grove objects to subsection (d) in that it is duplicative of the document

requests issued by the NPA.  Subject to the foregoing objections, Morton Grove hereby states:[1]

### Statement listed in Complaint Paragraph 23:

> Symptoms [from] exposure [to Lindane include:] acute renal
> failure with azotemia, ADD/ADHD[,] anxiety, autism, atonia,
> agranulocytosis, aplastic anemia, anorexia, apprehensive mental
> state, behavior-mood disturbances, bullae, cancer, cardiac
> arrhythmias, clumsiness, coma, confusion, conjunctivitis,
> convulsions, cough, cyanosis, death, dermatitis, diaphoresis,
> diarrhea, disorientation, dizziness, dyspnea, emotional lability,
> excitement, excessive hair growth, fast heartbeat, fatigue, fever,
> giddiness, grinding teeth, headaches, heart palpitations, hematuria,
> hyperirritability, hypersensitivity, incoordination, kidney damage,
> liver damage, liver enlargement, loss of appetite, mania, mental
> retardation, muscle cramps, muscle spasms, muscle tremors,
> nausea, nervousness, oliguria, pallor, paraesthesia, paresis,
> paresthesia, porphyria, proteinuria, pulmonary edema, restlessness,
> respiratory failure, seizures, shaking, sweating, tachycardia,
> tearing, thirst, trouble breathing, trouble swallowing, urticaria,
> vertigo, vomiting, weakness, wheezing, elevated LDH, GOT, GPT,
> alkaline phosphatase, ALT, AST enzymes.

(a)    The vast majority of these effects are not listed in the FDA-approved product

labels for Lindane Lotion and Lindane Shampoo, which were updated for safety in 2003.

Further, they do not reflect the events reported to the FDA through its Adverse Event Reporting

System Database (1951-2003), nor do they reflect adverse events reported directly to Morton

Grove since acquiring the products in 1995.  The list of effects noted for acetone, a minor

ingredient in Lindane Lotion and Lindane Shampoo, have little relevance to the safety of those

products—there is a higher risk of exposure to acetone from nail polish.  Further, a large post-

marketing safety study, involving more than 34,000 patients, showed an exceptionally low rate

of side effects for Lindane—less than 0.5%; none were serious.

---

[1]      The following abbreviations are used in Morton Grove's response: EPA (Environmental Protection
Agency), FDA (Food and Drug Administration), CDC (Centers for Disease Control and Prevention), and AAP
(American Academy of Pediatrics).

(b)    Dr. Amy Paller and Dr. Adelaide Herbert have knowledge regarding the falsity of this statement.  Dr. Chang Lee may also have knowledge regarding the falsity of this statement.

(c)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

(d)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

**Statement listed in Complaint Paragraph 25:** Lindane is "sold or prescribed without adequate warnings or guidance on use.  It is applied to the scalp and overuse is encouraged."

(a)    Lindane is <u>not</u> sold without adequate warnings or guidance for use and Morton Grove has never encouraged the product's overuse.  In fact, the product bears FDA approved warnings and guidance.  In addition, significant actions have been taken by Morton Grove and the FDA to discourage overuse, including (1) adding a boxed warning; (2) issuing a public health advisory; (3) repackaging the product in small, single-use bottles; and (4) distributing legally required patient medication guides with every Lindane prescription.

(b)    Dr. Kastoob Gastar and Dr. Pat McGrath have knowledge regarding the falsity of this statement.

(c)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

(d)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

**Statements listed in Complaint Paragraph 26:** "Illinois Bans Lindane" and "Illinois Banned Lindane."

(a)    The State of Illinois has never banned Lindane.

8

     (b)    Dr. Kastoob Gastar and Dr. Pat McGrath have knowledge regarding the falsity of this statement.

     (c)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

     (d)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

     **Statement listed in Complaint Paragraph 27:** "When these [first-line] treatments fail, the guidelines unfortunately recommend the prescription pesticides malathion and Lindane. There are health risks inherent with the use of pesticides on children and these risks increase dramatically when you follow one chemical treatment with another."

     (a)    This statement cannot be supported by credible scientific evidence and runs counter to the perspectives of the AAP and the CDC, both of which set practice standards for the medical community. The AAP and CDC recommend use of over-the-counter products first, followed by prescription medications and second-line interventions such as Lindane, as appropriate, in cases of failure. The FDA has consistently maintained that Lindane medications are safe and effective when used properly. (Repeat treatment with Lindane is not recommended; use of Lindane following failure with another medication is considered appropriate.) The EPA has also determined Lindane Lotion and Lindane Shampoo to be safe and without undue risks when used as currently labeled.

     (b)    Dr. Amy Paller and Dr. Adelaide Herbert have knowledge regarding the falsity of this statement. Dr. Chang Lee also may have knowledge of the falsity of this statement.

     (c)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

     (d)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

**Statement listed in Complaint Paragraph 28:** "the main source of lindane in sewers is from treatment of head lice and scabies and that a single treatment of lindane pollutes 6 million gallons of water."

(a)    This statement is unsubstantiated scientifically and runs counter to the conclusions drawn by subject matter experts working with the EPA. First, more than 99% of lindane use has historically been for agricultural purposes, not for the treatment of head lice and scabies. The main exposure of the population to lindane is through consumption of food that has been agriculturally treated. In 2005, for example, 99.7% of lindane use was for agricultural purposes.

Second, there has never been 6 million gallons of water polluted by lindane. Third, the EPA has determined the amount of Lindane reaching water supplies from use of pharmaceutical products to be insignificant, specifically concluding: "[T]he Agency does not have risk concerns for concentrations of lindane in surface water used as a source of drinking water from consumer use for both lice and scabies treatments." (EPA RED 2002). Similarly, unrealistic, worst-case scenario estimates show that lindane levels would still be 67 to 333 times lower than maximum levels considered safe by the EPA, even if Lindane medications were poured directly into the public water supply instead of being filtered through the sewage system (as would normally occur in a real-world use situation).

These findings are further reinforced by the results of large-scale water sampling studies conducted by the EPA and the United States Geologic Survey. In 2003, the EPA published test results of 16,000 water systems serving 100 million people across 16 states and found that 0% had lindane levels that were above conservative levels considered safe. The United States Geologic Survey also conducted large-scale contaminant testing in 1999 and 2000 of 139 streams near large cities and farms across 30 states, and it found that 93.9% of the samples tested

negative for lindane.  Of the 5.9% of samples that tested positive, all were well below levels considered unsafe.

For context, the EPA sets Maximum Contaminant Levels (MCLs) for many contaminants.  An MCL is defined as the level at which no known or anticipated adverse health effects will occur.  In 1991, the EPA set the MCL for lindane at 0.2 parts per billion (ppb). (Note: The EPA's "down-the-drain" estimate of the amount of lindane reaching public water supplies from pharmaceutical sources, using data from California water treatment facilities, is 0.00003 ppb—a level that is insignificant.)  California, on the other hand, applies a more stringent MCL standard for lindane of 19 parts per trillion (ppt)—a level that is more than 10 times lower than that applied to the rest of the nation and considered safe by the EPA. Moreover, the California standard is based on an outdated 1988 national water quality criterion and predicated upon the results of a flawed animal cancer study that the EPA's Office of Pesticides no longer supports the results of.  In fact, the EPA more recently reported in 2003 on scientific justification for raising the MCL water standard for lindane to 1.0 ppb (more than 50 times higher than the California standard); however, the change was never implemented for practical reasons, as states had no apparent difficulty in maintaining levels within the 0.2 ppb safety standard previously set.  Further, challenges to the EPA's water contamination assessments by the California Sanitation District of Los Angeles were refuted by the Agency as noted in a memorandum published in 2006.

(b)    Dr. Shayne Gad has knowledge of the falsity of this statement.  Dr. Chang Lee may also have knowledge regarding the falsity of this statement.

(c)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

(d)      Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

**Statement (a) listed in Complaint Paragraph 29:** "[T]he U.S. EPA classif[ies] lindane as a possible human carcinogen."

(a)      There has been no established link between the use of Lindane medications and cancer in humans, despite more than fifty years of clinical use.  While the chemical lindane was previously classified as a "possible/probable" carcinogen, in 2001, the EPA downgraded the cancer classification of Lindane to the same low-level rating as first-line over-the-counter medications, and it concluded that no additional cancer risk assessments of Lindane in humans were necessary.  Defendants' statements were made after this determination by the EPA.

(b)      Dr. Shayne Gad has knowledge of the falsity of this statement.  Dr. Chang Lee may also have knowledge regarding the falsity of this statement.

(c)      Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

(d)      Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

**Statement (b) listed in Complaint Paragraph 29:** "Lindane should be handled as a CARCINOGEN WITH EXTREME CAUTION."

(a)      There has been no established link between the use of Lindane medications and cancer in humans, despite more than fifty years of clinical use.  While Lindane was previously classified as a "possible/probable" carcinogen, in 2001, the EPA downgraded the cancer specification of Lindane to the same low-level rating as first-line over-the-counter medications, and it concluded that no additional cancer risk assessments of Lindane in humans were necessary.  Defendants' statements were made after this determination by the EPA.  Moreover,

the Joint Committee on Pesticide Residues (JMPR) of the World Health Organization and Food and Agriculture Organization of the United Nations similarly concluded in a report published in 2004 that "[i]n the absence of genotoxicity and on the basis of the weight of the evidence from the studies of carcinogenicity, JMPR has concluded that lindane is not likely to pose a carcinogenic risk to humans." Further, researchers involved in a large epidemiologic study of the cancer risks of lindane medications specifically (Friedman et al.), which was based on a 143,594-patient database and up to 21 years of follow up, concluded in their 1997 published report that "[t]here is still no persuasive evidence from studies of humans that lindane, as ordinarily used clinically, is carcinogenic in humans."

The FDA has repeatedly concluded that Lindane medications fill an important medical need as second-line treatment options for patients with scabies and lice who have few reasonable alternatives. The EPA has similarly concluded that Lindane medications do not pose significant risks to the public or the environment when used as currently labeled. In addition, the FDA has consistently rejected petitions, including those submitted by the NPA, to ban the use of prescription Lindane therapies, after determining their arguments to be without merit. The EPA has also refuted criticisms from the NPA regarding their scientific assessments of these medical products.

Concerning agricultural lindane, the EPA concluded in August 2006 that agricultural lindane products were no longer eligible for registration as it has originally determined in its initial review published in 2002. The introduction of newer pesticide alternatives and a diminished agricultural need (from 2002 to 2006) formed the basis of this reversed decision. The cancellation of agricultural lindane took effect in July 2007, and use of stockpiles will be allowed for an additional two years.

Further, this statement appeared on a page entitled "Laundering Pesticide Contaminated Clothing," dated 1988, along with other information, none of which relates to the clinical safety of Lindane medications specifically but rather risks associated with occupational and high-level exposures, including the use of twenty-five-pound cans of lindane powder, which was never approved for medical use by the FDA, but used by the military for mass delousing of prisoners of war until the early 1990s (available at: http://www.headlice.org/lindane/lindane/lindane2761.htm).

(b)    Dr. Shayne Gad has knowledge of the falsity of this statement.  Dr. Chang Lee may also have knowledge regarding the falsity of this statement.

(c)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

(d)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

**Statement listed in Complaint Paragraph 30:** "Case-controlled research shows a significant association between the incidences of brain tumors in children with the use of lindane-containing lice shampoos."

(a)    There has been no established link between the use of Lindane medications and cancer in humans, despite more than fifty years of clinical use.  The "case-controlled research" cited in the NPA's statement above prompted a special review by the FDA's Dermatologic Advisory Committee the same year it was published.  The FDA review concluded: "[T]here were several flaws in the data presented in the article and that there was an unlikely association based on the data.  The committee voted that lindane was safe when properly used, and that it should remain on the market."

Further, this study was not designed to evaluate the safety of lindane medications but rather a variety of insecticides used in the home, including no pest strips, flea collars, and garden herbicides. In fact, there were only <u>seven cases</u> where lindane was reportedly used for the treatment of head lice—findings that were based on telephone interviews and participant recall of events dating back up to 10 years. For this and other reasons, the Davis study has been widely criticized for its lack of scientific rigor. For example, Duffy et al. notes: "[T]he report suffers from major flaws in the epidemiologic design and lacks sufficient power to detect risks for appropriate age-matched sub-classifications of exposure based on histologic type and exposure history." (Duffy LC, et al. 1994). These same experts further state that the study was "biased towards a positive association" with lindane shampoo. Similarly, the CDC's Agency for Toxic Substance and Disease Registry points out that this study "was limited by small sample sizes, potential recall bias in questionnaires, multiple comparisons, and the lack of detailed exposure information." Even the study investigators (Davis et al.) highlight the limitations of their research by noting that "[g]iven the large number of comparisons in the study, several of the significant findings may be due to chance alone."

In contrast, results of the large epidemiologic study published by Friedman in 1997 based on a database of more than 140,000 patients and up to 21 years of follow up showed no link between the use of lindane medications and cancer. Similarly, the most recent expert assessments of lindane carcinogenic potential by the EPA Cancer Assessment Review Committee, published in 2001, and the Joint Committee on Pesticide Residues (JMPR), published in 2004, both concluded that lindane was not likely to pose carcinogenic risks to humans.

(b)    Dr. Amy Paller and Dr. Adelaide Herbert have knowledge regarding the falsity of this statement.  Dr. Chang Lee also may have knowledge regarding the falsity of this statement.

(c)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

(d)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

**Statement (a) listed in Complaint Paragraph 31:** "Be Sure You Provide a Non-Chemical Choice For Your Children . . . Because it's not worth taking unnecessary risks when the bottom line will always be the manual removal of lice and nits."

(a)    While all lice medications are associated with risks to some extent, the FDA has determined that such risks, which are low, are outweighed by the health benefits the medications provide.  Both the AAP and the CDC recommend pediculicidal agents (chemical treatments) over non-chemical, mechanical removal of lice and nits with specialized comb products.  These expert recommendations are supported, in part, by the results of a rigorous head-to-head clinical study, published in *Lancet* by Roberts et al. in 2000, that showed manual removal of head lice with a commercial combing kit to be less than half as effective as treatment with a prescription pediculicide.  Similarly, the most current Cochrane Systematic Review of head lice treatments—an independent, authoritative analysis of evidence-based research—concluded  that combing was "ineffective" and "impractical" and "inappropriate" as a primary treatment for head lice infestation.

(b)    Dr. Amy Paller and Dr. Adelaide Herbert have knowledge regarding the falsity of this statement.  Dr. Chang Lee also may have knowledge regarding the falsity of this statement.

(c)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

(d)      Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

**Statement (b) listed in Complaint Paragraph 31:** "Never resort to dangerous remedies such as lindane, kerosene, or pet shampoos."

(a)      There is no scientific basis to justify likening Lindane medications to kerosene, an industrial chemical void of therapeutic properties, for the treatment of lice or scabies. The FDA has repeatedly concluded that Lindane medications fill an important medical need as second-line treatment options for patients with scabies and lice who have few reasonable alternatives. The EPA has similarly concluded that Lindane medications do not pose significant risks to the public or the environment when used as currently labeled. In addition, the FDA has consistently rejected petitions, including those submitted by the NPA, to ban the use of prescription Lindane therapies, after determining their arguments to be without merit. The EPA has also refuted criticisms from the NPA regarding their scientific assessments of these medical products.

(b)      Dr. Amy Paller and Dr. Adelaide Herbert have knowledge regarding the falsity of this statement. Dr. Chang Lee also may have knowledge regarding the falsity of this statement.

(c)      Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

(d)      Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

**Statement (c) listed in Complaint Paragraph 31:** "When used for early detection and manual removal, the LiceMeister comb is the realistic and practical alternative to unnecessary and potentially harmful pesticides. The LiceMeister is the safe and cost effective way to win the war against head lice and keep the kids in school safe, lice and nit free."

