**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC., | ) ) ) | |
| | ) | No. 08-CV-1384 |
| Plaintiff, | ) | |
| | ) | Judge Bucklo |
| vs. | ) | Magistrate Judge Mason |
| | ) | |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., | ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

**OPPOSITION TO MORTON GROVE PHARMACEUTICALS, INC.'S MOTION TO
<u>DISMISS THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'S COUNTERCLAIM</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION ...........................................................................................1

FACTUAL ALLEGATIONS ............................................................................1

ARGUMENT ..................................................................................................3

  I.   COUNT II STATES A CLAIM FOR FALSE ADVERTISING UNDER THE
      LANHAM ACT. .....................................................................................4

     A. Count II Sufficiently Alleges That The Statements At Issue Are Commercial
        Advertisements Or Promotions. ...................................................................4

        1. The counterclaim alleges that Morton Grove's letters sent to pediatricians
           and other healthcare professionals are commercial advertisements because
           they enhance its competitive position. ...................................................4

        2. The counterclaim adequately alleges that lindane.com is a promotional
           website. ............................................................................................7

        3. The counterclaim alleges that the testimonials on lindane.com are
           commercial advertisements. ...............................................................11

     B. Count II Sufficiently Alleges That It Is Based On Morton Grove's
        Commercial Speech. ...............................................................................12

        1. The Lanham Act's narrow political speech exception is inapplicable
           because the statements concern Morton Grove's products. ....................12

        2. Neither Noerr-Pennington nor a legislative privilege is applicable because
           Morton Grove did not make the statements to governmental entities. ..................15

     C. Morton Grove's Statements Are Factual Assertions, Not Opinion. ............16

     D. Count II Sufficiently Alleges Causation. ...................................................17

  II.  COUNT I STATES A CLAIM UNDER THE ILLINOIS DECEPTIVE TRADE
      PRACTICES ACT FOR THE SAME REASONS THAT COUNT II STATES A
      CLAIM UNDER THE LANHAM ACT..........................................................19

  III. MORTON GROVE'S SUGGESTION IN ITS CONCLUSION THAT THE
       COURT CONSIDER SANCTIONS UNDER RULE 11 IS IMPROPER AND
       WITHOUT MERIT. ...............................................................................20

CONCLUSION...............................................................................................22

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Family Life Ins. Co. v. Hagan*, 266 F. Supp. 2d 682 (N.D. Ohio 2002).......................... 13, 14

*Am. Needle & Novelty v. Drew Pearson Mktg., Inc.*, 820 F. Supp 1072 (N.D. Ill. 1993).......... 6, 7

*Balthazar v. Sw. Bell Corp.*, 494 F. Supp. 2d 930 (N.D. Ill. 2007) ........................................... 3, 8

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ..................................................... 12, 13

*Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672 (9th Cir. 2005)............................................... 9, 10

*Cardtoons v. Major League Baseball Players Ass'n*, 208 F.3d 885 (10th Cir. 2000)................. 15

*Corley v. Rosewood Care Ctr., Inc. of Peoria*, 142 F.3d 1041 (7th Cir. 1998)........................... 21

*Criticare Sys., Inc. v. Nellcor Inc.*, 856 F. Supp. 495 (E.D. Wisc. 1994).............................. 11, 16

*Eazypower Corp. v. Alden Corp.*, No. 03 C 3164, 2003 WL 22859492
    (N.D. Ill. Dec. 2, 2003) .............................................................................................................. 15

*Flentye v. Kathrein*, 485 F. Supp. 2d 903 (N.D. Ill. 2007) ........................................................ 20

*H & R Indus., Inc. v. Kirschner*, 899 F. Supp. 995 (E.D.N.Y. 1995) ........................................ 12

*Harding Univ. v. Consulting Servs. Group*, 48 F. Supp. 2d 765 (N. D. Ill. 1999) ...................... 21

*Hartmarx Corp. v. Abboud*, 326 F.2d 862 (7th Cir. 2003) ......................................................... 22

*Health Care Compare Corp. v. United Payors & United Providers, Inc.*, No. 96 C 2518,
    1998 WL 122900 (N.D. Ill. Mar. 13, 1998)............................................................................ 5

*Healthport Corp. v. Tanita Corp. of Am.*, No. 06-419-PK, 2008 WL 2224398
    (D. Or. May 23, 2008) .............................................................................................................. 5

*Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813 (7th Cir. 1999) ................................................ 17

*Huntingdon Life Scis., Inc. v. Rokke*, 978 F. Supp. 662 (E.D. Va. 1997) ................................... 14

*Johnson v. Waddell & Reed, Inc.*, 74 F.3d 147 (7th Cir. 1996).................................................... 21

*Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056 (9th Cir. 1998) ......................................................... 15

*M&R Printing Equip., Inc. v. Anatol Equip. Mfg. Co.*, 321 F. Supp. 2d 949 (N.D. Ill. 2004) ..... 19

*MasterCard Int'l, Inc. v. Nader 2000 Primary Comm., Inc.*, No. 00 Civ. 6068,
    2004 WL 434404 (S.D.N.Y. Mar. 8, 2004) ........................................................................... 14

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)........................ 18, 19

*McDonagh v. Bergan*, No. 03 C 1465, 2003 WL 21798735 (N.D. Ill. July 25, 2003)................. 16

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir. 1983)............................ 15

*Midwest Canvas Corp. v. Commonwealth Canvas, Inc.*, No. 07 C 0085, 2008 WL 162757
    (N.D. Ill. Jan. 16, 2008) ............................................................................... 10

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) .................................................... 16

*Nagel v. ADM Investor Servs., Inc.*, 65 F. Supp. 2d 740 (N.D. Ill. 1999),
    *aff'd*, 217 F.3d 436 (7th Cir. 2000) ............................................................... 21

*Native Am. Arts, Inc. v. Chico Arts, Inc.*, 8 F. Supp. 2d 1066 (N.D. Ill. 1998) ........................... 20

*Papa John's Int'l, Inc. v. Rezko*, No. 04 C 3131, 2006 WL 566468 (N.D. Ill. Mar. 3, 2006)...... 21