(a)      Evidence for the efficacy of "wet combing" is generally considered to be lacking. In a head-to-head clinical study published in *Lancet*, manual removal of head lice with a

17

commercial combing kit was found to be less than half as effective as treatment with a prescription pediculicide. Wet combing is also extremely labor intensive and requires combing of the hair for fifteen to thirty minutes or more, every three to four days, for several weeks. In contrast, Lindane Shampoo is recommended as one-time treatment to be left in the hair no longer than four minutes. Both the CDC and AAP recommend pediculicidal agents over manual removal with special combs for the treatment of head lice.

Similarly, the most recent Cochrane Systematic Review of head lice treatments—an independent, authoritative analysis of evidence-based research—concluded: "[P]hysical control methods, such as combing/'BugBusting' are <u>ineffective</u> as a means of curing head lice infections. This type of method of intervention is very <u>labor intensive</u> and requires a certain level of skill to be effective, which makes the treatment <u>inappropriate as a primary treatment</u> against head louse infestation."

    (b)    Dr. Amy Paller and Dr. Adelaide Herbert have knowledge regarding the falsity of this statement. Dr. Chang Lee also may have knowledge regarding the falsity of this statement.

    (c)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

    (d)    Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

**Statement (d) listed in Complaint Paragraph 31:** "Do not recommend products containing lindane. The Food and Drug Administration (FDA) regards it as potentially more toxic than all other pediculicidal choices and no more effective."

    (a)    Lindane is FDA-approved as safe and effective for second-line treatment of scabies, head lice, and pubic lice. Second-line treatments are used when first-line treatments have failed or cannot be tolerated; thus for individual patients, Lindane is more effective and/or

safer than other treatments. Moreover, the increasing rate of resistance to permethrin, the most commonly used therapy, makes the availability of second-line treatments like Lindane even more relevant.

(b)     Dr. Amy Paller and Dr. Adelaide Herbert have knowledge regarding the falsity of this statement. Dr. Kastoob Gastar, Dr. Pat McGrath, and Dr. Chang Lee also may have knowledge regarding the falsity of this statement.

(c)     Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

(d)     Subject to Morton Grove's objections to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents responsive to this request.

**INTERROGATORY NO. 3:**

Identify every way in which Morton Grove has been harmed by NPA's statements. In answering this interrogatory, please

(a)    state all facts upon which you base your allegation(s) of harm;
(b)    identify all persons with knowledge or information regarding your allegation(s) of harm;
(c)    identify all documents relating to the facts and contentions in this response;
(d)    identify all "consumers and physicians" who Morton Grove alleges in paragraph 36 of the Complaint have falsely questioned the safety and effectiveness of Lindane Lotion and Lindane Shampoo, and for each of them identify every communication between Morton Grove and them and the content of the communication; and
(e)    identify all emerging markets from which Morton Grove alleges in paragraph 36 of the Complaint that it has been precluded from making new sales in, including the basis for Morton Grove's allegation that it was precluded from making each new sale.

**RESPONSE:**

Morton Grove objects to this interrogatory on the basis that it is overly broad and unduly burdensome. Morton Grove also objects to this interrogatory on the basis that is premature at this nascent stage of this litigation. Morton Grove's investigation continues, and, subject to its

objections, Morton Grove states that it will seasonably supplement its response hereto. In addition, Morton Grove states that it will produce documents responsive to this inquiry.

**INTERROGATORY NO. 4:**

Identify and quantify each loss in sales Morton Grove alleges it suffered as a result of NPA's Statements, including the date or time period of the loss; the product or products whose sales decrease constitutes the loss; the amount of the loss and the portion of that loss you allege was caused by NPA's Statement or Statements; the method used by Morton Grove in calculating the loss caused by NPA; and the NPA Statement or Statements you allege proximately caused the loss.

**RESPONSE:**

Morton Grove objects to this interrogatory on the basis that it is overly broad and unduly burdensome. Morton Grove also objects to this interrogatory on the basis that is premature at this nascent stage of this litigation. Morton Grove's investigation continues, and, subject to its objections, Morton Grove states that it will seasonably supplement its response hereto. In addition, Morton Grove states that it will produce documents responsive to this inquiry.

**INTERROGATORY NO. 5:**

Identify Morton Grove's competitors for Lindane Lotion and/or Lindane Shampoo and the products those competitors produce, manufacture or sell.

**RESPONSE:**

Morton Grove's competitors for Lindane Lotion and/or Lindane Shampoo include the National Pediculosis Association (LiceMeister® Comb), Taro Pharmaceuticals, Inc. (Ovide®), Medicis Pharmaceuticals, Inc. (Ovide® – malathion), Insight Pharmaceuticals, Inc. (Nix®, formerly owned by Pfizer, Inc.), Allergan, Inc. (Elimite®), DSM Pharmaceuticals, Inc. (Elimite), Mylan Bertek Pharmaceuticals, Inc. (Acticin), Westwood-Squibb Pharmaceuticals, Inc. (Eurax®), and Merck & Co., Inc. (Stromectol®).

**INTERROGATORY NO. 6:**

Identify each and every means of communication, including but not limited to websites, advertisements, position papers, presentations, testimony before government entities or administrative agencies, press conferences, interviews, public service announcements, community service announcements, and press releases that Morton Grove has employed or used to disseminate information about Lindane Lotion, Lindane Shampoo, or lindane.

**RESPONSE:**

Morton Grove objects to this interrogatory on the basis that it is overly broad, unduly burdensome, calculated to harass, and duplicative of the NPA's requests for documents issued in this litigation. Subject to this objection and the objections contained in Morton Grove's responses to the NPA's first set of document requests, Morton Grove states that it will produce non-privileged documents in its possession, custody or control.

**INTERROGATORY NO. 7:**

Identify the steps, and the persons or entities involved in each step, in the distribution chain of Lindane Lotion and Lindane Shampoo from Morton Grove to any intermediaries, including but not limited to wholesalers, retailers, marketers, and Alliant Pharmaceuticals, to consumers.

**RESPONSE:**

Morton Grove objects to this interrogatory to the extent is overly broad and unduly burdensome. Subject to its objections, Morton Grove states that its current distribution chain is as follows: (1) Morton Grove manufacturers Lindane Lotion and Shampoo; (2) Morton Grove packages Lindane Lotion and Shampoo; and (3) Morton Grove ships Lindane Lotion and Lindane Shampoo to either a drug store or a pharmaceutical wholesaler, who ultimately sells Lindane Lotion and Lindane Shampoo to consumers.

Dated:  October 1, 2007                    Respectfully Submitted,


**MORTON GROVE PHARMACEUTICALS, INC.**


By: _Cherish M Keller_____
     One of Its Attorneys

W. Gordon Dobie
Timothy Rivelli
William C. O'Neil
Cherish M. Keller
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
T:  (312) 558-5600
F:  (312) 558-5700

## **VERIFICATION**

I, William Goldberg, being duly sworn on oath depose and say as follows:

      1.     I am above the age of 18 and am otherwise competent to make this affidavit.

      2.     I am General Manager of Morton Grove Pharmaceuticals, Inc. ("Morton Grove").

      3.     I have reviewed Morton Grove Pharmaceuticals, Inc.'s Response to Defendant National Pediculosis Association, Inc.'s First Set of Interrogatories.

      4.     Some of the facts set forth in Morton Grove's Response are not within my personal knowledge but have been gathered and compiled by other employees of Morton Grove at my request or at the request of Morton Grove's attorneys. Based upon the information provided to me, I believe the facts contained in Morton Grove's Response to be true.

      5.     The remaining facts are known by me to be true.

FURTHER AFFIANT SAYETH NAUGHT.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 27, 2007.

 

                                                  _____
                                                  William Goldberg

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of October 2007, I caused to be served a copy of **Morton Grove Pharmaceuticals, Inc.'s Response to Defendant The National Pediculosis Association, Inc.'s First Set of Interrogatories** to be served on counsel of record via Federal Express:

> Richard M. Waris
> James J. Sipchen
> Amy J. Thompson
> PRETZEL & STOUFFER, CHARTERED
> One South Wacker Drive - Suite 2500
> Chicago, Illinois 60606
> T: (312) 578-7404
> F: (312) 346-8242
>
> Debbie L. Berman
> Jennifer A. Hasch
> Amanda S. Amert
> Wade A. Thomson
> JENNER & BLOCK LLP
> 330 North Wabash Avenue
> Chicago, Illinois 60611
> T: (312) 222-9350
> F: (312) 527-0484

24

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MORTON GROVE
PHARMACEUTICALS, INC.

　　　　　　　　　　Plaintiff,

　　　　v.

THE NATIONAL PEDICULOSIS
ASSOCIATION, INC.

　　　　　　　　　　Defendant.

）
）
）
）
）
）
）
）
）
）
）
）
）

No: 08-CV-1384

Judge Bucklo
Magistrate Judge Mason

**MORTON GROVE PHARMACEUTICALS, INC.'S
THIRD SUPPLEMENTAL AND AMENDED RESPONSE
TO DEFENDANT THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'S
FIRST SET OF INTERROGATORIES**

Plaintiff Morton Grove Pharmaceuticals, Inc. ("Morton Grove"), by and through its attorneys Winston & Strawn LLP, hereby supplements and, where specified, amends its response to Defendant the National Pediculosis Association, Inc.'s ("NPA's") First Set of Interrogatories, Nos. 1, 2, 3, 4, and 6. For each Interrogatory, Morton Grove incorporates its Preliminary Statement along with its General Objections from its Responses to the NPA's First Set of Interrogatories as if fully set forth herein.

**SUPPLEMENTARY RESPONSES**

**INTERROGATORY NO. 1:**

Identify all Persons who may have personal knowledge of any fact alleged in the Complaint (including knowledge as to the truth or falsity of any such fact), and state the general subject matter of the knowledge that may be possessed by each such person.

**SUPPLEMENTAL AND AMENDED RESPONSE:**

Morton Grove objects to this interrogatory on the grounds that it is overbroad, unduly burdensome, vague, and designed to improperly harass rather than discover the identity of fact occurrence or expert witnesses. Specifically, Morton Grove objects to the phrase "personal knowledge of *any* fact alleged in the Complaint" (emphasis supplied), which is patently vague and overbroad. As drafted, this interrogatory could require disclosure of counsel for Morton Grove and counsel for the NPA. Morton Grove will disclose those persons that have "personal knowledge" in the sense of an occurrence fact witnesses. Morton Grove is not including, for example, lawyers, consulting experts, and/or lobbyists who have represented the company in proceedings who may possess knowledge of arguments that Morton Grove has previously made in such proceedings (just as Jenner & Block would not be a fact witness just because it handled a prior case for the same client involving similar issues). Morton Grove further states, subject to and without waiver of its objections, that it produced documents sufficient to identify lobbyists it retained relating to Lindane.

Morton Grove also objects on the grounds that this interrogatory requires Morton Grove to speculate on what other persons or entities, including those with no contacts with or relation to Morton Grove, may or may not know.

Without waiver of the foregoing objections, Morton Grove hereby supplements and amends its previous response as follows. This list amends, and thus supersedes, all Morton Grove's previous lists in response to this interrogatory.

| Name and Business Information | General Knowledge |
|---|---|
| Mr. Surendra Chirra<br>Senior Director of Technical Services & New Product Development<br>Morton Grove Pharmaceuticals, Inc. | Lindane's safety profile and Morton Grove's ongoing sales efforts regarding Lindane medications |
| Dr. Kastoob Gastar<br>Former Vice President, Quality Systems<br>Morton Grove Pharmaceuticals, Inc. | Lindane's safety profile and FDA and other regulatory matters regarding Lindane |
| Mr. Bill Goldberg<br>Former President<br>Morton Grove Pharmaceuticals, Inc. | Morton Grove's sales and marketing efforts regarding Lindane |
| Ms. Paula Grist<br>Senior Director, Sales & Business Development<br>Morton Grove Pharmaceuticals, Inc. | Morton Grove's sales and marketing efforts regarding Lindane after the termination of Alliant Pharmaceuticals |
| Dr. Ralph Hodosh<br>Director, Regulatory Affairs<br>Morton Grove Pharmaceuticals, Inc. | Certain regulatory matters regarding Lindane medications |
| Mr. Dave Kapka<br>Former Business Analyst<br>Morton Grove Pharmaceuticals, Inc. | Quantitative analysis of Morton Grove's sales efforts regarding Lindane |
| Dr. Chang Lee<br>Former Vice President, Regulatory<br>Morton Grove Pharmaceuticals, Inc. | Lindane's safety profile and FDA and other regulatory matters regarding Lindane |
| Mr. Rick Lopatin<br>Former Chief Financial Officer<br>Morton Grove Pharmaceuticals, Inc. | Morton Grove's sales and profits from Lindane |
| Dr. Pat McGrath<br>Former Vice President, Research & Development<br>Current Advisor to the President<br>Morton Grove Pharmaceuticals, Inc. | Lindane's safety profile and FDA and other regulatory matters regarding Lindane |
| Mr. Richard O'Hara<br>Former Vice President, Sales & Marketing<br>Morton Grove Pharmaceuticals, Inc. | Morton Grove's sales and marketing efforts regarding Lindane |

| Name and Business Information | General Knowledge |
|---|---|
| Mr. Brian Tambi<br>Former CEO<br>Morton Grove Pharmaceuticals, Inc. | Morton Grove's sales and marketing efforts regarding Lindane |
| Ms. Crystal Friend<br>Former Marketing Manager, Alliant Pharmaceuticals, Inc.<br>(now with Sciele Pharma, Inc.) | Alliant's sales and marketing efforts regarding Lindane |
| Ms. Jill Hackett<br>Former Michigan Territory Manager, Alliant Pharmaceuticals, Inc.<br>(now with Sciele Pharma, Inc.) | Alliant's sales and marketing efforts regarding Lindane |
| Mr. Peter Joiner<br>Former Vice President of Alliant Pharmaceuticals, Inc. | Alliant's sales and marketing efforts regarding Lindane |
| Dr. Shayne Gad, PhD, DABT, ATS<br>Principal, Gad Consulting<br>Adjunct Prof. of Toxicology<br>Duke University Medical Center<br>Durham, NC 27706 | The falsity of NPA's statements |
| Dr. Adelaide A. Hebert, M.D.<br>Professor of Pediatrics and Dermatology<br>University of Texas Medical School<br>Department of Dermatology<br>6655 Travis, Suite 980<br>Houston, TX 77030 | The falsity of NPA's statements |
| Dr. Amy S. Paller, M.D.<br>Chair, Department of Dermatology<br>Northwestern University School of Medicine<br>676 N. St. Clair, Suite 1600<br>Chicago, IL 60611 | The falsity of NPA's statements |
| Dr. Tor Shwayder, M.D.<br>Department of Dermatology<br>Henry Forth Medical Center<br>3031 West Grand Boulevard, Suite 800<br>Detroit, MI 48202 | The falsity of NPA's statements |

| Name and Business Information | General Knowledge |
|---|---|
| Ms. Deborah Altschuler<br>The National Pediculosis Association, Inc. | NPA's statements |
| Ms. Bethezda Cervantes<br>The National Pediculosis Association, Inc. | NPA's statements |
| Ms. Jane Cotter<br>The National Pediculosis Association, Inc. | NPA's statements |
| Ms. Ann Heil<br>Los Angeles County Sanitation District | NPA's statements |
| Mr. Eric Phan<br>CIRE Consulting | NPA's statements |
| Mr. Dan Sheridan<br>The National Pediculosis Association, Inc. | NPA's statements |

In addition, Morton Grove expressly reserves the right to further supplement this response as appropriate.