*Patient Transfer Sys., Inc. v. Patient Handling Solutions, Inc.*, No. CIV.A. 97-1568,
    2001 WL 936641 (E.D. Pa. Aug. 16, 2001) ......................................................... 11

*Republic Tobacco v. North Atl. Trading Co.*, No. 98 C 4011, 1999 WL 261712
    (N.D. Ill. Apr. 9, 1999) ................................................................................ 4

*Sanner v. Board of Trade*, 62 F.3d 918 (7th Cir. 1995)............................................... 3, 8

*Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108 (6th Cir. 1995) ...................................... 5, 12, 14

*Taubman Co. v. Webfeats*, 319 F.3d 770 (6th Cir. 2003) ........................................ 9, 10

*TMI, Inc. v. Maxwell*, 368 F.3d 433 (5th Cir. 2004)............................................ 9, 10

*Utah Lighthouse Ministry, Inc. v. Discovery Computing, Inc.*, 506 F. Supp. 2d 889
    (D. Utah 2007) ..................................................................................... 9, 10

**Statutes**

815 ILCS 510/2(8) (2008) ....................................................................................... 19

**Other Authorities**

134 Cong. Rec. H10,411-02 (daily ed. Oct. 19, 1988) (remarks of Rep. Katenmeier) ............... 13

134 Cong. Rec. S16971 (daily ed. Oct. 20, 1988) (remarks of Sen. DeConcini) ........................ 14

## INTRODUCTION

Morton Grove Pharmaceuticals, Inc. ("Morton Grove") bases its motion to dismiss on the erroneous premise that defendant the National Pediculosis Association, Inc. ("NPA") sued Morton Grove for political statements it made. This assertion conflicts with the well-pled allegations in NPA's counterclaim that Morton Grove's statements are part of a commercial advertising and promotional campaign. Morton Grove's motion violates the basic tenets of motions to dismiss: all well-pled allegations in the complaint must be taken as true and all reasonable inferences are to be made in favor of the non-movant. Applying these standards to the actual allegations in the counterclaim (as opposed to Morton Grove's characterization of them), NPA's counterclaim states claims under the Lanham Act and Illinois Deceptive Trade Practices Act. Accordingly, Morton Grove's motion to dismiss should be denied. Furthermore, Morton Grove's request for sanctions in the conclusion of its memorandum of law in the form of an "invitation" to the Court to consider imposing sanctions on its own initiative fails to comply with Federal Rule of Civil Procedure 11 and is completely unfounded; therefore, it should be rejected by the Court.

## FACTUAL ALLEGATIONS

Morton Grove manufactures and sells two prescription lice and scabies pesticidal treatments containing the chemical lindane, Lindane Lotion USP 1% and Lindane Shampoo USP 1%. (NPA Counterclaim, hereinafter "CC", ¶ 1.) Over the last fifteen years, in light of the toxicity and dangers of pharmaceutical lindane, the U.S. Food and Drug Administration ("FDA") and other government entities have imposed increasingly stringent restrictions on the packaging, labeling and approved uses of Morton Grove's lindane products. (*Id.*) Today these products are banned in California and may be sold elsewhere in the United States only in single-use packages

containing an FDA-mandated "black box" warning that details some of the reported risks of their use. (*Id.*; *see also id.* ¶¶ 20-24.)

In response to these events, Morton Grove engaged in an aggressive, targeted promotional campaign designed to mislead both consumers and healthcare professionals about the dangers of its lindane products. (CC ¶ 2.) As part of this campaign, Morton Grove has advertised and promoted its lindane pesticidal treatments in a manner that disregards their risks and use restrictions, including those contained in the FDA's mandated "black box" public health warning concerning those products. (*Id.* ¶ 3.)

In particular, Morton Grove has targeted pediatricians and other healthcare professionals, seeking to convince them to write prescriptions for, or recommend use of, these products despite the increasing regulatory scrutiny of pharmaceutical lindane and despite the risks described in the FDA's black box warning and elsewhere. (CC ¶¶ 27-28.) For example, in May 2006, Morton Grove sent at least five form letters to pediatricians and other healthcare professionals which contained misleading impressions regarding the safety of Morton Grove's lindane products. (*Id.* ¶¶ 35-36, 46-59, 76-106.) Additionally, Morton Grove created websites, including lindane.com and lindanetruth.com, which similarly promoted its lindane products through misleading statements. (*Id.* ¶¶ 60-75.) Morton Grove continued to promote its lindane products by using misleading statements about their safety and efficacy despite a 2007 FDA Warning Letter to Morton Grove that chastised Morton Grove for downplaying the risks associated with its lindane products in previous promotional materials. (*Id.* ¶¶ 29-34, 60.)

Also as part of its marketing campaign, Morton Grove has sought to discredit NPA and other non-profit organizations that warn about the dangers of the chemical lindane and its use in lice and scabies treatments. (*Id.* ¶¶ 1, 110-118.) Among other things, Morton Grove has falsely

accused NPA of being a sham non-profit organization that speaks out about the dangers of lindane pesticidal treatments only as a pretense so that it can increase its profits through sales of its allegedly defective LiceMeister® comb.  (*Id.* ¶¶ 111-118.)

NPA filed its counterclaim to redress the false and misleading statements made by Morton Grove regarding Morton Grove's lindane products and NPA's services and business. (*Id.* ¶ 5.)  Although NPA's primary position is that it is not a competitor of Morton Grove's, NPA brought its counterclaim in case the Court determines that NPA and Morton Grove are competitors in connection with Morton Grove's claims.  (*Id.* ¶ 7.)

## ARGUMENT

It is well-settled that in evaluating Morton Grove's motion to dismiss, the Court must "accept all well-pled facts in [NPA's counterclaim] as true."  *Balthazar v. Sw. Bell Corp.*, 494 F. Supp. 2d 930, 931 (N.D. Ill. 2007) (citations omitted) (denying motion to dismiss because of well-pled facts in complaint).  It also must "view those allegations in the light most favorable to [NPA] and make all reasonable inferences in [its] favor."  *Sanner v. Board of Trade*, 62 F.3d 918, 925 (7th Cir. 1995) (citation omitted).  Furthermore, Morton Grove "cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations." *Id.* (quotation omitted) (affirming denial of motion to dismiss where motion was based on allegations contrary to complaint).  In its "legal framework" section, Morton Grove does not even acknowledge these fundamental principles (MG Mem. at 6-7), but rather bases its motion on allegations and characterizations that directly contradict those in the counterclaim.  As such, Morton Grove's motion to dismiss should be denied.