**INTERROGATORY NO. 2:**

State the basis for Morton Grove's allegation that NPA's Statements are false. For each NPA Statement, please identify:

    (a)     all facts upon which you base your allegations(s) of falsity;
    (b)     all persons with knowledge or information regarding your allegation(s) of falsity;
    (c)     all communications among or between Morton Grove employees, directors, attorneys or agents, regarding the truth or falsity of NPA's Statements; and
    (d)     all documents relating to the facts and contentions in this response.

**SUPPLEMENTAL AND AMENDED RESPONSE:**

Morton Grove objects to this interrogatory on the basis that this type of extensive and detailed information is more appropriately addressed during a deposition, not through an interrogatory. Further, Morton Grove maintains all objections as previously stated. Without

waiver of the foregoing objections, Morton Grove hereby supplements and amends, as indicated, its previous response as follows:

**Statement listed in Complaint Paragraph 23 [former Paragraph 23]:**

> Symptoms [from] exposure [to Lindane include:] acute renal failure with azotemia, ADD/ADHD[,] anxiety, autism, atonia, agranulocytosis, aplastic anemia, anorexia, apprehensive mental state, behavior-mood disturbances, bullae, cancer, cardiac arrhythmias, clumsiness, coma, confusion, conjunctivitis, convulsions, cough, cyanosis, death, dermatitis, diaphoresis, diarrhea, disorientation, dizziness, dyspnea, emotional lability, excitement, excessive hair growth, fast heartbeat, fatigue, fever, giddiness, grinding teeth, headaches, heart palpitations, hematuria, hyperirritability, hypersensitivity, incoordination, kidney damage, liver damage, liver enlargement, loss of appetite, mania, mental retardation, muscle cramps, muscle spasms, muscle tremors, nausea, nervousness, oliguria, pallor, paraesthesia, paresis, paresthesia, porphyria, proteinuria, pulmonary edema, restlessness, respiratory failure, seizures, shaking, sweating, tachycardia, tearing, thirst, trouble breathing, trouble swallowing, urticaria, vertigo, vomiting, weakness, wheezing, elevated LDH, GOT, GPT, alkaline phosphatase, ALT, AST enzymes.

(b) Amendment: Dr. Amy Paller and Dr. Adelaide Hebert have knowledge regarding the falsity of this statement. Surendra Chirra may also have knowledge regarding the falsity of this statement.

**Statement listed in Complaint Paragraph 25 [former Paragraph 26]:** "Illinois Bans Lindane" and "Illinois Banned Lindane."

(b) Amendment: Illinois House and Senate members and Ralph Hodosh have knowledge regarding the falsity of this statement.

**Statement listed in Complaint Paragraph 26 [former Paragraph 28]:** "one dose of a lindane treatment for head lice can pollute 6 million gallons of water to levels exceeding drinking water standards."

(b) Amendment: Dr. Shayne Gad has knowledge regarding the falsity of this statement. Surendra Chirra may also have knowledge regarding the falsity of this statement.

**Statement (a) listed in Complaint Paragraph 33 [former Paragraph 29 statement (a)]:** "[T]he U.S. EPA classif[ies] lindane as a possible human carcinogen."

(b) Amendment: Surendra Chirra has knowledge regarding the falsity of this statement.

**Statement (b) listed in Complaint Paragraph 33 [former Paragraph 29 statement (b)]:** "Lindane should be handled as a CARCINOGEN WITH EXTREME CAUTION."

(b) Amendment: Surendra Chirra has knowledge regarding the falsity of this statement.

**Statement listed in Complaint Paragraph 37 [former Paragraph 30]:** "Case-controlled research shows a significant association between the incidences of brain tumors in children with the use of lindane-containing lice shampoos."

(b) Amendment: Surendra Chirra has knowledge regarding the falsity of this statement.

**Statement listed in Complaint Paragraph 38:** "Lindane, first used as a smoke bomb during WWI, is an endocrine disrupting, bio-accumulative and toxic chemical. It is a known health risk to humans, especially children, with potential adverse effects ranging from learning disabilities, to birth defects, to breast cancer, to leukemia, to seizures, to death."

This section of response supplements Morton Grove's prior response.

(a) First and foremost, Lindane Lotion and Lindane Shampoo are prescription medications that are approved by the FDA as safe and effective for the second-line treatment of head lice, pubic lice, and scabies. These diseases, two of which are sexually transmitted, affect tens of millions of Americans every year and remain challenging public health issues. Lindane medications have been reviewed for safety on at least a dozen separate occasions since their approval in 1951, and as recently as 2002, by subject matter experts working with the FDA who have repeatedly concluded that Lindane medications are safe when used as directed and should remain on the market for patients who need them. During this same time frame, numerous petitions to ban Lindane medications, including those submitted by the Defendant, have all been rejected and determined to be "without merit." (FDA Lindane Assessment Memo 2003.) The FDA has not wavered on this position and maintains that Lindane medications serve an important public health need with benefits that outweigh potential risks—a factor for all

medications. Indeed, the FDA noted specifically in the case of head lice that "[i]t is in the best interest of public health to have lindane shampoo available by prescription." (*Id.*)

The clinical value of Lindane medications are further reinforced by The Center for Disease Control and Prevention, the American Academy of Pediatrics, and the World Health Organization, all of which have issued medical treatment guidelines that include lindane medications as viable treatment alternatives for the management of scabies and lice in appropriate patients. (CDC 2006 Sexually Transmitted Disease Treatment Guidelines; AAP 2006 Redbook; WHO 2003 Guidelines for the Management of Sexually Transmitted Infections.)

As noted in the FDA-approved product medication guides for Lindane Lotion and Lindane Shampoo, the most common side effects associated with the use of these medications are non-serious reactions of the skin, such as itching, burning, dryness, and rash. (Lindane Lotion and Lindane Shampoo Medications Guides, updated 2003.) Although serious adverse events like seizures have occurred with use of these medications, such effects are rare. As noted by the FDA in its most recent Postmarketing Safety Analysis of Lindane medications (2002): "In all age groups, adverse events occurred mainly in patients who appear to have misapplied or orally ingested lindane." (FDA Lindane Assessment Memo 2003.) In fact, only 2 deaths attributed to Lindane medications were reported to the FDA from 1951 through 2002, including a suicidal ingestion. (FDA Postmarketing Safety Analysis 2002.) This compares favorably with the roughly 500 deaths that are reported every year for acetaminophen, the active ingredient in Tylenol. Indeed, the vast majority of side effects (85%) reported to FDA during this 51-year period were non-serious in nature, with just 14 serious adverse events—no deaths—presumably resulting from the use of Lindane medication in accordance with labeled instructions. These numbers are exceptionally low, given that Lindane medications have been prescribed for tens of

millions of patients, including children, over the course of several decades. This is why the FDA has stated that serious adverse events with use of Lindane medications are "rare." (Lindane Shampoo and Lindane Lotion Prescribing Information, updated 2003.) Further, in 2003, Lindane medications were limited to small, unit-dose bottles to mitigate the risk for product misuse.

Defendant's statement that Lindane was "first used as a smoke bomb during WWI" has no relevance to the clinical use of Lindane medications. An unrelated statement in reference to technical-grade hexachlorocyclohexane (HCH) can be traced back to a 1991 chapter by A.G. Smith entitled "Chlorinated Hydrocarbon Insecticides" in the Handbook of Pesticide Toxicology, W.J. Hayes, Jr. and E.R. Laws, Jr., eds. (San Diego, California: Academic Press, Inc.). As a basic matter of fact, it is well understood that technical-grade HCH is not Lindane but rather a mixture of different chemical isomers, 90% of which are the more toxic alpha- and beta-HCH forms. Just a minor component of technical-grade HCH is the gamma isomer—the least toxic of the three chemicals and the only form with insecticidal activity, also known as Lindane. Notably, technical-grade HCH was used agriculturally in the United States until 1978 but has never been used for healthcare purposes.

The other ill effects listed in this statement are not associated with the use of Lindane medications and are not highlighted as potential risks in the current product labeling for either Lindane Lotion or Lindane Shampoo, both of which were updated for safety by FDA in 2003. Indeed, topical Lindane medications are not teratogenic. Drugs that are known to cause fetal damage and birth defects are contraindicated for use during pregnancy and assigned a Pregnancy Category X rating by the FDA, like the acne drug Accutane and the cholesterol-lowering drug Lipitor. Lindane medications, on the other hand, are *not* contraindicated during pregnancy and have a Pregnancy Category C rating. This means that they can be prescribed by physicians for

use during pregnancy if needed.  Examples of drugs that have the same Pregnancy Category C rating as Lindane (of which there are many) include the antibiotic Cipro, the yeast medication Diflucan, and the antihistamine Allegra.

After nearly 60 years of clinical use, Lindane medications have not been shown to cause cancer—leukemia, breast cancer, or any other cancer.  In fact, the FDA noted in 1997 in response to citizen petitions to ban Lindane medications that "The National Cancer Institute (NCI) has also examined lindane for possible carcinogenicity. On November 11, 1977, the NCI published the results of a study indicating lindane is not carcinogenic in topical use (42 FR 58791)" and further stated that "Lindane is safe and effective if used as directed." (Janet Woodcock, MD, Director, Center for Drug Evaluation and Research, FDA, Re: Docket No. 95P-0018/CP and Docket No. 81P-0416/CP, May 13, 1997.)

In this same year, the results of large epidemiologic study conducted by researchers at Kaiser Permanente—a large 50-year-old Health Maintenance Organization—found no evidence of increased cancer risk among patients who had been treated with Lindane medications, concluding that "There is still no persuasive evidence from studies of humans that lindane, as ordinarily used clinically, is carcinogenic in humans."  This study was based on a ***143,594-patient database with up to 21 years of patient follow-up data*** and was designed to evaluate the potential cancer risks associated with healthcare uses of lindane medications.  (Friendman 1997.)  In stark contrast, Defendant often cites a study by Menegeaux (2006)—a study that was not designed to evaluate the safety of Lindane medications specifically but rather a variety of insecticides used around the home and in the garden.  In fact, just ***6 of the 568*** children who were involved in this study had ever been treated with Lindane shampoo. More importantly, there was ***no*** statistically significant difference in the risk of developing leukemia among children who had

ever been treated with Lindane shampoo for head lice compared with those who had not.  This is readily apparent by a wide 95% confidence interval that includes the "no effect" value of 1 (0.5 to 8.7) as reported by these investigators.

In 2001, the EPA's Cancer Assessment Review Committee's (CARC) downgraded the cancer classification of Lindane following a reevaluation of all available scientific evidence on Lindane, including the results of newer studies requested by this committee after determining older studies to be flawed.  The committee concluded that the evidence did not warrant additional assessment of the cancer risk of Lindane in humans, noting that "[q]uantification of human cancer risk is not required."  The EPA's cancer classification for lindane is now lower than the rating that this same expert committee assigned in 2002 to permethrin—the most commonly used first-line treatment for scabies and lice.  Lindane also has a lower cancer rating than piperonyl butoxide, another active ingredient in over-the-counter head lice treatments like RID. (EPA Cancer Assessment for Lindane 2001; EPA 2002 RED for Permethrin; EPA 2006 RED for Piperonyl Butoxide.)

*Current Cancer Ratings by EPA Cancer Assessment Review Committee*

| *Lindane*<br><br>(second-line, prescription only) | *Permethrin*<br><br>(first line, OTC) | *Piperonyl butoxide*<br><br>(first line, OTC) |
|---|---|---|
| "Suggestive evidence but not sufficient to assess cancer risk in humans"[*] | "Likely to cause cancer by the oral route" | "Possible carcinogen" |

*This rating is based on the occurrence of <u>benign</u> lung tumors in just one sex of one animal species—specifically female CD-1 mice, which are genetically predisposed to developing lung tumors. In this study, mice were fed high doses of lindane orally for 78 weeks, which is not how Lindane medications are used.

Similarly, The Joint Committee on Pesticide Residues (JMPR) of the World Health Organization (WHO) concluded in 2004 that "In the absence of genotoxicity and on the basis of the weight of the evidence from the studies of carcinogenicity, JMPR has concluded that lindane is not likely to pose a carcinogenic risk to humans."  It further stated that "In an epidemiological study designed to assess the potential association between breast cancer and exposure to chlorinated pesticides, no correlation with lindane was found." (WHO 2004.)

(b) Surendra Chirra has knowledge regarding the falsity of this statement.

(c) Subject to Morton Grove's objections to the NPA's document requests, Morton Grove states that it has produced and/or will produce non-privileged documents responsive to this request.

(d) Subject to Morton Grove's objections to the NPA's document requests, Morton Grove states that it has produced and/or will produce non-privileged documents responsive to this request.

**Statement (a) listed in Complaint Paragraph 40 [former paragraph 31 statement (a)]:** "Be Sure You Provide a Non-Chemical Choice For Your Children . . . Because it's not worth taking unnecessary risks when the bottom line will always be the manual removal of lice and nits."

(b) Amendment: Dr. Amy Paller and Dr. Adelaide Hebert have knowledge regarding the falsity of this statement. Surendra Chirra may also have knowledge regarding the falsity of this statement.

**Statement (b) listed in Complaint Paragraph 40 [former paragraph 31 statement (b)]:** "Never resort to **dangerous remedies** such as lindane, kerosene, or pet shampoos." (emphasis supplied).

(b) Amendment: Dr. Amy Paller and Dr. Adelaide Hebert have knowledge regarding the falsity of this statement. Surendra Chirra may also have knowledge regarding the falsity of this statement.

**Statement (c) listed in Complaint Paragraph 40 [former paragraph 31 statement (c)]:** "When used for early detection and manual removal, the LiceMeister comb is the realistic and practical alternative to unnecessary and potentially harmful pesticides. The LiceMeister is the safe and cost effective way to win the war against head lice and keep the kids in school safe, lice and nit free."

(b) Amendment: Dr. Amy Paller and Dr. Adelaide Hebert have knowledge regarding the falsity of this statement. Surendra Chirra may also have knowledge regarding the falsity of this statement.

**Statement (d) listed in Complaint Paragraph 40 [former paragraph 31 statement (d)]:** "Do not recommend products containing lindane. The Food and Drug Administration (FDA) regards it as potentially more toxic than all other pediculicidal choices and no more effective."

(b) Amendment: Dr. Amy Paller and Dr. Adelaide Hebert have knowledge regarding the falsity of this statement. Surendra Chirra and Ralph Hodosh may also have knowledge regarding the falsity of this statement.

**Statement (a) listed in Complaint Paragraph 41:** "Lindane is quite toxic to humans. The acute (short-term) effects of lindane through inhalation exposure in humans consist of irritation of the nose and throat and effects on the blood and skin. Chronic (long-term) exposure to lindane by inhalation in humans has been associated with effects on the liver, blood, and nervous, cardiovascular, and immune systems."

This section of response supplements Morton Grove's prior response.

(a) These statements are not relevant to Lindane medications, particularly considering that inhalation is not a primary route of lindane exposure with topical uses of Lindane Lotion or Lindane Shampoo. Rather, the above statements relate to effects associated with occupational risks of farm workers and individuals working in seed-treatment facilities and chemical manufacturing plants who are exposed to agricultural lindane, technical-grade hexachlorocyclohexane, and high concentrations of bulk lindane chemicals. Concerning agricultural lindane, the EPA concluded in August 2006 that agricultural products were no longer eligible for re-registration as it had originally determined in its initial review published in 2002. The introduction of newer pesticide alternatives and a diminished agricultural need formed the basis of this reversed decision. The cancellation of agricultural lindane took effect in July 2007, with the use of stockpiles allowed for an additional two years. Notably, however, the EPA concluded as part of its re-registration process for agricultural lindane that Lindane medications do not pose significant risks to the public or the environment when used as currently labeled. (EPA 2002 RED.) Similarly, the FDA has repeatedly asserted that Lindane medications are safe when used as directed and continue to provide health benefits to the public, noting that *all* medications used to treat scabies and lice are associated with risks. (FDA Lindane Assessment Memo 2003.)