## I.    COUNT II STATES A CLAIM FOR FALSE ADVERTISING UNDER THE LANHAM ACT.

### A.    Count II Sufficiently Alleges That The Statements At Issue Are Commercial Advertisements Or Promotions.

#### 1.    The counterclaim alleges that Morton Grove's letters sent to pediatricians and other healthcare professionals are commercial advertisements because they enhance its competitive position.

Morton Grove argues that its letters to pediatricians and healthcare professionals cannot be commercial advertisements because they were targeted to specific individuals and do not propose a commercial transaction.  (MG Mem. at 8-9.)  Contrary to Morton Grove's claim, targeted advertising campaigns can be commercial advertisements under the Lanham Act.  The dispositive issue is not whether the letters were personalized, but rather the purpose of the letters.  If the letters could affect purchasing decisions, even indirectly, they are actionable.

For example, in *Republic Tobacco v. North Atlantic Trading Co.*, No. 98 C 4011, 1999 WL 261712 (N.D. Ill. Apr. 9, 1999) (App. 1)[1], a case cited by Morton Grove, the Court denied the defendant's motion to dismiss a Lanham Act false advertising claim that was based on a letter sent to one of the plaintiff's distributors, statements made to distributors who sold both parties' products and letters to sent to defendant's customers, many of whom also were the plaintiff's customers.  *Id.* at *2-3, 8.  The Court rejected the defendant's argument that these isolated communications made to "middlemen" could not be commercial advertisements because the defendant made multiple communications and the statements were made to the distributors "for the purpose of enhancing its competitive position, directly or indirectly, with the consuming public."  *Id.* at *7-8.  As the Court explained, "the Lanham Act does not require the allegedly false statements to reach the ultimate consumer before they are actionable."  *Id.* at *8.

---

[1] Citations to "App." refer to the appendix of unpublished cases that accompanies this memorandum. Citations to "Ex." refer to exhibits attached to this memorandum.

The Court in *Health Care Compare Corp. v. United Payors & United Providers, Inc.*, No. 96 C 2518, 1998 WL 122900, at *3-4 (N.D. Ill. Mar. 13, 1998) (App. 2), reached a similar conclusion.   In *Health Care*, the plaintiff claimed that statements the defendant, another healthcare network operator, made to healthcare providers (doctors and hospitals) violated the Lanham Act.   *Id.* at *1-2.   The defendant moved for summary judgment claiming that the statements could not be false advertisements because the true consumers are the employers and insurance companies who buy the network services.   *Id.* at *3.   The Court denied the motion, holding that "it is enough if the false advertising is directed to an identifiable group that the advertiser seeks to persuade for the purpose of enhancing its competitive position, directly or indirectly, with the consuming public."   *Id.* at *4.

Indeed, "[s]peech need not closely resemble a typical advertisement to be commercial." *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 112 (6th Cir. 1995).   In *Semco*, the plaintiff sued a competitor for statements made in a trade journal article.   *Id.* at 110.   The competitor successfully moved for summary judgment on the ground that the article was not a commercial advertisement within the meaning of the Lanham Act.   *Id.*   The Sixth Circuit reversed, holding that the "article does refer generally to [defendant's] products, and a rational jury could easily find that [defendant] had an economic motivation for submitting the article through its president" thus satisfying the commercial advertising prong.   *Id.* at 112-13.   "[T]he alleged misrepresentations contained in the [defendant's] article represent commercial speech and are actionable under the Lanham Act."   *Id.* at 113-14; *see also Healthport Corp. v. Tanita Corp. of Am.*, No. 06-419-PK, 2008 WL 2224398, at *7 (D. Or. May 23, 2008) (App. 3) (holding that false statement concerning credentials of defendant's president actionable under Lanham Act

even though statement did not relate directly to product because it "may deceive consumers and influence consumer decisions on whether to purchase" defendant's product).

As in these cases, Morton Grove sent letters to pediatricians and other healthcare professionals in an attempt to sell more products, at least indirectly. In the letters, "Morton Grove seeks to convince them to write prescriptions for, or recommend use of, these products despite the increasing regulatory scrutiny of pharmaceutical lindane, and despite the risks described in the FDA's black warning and elsewhere." (CC ¶ 28; *see also id.* ¶ 35.) Morton Grove also mentions its own products by name and tries to downplay the risks associated with them so that doctors will be more likely to prescribe these medications. (*Id.* ¶ 37 & Exs. B-F.) Because these products are available only with a prescription, doctors and other healthcare professionals are key to the purchasing decision even though they are not the ultimate consumers. Therefore, these letters are commercial speech. Morton Grove's argument that they cannot be commercial advertisements because they do not tell how "Lindane medications can be obtained" (MG Mem. at 9) is meritless because the letters were sent to doctors and others who know how to obtain prescription-only medicines without having to be told that information.

Furthermore, Morton Grove's reliance on *American Needle & Novelty v. Drew Pearson Marketing, Inc.*, 820 F. Supp 1072 (N.D. Ill. 1993), is misplaced. In *American Needle*, the plaintiff alleged that the defendant violated the Lanham Act by sending a letter to the National Basketball Association ("NBA") informing it that the defendant, an NBA licensee, had terminated its distribution agreement with the plaintiff. *Id.* at 1074-75. The defendant moved to dismiss on the ground that the letter "was not sent to the NBA for purposes of influencing consumers to purchase its licensed headwear." *Id.* at 1077. The Court agreed, explaining that even though "the Lanham Act does not require allegedly false statements to reach the consuming

public before they are actionable. . . a single letter privately addressed to a non-consuming licensor" was not sufficient. *Id.* at 1077-78.

Unlike in *American Needle*, Morton Grove did not send one isolated letter; there were at least five letters as well as statements on its public websites. Also, while the letters were addressed to individuals, they were not "individualized lobbying pitches" as Morton Grove suggests. Indeed, Morton Grove admits that they were form letters with identical content. (MG Mem. at 4; *see also* CC ¶¶ 46-59 & Exs. B-F.) And, importantly, the recipients of Morton Grove's letters, unlike the NBA, were involved in the ultimate purchasing decision because they have to write the prescriptions in order for consumers to buy Morton Grove's products.