The safety profile of Lindane lotion and Lindane shampoo is well characterized after nearly 60 years of clinical use in tens of millions of patients. Study after study have shown Lindane medications to be safe and well tolerated, including the results of one of the largest postmarketing safety studies of head lice treatments that involved more than 34,000 patients. (Anderws 1992.) In that study, less than 0.5% of patients treated with lindane shampoo experienced an adverse event of any kind, none of which were serious or unexpected. In

addition, there was no difference in the risk of clinically significant adverse events compared with permethrin, the most commonly prescribed first-line treatment for lice. Indeed, serious side effects, such as seizures, have been quanitified by the FDA as *rare* and have almost always been the result of gross product misuse, like drinking lindane or applying the medication in excessive amounts.

(b) Surendra Chirra has knowledge regarding the falsity of this statement.

(c) Subject to Morton Grove's objections to the NPA's document requests, Morton Grove states that it has produced and/or will produce non-privileged documents responsive to this request.

(d) Subject to Morton Grove's objections to the NPA's document requests, Morton Grove states that it has produced and/or will produce non-privileged documents responsive to this request.

**Statement (b) listed in Complaint Paragraph 41:** "Chronic effects include damage to the nervous system and liver disease. Worker exposures have resulted in blood disorders, headaches, convulsions, and disruption of the reproductive hormones of the endocrine system."

This section of response supplements Morton Grove's prior response.

(a) Like statement (a) in Paragraph 41, this statement is not relevant to appropriate public health uses of Lindane medications, but rather relates to occupational exposure to agricultural-grade lindane and alpha- and beta-hexachlorcyclohexane chemicals. Indeed, Lindane medications are not used chronically; they are typically prescribed as one-time treatments applied in low concentration (1%) to the hair or skin for short periods of time—four minutes in the case of head lice. Further, while serious nervous system effects such as convulsions have occurred with the use of Lindane medications—a potential risk with ALL approved chemical treatments for scabies and lice—these effects are rare and have almost always

resulted from gross product misuse.  Notably, Lindane medications were restricted to small, unit-dose bottles in 2003 to mitigate these risks.

The public health value and safety of Lindane medications as second-line therapies for scabies and lice is supported by numerous expert assessments and current treatment guidelines published by the Food and Drug Administration, the Environmental Protection Agency, the Centers for Disease Control and Prevention, the American Academy of Pediatrics, and the World Health Organization. (FDA Lindane Assessment Memo 2003; EPA 2002 RED; CDC 2006 Sexually Transmitted Disease Treatment Guidelines; AAP 2006 Redbook; WHO 2003 Guidelines for the Management of Sexually Transmitted Infections.)

(b) Surendra Chirra has knowledge regarding the falsity of this statement.

(c) Subject to Morton Grove's objections to the NPA's document requests, Morton Grove states that it has produced and/or will produce non-privileged documents responsive to this request.

(d) Subject to Morton Grove's objections to the NPA's document requests, Morton Grove states that it has produced and/or will produce non-privileged documents responsive to this request.

## INTERROGATORY NO. 3:

Identify every way in which Morton Grove has been harmed by NPA's statements.  In answering this interrogatory, please

- (a)    state all facts upon which you base your allegation(s) of harm;
- (b)    identify all persons with knowledge or information regarding your allegations of harm;
- (c)    identify all documents relating to the facts and contentions in this response;
- (d)    identify all "consumers and physicians" who Morton Grove alleges in paragraph 36 of the Complaint have falsely questioned the safety and effectiveness of Lindane Lotion and Lindane Shampoo, and for each of them identify every communication between Morton Grove and them and the content of the communication; and

16

(e)    identify all emerging markets from which Morton Grove alleges in paragraph 36 of the Complaint that it has been precluded from making new sales in, including the basis of Morton Grove's allegations that it was precluded from making each new sale.

## SUPPLEMENTAL RESPONSE:

Morton Grove no longer plans to introduce expert testimony on monetary damages; instead, Morton Grove plans to introduce expert testimony on the injury Morton Grove has suffered as a result of the NPA's consumer deception. Morton Grove thus also objects to this interrogatory on the basis that it seeks information that is more properly, and will in fact be, the subject of expert testimony on injury.

## INTERROGATORY NO. 4:

Identify and quantify each loss in sales Morton Grove alleges it suffered as a result of NPA's statements, including the date or time period of the loss; the product or the products whose sales decrease constitutes the loss; the amount of the loss and the portion of the loss that you allege was caused by the NPA's Statement or Statements; the method used by Morton Grove in calculating the loss caused by NPA; and the NPA Statement or Statements you allege proximately caused the loss.

## SUPPLEMENTAL RESPONSE:

Morton Grove no longer plans to introduce expert testimony on monetary damages; instead, Morton Grove plans to introduce expert testimony on the injury Morton Grove has suffered as a result of the NPA's consumer deception. Morton Grove thus also objects to this interrogatory on the basis that it seeks information that is more properly, and will in fact be, the subject of expert testimony on injury.

## INTERROGATORY NO. 6:

**Narrowed interrogatory from October 17 letter:** From January 2000 through present, identify all websites, press releases, advertisements, and testimony before any governmental or administrative body that Morton Grove has employed or used to disseminate information about Lindane Lotion, Lindane Shampoo, other pediculicidal products containing lindane, and/or the chemical lindane.

**SUPPLEMENTAL AND AMENDED RESPONSE:**

Morton Grove objects to this interrogatory on the basis that it is duplicative of the NPA's requests for documents issued in this litigation. Subject to its objections, Morton Grove hereby supplements and amends its previous response as follows. This list amends, and thus supersedes, any lists in Morton Grove's previous responses to this particular interrogatory. Morton Grove expressly reserves its right to supplement this response.

Websites:

- Morton Grove has used www.lindane.com (also available via lindane.com, www.lindanetruth.com, lindanetruth.com, www.lindanefacts.com, and lindanefacts.com) and www.mgp-online.com.

- Morton Grove has also, from time to time, attempted to correct inaccurate information posted on www.wikipedia.org.

Press releases/announcements:

- June 1, 2005 announcement by Alliant; investigation continues concerning this document.

Physician detailing aids, mailers, and/or promotional pieces. This list contains both Morton Grove and/or Alliant material:

- "Supporting a managed care approach for the treatment of headlice with prescription pediculicides." See, for example, MGP001243-44.

- Various pieces entitled "The nits are gonna hit the fan." See, for example, MGP000766-69, MGP001662-63, MGP003494-99, MGP006472-77, and MGP035553-54.

- Various pieces entitled "Timed for Success." See, for example, MGP006501-04, MGP003063-64, MGP006506-11, MGP001665-66, and MGP035519-20.

- "MGP Lindane Shampoo, USP 1%." See, for example, MGP001297.

- "Now available only in 2oz. single-use bottles" See, for example, MGP001334-35.

- "The Nit Picking News: Vol. 1 No. 1." See, for example, MGP003483-88.

- "The Nit Picking News: Vol. 2 No. 1." See, for example, MGP003760-65.

- "Lindane Clinical Monograph." See, for example, MGP001253-72.

- May-August 2007 "Dear Customer" letters. See, for example, MGP001953-54, MGP003570-71, MGP035478-80, MGP035484-86, and MGP035492-93.

- MGP Lindane Lotion & Shampoo announcements. See, for example, MGP003578, MGP003579, and MGP003580-81.

- August and September "Dear Customer" letters. See, for example, MGP001331-32, MGP003584-85, and MGP035509.

- "Dear Healthcare Provider" letter. See, for example, MGP003586.

- "M.D./alert; Important: Lindane administration update." See, for example, MGP003043-45.

- "Pharm/alert; Important new information about Lindane Shampoo and Lindane Lotion, USP 1%" See, for example, MGP003505-10.

- "Nurse's Notes." See, for example, MGP035522.

- Lindane Shampoo Telewire. See, for example, MGP035524 and MGP035571.

- Various pieces entitled "Introducing . . . The re-launch of Lindane Shampoo/Lotion." See, for example, MGP051762-65 and MGP051619.

- Other materials, including pens (see, for example MGP035556), coupons/rebates (see, for example, MGP035558 and MGP035575), coupon holders (see, for example, MGP035574 and MGP035562), dosing cards (see, for example, MGP035560), medication instruction guides (see, for example, MGP035573), and patient instruction kits (including instruction guide, package insert, coupon, magnifier, comb, and gloves) (see, for example, MGP035565-69).

Testimony:

- Plaintiff's investigation has revealed no previous testimony.


Dated: May 30, 2008                    Respectfully Submitted,


**MORTON GROVE PHARMACEUTICALS, INC.**


By: _Cherish M. Keller_
        One of Its Attorneys

W. Gordon Dobie (wdobie@winston.com)
Timothy Rivelli (trivelli@winston.com)
William C. O'Neil (woneil@winston.com)
Cherish M. Keller (ckeller@winston.com)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
T:  (312) 558-5600
F:  (312) 558-5700

## VERIFICATION

I, Ralph J. Hodosh, Ph.D., declare as follows:

1.      I am above the age of 18 and am otherwise competent to make this declaration.

2.      I am Director of Regulatory Affairs at Morton Grove Pharmaceuticals, Inc. ("Morton Grove").

3.      I have reviewed Morton Grove Pharmaceuticals, Inc.'s Third Supplemental and Amended Response to Defendant the National Pediculosis Association, Inc.'s First Set of Interrogatories.

4.      Some of the facts set forth in Morton Grove's Third Supplemental and Amended Response are not within my personal knowledge but have been gathered and compiled by other employees of Morton Grove at my request, the request of other executives, or the request of Morton Grove's attorneys. Based upon the information provided to me, I believe the facts contained in Morton Grove's Third Supplemental and Amended Response to be true.

5.      The remaining facts are known by me to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 29, 2008.

_____
Ralph J. Hodosh, Ph.D.

21

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of May 2008, I caused a copy of **Morton Grove Pharmaceuticals, Inc.'s Third Supplemental and Amended Response to Defendant The National Pediculosis Association, Inc.'s First Set of Interrogatories** to be served on counsel of record via e-mail and U.S. Mail:

Debbie L. Berman
Jennifer A. Hasch
Amanda S. Amert
Wade A. Thomson
April A. Otterberg
JENNER & BLOCK LLP
330 North Wabash Avenue
Chicago, Illinois 60611
T: (312) 222-9350
F: (312) 527-0484

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC., | ) ) | |
| Plaintiff, | ) | No.:  08-CV-1384 |
| | ) | |
| v. | ) | Judge Bucklo |
| | ) | Magistrate Judge Mason |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., | ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF WADE A. THOMSON IN SUPPORT OF DEFENDANT
THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'s
MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS
AND DEPOSITION OF NON-PARTY DR. AMY S. PALLER**

I, Wade A. Thomson, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am one of the attorneys for defendant the National Pediculosis Association, Inc.

("NPA") in this matter.

2.      The statements made in this declaration are based on my personal knowledge.

3.      On June 9, 2008, NPA asked Morton Grove's attorneys whether they represented

non-party Dr. Amy Paller for purposes of this lawsuit.  (*See* Exhibit A, attached hereto.)

4.      On June 16, Morton Grove's attorneys responded that although Dr. Paller would

not be produced for a deposition voluntarily, its attorneys would represent her if necessary.  (*See*

Exhibit B, attached hereto.)

5.      On June 17, I wrote to Morton Grove's attorneys about their refusal to produce

Dr. Paller for depositions, explaining that Morton Grove had identified her as someone with

knowledge of the statements at the heart of the litigation.  (*See* Exhibit C, attached hereto.)

6.    On June 20, Morton Grove's attorneys responded, reiterating their objections and asking if NPA would be willing to "pay [Dr. Paller's] standard hourly rates for [her] time?" (*See* Exhibit D, attached hereto.)

7.    NPA's process server effectuated service on June 20, 2008 by serving Dr. Paller's administrative assistant; the subpoena was accompanied by the statutory witness and mileage fees.  (*See* Exhibit E, attached hereto.)

8.    On June 23, my colleague, April Otterberg wrote to Morton Grove's attorneys informing them of the fact that non-party Dr. Tor Shwayder was avoiding service of his subpoena and inquiring whether Winston & Strawn would accept service on his behalf.  (*See* Exhibit F, attached hereto.)

9.    Also on June 23, Morton Grove's attorneys responded to Ms. Otterberg's letter by email stating that they had "not been authorized to accept service on behalf of Dr. Shwayder." (*See* Exhibit G, attached hereto.)

10.    On June 26, NPA wrote to Morton Grove's attorneys asking for convenient dates for depositions of certain witnesses.  NPA also indicated that it intended to go forward with the deposition dates set forth in the subpoena to Dr. Paller.  (*See* Exhibit H, attached hereto.)

11.    On June 27, Morton Grove's attorneys informed NPA that, contrary to their previous assertions, they did *not* represent Dr. Paller.  (*See* Exhibit I, attached hereto.)

12.    Despite this, on July 3, 2008, Morton Grove attempted to submit objections to Dr. Paller's subpoena.  (*See* Exhibit J, attached hereto.)

13.    On July 7, 2008, NPA informed Morton Grove that its purported objections were invalid because Winston & Strawn had said it *did not* represent Dr. Paller.  (*See* Exhibit K, attached hereto.)

14.     Later on July 7, Morton Grove's attorneys again reversed course and informed NPA that they now represented Dr. Paller.  (*See* Exhibit L, attached hereto.)   On the same date, they also served Dr. Paller's objections to NPA's subpoena and subpoena duces tecum.  (*See id*.) Concurrent with the service of Dr. Paller's objections, Morton Grove's attorneys suggested discussing narrowing the subpoena but stated that a meet and confer would not be "terribly productive" if NPA was not willing "to drop its requests for depositions and severely limit its document requests."

15.     On July 8, 2008, NPA wrote to Morton Grove's counsel and asked them to confirm by 3 p.m. the following day whether they would be producing Dr. Paller, among others, for their noticed deposition dates.  (*See* Exhibit M, attached hereto.)  Morton Grove's counsel did not respond.

16.     On July 14, 2008, NPA wrote Morton Grove's counsel to confirm they would not be producing Dr. Paller, among others, for their noticed deposition dates.  (*See* Exhibit N, attached hereto.)

17.     One of Morton Grove's counsel, William O'Neil (on behalf of Dr. Paller), and I met and conferred by telephone on July 16, 2008.  (*See* Exhibit O, attached hereto.)  I informed him that NPA was willing to limit the scope of the document requests and to discuss a short deposition once it better understood the types and amounts of information Dr. Paller had.  (*See id*.)  Morton Grove's attorneys requested a time limit for the deposition and that NPA pay Dr. Paller's hourly rates.  (*See id*.)  The parties agreed they were at an impasse and had satisfied their obligations under Local Rule 37.2.

18.     To date, Morton Grove has only produced 16 documents bearing Dr. Paller's name.

19.     Morton Grove's production has not included some documents that have been

produced by other third-party subpoena recipients.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 28th day of July, 2008.

_____s/ Wade A. Thomson_____
Wade A. Thomson

# EXHIBIT A

**JENNER&BLOCK**

June 9, 2008

Jenner & Block LLP          Chicago
330 N. Wabash Avenue        New York
Chicago, IL 60611-7603      Washington, DC
Tel 312 222-9350
www.jenner.com

**BY ELECTRONIC MAIL**

Wade A. Thomson
Tel  312 840-8613
Fax  312 840-8713
wthomson@jenner.com

William C. O'Neil
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois  60601

Re:    *Morton Grove Pharmaceuticals, Inc. v. National Pediculosis Association, Inc.*
       **Case No. 08-CV-1384 (N.D. Ill.)**

Dear Bill:

I am in receipt of your email and deposition notices you sent last week.  As a preliminary matter, we look forward to cooperating with you to schedule the dates for all depositions so that they accommodate the schedules of the witnesses and attorneys.