### 2. The counterclaim adequately alleges that lindane.com is a promotional website.

Morton Grove argues that statements on lindane.com are not actionable because the website "is purely informational, exists exclusively for lobbying purposes, and is not a promotional website." (MG Mem. at 9.) As a preliminary matter, NPA sued for statements made on two different websites: lindane.com and lindanetruth.com. Morton Grove makes no arguments as to why the statements on lindanetruth.com are not actionable, and thus its motion to dismiss should be denied with respect to those statements.

With respect to the statements on lindane.com, Morton Grove's argument is meritless. <u>First</u>, Morton Grove's argument that lindane.com exists "exclusively for lobbying purposes" and was launched in "response to the misleading and unfounded information about" its products directly conflicts with the well-pled allegations in the counterclaim.[2] (MG Mem. at 9, 11.) The

---

[2] Morton Grove also argues that the website cannot be promotional because the members of the website's advisory panel "may not have offered to participate in a commercial website." (MG Mem. at 11.) Morton Grove cites no authority that this factor (if true) is relevant. Moreover, it is misleading because at least one member is Morton Grove's paid consultant, as NPA recently learned in a deposition. Morton Grove refuses to provide information regarding the other members.

counterclaim alleges that "in response to the increasing scrutiny of the chemical lindane and its pharmaceutical uses, Morton Grove launched an aggressive advertising and promotional campaign designed to minimize the dangers and risk of using [Morton Grove's products]."  (CC ¶ 26; *see also id.* ¶ 60.)  That campaign included "creation and maintenance of two websites, www.lindane.com and www.lindanetruth.com."  (*Id.* ¶ 27; *see also id.* ¶ 61.)  "These two websites are one component of Morton Grove's overall marketing and advertising strategy regarding its products. . . .  These websites function an as important portal for non-personal selling" of those products.  (*Id.* ¶ 62.)  Because Morton Grove's argument impermissibly rejects the counterclaim's allegations, it should be denied.  *See Sanner*, 62 F.3d at 925.

Second, Morton Grove's characterization of lindane.com directly conflicts with that of the marketing agency that Morton Grove hired to develop that website, Closerlook.[3]  (Ex. 1.) Closerlook stated that lindane.com was aimed at consumers and doctors, not just legislators. (*Id.*)  Closerlook's description is consistent with lindane.com itself, which can be accessed by anyone.  There is nothing on lindane.com informing consumers and doctors that this is the wrong website for them or directing them to Morton Grove's purported commercial website.  Also, lindane.com contains statements that are virtually the same as ones that appeared on lindane4lice.com, an undisputedly commercial website, before the FDA required Morton Grove to change that website.  (CC ¶¶ 60, 76-106 & Ex. A.)

Third, Morton Grove's argument that it maintains a separate promotional website, mgp-online.com, should be disregarded because it relies on "facts" outside of the counterclaim and is

_____

[3] The Court may consider this additional information even though it was not alleged in the counterclaim. *See Balthazar*, 494 F. Supp. 2d at 931-32 (denying motion to dismiss in part based upon affidavit submitted in opposition to motion, stating that "plaintiff may add essential facts 'by affidavit or brief in order to defeat a motion to dismiss if the facts are consistent with the allegations of the complaint'") (citation and quotation omitted).

belied by the actual content of that website.  (MG Mem. at 5.)  In addition, a review of mgp-online.com demonstrates that it does not even meet the criteria that Morton Grove claims are necessary for a promotional website.  While there is a listing of Morton Grove products, consumers cannot purchase these products on the website, nor are there links to any commercial websites where such a purchase can be made.  (Ex. 2.)  Moreover, mgp-online.com does not include a statement concerning the side effects or warnings for these products even though such information must be included in any promotion of them, but that information is posted on lindane.com.  (Ex. 3 at 3-43, 47-48.)

Fourth, as explained above (pp. 5-6), statements need not be traditional advertisements to be actionable under the Lanham Act.  Lindane.com contains numerous references to Morton Grove's lindane products.  (Ex. 3 at 1-42, 45-53.)  There is even a section on how Morton Grove has made "advancements" to these products.  (*Id.* at 43-53.)  As such, lindane.com is a commercial advertisement within the meaning of the Lanham Act.  *See Semco*, 52 F.3d at 112.

Fifth, the cases cited by Morton Grove are inapposite.  (MG Mem. at 10.)  None concern the false advertising section of the Lanham Act.  Instead they involve trademark dilution or infringement claims brought against disgruntled customers or other cyber-gripers who set up websites to complain about the plaintiff.[4]  Accordingly, the plaintiffs in those cases could not establish liability on the basis that defendants could benefit directly or indirectly from increased sales as a result of statements on their website.  As one court explained:  "Any harm to [plaintiff] arises not from a competitor's sale of a similar product under [plaintiff's] mark, but from

---

[4] *See Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 674-75 (9th Cir. 2005) (dissatisfied customer); *TMI, Inc. v. Maxwell*, 368 F.3d 433, 438 (5th Cir. 2004) (disgruntled customer); *Taubman Co. v. Webfeats*, 319 F.3d 770, 772-78 (6th Cir. 2003) ("fan" and then cyber-griper); *Utah Lighthouse Ministry, Inc. v. Discovery Computing, Inc.*, 506 F. Supp. 2d 889, 898 (D. Utah 2007) (parody of website critical of church).