As to your three deposition notices, we will represent each of those individuals for their depositions.  But, as you are aware from NPA's initial disclosures, Mr. Sheridan and Ms. Cotter reside in the greater Boston area, and Ms. Cervantes resides in Arizona.  As non-parties who live out of state, these individuals need to be deposed where they live.  We believe that we can find dates for depositions of Ms. Cotter and Mr. Sheridan in the Boston area near the days you proposed, and we believe scheduling them for a single trip would be the most efficient use of resources for all involved.  Please let us know if there are back-to-back dates or a three-day period that you and/or your colleagues could travel to the Boston area to do these depositions and we would be happy to see what we can work out with Ms. Cotter and Mr. Sheridan to accommodate.  We are checking with Ms. Cervantes for dates she can make herself available in Arizona.  Ms. Cervantes is not in good health and may require special accommodations (i.e., splitting the deposition between two days, etc.) for her deposition, depending on how she is doing.

On a related matter, in its recent Rule 26.1 disclosures, Morton Grove states that all present and former employees or affiliates should be contacted only through Winston & Strawn LLP.  Please confirm that your firm represents the current and former Morton Grove employees listed in its recent 26.1 disclosures.  Also, to the extent Winston & Strawn is representing any "affiliates" please explain exactly who that is.  Additionally, please confirm whether your firm is representing Dr. Shayne Gad, Dr. Adelaide A. Herbert, Dr. Amy S. Paller, and Dr. Tor Shwayder.  Please provide us responses to these as soon as possible so that we can plan depositions accordingly.

In hopes of cooperating to schedule the depositions in a manner that will accommodate everyone's schedules, we would like to inquire about availability of some witnesses prior to

William C. O'Neil
June 9, 2008
Page 2

sending deposition notices. NPA would like to take the depositions of Mr. Surendra Chirra and Mr. Ralph Hodosh in early July. Please let me know if either or both of them will be available to come to our offices for a deposition during the week of July 7, 2008. If so, please let me know which days they would be available. We would prefer these depositions be separated by at least two full days. Alternatively, if one or both of them is not available that week, please let me know their availability the following week.

Sincerely,

Wade A. Thomson

cc:    Debbie L. Berman
       Amanda S. Amert

# EXHIBIT B

## Thomson, Wade A

| | |
|---|---|
| **From:** | O'Neil, William C. [WOneil@winston.com] |
| **Sent:** | Monday, June 16, 2008 7:45 PM |
| **To:** | Thomson, Wade A |
| **Cc:** | Dobie, Gordon |
| **Subject:** | RE: MGP v. NPA - ltr. regarding deposition notices |

Wade,

Mr. Hodosh is available for deposition at our office on July 8. Mr. Chirra is available for deposition at our office on July 11.

Regarding the other issues in your June 9 letter, Morton Grove will be representing the current and former employees listed in Morton Grove's Rule 26 disclosures. I am not sure what you are referring to with respect to your use of the term "affiliates," but if you intend that term to mean Wockhardt, Morton Grove will also be representing Wockhardt.

With respect to Doctors Gad, Herbert, Paller and Shwayder, Morton Grove vehemently objects to their inclusion in these proceedings . The NPA's attempt to drag them into this case through its frivolous counterclaim is sanctionable in our judgment. Morton Grove will represent these individuals if necessary, but please be assured that these third parties will be not voluntarily produced for depositions in this matter.

Regards,

Bill

---

**From:** Thomson, Wade A [mailto:WThomson@jenner.com]
**Sent:** Monday, June 16, 2008 9:13 AM
**To:** O'Neil, William C.
**Subject:** RE: MGP v. NPA - ltr. regarding deposition notices

Bill,

Sorry but we are going to have to do July 1 (Cotter) and July 2 (Sheridan). Also, per my letter of June 9, please (a) let me know the availability of the two Morton Grove witnesses we inquired about for early July and (b) respond to the remaining part of the June 9 letter about who Morton Grove represents, etc., so that we can move forward with planning the next round of depositions.

Thanks, Wade

---

**From:** O'Neil, William C. [mailto:WOneil@winston.com]
**Sent:** Friday, June 13, 2008 3:21 PM
**To:** Thomson, Wade A
**Subject:** RE: MGP v. NPA - ltr. regarding deposition notices

Wade,

I would prefer to do it any two days back to back the prior week, but if that is not possible, I will plan on July 1 and 2 in Boston.

Regards,

Bill

---

**From:** Thomson, Wade A [mailto:WThomson@jenner.com]
**Sent:** Thursday, June 12, 2008 12:26 PM
**To:** O'Neil, William C.
**Subject:** RE: MGP v. NPA - ltr. regarding deposition notices

Bill,

In terms of back-to-back days around the dates you requested in your dep notices, we can do Ms. Cotter on July 1 (in Providence, where she resides, or possibly in Boston) and Mr. Sheridan on July 2 (in Boston). Please let me know if that will work for you.

---

**From:** O'Neil, William C. [mailto:WOneil@winston.com]
**Sent:** Wednesday, June 11, 2008 7:16 AM
**To:** Thomson, Wade A
**Subject:** RE: MGP v. NPA - ltr. regarding deposition notices

Wade,

Can we do June 24 and 25 for Sheridan and Cotter in Boston?

I will check with our witnesses about the week in July you suggested.

Bill

---

**From:** Thomson, Wade A [mailto:WThomson@jenner.com]
**Sent:** Monday, June 09, 2008 4:15 PM
**To:** O'Neil, William C.
**Cc:** Berman, Debbie L; Amert, Amanda S
**Subject:** MGP v. NPA - ltr. regarding deposition notices

Bill,

Please see attached.

---

**Wade A. Thomson**
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611-7603
Tel (312) 840-8613
Fax (312) 840-8713
WThomson@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

7/17/2008

# EXHIBIT C

**J E N N E R & B L O C K**

June 17, 2008

Jenner & Block LLP          Chicago
330 N. Wabash Avenue      Dallas
Chicago, IL 60611           New York
Tel 312-222-9350           Washington, DC
www.jenner.com

**BY ELECTRONIC MAIL**

William C. O'Neil                          Wade A. Thomson
Winston & Strawn LLP                 Tel   312 840-8613
35 W. Wacker Drive                     Fax  312 840-8713
Chicago, Illinois  60601                wthomson@jenner.com

Re:    *Morton Grove Pharmaceuticals, Inc. v. National Pediculosis Association, Inc.*
       **Case No. 08-CV-1384 (N.D. Ill.)**

Dear Bill:

I write in response to your email dated June 16, 2008.  First, thank you for confirming that Mr.
Hodosh and Mr. Chirra are available for depositions on July 8 and 11, respectively.  While we
appreciate your offer to hold these depositions at your office, the depositions will take place at
our office as is customary.  We will send you deposition notices for these.

Second, we are confused when you state that you are not sure what the term "affiliates" relates
because neither are we.  That is why we asked you what you meant when you used that term in
Morton Grove's amended Rule 26 disclosures section A.  That sections states, "All present and
former employees or <u>affiliates</u> should be contacted only through Winston & Strawn."  From your
email, it appears as though this means Wockhardt.  Please confirm.

Third, we are appalled that Morton Grove is refusing to produce Drs. Gad, Hebert, Paller and
Shwayder for depositions.  Morton Grove identifies all of these individuals as having knowledge
of the facts alleged in *Morton Grove's* complaint, specifically the purported falsity of NPA's
statements in response to Interrogatory Nos. 1 and 2 of NPA's First Set of Interrogatories.  Thus,
contrary to your assertion, these individuals have not been "dragged" into this case by NPA's
counterclaims but rather by Morton Grove for the purposes of proving Morton Grove's case.
NPA clearly is entitled to depose individuals Morton Grove has identified as having knowledge
of the allegations in Morton Grove's complaint.  Accordingly, we will serve subpoenas on them.

Sincerely,

Wade A. Thomson

cc:    Timothy Rivelli
       W. Gordon Dobie
       Debbie L. Berman
       Amanda S. Amert

# EXHIBIT D

# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| 43 RUE DU RHONE<br>1204 GENEVA, SWITZERLAND | 35 WEST WACKER DRIVE<br>CHICAGO, ILLINOIS 60601-9703 | 200 PARK AVENUE<br>NEW YORK, NEW YORK 10166-4193 |
| 99 GRESHAM STREET<br>LONDON EC2V 7NG | (312) 558-5600 | 25 AVENUE MARCEAU<br>75116 PARIS, FRANCE |
| 333 SOUTH GRAND AVENUE<br>LOS ANGELES, CALIFORNIA 90071-1543 | FACSIMILE (312) 558-5700 | 101 CALIFORNIA STREET<br>SAN FRANCISCO, CALIFORNIA 94111-5894 |
| | www.winston.com | 1700 K STREET, N.W.<br>WASHINGTON, D.C. 20006-3817 |

WRITER'S DIRECT DIAL NUMBER

(312) 558-5308
woneil@winston.com

June 20, 2008

**VIA EMAIL**
Wade A. Thomson
Jenner & Block LLP
330 N. Wabash Ave.
Chicago, IL  60611

      **Re:**    ***Morton Grove v. NPA***

Dear Wade:

    I write in response to your June 18 letter regarding deposition scheduling.  To date, you have noticed depositions for Closerlook, Inc., Sciele Pharma, Inc., Ralph Hodosh, and Surrendra Chirra.  In your June 9 letter, you indicated that the NPA intends to take the depositions of Doctors Gad, Hebert, Paller, and Shwayder, and in your June 18 letter, you ask for dates for seven more individuals.  This is a total of fifteen depositions.  Federal Rule of Civil Procedure 30(a)(2) allows only ten depositions per party—Morton Grove does not consent to the NPA exceeding this limitation, nor has the NPA obtained leave of court to do so.  I will seek available dates for the witnesses in your June 18 letter once you inform me which ten witnesses the NPA intends to depose in this matter.

    Furthermore, with respect to your stated intention to subpoena Doctors Gad, Hebert, Paller, and Shwayder, I reiterate Morton Grove's objection to the depositions of these witnesses.  Also, if you were to depose these physicians, would you be willing to pay their standard hourly rates for their time?

      Best regards,

William C. O'Neil

# EXHIBIT E

AO88 (Rev. 12/07) Subpoena in a Civil Case

## Issued by the

# UNITED STATES DISTRICT COURT

### Northern District of Illinois

Morton Grove Pharmaceuticals, Inc.

V.

The National Pediculosis Association, Inc.

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]  08 C 1384 (N.D. Illinois)

TO:  Dr. Amy S. Paller
Northwestern University School of Medicine
676 N. St. Clair, Suite 1600
Chicago, IL 60611

☐  YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☑  YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION   Jenner & Block LLP, 330 N. Wabash Ave., Chicago, IL 60611 | DATE AND TIME 8/7/2008 9:00 am |
|---|---|

☑  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):

SEE ATTACHED RIDER.

| PLACE   Jenner & Block LLP, 330 N. Wabash Ave., Chicago, IL 60611 | DATE AND TIME 7/17/2008 9:00 am |
|---|---|

☐  YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rule of Civil Procedure 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT)  *(Def.)* | DATE 6/19/2008 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Wade A. Thomson, Jenner & Block LLP, 330 N. Wabash Avenue, Chicago, Illinois 60611    (312) 222-9350

(See Federal Rule of Civil Procedure 45 (c), (d), and (e), on next page)

[1] If action is pending in district other than district of issuance, state district under case number.

AO88  (Rev.  12/07) Subpoena in a Civil Case (Page 2)

## PROOF OF SERVICE

| | DATE | PLACE |
|---|---|---|
| SERVED | 20 JUN 08 | Northwestern University School of Medicine 676 N. St Clair #1600 Chicago IL |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| Selena Peters- administrative assistant | Hand |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| Kenneth W. Ulasovich | Process server |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on    20 JUN 08
                        DATE

SIGNATURE OF SERVER

10700 W. Higgins #200
ADDRESS OF SERVER

Rosemont IL

---

Federal Rule of Civil Procedure 45 (c), (d), and (e), as amended on December 1, 2007:

**(c) PROTECTING A PERSON SUBJECT TO A SUBPOENA.**
(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.
(2) Command to Produce Materials or Permit Inspection.
(A) Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.
(3) Quashing or Modifying a Subpoena.
(A) When Required. On timely motion, the issuing court must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) When Permitted. To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information;
(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or
(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial
(C) Specifying Conditions as an Alternative. In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) DUTIES IN RESPONDING TO A SUBPOENA.**
(1) Producing Documents or Electronically Stored Information. These procedures apply to producing documents or electronically stored information:
(A) Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
(D) Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.
(2) Claiming Privilege or Protection.
(A) Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may  promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) CONTEMPT.**
The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## RIDER

## DEFINITIONS

1.     "NPA" shall mean defendant The National Pediculosis Association, Inc., its predecessor, and its respective present and former officers, directors, employees, agents, representatives and any other persons acting on its behalf.

2.     "Morton Grove" shall mean plaintiff Morton Grove Pharmaceuticals, Inc., and its respective present and former subsidiaries, parents, affiliates, divisions, successors, assigns, officers, directors, employees, agents, consultants (paid or unpaid), advisors, representatives and any other persons acting or purporting to act on their behalf.

3.     "Lindane Lotion" shall mean the lotion containing the chemical lindane manufactured by Morton Grove.

4.     "Lindane Shampoo" shall mean the shampoo containing the chemical lindane manufactured by Morton Grove.

5.     The term "lindane" shall mean the chemical lindane.

6.     The terms "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of these interrogatories any information which might otherwise be construed as outside their scope.

7.     The singular and the plural form shall be construed interchangeably so as to bring within the scope of these interrogatories any information which might otherwise be construed as outside their scope.

8.     "Relating to" shall mean concerning, consisting of, referring to, reflecting, regarding, supporting, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the subject matter discussed.

9.     The term "including" means "including, but not limited to."

10.     "Document" shall mean all writings, papers, or tangible things of any kind whatsoever, including but not limited to all originals and non-identical copies or reproductions of letters, memoranda, correspondence of any kind, handwritten notes, time records, pay slips, appointment books, notepads, notebooks, electronic mail, Electronically Stored Information ("ESI"), postcards, telegrams, facsimiles, telexes, films, photographs, recordings, tapes, transcriptions, books, records, ledgers, journals, and other things, whether prepared by handwriting, typing, printing, photostating, and every other means of recording upon any tangible thing and form of communicating or representation, including letters, words, pictures, sounds or symbols, or combinations thereof.

11.     With respect to any Documents or portions of Documents withheld on a claim of privilege or work product protection from discovery, provide a statement setting forth as to each such Document:

    (a)     the type of Document;

    (b)     the date of the Document;

    (c)     the author(s) and recipient(s) of the Document;

    (d)     the subject matter of the Document; and

    (e)     the legal and factual basis for the privilege or protection claimed.

12.    When a Document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible without disclosing the privileged material.

13.    If no Documents responsive to an individual numbered request are in the possession, custody or control of Closerlook, please indicate this in a written response.