[defendant's] criticism of their services." *Bosley*, 403 F.3d at 680. In contrast, as explained above, the counterclaim alleges that Morton Grove used lindane.com to increase sales of its lindane products (or at least minimize a drop in sales) by downplaying the risks of its products to doctors and consumers. Also, none of Morton Grove's cases involve a motion to dismiss; instead, in each case, the court found that the website was not commercial only after an evidentiary hearing, not on a motion to dismiss where the complaint alleged otherwise.[5]

Similarly, *Midwest Canvas Corp. v. Commonwealth Canvas, Inc.*, No. 07 C 0085, 2008 WL 162757 (N.D. Ill. Jan. 16, 2008) (App. 4), is readily distinguishable. In *Midwest*, the plaintiff sued the defendant for a statement on the website of the New York Department of Transportation ("NYDOT"). *Id.* at *1-2. The Court held that the statement could not be a commercial advertisement because the NYDOT, "a state governmental entity, is not in direct commercial competition with any of the companies whose [products] are listed on the website, including [plaintiff and defendant]." *Id.* at *4. The Court also noted that the NYDOT statement was not an inducement to buy any product, but instead was part of quality assurance program that listed approved products. *Id.* at *5. Unlike in *Midwest Canvas*, Morton Grove is not a governmental entity, but rather it claims to be NPA's direct competitor. As explained above, Morton Grove designed lindane.com for consumers and doctors, not just for "lobbying" purposes. Also, providing "information" by way of downplaying the products' risks to consumers or to doctors who may prescribe the products is for one purpose and one purpose only -- to get them to ask for or prescribe these products.

---

[5] *See Bosley*, 403 F.3d at 675 (summary judgment); *TMI*, 368 F.3d at 434 (bench trial); *Taubman*, 319 F.3d at 774 (preliminary injunction); *Utah Lighthouse*, 506 F. Supp. 2d at 894 (summary judgment).

### 3.    The counterclaim alleges that the testimonials on lindane.com are commercial advertisements.

Morton Grove argues that the testimonials of Drs. Shwayder and Hebert are not actionable because they were sent to legislators.  (MG Mem. at 11-12.)  While that may have been the original purpose, Morton Grove subsequently posted these letters on its commercial website, lindane.com.  Morton Grove posted these letters, which downplay the risks of Morton Grove's lindane products, for economic gain.  Thus, they are commercial advertisements.  (*See* pp. 4-10, above.)

Furthermore, contrary to Morton Grove's argument (MG Mem. at 16), a party can be liable for statements made in third-party testimonials.  In *Criticare Systems, Inc. v. Nellcor Inc.*, 856 F. Supp. 495, 498-99 (E.D. Wisc. 1994), the plaintiff sued for false advertising under the Lanham Act based on a letter from a third-party doctor to another doctor that the defendant showed to a potential customer.  The court denied defendant's motion for summary judgment because the defendant could be liable for using that third-party letter.  *Id.* at 507; *see also Patient Transfer Sys., Inc. v. Patient Handling Solutions, Inc.*, No. CIV.A. 97-1568, 2001 WL 936641, at *18 (E.D. Pa. Aug. 16, 2001) (App. 5) (holding defendants liable for false advertising under the Lanham Act based on statements in testimonial letters).

Indeed, if Morton Grove's argument were correct, the Court should dismiss Morton Grove's claims against NPA based upon NPA's posting on its website a third-party document, entitled "Statement in Support of the Elimination of Lindane Use in North America," which was sent to North American governmental entities asking them to ban lindane.  (*See* Dkt. No. 1, Compl. at Ex. A.)

**B.      Count II Sufficiently Alleges That It Is Based On Morton Grove's Commercial Speech.**

**1.      The Lanham Act's narrow political speech exception is inapplicable because the statements concern Morton Grove's products.**

Morton Grove's attempt to shoe-horn its statements into the protected political speech exemption to the Lanham Act is unavailing.  <u>First</u>, Morton Grove again impermissibly contradicts the well-pled allegations of the counterclaim and the actual content of lindane.com. Lindane.com does not have the indicia of a "political" website.  Access to the website it not limited to states where legislation is pending or just to legislators or other government officials, but instead is accessible to anyone surfing the Internet.  Also, it does not encourage its audience to take any political action, such as writing letters to legislators.

<u>Second</u>, it is well established that if speech concerns the speaker's product and is made for the speaker's economic gain, it is commercial speech.  In the seminal case, *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983), a contraception manufacturer argued that informational pamphlets it distributed about venereal disease were not commercial speech because they provided information about a matter of public interest.  *Id.* at 62.  The Court rejected Bolger's arguments because the pamphlets mentioned its products by name (even though one pamphlet only mentioned that Bolger was the distributor of certain condoms at the very end of booklet) and Bolger had an economic interest in sending them out.  *Id.* at 62 n.4, 67-69.  As such, the Court held that the pamphlets were commercial speech.  *Id.* at 68.  The reasoning in *Bolger* has been applied to Lanham Act false advertising cases.  *See, e.g.*, *Semco*, 52 F.3d at 112; *H & R Indus., Inc. v. Kirschner*, 899 F. Supp. 995, 1006 (E.D.N.Y. 1995).

Under the *Bolger* standard, even if the Court were to conclude that Morton Grove's website and letters provided information about safe and effective pesticidal treatments for lice and scabies, the statements still are actionable under the Lanham Act because, as explained

above, Morton Grove had an economic interest in making those statements, and it referred to its own products.[6]  (*See* CC ¶¶ 26-28, 47-49, 53-59, 60-75.)  Indeed, Morton Grove's references are far more substantial than those in *Bolger*.  *See* 463 U.S. at 62 & n.4, 66 & n.12-13.

Third, Morton Grove's argument is premised on a partial quotation from the Lanham Act's legislative history.  (MG Mem. at 12.)  A look at the entire quote makes clear that the political speech exception is narrowly tailored and specifically excludes statements about goods and services.  After the section quoted by Morton Grove, the legislative history continues: "'[h]owever, if a political or other similar organization engages in business conduct incidental to its political functions, then the business conduct would be considered 'commercial' and would fall within the confines of [§ 1125(a)].'"  134 Cong. Rec. H10,411-02 (daily ed. Oct. 19, 1988) (remarks of Rep. Katenmeier), *quoted in Am. Family Life Ins. Co. v. Hagan*, 266 F. Supp. 2d 682, 698 n.18 (N.D. Ohio 2002).  As explained in *American Family*, "the 1988 presidential campaign was in full swing and the candidates were exchanging strident charges of misrepresentation.  The addition of the word 'commercial' was meant to protect political candidates from civil liability under [§ 1125(a)]."  266 F. Supp. 2d at 698 n.18  (quotation omitted).