14.    For ESI, please do the following:

(a)    produce all documents as Group IV single page tiff format files imaged at 300 dpi.  Name each tiff file with a unique name matching the Bates number labeled on the corresponding page.  Group every 1000 tiffs into a new folder; do not create a separate folder for each document;

(b)    provide an image load file (Opticon file) that contains document boundaries;

(c)    produce the extracted, full text from the body of each document originally kept in electronic form as a .txt file named for the beginning bates number of the document, in the same directory as the image of the first page of the document;

(d)    any redacted, privileged material should be clearly labeled to show the redactions on the tiff image; and

(e)    produce extracted metadata for each document in the form of a .dat file, and include the following fields:

| FIELDNAME | DESCRIPTION |
|---|---|
| BATES_BEGIN | The bates label of the first page of the document |
| BATES_END | The bates label of the last page of the document |
| ATTACH_BEGIN | The bates label of the first page of a family of documents |
| ATTACH_END | The bates label of the last page of a family of documents |
| TITLE | Subject of e-mail or file name of attachment/standalone file |
| DATE | Document Date or E-mail Sent Date or operating system Date Last Modified for attachments and standalone electronic files |
| TIME | E-mail sent time or operating system Time Last Modified for attachments and standalone electronic files |
| AUTHOR | Author of Document or E-mail |
| RECIPIENT | Recipient of Document or E-mail |
| CC | Copies |
| BCC | BCC (blind copies) |
| CUSTODIAN | Custodian(s) in whose files the document was found |
| FOLDER | Email Folder Information or the original file path of the native file, (for each location in which a duplicate was found) |
| MD5 | MD5Hash value |
| MESSAGE_ID | Unique e-mail message Identifier |
| NATIVE_FILE | The production path to any document produced in native form |

-3-

16.    Unless otherwise stated, this subpoena calls for the production of documents dated or created during the time period January 1, 2000 to the present.

## DOCUMENTS SUBPOENAED

1.    Documents sufficient to show all monetary or other compensation or payments received from Morton Grove.

2.    Documents sufficient to show all monetary or other compensation or payments received from entities marketing, advertising, or selling pharmaceutical products on behalf of Morton Grove.

3.    All contracts or agreements between you and Morton Grove, or with any entities marketing, advertising, or selling pharmaceutical products on behalf of Morton Grove.

4.    Your most current curriculum vitae.

5.    Any and all publication(s) or article(s) related to head lice, scabies, or options for managing head lice or scabies, including but not limited to lice or scabies treatments containing lindane, for which you were an author, co-author, editor, or researcher.

6.    All documents relating to or mentioning NPA.

7.    All documents concerning the truth or falsity of the statements attributed to NPA and identified in paragraphs 23, 25, 26, 33, 37, 38, 40, and 41 of Morton Grove's complaint in this action (attached hereto).

8.      All documents relating to lindane.com, including but not limited to documents concerning the decision to launch lindane.com, documents relied on in creating the content, drafts of the content, reviews of the content, and communications regarding the content.

9.      All documents concerning the truth or falsity of the statements identified in paragraphs 48-49, 51, 63, 68-70, 73-74, 111, and 113 of NPA's counterclaim in this action (attached hereto).

# EXHIBIT F

**JENNER&BLOCK**

June 23, 2008

Jenner & Block LLP          Chicago
330 N. Wabash Avenue        Dallas
Chicago, IL 60611-7603      New York
Tel 312 222-9350            Washington, DC
www.jenner.com

**VIA ELECTRONIC MAIL**

April A. Otterberg
Tel  312 840-8646
Fax  312 840-8746
aotterberg@jenner.com

William C. O'Neil
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois  60601

**Re:**   ***Morton Grove Pharmaceuticals, Inc. v. National Pediculosis Association, Inc.***
        ***Case No. 08-CV-1384 (N.D. Ill.)***

Dear Bill:

As you are aware, we have issued a non-party subpoena to Dr. Tor Shwayder, an individual
identified by Morton Grove in response to NPA's Interrogatory No. 1 as having knowledge of
the alleged falsity of NPA's statements.  Despite several attempts beginning last Friday and
continuing through today, Dr. Shwayder thus far has refused to accept service.  You indicated in
your June 16 email to my colleague, Wade Thomson, that Winston & Strawn will represent Dr.
Shwayder if necessary.  Accordingly, please advise by the close of business today whether you
will accept service of the subpoena on Dr. Shwayder's behalf.

Regards,

April A. Otterberg

AAO:prm

cc:    Debbie L. Berman
       Amanda S. Amert
       Wade A. Thomson

# EXHIBIT G

**Otterberg, April A.**

| | |
|---|---|
| **From:** | O'Neil, William C. [WOneil@winston.com] |
| **Sent:** | Monday, June 23, 2008 2:37 PM |
| **To:** | Otterberg, April A. |
| **Subject:** | RE: MGP v. NPA -- Subpoena |

Winston & Strawn has not been authorized to accept service on behalf of Dr. Shwayder.

---

**From:** Otterberg, April A. [mailto:AOtterberg@jenner.com]
**Sent:** Monday, June 23, 2008 1:24 PM
**To:** O'Neil, William C.
**Cc:** Keller, Cherish M.; Berman, Debbie L; Amert, Amanda S; Thomson, Wade A
**Subject:** MGP v. NPA -- Subpoena

Bill:

Please see the attached correspondence.


Regards,
April

---

**April A. Otterberg**
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611-7603
Tel (312) 840-8646
Fax (312) 840-8746
AOtterberg@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient (s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.
************************************************************************
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

# EXHIBIT H

**JENNER&BLOCK**

June 26, 2008

Jenner & Block LLP          Chicago
330 N. Wabash Avenue      Dallas
Chicago, IL 60611         New York
Tel 312-222-9350          Washington, DC
www.jenner.com

**BY ELECTRONIC MAIL**

William C. O'Neil
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, Illinois  60601

Wade A. Thomson
Tel  312 840-8613
Fax  312 840-8713
wthomson@jenner.com

Re:     *Morton Grove Pharmaceuticals, Inc. v. National Pediculosis Association, Inc.*
        **Case No. 08-CV-1384 (N.D. Ill.)**

Dear Bill:

Per our discussion today after Court, we would like to prioritize the scheduling of depositions as follows:

First: Paula Grist and Dr. Pat McGrath;

Second: Richard O'Hara, Dr. Chang Lee and Richard Lopatin;

Third:  Brian Tambi and William Goldberg.

As you know, dates for the depositions of Drs. Gad (Aug. 20), Hebert (July 31), Paller (Aug. 7) and Shwayder (Aug. 5) are set forth in their subpoenas.  We plan on going ahead with those dates unless we hear from you that they are not feasible for those witnesses.  (As we previously informed you, Dr. Shwayder is evading service of his subpoena, but we assume that we will go forward with his noticed date once service is completed.)

Given our fact discovery deadline, we would like to schedule all the above depositions during the final two weeks of July and the first three weeks of August.  Please let us know convenient date ranges for these witnesses and we will do our best to work with you to find convenient days to schedule their depositions.

Sincerely,

Wade A. Thomson

cc:     Debbie L. Berman
        Amanda S. Amert

# EXHIBIT I

# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| 43 RUE DU RHONE<br>1204 GENEVA, SWITZERLAND<br><br>99 GRESHAM STREET<br>LONDON EC2V 7NG<br><br>333 SOUTH GRAND AVENUE<br>LOS ANGELES, CALIFORNIA 90071-1543<br><br>WRITER'S DIRECT DIAL NUMBER<br>(312) 558-5308<br>woneil@winston.com | 35 WEST WACKER DRIVE<br>CHICAGO, ILLINOIS 60601-9703<br><br>(312) 558-5600<br><br>FACSIMILE (312) 558-5700<br><br>www.winston.com | 200 PARK AVENUE<br>NEW YORK, NEW YORK 10166-4193<br><br>25 AVENUE MARCEAU<br>75116 PARIS, FRANCE<br><br>101 CALIFORNIA STREET<br>SAN FRANCISCO, CALIFORNIA 94111-5894<br><br>1700 K STREET, N.W.<br>WASHINGTON, D.C. 20006-3817 |

June 27, 2008

**VIA EMAIL**
Wade A. Thomson
Jenner & Block LLP
330 N. Wabash Ave.
Chicago, IL 60611

> Re:    *Morton Grove v. NPA*

Dear Wade:

I write in reply to your June 26th letter about scheduling depositions.

Regarding the four doctors, my firm represents only Dr. Gad at this point. Dr. Gad vehemently objects to sitting for a deposition and Morton Grove and Dr. Gad will formally object to your subpoena in a timely fashion. At this point, however, based on Dr. Gad's objections to the NPA's subpoena, you should be aware that Dr. Gad is not willing voluntarily sit for a deposition and will not appear on the date noticed.

With regard to the other doctors, we do not represent Drs. Paller or Hebert, and Morton Grove also objects to the NPA's taking of their depositions. If these third parties should agree to be deposed on the dates you have noticed, those dates will work for our office. As for Dr. Shwayder, we also do not currently represent him. We can discuss his deposition if and when he is properly served.

With regard to the depositions of current and former Morton Grove employees, we maintain our objection to exceeding ten depositions per party. I will get back to you with dates for some of the individuals in the order of priority you have requested.

Best regards,

William C. O'Neil

# EXHIBIT J

# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| 43 RUE DU RHONE<br>1204 GENEVA, SWITZERLAND | 35 WEST WACKER DRIVE<br>CHICAGO, ILLINOIS 60601-9703 | 200 PARK AVENUE<br>NEW YORK, NEW YORK 10166-4193 |
| 99 GRESHAM STREET<br>LONDON EC2V 7NG | (312) 558-5600 | 25 AVENUE MARCEAU<br>75116 PARIS, FRANCE |
| 333 SOUTH GRAND AVENUE<br>LOS ANGELES, CALIFORNIA 90071-1543 | FACSIMILE (312) 558-5700 | 101 CALIFORNIA STREET<br>SAN FRANCISCO, CALIFORNIA 94111-5894 |
| | www.winston.com | 1700 K STREET, N.W.<br>WASHINGTON, D.C. 20006-3817 |

WRITER'S DIRECT DIAL NUMBER
(312) 558-5308
woneil@winston.com

July 3, 2008

**VIA EMAIL**
Wade A. Thomson
Jenner & Block LLP
330 N. Wabash Ave.
Chicago, IL 60611

Re:    *Morton Grove v. NPA*

Dear Wade:

On behalf of my client, Morton Grove Pharmaceuticals, Inc., I submit the following objections to the subpoenas you issued to Dr. Shayne Gad, Dr. Amy Paller, Dr. Adelaide Hebert, and Dr. Tor Shwayder:

1.    Morton Grove objects to these subpoenas because they were served for an improper purpose, namely to harass these highly decorated third-parties in the hopes of stifling their First Amendment rights to free speech.

2.    Morton Grove objects to the subpoenas to the extent they failed to provide appropriate fees for mileage as required by Federal Rule of Civil Procedure 45(b)(1).

3.    Morton Grove objects to the subpoenas because they failed to provide these physicians with compensation at their standard hourly rates for the time these depositions will take them away from their practice. In addition, I followed up with you via letter on this specific point and you have failed to respond.

4.    Morton Grove objects to the subpoenas because they failed to provide a reasonable amount of time to comply with the detailed and technical document production requests. This is improper under Rule 45(d)(1)(D)—electronically stored information for a period of more than eight years is not reasonably accessible to individual non-parties because of undue burden and cost. This is also improper under Rule 45(c)(1), because it places an undue burden and expense on non-parties. Such extensive and technical document production

WINSTON & STRAWN LLP

Wade A. Thomson
July 3, 2008
Page 2

typically requires the involvement of an e-discovery vendor and significant time and money. Moreover, the subpoena makes no offer of cost-shifting.

5.      Morton Grove objects to the document requests and subpoenas to the extent that they attempt to gain the opinion of the doctors as unretained experts. Pursuant to Rule 45(c)(3)(B)(ii), requests that require "an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party" is grounds to quash a subpoena.

6.      Morton Grove objects to the document requests and definitions that accompany them to the extent that they attempt to alter the scope of discovery allowed under the Federal Rules of Civil Procedure and applicable local rules.

7.      Morton Grove objects to the scope of the document requests. Many of the requests are wildly overbroad, asking for all documents on a topic. First, many of the requested documents have already been produced in this action. Second, many of the requested documents are unlikely to be in the subpoenaed third parties' possession, custody, or control. Third, many of the requested documents are in the NPA's own possession, such as the documents about the NPA that are on its website.

8.      Morton Grove objects to the time frame specified in the subpoenas. They ask for documents as far back as 2000, yet most document requests issued between the parties called for a shorter time frame (2003 to the present).

9.      Morton Grove objects to the document requests to the extent that they seek information not calculated to lead to the discovery of admissible evidence; they are unreasonably cumulative or duplicative; they ask for information obtainable form another source that is more convenient, less burdensome, or less expensive; or they seek information available to the public or equally accessible to the NPA.

10.     Morton Grove objects to document requests to the extent that they seek trade secrets, confidential information, or research and development materials that are likely in the possession of these doctors and researchers and provide no means by which such information can be produced in a confidential manner.

11.     Morton Grove objects to the document requests to the extent that any request demands production of documents, information, or things protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege.

In addition, Morton Grove refutes your assertion that it has put some of these physicians at issue in this case by responding to an NPA interrogatory and stating that they have knowledge of the falsity of the NPA's statements. This fact hardly makes them a witness—anyone who adequately studied the current state of medical science would have knowledge of the

**WINSTON & STRAWN** LLP

Wade A. Thomson
July 3, 2008
Page 3

falsity of the NPA' statements.  Importantly, Morton Grove has **not** disclosed these physicians pursuant to Rule 26 as witnesses Morton Grove intends to rely upon to prove its claims or defenses.

Best regards,

William C. O'Neil

# EXHIBIT K

**JENNER&BLOCK**

July 7, 2008

Jenner & Block LLP          Chicago
330 N. Wabash Avenue      Dallas
Chicago, IL 60611            New York
Tel 312-222-9350            Washington, DC
www.jenner.com

**BY ELECTRONIC MAIL**

William C. O'Neil
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, Illinois 60601

Wade A. Thomson
Tel  312 840-8613
Fax  312 840-8713
wthomson@jenner.com

**Re:**   *Morton Grove Pharmaceuticals, Inc. v. National Pediculosis Association, Inc.*
   **Case No. 08-CV-1384 (N.D. Ill.)**

Dear Bill:

I write in response to your July 3, 2008 email, in which you purported to submit objections on behalf of Morton Grove Pharmaceuticals, Inc. for subpoenas served on Drs. Gad, Paller, Hebert, and Shwayder.

As a preliminary matter, Rule 45(c)(2)(B) requires that the person commanded to produce documents serve objections.  At this point, Morton Grove has only served *its own* objections; none of the doctors have served objections.  Moreover, Winston & Strawn has told us it does not represent Drs. Paller, Hebert, or Shawyder (after originally telling us that it did).  Unless the doctors (or their counsel) provide written objections before the earlier of the time specified for compliance or 14 days after the subpoena is served, they will be in contempt of the subpoenas under Rule 45(e).  As I indicated in my letter of July 3, NPA will not hesitate to seek costs and contempt if the subpoenas are not obeyed.

As for the substance of Morton Grove's objections, they are without merit and in many cases inaccurate.  For example, Morton Grove states that the subpoenas failed to include witness fees. As a matter of fact, witness and mileage fee checks were served with the subpoenas.  This letter will not attempt address all the shortcomings of Morton Grove's objections, especially in light of the fact that the persons subpoenaed have yet to provide their own objections as they are required to do.

During our phone call this afternoon, you asked if the subpoenas could possibly be narrowed. Given that Winston & Strawn has said it represents Dr. Gad, we would be happy to discuss possible ways to narrow that subpoena in order to avoid unnecessary motion practice.  To the extent you want to discuss narrowing subpoenas of the others, we do not understand how Winston & Strawn can make an agreement on behalf of the other doctors.  I suggest we talk

William C. O'Neil
July 7, 2008
Page 2

Wednesday morning, July 9 at 9:30 a.m. to discuss Dr. Gad's subpoena.  Please let me know if this time works for you.