Furthermore, the Senate's legislative history shows that:

> "[T]he word 'commercial' is intended only to eliminate any possibility that the section might be applied to political speech.  Although the Senate sees this language as unnecessary because section 43(a) requires that the misrepresentations be made with respect to good or services, we consider inclusion of the language so long as Congress' intent that it be interpreted only as excluding political speech is clear.  It is also Congress' intent that the 'commercial' language be applicable any time there is a misrepresentation relating to goods or service."

---

[6] However, if the Court holds that Morton Grove's statements are not actionable because they involve this public debate, it also should dismiss Morton Grove's complaint against NPA because, as Morton Grove asserts (MG Mem. at 1), NPA was engaged in that same debate.

134 Cong. Rec. S16971 (daily ed. Oct. 20, 1988) (remarks of Sen. DeConcini), *quoted in Semco*, 52 F.3d at 111-12.  In light of this legislative history and contrary to Morton Grove's claim (MG Mem. at 12), "the Lanham Act has been successfully invoked by and against parties engaged primarily in dissemination of political messages." *Am. Family*, 266 F. Supp. 2d at 694.

Fourth, the cases cited by Morton Grove are inapposite.  *MasterCard International, Inc. v. Nader 2000 Primary Committee, Inc.*, No. 00 Civ. 6068, 2004 WL 434404, at *1 (S.D.N.Y. Mar. 8, 2004) (App. 6), involves Ralph Nader's use of MasterCard's "Priceless" trademarked slogan in his ads during his campaign for president.  This is the quintessential political speech contemplated by the political exception inserted by Congress.  Morton Grove's statements, on the other hand, were not made in the context of a campaign for public office.  Similarly, in *Huntingdon Life Sciences, Inc. v. Rokke*, 978 F. Supp. 662, 666 (E.D. Va. 1997), PETA distributed a video and a press release concerning the plaintiff's animal testing practices.  The court held that these items were not commercial speech because "[n]one of the allegations . . . specify an economic motive for PETA's actions."[7]  *Id.*  By contrast, here, the counterclaim is replete with allegations concerning Morton Grove's economic motives for the false statements it made.  (CC ¶¶ 26-28, 47-49, 53-75.)

Finally, if Morton Grove's argument were correct about the political speech exemption, the Court should dismiss Morton Grove's claims against NPA that are premised on a third-party's statement sent to North American governmental agencies to ban lindane because that letter would be protected as part of the right to petition government.

---

[7] The court further noted that the plaintiff could not establish the video and press release were advertisements because PETA did not provide testing services, and thus PETA and the defendant were not direct competitors.  *Id.* at 666-67.

2.    **Neither Noerr-Pennington nor a legislative privilege is applicable because Morton Grove did not make the statements to governmental entities.**

Contrary to Morton Grove's claim (MG Mem. at 14-15), the *Noerr-Pennington* doctrine is inapplicable. In the cases cited by Morton Grove, the courts held that statements made to governmental agencies were not actionable. That is not the case here. NPA sued over statements Morton Grove made to doctors, medical organizations and on its public website. The case cited by Morton Grove, *Kottle v. Northwest Kidney Centers*, 146 F.3d 1056, 1059 n.3 (9th Cir. 1998), specifically states that "the Noerr-Pennington doctrine does not protect lobbying efforts directed at private organizations."[8] Similarly, the Seventh Circuit has held that: "The *Noerr-Pennington* doctrine is concerned solely with the right to attempt to influence government action. It thus immunizes only those actions directed toward governmental agencies or officials. The fact that a [party's action] may eventually provoke agency action or review does not alone call the *Noerr-Pennington* doctrine into play." *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1159-60 (7th Cir. 1983); *cf. Cardtoons v. Major League Baseball Players Ass'n*, 208 F.3d 885, 892 (10th Cir. 2000) (holding *Noerr-Pennington* inapplicable because a "letter from one private party to another private party simply does not implicate the right to petition").

Morton Grove's claim that a legislative privilege applies is equally flawed. (MG Mem. at 15-16.) As the cases Morton Grove cites make clear, that privilege applies to statements made to legislative bodies. (*Id*.) Again, Morton Grove has not been sued for making any such statements.

---

[8] Moreover, *Eazypower Corp. v. Alden Corp.*, No. 03 C 3164, 2003 WL 22859492 (N.D. Ill. Dec. 2, 2003) (App. 7), is inapposite. In *Eazypower*, the Court explained that *Noerr-Pennington* has been applied to protect patent holders who send cease and desist letters to infringers because the patent laws require such letters; therefore, the letters were reasonably related to the petitioning litigation process. *Id.* at *2-3 This is not a patent case, and no law required Morton Grove to make the statements at issue before it could sue or otherwise petition the government.

C.      Morton Grove's Statements Are Factual Assertions, Not Opinion.

Morton Grove argues that certain statements by Drs. Shwayder and Hebert are protected opinion.  (MG Mem. at 17-18.)  NPA agrees that there is a vigorous, contested debate about the safety and efficacy of lice treatments and that courts should be not be the arbiter of that debate. Accordingly, if the Court finds *McDonagh v. Bergan*, No. 03 C 1465, 2003 WL 21798735, at *3 (N.D. Ill. July 25, 2003) (App. 8), applicable to this case, the Court should dismiss Morton Grove's claims against NPA.

The statements by Drs. Shwayder and Hebert, however, do not implicate these concerns. As detailed in the counterclaim, the issue is whether Morton Grove violated the Lanham Act by posting on its websites:  (1) Dr. Shwayder's letter which implies that Morton Grove's lindane products are safe to be used on pregnant women despite the FDA's labeling guidelines that these products should be used on pregnant women only if clearly needed and that there have not been adequate studies of the safety of this product on pregnant women; and (2) Dr. Hebert's letter which implies that Morton Grove's lindane products generally are safe to use on small children despite the black box warning that these products should be used with caution on children weighing less than 110 pounds.  (CC ¶¶ 67-75.)  It is difficult to see what constitutionally protected opinion is involved.[9]  Indeed, courts routinely decide these types of issues in connection with Lanham Act claims.  *See, e.g.*, *Criticare*, 856 F. Supp. at 506-07 (holding that defendant could be liable for false advertising for showing to a potential customer a letter from

---

[9] Moreover, Morton Grove's argument is based upon outdated case law.  The Supreme Court in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17-19 (1990), rejected the old fact/opinion dichotomy in *Gertz v. Robert Welch, Inc.* 418 U.S. 323, 339-40 (1974).  Instead, a statement can be actionable unless it "cannot 'reasonably [be] interpreted as stating actual facts.'" *Milkovich*, 497 U.S. at 20 (quotation omitted).  This is the standard applied by the *McDonagh* court.  2003 WL 1798735, at *2.

one doctor to another doctor about the efficacy of plaintiff's medical product in connection with a specific case).