Sincerely,

Wade A. Thomson

cc:     Debbie L. Berman
        Amanda S. Amert

# EXHIBIT L

**Thomson, Wade A**

| | |
|---|---|
| **From:** | O'Neil, William C. [WOneil@winston.com] |
| **Sent:** | Monday, July 07, 2008 7:51 PM |
| **To:** | Thomson, Wade A |
| **Cc:** | Dobie, W. Gordon; Keller, Cherish M.; Berman, Debbie L |
| **Subject:** | Objections to Subpoenas Served on Dr. Gad & Dr. Hebert |
| **Attachments:** | Dr. Gad's Objections to NPA's Subpoena.pdf; Dr. Hebert's Objections to NPA's Subpoena.pdf; Dr. Paller's Objections to NPA's Subpoena.pdf |

Wade,

This confirms that Winston & Straw represents Doctors Gad, Paller and Hebert. Attached please find their timely objections to the subpoenas issued upon them by the NPA.

Furthermore, I am in receipt of your letters of July 3 and of this evening. I strongly disagree with your understanding of the facts and the law with respect to third party subpoena deponents. As I mentioned when we spoke via phone today, it is the law that once a third-party's files timely objections to a subpoena, it becomes the subpoena proponent's burden to move to compel against the witnesses in his home jurisdictions. *See* 9 Moore's Federal Practice & Procedure § 45.41[2][b] ("If a timely written objection to production or inspection commanded by a subpoena is lodged, the person subject to the subpoena is excused from compliance unless a court order is obtained enforcing the subpoena. An objection, therefore, presumptively excuses compliance, and the burden is shifted to the party serving the subpoena to bring a motion to compel the production or inspection.")

Nevertheless, as you suggest, I am willing to discussing a narrowing of these subpoenas by your client. The next available time I have is July 14 at 9:30 AM. Unless, however, the NPA is willing to drop its requests for depositions and severely limit its document requests, this call may not be terribly productive. These are busy physicians who are not willing to take time away from their time at indigent medical clinics and teaching responsibilities for this matter solely because they, like anyone else who has studied the issues, have knowledge that NPA's statements are false. I reiterate that Morton Grove has not disclosed these witnesses pursuant to Rule 26(a). Further, to the extent you claim these witnesses are knowledge regarding lindane.com, Morton Grove's lobbying website, there is a pending motion for protective order on that topic. .

Regards,

Bill

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.
*****************************************************************************
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MORTON GROVE PHARMACEUTICALS, INC. )<br><br>Plaintiff, )<br><br>v. )<br><br>THE NATIONAL PEDICULOSIS ASSOCIATION, INC. )<br><br>Defendant. ) | No: 08-CV-1384<br><br>Judge Bucklo<br>Magistrate Judge Mason |

## OBJECTIONS AND RESPONSES TO SUBPOENA ISSUED TO DR. AMY PALLER

Pursuant to Federal Rule of Civil Procedure 45(c)(2)(B), third party Dr. Amy Paller hereby serves her objections and responses to the subpoena in the above-captioned case that was served upon her on June 20, 2008.

## OBJECTIONS TO FORM AND SERVICE

Dr. Paller asserts the following objections to the subpoena:

1.      The subpoena fails to provide a reasonable amount of time to comply, as required by Rule 45(c)(3)(A). The subpoena was served on Dr. Paller via service on her administrative assistant on June 20. The subpoena demands documents be produced at 9:00 a.m. on July 17, less than a month later. This is a significant burden for Dr. Paller, a busy doctor and professor at Northwestern University School of Medicine and a non-party in this action.

2.      No offer was made to pay Dr. Paller's hourly fees for her time.

## OBJECTIONS APPLICABLE TO ALL REQUESTS

Each of the following objections are incorporated into each and every one of Dr. Paller's responses as if fully set forth therein and are in addition to any other objections stated in response to a particular request.

1.     Dr. Paller objects to the subpoena because it places an undue burden and expense on her, a non-party, which the issuing counsel was obligated to take reasonable steps to avoid pursuant to Rule 45(c)(1). The subpoena requests, in addition to paper documents, electronically stored information from a period spanning more than eight years, in a specific, technical format. Implicit in this request is a requirement that Dr. Paller spend a substantial sum to hire an e-discovery vendor to gather and format this information.

2.     Dr. Paller objects to the subpoena pursuant to Rule 45(d)(1)(D), as most of her electronically stored information is not reasonably accessible because of undue burden and cost. Dr. Paller has both private electronic documents as well as electronic documents associated with her work at Northwestern University School of Medicine. Requiring her to produce electronic documents from both sources would require a substantial sum and hiring of an e-discovery vendor, as well as potentially significant discussions with Northwestern University School of Medicine officials about producing documents relating to university matters. Moreover, cost shifting is appropriate in this instance and no such offer was made by the NPA.

3.     Dr. Paller objects to the subpoena and document requests to the degree that she is an expert in her field, she has not been retained by a party, and the requests require "an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party." This is not permissible pursuant to Rule 45(c)(3)(B)(ii).

2

4.     Dr. Paller objects to the document requests and the definitions that accompany them to the extent that they attempt to alter the scope of discovery under the Federal Rules of Civil Procedure and applicable local rules.

5.     Dr. Paller objects to the document requests to the extent that they seek documents that are not in Dr. Paller's possession, custody, or control.

6.     Dr. Paller objects to the document requests to the extent that they are vague and ambiguous and overly broad as to time and scope.

7.     Dr. Paller objects to the document requests to the extent that they seek information not reasonably calculated to lead to the discovery of admissible evidence.

8.     Dr. Paller objects to the document requests to the extent that they are unreasonably cumulative or duplicative; obtainable from another source that is more convenient, less burdensome, or less expensive; and/or publicly available or equally accessible to the NPA.

9.     Dr. Paller objects to the document requests to the extent that they seek trade secrets or confidential information or research and/or development materials, including any material in Dr. Paller's possession pursuant to confidentiality or non-disclosure restrictions imposed by contract or law.

10.     Dr. Paller objects to the document requests to the extent that any request demands production of documents, information, or things protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege.

11.     Dr. Paller objects to the subpoena to the extent it was served for an improper purpose, namely to harass a third-party medical expert and to chill future core political speech.

12.     To the extent that Dr. Paller is ordered to produce documents responsive to any particular request, agreeing to comply with such an order does not suggest that responsive

documents exist but is merely an indication that that Dr. Paller will produce such documents if they exist and if they are within her possession, custody, or control. Further, any such agreement does not suggest that the documents are relevant or admissible, nor does it suggest that Dr. Paller agrees with any characterizations or implications of the requests.

**SPECIFIC OBJECTIONS AND RESPONSES**
**TO THE REQUESTS IN THE SUBPOENA RIDER**

**REQUEST NO. 1**

Documents sufficient to show all monetary or other compensation or payments received from Morton Grove.

**RESPONSE:**

Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome, and any such documents are not relevant and will not lead to admissible evidence.

**REQUEST NO. 2**

Documents sufficient to show all monetary or other compensation or payments received from entities marketing, advertising, or selling pharmaceutical products on behalf of Morton Grove.

**RESPONSE:**

Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome, and any such documents are not relevant and will not lead to admissible evidence.

**REQUEST NO. 3**

All contracts or agreements between you and Morton Grove, or with any entities marketing, advertising, or selling pharmaceutical products on behalf of Morton Grove.

**RESPONSE:**

Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome, and any such documents are not relevant and will not lead to admissible evidence.

**REQUEST NO. 4**

Your most current curriculum vitae.

**RESPONSE:**

Dr. Paller objects to this request on the basis that any such document is not relevant and will not lead to admissible evidence.

**REQUEST NO. 5**

Any and all publication(s) or article(s) related to head lice, scabies, or opinions for managing head lice or scabies, including but not limited to lice or scabies treatments containing lindane, for which you were an author, co-author, editor, or researcher.

**RESPONSE:**

Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome. Dr. Paller further objects to this request because it is duplicative and redundant of document requests served to the parties to this action, in response to which voluminous documents were produced, and is about topics that will be the subject of paid expert testimony.

**REQUEST NO. 6**

All documents relating to or mentioning NPA.

**RESPONSE:**

Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome, and any such documents are not relevant and will not lead to admissible evidence.

**REQUEST NO. 7**

All documents concerning the truth or falsity of the statements attributed to NPA and identified in paragraphs 23, 25, 26, 33, 37, 38, 40, and 41 of Morton Grove's complaint in this action (attached hereto).

**RESPONSE:**

 Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome. Dr. Paller further objects to this request because it is duplicative and redundant of document requests served to the parties to this action, in response to which voluminous documents were produced, and is about topics that will be the subject of paid expert testimony.

**REQUEST NO. 8**

 All documents relating to lindane.com, including but not limited to documents concerning the decision to launch lindane.com, documents relied on in creating the content, drafts of the content, reviews of the content, and communications regarding the content.

**RESPONSE:**

 Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome, and any such documents are not relevant and will not lead to admissible evidence. In addition, the vast majority of these documents are not in Dr. Paller's possession, custody, or control.

**REQUEST NO. 9**

 All documents concerning the truth or falsity of the statements identified in paragraphs 48-49, 51, 63, 68-70, 73-74, 111, and 113 of NPA's counterclaim in this action (attached hereto).

**RESPONSE:**

 Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome. Dr. Paller further objects to this request because it is duplicative and redundant of document requests served to the parties to this action, in response to which voluminous documents were produced, and is about topics that will be the subject of paid expert testimony.

Dated: July 7, 2008                    Respectfully Submitted,


                                       DR. AMY PALLER


                                       By: _Cherish M Keller_
                                             One of Her Attorneys

W. Gordon Dobie (wdobie@winston.com)
William C. O'Neil (woneil@winston.com)
Cherish M. Keller (ckeller@winston.com)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
T:  (312) 558-5600
F:  (312) 558-5700

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of July 2008, I caused a copy of **Objections and Responses to Subpoena Issued to Dr. Amy Paller** to be served on counsel of record via e-mail and U.S. Mail:

Debbie L. Berman
Amanda S. Amert
Wade A. Thomson
April A. Otterberg
JENNER & BLOCK LLP
330 North Wabash Avenue
Chicago, Illinois 60611
T: (312) 222-9350
F: (312) 527-0484

*Christ M Keller*

# EXHIBIT M

**JENNER&BLOCK**

July 8, 2008

Jenner & Block LLP        Chicago
330 N. Wabash Avenue      Dallas
Chicago, IL 60611         New York
Tel 312-222-9350          Washington, DC
www.jenner.com

**BY ELECTRONIC MAIL**

William C. O'Neil
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, Illinois 60601

Wade A. Thomson
Tel 312 840-8613
Fax 312 840-8713
wthomson@jenner.com

Re: *Morton Grove Pharmaceuticals, Inc. v. National Pediculosis Association, Inc.*
    *Case No. 08-CV-1384 (N.D. Ill.)*

Dear Bill:

I write in response to your July 7, 2008 email concerning the depositions of Drs. Gad, Paller, Hebert and Shwayder.

First, I would like to confirm that Winston & Strawn is not representing Dr. Shawyder. If I do not hear otherwise by 3 p.m. tomorrow, Wednesday, July 9, we will assume that Winston & Strawn does not represent him and will proceed accordingly.

Second, as for your objections to the subpoenas of the other three doctors, Winston & Strawn has taken the position that it will not produce any of them for their scheduled depositions and has refused to produce any documents. You state in your email that you would be willing to discuss narrowing of the subpoenas next Monday, July 14, but that unless NPA is willing to drop its requests for depositions and severely limit its document requests, "this call may not be terribly productive." While NPA is willing to discuss narrowing the scope of the documents requested, it is not willing to forego depositions at this time. Thus, given your position, I too question the need for another call, although NPA hopes that Winston & Strawn reconsiders its position.

Please confirm for me by 3 p.m. tomorrow, Wednesday, July 9, whether Winston & Strawn will be making these individuals available for their depositions or not. If Winston & Strawn maintains its refusal to produce them for depositions or does not respond to this letter by 3 p.m. tomorrow afternoon, there appears to be no need for a call next Monday as the parties have satisfied their meet and confer obligations under Local Rule 37, and NPA will file motions to compel.

Sincerely,

Wade A. Thomson

cc:    Debbie L. Berman
       Amanda S. Amert

# EXHIBIT N

**Thomson, Wade A**

| | |
|---|---|
| **From:** | O'Neil, William C. [WOneil@winston.com] |
| **Sent:** | Tuesday, July 15, 2008 3:05 PM |
| **To:** | Thomson, Wade A |
| **Subject:** | RE: MGP v. NPA:  July 8 letter regarding third-party subpoenas |

I land at 9:30 AM.  I will call you when I get to the office.  Around 10:30 or 11:00.


-----Original Message-----
From: Thomson, Wade A [mailto:WThomson@jenner.com]

Sent: Tuesday, July 15, 2008 2:11 PM
To: O'Neil, William C.
Cc: Berman, Debbie L; Amert, Amanda S; Dobie, W. Gordon; Keller, Cherish M.
Subject: RE: MGP v. NPA: July 8 letter regarding third-party subpoenas

Bill,

Please let me know what time is good for you to discuss tomorrow morning.   Thanks

-----Original Message-----
From: O'Neil, William C. [mailto:WOneil@winston.com]
Sent: Monday, July 14, 2008 2:14 PM
To: Thomson, Wade A
Cc: Berman, Debbie L; Amert, Amanda S; Dobie, W. Gordon; Keller, Cherish M.
Subject: Re: MGP v. NPA: July 8 letter regarding third-party subpoenas


Wade,

It is not as black and white as you suggest. They may, for example, be willing to do a 30 minute telephone dep if you pay their normal hourly rates.  I cannot be sure though because I don't have anything to take to them to consider.  Moreover, each doctor may have a different response.
I can say, however, that none of them are willing to do a 7 hour dep without any compensation for their time, so if that is your final position, go ahead and file your motions. If you would like to discuss, I remain available on Wednesday. Let me know.

Bill


William C. O'Neil
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL  60601
P: 312.558.5308
F: 312.558.5700
woneil@winston.com

----- Original Message -----
From: Thomson, Wade A <WThomson@jenner.com>
To: O'Neil, William C.
Cc: Berman, Debbie L <DBerman@jenner.com>; Amert, Amanda S <AAmert@jenner.com>; Dobie, W. Gordon; Keller, Cherish M.
Sent: Mon Jul 14 14:06:26 2008
Subject: RE: MGP v. NPA:  July 8 letter regarding third-party subpoenas

Bill,

1

In response to your email of July 7 (in which you suggested a July 14 meet and confer), I sent you a letter dated July 8, which said in relevant part:

"Second, as for your objections to the subpoenas of the other three doctors, Winston & Strawn has taken the position that it will not produce any of them for their scheduled depositions and has refused to produce any documents. You state in your email that you would be willing to discuss narrowing of the subpoenas next Monday, July 14, but that unless NPA is willing to drop its requests for depositions and severely limit its document requests, "this call may not be terribly productive." While NPA is willing to discuss narrowing the scope of the documents requested, it is not willing to forego depositions at this time. Thus, given your position, I too question the need for another call, although NPA hopes that Winston & Strawn reconsiders its position.

Please confirm for me by 3 p.m. tomorrow, Wednesday, July 9, whether Winston & Strawn will be making these individuals available for their depositions or not. If Winston & Strawn maintains its refusal to produce them for depositions or does not respond to this letter by 3 p.m. tomorrow afternoon, there appears to be no need for a call next Monday as the parties have satisfied their meet and confer obligations under Local Rule 37, and NPA will file motions to compel."

Because I did not get a response to my July 8 question above, my question remains: will Winston & Strawn make these individuals available for deposition or not? If Winston & Strawn will not, NPA will need to file a motion to compel their depositions and we see no need to delay any further. I know you are traveling, but please let me know sometime today so we can move forward.