Furthermore, Morton Grove's claims that NPA sued over these statements to chill the doctors' free speech is without merit.  (MG Mem. at 18-19.)  NPA did not sue the doctors; it sued Morton Grove for posting those letters on its commercial website -- which it did for its own economic benefit.  And, thus, it is Morton Grove that involved the doctors in this dispute.

###    D.    Count II Sufficiently Alleges Causation.

Morton Grove's argument that "NPA has failed to properly plead causation" is incorrect.  (MG Mem. at 21.)  A plaintiff must allege that it "has been or is likely to be injured as a result of the false statement, either by a direct diversion of sales from itself to defendant or by a loss of goodwill associated with its product."  *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819 (7th Cir. 1999).  The counterclaim sufficiently pleads this element:  Morton Grove's false and misleading statements have injured NPA's goodwill in two ways:  (1) "[b]y promoting [its products] through false or misleading statements . . .  Morton Grove unfairly discredits NPA and hinders its efforts to educate the public about the dangers of lindane pesticidal treatments.  Thus, as a result of these Morton Grove statements, NPA's 25-year reputation for educating the public after safe and effective options for managing and treating headlice has been irreparably tarnished"  (CC ¶ 120); and (2) "to the extent that this Court determines that Morton Grove and NPA are competitors, Morton Grove's false and misleading advertising . . .  negatively affects NPA's LiceMeister® Comb by increasing the market share of [Morton Grove's products] at the expense of market share of the LiceMeister® Comb" (*id.* ¶ 123).

Morton Grove argues that NPA has not satisfied *Hot Wax* because it cannot show how Dr. Shwayder's statements hurt NPA because he did not mention NPA and some of the statements concern his background.  (MG Mem. at 21-22.)  As Morton Grove concedes (MG

Mem. at 8), statements can be actionable under the Lanham Act if they concern either the defendant's or plaintiff's products.  Furthermore, assuming that Morton Grove and NPA are competitors (as Morton Grove alleges), misleading statements that downplay the risks of Morton Grove's products could result in increased sales at the expense of NPA's sales.  Also, to the extent that the false statements reject the positions that NPA has taken as part of its educational mission to be a public interest provider of information concerning lice treatments, NPA's services and goodwill in that regard may be injured.

Similarly, NPA does not allege that it was injured by statements about Dr. Shwayder's background.  As explained in section I.C. above, the counterclaim alleges that the misleading aspect of Morton Grove's use of Dr. Shwayder's letter is that it suggests Morton Grove's products are safe to be used on pregnant women despite the FDA's labeling guidelines concerning such use.  (CC ¶¶ 67-71.)  Dr. Shwayder's qualifications are included only to give context to the misleading statement and because Morton Grove clearly believes (and a potential consumer might think) that Dr. Shwayder's credentials give credibility to the misleading statements.  (MG Mem. at 18 (he is one of "the nation's most highly decorated and scholarly pediatric dermatologists").)

Furthermore, Morton Grove's reliance on *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), is misplaced.  *Matsushita* is an antitrust case, not a Lanham Act case, and the issue was "the standard district courts must apply when deciding whether to grant summary judgment in an antitrust conspiracy case."  *Id.* at 576.  In so doing, the Court held that "[i]t follows from these settled [summary judgment] principles that if the factual context renders respondents' claim implausible -- if the claim is one that simply makes no economic sense -- respondents must come forward with more persuasive evidence to support their

claim[s] . . . ."  *Id.* at 587.  This, however, is a motion to dismiss where the standards and burdens are significantly different.  Moreover, NPA's counterclaim makes economic sense -- to the extent that NPA and Morton Grove are competitors, Morton Grove's misleading or false statements downplaying the risks of its own products hurt NPA.

## II.    COUNT I STATES A CLAIM UNDER THE ILLINOIS DECEPTIVE TRADE PRACTICES ACT FOR THE SAME REASONS THAT COUNT II STATES A CLAIM UNDER THE LANHAM ACT.

The parties agree that NPA's Illinois Deceptive Trade Practices Act claim ("IDTPA") should be analyzed under the same rubric as its Lanham Act claim.  (MG Mem. at 19.)  Because Count II states a claim under the Lanham Act, Count I, which is premised on the same factual assertions, states a claim under the IDTPA.  Morton Grove then curiously argues that the IDTPA is more limited than the Lanham Act.  Morton Grove argues that certain statements are not actionable because they are not about Morton Grove's goods and services, but instead are about personal experiences of certain doctors.  (MG Mem. at 20.)  As explained above, NPA is suing only on the portion of those statements that relate to Morton Grove's products.

Morton Grove also argues that two of the statements are not actionable because they do not mention Morton Grove's products.  (MG Mem. at 20.)  However, to be actionable, the statements do not have to refer to Morton Grove's products; they can refer to NPA's business or products.  *See, e.g.*, *M&R Printing Equip., Inc. v. Anatol Equip. Mfg. Co.*, 321 F. Supp. 2d 949, 952 (N.D. Ill. 2004).  Furthermore, the statement in Paragraph 111 specifically refers to Morton Grove's own product.  Moreover, to the extent that Morton Grove is arguing that the statements are not actionable because they disparage NPA's business as opposed to NPA's products, this argument is belied by the plain language of the IDTPA which includes disparagement of "goods, services or business of another by false or misleading misrepresentations of fact."  815 ILCS 510/2(8) (2008).

These terms have been broadly interpreted. In *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 918-19 (N.D. Ill. 2007), the plaintiff sued under the IDTPA because on their website, the defendants falsely accused one plaintiff, "who is in the real estate business, of using a close circuit video camera for illegal and/or sexually motivated purposes and recording private activities through tenants' windows at night." The Court denied the defendants' motion to dismiss, holding that the plaintiffs had sufficiently stated a cause of action. *Id.* at 919. Applying this standard, Morton Grove's statements -- accusing NPA of making false statements about the efficacy of Morton Grove's product because NPA stands to profit from selling its comb -- disparage NPA's business and products.