Thanks, Wade


-----Original Message-----
From: O'Neil, William C. [mailto:WOneil@winston.com]
Sent: Monday, July 14, 2008 1:39 PM
To: Thomson, Wade A
Cc: Berman, Debbie L; Amert, Amanda S; Dobie, W. Gordon; Keller, Cherish M.
Subject: Re: MGP v. NPA: July 8 letter regarding third-party subpoenas


That is not my recollection. I beilieve I told you I was available to discuss the issue this morning and I didn't hear from you. In any event, I am next available to discuss mid-morning on Wednesday. These doctors have lodged legitimate and timely objections to your subpoenas, but they are willing to entertain a proposal from you to narrow the subpoena and minimize the burden.
Bill

William C. O'Neil
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601
P: 312.558.5308
F: 312.558.5700
woneil@winston.com

----- Original Message -----
From: Thomson, Wade A <WThomson@jenner.com>
To: O'Neil, William C.
Cc: Berman, Debbie L <DBerman@jenner.com>; Amert, Amanda S <AAmert@jenner.com>
Sent: Mon Jul 14 13:11:21 2008
Subject: FW: MGP v. NPA:  July 8 letter regarding third-party subpoenas

Bill,

This email is to confirm that Winston & Strawn is not making available for depositions the individuals (Drs. Gad, Paller, Shwayder, and Hebert) discussed in my letter from last Tuesday. Indeed, there was no response to my letter. Therefore, we have satisfied our Local Rule 37 meet and confer obligations, and NPA will be filing motions to compel.


Regards, Wade

---

From: Thomson, Wade A

2

Sent: Tuesday, July 08, 2008 12:29 PM
To: O'Neil, William C.
Cc: Berman, Debbie L; Amert, Amanda S; Keller, Cherish M.
Subject: MGP v. NPA: July 8 letter regarding third-party subpoenas

Bill,

Please see attached correspondence.  Thanks, Wade

_____

Wade A. Thomson
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611-7603
Tel (312) 840-8613
Fax (312) 840-8713
WThomson@jenner.com
www.jenner.com <http://www.jenner.com/>

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

_____

The contents of this message may be privileged and confidential.
Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.
**********************************************************************
******
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

The contents of this message may be privileged and confidential.
Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.
**********************************************************************
******
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

The contents of this message may be privileged and confidential. Therefore, if this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author.
**********************************************************************
Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under the Internal Revenue Code of 1986, as amended.

# EXHIBIT O

## Thomson, Wade A

| | |
|---|---|
| **From:** | Thomson, Wade A |
| **Sent:** | Wednesday, July 16, 2008 12:36 PM |
| **To:** | O'Neil, William C. |
| **Subject:** | RE: MGP v. NPA - NPA upcoming discovery responses |

Bill,

As we discussed today, the parties are at an impasse regarding the subpoenas for Drs. Paller, Schwayder, Hebert and Gad. As I explained, NPA was willing to narrow the scope of documents sought but needed to know the universe of documents first. NPA was not willing at this point to forego depositions, commit to specific time limits on the depositions (in light of the fact we do not have documents and do not know the scope of their factual knowledge; although I said NPA anticipated the depositions to probably be around a half-day or so), or willing to pay the deponents' hourly rates. Therefore NPA will file motions to compel.

Thanks, Wade

---

**From:** O'Neil, William C. [mailto:WOneil@winston.com]
**Sent:** Wednesday, July 16, 2008 11:10 AM
**To:** Thomson, Wade A
**Subject:** RE: MGP v. NPA - NPA upcoming discovery responses

Per our phone conversation, this is agreed.

---

**From:** Thomson, Wade A [mailto:WThomson@jenner.com]
**Sent:** Tuesday, July 15, 2008 4:41 PM
**To:** O'Neil, William C.
**Subject:** MGP v. NPA - NPA upcoming discovery responses

Bill,

NPA's responses to MGP's 2nd Set of RFAs, 6th Set of Doc Reqs, and 4th Set of Interrogatories are due on July 21. Because of our schedules over the next couple of weeks, we would like an extension of two weeks until August 4. Please let me know when you have the chance. Thanks, Wade

**Wade A. Thomson**
Jenner & Block LLP
330 N. Wabash Avenue
Chicago, IL 60611-7603
Tel (312) 840-8613
Fax (312) 840-8713
WThomson@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient (s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

---

7/17/2008

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MORTON GROVE PHARMACEUTICALS, INC. ) ) ) Plaintiff, ) ) v. ) ) THE NATIONAL PEDICULOSIS ) ASSOCIATION, INC. ) ) Defendant. ) ) ) | No: 08-CV-1384 Judge Bucklo Magistrate Judge Mason |

## OBJECTIONS AND RESPONSES TO SUBPOENA ISSUED TO DR. AMY PALLER

Pursuant to Federal Rule of Civil Procedure 45(c)(2)(B), third party Dr. Amy Paller hereby serves her objections and responses to the subpoena in the above-captioned case that was served upon her on June 20, 2008.

## OBJECTIONS TO FORM AND SERVICE

Dr. Paller asserts the following objections to the subpoena:

1.	The subpoena fails to provide a reasonable amount of time to comply, as required by Rule 45(c)(3)(A). The subpoena was served on Dr. Paller via service on her administrative assistant on June 20. The subpoena demands documents be produced at 9:00 a.m. on July 17, less than a month later. This is a significant burden for Dr. Paller, a busy doctor and professor at Northwestern University School of Medicine and a non-party in this action.

2.	No offer was made to pay Dr. Paller's hourly fees for her time.

## OBJECTIONS APPLICABLE TO ALL REQUESTS

Each of the following objections are incorporated into each and every one of Dr. Paller's responses as if fully set forth therein and are in addition to any other objections stated in response to a particular request.

1.     Dr. Paller objects to the subpoena because it places an undue burden and expense on her, a non-party, which the issuing counsel was obligated to take reasonable steps to avoid pursuant to Rule 45(c)(1).  The subpoena requests, in addition to paper documents, electronically stored information from a period spanning more than eight years, in a specific, technical format. Implicit in this request is a requirement that Dr. Paller spend a substantial sum to hire an e-discovery vendor to gather and format this information.

2.     Dr. Paller objects to the subpoena pursuant to Rule 45(d)(1)(D), as most of her electronically stored information is not reasonably accessible because of undue burden and cost. Dr. Paller has both private electronic documents as well as electronic documents associated with her work at Northwestern University School of Medicine.  Requiring her to produce electronic documents from both sources would require a substantial sum and hiring of an e-discovery vendor, as well as potentially significant discussions with Northwestern University School of Medicine officials about producing documents relating to university matters.  Moreover, cost shifting is appropriate in this instance and no such offer was made by the NPA.

3.     Dr. Paller objects to the subpoena and document requests to the degree that she is an expert in her field, she has not been retained by a party, and the requests require "an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party."  This is not permissible pursuant to Rule 45(c)(3)(B)(ii).

2

4.     Dr. Paller objects to the document requests and the definitions that accompany them to the extent that they attempt to alter the scope of discovery under the Federal Rules of Civil Procedure and applicable local rules.

5.     Dr. Paller objects to the document requests to the extent that they seek documents that are not in Dr. Paller's possession, custody, or control.

6.     Dr. Paller objects to the document requests to the extent that they are vague and ambiguous and overly broad as to time and scope.

7.     Dr. Paller objects to the document requests to the extent that they seek information not reasonably calculated to lead to the discovery of admissible evidence.

8.     Dr. Paller objects to the document requests to the extent that they are unreasonably cumulative or duplicative; obtainable from another source that is more convenient, less burdensome, or less expensive; and/or publicly available or equally accessible to the NPA.

9.     Dr. Paller objects to the document requests to the extent that they seek trade secrets or confidential information or research and/or development materials, including any material in Dr. Paller's possession pursuant to confidentiality or non-disclosure restrictions imposed by contract or law.

10.     Dr. Paller objects to the document requests to the extent that any request demands production of documents, information, or things protected by the attorney-client privilege, work product doctrine, and/or any other applicable privilege.

11.     Dr. Paller objects to the subpoena to the extent it was served for an improper purpose, namely to harass a third-party medical expert and to chill future core political speech.

12.     To the extent that Dr. Paller is ordered to produce documents responsive to any particular request, agreeing to comply with such an order does not suggest that responsive

documents exist but is merely an indication that that Dr. Paller will produce such documents if they exist and if they are within her possession, custody, or control.  Further, any such agreement does not suggest that the documents are relevant or admissible, nor does it suggest that Dr. Paller agrees with any characterizations or implications of the requests.

**SPECIFIC OBJECTIONS AND RESPONSES
TO THE REQUESTS IN THE SUBPOENA RIDER**

**REQUEST NO. 1**

Documents sufficient to show all monetary or other compensation or payments received from Morton Grove.

**RESPONSE:**

Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome, and any such documents are not relevant and will not lead to admissible evidence.

**REQUEST NO. 2**

Documents sufficient to show all monetary or other compensation or payments received from entities marketing, advertising, or selling pharmaceutical products on behalf of Morton Grove.

**RESPONSE:**

Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome, and any such documents are not relevant and will not lead to admissible evidence.

**REQUEST NO. 3**

All contracts or agreements between you and Morton Grove, or with any entities marketing, advertising, or selling pharmaceutical products on behalf of Morton Grove.

**RESPONSE:**

Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome, and any such documents are not relevant and will not lead to admissible evidence.

**REQUEST NO. 4**

Your most current curriculum vitae.

**RESPONSE:**

Dr. Paller objects to this request on the basis that any such document is not relevant and will not lead to admissible evidence.

**REQUEST NO. 5**

Any and all publication(s) or article(s) related to head lice, scabies, or opinions for managing head lice or scabies, including but not limited to lice or scabies treatments containing lindane, for which you were an author, co-author, editor, or researcher.

**RESPONSE:**

Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome. Dr. Paller further objects to this request because it is duplicative and redundant of document requests served to the parties to this action, in response to which voluminous documents were produced, and is about topics that will be the subject of paid expert testimony.

**REQUEST NO. 6**

All documents relating to or mentioning NPA.

**RESPONSE:**

Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome, and any such documents are not relevant and will not lead to admissible evidence.

**REQUEST NO. 7**

All documents concerning the truth or falsity of the statements attributed to NPA and identified in paragraphs 23, 25, 26, 33, 37, 38, 40, and 41 of Morton Grove's complaint in this action (attached hereto).

**RESPONSE:**

Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome. Dr. Paller further objects to this request because it is duplicative and redundant of document requests served to the parties to this action, in response to which voluminous documents were produced, and is about topics that will be the subject of paid expert testimony.

**REQUEST NO. 8**

All documents relating to lindane.com, including but not limited to documents concerning the decision to launch lindane.com, documents relied on in creating the content, drafts of the content, reviews of the content, and communications regarding the content.

**RESPONSE:**

Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome, and any such documents are not relevant and will not lead to admissible evidence. In addition, the vast majority of these documents are not in Dr. Paller's possession, custody, or control.

**REQUEST NO. 9**

All documents concerning the truth or falsity of the statements identified in paragraphs 48-49, 51, 63, 68-70, 73-74, 111, and 113 of NPA's counterclaim in this action (attached hereto).

**RESPONSE:**

Dr. Paller objects to this request on the basis that is overly broad in scope and burdensome. Dr. Paller further objects to this request because it is duplicative and redundant of document requests served to the parties to this action, in response to which voluminous documents were produced, and is about topics that will be the subject of paid expert testimony.

Dated: July 7, 2008                    Respectfully Submitted,


                                       DR. AMY PALLER


                                       By: _Cherish M Keller_____
                                            One of Her Attorneys

W. Gordon Dobie (wdobie@winston.com)
William C. O'Neil (woneil@winston.com)
Cherish M. Keller (ckeller@winston.com)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
T:  (312) 558-5600
F:  (312) 558-5700

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of July 2008, I caused a copy of **Objections and Responses to Subpoena Issued to Dr. Amy Paller** to be served on counsel of record via e-mail and U.S. Mail:

> Debbie L. Berman
> Amanda S. Amert
> Wade A. Thomson
> April A. Otterberg
> JENNER & BLOCK LLP
> 330 North Wabash Avenue
> Chicago, Illinois 60611
> T: (312) 222-9350
> F: (312) 527-0484

# EXHIBIT 5

*Expert*

EDITORIAL REVIEW*

**Shayne Gad**, PhD, DABT, ATS
Principal, Gad Consulting
Adjunct Prof. of Toxicology
Duke University Medical Center

**Adelaide Ann Hebert**, MD
Prof., Dept. of Dermatology
and Pediatrics
The University of Texas
Medical School at Houston

**Amy S. Paller**, MD
Walter J. Hamlin Prof. and
Chair, Dept. of Dermatology
Prof. of Pediatrics, Feinberg
School of Medicine
Northwestern University

* The content of this site has been
independently reviewed by the
above subject matter experts.

# *The truth about* LINDANE

Lindane medications have been used in healthcare for more than 50 years. They are currently approved by the Food and Drug Administration (FDA) for the second-line treatment of scabies and lice, meaning they are only prescribed when first-line therapies have failed or cannot be tolerated.

Scabies and lice infestations are highly-contagious parasitic diseases of the skin that affect millions of Americans and hundreds of millions of people worldwide. Despite available treatments, these conditions remain common public health problems that require a range of treatment options.

The FDA, the Environmental Protection Agency (EPA), and the Centers for Disease Control and Prevention (CDC) continue to support the appropriate use of lindane medications in clinical practice. Petitions to ban the manufacture, sale, and prescription of these necessary therapies have been repeatedly rejected by medical and scientific experts working with U.S. regulatory agencies, who have determined all such petitions to be without merit.

Important changes in prescription packaging and labeling and patient education have further enhanced the benefit-safety balance of lindane medications.

Please See Important Safety Information on Lindane

*Information* DOWNLOADS

*Points of View on Lindane:*

FOOD AND DRUG
ADMINISTRATION

ENVIRONMENTAL
PROTECTION AGENCY

CENTERS FOR DISEASE
CONTROL AND PREVENTION

MEDICAL & SCIENTIFIC
OPINIONS

Commitment to Public Health and Safety | Lindane Prescribing Information | FDA Information on Lindane

Copyright © 2007 Morton Grove Pharmaceuticals, Inc.

*Expert*

EDITORIAL REVIEW*

**Shayne Gad**, PhD, DABT, ATS
Principal, Gad Consulting
Adjunct Prof. of Toxicology
Duke University Medical Center

**Adelaide Ann Hebert**, MD
Prof., Dept. of Dermatology
and Pediatrics
The University of Texas
Medical School at Houston

**Amy S. Paller**, MD
Walter J. Hamlin Prof. and
Chair, Dept. of Dermatology
Prof. of Pediatrics, Feinberg
School of Medicine
Northwestern University

* The content of this site has been
independently reviewed by the
above subject matter experts.

## *The truth about* LINDANE

Lindane medications have been used in healthcare for more than 50 years. They are currently approved by the Food and Drug Administration (FDA) for the second-line treatment of scabies and lice, meaning they are only prescribed when first-line therapies have failed or cannot be tolerated.

Scabies and lice infestations are highly-contagious parasitic diseases of the skin that affect millions of Americans and hundreds of millions of people worldwide. Despite available treatments, these conditions remain common public health problems that require a range of treatment options.

The FDA, the Environmental Protection Agency (EPA), and the Centers for Disease Control and Prevention (CDC) continue to support the appropriate use of lindane medications in clinical practice. Petitions to ban the manufacture, sale, and prescription of these necessary therapies have been repeatedly rejected by medical and scientific experts working with U.S. regulatory agencies, who have determined all such petitions to be without merit.

Important changes in prescription packaging and labeling and patient education have further enhanced the benefit-safety balance of lindane medications.

Please See Important Safety Information on Lindane

*Information* DOWNLOADS

*Points of View on Lindane:*

FOOD AND DRUG
ADMINISTRATION

ENVIRONMENTAL
PROTECTION AGENCY

CENTERS FOR DISEASE
CONTROL AND PREVENTION

MEDICAL & SCIENTIFIC
OPINIONS

Commitment to Public Health and Safety | Lindane Prescribing Information | FDA Information on Lindane

Copyright © 2007 Morton Grove Pharmaceuticals, Inc.