Finally, Morton Grove argues that the statements concerning its own products do not disparage NPA's products. Not only is this inconsistent with Morton Grove's first argument that the statements need to mention its product, but it also is inconsistent with the law. A party can disparage another's product by making misleading statements about its own product. *See Native Am. Arts, Inc. v. Chico Arts, Inc.*, 8 F. Supp. 2d 1066, 1069 (N.D. Ill. 1998) (denying motion to dismiss IDTPA claim based upon misleading statement about own product).

III.    **MORTON GROVE'S SUGGESTION IN ITS CONCLUSION THAT THE COURT CONSIDER SANCTIONS UNDER RULE 11 IS IMPROPER AND WITHOUT MERIT.**

In its conclusion, Morton Grove suggests that "[t]he Court should further consider Rule 11(c)(3) and order the NPA and its counsel to show cause why its conduct has not violated Rule 11(b)." (MG Mem. at 23.) Morton Grove's request is improper because it fails to comply with Federal Rule of Civil Procedure 11, which requires: "(1) that a request for sanctions be made in a separate motion rather than as an appendage to another motion or responsive memorandum, and (2) that the party to be sanctioned be given a twenty-one day safe harbor in which to withdraw or correct the allegedly offending filing." *Corley v. Rosewood Care Ctr., Inc. of*

*Peoria*, 142 F.3d 1041, 1058 (7th Cir. 1998) (citing Fed. R. Civ. P. 11(c)(1)(A)).  Morton Grove

did neither.  For this reason alone, Morton Grove's request should be denied.  *See, e.g.*, *id.* at

1058-59 (vacating award of sanctions, holding that district court abused its discretion because

defendants failed to comply with Rule 11's procedural requirements); *Johnson v. Waddell &*

*Reed, Inc.*, 74 F.3d 147, 151 (7th Cir. 1996) (vacating sanctions award based upon request in

motion to dismiss because "the inclusion of a request for sanctions as part of [the party's]

memorandum in support of its motion to dismiss obviously does not meet the notice requirement

imposed by Rule 11(c)(1)(A)").  Morton Grove's attempt to circumvent these procedural

requirements by inviting the Court to proceed under Rule 11(c)(3) should be rejected.  However

"packaged," Morton Grove's invitation is plainly a request for sanctions governed by the

procedural requirements of Rule 11.

Moreover, while Morton Grove does not specifically identify the basis for its sanctions

request -- an independent ground for denying sanctions[10] -- it appears to be based on Morton

Grove's belief that it should prevail on its motion to dismiss.  Assuming that this is the case, it is

not a valid basis for sanctions.  Instead, a "[p]otential violation of Rule 11 is analyzed under a

negligence standard and turns on whether the conduct was objectively reasonable." *Papa John's*

*Int'l, Inc. v. Rezko*, No. 04 C 3131, 2006 WL 566468, at *2 (N.D. Ill. Mar. 3, 2006) (denying

motion for sanctions) (App. 9).  Furthermore, a "sanction will not be imposed unless a specific

allegation is utterly devoid of support." *Harding Univ. v. Consulting Servs. Group*, 48 F. Supp.

2d 765, 769 (N. D. Ill. 1999) (denying motion for sanctions).

---

[10] S*ee Nagel v. ADM Investor Servs., Inc.*, 65 F. Supp. 2d 740, 756 (N.D. Ill. 1999) (failure to cited alleged Rule 11 violations with specificity waived movant's claim for sanctions), *aff'd*, 217 F.3d 436 (7th Cir. 2000).

Morton Grove has not come close to meeting this standard. As explained in detail above, Morton Grove's argument mischaracterizes the allegations in NPA's counterclaim, and NPA's claims under the Lanham Act and the IDTPA concerning Morton Grove's statements to doctors, medical organizations and on its websites are well supported by existing case law. Therefore, Morton Grove's request for sanctions should be denied. *See, e.g.*, *Hartmarx Corp. v. Abboud*, 326 F.2d 862, 868 (7th Cir. 2003) (reversing sanctions award, holding that as long as party took "a reasonable legal position on the meaning" of the law, "it should not be sanctioned even if the district court concluded that [the other party] had the better reading").

## <u>CONCLUSION</u>

As demonstrated above, Morton Grove's motion to dismiss is premised on factual assertions that are directly contrary to the well-pleaded allegations of the counterclaim. Applying the proper standards for a motion to dismiss, it is clear that NPA's counterclaim states claims under both the Lanham Act and the Illinois Deceptive Trade Practices Act. Thus, Morton Grove's motion to dismiss should be denied.

Dated: July 24, 2008                                  Respectfully Submitted,

Debbie L. Berman (#6205154)               THE NATIONAL PEDICULOSIS
Amanda S. Amert (#6271860)                 ASSOCIATION, INC.
Wade A. Thomson (#6282174)
April A. Otterberg (#6290396)
JENNER & BLOCK LLP                          By:    s/ Debbie L. Berman
330 N. Wabash Avenue                                   One of Its Attorneys
Chicago, Illinois  60611
312-222-9350

## <u>CERTIFICATE OF SERVICE</u>

I, Debbie L. Berman, hereby certify that on July 30, 2008, I caused copies of the

foregoing **Opposition to Morton Grove Pharmaceuticals, Inc.'s Motion to Dismiss the**

**National Pediculosis Association, Inc.'s Counterclaim,** and its accompanying exhibits and

appendix, to be served upon the following via electronic filing through the CM/ECF system:

Timothy Joseph Rivelli (*trivelli@winston.com*)
W. Gordon Dobie (*wdobie@winston.com*)
William Charles O'Neil (*woneil@winston.com*)
Cherish M. Keller (*ckeller@winston.com*)
WINSTON & STRAWN, LLP
35 West Wacker Drive
41st Floor
Chicago, IL  60601
Telephone:  (312) 558-5600
Facsimile:  (312) 558-5700


                    s/ Debbie L. Berman