## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

MORTON GROVE )
PHARMACEUTICALS, INC., )
            ) No. 08-CV-1384
        Plaintiff, )
            ) Judge Bucklo
vs. ) Magistrate Judge Mason
            )
THE NATIONAL PEDICULOSIS ) **JURY TRIAL DEMANDED**
ASSOCIATION, INC., )
            )
        Defendant. )

**OPPOSITION TO MORTON GROVE PHARMACEUTICALS, INC.'S MOTION TO DISMISS THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'S COUNTERCLAIM**

## APPENDIX OF UNPUBLISHED CASES

App. 1    *Republic Tobacco v. North Atl. Trading Co.*, No. 98 C 4011, 1999 WL 261712 (N.D. Ill. Apr. 9, 1999)

App. 2    *Health Care Compare Corp. v. United Payors & United Providers, Inc.*, No. 96 C 2518, 1998 WL 122900 (N.D. Ill. Mar. 13, 1998)

App. 3    *Healthport Corp. v. Tanita Corp. of Am.*, No. 06-419-PK, 2008 WL 2224398 (D. Or. May 23, 2008)

App. 4    *Midwest Canvas Corp. v. Commonwealth Canvas, Inc.*, No. 07 C 0085, 2008 WL 162757 (N.D. Ill. Jan. 16, 2008)

App. 5    *Patient Transfer Sys., Inc. v. Patient Handling Solutions, Inc.*, No. CIV.A. 97-1568, 2001 WL 936641 (E.D. Pa. Aug. 16, 2001)

App. 6    *MasterCard Int'l, Inc. v. Nader 2000 Primary Comm., Inc.*, No. 00 Civ. 6068, 2004 WL 434404 (S.D.N.Y. Mar. 8, 2004)

App. 7    *Eazypower Corp. v. Alden Corp.*, No. 03 C 3164, 2003 WL 22859492 (N.D. Ill. Dec. 2, 2003)

App. 8    *McDonagh v. Bergan*, No. 03 C 1465, 2003 WL 21798735 (N.D. Ill. July 25, 2003)

App. 9    *Papa John's Int'l, Inc. v. Rezko*, No. 04 C 3131, 2006 WL 566468 (N.D. Ill. Mar. 3, 2006)

# APPENDIX 1

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 1999 WL 261712 (N.D.Ill.), 1999-1 Trade Cases P 72,554
**1999 WL 261712 (N.D.Ill.)**

**H**Republic Tobacco, L.P. v. North Atlantic Trading Co.
N.D.Ill.,1999.

United States District Court, N.D. Illinois, Eastern Division.
REPUBLIC TOBACCO, L.P., Plaintiff,
v.
NORTH ATLANTIC TRADING COMPANY et al., Defendants.
**No. 98 C 4011.**

April 9, 1999.

MEMORANDUM OPINION

GRADY, District J.

*1 Before the court are two motions: defendants' motion to dismiss Counts I, IV, V, VII, VIII, IX, and X of the amended complaint and plaintiff's motion to strike defendants' counterclaim. For the reasons stated in this opinion, defendants' motion to dismiss is granted in part and denied in part. Plaintiff's motion to strike, more appropriately characterized as a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, is granted.

BACKGROUND

Plaintiff Republic Tobacco, L.P. ("Republic") is a Delaware limited partnership with its principal place of business in Chicago, Illinois. Republic imports and sells tobacco, roll-your-own ("RYO") cigarette papers, and other tobacco-related products. Defendant North Atlantic Trading Company, Inc. ("NATC"), Republic's direct competitor in the tobacco and tobacco-related products market, is a Delaware corporation headquartered in New York. Defendants North Atlantic Operating Company, Inc. ("NAOC") and National Tobacco Company, L.P. ("National") are wholly-owned subsidiaries of NATC. NAOC imports RYO cigarette papers and other tobacco-related products sold under the "ZIG-ZAG" brand name. National distributes and sells ZIG-ZAG cigarette papers, Beech-Nut loose leaf chewing tobacco, and other tobacco-related products. We will refer to all defendants collectively as "North

Atlantic" where appropriate. The following allegations are taken from Republic's amended complaint.

*Incentive Programs*

Republic and North Atlantic market their RYO cigarette paper primarily through distributors and wholesalers, who resell the products to outlets such as convenience, drug, and variety stores and gas station/mini-marts. As part of its marketing strategy, Republic offers three programs to these customers as incentives to stock, sell, (and promote, in the case of distributors) Republic's products. Customers joining these incentive programs can receive rebates, free products, and free travel in exchange for stocking or promoting specified amounts of certain Republic RYO cigarette paper brands and meeting certain sales goals.[FN1] Amended Complaint, Exs. A-D (sample incentive program agreements).

> FN1. The Republic Value-Added Rebate Incentive Program provides incentives to distributors for stocking, promoting, and selling Republic products to their retail accounts. Amended Complaint, ¶ 12. The Republic Convenience Store Distribution Incentive Program provides incentives to convenience stores for stocking and selling Republic products. Id. ¶ 13.The Republic Travel Plus Program, open to both distributors and convenience stores, offers "points" to be used toward trips, such as cruises. Id. ¶ 14 & Exs. C, D.

*Display Boxes*

North Atlantic and its predecessors sometimes sold their RYO cigarette papers in limited promotional runs, packaged in a plastic display box.[FN2] Customers received ownership of the display box in return for buying the products inside. Some of Republic's customers wanted to use these boxes to display and sell Republic's RYO cigarette papers, so Republic obtained unused boxes from third-party distributors. Republic then re-labeled the boxes with its own labels, restocked the boxes with its products, and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 261712 (N.D.Ill.), 1999-1 Trade Cases P 72,554
**1999 WL 261712 (N.D.Ill.)**

made them available to the customers who had requested them.[FN3]

> FN2. Most of the display boxes are off-white; some are colored.*Id*.¶ 17.

> FN3. Republic also alleges that its sister company, Adams Apple Distributing Company, purchased some of the display boxes directly from U.S. Tobacco, without any restrictions on the use of the boxes. At the time, U.S. Tobacco was the national importer and distributor of ZIG-ZAG cigarette papers; Jack Africk, who is now president of North Atlantic, was U.S. Tobacco's Vice-Chairman and Executive Vice President. *Id.* ¶ 19.

*Disparaging Remarks*

Republic alleges that North Atlantic engaged in an unlawful "pattern of anticompetitive conduct" by making disparaging remarks to Republic's customers regarding Republic's incentive programs and display boxes. Republic claims that North Atlantic contacted Republic's customers, both orally and in writing, and falsely told those customers that Republic's incentive programs violated federal and state antitrust and unfair competition laws. Republic claims that "North Atlantic's statements were designed to interfere with Republic's customer relationships by causing customers to be concerned about the legality of the programs and to believe that Republic would be unable to honor its obligations under the programs ."*Id.* ¶ 16.

*2 Moreover, Republic contends that North Atlantic contacted many of Republic's customers and falsely told those customers that Republic's refurbishment of the display boxes violated patent and trademark laws. Republic claims that North Atlantic threatened those customers by stating that the customers might be sued for continuing to use the display boxes. Republic also alleges that North Atlantic threatened to sue display box distributors if the distributors sold any display boxes to Republic in the future, even those distributors who had never sold display boxes to Republic in the first place.*Id.* ¶ 20.

Republic alleges that North Atlantic made unlawful disparaging remarks on several occasions. First, John Czerewko, North Atlantic's director of sales for the Midwest, sent a letter in late January 1998 to Clark Refining and Marketing Company ("Clark"), which sells Republic's products to customers of its gas station/convenience stores. *Id.* ¶¶ 22-23.The letter reads:

Recently, another Chain was positioned for exclusivity and a modified, defaced Zig Zag [display box] was used. We own the patent-trademark which has been violated. Our Attorneys initiated legal action regarding this and had to include the Chain [that had used the display box] in Trademark-Patent violation.

*Id.,* Ex. E ("Czerewko Letter"). Republic contends that these statements were false because North Atlantic held no patent or trademark rights in the boxes and had not initiated litigation against anyone in connection with the display boxes. Republic also asserts that the Czerewko letter falsely hints that Republic's incentive programs are illegal by referring to the programs as "Smoke & Mirrors" and warning Clark to "[b]e aware of the Robinson-Patman Act."[FN4]

> FN4. The Robinson-Patman Act, 15 U.S.C. § 13(a)-(f), prohibits certain price discrimination by a seller among its customers.

Republic alleges that Clark forwarded the Czerewko letter to Clark's supplier, Eby-Brown, which buys products directly from Republic, and that Eby-Brown discontinued its participation in Republic's incentive programs after receiving the letter. Eby-Brown sent a memorandum to Republic in late May 1998, which stated that North Atlantic had notified Eby-Brown that it intended to take legal action to enforce its patents in the display boxes.[FN5]*Id.,* Ex. F. Republic alleges that Eby-Brown discussed the memorandum with Clark and that Clark subsequently discontinued its participation in Republic's incentive programs as well.[FN6]

> FN5. Republic claims that North Atlantic also told other Republic customers that it was suing Republic in connection with the relabeled display boxes.

> FN6. Republic states that Eby-Brown and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Clark were longtime participants in its incentive programs. *Id.* ¶ 34.

Furthermore, Republic claims that Jay Martin, North Atlantic's chief operating officer, told representatives of five nationwide tobacco-product distributors (who were also Republic's customers) that Republic's programs were illegal. This statement allegedly occurred at a meeting in Chicago in late July 1998. Republic asserts that Martin also told the representatives that North Atlantic had initiated litigation against Republic, but Martin failed to tell them that Republic had first filed the instant case. Less than two months after the meeting, Garber Brothers, Inc., one of the distributors represented at the meeting, discontinued its participation in Republic's incentive programs and told Republic it anticipated no future purchases of Republic's JOB brand cigarette papers. *Id.* ¶¶ 37-40.

**\*3** Republic also alleges that, in mid-August 1998, North Atlantic sent a letter (the "August letter") to its customers, many of whom are also Republic customers. The August letter states that North Atlantic filed a lawsuit against Republic in Kentucky, and describes North Atlantic's allegations in that suit.[FN7] The allegations address, among other things, Republic's incentive programs and use of the display boxes. *Id.,* Ex. G. Republic asserts that the August letter falsely suggests that Republic will be unable to honor its obligations under its incentive programs, and that customers who received the letter are now concerned about the status of Republic's incentive programs.*Id.* ¶¶ 41-43.

> FN7. Republic notes that the August letter failed to mention the instant action. *Id.* ¶ 44.

Republic contends that North Atlantic's alleged misstatements have caused Republic to lose sales and have discouraged Republic's customers from participating in its incentive programs. *Id.* ¶ 46.

*Pricing Practices*

Republic also alleges that North Atlantic has engaged in anticompetitive pricing practices. The amended complaint states that "North Atlantic has leveraged ZIG-ZAG's market power to increase prices much faster than the rate of inflation."*Id.* ¶ 51.Republic claims that North Atlantic "prices products of like

grade and quality differently" and that it uses this differential pricing to reinforce its market share. *Id.* ¶ 52.Republic also asserts that North Atlantic uses "leveraging tactics," such as making promotions of one product available only to customers who agree to purchase other products, to add new distributors and retailers. *Id .* ¶ 54-55.

*The Pending Actions*

On June 30, 1998, Republic filed a four-count complaint in the instant case against NATC and NAOC. After NATC and NAOC moved to dismiss several counts of the complaint, we gave Republic leave to amend. Republic filed an amended complaint on September 16, 1998, which added National as a defendant.

On July 15, 1998, NAOC and National filed an action against Republic and its affiliated companies in the United States District Court for the Western District of Kentucky (the "Kentucky action"), primarily alleging antitrust violations. The two pending actions have some overlapping facts; thus, all matters relating to discovery in both cases are being heard in this court.[FN8]

> FN8. In a minute order dated September 2, 1998, we denied defendants' motion to transfer or stay these proceedings.

In the instant case, Republic seeks declaratory relief regarding patent noninfringement (Count I) and trademark noninfringement (Count II). It also seeks declaratory relief that its incentive programs do not violate federal antitrust laws (Count III). Republic alleges a variety of other claims against defendants, including tortious interference with customer relationships (Count IV); false advertising in violation of the Lanham Act (Count V); violation of the Uniform Deceptive Trade Practices Act (Count VI); violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count VII); defamation (Count VIII); unfair competition (Count IX); and unlawful monopolization and attempted monopolization in violation of the Sherman Act (Count X). North Atlantic moves to dismiss Counts I, IV, V, VII, VIII, IX, and X for failure to state a claim upon which relief can be granted.

**\*4** Furthermore, North Atlantic has asserted a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 261712 (N.D.Ill.), 1999-1 Trade Cases P 72,554
**1999 WL 261712 (N.D.Ill.)**

counterclaim in this case, which Republic moves to "strike." Republic's motion is more appropriately characterized as a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted, and we treat it accordingly.

## DISCUSSION

### A. Defendants' Motion to Dismiss

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356, at 294 (2d ed.1990). When evaluating such a motion, the court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Jang v. A.M. Miller & Assocs.,* 122 F.3d 480, 483 (7th Cir.1997); *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1429 (7th Cir.1996). Dismissal is appropriate only if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." ' *Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir.1997) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73 (1984)); *Jones v. General Elec. Co.,* 87 F.3d 209, 211 (7th Cir.), *cert. denied,* 117 S.Ct. 510 (1996).

The Seventh Circuit has held that, under the liberal system of notice pleading envisioned by Federal Rule of Civil Procedure 8,

complaints need not contain elaborate factual recitations. They are supposed to be succinct.... Any need to plead facts that, if true, establish each element of a "cause of action" was abolished by the Rules of Civil Procedure in 1938, which to signify the radical change from code pleading also replaced "cause of action" with "claim for relief." One pleads a "claim for relief" by briefly describing the events. At this stage the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.

*Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir.1994) (citations omitted), *cert. denied,* 516 U.S. 1159 (1996).

Count I-Declaratory Relief Regarding Patent

Infringement

In Count I of its amended complaint, Republic seeks declaratory relief pursuant to 28 U.S.C. § 2201(a)-specifically, a declaration that North Atlantic holds no valid patent in the cigarette paper display boxes, that Republic has not infringed any valid patent in them, and that the display boxes may be used by Republic and its customers "for whatever lawful purpose they desire."Amended Complaint at 16.

North Atlantic argues that it does not claim that it has a patent for the display boxes and that we should dismiss this count because it presents no "actual controversy" as required by 28 U.S.C. § 2201 to award relief.[FN9] North Atlantic submits the affidavit of Jeffrey S. Hay, Executive Vice President and General Counsel of NATC and NAOC. Defendants' Memorandum in Support of Motion to Dismiss Counts I, IV, V, VII, VIII, IX and X of the Amended Complaint ("Defendants' Memorandum"), Ex. A ("Hay Affidavit"). Hay states that "on June 3, 1998, I specifically informed Seth I. Gold, Republic's Executive Vice President and in-house counsel, that North Atlantic did not claim any patent rights in the [display boxes] and that North Atlantic patent rights were not at issue in the dispute between North Atlantic and Republic."Hay Affidavit, ¶ 4.

> FN9. Thus, North Atlantic's motion to dismiss Count I is not a Rule 12(b)(6) motion for failure to state a claim; rather, it is a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. When considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a district court accepts as true all well-pled factual allegations and draws reasonable inferences from the allegations in favor of the plaintiff. *Capitol Leasing Co. v. FDIC,* 999 F.2d 188, 191 (7th Cir.1993). The court may also look beyond the allegations of the complaint and consider affidavits and other documentary evidence to determine whether subject matter jurisdiction exists. *Id.*

**\*5** The Declaratory Judgment Act, 28 U.S.C. § 2201, allows federal courts to render declaratory judgments only when an "actual controversy" exists. *Crown Drug Co. v. Revlon, Inc.,* 703 F.2d 240, 243 (7th

Not Reported in F.Supp.2d                                                                                            Page 5
Not Reported in F.Supp.2d, 1999 WL 261712 (N.D.Ill.), 1999-1 Trade Cases P 72,554
**1999 WL 261712 (N.D.Ill.)**

Cir.1983)."[T]he question ... is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment."*Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273 (1941)." 'The defendant must have engaged in conduct giving rise to a reasonable apprehension on plaintiff's part that it will face ... suit or the threat of one if it commences or continues the activity in question." ' *Trippe Mfg. Co. v. American Power Conversion Corp.,* 46 F.3d 624, 627 (7th Cir.1995) (quoting *International Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1210 (7th Cir.1980)). "The focus of the inquiry must rest on the defendant's statements and conduct ...." *Id.*Because the crucial date for determining whether a federal court has jurisdiction is the date the complaint was filed, *see Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 734 n. 2 (Fed.Cir.1988), we must confine our analysis to factual developments occurring before the June 30, 1998 filing of the complaint.

Republic argues that North Atlantic's statements to Republic's customers regarding its patent rights, coupled with its direct threats of filing suit against Republic for violating unspecified laws, gave Republic a "reasonable apprehension" at the time of filing this suit "that North Atlantic would continue to harass its customers and threaten litigation without seeking judicial resolution of the parties' dispute."Plaintiff Republic Tobacco, L.P.'s Response Brief in Opposition to Defendants' Motion to Dismiss Counts I, IV, V, VII, IX and X of the Amended Complaint ("Response") at 9-10.[FN10]Perhaps this is true, but the key question is whether Republic had a reasonable apprehension of *litigation* itself-more specifically, litigation regarding a patent claim made by North Atlantic.

> FN10. Apparently, Republic inadvertently omitted "Count VIII" from the title of its Response.

We consider relevant the fact that Hay, North Atlantic's general counsel, told Gold, Republic's in-house counsel, that there were no patent rights at issue regarding the display boxes. Hay states that he specifically told Gold so on June 3, 1998.[FN11]These circumstances strongly suggest that Republic did not

have a reasonable apprehension that it would face a patent infringement suit with respect to the display boxes.

> FN11. The statements would therefore negate any impression to the contrary created by the Czerewko letter, which was sent in late January 1998. Thus, we need not consider whether Czerewko even had the authority to make charges of patent infringement.

More importantly, there is no evidence that North Atlantic holds a patent for the display boxes. And no justiciable case or controversy exists where there is no issued patent for the court to declare "invalid" or "not infringed":

[D]efendant argues that ... nowhere in the patent laws is a cause of action created for the alleged infringement of an invention that has never been patented. Accordingly, since defendant could not sue under the patent laws for damages for infringement of a nonexistent patent, plaintiff may not use the declaratory judgment device to accomplish the same result. This court must agree with this contention.

**\*6** *Pittway Corp. v. BRK Shareholders' Comm.,* 444 F.Supp. 1210, 1214 (N.D.Ill.), *aff'd,*588 F.2d 835 (7th Cir.1978) (citation omitted); *see also* *GAF Bldg. Materials Corp. v. Elk Corp.,* 90 F.3d 479, 482 (Fed.Cir.1996) ( "We ... hold that a threat is not sufficient to create a case or controversy unless it is made with respect to a patent that has issued before a complaint is filed ."). Accordingly, Count I is dismissed.

Count IV-Tortious Interference with Customer Relationships

In Count IV of its amended complaint, Republic alleges that defendants tortiously interfered with its customer relationships. Republic claims that North Atlantic wrongfully induced Republic's customers to end or diminish certain business relationships with Republic, leading to lost sales. This tort generally is recognized in Illinois as "tortious interference with prospective economic advantage."*See, e.g., Dowd & Dowd, Ltd. v. Gleason,* 693 N.E.2d 358 (Ill.1998).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 1999 WL 261712 (N.D.Ill.), 1999-1 Trade Cases P 72,554
**1999 WL 261712 (N.D.Ill.)**

To state a claim for tortious interference with prospective economic advantage, a plaintiff must allege four elements: 1) a reasonable expectation of a valid business relationship or economic advantage; (2) the defendant's knowledge of the expectancy; (3) purposeful interference by the defendant that defeats the expectancy; and (4) damages to the plaintiff resulting from the interference. *See Douglas Theater Corp. v. Chicago Title & Trust Co.,* 641 N.E.2d 584, 590 (Ill.App.Ct.1994).

North Atlantic argues that Republic fails to allege the requisite interference because the interference must induce a breach or termination of the business relationship or expectancy. North Atlantic contends that Republic has not alleged that any of Republic's customers stopped doing business with Republic altogether; rather, Republic has only alleged that certain customers stopped participating in its incentive programs and that one customer told Republic it did not anticipate further purchases of a certain brand of Republic cigarette papers.

North Atlantic cites several Illinois cases that purportedly support its strict view that Republic must allege that a customer ceased doing business with it altogether. However, those cases merely stand for the proposition that "the interference complained of must induce or cause a breach or termination of the relationship or expectancy."*Heying v. Simonaitis,* 466 N.E.2d 1137, 1141 (Ill.App.Ct.1984). Nowhere do the Illinois cases say that the interference complained of must cause a complete termination of the entire business relationship between plaintiff and a third party. The cases refer, significantly, to a relationship *or* expectancy.

Even if the Illinois cases did require a complete termination of a business relationship, Republic's amended complaint would still pass muster under the liberal standards of federal notice pleading. While a plaintiff in state court might be required to allege all facts necessary to recover under his chosen legal theory, that is not the case in federal court. *See Albiero v. City of Kankakee,* 122 F.3d 417 (7th Cir.1997). In the federal notice pleading system, a claim should not be dismissed so long as it is possible to hypothesize facts, consistent with the complaint, that would make out a claim for relief. Not only is it possible, but it is easy for the court to hypothesize that one or more of Republic's customers terminated

its relationship with Republic as a result of the alleged actions of North Atlantic. Accordingly, defendants' motion to dismiss is denied as to Count IV.

Count V-Lanham Act

**\*7** In Count V of its amended complaint, Republic alleges that North Atlantic made false statements to Republic's customers regarding Republic's incentive programs and use of the display boxes, and thereby violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

The Lanham Act provides a cause of action for false description or presentation, known as a "false advertising" claim. Section 43(a) of the Lanham Act provides in relevant part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which-

...

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). A statement constitutes "commercial advertising or promotion" when it is "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendants' goods or services; and (4) disseminated sufficiently to the relevant purchasing public."*See Liberty Tel. Co. v. Burke,* No. 96 C 50381, 1997 WL 177140, at *5 (N.D.Ill. Mar. 31, 1997) (citing *Seven-Up Co. v. Coca-Cola Co.,* 86 F.3d 1379, 1384 (5th Cir.1996)).

The only factor at issue here is whether North Atlantic's statements were disseminated sufficiently to the relevant purchasing public. North Atlantic contends that all the alleged statements were not

Not Reported in F.Supp.2d                                      Page 7
Not Reported in F.Supp.2d, 1999 WL 261712 (N.D.Ill.), 1999-1 Trade Cases P 72,554
**1999 WL 261712 (N.D.Ill.)**

made to the purchasing public, but rather to "middlemen" in the distribution chain. Reply at 6. North Atlantic also contends that "an isolated letter or other communication is not 'advertising' or 'promotion' under the Lanham Act."Defendants' Memorandum at 5. North Atlantic relies primarily on _American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,_ 820 F.Supp. 1072 (N.D.Ill.1993), where the court held that a single letter, privately addressed to a non-consuming licensor of sports-logo head wear, did not constitute commercial advertising or promotion._Id._ at 1078.But _American Needle_ also recognized that "[t]he level of circulation required to constitute advertising and promotion will undeniably vary from industry to industry and from case to case."_Id._ The resolution of the issue depends on how an industry advertises or promotes its goods or services, and in some cases, "where the potential purchasers in the market are relatively limited in number, a single promotional presentation may be enough to trigger the protections of section 1125(a)."_Liberty Tel.,_ 1997 WL 177140, at *5. Thus, whether North Atlantic's statements constituted advertising or promotion depends on how Republic and North Atlantic's industry advertises or promotes RYO cigarette papers and on the size of their relevant purchasing public.

**\*8** North Atlantic's arguments are unpersuasive. First, Republic does not base its Lanham Act claim on a single, privately addressed letter, as was the case in _American Needle._Rather, Republic claims that North Atlantic made false and misleading statements on several different occasions. Moreover, North Atlantic conveniently glosses over the word "relevant" in the term "relevant purchasing public." The Lanham Act does not require allegedly false statements to reach the ultimate consumer before they are actionable. _See American Needle,_ 820 F.Supp. at 1077;_Health Care Compare Corp. v. United Payors & United Providers, Inc.,_ No. 96 C 2518, 1998 WL 122900, at *4 (N.D.Ill. Mar. 13, 1998) ("We think it is enough if the false advertising is directed to an identifiable group that the advertiser seeks to persuade for the purpose of enhancing its competitive position, directly or indirectly, with the consuming public."). We can infer from the amended complaint that the promotion and marketing of RYO cigarette papers is directed at distributors, wholesalers, and retailers. Amended Complaint, ¶¶ 5-6. Therefore, those "middlemen" are the relevant purchasing public for Lanham Act purposes. Furthermore, Republic alleges

that North Atlantic's statements were made to a substantial number of the middlemen. _Id._ ¶ 72.These allegations sufficiently state a claim under § 43(a) of the Lanham Act.

North Atlantic also argues, to no avail, that the statements it allegedly made do not fall within the category of speech governed by § 43(a) of the Lanham Act because they "do not address Republic's goods or services."Defendants' Memorandum at 6. The plain language of § 43(a) provides a remedy for misrepresentations relating to "goods, services, _or commercial activities._ " 15 U.S.C. § 1125(a)(1)(B) (emphasis added).FN12 North Atlantic's alleged misrepresentations relate to Republic's incentive programs and use of the display boxes, which constitute "commercial activities." North Atlantic's motion to dismiss is denied as to Count V.

> FN12. The Trademark Law Revision Act of 1988, amending and expanding § 43(a) of the Lanham Act, added the "commercial activities" language.

Count VII-Illinois Consumer Fraud and Deceptive Business Practices Act

In Count VII of its amended complaint, Republic alleges that defendants' false and misleading statements to Republic's customers about Republic's trade programs and refurbished display boxes constituted unfair and deceptive business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Consumer Fraud Act"), 815 Ill. Comp. Stat. Ann. § 505/2. North Atlantic argues that, for a dispute between two businesses to fall within the protections of the act, the alleged conduct must implicate consumer protection concerns. Defendants' Memorandum at 8. North Atlantic asserts that Republic fails to state a claim under the Consumer Fraud Act by failing to allege this consumer nexus.

The Consumer Fraud Act provides in relevant part:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 261712 (N.D.Ill.), 1999-1 Trade Cases P 72,554
**1999 WL 261712 (N.D.Ill.)**

concealment, suppression or omission of such material fact ... are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

**\*9**  815 Ill. Comp. Stat. Ann. 505/2.

Claims under the Consumer Fraud Act must meet the consumer nexus test by alleging that the complained-of conduct "involves trade practices directed to the market generally or otherwise implicates consumer protection concerns."*Athey Prods. Corp. v. Harris Bank Roselle,* 89 F.3d 430, 436-37 (7th Cir.1996); *see also Brody v. Finch Univ. of Health Sciences/The Chicago Med. Sch.,* 698 N.E.2d 257, 269 (Ill.App.Ct.1998); *Lake County Grading Co. v. Advance Mechanical Contractors, Inc.,* 654 N.E.2d 1109, 1115-16 (Ill.App.Ct.1995).

Republic argues that the amended complaint alleges that North Atlantic's misrepresentations were directed to the market generally-the "relevant consuming public" of Republic's products, distributors and retailers. Response at 16. We are unpersuaded. Alleged statements to distributors and retailers do not constitute the required connection to consumers. Republic also argues that "North Atlantic's false statements also implicate consumer protection concerns by wrongfully diverting sales from Republic, thereby affecting the supply of Republic's products available for purchase by consumers."*Id.* at 17. This claimed consumer connection is far too indirect to satisfy the consumer nexus requirements. Because the amended complaint fails to identify any misrepresentation by defendants which affected a consumer or implicated consumer protection concerns, it does not state a claim under the Consumer Fraud Act. It may be, however, that Republic could supply these missing allegations in an amended Count VII. Therefore, North Atlantic's motion to dismiss Count VII is granted, with leave to amend granted to Republic to allege facts showing a consumer nexus if it can do so.

Count VIII-Defamation

North Atlantic next challenges Count VIII of Republic's amended complaint, which alleges that North Atlantic's false statements to Republic's customers about the display boxes and incentive programs damaged Republic's reputation, sales, and customer relationships.

Under Illinois law, the elements of a claim for defamation are (1) a false statement concerning plaintiff; (2) defendant's unprivileged publication of that statement to a third party; and (3) damage to the plaintiff. See *Krasinski v. United Parcel Service, Inc.,* 530 N.E.2d 468, 471 (Ill.1988).

North Atlantic first argues that the amended complaint does not allege the first element of defamation-that North Atlantic made false statements. North Atlantic contends that the August letter simply states that North Atlantic's "*complaint alleges* " that Republic's activities are illegal, and that this statement is true because "North Atlantic *has* filed a complaint and that complaint *does* allege that Republic's ... practices are unlawful."Defendants' Memorandum at 9.

An examination of the August letter reveals that each sentence that refers to the allegations in the Kentucky action does begin with a phrase similar to "the complaint alleges." But it is plain that North Atlantic was conveying the substance of its allegations to Republic's customers, not the mere fact that the allegations had been made. And it is the substance of those allegations that Republic is claiming to be false. North Atlantic cannot preface defamatory statements with the words "the complaint alleges" and then claim that the statements are literally true. We hold, therefore, that Republic's allegations of falsity in relation to the August letter, in addition to the Czerewko letter and the Martin meeting, are sufficiently pleaded.

**\*10** North Atlantic also contends that Republic cannot state a claim of defamation based on the August letter, the Czerewko letter, or the Martin meeting statements because each of those communications was absolutely privileged as related to a judicial proceeding. This argument fails. North Atlantic accurately states that, under Illinois law, statements made preliminary to or during a judicial proceeding are absolutely privileged if the statements relate to the proceeding. *See Bushell v. Caterpillar, Inc.,* 683 N.E.2d 1286, 1287-88 (Ill.App.Ct.1997). But North Atlantic fails to recognize that the privilege applies only when the defendant is acting in furtherance of some interest of social importance.[FN13]The privilege does not apply if the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

statements are made to parties not involved in the suit or through improper channels. *See Thomas v. Petrulis,* 465 N.E.2d 1059, 1064 (Ill.App.Ct.1984). Here, the statements were made to third parties. Moreover, there is some dispute over whether they related to proposed litigation. The court cannot determine on a motion to dismiss whether the alleged statements were pertinent to proposed litigation.

> FN13. And in its Reply, North Atlantic makes a misleading statement in reference to this court's opinion in *Jernryd v. Nilsson,* No. 84 C 7551, 1985 WL 3590, at *17 (N.D.Ill. Nov. 8, 1985). North Atlantic states: "In *Jernryd,* this Court recognized that the judicial privilege protects all statements, regardless of their purpose, if they are relevant to proposed or pending litigation."Reply at 13. But North Atlantic fails to acknowledge our statement just four sentences below: "[I]f the statements are made to parties not involved in the suit or through improper channels, the privilege does not apply."North Atlantic should be more careful in its citation of authority.

Defendants' motion to dismiss is denied as to Count VIII.

Count IX-Unfair Competition

In Count IX of the amended complaint, Republic alleges that defendants' false statements to Republic's customers regarding Republic's refurbished display boxes and trade programs constitute unfair competition and have damaged Republic. North Atlantic argues that this claim fails under Illinois law because "Republic does not allege that North Atlantic engaged in any conduct that would result in confusion as to the source of the parties' goods."Defendants' Memorandum at 11.

A review of Illinois law and reference to other federal courts dealing with this issue reveals that Illinois courts recognize only two types of unfair competition actions: (1) tortious interference with prospective economic advantage; and (2) trademark-type likelihood of confusion claims. *See WorldCom, Inc. v. Transcend Allegiance, Inc.,* No. 97 C 6150, 1998 WL 111636, at *2 (N.D.Ill. Mar. 6, 1998) ("Despite more reaching grounds for unfair competition in other jurisdictions, Illinois courts have limited these suits to tortious interference and trademark or trademark-type claims.") (citing *Barry Gilberg, Ltd. v. Craftex Corp.,* 665 F.Supp. 585, 597 (N.D.Ill.1987)).

Republic has stated a tortious interference claim; therefore, its unfair competition claim would have to be premised on likelihood of confusion-that "the adoption and use of a product name by a defendant is likely to cause confusion in the trade as to the source of the products or is likely to lead the public to believe that defendant is in some way connected with the plaintiff."*Barry Gilberg,* 665 F.Supp. at 597 (citing *Lady Esther v. Lady Esther Corset Shoppe,* 46 N.E.2d 165 (Ill.App.Ct.1943)).[FN14] Republic alleges nowhere that North Atlantic engaged in conduct that would result in confusion as to the source of the parties' goods. Consequently, we grant defendants' motion to dismiss Count IX.

> FN14. The cases cited by Republic are inapposite because they did not address Illinois unfair competition law. *Wilson v. Electro Marine Systems, Inc.,* 915 F.2d 1110 (7th Cir.1990), discusses New York law; *Stephen & Hayes Construction Co. v. Meadowbrook Homes, Inc.,* 988 F.Supp. 1194 (N.D.Ill.1998), relies on *Wilson* without analyzing Illinois law.

Count X-Sherman Act

**11** In Count X of its amended complaint, Republic alleges that North Atlantic violated § 2 of the Sherman Act, 15 U.S.C. § 2. Section 2 allows plaintiffs to proceed under two separate theories of recovery-monopolization and attempted monopolization.[FN15]

> FN15.Section 2 of the Sherman Act makes it an offense for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."15 U.S.C. § 2.

To state a claim for monopolization under § 2, Republic must allege that (1) North Atlantic possesses monopoly power in a defined, relevant

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 261712 (N.D.Ill.), 1999-1 Trade Cases P 72,554
**1999 WL 261712 (N.D.Ill.)**

market; and (2) North Atlantic willfully acquired or maintained that power, as distinguished from growth or development due to a superior product, business acumen, or historic accident. *See United States v. Grinnell Corp.,* 384 U.S. 563, 570-71 (1966). To state a claim for attempted monopolization under § 2, Republic must allege that (1) North Atlantic had the specific intent to acquire monopoly power; (2) North Atlantic engaged in anticompetitive or predatory conduct to further its goal of monopolization; and (3) there is a dangerous probability of North Atlantic's success in acquiring monopoly power. *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456 (1993). Monopoly power is the power to control prices or exclude competition. *See Grinnell,* 384 U.S. at 571.

Thus, a § 2 claim under either theory requires Republic to allege that North Atlantic holds, or that there is a dangerous probability of North Atlantic gaining, monopoly power. Republic defines the relevant market as "the nationwide market for distribution of RYO cigarette papers," and then alleges that North Atlantic maintains a market share of approximately 50% in that market. Amended Complaint, ¶ 90. We cannot infer monopoly power simply on the basis of this market share because 50% does not constitute predominance. *See Grinnell,* 384 U.S. at 571.

That does not end the inquiry, for the existence of monopoly power depends upon a variety of market characteristics in addition to market share, such as "the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct and the elasticity of consumer demand."*International Distrib. Ctrs., Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 792 (2d Cir.1987). Republic alleges that North Atlantic itself has stated that the RYO cigarette paper market has "significant barriers to entry," and that North Atlantic's ZIG-ZAG brand papers are the number-one seller in the United States. Amended Complaint, ¶¶ 7, 8. These allegations alone do not allow us reasonably to infer that North Atlantic has, or that there is a dangerous probability of its acquiring, the power to control prices or to exclude competition.[FN16] Accordingly, Republic fails to state a § 2 claim for monopolization or attempted monopolization. Defendants' motion to dismiss Count X of the amended complaint is granted.

FN16. We therefore need not address the other elements of § 2 claims.

B. Plaintiff's Motion to Strike the Counterclaim

Republic moves to "strike" North Atlantic's counterclaim. Rule 12(f) of the Federal Rules of Civil Procedure governs motions to strike and provides that "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."However, Republic does not assert that the counterclaim contains any redundant, immaterial, impertinent, or scandalous matter. Rather, it contends that the counterclaim fails to state a claim upon which relief may be granted. Therefore, we treat the motion as a Rule 12(b)(6) motion to dismiss.

**\*12** North Atlantic's counterclaim states in its entirety:

Defendants have valid claims against plaintiff and other entities that are currently pending in the United States District Court for the Western District of Kentucky in the case captioned *North Atlantic Trading Company, Inc., et al. v. Republic Tobacco, Inc., et al.,* No. 3:98CV-462H ("Kentucky Action"). Those claims are hereby alleged in this action to the extent that they are compulsory counterclaims, and the allegations supporting such compulsory counterclaims that are stated in the Amended Complaint filed in the Kentucky Action are expressly incorporated herein.

Answer and Affirmative Defenses to Amended Complaint, Counterclaims and Third-Party Claims, at 14. Republic argues that this statement is "too vague, too ambiguous, and too contingent to constitute a 'short and plain statement of the claim'" as required by Federal Rule of Civil Procedure 8(a). Plaintiff Republic Tobacco, L.P.'s Memorandum in Support of Its Motion to Strike Counterclaim at 4. Republic also asserts that "[r]ather than putting Republic on notice, the counterclaim seeks to place the burden on Republic to guess which of North Atlantic's claims are compulsory under Rule 13(a)."*Id.*[FN17]

FN17. Rule 13(a) of the Federal Rules of Civil Procedure deals with compulsory counterclaims and provides in relevant part:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim ....

North Atlantic responds that Republic's argument is "spurious" because Republic answered the amended complaint in the Kentucky action and is therefore on notice of all of defendants' claims that are compulsory counterclaims in this action. Defendants' Opposition to Plaintiff's Motion to Strike Counterclaims at 1-2. North Atlantic adds that "[t]here is no need at this time to address which, if any, of NAOC's and National's claims are compulsory counterclaims in the present action."*Id.* at 2.

We disagree. Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of the claim," but it is axiomatic that such a statement must give the opposing party fair notice of what the claim is and the grounds upon which it rests. *See Conley v. Gibson,* 355 U.S. 41, 47 (1957). North Atlantic's counterclaim is not sufficiently specific to put Republic on notice of the claims against it. And while North Atlantic may believe that it is not necessary to determine at this point which of its Kentucky claims are compulsory counterclaims, Rule 13 requires North Atlantic to identify its compulsory counterclaims, if any, in its answer. *See also Harbor Ins. Co. v. Continental Bank Corp.,* 922 F.2d 357, 360 (7th Cir.1990) ("A compulsory counterclaim is compulsory; unless set forth in the answer to the complaint it is waived."). The existence of the Kentucky proceeding does not relieve North Atlantic of this obligation. Therefore, defendants' counterclaim is dismissed with leave to amend.

## CONCLUSION

For the foregoing reasons, we grant defendants' motion to dismiss Counts I, VII, IX, and X of the amended complaint, and we deny defendants' motion to dismiss Counts IV, V, and VIII. Plaintiff may have until April 30, 1999 should it wish to replead Count VII to allege facts indicating a consumer nexus.

**\*13** We grant plaintiff's motion to dismiss defendants' counterclaim for failure to state a claim. Defendants may have until April 30, 1999 to file an amended counterclaim in compliance with this opinion.

N.D.Ill.,1999.
Republic Tobacco, L.P. v. North Atlantic Trading Co.
Not Reported in F.Supp.2d, 1999 WL 261712 (N.D.Ill.), 1999-1 Trade Cases P 72,554

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 2

Westlaw.

Not Reported in F.Supp.                                                                 Page 1
Not Reported in F.Supp., 1998 WL 122900 (N.D.Ill.), 1998-1 Trade Cases P 72,181
**1998 WL 122900 (N.D.Ill.)**

◼Health Care Compare Corp. v. United Payor &
United Providers, Inc.
N.D.Ill.,1998.

United States District Court, N.D. Illinois.
HEALTH CARE COMPARE CORP. d/b/a the
Affordable Medical Networks Plaintiff,
v.
UNITED PAYORS & UNITED PROVIDERS, INC.,
a Delaware corporation, d/b/a/ UP & UP, corporately
and as successor-in-interest to PB Newco, Inc.,, an
Iowa corporation and United Payors & United
Providers, Inc., a Maryland corporation, d/b/a/ UP &
UP; One or More John or Jane Does; and One or
More Coe Entities, Defendants.
**No. 96 C 2518.**

March 13, 1998.

MEMORANDUM AND ORDER

MORAN, Senior J.
**\*1** Plaintiff HealthCare Compare Corp. (HealthCare)
has brought a six-count complaint against defendant
United Payors & United Providers, Inc. (United
Payors), in which it alleges that United Payors is
liable for (1) false designation of origin under the
Lanham Act, 15 U.S.C. 1125(a)(1)(A) (Count I); (2)
false advertising under the Lanham Act, 15 U.S.C.
1125(a)(1)(B) (Count II); (3) fraud and deceptive
trade practices under the Illinois Deceptive Trade
Practices Act, 815 ILCS 510/1et seq., including §
510/2(2), (3), (5) and (12), incorporating by reference
the Lanham Act claims (Count III); (4) fraud and
deceptive business practices under the Illinois
Consumer Fraud Act, 815 ILCS 505/1et seq,
incorporating by reference the Lanham Act claims
(Count IV); (5) intentional interference with contracts
under state law, incorporating by reference the
Lanham Act claims (Count V); and (6) unfair
competition under state law, incorporating by
reference the Lanham Act claims (Count VI).

Defendant United Payors has moved for summary
judgment on Count II and all related state law claims.
For the reasons stated below we deny this motion in
its entirety.

BACKGROUND

HealthCare and United Payors are two companies
that operate health care networks. HealthCare
operates a preferred provider organization (PPO)
under the name, "The *AFFORDABLE* Medical
Network." The network forms contracts with two
distinct types of entities, "payors" and "providers."
"Payors" is the term used to describe insurance
companies, self-insured employers, employee groups,
and any other entity seeking to purchase access to
health services providers on behalf of their
constituent members (*ie.,* the insureds and the
employees). "Providers" are the doctors and
hospitals who provide the desired health care
services. HealthCare acts as an intermediary between
these two groups. On one hand, HealthCare enters
into agreements with the payors wherein the payors
agree to pay a fee to HealthCare and in exchange are
given access to discounted medical services that
HealthCare contracts to receive from the providers.
On the other side, HealthCare forms contracts with
the providers wherein the providers agree to provide
medical services at a discounted rate in exchange for
access to the needs of the payors in HealthCare's
network. HeathCare's PPO is considered a "directed"
network because its agreements with payors require
the payors to create financial and other incentives to
encourage their members to use the medical
providers in the PPO.

United Payors is also a health care network company
with a structure and function similar to HeathCare's.
United Payors enters into agreements with both
providers and payors. Instead of being a "directed"
network, however, United Payors operates under
"quick pay" procedures and does not require its
payor-clients to create financial incentives and other
devices to channel their members to the plan
providers.

**\*2** In the course of soliciting business from providers,
United Payors informs the providers of the number
of"covered lives" that participate in its payor clients'
plans and sends copies of a "Payor Directory" to the
providers. These directories list the participating
payors, but do not state whether the payors have an

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 2
Not Reported in F.Supp., 1998 WL 122900 (N.D.Ill.), 1998-1 Trade Cases P 72,181
**1998 WL 122900 (N.D.Ill.)**

obligation to create incentives for their members to use the participating providers. Additionally, United Payors has contacted several of the providers with which HealthCare has provider agreements, distributed the directories to those providers and made statements indicating HealthCare and United Payors are somehow related, as well as other false and misleading representations.[FN1]

> FN1. For purposes of the motion for summary judgment presently before the court, United Payors has agreed to accept the facts in HealthCare's complaint as true (insofar as they are relevant to the instant motion).

HealthCare subsequently brought this action against United Payors alleging, among other things, that the statements United Payors made to the providers constitute "false advertisement" under the Lanham Act.

### ANALYSIS

#### A. Standard of Review

A motion for summary judgment may be granted where the pleadings and evidence present no genuine issues of fact and the movant is consequently entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Renovitch v. Kaufman,* 905 F.2d 1040, 1044 (7th Cir.1990). The movant must point to those portions of the record which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment should be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322. The reviewing court shall draw all reasonable inferences in favor of the non-movant. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Bank Leumi Le-Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991). When it is clear that the plaintiff cannot carry her burden of persuasion at trial on one or more elements, summary judgment is appropriate for the defendant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

#### B. The Lanham Act

The Lanham Act provides two distinct causes of action to prevent consumer confusion regarding product's source: false designation of origin or source, known as "product infringement" claims, and false description or presentation known as "false advertising" claims. *Agee v. Paramount Communications Inc.,* 853 F.Supp. 778 (S.D.N.Y.1994)*aff'd in part, rev'd in part*59 F.3d 317 (1995). Plaintiffs second amended complaint alleges violations of both sections, but defendant has moved for summary judgment only with respect to Count II, which involves the latter type of claim and is governed by 15 U.S.C. § 1125(a)(1)(B). That section provides:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any ... false or misleading description of fact, or false or misleading representation of fact, which-

**\*3** (A) * * *

(B) *in commercial advertising or promotion,* misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a) (emphasis added). United Payors contends that it is entitled to summary judgment on Count II on the grounds that the statements United Payor allegedly made to its providers do not constitute commercial "advertising" for the purposes of the Lanham Act and, consequently, are not actionable under the above section.

In order for a statement to amount to "commercial advertising or promotion," the statements must be "(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendants' goods or services; and (4) disseminated sufficiently to the relevant purchasing public." *Liberty Telephone Co., Inc. v. Burke,* 1997 WL 177140

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 3
Not Reported in F.Supp., 1998 WL 122900 (N.D.Ill.), 1998-1 Trade Cases P 72,181
**1998 WL 122900 (N.D.Ill.)**

(N.D.Ill.1997)*citing* <u>Seven-Up Co. V. Coca-Cola Co.,</u> <u>86 F.3d 1379, 1384 (5th Cir.1996)</u> (other supporting citations omitted).

United Payors argues that the relationship between itself and its providers could not have involved "advertising" because any statements made in an effort to form the resulting contracts were not made for the "purpose of influencing *consumers to buy* [its] goods or services" and were not disseminated to the "*relevant purchasing public*" (elements 3 and 4 above). United Payors contends that the true "consumers" of its services are the payor entities (the employers and health insurance companies who buy the discounted services), not the providers (the doctors and hospitals who agree to provide health-related services at a discount). Consequently, United Payors argues that it is the payors who constitute the "relevant purchasing public" for purposes of the Lanham Act.

This argument, however, fails to recognize the economic realities present here. United Payors engages itself in two primary types of activities. On the one hand, it forms contracts with payor entities wherein it agrees to provide access to discounted medical services in exchange for the entities' agreement to pay for those services and make them available to the payor's members. On the other hand, United Payors forms contracts with provider entities wherein the provider agrees to sell medical services at below its usual rate in exchange for United Payors' promise to direct its payor clients to use the services of those particular individuals or companies. United Payors cannot succeed unless it persuades both payors and providers to use its services. United Payors' "advertising" must be directed to both groups if it is to remain competitive. Both are consumers of United Payors' services, with United Payors providing each with access to the other.

**\*4** United Payors argues that the providers cannot be considered a "consumer" of United Payors' services on the grounds that they do not pay any sort of fee to United Payors. We do not agree that to be considered a "consumer" for Lanham Act purposes one must pay money for the product or service that is the subject of the alleged false advertising. The statute imposes no such requirement, and neither do the cases. For example, in <u>Mylan Laboratories, Inc. v.</u> <u>Pharmaceutical Basics, In ., 808 F.Supp. 446</u>

(D.Md.1992), *rev'd on other grounds,*<u>7 F.3d 1130</u> <u>(4th Cir.1993)</u>, the "advertising" was directed to health care providers by inserts in free samples. Patients were the ultimate purchasing public, but the determining influence upon their purchasing decisions were the recommendations of health care providers. In <u>American Needle & Novelty, Inc. v.</u> <u>Drew Pearson Marketing, Inc., 820 F.Supp. 1072</u> <u>(N.D.Ill.1993)</u>, the alleged false advertising was directed to a licensor that controlled the right to use sports logos, not the retailers selling products bearing sports logos. In <u>Liberty Telephone v. Burke,</u> 1997 WL <u>177140, \*1 (N.D.Ill.1997)</u>, the parties competed in the placement and servicing of pay telephones in business premises. They received revenue from those using the telephones and, in turn, paid the owner of the business premises a commission. The alleged false advertising was directed to the owners. In all three cases the allegedly false advertising was held to be within the ambit of the statute. We think it is enough if the false advertising is directed to an identifiable group that the advertiser seeks to persuade for the purpose of enhancing its competitive position, directly or indirectly, with the consuming public.

Further, the providers have, in a sense, "paid" United Payors. The payors may pay the cash fee, but that payment is from the margin created by the providers' discount and, indeed, is related to the size of that discount.

Defendant contends that the relationship between providers to United Payors is similar to the relationship between subcontractors and a general contractor and that extending the reach of a false advertising claim to that relationship would extend it, as well, to an ordinary vendor contract in which a seller provides goods or services to a purchaser. We disagree.

It is unclear why such labeling would make a difference in this case. We are interested not in how United Payors labels its relationships with its providers, but in the substance of that relationship. The relevant inquiry is whether the providers can be characterized as "consumers" of United Payors' services for advertising purposes. As discussed earlier, the facts presently known indicate that the providers compose a definite market for United Payors' networking services, that they purchase entry

into the network by discounting their medical services and that their willingness to enter into such contracts could definitely be affected by misstatements about United Payors, HealthCare or any other networking company in that market. We conclude that the providers are in fact members of the "relevant purchasing public" for Lanham Act purposes.

C. The State Law Claims

**\*5** Defendant United Payors also moves for summary judgment on such of HealthCare's claims that incorporate by reference defendant's Lanham Act claims (Counts III, IV, V and V) These counts are based on Illinois' Deceptive Trade Practices Act, the Consumer Fraud Act, common law intentional interference with contracts and common law unfair competition, respectively. United Payors contends that it is entitled to summary judgment on these claims to the extent that they are based on the allegations used to support Count II, the Lanham Act false advertising claim. Defendant concedes that to the extent the Illinois claims are not based on the false advertising allegations, they are not at issue for purposes of the instant motion.

It is true that claims brought under Illinois' Deceptive Trade Practices Act and Consumer Fraud Act are to be resolved according to principles set forth under the Lanham Act. _Spex, Inc. v. Joy of Spex, Inc., 847 F.Supp. 567, 579 (N.D.Ill.1994)_ However, because we have denied summary judgment on Count II, we obviously cannot grant summary judgment on the state claims solely on the ground that they are co-extensive with Count II. In the absence of any alternative argument in support of defendant's position, we must deny its motion for summary judgment with respect to HealthCare's state law claims.

CONCLUSION

For the reasons stated above, defendant United Payors' motion for summary judgment is denied in its entirety.

N.D.Ill.,1998.
Health Care Compare Corp. v. United Payor & United Providers, Inc.
Not Reported in F.Supp., 1998 WL 122900

(N.D.Ill.), 1998-1 Trade Cases P 72,181

END OF DOCUMENT

# APPENDIX 3

Westlaw.

--- F.Supp.2d ----                                                                     Page 1
--- F.Supp.2d ----, 2008 WL 2224398 (D.Or.)
**2008 WL 2224398 (D.Or.)**

**H**Healthport Corp. v. Tanita Corp. of America
D.Or.,2008.
Only the Westlaw citation is currently available.
United States District Court,D. Oregon.
HEALTHPORT CORPORATION, a Delaware
corporation, Plaintiff/Counter-Defendant,
v.
TANITA CORPORATION OF AMERICA, an
Illinois corporation, Defendant/Counter-Claimant.
**Civil No. 06-419-PK.**

May 23, 2008.

David J. Elkanich, Hinshaw & Culbertson, LLP,
Portland, OR, Frank Frisenda, Frisenda Quinton &
Nicholson, Los Angeles, CA, for Plaintiff/Counter-
Defendant.

Evan A. Parke, Joel M. Freed, Kenneth L. Cage,
Sudip K. Kundu, McDermott Will & Emery LLP,
Michael A. Messina, MC, Washington, DC, J.
Christopher Carraway, Todd M. Siegel, Klarquist
Sparkman, LLP, Portland, OR, for
Defendant/Counter-Claimant.

ORDER

HAGGERTY, Chief Judge.
**\*1** Magistrate Judge Papak referred to this court a
Findings and Recommendation [130] in this matter.
The Findings and Recommendation recommends
denying plaintiff's motion for summary judgment,
granting defendant's motion for summary judgment,
and entering judgment and an injunction in this
matter. Both parties have filed objections.

When a party objects to any portion of a Findings and
Recommendation, the district court must conduct a
de novo review. 28 U.S.C. § 636(b)(1)(B);
*McDonnell Douglas Corp. v. Commodore Bus.
Mach. Inc.,* 656 F.2d 1309, 1313 (9th Cir.1981).
Here, the court has performed a de novo review,
evaluated the Findings and Recommendation, the
objections, and the entire record. Based upon that
review, the court agrees with Judge Papak's Findings
and Recommendation.[FN1]

The court adopts the Findings and Recommendation

[130]. Defendant's Motion for Summary Judgment
[99] is GRANTED and plaintiffs Motion for
Summary Judgment [100] is DENIED. Healthport
Corporation is ORDERED to remove the ELG
misrepresentations from its web sites. Healthport
Corporation and its officers, directors, agents,
employees, and all persons acting in concert with it
are PERMANENTLY ENJOINED from publishing
or disseminating in any form any advertising or
promotional material that contains representations to
the effect that the ELG: (1) is the only patented body
composition analyzer or metabolic analyzer in the
United States or abroad; (2) is patented for unequaled
accuracy and validity; (3) is the only body
composition analyzer or metabolic analyzer patented
for unequaled accuracy and validity; or (4) is
unequaled in accuracy and validity as compared to
other body composition analyzers. Further,
Healthport Corporation and its officers, directors,
agents, employees, and all persons acting in concert
with it are PERMANENTLY ENJOINED from
publishing or disseminating in any form any
advertising or promotional material that contains
false representations about the credentials of Richard
Wooten.

IT IS SO ORDERED.

FINDINGS AND RECOMMENDATION

PAPAK, United States Magistrate Judge.
Healthport Corporation ("Healthport") filed this
lawsuit against Tanita Corporation of America
("Tanita") on March 27, 2006, alleging patent
infringement related to their competing body
composition monitors. On May 26, 2006, Tanita filed
two counterclaims alleging Healthport web site
advertisements violate the false advertising prong of
the Lanham Act and common law unfair competition.
(# 11.) Tanita requested money damages along with
other forms of relief on its counterclaims.[FN1]

On August 7, 2006, Tanita filed a motion for
summary judgment on Healthport's patent
infringement claims. (# 18.) The district court
adopted this court's Findings and Recommendation (#
61) and granted summary judgment in favor of Tanita
and dismissed Healthport's patent claims. (# 70.)

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                                        Page 2
--- F.Supp.2d ----, 2008 WL 2224398 (D.Or.)
**2008 WL 2224398 (D.Or.)**

Pending before the court are the parties' cross motions for summary judgment related to Tanita's counterclaims. Tanita seeks summary judgment on its claim for false advertising brought under the Lanham Act.[FN2](# 99.) Healthport Corporation ("Healthport") seeks summary judgment on both of Tanita's counterclaims-false advertising and common law unfair competition. (# 100.) For the reasons set forth below, Tanita's motion for summary judgment should be granted and Healthport's denied.

## LEGAL STANDARD

**\*2** Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."Fed.R.Civ.P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995), *cert. denied,*516 U.S. 1171, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554-55, 110 S.Ct. 1331, 108 L.Ed.2d 504 (1990); *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105(2000).

On cross-motions for summary judgment, the court must consider each motion separately to determine whether either party has met its burden with the facts construed in the light most favorable to the non-moving party. Fed.R.Civ.P. 56; *Fair Housing Council of Riverside County, Inc. v. Riverside Two,* 249 F.3d 1132, 1136 (9th Cir.2001). Summary judgment, of course, may not be granted where the court finds unresolved issues of material fact, even in situations where the cross motions allege that no disputed facts exist. *Id.*

## FACTUAL BACKGROUND

### A. Healthport Web Sites

Healthport maintains two web sites, which promote or are part of an offering of its web-based services. One web site targets healthcare professionals and offers "an integrated and turnkey Obesity Management & Preventive Medicine System designed to be prescribed by physicians."[FN3](The "CyberCare Plan" web site.) The second web site addresses employers and healthcare benefits providers and offers an online "health risk assessment and individualized 12-week care plan aimed specifically at reducing [an] employee's identified health risk factors."[FN4](The "Health-e-Changes" web site.) Anyone with an Internet connection can access these web sites. The sites do not require a login or password to view them.[FN5]

Tanita's false advertising claim asserts two alleged misrepresentations that appear on the CyberCare Plan and Health-e-Changes web sites. The first describes a Healthport body composition monitor. The other promotes the credentials of Richard Wooten, Healthport's president and chief technology officer.

### B. The Body Composition Monitor Advertisement

Both of the Healthport web sites contain descriptions of Healthport's ElectroLipoGraph metabolic analyzer ("ELG"), a body composition monitor. Healthport touts the ELG as "the only metabolic analyzer patented in the United States and abroad for unequaled accuracy and validity in the prediction of human body composition."Healthport goes on to state that the "patented accuracy of the ELG is backed by the largest study on body composition analyzers ever conducted, including more than 750 subjects from a wide demographic population."

**\*3** To substantiate its claims regarding the ELG, Healthport relies on two studies performed by the University of Southern California. Neither study provides a head-to-head comparison of the ELG with any other body composition monitors. In addition, neither study describes the ELG as having unequaled accuracy. Both studies describe the ELG as an accurate method of measuring body composition. One study adds a note that the ELG is used to measure patients while they are lying down.

Healthport owns two patents related to the ELG.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                          Page 3
--- F.Supp.2d ----, 2008 WL 2224398 (D.Or.)
**2008 WL 2224398 (D.Or.)**

Healthport relies on these patents to substantiate the claims it makes in the ELG advertisement. However, neither patent suggests that Healthport's ELG has unsurpassed accuracy or validity as compared to other body composition monitors.

*C. Richard Wooten Credentials*

Richard Wooten serves as Healthport's president and chief technology officer. Both the Healthport web sites offer information about Healthport's management team. That information included statements that Mr. Wooten "received his M.S. degree from Oregon Graduate School of Health Sciences and a B.S. in Biology from Portland State University."Healthport apparently removed Mr. Wooten's credentials from the CyberCare Plan web site in the Summer of 2007, but as of November 2007 the credentials continued to appear on the Health-e-Changes web site. Mr. Wooten admits that he has not earned a college or post graduate degree in any discipline.

**ANALYSIS**

**A. Common Law Unfair Competition**

Healthport moves for summary judgment on Tanita's common law unfair competition claim. Healthport asserts that Oregon courts follow federal law when deciding common law unfair competition claims. However, the arguments presented by Healthport address the Oregon Unfair Trade Practices Act, which is not relevant here. Accordingly, Healthport's motion for summary judgment as to the common law unfair competition claim should be denied.

**B. False Advertising**

Both parties move for summary judgment on Tanita's Lanham Act false advertising claim. Healthport argues that it is entitled to summary judgment because Tanita lacks standing to bring this claim or because Tanita cannot establish causation and injury. Tanita argues that summary judgement in its favor is appropriate because it meets the standing requirements and because the undisputed material facts sufficiently prove its false advertising claim.

**1. Lanham Act Standing**

The Lanham Act confers standing on "any person who believes that he or she is or is likely to be damaged" by misrepresentations in commercial advertising or promotion. 15 U.S.C. § 1125(a)(1)(B). To establish standing for a false advertising claim brought pursuant to the Lanham Act, a party must allege: "(1) a commercial injury based upon a misrepresentation about a product; and (2) that the injury is 'competitive,' or harmful to the plaintiff's ability to compete with the defendant."*Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.,* 407 F.3d 1027, 1037 (9th Cir.2005); *Barrus v. Sylvania,* 55 F.3d 468, 469-70 (9th Cir.1995). Thus, a plaintiff has standing where the alleged misrepresentation could divert business from the plaintiff to the defendant. *See Coastal Abstract Serv. Inc. v. First Am. Ins. Co.,* 173 F.3d 725, 734 (9th Cir.1999) (standing exists where defendant's false statements sought to divert business away from competitor); *Waits v. Frito-Lay, Inc.,* 978 F.2d 1093, 1109 (standing exists for false advertising where misrepresentations about product quality could theoretically draw a consumer away from competitor's product); *see also Barrus,* 55 F.3d at 470 (stating that false advertising discussion in *Waits* is not dicta).

**\*4** Although Healthport asserts in its motion for summary judgment that no evidence indicates that Tanita and Healthport are competitors, Healthport's own statements suggest otherwise. In its Answer to Tanita's counterclaims, Healthport asserted as its tenth affirmative defense that "Healthport is privileged to lawfully compete with Defendant [Tanita] in market segments."Richard Wooten testified in his deposition that Tanita and Healthport are competitors. Dr. Alfred Libke, Healthport's chairman and CEO, testified that Healthport's ELG competes with Tanita products. Thus, even viewed in the light most favorable to Healthport, ample undisputed evidence demonstrates that Healthport and Tanita are competitors.

Healthport's Motion for Summary Judgment also argues that because it derived no revenue from its web-based CyberCare Plan that Tanita cannot prove it has suffered a competitive injury.[FN6]However, Healthport's arguments miss the mark. Healthport confuses Tanita's allegations as challenging the CyberCare Plan itself, rather than the description of

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2224398 (D.Or.)
**2008 WL 2224398 (D.Or.)**

the ELG and of Mr. Wooten's credentials that are contained within the CyberCare Plan and Health-e-Changes web sites.

The description of Healthport's ELG body composition monitor inherently draws comparisons with competing products, which include Tanita products, and has the potential of diverting business away from Tanita. Both companies offer body composition monitors, and a sale of one of the competing products would result in a denial of a sale for the other. Those facts satisfy the standing requirements for false advertising. Accordingly, this Court rejects Healthport's assertion that Tanita lacks standing for its Lanham Act claim.

**2. Lanham Act False Advertising Claim**

To prevail on its false advertising claim under the Lanham Act, Tanita must establish that: (1) Healthport made a false statement of fact in a commercial advertisement; (2) the statement deceived or has the tendency to deceive a substantial segment of its audience; (3) the false statement is material in that it is likely to influence the purchasing decision; (4) Healthport caused the false statement to enter interstate commerce; and (5) Tanita has been or is likely to be injured as a result of the false statement. 15 U.S.C. § 1125(a)(1)(b); _Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir.1997)._

**a. Element One-Falsity in a Commercial Advertisement**

The Lanham Act proscribes misrepresentation in "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). Representations constitute commercial advertising for Lanham Act purposes if they are 1) commercial speech; 2) by a defendant who is in commercial competition with the plaintiff; 3) for the purpose of influencing consumers to buy the defendant's goods or services and 4) sufficiently disseminated to the relevant purchasing public. _Coastal Abstract Serv., 173 F.3d at 735._ Commercial speech is "expression related solely to the economic interests of the speaker and its audience." _Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980)._ A representation is false if a claimant can show that the statement was literally false, false by

necessary implication, or literally true but likely to mislead or confuse consumers. _Southland Sod Farms, 108 F.3d at 1139._

**\*5** Healthport opposes Tanita's Motion for Summary Judgment on grounds that the statements on the CyberCare plan web site are not commercial advertising or promotion. Neither party disputes that the description of the ELG monitor and of Mr. Wooten's credentials are commercial speech. Healthport is in commercial competition with Tanita. The parties do not dispute that the descriptions appeared on the CyberCare Plan and Health-e-Changes web sites, and that Healthport created those sites to sell health-related services. Finally, the CyberCare Plan and Health-e-Changes sites are accessible to the public. Therefore, the Court finds that the representations constitute commercial advertising for the purposes of the Lanham Act.

The Court further finds that the representations are false. With respect to the statements regarding Mr. Wooten's credentials, the record demonstrates that they are literally false. Healthport has admitted that Mr. Wooten's credentials were manufactured, and Mr. Wooten himself testified that he has not received any college or graduate degrees.

The second statement at issue is Healthport's claim that the ELG is "the only metabolic analyzer patented in the United States and abroad for unequaled accuracy and validity in the prediction of human body composition." Although this statement gives rise to three possible interpretations, the undisputed facts demonstrate that each interpretation is literally false. First, if the statement means the ELG is the only _patented_ metabolic analyzer in the United States and abroad, that is a literally false statement. The testimony of both Mr. Wooten and Dr. Lipke revealed that other patented body composition analyzers can perform the same function.

Second, if the statement means the ELG is patented for unequaled accuracy and validity, or that it is the only one patented for those characteristics, that too is literally false. The parties do not dispute that Healthport did not review patents for body composition analyzers when it created the ELG advertisement and thus did not substantiate its assertion. More importantly, ELG's patents do not indicate the patents were awarded for "unequaled

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----                                                                              Page 5
--- F.Supp.2d ----, 2008 WL 2224398 (D.Or.)
**2008 WL 2224398 (D.Or.)**

accuracy and validity."

Finally, if the ELG statement means the ELG is unsurpassed in accuracy and validity when compared to other body composition analyzers, Healthport cannot substantiate that claim. Healthport's principals testified they did no comparative or tests to verify their product was "unsurpassed in accuracy and validity." Although Healthport claims to rely on studies to substantiate their claims, those studies simply do not support Healthport's assertions. The studies merely conclude that the ELG is accurate. However, the studies do not suggest the ELG may be more accurate than competing products, nor do the studies compare the ELG with other body composition analyzers. *Southland Sod Farms,* 108 F.3d at 1139 (plaintiff can establish literal falsity if the tests, even if reliable, do not establish the proposition asserted by the defendant).

**\*6** The statements at issue constitute commercial advertising and are literally false. As a result, Tanita satisfied the first element of its false advertising claim.

**b. Elements 2 and 3-Deception and Materiality**

Healthport argues that Tanita must prove through the use of consumer surveys or market research that consumers have actually been deceived by the advertisements. Healthport is wrong. Courts may presume consumer deception and reliance if the defendant made an intentionally false statement regarding the defendants' product, even if the statement entailed "little overt reference to plaintiff or plaintiff's product." *Harper House Inc. v. Thomas Nelson, Inc .,* 889 F.2d 197, 209 (9th Cir.1989) (applying presumption to claim that product cost less than similar products and offered more features); *see also Southland Sod Farms,* 108 F.3d at 1145 ("[T]here need not be a direct comparison to a competitor for a statement to be actionable under the Lanham Act.").

Earlier cases required the expenditure of substantial funds by the defendant before a court would presume consumer deception and reliance. *See Harper House Inc.,* 889 F.2d at 209;*U-Haul Int'l, Inc. v. Jartran, Inc.,* 793 F.2d 1034, 1040-41 (9th Cir.1986). Courts imposed this condition "because the misleading statements may not have reached and deceived a

substantial portion of consumers unless the defendant spent enough funds to disseminate the statements widely."*William H. Morris Co. v. Group W, Inc.,* 66 F.3d 255, 259 n. 2 (9th Cir.1995). In the case of online advertising, however, a defendant need not spend substantial funds to reach a wide audience. *See Allen v. The Ghoulish Gallery,* No. 06-371, 2007 U.S. Dist. LEXIS 86224, 2007 WL 5101179 at\*29-30 (S.D.Cal. Nov. 20, 2007). More importantly, courts have found that non-comparative false statements may support a claim for injunctive relief if the claim is material. *See Allen,* 2007 U.S. Dist. LEXIS 86224, 2007 WL 5101179 at\*29-30 (S.D.Cal. Nov. 20, 2007) (non-comparative false statement regarding length of time in business was material and sufficient for injunctive relief); *see also Societe Civile Succession Richard Guino v. Beseder Inc.,* No. 03-1310, 2007 U.S. Dist. LEXIS 83782, 2007 WL 3238703, at \* 21 (D.Ariz.2007) (non-comparative false statement regarding authenticity of artwork sufficient for injunctive relief). Deception is material if "it is likely to influence the purchasing decision."*Southland Sod Farms,* 108 F.3d at 1139.

Healthport's description of the ELG monitor as "the only metabolic analyzer patented in the United States and abroad for unequaled accuracy and validity in the prediction of human body composition" is a material, false claim regarding its product. Tanita has submitted uncontroverted evidence that the challenged deception is material. Tanita submitted testimony from health professionals who stated that they seek the most accurate equipment for determining body composition and that claims that a metabolic analyzer is the most accurate or the only one patented for accuracy would influence their purchasing decisions. Healthport did not deny these statements. As a result, this statement gives rise to a presumption of consumer deception and reliance. *See Harper House Inc.,* 889 F.2d at 209.

**\*7** The false statement regarding Mr. Wooten's credentials present a closer issue, as that statement does not directly relate to a Healthport product. However, Dr. Libke, Healthport's co-founder, testified that his advanced medical degree is important to Healthport's customers. Thus, even viewing the evidence in a light most favorable to Healthport, the false statement regarding Mr. Wooten's credentials may deceive consumers and influence consumer decisions on whether to purchase

--- F.Supp.2d ----
--- F.Supp.2d ----, 2008 WL 2224398 (D.Or.)
**2008 WL 2224398 (D.Or.)**

the ELG body composition monitor. *See* 5 McCarthy on Trademarks and Unfair Competition § 27:31 (2008) ("Since § 43(a) was passed to protect consumers as well as competitors, the courts are not and should not be reluctant to allow a commercial plaintiff to obtain an injunction even where the likelihood of provable impact on the plaintiff may be subtle and slight.")

**c. Element 4-Interstate Commerce**

By posting the Wooten and ELG advertisements on their web sites, Healthport caused the false statements to enter interstate commerce. *See, e.g.* U.S. v. Horne, 474 F.3d 1004, 1006 (7th Cir.2007) (an Internet web site "is an avenue of interstate commerce.")

**d. Element 5-Injury**

Healthport argues that Tanita's motion for summary judgment should be denied because Tanita has presented no direct evidence of actual injury. However, "because of the possibility that competitor may suffer future injury, as well as the additional rationale underlying section 43(a)-consumer protection-a competitor need not prove injury when suing to enjoin conduct that violates section 43(a)." *Harper House, Inc.,* 889 F.2d at 211. To the extent that Tanita seeks injunctive relief, it need not demonstrate actual injury to establish a Lanham Act violation occurred here.

The undisputed evidence demonstrates that Healthport's statements concerning the ELG monitor and Mr. Wooten's credentials violate the Lanham Act. Healthport's motion for summary judgement on this issue should be denied. As a result, Tanita's motion for summary judgment should be granted. Tanita's request for an injunction permanently prohibiting Healthport from disseminating the false statements should likewise be granted. *See* 15 U.S.C. § 1116(a).

**3. Other Relief Requested**

In addition to injunctive relief prohibiting future dissemination of the false statements, Tanita seeks corrective advertising, disgorgement of Healthport's profits, and attorneys fees. A plaintiff who establishes

"a violation under section 43(a)" of the Lanham Act can recover the defendant's profits "subject to the principles of equity." 15 U.S.C. § 1117(a). In addition, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." *Id.*

"An inability to show actual damages does not alone preclude a recovery" under the Lanham Act. *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1411 (9th Cir.1993). "The preferred approach allows the district court in its discretion to fashion relief, including monetary relief, based on the totality of the circumstances." *Southland Sod Farms,* 108 F.3d at 1146. Those circumstances include "the nature of the infringing actions, including the intent with which they were motivated and the actuality, if any, of their adverse effects upon the aggrieved party." *Lindy Pen Co.,* 982 F.2d at 1405.

**a. The Defendant's Profits**

**\*8** A plaintiff who seeks the defendant's profits as a measure of the plaintiff's own damages need not prove that the defendant's conduct was willful. *Adray v. Adry-Mart, Inc.,* 76 F.3d 984, 988 (9th Cir.1995) (citing *Lindy Pen Co.,* 982 F.2d at 1407-09). In those situations, lost profits serve as "surrogate measures of damages." *Harper,* 889 F.2d at 209 n. 8. Moreover, when an advertisement draws a direct comparison between the competitor's product and the plaintiff's, a court may presume injury because "[a] misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer." *McNeilab, Inc. v. Am. Home Products Corp.,* 848 F.2d 34, 38 (2nd Cir.1988); *see also Southland Sod Farms,* 108 F.3d at 1146; *Harper,* 889 F.2d at 209 n. 8. Where an advertisement does not draw a direct comparison, however, the plaintiff must present evidence of an injury "causally related to the defendant's deception." *Harper,* 889 F.2d at 209-210; *see also Lindy Pen Co.,* 982 F.2d at 1407-1409 (plaintiff must prove both the fact and amount of damages).

Alternately, a plaintiff can recover an accounting of the defendant's profits under a theory of unjust enrichment. *See Maier Brewing Co. v. Fleishmann Distilling Corp.,* 390 F.2d 117, 121 (9th Cir.1968). The court must consider whether an award of profits is necessary to remove the economic incentive to violate the Lanham Act. *See Polo Fashions, Inc. v.*

--- F.Supp.2d ----                                                                     Page 7
--- F.Supp.2d ----, 2008 WL 2224398 (D.Or.)
**2008 WL 2224398 (D.Or.)**

_Dick Bruhn, Inc.,_ 793 F.2d 1132, (9th Cir.1986) (plaintiff injured by defendant's deliberate sale of counterfeit products); _Playboy Enterprises, Inc. v. Baccarat Clothing Co.,_ 692 F.2d 1272, 1274 (9th Cir.1982) (plaintiff injured by defendant's deliberate manufacture and sale of counterfeit products); _Maier Brewing Co.,_ 390 F.2d at 121 (plaintiff injured by defendant's deliberate use of plaintiff's mark). The Ninth Circuit "has cautioned that an accounting is proper only where the defendant is 'attempting to gain the value of an established name of another.'"_Lindy Pen Co.,_ 982 F.2d at 1406 (citing _Maier Brewing Co.,_ 390 F.2d at 123). Thus, a willful violation may support an award of profits to the plaintiff but does not require one. _Faberge, Inc. v. Saxony Products, Inc.,_ 605 F.2d 426, 429 (9th Cir.1979) (defendant's trade dress infringement sufficiently deterred by the costs of litigation and of modifying product packaging).

Here, the totality of the circumstances does not warrant an award of lost profits damages to Tanita. Assuming this remedy applies to false advertising claims, Tanita has provided no evidence that Healthport profited from its misrepresentations. _See Playboy Enterprises, Inc.,_ 692 F.2d at 1276 (equity-based accounting of profits not appropriate if premised on "potentially fictitious sales from which the defendant derived no economic gain"). Thus, Tanita has not demonstrated that it suffered any actual harm or that Healthport derived any actual benefit that would justify the monetary relief Tanita seeks. Tanita's motion for summary judgment on lost profits damages should therefore be denied.

**b. Corrective Advertising**

**\*9** Corrective advertising may be appropriate to remedy consumer confusion caused by false advertising messages. _See Rhone-Poulend Rorer Pharmaceuticals, Inc. v. Marion Merrell Dow, Inc.,_ 93 F.3d 511, 516 (1996) (corrective advertising appropriate where advertisements falsely represented that two prescription medications could be indiscriminately substituted); _ALPO Petfoods, Inc. v. Ralston Purina Co.,_ 720 F.Supp. 194, 199-200 216 (D.D.C.1989) (corrective advertising ordered where extensive ad campaign falsely claimed that dog food effective in preventing canine hip dysplasia) _aff'd in part and vacated in part, remanded_913 F.2d 958;_see also Warner-Lambert Co. v. FTC,_ 562 F.2d 749, 771

(1977) (corrective advertising did not violate the First Amendment where ad campaign falsely led consumers to believe product could cure common cold).

Tanita has requested that this Court order Healthport to post corrective advertising on all of Healthport's websites and to send corrective advertising to all of Healthport's "past and/or existing clients." Tanita. however, has presented no evidence that a large audience actually viewed the site or that consumers were and continue to be actually deceived about the nature of Healthport's products. As a result, this Court finds that corrective advertising is not necessary. _See Adray,_ 76 F.3d 984 at 989 (damages for costs of prospective corrective advertising should not exceed the damage to the value of trademark). Tanita's request for corrective advertising should therefore be denied.

**c. Attorneys Fees**

Under 15 U.S.C. § 1117(a), a court may award reasonable attorneys' fees to the prevailing party in exceptional circumstances, which includes cases in which the act is fraudulent, deliberate, or willful. _See Gracie v. Gracie,_ 217 F.3d 1060, 1068 (9th Cir.2000). A finding that the defendant acted intentionally "does not necessarily equate" with the malicious, fraudulent, deliberate or willful conduct. _See Watec Co., Ltd. v. Liu,_ 403 F.3d 645, 656 (9th Cir.2005). Thus, sufficient **undisputed evidence must demonstrate that** the defendant deliberately intended to deceive consumers. _See Earthquake Sound Corp. v. Bumper Indus.,_ 352 F.3d 1210, 1217-18 (9th Cir.2003).

Here, Healthport's liability rests on a presumption of consumer deception and reliance. This Court recognizes that Healthport intentionally made a false statement concerning Mr. Wooten's credentials. However, this statement is only marginally material to consumer purchasing decisions. While the statement regarding ELG accuracy bears more relevance to consumer decisions, the evidence does not demonstrate that Healthport engaged in a concerted effort to deceive consumers sufficient to justify an award of attorneys fees. As a result, Tanita's request for attorney's fees should be denied.

**CONCLUSION**

--- F.Supp.2d ----
Page 8
--- F.Supp.2d ----, 2008 WL 2224398 (D.Or.)
**2008 WL 2224398 (D.Or.)**

I recommend denying Healthport's motion for summary judgment (# 100), and granting Tanita's motion for summary judgment (# 99). I recommend that an injunctive order be entered requiring Healthport to immediately remove the ELG and Wooten misrepresentations from its web sites, and which forever prohibits Healthport from publishing any advertising or promotional material that contains representations to the effect that the ELG: (1) is the only patented body composition analyzer or metabolic analyzer in the United States or abroad; (2) is patented for unequaled accuracy and validity; (3) is the only body composition analyzer or metabolic analyzer patented for unequaled accuracy and validity; (4) is unequaled in accuracy and validity as compared to other body composition analyzers. I also recommend that an injunctive order be entered that forever prohibits Healthport from publishing any advertising or promotional material which falsely represents the credentials of Richard Wooten or other principals and employees of Healthport.

**\*10** Finally, in light of Tanita's indication that its common law unfair competition claim will rise and fall with its Lanham Act claim, this ruling on the parties' cross-motions for summary judgment resolves all the claims in this case. Judgment should be entered accordingly.

### SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due April 23, 2008. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

FN1. As part of this decision, defendant's other pending objection [106] is overruled.

FN1. Tanita filed an Amended Answer and Counterclaims on February 13, 2008, which abandoned its request for money damages.

FN2. Tanita did not move for summary judgment on its common law unfair competition claim. At oral argument, however, Tanita indicated that its unfair competition claim rises and falls with its Lanham Act claim.

FN3. www.cybercareplan.md/what.htm

FN4. www.healthechanges.com/benefits.cqs

FN5. Although Healthport asserted that the CyberCare site contained a login page, testimony by Mr. Wooten and Dr. Libke indicated otherwise and this Court was able to access both sites without a login or password. This Court finds that the question of the existence of a login page is not a disputed material fact. "The opposing party may not rely on denials in the pleadings but must produce specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." _Kennedy v. Allied Mut. Ins. Co.,_ 952 F.2d 262, 265 (9th Cir.1991).

FN6. Healthport presented no facts concerning the Health-e-Changes site. However, Dr. Libke's deposition testimony indicated that the Health-e-Changes and CyberCare Plan sites had similar content and served a similar purpose.

D.Or.,2008.
Healthport Corp. v. Tanita Corp. of America
--- F.Supp.2d ----, 2008 WL 2224398 (D.Or.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 4

Westlaw.

Slip Copy                                                                                              Page 1
Slip Copy, 2008 WL 162757 (N.D.Ill.)
**2008 WL 162757 (N.D.Ill.)**

C Midwest Canvas Corp. v. Commonwealth Canvas, Inc.
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern Division.
MIDWEST CANVAS CORP., an Illinois Corporation, Plaintiff,
v.
COMMONWEALTH CANVAS, INC., a Massachusetts Corp., et al., Defendants.
**No. 07 C 0085.**

Jan. 16, 2008.

Jennifer Ann Esposito, Kantor & Apter, Ltd., David G. Rosenbaum, John Peter Paredes, Rosenbaum And Associates, P.C., Northbrook, IL, for Plaintiff.
Jan M. Michaels, John A. Lee, Steven Schulwolf, Michaels & May, P.C., Robert A. Habib, Attorney at Law, Peter Carl Nabhani, Law Office of Peter Nabhani, Stephen Andrew Skardon, Chicago, IL, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

JOAN B. GOTTSCHALL, District Judge.
**\*1** Plaintiff Midwest Canvas Corp. ("Midwest") has filed suit against defendants Commonwealth Canvas, Inc. ("Commonwealth"), Raw Equipment Corporation ("Raw"), and Constructioncomplete.com ("CC.com") alleging, *inter alia,* violations by Commonwealth and Raw of the Lanham Act, 15 U.S.C. § 1125(a) (Count V); the Uniform Trade Deceptive Practices Act, 815 ILCS 510/1 (Count VI); and state common law unfair competition (Count VII); and violation by Commonwealth and CC.com of the Lanham Act (Count VIII); the Uniform Trade Deceptive Practices Act (Count IX); and state common law unfair competition (Count X). Before the court is Commonwealth's motion to dismiss Counts V-X and Raw's motion to dismiss Counts V-VII. For the reasons set forth below, Commonwealth's and Raw's motions to dismiss are granted.

### I. BACKGROUND

Midwest and Commonwealth are competing corporations engaged in the manufacture of, among other items, concrete curing blankets. Pl .'s First Amended Compl. ¶¶ 1-2. Concrete curing blankets are employed to cover freshly poured concrete. The blanket protects the surface of the concrete and its insulating qualities trap the heat released as the concrete cures and thus accelerates the hardening process; this is particularly important during construction in cold weather. Raw is a corporation engaged in the marketing and distribution of Commonwealth's products, including its curing blankets. Pl.'s First Amended Compl. ¶¶ 3-4.

One of Commonwealth's curing blankets, with the trade name "Cure-All," is listed on the website of the New York Department of Transportation ("NYDOT") on the page presenting the "Technical Services-Materials-Approved List" of form insulation materials for winter concreting (Form 711-07). Pl.'s First Amended Compl. ¶¶ 40-41; *see also* h ttps://www.nysdot.gov/portal/ page/portal/divisions/engineering/technicalservices/te chnical-services-repository/alme/pages/310-1.html (last visited Jan. 8, 2008). Commonwealth's blanket is one of seventeen curing blankets manufactured by eleven different corporations (including two of Midwest's "Insul-Tarp" products) that are listed as approved for use in NYDOT construction projects. *Id.;* Pl.'s First Amended Comp. Exh. C. The NYDOT website lists the Commonwealth "Cure-All" blanket as having a thickness of 25 mm (1 ). Pl.'s First Amended Compl. ¶ 42. No pricing or direct ordering information are listed on the website. Pl.'s First Amended Comp. Exh. C.

In April 2007, after the initial complaint in this suit was filed [FN1] Tim Dunphy ("Dunphy"), who was employed as a sales manager by Midwest, placed an order with Raw for a 25 mm "Cure-All" curing blanket, the same as listed on the NYDOT website. Pl.'s First Amended Compl. ¶¶ 43-44. Raw duly delivered a curing blanket, together with an invoice describing it as a "CLOSED CELL 1 NYSDOT CURING BLANKETS (sic) 6'x 25'."Pl.'s First Amended Compl. ¶¶ 45-46, Exh. D. Midwest claims that Dunphy, upon inspecting the curing blanket

Slip Copy
Slip Copy, 2008 WL 162757 (N.D.Ill.)
**2008 WL 162757 (N.D.Ill.)**

received from Raw, discovered that it was not 25 mm in thickness. Pl.'s First Amended Compl. ¶¶ 47-48.

> FN1. The initial complaint in this suit was filed on January 8, 2007. Midwest filed its amended complaint on June 28, 2007.

**\*2** Previously, in February 2007, Dunphy had likewise ordered a 1/2 (CC2) and 1 ("CC4") curing blankets from CC.com, which advertises and sells Commonwealth curing blankets. Pl.'s First Amended Compl. ¶¶ 62-65, Exh. E. The order was confirmed via email and, later, two curing blankets, together with a work order describing the blankets as being "CC2 6x25 2 LAYER FOAM CONCRETE CURING BLANKET" and "MISC CC-2 4 LAYER FOAM CONCRETE CURING BLANKET," were received by Midwest. Pl.'s First Amended Compl. ¶¶ 66-68, Exhs. F-G. Midwest claims that the received blankets were not 1/2 and 1 respectively in thickness. Pl.'s First Amended Compl. ¶ 69.

Count V of Midwest's first amended complaint claims that the invoice accompanying the curing blanket received from Raw constitutes commercial advertising as defined by the Lanham Act, 15 U.S.C. § 1125(a), and that Raw's provision of a curing blanket that was not 25 mm in thickness thereby constituted materially false and misleading representations about the nature and quality of the curing blanket. Counts VI and VII are pendant state and common law claims that Raw's actions respectively constituted a violation of the Illinois Uniform Trade Practices Act, 815 ILCS 510/1 et seq. and "New York and other state common law unfair competition."

Similarly, Count VIII of Midwest's amended complaint claims that the work order received with the blankets from CC.com constitutes false advertising in violation of the Lanham Act and that Commonwealth and CC.com's actions in selling the blankets are misleading and false. Counts IX and X claim respectively violations of the Illinois Uniform Trade Practices Act, 815 ILCS 510/1 et seq., and unfair competition under Illinois common law. Commonwealth has filed a motion to dismiss Counts V-X under Federal Rule of Civil Procedure 12(b)(6) and Raw has filed a motion to dismiss Counts V-VII on the same theory. Raw has also moved to dismiss the amended complaint under Federal Rule of Civil

Procedure 9(b), alleging that Midwest has failed to plead fraud with the required particularity. Because the issues in both motions are essentially identical, the court considers both of these motions together.

## II. ANALYSIS

To survive a motion to dismiss under 12(b)(6), "the complaint need only contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.' " _Equal Opportunity Comm'n v. Concentra Health Servs., Inc._, 496 F.3d 773, 776 (7th Cir.2007) (quoting Fed.R.Civ.P. 8(a)(2)). The complaint "must describe the claim in sufficient detail to give the defendant 'fair notice of what the ... claim is and the grounds upon which it rests' ... [and] its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." _Concentra_, 496 F.3d at 776 (quoting _Bell Atlantic Corp. v. Twombly_, --- U.S. ----, 127 S.Ct. 1955, 1964, 1973 n. 14, 167 L.Ed.2d 929 (2007)).

### A. Midwest's Counts V-VII

**\*3** Count V claims specifically that the invoice accompanying Raw's shipment of the blanket to Midwest constituted advertising under the Lanham Act, and that Commonwealth and Raw's collective actions of selling blankets that are purported to be 1 thick but are not constitute material false and misleading misrepresentations about the nature of Commonwealth's products.

The Lanham Act (§ 43(a)) provides in relevant part that any person who: "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act." 15 U .S.C. § 1125(a)(1)(B). To establish a claim under the false or deceptive advertising prong of § 43(a) of the Lanham Act, a plaintiff must prove: (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products. _Hot Wax, Inc. v. Turtle Wax, Inc.,_ 191 F.3d 813, 819 (7th Cir.1999); _The Monotype Corp. v. Simon & Schuster, Inc.,_ No. 99 C 4128, 2000 WL 1852907, at *6 (N.D.Ill. Sept.8, 2000).

Midwest specifically claims that the invoice accompanying the allegedly misrepresented curing blanket constitutes false commercial advertising under the Lanham Act. For a statement to amount to "commercial advertising or promotion" the statements must be (1) commercial speech (2) by a defendant who is in commercial competition with the plaintiff (3) for the purpose of inducing consumers to buy defendant's goods or services (4) disseminated sufficiently to the relevant purchasing public. _Health Care Compare Corp. v. United Payors and United Providers, Inc.,_ No. 96 C 2518, 1998 WL 122900 at *3 (N.D.Ill. Mar.13, 1998).

The court finds that Midwest's argument that the invoice accompanying Raw's delivered curing blanket constitutes advertising fails to meet these criteria. An invoice sent to an individual customer and accompanying an order can hardly be construed to have been "disseminated sufficiently to the relevant purchasing public" because it lacks the element of publicity required by the Lanham Act._American Needle & Novelty, Inc. v. Drew Pearson Marketing, Inc.,_ 820 F.Supp. 1072, 1078 (N.D.Ill.1993) (Lanham Act's use of the terms "advertising" or "promotion" have requisite element of publicity); _see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,_ 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) ("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). An invoice accompanying an order shipped to an individual customer lacks the requisite element of publicity. It is true, as Midwest points out correctly, that the required level of circulation establishing publicity will vary according to the specifics of each industry and can be so small as to comprise a single party. _Seven-up Co. v. Coca-Cola Co.,_ 86 F.3d 1379, 1385 (5th Cir.1996). Nevertheless, even if a presentation to a single individual could possibly be considered public enough to satisfy publicity requirement of the statute, an invoice cannot be advertising because it is not an inducement to buy, but rather reflects an agreed-upon transaction.

**\*4** Specifically, an invoice accompanying an order shipped to a client is not sent for the "purpose of inducing consumers to buy defendant's goods or services"; the goods accompanying a shipment have already been ordered by the consumer who needs no further inducement to buy them. In sum, a single private communication from one party to another that is not an inducement to buy does not constitute commercial advertising sufficient to establish liability under the Lanham Act. _See American Needle,_ 820 F.Supp. at 1078.

In its response to Commonwealth's and Raw's motions to dismiss, Midwest argues that the fourth prong is also satisfied because Commonwealth caused its products to become listed by NYDOT on NYDOT's website, and also because Commonwealth allegedly employed distributors who disseminated the "defendant's" (presumably Commonwealth's) statements over the internet in connection with promoting the sale of 1 NYDOT approved concrete curing blankets. The specifics of this claim are not clearly alleged in Midwest's complaint, but the court will assume, _arguendo,_ that this argument falls under the rubric of Midwest's allegations, stated in its complaint, that Commonwealth's and Raw's "misrepresentations constituting false advertising" resulted from their "actions of selling concrete curing blankets that are purported to be 1 blankets when they are not ...." Pl.'s First Amended Compl. ¶¶ 50-52

To begin with, Midwest's claims on this point fall far short of the particularity required by Federal Rule of Civil Procedure 9(b) for pleadings alleging fraud. When alleging claims of fraud or mistake, the plaintiff is required to plead with specificity the who, the what, the where, and the when of the alleged fraud. FED R. CIV. P. 9(b); _Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins.,_ 412 F.3d 745, 749 (7th Cir.2005). In Count V, Midwest vaguely alleges that the listing of the Commonwealth blanket on the NYDOT site, and Commonwealth's and Raw's alleged misrepresentations, are somehow connected in such a way as to create a fraudulent advertisement in violation of the Lanham Act. But

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                        Page 4
Slip Copy, 2008 WL 162757 (N.D.Ill.)
**2008 WL 162757 (N.D.Ill.)**

Midwest fails to allege with particularity just what, if any, the connection between the NYDOT website and Raw is. Not does it aver with any particularity what allegedly false statements have been made by Commonwealth or Raw other than the invoice; and the court has already determined that the invoice is not a commercial advertisement. Moreover, it does not allege with sufficient particularity a causal connection between Commonwealth's listing of its product on the NYDOT website and any direct or indirect misrepresentation whatever by Commonwealth to Midwest.

Even placing the issue of particularity aside, the listing of Commonwealth's (and Midwest's) curing blankets on the NYDOT website cannot be construed as a commercial advertisement by Commonwealth because the actual maker of the statement, NYDOT, a state government entity, is not in direct commercial competition with any of the companies whose curing blankets are listed on its Website, including Commonwealth and Midwest. Therefore, the listing cannot be a commercial advertisement or promotion by which liability can be established under § 43(a) of the Lanham Act. *Health Care Compare,* 1998 WL 122900 at *3.

**\*5** Furthermore, the NYDOT website listing of approved construction materials, including curing blankets, is not an inducement to the public to buy Commonwealth's (or any of the other manufacturer's) products. The listing of approved materials on the NYDOT website is presented as part of a "quality assurance program for materials incorporated into [NYDOT] projects ...."*See* https://www.nysdot.gov/porta l/page/portal/divisions/engineering/technicalservices/ materials-bureau/materials-and-equipment (last visited Jan. 8, 2008). In short, the website lists materials approved for use by NYDOT and its contractors in carrying out NYDOT projects. It is just possible, arguably, that such a listing could have mixed commercial and non-commercial components-identifying blankets suitable for NYDOT purposes as well as supporting preferred vendors. The key to determining whether such a listing might qualify as commercial advertising for Lanham Act purposes is an analysis of whether the language is motivated primarily by commercial concerns, or whether there are sufficient non-commercial motivations. *Monotype,* 2000 WL 1852907, at *7:*Oxycal Lab.,*

*Inc. v. Jeffers,* 909 F.Supp. 719, 725 (S.D.Cal.1995). Under this analysis, the listing of approved materials cannot be construed as commercial advertising: its principal purpose is to ensure that approved materials of sufficient quality are employed by NYDOT and its contractors in its construction projects. Such a purpose is most reasonably interpreted as being motivated by both quality assurance and public safety concerns. Because the principal purpose of the listing is informational, rather than commercial, it is not commercial advertising, and Midwest's claim fails. *Monotype,* 2000 WL 1852907, at *7.

Finally, Counts VI and VII allege the same factual elements as Count V. The same analysis employed in determining whether a claim for false or deceptive advertising exists under the Lanham Act is employed for Illinois false advertising claims. *Muzikowski v. Paramount Pictures Corp.,* 477 F.3d 899, 907 (7th Cir.2007); *Peaceable Planet, Inc. v. Ty, Inc.,* 362 F.3d 986, 994 (7th Cir.2004). Therefore, for the same reasons presented above, Counts VI and VII also fail to state a claim upon which relief can be granted under the Illinois Uniform Trade Practices Act, 815 ILCS 510/1 et seq., and state common law unfair competition.[FN2]Midwest's Counts V through VII against Commonwealth and Raw are consequently dismissed.

> FN2. Count VII alleges violations by Raw of "New York and other state common law unfair competition," whereas Count X alleges "unfair competition, deceptive advertising and unfair trade practices under Illinois common law. (Confusingly, Counts VI and IX allege violation of the Illinois Uniform Trade Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.). Federal courts sitting in Illinois employ Illinois state choice of law rules. *Gramercy Mills, Inc. v. Wolens,* 63 F.3d 569, 572 (7th Cir.1995). However, the choice of law issue confronting the court is moot in this instance, because the elements of both New York and Illinois unfair competition common law are very similar or identical to the Lanham Act and the legal analysis is substantially the same. *See, e.g., Paco Sport, Ltd. v. Paco Rabanne Perfumes,* 234 F.3d 1262, 1262 (2d Cir.2000); *Muzikowski v. Paramount Pictures Corp.,* 477 F.3d 899, 907 (7th

Slip Copy                                                                                                Page 5
Slip Copy, 2008 WL 162757 (N.D.Ill.)
**2008 WL 162757 (N.D.Ill.)**

Cir.2007). Under either Illinois or New York unfair competition common law, Midwest's Count VIII must be dismissed.

*B. Midwest's Counts VIII-X*

Midwest's Counts VIII through X against Commonwealth and CC.com have the same weaknesses as do Counts V through VII of their amended complaint against Commonwealth and Raw. Midwest's argument that the "work order" accompanying its order of two curing blankets from CC .com fails because a work order cannot be construed as commercial advertising by the court for the same reason that an invoice cannot be: it fails to meet the required elements of inducement of the public to buy and publicity. *See American Needle, 820 F.Supp. at 1078*. Midwest's implied claim that Commonwealth is somehow responsible for the representations on CC.com's website (which are presented as exhibits but not alleged as constituting false advertising in Counts VIII-X complaint) is not made with sufficient particularity to satisfy the requirements of Federal Rule of Civil Procedure 9(b).[FN3] Moreover, for the same reasons as listed above, because Count VIII fails to state a claim upon which relief can be granted under the Lanham Act, the Illinois statutory and common law claims of Counts IX and X also fail and Commonwealth's motion to dismiss these Counts is also granted.

FN3. Defendant CC.com has not yet filed an answer to Midwest's complaint and so this order will not consider CC.com's role in this suit.

### III. CONCLUSION

**\*6** For the reasons listed above, Commonwealth's motion to dismiss Counts V-X and Raw's motion to dismiss Counts V-VII of Midwest's first amended complaint are granted.

N.D.Ill.,2008.
Midwest Canvas Corp. v. Commonwealth Canvas, Inc.
Slip Copy, 2008 WL 162757 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 5

Not Reported in F.Supp.2d                                                                                     Page 1
Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)
**2001 WL 936641 (E.D.Pa.)**

H

Patient Transfer Systems, Inc. v. Patient Handling Solutions, Inc.
E.D.Pa.,2001.
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
PATIENT TRANSFER SYSTEMS, INC., Plaintiff,
v.
PATIENT HANDLING SOLUTIONS, INC., D.T. Davis Enterprises, Ltd., David T. Davis, and Joanne S. Davis, Defendants.
**No. CIV.A. 97-1568.**

Aug. 16, 2001.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

YOHN, J.

**\*1** Patient Transfer Systems, Inc. ["PTS"] sued David T. Davis, Patient Handling Solutions, Inc. ["PHSI"], and D.T. Davis Enterprises, Ltd. [collectively, "defendants"] for infringing on patent number 5,561,873 [" '873 patent"], false advertising, breach of fiduciary duty, conversion of corporate assets, and misappropriation of trade secrets.FN1PTS manufactures and sells air inflatable mattress pads that are used to support and move patients in hospitals and other health care facilities.FN2PTS employed Davis until November 1994. Sometime after Davis left PTS, he incorporated PHSI, a business that competed with PTS as a manufacturer and seller of air inflatable mattress pads. This lawsuit resulted.

> FN1. PTS has stipulated to the dismissal of claims against Joanne S. Davis. *See* Pl.'s Pre-Trial Mem. 1 (Doc. No. 138). Furthermore, the parties stipulated to the dismissal of PTS's claim for copyright infringement and Davis's counterclaim for tortious interference with prospective contractual relations. *See* Pl.'s Trial Mem. on the Legal Is-

sues Involved in the Case (Doc. No. 145/146).

> FN2. In this opinion, I will generally refer to this type of product as an "air transfer mattress."

The trial on damages has been bifurcated from the trial of liability. *See* Order of May 19, 1998 (Doc. No. 80). Having considered both parties' pre- and post-trial filings as well as all of the testimony and exhibits offered at trial on the issue of liability, I now, pursuant to Fed.R.Civ.P. 52(a), make the following findings of fact and conclusions of law:

I. Findings of Fact

A. Background

1. History of the Air Transfer Mattress

a. General Description of an Air Transfer Mattress

(1) An air transfer mattress is an inflatable pad composed of a series of interconnected inflatable chambers that is primarily used to move patients in hospitals and in emergency rescue situations from one horizontal surface to another. The surface of the bottom of the mattress has a pattern of small, closely spaced pinholes that allow air to escape from the mattress. This air forms an air bearing "lift" under the weight of the patient that reduces the exertion necessary to move a patient and, as a result, the risk of injury to the individual(s) moving the patient. *See* Joint Findings of Fact and Conclusions of Law ["JFF"] ¶ 5 (Doc. No. 140).

b. Early Air Transfer Technology

(1) Raynor Johnson and another individual patented an air-bearing pallet for moving heavy cartons (U.S. 3,948,344).*See* JFF ¶ 7.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)
**2001 WL 936641 (E.D.Pa.)**

(2) Johnson incorporated American Industrial Research, Inc. ["A.I.R."]. *See* JFF ¶ 7.

(3) Jack Wegener became associated with A.I.R., and Johnson and Wegener decided to develop and market an air transfer pad. *See* JFF ¶ 7.

(4) Using a concept similar to the air-bearing pallet Johnson invented, Wegener patented an air pallet for use in a hospital setting, patent number 4,272,856. *See* JFF ¶ 7.

### c. The A.I.R. PAL "Hard Pad"

(1) The air-bearing pallet Wegener patented utilized a rigid insert to keep the pad level during inflation and to provide stable support for the load. As a result, the air-bearing pallet was referred to as a "hard pad." *See* JFF ¶ 9.

(2) A.I.R. decided to develop the air-bearing pallet technology to make air transfer devices for moving human beings. *See* JFF ¶ 7.

(3) Johnson and Wegener presented their business plan to Robert E. Weedling and asked him to join their venture. *See* JFF ¶ 7.

**\*2** (4) Weedling incorporated LCI Medical, Inc. to develop and market air transfer devices that would be used to move patients. *See* JFF ¶ 8.

(5) IN 1984, LCI Medical began manufacturing the pallet as a transfer pad mover for patients and began shipping these "hard pad" patient movers under the A.I.R. PAL trademark it licensed from A.I.R. *See* JFF ¶ 9.

### d. Development of "Soft Pads"

(1) The size and bulk of these "hard pad" patient movers made them difficult to store. *See* JFF ¶¶ 9-10. As a result, from 1986 to 1990, LCI Medical, Wegener, and Johnson attempted to develop a patient transfer pad that did not require a rigid insert. *See* JFF ¶ 10.

(2) These development efforts resulted in two designs of a flexible "soft pad." *See* JFF ¶ 10.

### e. The "Old Blue" Soft Pad

(1) The first "soft pad" was called "Old Blue" and it had a single layer of longitudinal (head-to-toe) air chambers. LCI Medical sold "Old Blue" soft pads in 1988 and 1989. *See* JFF ¶ 10.

### f. The '189 Patent

(1) In 1988 or 1989, PTS retained patent attorney Donald E. Zinn to prepare a patent application for a second "soft pad." Zinn met with Wegener, Johnson, Weedling, and William Swallen at Johnson's A.I.R. facility in Newark, Delaware to discuss this purported invention. *See* Weedling Direct Testimony (Jan. 22, 2001); Cross Examination of Swallen (Jan. 24, 2001); DX-84 (Zinn Deposition) at 6. Ultimately, the second "soft pad" became the subject matter of the 1990 patent application that became patent number 5,067,189 [" '189 patent"].*See* JFF ¶ 11.

(2) The '189 Patent named Weedling, Swallen, Johnson, Wegener, and Davis as co-inventors. However, Davis and Swallen assigned their interests in the patent to Weedling. *See* JFF ¶ 11.

(3) The pads described in the '189 patent were first shipped in late 1989 and they replaced the "Old Blue" as LCI Medical's "soft pad." *See* JFF ¶ 11.

(4) In 1993, Weedling retained Sanford J. Piltch, Esq. as a patent attorney to review the '189 patent with the inventors. As a result of that review, in November 1993, Piltch filed an application for a broadening re-issue of the '189 patent (Patent No. RE 235,299). In July 1996, the Patent Office examined the patent and re-issued it with broader claims covering lateral chambers. *See* JFF ¶ 13.

### g. The '873 Patent

Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)

**2001 WL 936641 (E.D.Pa.)**

(1) Between approximately May 1993 to October 1994, the current air transfer mattress was designed at PTS. *See* JFF ¶ 14.

(2) The current air transfer mattress was designed to eliminate the instability of the older air pads. *See* JFF ¶ 15.

(3) The current design also features offset partitions so that, when the mattress is deflated, the partitions lie down flat. This feature eliminated the folds of the older air pads that caused patient discomfort. *See* JFF ¶ 16.

(4) During the design process, PTS received a request from the Mayo Clinic for an oversized pad to transfer an obese patient. As a result of this request, an oversized pad was constructed with a longitudinal (head-to-toe) partition along each side to add stability. Holes were placed in the longitudinal stringers to facilitate air flow into the lateral air chambers. On January 6, 1994, the oversized pad was sent to the Mayo Clinic. *See* JFF ¶ 17.

**\*3** (5) After discussions with Piltch, the application for the current design of the air mattress, which became the '873 patent, was filed on July 15, 1994. The patent application listed Weedling and Davis as co-inventors. *See* JFF ¶ 18-19.

2. Weedling's Employment History

a. Weedling founded Lehigh Valley Packing in 1975. In 1980, Weedling changed the name of Lehigh Valley Packing to Lehigh Consolidated Industries (LCI).*See* JFF ¶ 6.

b. In 1984, Weedling incorporated LCI Medical. *See* JFF ¶ 8.

c. In 1992, Weedling filed for bankruptcy and LCI Medical went out of business. *See* JFF ¶ 12.

d. In August 1992, Weedling incorporated PTS, and he has been the president and majority shareholder of PTS since that time. *See* JFF ¶ 1.

e. PTS is a Pennsylvania corporation that manufactures and sells air transfer mattresses. *See* JFF ¶ 1.

3. Davis's Employment History

a. Davis was employed by LCI from 1982 to 1984. *See* JFF ¶ 20.

b. In 1984, Davis became an employee of LCI Medical.

c. At LCI Medical, Davis supervised the manufacture of the air transfer pads. Davis also made regular sales calls to customers and potential customers, provided demonstrations of the A.I.R. PAL, and trained customers to use the A.I.R. PAL. Davis also maintained LCI Medical's parts inventory. As a result, Davis had access to LCI Medical's manufacturing records, research files, vendor lists, and user lists. *See* JFF ¶ 21.

d. In 1992, Davis was appointed a Vice President of Sales at LCI Medical. *See* JFF ¶ 20.

e. In August 1992, Davis became the Vice President of Sales of PTS. At the time, Davis was the only full-time employee of PTS. *See* JFF ¶ 20.

f. While he was employed by PTS, Davis was an "at will" employee. Davis did not have a written employment agreement or any confidentiality or secrecy agreement or covenant not to compete with PTS. Davis was also not a shareholder of PTS. *See* JFF ¶ 20.

g. In 1993, PTS moved into an industrial warehouse in Allentown, Pennsylvania with another company incorporated by Weedling, Gateway Industrial Services, Inc.

h. As noted above, the patent application for the current design of the air transfer mattress, which became the '873 patent, listed Weedling and Davis as co-inventors. *See* JFF ¶ 18-19.

i. At some point thereafter, Weedling asked Davis to assign his interest in the patent to PTS. Davis

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)

**2001 WL 936641 (E.D.Pa.)**

considered Weedling's request but, ultimately, in November 1994, he refused to transfer his interest in the patent. *See* JFF ¶ .

j. In September 1994, Davis met with the owner of Ryan Medical, Inc., Roger Parking. On October 19, 1994, Davis agreed not to disclose to any other party a proposed business transaction between Ryan Medical and Davis. *See* JFF ¶ 28.

**\*4** k. On November 14, 1994. Davis resigned from his job at PTS. *See* JFF ¶ 22.

l. In December 1994, Davis became an employee of Ryan Medical. Davis was hired by Ryan Medical to sell patient lift devices and to begin to market an air transfer mattress. *See* JFF ¶ 30.

m. On December 22, 1994, Davis entered a written agreement with Ryan Medical to assign any rights he had in the patent application that later became the '873 patent to Roger Parkin. *See* JFF ¶ 31.

n. On January 27, 1995, Davis and Ryan Medical terminated his employment and their agreement by mutual consent. Davis paid Roger Parkin $9,486.50 for legal expenses and the nylon fabric purchased in November 1994 from Brookwood. *See* JFF ¶ 32.

o. In January 1995, Davis asked PTS's vendor for fabric perforation services, Perforating Industries, Inc., to fax him copies of the perforation drawing sheets that PTS had supplied to Perforating Industries. Perforating Industries faxed the drawings to Davis. *See* JFF ¶ 34.

p. In March 1995, Davis sent 300 yards of the nylon fabric that Ryan Medical purchased from Brookwood to Perforating Industries with instructions for the fabric to be perforated as described in one of the drawing sheets PTS had supplied to Perforating Industries. *See* JFF ¶ 35.

q. On June 27, 1995, Davis acquired a license to the '189 patent from Wegener. *See* JFF ¶ 36.

r. Davis purchased almost all of the materials, parts,

and services for his air transfer mattresses from the same vendors used by PTS. *See* JFF ¶ 40.

s. In August 1995, Davis ordered air supply hoses from R/W Connection, PTS's former vendor for this component. R/W Connection addressed its invoice to PTS but sent the hoses to Davis's address. *See* JFF ¶ 41.

t. In 1995, Davis contacted PTS customers Carney Hospital, Crozer-Chester Hospital, Concord Hospital, Frankford Hospital, Sacred Heart Hospital, and the Medical Center of Delaware. *See* JFF ¶ 42.

u. In mid-1995, Davis made several air transfer mattresses and provided them to the Medical Center of Delaware for an evaluation. *See* JFF ¶ 39.

v. Davis initially marketed his air transfer mattresses under the name "AIR PAD." In 1996, Davis changed the name to "TransPad." In 1997, Davis changed the name to the present name, "HoverMatt." *See* JFF ¶ 43.

w. Davis incorporated PHSI in August 1995. PHSI manufactured and sold inflatable air transfer mattresses until April 1997. *See* JFF ¶ 2.

x. Davis incorporated D.T. Davis Enterprises (DTD), Ltd. on May 8, 1997. DTD trades under the name Patient Handling Technologies, and it has manufactured and sold air transfer mattresses since May 1997. *See* JFF ¶ 4.

B. Patent Infringement FN3

> FN3. During closing arguments, PTS dropped its infringement claim as to the Air Pad, and defendants dropped their request to invalidate the '873 patent.

1. Weedling's Knowledge of the Standard for Inventorship

a. During a 1988 or 1989 meeting regarding the preparation of the '189 patent, Attorney Zinn told Weedling that the standard for inventorship is that

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)

**2001 WL 936641 (E.D.Pa.)**

the individual must contribute to the novel aspect of at least one claim of the patent. *See* DX-84 (Zinn Deposition) at 5-8, 10, 12; Wegener Direct Testimony (Jan. 25, 2001).

**\*5** b. After being informed of this standard, Weedling told Attorney Zinn that Davis had made a contribution and should be named as an inventor in the '189 patent application. *See* Weedling Direct Testimony (Jan. 22, 2001); Wegener Direct Testimony (Jan. 25, 2001).

c. As noted above, Davis was also named as an inventor on the later '873 patent application.

2. Responsibility for Preparing Drawings

a. Weedling has limited drawing experience. *See* Weedling Direct Testimony (Jan. 22, 2001).

b. Davis has an associate degree in Civil Engineering and has taken drafting courses. *See* Cross Examination of Davis as a Hostile Witness (Jan. 24, 2001).

c. After Swallen retired, Davis was responsible for preparing drawings. *See* Weedling Direct Testimony (Jan. 22, 2001); Cross Examination of Weedling (Jan. 23, 2001); PX-11.

d. The drawings in PX-11 are not memorializations of tests. Instead, given Davis's level of knowledge about the drawings and the reasons for the adjustments that the drawings show, it is clear that Davis made these drawings to propose ideas to Weedling. *See* Davis Direct Testimony (Jan. 26, 2001).

3. Conception of the Claims in the '873 Patent

a. Swallen stated that development was a group effort. Cross Examination of Swallen (Jan. 24, 2001).

b. When he visited PTS, Wegener observed Davis contributing to discussions and presenting his own ideas. *See* Wegener Direct Testimony (Jan. 25, 2001).

c. Davis claims that he conceived of the following elements of claims in the '873 patent:

(1) "lateral partition members making a lateral chamber with an arcuate lower longitudinal partition member and also the varying height partition members in a lateral direction"; FN4

> FN4. Davis later restated this conception as follows: "lateral partition members with varying heights along with the longitudinal partition members going from a smaller height at the foot end to a larger height under the middle section and the upper torso with apertures [in the longitudinal partition members to allow air to go] into the lateral chambers."*See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).

(2) lateral array of chambers; and

(3) lateral chambers surrounded by a perimeter chamber.

*See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).

d. Davis claims that he and Weedling jointly conceived of the offset between the top and bottom sheets. *See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).

e. Davis explained his contributions to each of the various ideas incorporated in the '873 patent and seemed very knowledgeable about what he contributed to its design. *See generally* Davis Direct Testimony as a Hostile Witness (Jan. 23-24, 2001); Davis Direct Testimony (Jan. 26, 2001).

f. Davis reviewed the drawings which he prepared contemporaneously with the events and explained the purpose of each of the various changes as the air transfer mattress was developed which resulted in the '873 patent. Davis displayed superior knowledge of the '873 patent and air transfer mattress technology in general. His contemporaneous draw-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)

**2001 WL 936641 (E.D.Pa.)**

ings corroborated his testimony. It is undisputed that Davis did most of the work on the Mayo mattress which was the predecessor of the '873 patent. *See generally* Davis Direct Testimony as a Hostile Witness (Jan. 23-24, 2001); Davis Direct Testimony (Jan. 26, 2001).

g. Weedling's testimony on the conceptions of the '873 patent and air transfer mattress technology in general was markedly less confident than Davis's testimony. For example, Weedling used less detail in explaining the claims of the '873 patent and his explanations often appeared to mimic the idiosyncratic terminology Davis used to describe his conceptions. Furthermore, Weedling made a number of errors while he was discussing his supposed conceptions. Finally, Weedling used the term "we" throughout his explanation of the invention development process. *See, e.g.,* Weedling Rebuttal Testimony (Feb. 1, 2001).

**\*6** h. Lateral Chambers

(1) Swallen and Weedling worked with lateral tubes on a wheelchair pad during the late 1980s. *See* Weedling Direct Testimony (Jan. 22, 2001); Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).

(2) Although, prior to the '873 patent, PTS had used lateral air chambers in a pad, that pad was not an air transfer mattress because it does not have air holes in the bottom sheet. Cross Examination of Davis (Feb. 1, 2001).

(3) Davis claims that he conceived of the use of lateral chambers in an air transfer mattress while trying to solve a stability problem. *See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).*See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).

(4) Drawing No. 4 in PX-11 provides evidence that Davis conceived of an air transfer mattress with an array of lateral chambers. *See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).

4. Deletion of Davis as a Named Inventor on the '873 Patent

a. Attorney Piltch did not undertake a substantial investigation into the inventorship claims of Davis and Weedling when the '873 patent application was prepared. *See* Cross Examination of Piltch (Jan. 25, 2001); DX-79.

b. In June 1995, at Weedling's request, Attorney Piltch prepared a request to delete Davis as an inventor of the '873 patent before Piltch withdrew as an attorney for Davis. *See* Cross Examination of Piltch (Jan. 25, 2001); DX-79.

c. Piltch sent the letter to Davis by which he withdrew from representing Davis on June 21, 1995. Piltch sent the application to the Patent Office requesting deletion of Davis as a named inventor on June 22, 1995. Piltch did not notify Davis that he was doing so, and he did not notify the Patent Office that he no longer represented Davis. Moreover, even after Davis later retained an attorney, Piltch did not advise that attorney of the deletion. The method used to delete Davis as a co-inventor, although apparently legal, suggests that PTS felt Davis had a strong claim as a co-inventor. *See* Cross Examination of Piltch (Jan. 24, 2001); DX-20; DX-21.

d. Counsel stipulated that there was no deceptive intent on the part of Davis with regard to his removal as a named inventor.

5. Longitudinally Extending Portions FN5

> FN5. Plaintiff is relying solely on the visual inspection of the air transfer mattresses to determine the issue of whether a portion of the partition member extends more in the direction of the longitudinal axis than in the direction of the lateral or transverse axis. Although the plaintiff offered considerable testimony regarding the distance the partition members extend in the longitudinal direction, *see* Piltch Direct Testimony

(Jan. 24, 2001); Cross Examination of Piltch (Jan. 24, 2001), both parties later agreed that this testimony was irrelevant. Neither party measured the relevant angles, even after suggestion by the court. *See* Piltch Direct Testimony (Jan. 24, 2001); Cross Examination of Piltch (Jan. 24, 2001); Davis Direct Testimony (Jan. 26, 2001); Cross Examination of Davis (Feb. 1, 2001).

*\*7* a. Upon visual inspection of deflated and inflated TransPad and HoverMatt air transfer mattresses, it is clear that no portion of any of the partition members in these air transfer mattresses is both: 1) attached to the top and bottom sheets of the air transfer mattress, and 2) extends more in the direction of the longitudinal axis than in the direction of the lateral or transverse axis. *See;* DX-66 (Air Pad Serial No. 3125); DX-66A (HoverMatt Serial No. 5024); DX-66C (See-through mattress that approximates DX-66A & DX-85); DX-68A (Air Pad Serial No. 3005 that approximates early TransPad); DX-85 (Equivalent to HoverMatt Serial No. 5024); DX-86 (Early TransPad); PX-121 (Lateral partition member); Piltch Direct Testimony (Jan. 24, 2001); Cross Examination of Piltch (Jan. 24, 2001); Davis Direct Testimony (Jan. 26, 2001); Cross Examination of Davis (Feb. 1, 2001).

b. My finding is confirmed by the expert testimony of patent attorney Lewis F. Gould, Jr. In particular, Gould found that neither the TransPad nor the HoverMatt contains partition members that have longitudinally extending portions, and that, even if the partition members do have longitudinally extending portions, those portions are not attached to the top and bottom sheets of the air transfer mattress. *See* Gould Direct Testimony (Jan. 25, 2001); Cross Examination of Gould (Jan. 25, 2001); DX-70 (Gould's Expert Report).

C. False Advertising

1. Among the PTS correspondence found in Davis's

possession in March 1997 were the following testimonial letters and evaluation reports concerning the A.I.R. PAL:

a. An April 19, 1993 letter written by Colin J. Brigham, the Loss Control Manager of EBI Industries, that reported cost savings at an unnamed 230-bed hospital due to the use of the A.I.R. PAL.

b. A letter written by Brian Sanders of Crozier Keystone that reports cost reductions at that hospital.

c. An April 23, 1990 report written by Christine Collins of the Medical Center of Delaware that describes the results of a study of the A.I.R. PAL.

d. A June 22, 1989 letter written by Catherine Hujdich of St. Francis Hospital.

e. An April 28, 1993 letter written by Harold Hardinger of the University of Maryland.

f. An August 14, 1989 letter written by Hardinger.

g. A letter from Mt. Diablo Hospital.

h. A report on a 1989 study of the effect A.I.R. PAL material had on x-rays.

i. The "infection resistance report" of Lehigh Valley Hospital.

*See* JFF 25.

1. PTS used reproductions of these letters and materials in its sales and marketing efforts. *See* JFF ¶ 26.

2. PTS owns federal trademark registration 2,369,632 for AIR PAL and design for use on inflatable patient transfer and therapy pads. *See* JFF ¶ 47.

4. During 1995 and 1996, Davis sent letters on PHSI stationary to prospective customers in which he enclosed copies of the above-mentioned testimonial letters and evaluation reports. Although Davis

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)
**2001 WL 936641 (E.D.Pa.)**

removed any references to PTS in the testimonial letters and evaluation reports, his use of the letters and reports was misleading. *See* JFF ¶ 44.

5. Hardinger's Testimonial Letter

**\*8** a. While he was employed by PTS, Davis asked Hardinger, a Registered Nurse at the University of Maryland Shock Trauma Center, to write a letter about his experience with air transfer mattresses. *See* Hardinger Direct Testimony (Jan. 24, 2001).

b. After Davis left PTS, he notified Hardinger that he no longer worked for PTS. *See* Hardinger Direct Testimony (Jan. 24, 2001).*See also* DX-37.

c. Davis asked Hardinger to "update" the testimonial letters he had written to LCI Medical or PTS. Hardinger updated his letter on March 30, 1996. In the updated letter, Hardinger removed references to the "AIR PAL" and the letter noted that the air transfer system had been used for seven years. *See* JFF ¶ 45.

d. Hardinger was aware that the Air Pad, TransPad, and HoverMatt were not manufactured and sold by the same entity that manufactured and sold the Air Pal. *See* Hardinger Direct Testimony (Jan. 24, 2001).

e. After Davis left PTS, Hardinger preferred to continue dealing with Davis because he was not impressed by a demonstration conducted by Weedling. *See* Hardinger Direct Testimony (Jan. 24, 2001).

6. Brigham's Testimonial Letter

a. Davis asked Amos Brigham, a Safety and Health Consultant, if PHSI could use the results of the Sacred Heart Hospital study. Brigham gave his approval and updated his letter with one dated February 19, 1996. At Davis's request, Brigham addressed the updated letter to PHSI and replaced references to the "AIR PAL" with the phrase "patient/air

transfer technology product." *See* JFF ¶ 45; Brigham Direct Testimony (Jan 25, 2001).

b. When Brigham approved these changes, he was aware that Davis no longer was working for PTS and that PHSI was a different entity. Brigham was also aware that the Air Pad, TransPad, and Hover-Matt were not manufactured and sold by the same entity that manufactured and sold the Air Pal. *See* Brigham Direct Testimony (Jan 25, 2001).

c. Davis sent the updated Brigham letter to prospective customers. *See* JFF ¶ 45.

7. Sanders's Testimonial Letter

a. Davis asked Sanders to "update" the testimonial letters he had written to LCI Medical or PTS. Sanders updated his letter on January 16, 1997 and addressed it to Davis at PHSI, and again on June 24, 1997, this time addressing it to Davis at PHT. In both letters, Sanders replaced references to the "AIR PAL" with the phrase "Air/Transfer Technologic system." *See* JFF ¶ 45.

b. Davis sent the updated Sanders letter to prospective customers. *See* JFF ¶ 45.

8. Koury and the Acquisition of "Air Pals" from PHSI

a. After Davis left PTS, Steve Koury, the Clinical manager at Carney Hospital in Boston, was not impressed by a product demonstration conducted by Weedling. As a result, Koury preferred to continue dealing with Davis. *See* Koury Direct Testimony (Jan. 24, 2001).

b. In three price quote letters to Koury, Davis referred to his product as the "AIR PAL." On April 12, 1996, Carney Hospital ordered 17 "AIR PAL" mattresses and 5 "AIR PAL" blowers. On May 13, 1996, Carney Hospital ordered an additional 7 "AIR PAL transfer mattresses." On June 12, 1996, Carney Hospital ordered 17 additional "AIR PAL

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)
**2001 WL 936641 (E.D.Pa.)**

Transfer Mattresses." *See* JFF ¶ 46.

c. Koury called the air transfer mattresses he order from Davis after he left PTS, "Air Pals" because he wanted to get the order through the Carney Hospital acquisition process quickly. *See* Koury Direct Testimony (Jan. 24, 2001).

**\*9** d. When Koury placed these orders, he was aware that Davis no longer was working for PTS and that PHSI was a different entity. Brigham was also aware that the Air Pad, TransPad, and Hover-Matt were not manufactured and sold by the same entity that manufactured and sold the Air Pal. *See* Koury Direct Testimony (Jan 24, 2001).

8. Burton's Purchases

a. Suzanne Burton of Concord Hospital was not impressed by a product demonstration Weedling conducted after Davis left PTS. *See* Burton Direct Testimony (Jan. 25, 2001).

b. Burton learned that Davis started his own company and, as a result, she decided to cancel her order with Weedling. *See* Burton Direct Testimony (Jan. 25, 2001).

c. Burton was aware that PHSI and PTS were separate companies and that the Air Pal and Air Pad were different products. *See* Burton Direct Testimony (Jan. 25, 2001).

9. At PTS, Weedling received purchase order from individuals who were not currently PTS customers, invoices from part-suppliers for parts that PTS did not order, and a product return of a HoverMatt. *See* Weedling Direct Testimony (Jan. 23, 2001).

10. Davis sent the following seven letters containing literally false statements to prospective customers.

a. A June 29, 1995 letter from Davis to Linda Young of St. Luke's Hospital uses the following phrase: "The AIR PAL, now called the AIR

PAD,...."*See* PX-76.

b. A August 14, 1995 letter from Davis to Collins of Medical Center of Delaware uses the following phrase: "... the AIR MOVER transfer system (the new name for the improved AIR PAL)."*See* PX-76.

c. A January 30, 1996 letter from Davis to Patty Smith of Valley View Nursing Center states that "... [PHSI] made special units for the MAYO Clinic to handle 800 lb. patients."*See* PX-77.

d. A February 16, 1996 letter from Davis to Robert Conrad of Inservco states: "I have been in the patient handling arena for twelve years, initially developing a product to facilitate lateral patient transfers. This is the AIR PAD."*See* PX-77.

e. A February 27, 1996 letter from Davis to Deb Fontaine of Workers' Compensation Services states: "Part of the literature describes a product called the AIR PAD. This product has been used in the Shock Trauma unit at the University for several years..... The AIR PAD is a new and improved version of the AIR PAL."*See* PX-77.

f. An April 1, 1996 letter from Davis to Chuck Singleton states: "[Two years ago], the MAYO Clinic asked us to manufacture a transfer pad to move an 800 pound patient off the OR table."*See* PX-77.

g. A November 8, 1996 letter from Davis to Linda Young of St. Luke's Hospital states: "[Annette Friday and Chris Collins of the Medical Center of Delaware] may both identify the Trans Pad by its earlier nameAir Pal."*See* PX-77.

D. Breach of Fiduciary Duty [FN6]

> [FN6]. At mid-trial, I granted defendants' motion for judgment on partial findings with regard to the breach of fiduciary duty claim as to sales made to Frankford Hospital. Therefore, the breach of fiduciary duty claim applies only to sales made to

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)
**2001 WL 936641 (E.D.Pa.)**

the Medical Center of Delaware.

**\*10** 1. In 1990, the Medical Center of Delaware did a pilot evaluation of the A.I.R. PAL. Davis was PTS's contact with the Medical Center for this evaluation. The evaluation provided a cost justification for using the AIR PAL and, as a result, the Center purchased several air transfer mattresses. *See* JFF ¶ 27.

2. In 1994, the Medical Center of Delaware decided to conduct a larger evaluation with vertical lift, patient positioning devices, and patient transfer devices. While Davis was still a PTS employee, Collins told Davis that the Medical Center was planning to conduct this evaluation. *See* JFF ¶ 27; Collins Direct Testimony (Jan. 26, 2001).

3. It is undisputed that, before Davis left PTS in November 1994, Davis told Weedling that the Medical Center of Delaware was "about to pop." Weedling understood this to mean that the Medical Center of Delaware wanted to purchase additional Air Pals. *See* DX-83 (Weedling Deposition), at 243.

4. Weedling never followed up on this information until he made a sales presentation to the Medical Center of Delaware in late 1995 or early 1996. Hospital officials informed Weedling that they were aware of the difference between PTS and PHSI. *See* Cross Examination of Weedling (Jan. 23, 2001); Weedling Rebuttal Testimony (Feb. 1, 2001).

5. Davis did not contact anyone about starting his own company before he left PTS.

6. After Davis left, Weedling sold three air transfer mattresses to the Medical Center of Delaware. However, the mattresses were not purchased by Collins's department at the Medical Center of Delaware. *See* Cross Examination of Weedling during Rebuttal (Feb. 1, 2001).

7. Collins preferred to purchase products from Davis because Davis was willing to adapt air transfer mattresses based on her feedback about their performance. Collins Re-Direct Testimony (Jan. 26,

2001).

8. The Medical Center of Delaware purchased approximately \$70,000 worth of air transfer mattresses from Davis between September 1995 and September 1996. *See* Cross Examination of Davis (Feb. 1, 2001).

E. Conversion of Corporate Assets [FN7]

> [FN7]. During closing arguments, plaintiffs dropped all of their conversion of corporate assets claims other than their claim involving the demonstration kit.

1. Davis did not tell Weedling that he had a demonstration scheduled at Frankford Hospital the day his employment was terminated. *See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).

2. Davis kept the demonstration kit that he had in his car when his employment was terminated on November 15, 1994. *See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).

3. Despite Weedling's claim to the contrary, on November 15, 1994, Weedling did not ask Davis if he had any PTS property in his possession. *See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).

4. Davis is no longer in possession of the demonstration kit. *See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).

F. Misappropriation of Trade Secrets [FN8]

> [FN8]. At mid-trial, I granted defendants' motion for judgment on partial findings with regard to: 1) customer lists that were published by PTS, 2) sales records from 1993-94 that were Davis's personal records of his progress. Therefore, the misappropriation of trade secrets claim applies only to the vendor list, the part numbers and prices list found in PX-26, the contact list

found in PX-60, and the drawings that were in Davis's possession in March 1997.

1. In March 1997, the following items were in Davis's possession:

a. A folder labeled "Purchase Orders" that contained, among other documents, copies of purchase orders from PTS to vendors for the parts and services used to make the A.I.R. PAL. The purchase orders show the vendor name, contact information, numbers, and prices for parts and services.

b. A folder labeled "Drawings" that contained, among other documents, copies of LCI Medical and PTS development drawings, production drawings, and cutting and sewing instructions for transfer pads from 1990 through 1994.

**\*11** c. A folder labeled "Drawings-Production" that contained, among other documents, copies of PTS drawings for production of the 1994 design.

d. A folder that contained, among other documents, a copy of PTS's "Cost Justification Report" and copies of testimonial letters and reports that had been sent to PTS.

e. A folder labeled "Originals" containing, among other documents, copies of various PTS correspondence, instructions, price lists, user lists, packing lists, evaluation forms, warranty forms and definitions, and test reports.

f. A folder labeled "PTS/Weedling Documents" containing copies of various LCI Medical, PTS, and Weedling documents.

g. Records of the sales demonstrations Davis made while he was employed by PTS.

h. PTS's files regarding dealings with a company named ARJO. *See* JFF ¶ 24.

2. Vendor Lists

a. The identity of the vendors was not confidential and neither LCI Medical nor PTS had any exclusivity agreements with their vendors. *See* Cross Examination of Weedling (Jan. 23, 2001); Wegener Direct Testimony (Jan. 25, 2001).

b. The identity of the vendor from whom a given material is purchased is often marked on the material. *See* Cross Examination of Weedling (Jan. 23, 2001); Wegener Direct Testimony (Jan. 25, 2001).

c. Davis could easily remember the name and locations of each of the limited number of vendors involved without the benefit of any documents.

3. Part Numbers and Prices

a. Davis used almost all of the same vendors as PTS did. *See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).

b. Davis claims that, after he left PTS, he did not have to refer to the part numbers and prices listed in PX-26 because he had already memorized the information. *See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001). I find this statement not to be credible.

4. Unpublished Customer Contact List

a. Davis took a partial list of PTS customers with him when he left. This list included the contact person for each customer. *See* PX-60.

b. Given his experience, Davis would remember the contact information for some customers. However, there is no proof of how much information he would remember. Still, Davis could easily reestablish contact with customers who would direct him to the correct contact person.

5. Drawings

a. Production staff at PTS did not sign confidentiality agreements. *See* Cross Examination of Weedling (Jan. 23, 2001).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

b. While he worked at PTS, Davis kept some files in a work area of the plant that was accessible to employees of Gateway Industrial Services, Inc. *See* James Weedling Direct Testimony (Jan. 24, 2001).

c. Approximately a month after Davis left PTS, Davis asked John Davis (no relation) of PTS to get his design and assembly drawings from PTS. John Davis did, in fact, deliver the documents to Davis. *See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).

d. Davis saved some time because he did not have to take apart an Air Pal, but he could easily do so and reverse engineer the product he desired to sell. *See* Davis Direct Testimony as a Hostile Witness (Jan. 23, 2001).

II. Conclusions of Law

A. Jurisdiction

**\*12** 1. This court has jurisdiction in this matter pursuant to 28 U.S.C. § 1331, 1338(a), 1338(b), and 1367(a).

B. Applicable Law

1. Patent Infringement

a. The analysis of patent infringement requires two steps. First, the court must determine the meaning and scope of the patent claims that the plaintiff asserts are being infringed. Second, the court compares the properly construed claims to the accused infringing device. *See Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed.Cir.1995), *aff'd,*517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).

b. In a prior opinion, this court construed the meaning and scope of the disputed limitations in claim sixteen of the '873 patent as follows:

(1) The phrase "partition members having laterally extending portions and longitudinally extending

portions" in the third subset of limitations in claim sixteen "describes partition members that each have at least one laterally extending portion and at least one longitudinally extending portion."*See Patient Transfer Systems, Inc. v. Patient Handling Solutions, Inc.,* No. CIV.A. 97-1568, 2000 WL 726792, \*2-5 (E.D.Pa.2000).

(2) The third subset of limitations in claim sixteen places restrictions on the partition members that form the "side-by-side, laterally extending elongated chambers," but on no other partition members in the invention. *See id.* at \*5-6.

(3) The longitudinally extending portions of the "partition members having laterally extending portions and longitudinally extending portions" described in the third subset of limitations in claim sixteen do not need to be perpendicular to the laterally extending portions of those partition members. Instead, "the longitudinally extending portions must extend more in the direction of the longitudinal axis ... than in the direction of the lateral or transverse axis...."*See id.* at \*6-7.

c. A patent may be infringed by literal infringement, or, alternatively, under what is known as the "doctrine of equivalents." *See Becton Dickinson & Co. v. C.R. Bard, Inc.,* 922 F.2d 792, 796-97 (Fed.Cir.1990).

d. In order to establish literal infringement of the patent, the patent owner must demonstrate, by a preponderance of evidence, that the accused device contains every limitation in the asserted claims. "If even one limitation is missing or not met as claimed, there is no literal infringement."*Elkay Mfg. Co. v. EBCO Mfg. Co.,* 192 F.3d 973, 980 (Fed.Cir.1999), *cert. denied,*529 U.S. 1066, 120 S.Ct. 1672, 146 L.Ed.2d 482 (2000).*See WMS Gaming, Inc. v. International Game Tech.,* 184 F.3d 1339, 1350 (Fed.Cir.1999).

e. If a claim is not literally infringed upon by the accused device, it may still be infringed under the doctrine of equivalents if the differences between

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)
**2001 WL 936641 (E.D.Pa.)**

Page 13

the claim and the accused device are insubstantial. *See WMS Gaming, Inc.,* 184 F.3d at 1352-53.

**\*13** f. Davis as a Co-Inventor

(1) "The inventors as named in an issued patent are presumed to be correct."*See Hess v. Advanced Cardiovascular Sys., Inc.,* 106 F.3d 976, 980 (Fed.Cir.1997), *cert. denied,*520 U.S. 1277, 117 S.Ct. 2459, 138 L.Ed.2d 216 (quotation omitted). As a result, the burden of showing nonjoinder of an inventor is on the party claiming nonjoinder, and the party claiming nonjoinder must prove its claim of co-inventorship by clear and convincing evidence. *See id.* at 979-80.

(2) A patented invention may be the work of two or more joint inventors. *See*35 U.S.C. § 116.

(3) "Conception is the touchstone of inventorship.... [Conception] is the formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention, as it is hereafter to be applied in practice..... Because [conception] is a mental act, courts require corroborating evidence of a contemporaneous disclosure that would enable one skilled in the art to make the invention."*Burroughs Wellcome Co. v. Barr Labs., Inc.,* 40 F.3d 1223, 1227-28 (Fed.Cir.1994), *cert. denied,*516 U.S. 1070, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996) (quotation and citations omitted).

(4) "[T]he test for conception is whether the inventor had an idea that was definite and permanent enough that one skilled in the art could understand the invention; the inventor must prove his conception by corroborating evidence, preferably by showing a contemporaneous disclosure. An idea is definite and permanent when the inventor has a specific, settled idea, a particular solution to the problem at hand, not just a general goal or research plan he hopes to pursue."*Id.* at 1228.

(5) It is not necessary for each joint inventor to make the same type or amount of contribution to the invention. "Rather, each needs to perform only

a part of the task which produces the invention. On the other hand, one does not qualify as a joint inventor by merely assisting the actual inventor after conception of the claimed invention."*See Ethicon, Inc. v. U.S. Surgical Corp.,* 135 F.3d 1456, 1460 (Fed.Cir.1998), *cert. denied,*525 U.S. 923, 119 S.Ct. 278, 142 L.Ed.2d 229. "Thus, the critical question for joint conception is who conceived, as that term is used in the patent law, the subject matter of the claims at issue."*Id.*

(6) As a result, "a co-inventor need not make a contribution to every claim of a patent. A contribution to one claim is enough."*Id.* (citations omitted).

(7) However, "[a]n inventor may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent."*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.,* 758 F.2d 613, 624 (Fed.Cir.1985), *cert. dismissed,*474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (quotation omitted).

**\*14** (8) An alleged co-inventor's testimony with respect to the facts underlying his claim of co-inventorship cannot, standing alone, rise to the level of clear and convincing proof. The testimony must be corroborated by independent evidence. *See Price v. Symsek,* 988 F.2d 1187, 1194-96 (Fed.Cir.1993).

(9) Corroborative evidence can take a variety of forms, including contemporaneous documents, circumstantial evidence about the inventive process, and the testimony of witnesses other than that the alleged inventor. *See Ethicon, Inc.,* 135 F.3d at 1461.

(10) All of the relevant evidence put forth by the alleged inventor, including any of his corroborating testimony, must be considered as a whole to determine whether he conceived the invention. "In other words, an inventor can conceivably prove prior conception by clear and convincing evidence although no one piece of evidence in and of itself establishes the prior conception."*Price,* 988 F.2d at

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)
**2001 WL 936641 (E.D.Pa.)**

Page 14

1196.

(11) 35 U.S.C. § 256 "provides that if 'through [inadvertent] error an inventor is not named in an issued patent ... the Commissioner [of Patents] may ... issue a certificate correcting such error,' and that '[t]he court ... may order correction of the patent ... and the Commissioner shall issue a certificate accordingly.'" *Hess,* 106 F.3d at 979 (alteration in the original).*See Ethicon, Inc.,* 135 F.3d at 1461 ("35 U.S.C. § 256 provides that a co-inventor omitted from an issued patent may be added to the patent by a court 'before which such matter is called in question.' ").

2. False Advertising

a. Section 43(a) of the Lanham Act creates a federal cause of action for a wide variety of acts of unfair competition, including false or misleading advertising. *See Rose Art Indus., Inc. v. Swanson,* 235 F.3d 165, 170 (3d Cir.2000).

b. To prevail on a Lanham Act false advertising claim, a plaintiff must prove that the advertisement is either literally false, or, if it is not literally false, that it is still likely to mislead or deceive consumers. *See Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.,* 19 F.3d 125, 129-30 (3d Cir.1994).

c. If a court finds that a statement made in advertising is literally false, it may grant relief without considering whether consumers were actually misled. *See id.* at 129.

e. To prove a claim for false advertising under 15 U.S.C. § 1125(a), plaintiff must prove by a preponderance of evidence:

(1) that the defendant has made false or misleading statements as to his own product or another's product;

**\*15** (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience;

(3) that the deception is material in that it is likely to influence purchasing decision;

(4) that the advertised goods traveled in interstate commerce; and

(5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*See U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 922-23 (3d Cir.1990), *cert. denied,*498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (quoting *Max Daetwyler Corp. v. Input Graphics, Inc.,* 545 F.Supp. 165, 171 (E.D.Pa.1982) (citation omitted).

3. Breach of Fiduciary Duty

a. In Pennsylvania, an officer of a corporation "shall perform his duties as an officer in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances."15 Pa.C.S.A. § 512(c); *see Confer v. Custom Eng'g Co.,* 952 F.2d 34, 38 (3d Cir.1991).

b. Because directors and officers of a corporation occupy a fiduciary relation toward the corporation for which they work, "they cannot directly or indirectly make any profit at the expense of the corporation."*See Weissman v. Weissman, Inc.,* 382 Pa. 189, 114 A.2d 797, 799 (Pa.1955).

c. In other words, in order to prove a claim of breach of fiduciary duty, the plaintiff must prove by a preponderance of the evidence:

(1) "that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed;"

(2) that the plaintiff suffered injury; and

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)

**2001 WL 936641 (E.D.Pa.)**

(3) "that the agent's failure to act solely for the plaintiff's benefit ... was a real factor in bring [sic] about plaintiff's injuries."

*See McDermott v. Party City Corp.,* 11 F.Supp.2d 612, 626 n. 18 (E.D.Pa.1998) (quotation omitted).

d. Fiduciary duty may be breached by failing to disclose a material fact. *See In re Allegheny Int'l, Inc.,* 954 F.2d 167, 180 (3d Cir.1992).

e. "[U]nder the law of Pennsylvania[,] employees at will do not breach a fiduciary duty to the employer by making preparations to compete upon termination of employment provided the employee does not use the confidential information of his employer, solicit the customers of his employer, or otherwise engage in conduct directly damaging his employer during the period of employment."*Oestreich v. Environmental Inks and Coatings Corp.,* Civ.A. No. 89-8907, 1990 WL 210599, at *6 (E.D.Pa.1990)(citing *Spring Steels, Inc. v. Molloy,* 400 Pa. 354, 162 A.2d 370 (1960)).

b. Because breach of fiduciary duty is tortious conduct, *see* Restatement (Second) of Torts, § 874 (1979), under Pennsylvania law, it is subject to a two-year statute of limitations period. *See* 42 Pa.C.S.A. § 5524(7).

4. Conversion of Corporate Assets

**\*16** a. In order to prove a claim of conversion of corporate assets, the plaintiff must prove by a preponderance of the evidence:

(1) "the deprivation of another's right of property in, or use or possession of, a chattel;"

(2) "without owner's consent;" and

(3) "without lawful justification."

*Bernhardt v. Needleman,* 705 A.2d 875, 878 (Pa.Super.1997).

b. "Where one lawfully comes into possession of

the chattel, a conversion occurs if a demand for the chattel is made by the rightful owner and the other party refuses to deliver."*The Prudential Insurance Co. v. Stella,* 994 F.Supp. 318, 323 (E.D.Pa.1998) (citing *Norriton East Realty Corp. v. Central-Penn Nat. Bank,* 435 Pa. 57, 254 A.2d 637, 638 (Pa.1969)).

c. Under Pennsylvania law, there is a two year statute of limitations for conversion. *See* 42 Pa.C.S.A. § 5524; *Shonberg v. Oswell,* 365 Pa.Super. 481, 530 A.2d 112, 114 (Pa.Super.1987).

d. "It is well settled that the commencement of an action in state court has no effect on the running of the statute with respect to an action filed later in federal court."*Price v. United States,* 466 F.Supp. 315, 318 (E.D.Pa.1979) (citing *Falsetti v. Local Union No.2026, United Mine Workers,* 355 F.2d 658, 662 (3d Cir.1966)).

e. "It is well-established that Pennsylvania law recognizes an exception to the statute of limitations which delays the running of the statute until the plaintiff knew, or through the exercise of reasonable diligence should have known, of the injury and its cause. Courts employ the same 'knew or should have known' standard whether the statute is tolled because of the discovery rule or because of fraudulent concealment."*Beauty Time, Inc. v. VU Skin Sys., Inc.,* 118 F.3d 140, 144 (3d Cir.1997) (quotations omitted).

f. "Reasonable diligence has been defined as follows: 'A fair, proper and due degree of care and acting, measured with reference to the particular circumstances; such diligence, care, or attention as might be expected from a man of ordinary prudence and activity.'"*Id.* (quoting *Black's Law Dictionary* 457 (6th ed. 1991)).

g. "[T]here are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and suggest investigation."*Id.* (citation omitted).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 16
Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)
**2001 WL 936641 (E.D.Pa.)**

h. Because the statute of limitations is an affirmative defense, the initial burden of establishing its applicability to a particular claim rests with the defendant. *See Van Buskirk v. Carey Canadian Mines, Ltd.,* 760 F.2d 481, 487 (3d Cir.1985). However, under Pennsylvania law, the burden shifts to the plaintiff if he or she asserts that the statute of limitations should be tolled by the discovery rule. *See id.* If the plaintiff satisfies this burden, the discovery rule delays the accrual of a cause of action until the plaintiff was aware or should have been aware that an injury occurred. *See Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1386 (3d Cir.1994).

5. Misappropriation of Trade Secrets

*17 a. To establish a claim of misappropriation of trade secrets, the plaintiff must prove the following:

(1) the existence of trade secrets.

(2) that the secrets were valuable to the plaintiff and important in the conduct of plaintiff's business.

(3) that the plaintiff had the right to the use and enjoyment of the secrets; and

(4) that the secrets were communicated to the defendant while he was employed in a position of trust and confidence under such circumstances as to make it inequitable and unjust for him to disclose the secrets to others, or to make use of them himself.

*See SI Handling Sys., Inc. v. Heisley,* 753 F.2d 1244, 1255 (3d Cir.1985).

b. Pennsylvania courts have adopted the definition of a trade secret given in the Restatement of Torts, § 757, comment b (1939):

A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

*Id.*

c. "Matters which are fully disclosed by a marketed product and are susceptible to 'reverse engineering'-i.e., starting with the known product and working backward to divine the process which aided in its manufacture, cannot be protected as trade secrets."*Id.* (quotation omitted).

d. In determining whether information constitutes a trade secret, a court should consider the extent to which the information is known outside the plaintiff's business; the extent to which it is known by employees and others; the measures taken to guard the secrecy of the information; the value of the information; the money and effort expended by the owner to develop the information; and the ease with which the information could be properly acquired or duplicated by others. *See id.* at 1256 (citing Restatement of Torts § 757 comment b (1939)).

e. Confidential customer lists can be protected as trade secrets under Pennsylvania law. *See id.* at 1258.However, "[c]ustomer lists ... cannot be trade secrets if they are easily or readily obtained, without great difficulty, through some independent source other than the trade secret holder. Accordingly, courts have denied protection to customer lists which are easily generated from trade journals, ordinary telephone listings, or an employee's general knowledge of who, in an established industry, is a potential customer for a given product."*BIEC Int'l, Inc. v. Global Steel Servs., Ltd.,* 791 F.Supp. 489, 545 (E.D.Pa.1992) (citations omitted).

f. "The secrecy in which a purported trade secret is kept need not be absolute but reasonable precautions under the circumstances must be taken to prevent disclosures to unauthorized third partes. The degree of secrecy must be such that it would be dif-

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)
**2001 WL 936641 (E.D.Pa.)**

Page 17

ficult for others to obtain the information without using improper means." *National Risk Mgmt., Inc. v. Bramwell,* 819 F.Supp. 417, 431 (E.D.Pa.1993).

g. Under Pennsylvania law, a claim of misappropriation of trade secrets is subject to a two year statute of limitations. *See* 42 Pa.C.S.A. § 5524; *Advanced Power Sys., Inc. v. Hi-Tech Sys., Inc.,* 801 F.Supp. 1450, 1455 (E.D.Pa.1992).

C. Liability

1. PTS's Patent Infringement Claim

**\*18** a. PTS claims that the defendants' TransPad and HoverMatt air transfer mattresses violate the '873 patent, which is held by PTS.

b. PTS has failed to demonstrate, by a preponderance of the evidence, that the TransPad and the HoverMatt contain every limitation in the claims asserted by the '873 patent. In particular, PTS has failed to establish that any portion of the partition members in these air transfer mattresses is both: 1) attached to the top and bottom sheets of the air transfer mattress, and 2) extends more in the direction of the longitudinal axis than in the direction of the lateral or transverse axis. PTS concedes that if this is true, which I have found it is, there is no literal infringement.

c. PTS has also failed to demonstrate, by a preponderance of the evidence, that the differences between claim sixteen and the TransPad or HoverMatt are insubstantial.

d. Therefore, PTS's patent infringement claim fails under both a literal infringement and a "doctrine of equivalents" theory of infringement.

e. Furthermore, PTS's patent infringement claim fails because the defendants have proven, by clear and convincing evidence, that Davis is a joint inventor of the subject matter of the '873 patent. In particular, the drawings in PX-11 and the testimony of Swallen, Wegener, and Attorney Zinn corrobor

ate Davis's claim that he conceived at least one claim of the '873 patent. Moreover, Weedling knew of the standard of inventorship and he added Davis a co-inventor on the '189 and '873 patent applications.

2. PTS's False Advertising Claim

a. PTS claims that the defendants violated the Lanham Act by utilizing false advertising to promote their air transfer mattress.

b. PTS has proven, by a preponderance of evidence, that the defendants have engaged in false advertising in violation of the Lanham Act by sending to prospective customers seven letters, noted above in Section I.C. 10, that contain statements that are literally false as a factual matter.

c. Moreover, PTS has also proven, by a preponderance of evidence, that the defendants' use of testimonial letters and evaluation reports, noted above in Section I.C. 1, constitutes false advertising in violation of the Lanham Act. Although the statements in these testimonial letters and evaluation reports are literally true, PTS has demonstrated that such statements have misled or confused consumers. The fact that PTS received purchase orders from individuals who were not currently PTS customers, invoices from part-suppliers for parts that PTS did not order, and a product return of a HoverMatt, demonstrate actual confusion on part of consumers and the likelihood of injury to PTS in terms of declining sales, loss of good will, etc.

3. PTS's Breach of Fiduciary Duty Claim

**\*19** a. PTS claims that Davis breached the fiduciary duty he owed to PTS by not disclosing that the Medical Center of Delaware was conducting an evaluation of air transfer mattresses. However, PTS concedes that Davis disclosed that the Medical Center of Delaware was "about to pop" which is functionally equivalent and put PTS on notice that it should have pursued the corporate opportunity

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)
**2001 WL 936641 (E.D.Pa.)**

Page 18

immediately after Davis left.

b. PTS has failed to prove, by a preponderance of evidence, two of the three elements of a breach of fiduciary duty.

c. First, because Davis, before he left PTS, told Wheeling that the Medical Center of Delaware was "about to pop," PTS has failed to prove that Davis failed to act in good faith and solely for the benefit of PTS while he was employed by PTS.

d. Second, because Wheeling was in contact with the Medical Center of Delaware after Davis left PTS, PTS sold three mattresses to the Medical Center of Delaware during the relevant time period, and Collins expressed a preference for dealing with Davis after she became aware of the difference between the two corporations, PTS has not established that any conduct by Davis was a real factor in bringing about any injury claimed by PTS.

### 4. PTS's Conversion of Corporate Assets Claim

a. PTS claims that Davis unlawfully converted a corporate asset when he kept PTS's demonstration kit after he ceased to work there.

b. PTS's conversion of corporate assets claim fails because it is barred by the statute of limitations.

c. PTS knew or, through the exercise of reasonable diligence, should have known that Davis had the demonstration kit on November 14, 1994. Although PTS filed a state lawsuit on November 1, 1995, because this lawsuit was not filed until February 27, 1997, PTS's conversion of corporate assets claim is barred by the statute of limitations. *See Price v. U.S.,* 466 F.Supp. 315, 318 (E.D.Pa.1979) ("It is well settled that the commencement of an action in state court has no effect on the running of the statute with respect to an action filed later in federal court.") (citing *Falsetti v. Local Union No.2026, United Mine Workers,* 355 F.2d 658, 662 (3d Cir.1966)).

d. PTS has not established a factual basis to toll the statute of limitations by the discovery rule.

### 5. PTS's Misappropriation of Trade Secrets Claim

a. PTS claims that Davis misappropriated PTS's trade secrets in the form of a vendor list, a part numbers and prices list, the unpublished contact list found in PX-60, and drawings.

b. With regard to the vendor list, PTS's misappropriation of trade secrets claim fails because the vendor list does not constitute a trade secret. First, PTS took few if any measures to guard the secrecy of the information contained in the vendor list. For example, the identity of the vendors was not confidential and neither LCI Medical nor PTS had any exclusivity agreements with their vendors. Second, Davis would have been easily capable of replicating the vendor list from memory because: the identity of the vendor from whom PTS purchased a given material was often marked on the material; there are only a limited number of vendors that provide products used in the construction of the Air Pal; and Davis had extensive knowledge about the construction of the Air Pal.

c. With regard to the part numbers and prices list, PTS has proven that the defendants have misappropriated PTS's trade secret. First, the part numbers and prices list constitutes a trade secret because the level of detail contained in the information compiled in this list would have been very difficult for Davis to replicate from memory. Furthermore, the defendants have not contested PTS's claims that: the list is valuable because it simplifies the ordering process and constitutes the basis for production cost approximations; PTS had the right to its use and enjoyment; and Davis became aware of this list while he was an officer of PTS.

*20 d. With regard to the contact list, PTS's misappropriation of trade secrets claim fails because the contact list does not constitute a trade secret. The contact list does not constitute a trade secret be-

Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)
**2001 WL 936641 (E.D.Pa.)**

cause, given his years of experience selling the Air Pal, Davis could have easily remembered the contact information for some customers. For those customers whose contact person he could not remember, Davis would have been easily able to reestablish contact with the customer who could then direct him to the correct contact person.

e. With regard to the drawings, PTS's misappropriation of trade secrets claim fails because the drawings do not constitute trade secrets. First, the drawings are not trade secrets because "matters which are fully disclosed by a marketed product and are susceptible to 'reverse engineering'-i.e., starting with the known product and working backward to divine the process which aided in its manufacture, cannot be protected as trade secrets." *See SI Handling Systems, Inc.,* 753 F.2d at 1255. Second, there is considerable evidence that PTS did not take appreciable measures to guard the secrecy of the information contained in the drawings. Third, given that Davis drafted most of the drawings, he would have been capable of replicating them.

D. Remedy

1. Because Davis is a joint inventor of the subject matter of the '873 patent, I will order the correction of the '873 patent.

2. Because the defendants have engaged in false advertising in violation of the Lanham Act by sending: 1) seven letters containing literally false statements to prospective customers, *see* Section I.C. 10, and 2) misleading testimonial letters and evaluation reports to prospective customers, *see* Section I.C. 1; and have misappropriated PTS's trade secret, as embodied in the part numbers and prices list, *see* PX-26, I will order a trial on damages arising out of these claims.

Order

AND NOW, this day of August, 2001, having con-

sidered both parties' pre- and post-trial filings as well as all of the testimony and exhibits offered at trial on the issue of liability, in accordance with the aforesaid findings of fact and conclusions of law, IT IS HEREBY ORDERED THAT judgment is entered as follows:

1. Because David T. Davis is a joint inventor of the subject matter of the '873 patent, the court orders the correction of the '873 patent by the Commissioner of Patents pursuant to 35 U.S.C. § 256 so that David T. Davis is reinstated as a joint inventor of the '873 patent;

2. Defendants have engaged in false advertising in violation of the Lanham Act by sending: 1) seven letters containing literally false statements to prospective customers, and 2) misleading testimonial letters and evaluation reports to prospective customers; and have misappropriated PTS's trade secret, as embodied in the part numbers and prices list; and

**\*21** 3. The parties shall notify the court within ten days as to: a) how soon they will be ready for a trial on damages based on the judgments against the defendants on the false advertising and misappropriation of trade secret claims; and b) their estimate as to how long a trial on damages will last.

E.D.Pa.,2001.
Patient Transfer Systems, Inc. v. Patient Handling Solutions, Inc.
Not Reported in F.Supp.2d, 2001 WL 936641 (E.D.Pa.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 6

Not Reported in F.Supp.2d                                          Page 1

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

C

MasterCard Intern. Inc. v. Nader 2000 Primary
Committee, Inc.
S.D.N.Y.,2004.

United States District Court,S.D. New York.
MASTERCARD INTERNATIONAL INCORPOR-
ATED Plaintiffs,
v.
NADER 2000 PRIMARY COMMITTEE, INC.,
Nader 2000 General Committee, Inc., and Ralph
Nader, Defendants.
**No. 00 Civ.6068(GBD).**

March 8, 2004.

**Background:** Financial services company that had
commissioned authorship of advertisements using
phrase "THERE ARE SOME THINGS MONEY
CAN'T BUY. FOR EVERYTHING ELSE
THERE'S MASTERCARD," and "PRICELESS,"
sued presidential candidate and his political com-
mittee for use of slogans similar to its service
marks, alleging claims for unfair competition, mis-
appropriation, trademark infringement, trademark
dilution under the Federal Trademark Act and state
and common law, as well as copyright infringement
under the Copyright Act. Defendants moved for
summary judgment.

**Holdings:** The District Court, Daniels, J., held that:
(1) plaintiff failed to establish likelihood of confu-
sion, as required to support trademark infringement
claims;
(2) state claims for unfair competition and misap-
propriation were preempted by the Copyright Act;
(3) lack of likelihood of consumer confusion de-
feated palming off claim under New York law;
(4) there was no evidence of trademark dilution;
(5) defendants' use of plaintiff's copyrighted works
was fair use, and thus, not an infringement; and
(6) defendants' use of plaintiff's copyrighted works
was not a material deceptive act or practice directed
to consumers that caused actual harm, as would

support deceptive acts or practices claim.

Motion granted.

West Headnotes

**[1] Trademarks 382T ⟐1092**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood
of Confusion
        382Tk1090 Nature of Marks
            382Tk1092 k. Strength or Fame of Marks;
Degree of Distinctiveness. Most Cited Cases
    (Formerly 382k350.1)
For purposes of determining likelihood of confu-
sion to public in trademark infringement action
based on presidential candidate and his political
committee's use of slogans similar to financial ser-
vices company's service marks "THERE ARE
SOME THINGS MONEY CAN'T BUY. FOR
EVERYTHING ELSE THERE'S MASTERCARD,"
and "PRICELESS," marks were strong enough to
have become a part of present-day American popu-
lar culture, and thus had acquired secondary mean-
ing. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15
U.S.C.A. §§ 1114(1), 1125(a).

**[2] Trademarks 382T ⟐1097**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood
of Confusion
        382Tk1093 Relationship Between Marks
            382Tk1097 k. Examination and Compar-
ison; Construction as Entirety. Most Cited Cases
    (Formerly 382k350.1)

**Trademarks 382T ⟐1098**

382T Trademarks
    382TIII Similarity Between Marks; Likelihood
of Confusion
        382Tk1093 Relationship Between Marks
            382Tk1098 k. Appearance, Sound, and

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

Meaning. Most Cited Cases

(Formerly 382k350.1)

Presidential candidate and his political committee's use of word "priceless" and phrase "there are some things money can't buy" in same look, sound, and commercial impression as employed by financial services company established sufficient degree of similarity to company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," as to support finding of likelihood of confusion to public, for purposes of company's trademark infringement action against candidate and committee. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[3] Trademarks 382T ⟿1104**

382T Trademarks

382TIII Similarity Between Marks; Likelihood of Confusion

382Tk1100 Relationship Between Goods or Services Underlying Marks

382Tk1104 k. Markets and Territories; Competition. Most Cited Cases

(Formerly 382k350.1)

For purposes of determining likelihood of confusion to public in trademark infringement action based on presidential candidate and his political committee's use of slogans similar to financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," plaintiff failed to show proximity between services and political candidacy, or likelihood that defendants would "bridge the gap" into its product or service line, or that it would have any direct involvement in supporting a candidate in a political presidential campaign. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[4] Trademarks 382T ⟿1086**

382T Trademarks

382TIII Similarity Between Marks; Likelihood of Confusion

of Confusion

382Tk1083 Nature of Confusion

382Tk1086 k. Actual Confusion. Most Cited Cases

(Formerly 382k350.1)

Presidential candidate and his political committee's use of word "priceless" and phrase "there are some things money can't buy" in same look, sound, and commercial impression as employed by financial services company did not create actual confusion with respect to company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," as would support finding of likelihood of confusion to public, for purposes of company's trademark infringement action against candidate and committee. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[5] Trademarks 382T ⟿1111**

382T Trademarks

382TIII Similarity Between Marks; Likelihood of Confusion

382Tk1111 k. Intent; Knowledge of Confusion or Similarity. Most Cited Cases

(Formerly 382k350.1)

Presidential candidate and his political committee's use of word "priceless" and phrase "there are some things money can't buy" in same look, sound, and commercial impression as financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," was not intended to confuse public, as would support finding of likelihood of confusion to public, for purposes of company's trademark infringement action against candidate and committee. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[6] Trademarks 382T ⟿1105**

382T Trademarks

382TIII Similarity Between Marks; Likelihood of Confusion

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

382Tk1100 Relationship Between Goods or Services Underlying Marks
382Tk1105 k. Relative Quality. Most Cited Cases
(Formerly 382k350.1)

For purposes of determining likelihood of confusion to public in trademark infringement action based on presidential candidate and his political committee's use of slogans similar to financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," there was no reasonable comparison to be made between quality of plaintiff's products and services and value of defendants' politics. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[7] Trademarks 382T 1112**

382T Trademarks
382TIII Similarity Between Marks; Likelihood of Confusion
382Tk1112 k. Persons Confused; Circumstances of Sale. Most Cited Cases
(Formerly 382k350.1)

For purposes of determining likelihood of confusion to public in trademark infringement action based on presidential candidate and his political committee's use of slogans similar to financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," plaintiff's customers were generally sophisticated enough to decipher between plaintiff's commercial purposes and defendants' political agenda. Lanham Trade-Mark Act, §§ 32(1), 43(a), 15 U.S.C.A. §§ 1114(1), 1125(a).

**[8] States 360 18.84**

360 States
360I Political Status and Relations
360I(B) Federal Supremacy; Preemption
360k18.83 Trade Regulation; Monopolies
360k18.84 k. In General. Most Cited Cases

Antitrust and Trade Regulation 29T 14

29T Antitrust and Trade Regulation
29TII Unfair Competition
29TII(A) In General
29Tk14 k. Preemption. Most Cited Cases
(Formerly 382k423.1 Trade Regulation)

Financial services company's state law claims for unfair competition and misappropriation against presidential candidate and his political committee, based on their alleged use of advertisement derived from company's copyrighted advertising, were preempted by the Copyright Act; advertisements fell within subject matter of the Act, and unfair competition and misappropriation claims were grounded solely in defendants' copying of copyrighted expression. 17 U.S.C.A. § 301(a), (b)(1).

**[9] Trademarks 382T 1428(1)**

382T Trademarks
382TVIII Violations of Rights
382TVIII(A) In General
382Tk1423 Particular Cases, Practices, or Conduct
382Tk1428 Passing Off or Palming Off
382Tk1428(1) k. In General. Most Cited Cases
(Formerly 382k404)

Under New York law, presidential candidate and his political committee's use of slogans similar to financial services company's service marks "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," did not create likelihood of consumer confusion, as would support palming off claim.

**[10] Trademarks 382T 1469**

382T Trademarks
382TVIII Violations of Rights
382TVIII(B) Dilution

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

382Tk1469 k. Nature of Defendant's Use; Use in Commerce. Most Cited Cases

(Formerly 382k366)

**Trademarks 382T ☞1524(1)**

382T Trademarks
　382TVIII Violations of Rights
　　382TVIII(D) Defenses, Excuses, and Justifications
　　　382Tk1521 Justified or Permissible Uses
　　　　382Tk1524 Expressive Use; Commentary
　　　　　382Tk1524(1) k. In General. Most Cited Cases

(Formerly 382k366)

Presidential candidate and his political committee's use of financial services company's trademarks, "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," was not commercial, but rather political in nature, and therefore was exempted from coverage by the Federal Trademark Dilution Act. 15 U.S.C.A. § 1125(c)(4)(B).

**[11] Trademarks 382T ☞1464**

382T Trademarks
　382TVIII Violations of Rights
　　382TVIII(B) Dilution
　　　382Tk1462 Reduction of Mark's Capacity to Identify; Blurring
　　　　382Tk1464 k. Particular Cases. Most Cited Cases

(Formerly 382k366)

Even if presidential candidate and his political committee's use of financial services company's trademarks, "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," was commercial, rather than political in nature, such use did not dilute distinctiveness of company's marks in violation of the Federal Trademark Dilution Act; plaintiff failed to show that defendants' use of its marks lessened their value or capacity to identify and distinguish its goods or services. 15

U.S.C.A. § 1125(c).

**[12] Trademarks 382T ☞1464**

382T Trademarks
　382TVIII Violations of Rights
　　382TVIII(B) Dilution
　　　382Tk1462 Reduction of Mark's Capacity to Identify; Blurring
　　　　382Tk1464 k. Particular Cases. Most Cited Cases

(Formerly 382k366)

Presidential candidate and his political committee's use of financial services company's trademarks, "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," did not create even a likelihood of dilution of company's marks in violation of the New York anti-dilution law; plaintiff failed to show that defendants' limited and political use of its marks could weaken their ability to serve as a unique identifier of its goods or services. McKinney's General Business Law § 360-l.

**[13] Copyrights and Intellectual Property 99 ☞67.3**

99 Copyrights and Intellectual Property
　99I Copyrights
　　99I(J) Infringement
　　　99I(J)1 What Constitutes Infringement
　　　　99k67.3 k. Other Works. Most Cited Cases

Presidential candidate and his political committee's use of financial services company's copyrighted service marks, "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," was fair use, and thus, not an infringement in violation of the Copyright Act, where allegedly infringing political advertisement was a parody, substance of defendants' message was different from message of plaintiff's advertisements, and use of allegedly infringing advertisement did not harm potential market for or value of copyrighted work. 17 U.S.C.A. § 107(2).

**2004 WL 434404 (S.D.N.Y.)**

[14] **Trademarks** 382T ⟸1427

382T Trademarks
   382TVIII Violations of Rights
     382TVIII(A) In General
       382Tk1423 Particular Cases, Practices, or Conduct
         382Tk1427 k. Advertising or Marketing. Most Cited Cases
    (Formerly 92Hk7 Consumer Protection)
Under New York law, presidential candidate and his political committee's use of financial services company's trademarks, "THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS," was not a material deceptive act or practice directed to consumers that caused actual harm, as would support deceptive acts or practices claim, where political advertisement was not used in connection with sale or promotion of a product or service, nor in the conduct of business, trade, or commerce. McKinney's General Business Law § 349.

**Trademarks** 382T ⟸1800

382T Trademarks
   382TXI Trademarks and Trade Names Adjudicated
     382Tk1800 k. Alphabetical Listing. Most Cited Cases
    (Formerly 382k736)
PRICELESS.

**Trademarks** 382T ⟸1800

382T Trademarks
   382TXI Trademarks and Trade Names Adjudicated
     382Tk1800 k. Alphabetical Listing. Most Cited Cases
    (Formerly 382k736)
THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD.

*MEMORANDUM OPINION AND ORDER*

DANIELS, J.

**\*1** Plaintiff MasterCard filed an action against defendants Ralph Nader and his political committee, alleging unfair competition, misappropriation, trademark infringement and dilution of MasterCard's trademarks under the Federal Trademark Act and state and common law. Plaintiff also alleged infringement of plaintiff's copyright under the Copyright Act of 1976. Defendants filed a motion for summary judgment. Defendants' motion for summary judgment is hereby GRANTED in its entirety.

*BACKGROUND*

MasterCard, a Delaware corporation with its principle place of business in New York, is a large financial institution that engages in the interchange of funds by credit and debit payment cards through over 23,000 banks and other foreign and domestic member financial institutions. Since Fall of 1997, MasterCard has commissioned the authorship of a series of advertisements that have come to be known as the "Priceless Advertisements." These advertisements feature the names and images of several goods and services purchased by individuals which, with voice overs and visual displays, convey to the viewer the price of each of these items. At the end of each of the Priceless Advertisements a phrase identifying some priceless intangible that cannot be purchased (such as "a day where all you have to do is breathe") is followed by the words or voice over: "Priceless. There are some things money can't buy, for everything else there's MasterCard."

In August 2000, MasterCard became aware that Ralph Nader and his presidential committee were broadcasting an allegedly similar advertisement on television that promoted the presidential candidacy of Ralph Nader in the 2000 presidential election. That political ad included a sequential display of a series of items showing the price of each ("grilled tenderloin for fund-raiser; $1,000 a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

plate;" "campaign ads filled with half-truths: $10 million;" "promises to special interest groups: over $100 billion"). The advertisement ends with a phrase identifying a priceless intangible that cannot be purchased ("finding out the truth: priceless. There are some things that money can't buy"). The resulting ad (the "Nader ad") was shown on television during a two week period from August 6-17, during the 2000 presidential campaign, and also appeared on the defendants' web site throughout that campaign. Plaintiff sent defendants a letter explaining its concern over the similarity of the commercials, and suggested that defendants broadcast a more "original" advertisement. When plaintiff contacted representatives of defendants a few days later, plaintiff MasterCard advised defendants to cease broadcasting their political advertisement due to its similarity with MasterCard's own commercial advertisement and resulting infringement liability.

When the parties could not come to an agreement, on August 16, 2000, MasterCard filed a complaint alleging the following counts against Ralph Nader and his presidential committee; trademark infringement and false designation of origin in violation of Section 43(a) of the Lanham Act; infringement of a registered trademark in violation of Section 32(1) of the Lanham Act; dilution in violation of Section 43(c) of the Lanham Act; copyright infringement in violation of the Copyright Act; unfair competition; misappropriation; infringement of New York Common Law Trademark Rights; dilution under New York law; and deceptive trade practices. Plaintiff sought a preliminary injunction during the 2000 presidential campaign which was denied by this Court. Thereafter, defendants moved for summary judgment on all nine of plaintiff's counts.

## DISCUSSION

**\*2** Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as

a matter of law." Fed.R.Civ.P. 56(c); *Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993). The burden of demonstrating that no factual dispute exists is on the moving party. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial ." Fed.R.Civ.P. 56(e). In deciding a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91L.3d.2d202 (1986). Summary judgment should be granted only when no reasonable trier of fact could find in favor of the nonmoving party. *Gallo v. Prudential Residential Services, Ltd.,* 22 F.3d 1219, 1224 (2d Cir.1994).

### 1. *Trademark Infringement*

MasterCard's first count is based on Section 43(a) of the Trademark Act, 15 U.S.C. Section 1125(a). Plaintiff claims that defendants have used two of MasterCard's service marks-"THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS" to misrepresent that the 2000 presidential candidacy of Ralph Nader for the office of President of the United States was endorsed by MasterCard. (Complaint ¶ 23). Plaintiff's second count also pleads a claim for trademark infringement due to defendants' use of the two federally registered trademarks, ("THERE ARE SOME THINGS MONEY CAN'T BUY. FOR EVERYTHING ELSE THERE'S MASTERCARD," and "PRICELESS"), pursuant to Section 32(1) of the Trademark Act, 15 U.S.C. Section 1114(1).

In trademark infringement cases, the Court must apply the undisputed facts to the balancing test outlined in *Polaroid Corp. v. Polarad Elecs., Corp.,* 287 F.2d 492, 495 (2d Cir.1961), and may grant summary judgment where it finds, as a matter of

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

law, that there is no likelihood of confusion to the public. See *Lois Sportswear, USA, Inc. v. Levi Strauss & Co.,* 799 F.2d 867 (2d Cir.1986); *Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 580 (2d Cir.1991). In determining whether there is a likelihood of confusion between MasterCard's Priceless Advertisements and Ralph Nader's Political Ad, the Court weighs eight factors, as articulated in *Polaroid,* 287 F.2d at 495:(1) strength of the Plaintiff's mark; (2) degree of similarity between the two marks; (3) proximity of the products or services; (4) likelihood that the prior owner will "bridge the gap" into the newcomer's product or service line; (5) evidence of actual confusion between the marks; (6) whether the defendant adopted the mark in good faith; (7) the quality of defendants' products or services; and (8) sophistication of the parties' consumers. *See Time, Inc. v. Petersen Publishing Co.,* 173 F.3d 113, 117 (2d Cir.1999); *See also Morningside Capital Group,* 182 F.3d 133, 137 (2d Cir.1999).

**\*3** **[1]** In demonstrating the strength of the trademark, the plaintiff must establish either that the mark is inherently distinctive or alternatively, that the mark has acquired secondary meaning. *See McGregor-Doniger Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). MasterCard's marks, "priceless" and "there are some things money can't buy, for everything else there's MasterCard," are registered. MasterCard asserts that their marks have attained secondary meaning. Defendants concede that MasterCard's Priceless Advertisements are strong enough to have become a part of present-day American popular culture. (Def.'s Mem. in Supp. of Mot. for Summ. J., p. 19). The strength of MasterCard's trademarks is indisputable.

**[2]** In determining the second factor, the similarity of the marks in issue, a court must consider whether the marks create the same overall commercial impression when viewed separately. *See Nikkon, Inc. v. Ikon Corp.,* 803 F.Supp. 901, 926 (S.D.N.Y.1992). A court may rely upon its own visual inspection in making this determination.

*e.g., Venetianaire Corp. v. A & P Import Co.,* 429 F.2d 1079, 1081 (2d Cir.1970). In this instance, it is not necessary for the Court to do so, because once again, defendants do not dispute that the Nader Ad employs the word "priceless" in the same manner used by MasterCard in its television advertisements. (Zopoth Aff. ¶¶ 304, Exs. 9 and 10). The Nader Ad also employs the phrase "there are some things money can't buy," which is part of a MasterCard trademark. Defendants do not dispute that they employ that phrase in the same look, sound and commercial impression as employed by MasterCard. *Id.*

**[3]** The third and fourth factors, the proximity of the products or services and the likelihood that the prior user will bridge the gap, respectively, weigh in favor of defendants. There is little similarity between MasterCard's credit and debit card business and Ralph Nader's political candidacy. There is little likelihood and no evidence that MasterCard, a financial services company, would have any direct involvement in supporting a candidate in a political presidential campaign. Similarly, neither Ralph Nader nor his political campaign committee have expressed any desire or intent to enter the credit card business or offer the public any direct financial services. (Def's Mem. in Supp. of Summ. J., p. 20).

**[4]** Evidence of actual confusion, the fifth factor, also weighs in favor of defendants. This factor is perhaps the most significant when considering the overall likelihood of confusion by the public. "The best evidence of likelihood of confusion is the occurrence of actual confusion and mistakes." *Lambda Electronics Corporation, et al. v. Lambda Technology, Inc.,* 515 F.Supp. 915, 926 (S.D.N.Y.1981). While it is not essential for a finding of trademark infringement to demonstrate actual confusion, "there can be no more positive proof of likelihood of confusion than evidence of actual confusion." *Id.,* at 926-27 (citing *Grotrian, et al. v. Steinway & Sons,* 365 F.Supp. 707, 715-16 (S.D.N.Y.1973), *aff'd,*523 F.2d 1331 (2d Cir.1975)). In *Lang v. Re-*

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

*tirement Living Publishing Co.,* 949 F.2d 576 (2d Cir.1991), the Second Circuit affirmed the trial court's grant of summary judgment to the defendants on the ground that plaintiff had failed to raise a genuine issue of fact on likelihood of confusion. In that case, where the plaintiff, whose trade name was similar to that of defendants, received 400 phone calls and several letters from third parties attempting to reach the defendant, the Court explained that the Lanham Act seeks to prevent consumer confusion that enables a seller to pass off his goods as the goods of another, not to protect against confusion generally. *Id.,* at 583.As evident by the present record, out of 452 e-mails to MasterCard regarding the Nader Ad, only two are relied upon as possibly reflecting confusion. (Grossman Aff. ¶ 9, Exs. 4). This is certainly not enough to show actual confusion or that such confusion inflicted commercial injury to MasterCard. In support of its argument that actual confusion exists, MasterCard also relies on the written transcript of a broadcast of CNN's *Late Edition,* during which Connecticut Senator Christopher Dodd stated that he thought the Nader Advertisement was a credit card ad. A viewing of a tape of that program shows Senator Dodd laughing at his own joke, while speaking the words on which MasterCard relies to establish actual confusion. It is little or no evidence of actual confusion. Even if Senator Dodd had actually been confused, a few isolated instances of actual confusion are not sufficient to defeat a motion for summary judgment. *See Brockmeyer v. The Hearst Corporation, et al.,* 428, F.Supp.2d 281, 298 (S.D.N.Y.2003) ("one anecdotal instance of purported actual confusion is at best de minimis, indeed infinitesimal, and insufficient;" a survey revealing a less than 3% rate of confusion was insufficient to show a likelihood of confusion .); *See also Cumberland Packing Corp. v. Monsanto Co.,* 140 F.Supp.2d 241, 254 (E.D.N.Y.2001) (a survey showing a 7.84% confusion rate found to be insufficient to raise a material fact as to the likelihood of confusion). The plaintiff should be able to demonstrate a reasonable likelihood that reasonable people will be confused.

**\*4** [5] The sixth factor regarding good faith adoption of the mark also favors defendants. The relevant intent in this inquiry is whether the alleged infringer intended "to palm off his products as those of another." *See Miss Universe, Inc. v. Patricelli,* 408 F.2d 506, 509 (2d Cir.1969); *See also Maternally Yours, Inc. v. your Maternity Shop, Inc.,* 234 F.2d 538, 542 (2d Cir.1956). In the present case, there is no evidence that defendants intended to confuse the public. There is no basis to argue that the Ralph Nader political ad which has the clear intent to criticize other political candidates who accept money from wealthy contributors, at the same time, attempts or intends to imply that he is a political candidate endorsed by MasterCard. There is uncontradicted testimony that neither Ralph Nader, nor his committees, had any such intent. (Nader Aff. ¶ 21; Zopoth Aff. ¶ 7, Ex. 16).

[6] The seventh factor, the quality of defendants' products or services, is of insignificant weight in this case. There is no reasonable comparison to be made between the quality of the products and services provided by MasterCard and the value of defendants' politics. MasterCard provides a quality of financial services which can readily be compared to its commercial competitors. However, it is purely the public's subjective opinion of the appeal and attractiveness of a political candidate's ideas and record which determines whether the public will buy the politics any candidate for office is selling.

[7] The eighth and final factor to be weighed is the level of consumer sophistication in either of the relevant markets for credit card services or for political candidates. Unless otherwise demonstrated, it is reasonable to conclude that the general American public is sophisticated enough to distinguish a Political Ad from a commercial advertisement. Rarely, if ever, is there a realistic opportunity to confuse the two. Indeed, as previously discussed, out of the 452 e-mails received by MasterCard regarding Ralph Nader's Political Ad, only 2-3 questioned MasterCard's involvement with Ralph Nader's campaign. This sampling of American con-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

sumers, which is the only proof offered on the re-
cord, is a sufficient indication that consumers are
generally sophisticated enough to decipher between
MasterCard's commercial purposes and Ralph
Nader's political agenda.

When balancing the eight *Polaroid* factors, no one
factor can determine the ultimate issue of likeli-
hood of confusion to the consumer. *SeeW.W.
Pharm. Co. v. The Gillette Co.,* 808 F.Supp. 1013,
1022 (S.D.N.Y.1992), *aff'd,*984 F.2d 567 (2d
Cir.1993). To properly weigh these factors requires
the court to view each factor in light of the totality
of the evidence. *Id.* Thus, after balancing the *Polar-
oid* factors, this Court finds that there is no genuine
issue of material fact with regard to any likelihood
of confusion between MasterCard's Priceless Ad-
vertisements and Ralph Nader's Political Ad which
could constitute a violation of the Trademark Act.
Defendants' summary judgment motion to dismiss
Counts One and Two of plaintiff's complaint is
therefore granted.

**\*5** MasterCard also alleges a state law claim under
New York common law for trademark infringement
in Count Seven of the complaint. Under New York
common law, as is required under federal law, a
plaintiff must show a likelihood of confusion
between the two products in order to prevail.
*SeeNabisco v. Warner-Lambert Co. .,* 32 F.Supp.2d
690, 701 (S.D.N.Y.1999). As with plaintiff's federal
Lanham Act claims, there is no likelihood of confu-
sion between MasterCard's Priceless Ads and Ralph
Nader's Political Ad. As a matter of law, plaintiff
has failed to show a genuine issue of material fact
as to the existence of a likelihood of confusion
between MasterCard's financial services and Ralph
Nader's 2000 presidential political campaign.
Therefore, defendants are granted summary judg-
ment on plaintiff's New York common law trade-
mark infringement claim in Count Seven of the
complaint.

2. *Unfair Competition and Misappropriation*

**[8]** In its fifth and sixth counts, MasterCard alleges
state law claims under New York common law for
unfair competition and misappropriation. Under
Section 301(a) of the Copyright Act, 17 U.S.C. §
301(a), all legal or equitable state rights that are
equivalent to any of the exclusive rights granted
within the general scope and subject matter of the
Copyright Act are preempted by the Copyright Act.
Courts have used a two-part test to determine
whether a state cause of action will be preempted
by the Copyright Act: (1) what is the nature of the
work in question; and (2) what are the rights
claimed in that work under state law. *SeeHarper &
Row, Publishers, Inc. v. Nations Enters.,* 501
F.Supp. 848, 850 (S.D.N.Y.1980), *aff'd.*723 F.2d
195 (2d Cir.1983), *rev'd on other grounds,*471 U.S.
539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985);
*Seealso**Mayer v. Josiah Wedgwood & Sons, Ltd.,*
601 F.Supp. 1523, 1532 (S.D.N.Y.1985).

The first prong for preemption is met when the
nature of the work protected comes within the sub-
ject matter of copyright as defined by § § 102 and
103 of the Copyright Act. *See*§ 301(b)(1). Because
MasterCard owns copyright registrations for several
of its "Priceless" television advertisements, and be-
cause "advertisements are generally capable of re-
ceiving copyright protection,"*Raffoler, Ltd. v. Pe-
abody & Wright, Ltd.,* 671 F.Supp. 947, 950
(E.D.N.Y.1987), MasterCard's advertisements
clearly fall within the subject matter of the Copy-
right Act.

The second prong for preemption is met when the
right granted under state law is "equivalent to any
of the exclusive rights within the general scope of
copyright as specified in Section 106."17 U.S.C. §
301(a).*Seealso**Harper,* 501 F.Supp. at 850;*Mayer,*
601 F.Supp. at 1532. The federal rights granted by
the Copyright Act include the right "to prepare de-
rivative works based upon the copyrighted
work."17 U.S.C. § 106. As evident in the Com-
plaint, MasterCard claims that the Nader Ad viol-
ated MasterCard's rights because it was derived
form MasterCard's "Priceless" advertising.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

(Compl.¶ 50). The Second Circuit Court of Appeals has held that misappropriation and unfair competition claims "grounded solely in the copying of plaintiff's protected expression are deemed preempted by Section 301." *Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 717 (2d Cir.1992)* (citations omitted); *See also American Movie Classics Co. v. Turner Entm't Co., 922 F.Supp. 926, 933 (S.D.N.Y.1996).* Thus, Counts Five and Six are dismissed on defendants' motion for summary judgment as those claims are preempted by federal copyright law.

**\*6** [9] In pleading its sixth count, along with its misappropriation claim, MasterCard also alleges the state law violation of "palming off" by defendants. (Compl.¶ 62). "Palming off" or passing off, "occurs when a producer misrepresents his own goods or services as someone else's." *Dastar Corporation v. Twentieth Century Fox Film Corporation, et al., 539 U.S. 23, 123 S.Ct. 2041, 2045, n. 1, 156 L.Ed.2d 18 (2003).* Lack of likely consumer confusion is independently sufficient to defeat a claim of palming off. *See Towle Mfg. Co. v. Godinger Silver Art Co., Ltd., 612 F.Supp. 986, 995-96 (S.D.N.Y.1985).* Therefore, this claim also fails for the same reason MasterCard's trademark infringement claim fails: there is no likelihood of confusion as a matter of law. Dismissal of Count Six is therefore warranted on this basis as well.

### 3. Dilution

Counts Three and Eight of plaintiff's complaint allege against defendants federal and state dilution of plaintiff's trademarks. The Federal Trademark Dilution Act, 15 U.S.C. § 1125(c) and the New York anti-dilution law, New York Gen. Bus. Law § 360-1, protect against the unauthorized use of marks that impairs the goodwill and value of plaintiff's mark. "Dilution" is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of (1) competition between the owner of the famous mark and other parties, or (2) likelihood of

confusion, mistake, or deception." 15 U.S.C. § 1127. Section 1125(c) provides that the owner of a famous mark is entitled to an injunction against another person's "commercial use in commerce of a mark if such use begins after the mark or trade name has become famous and causes dilution of the distinctive quality of the mark." Under federal law, the elements for a claim of dilution are that "1) plaintiff's mark is famous; 2) it is inherently distinctive; 3) defendant's use of the junior mark is a commercial use in commerce; 4) defendant's use began after plaintiff's mark became famous; and 5) defendant's use of the junior mark causes dilution of the distinctive quality of the plaintiff's mark." *Playtex Products, Inc. v. Georgia-Pacific, Inc., et al., 2003 WL 21939706, 8 (S.D.N.Y.2003).* Moreover, a plaintiff must show "actual dilution, rather than a likelihood of dilution." *Moseley, et al. v. V Secret Catalogue, Inc., et al., 537 U.S. 418, 433, 123 S.Ct. 1115, 155 L.Ed.2d 1 (2003).* Under both federal and New York law, dilution can involve either blurring or tarnishment. *New York Stock Exchange, Inc., v. New York, New York Hotel, LLC, 293 F.3d 550, 557 (2d Cir.2002); See also Perkins School for the Blind v. Maxi-Aids, Inc., et al., 274 F.Supp.2d 319, 325 (E.D.N.Y.2003); World Wrestling Federation Entertainment, Inc. v. Bozelli, 142 F.Supp.2d 514, 529 (S.D.N.Y.2001).*

Blurring has typically involved "the whittling away of an established trademark's selling power through its unauthorized use by others upon dissimilar products." *Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc., 875 F.2d 1026, 1031 (2d Cir.1989)* (describing such " 'hypothetical anomalies' as 'Dupont shoes, Buick aspirin tablets, Schlitz varnish, Kodak pianos, Bulova gowns, and so forth' ") (quoting legislative history of section 368-d) (citation omitted). That is, trademark dilution statutes are designed to cover those situations where the public knows that the defendant is not connected to or sponsored by the plaintiff, but the ability of the plaintiff's mark to serve as a unique identifier of the plaintiff's goods or services is weakened because the relevant public now also as-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

sociates that designation with a new and different source. See *Federal Express Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 174 (2d Cir.2000) (quoting *Sports Authority, Inc. v. Prime Hospitality Corp.,* 89 F.3d at 965-66 (discussing New York law) (internal quotation marks and brackets omitted).

**\*7** In *New York Stock Exchange,* the Second Circuit held that blurring occurs when " 'the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods or services, raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's product. To determine the likelihood of blurring, [courts] have looked to six factors, including: (i) the similarity of the marks; (ii) the similarity of the products covered; (iii) the sophistication of the consumers; (iv) the existence of predatory intent; (v) the renown of the senior mark; and (vi) the renown of the junior mark." *New York Stock Exchange, Inc. v. New York, New York Hotel, LLC,* 293 F.3d 550, 558 (2d Cir.2002) (citing *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 43 (2d Cir.1994)); See also *Katz, et al. v. Modiri, et al.,* 283 F.Supp.2d 883, 901 (S.D.N.Y.2003).

Tarnishment occurs when the plaintiff's mark is " 'linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context,' with the end result that 'the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods." ' *Id.* "The sine qua non of tarnishment is a finding that the plaintiff's mark will suffer negative associations through defendant's use." *Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 507 (2d Cir.1996).

The Federal Trademark Dilution Act specifically exempts noncommercial uses of a mark from its coverage. Section 1125(c)(4) provides that "[t]he following shall not be actionable under this section: ... (B) Noncommercial use of a mark."Therefore, prior to even addressing whether defendants have actually diluted plaintiff's marks under the federal

law, the Court must first determine whether defendants' use of the marks is "commercial," and thereby, whether that use is even covered by the statute.[FN1]

> FN1. Black's Law Dictionary defines 'commercial' as "Relates to or is connected with trade and traffic or commerce in general; is occupied with business and commerce. Generic term for most all aspects of buying and selling."
>
> The Lanham Act defines 'use in commerce' as the "use of a mark in the ordinary course of trade ... For purposes of this chapter, a mark shall be deemed to be in use in commerce-(1) on goods when-(A) it is placed in any manner on the goods or their containers or the displays associated therewith or on the tags or labels affixed thereto, or if the nature of the goods makes such placement impracticable, then on documents associated with the goods or their sale, and (B) the goods are sold or transported in commerce, and (2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce, or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services."15 U.S.C. § 1127.

**[10]** Plaintiff argues that Ralph Nader's Political Ad is commercial in nature even though it neither sells products or services, is not designed to entice consumers to buy products or services, and does not propose any kind of commercial transaction. MasterCard asserts that contributions to the Nader 2000 General Committee "increased from $5125 before the Ad ran to $818,000 in August 2000, after the Ad ran through the "DONATE ON-LINE" icon *orotherwise."*(Pl's. Mem. in Opp. to Summ. J. 26) (emphasis added). Although the Nader Ad ran before a large sum of contributions were made to his

Not Reported in F.Supp.2d                                    Page 12
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

campaign, plaintiff offers no evidence of a causal connection between the Ad and the contributions. There is nothing in the record other than the inference to be drawn from the proximity in time that advances the notion that the contributions Ralph Nader and his political committee received were a direct result of the Ad.

Even assuming the Nader Ad caused greater contributions to be made to his political campaign, this would not be enough to deem Ralph Nader's Ad "commercial." If so, then presumably, as suggested by defendants, all political campaign speech would also be "commercial speech" since all political candidates collect contributions. Ralph Nader's Political Ad attempts to communicate that other presidential candidates can be bought, but that the "truth," represented by himself, cannot. The Nader Ad is a strong political message which expresses his personal opinion on presidential campaigning. The legislative history of the Lanham Act clearly indicates that Congress did not intend for the Act to chill political speech. In speaking about the amendments to Section 43(a) that expanded what was actionable as deceptive advertisements, one of the new law's sponsors, United States Representative Robert Kastenmeier, pointed out that political advertising and promotion are not meant to be covered by the term "commercial." He stated that the statute

**\*8** uses the word "commercial" to describe advertising or promotion for business purposes, whether conducted by for-profit or non-profit organizations or individuals. *Political advertising and promotion is political speech, and therefore not encompassed by the term "commercial."* This is true whether what is being promoted is an individual candidacy for public office, or a particular political issue or point of view ...

134 Cong. Rec. H. 1297 (daily ed. April 13, 1989) (statement of Wisconsin Rep. Kastenmeier) (emphasis added).

Plaintiff MasterCard urges the Court to rely on *United We Stand America, Inc. v. United We Stand,*

*America New York, Inc.,* 128 F.3d 86 (2d Cir.1997) to conclude that Ralph Nader's activities are "commercial" in nature. That case is not instructive in determining whether or not MasterCard has a basis to bring a claim against defendants under the Federal Trademark Dilution Act. In *United We Stand,* the Court was determining whether a certain political activity fell under the scope and the meaning of the word "services" and "use in commerce" of the Lanham Trademark Act, § 32(1)(a), 15 U.S.C.A. § 1114(1)(a).[FN2] That particular section of the Lanham Act does not have a commercial activity requirement, nor does it exempt from liability noncommercial use of a mark. *See Planned Parenthood Federation of America Inc. v. U.S. District Court Southern District of New York,* 42 U.S.P.Q.2d 1430, 1434 (S.D.N.Y.1997). However, the Federal Trademark Dilution Act, 15 U.S.C.A. § 1125(c), specifically exempts from the scope of all provisions of Section 1125 the "noncommercial use of a mark." *See Id., at 1433.*

> FN2. "Any person who shall, without the consent of the registrant use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered trademark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive, shall be liable in a civil action by the registrant for the remedies hereinafter provided ." 15 U.S.C.A. § 1114(1)(a).

Though not binding, this Court finds the analysis in *American Family Life Insurance Company v. Hagan, et al.,* 266 F.Supp.2d 682 (N.D.Ohio 2002), to be relevant and persuasive. In that case, similar to the case at hand, the plaintiff, American Family Life Insurance Company, or AFLAC, ran well-known "AFLAC Duck" commercials which featured a white duck quacking the company's name "AFLAC." *Id., at 684.* One of the defendants was a candidate for Governor of the State of Ohio running

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 13
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

against the incumbent Governor Robert Taft. The candidate and his Campaign, developed internet commercials that " 'borrow[ed]' from AFLAC's commercials. Specifically, the internet commercials include[d] a crudely animated character made up of the incumbent Governor's head sitting on the body of a white cartoon duck; the duck quacks 'TaftQuack' several times during each commercial," which defendants ran on their website, www.taftquack.com. *Id.*Defendants' website also contained a link which visitors could use to make campaign contributions. *Id.* at 686-87.Among other claims, plaintiff sued defendants for federal trademark dilution and moved for a preliminary injunction.

In denying the plaintiff's motion for a preliminary injunction, and finding that the plaintiff was not likely to prevail on its dilution claim, the court also found that defendants' speech was political, rather than commercial. Specifically, the court stated that the candidate was "using a quacking cartoon character, which admittedly brings to mind AFLAC's marks, *as part of his communicative message,* in the context of expressing political speech."*Id.,* at 700 (emphasis in original). The court added that though "the consuming public may associate the AFLAC Duck and the TaftQuack character-a proposition the Court accepts-[this] is an insufficient predicate to support injunctive relief of political speech."*Id.,* at 701.The court further noted that though defendants included in their website a mechanism for visitors to make campaign contributions, "it is arguable whether [the candidate's] speech proposes a commercial transaction at all."*Id* ., at 697.The court stated that defendants' solicitation of contributions, and the resulting making of contributions, "is much more than merely a commercial transaction. Indeed, this exchange is properly classified not as a commercial transaction at all, but completely noncommercial, political speech."*Id.*

**\*9** [11] This Court finds that Ralph Nader's use of plaintiff's trademarks is not commercial, but instead

political in nature and that therefore, it is exempted from coverage by the Federal Trademark Dilution Act. However, even if Ralph Nader's use of plaintiff's trademarks could be deemed commercial in nature, such use did not dilute plaintiff's marks. Defendants do not dispute that plaintiff's marks are famous, distinctive, or that they used plaintiff's marks after such marks became famous. However, there is no evidence in the record that defendants' use of plaintiff's marks actually caused dilution of the distinctiveness of plaintiff's marks. Plaintiff does not offer evidence that defendants' limited use of the Priceless marks lessened its value or the capacity of these marks to identify and distinguish plaintiff's goods or services. Further, plaintiff does not claim, nor is there any evidence in the record, that due to defendant's use of plaintiff's marks, plaintiff altered or lessened its use of the marks to identify MasterCard's products or services.

Count Three of plaintiff's complaint alleging dilution of plaintiff's trademarks is dismissed on defendants' motion for summary judgment. Ralph Nader's use of plaintiff's trademarks is political in nature, not within a commercial context, and is therefore exempted from coverage by the Federal Trademark Dilution Act. Furthermore, there is no evidence on the record that Ralph Nader's use of plaintiff's trademarks diluted plaintiff's trademarks.

[12] Count Eight, alleging dilution of MasterCard's trademarks under state law, is based on N.Y.G.B.L. § 360-1. Section 360-1 provides that "[l]ikelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services."In order to show state trademark dilution under section 360-1, MasterCard must demonstrate that it's "trademark is of truly distinctive quality or has acquired secondary meaning, and, second, that there is a 'likelihood of dilution.' " *Brennan's, Inc.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 14
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

*v. Brennan's Restaurant, LLC, et al.,* 2003 WL 1338681, 6 (S.D.N.Y.2003) (citing *Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 42 (2d Cir.1994)).

Again, it is not in dispute that plaintiff's marks are of a distinctive quality, and have acquired secondary meaning. Yet, there is no evidence on the record that defendants' use of plaintiff's marks created even a likelihood of dilution of such marks. There is no evidence that defendants' limited and political use of plaintiff's marks could weaken those marks' ability to serve as a unique identifier of plaintiff's goods or services. Therefore, there is no evidence of possible dilution by "blurring." Further, there is no evidence that plaintiff's marks could be tarnished or suffer from negative associations in the eyes of the public due to defendants' use of those marks. Therefore, there is no evidence of dilution of plaintiff's marks by tarnishment. As with plaintiff's federal dilution claim, summary judgment for defendants on plaintiff's Count Eight alleging state law dilution of plaintiff's trademarks is hereby granted.

### 4. *Copyright Infringement*

**\*10** [13] In Count Four, plaintiff alleges copyright infringement of its Priceless Advertisements. In response, defendants argue the Nader Ad is a fair use of the Priceless Advertisements because it is a parody of the Priceless Advertisements.

"From the infancy of copyright protection," the fair use doctrine "has been thought necessary to fulfill copyright's very purpose, '[t]o promote the Progress of Science and useful Arts.'" *Campbell v. Acuff-Rose Music, Inc.,* 510 U.S. 569, 575, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994) (quoting U.S. Const., art. I, § 8, cl. 8). In *Campbell,* defendants Luther R. Campbell, Christopher Wongwon, Mark Ross, and David Hobbs, collectively known as 2 Live Crew, a rap music group, created a song entitled "Pretty Woman" that parodied Roy Orbison's copyrighted song, "Oh, Pretty Woman." *Id.,* at 571-72.Plaintiff Acuff-Rose Music, Inc., who

owned the rights to Orbison's song, sued defendants for copyright infringement. *Id.,* at 573.The District Court for the Middle District of Tennessee granted summary judgment in favor of defendants, finding that 2 Live Crew's song was a fair use parody of the Orbison song and that the commercial purpose of 2 Live Crew's song was not a bar to a finding of fair use. *Id.* The Court of Appeals for the Sixth Circuit reversed, holding that a finding of fair use was barred by the song's commercial character and excessive borrowing of the Orbison song. *Id.,* at 573-74.In reversing the Court of Appeals' decision, the United States Supreme Court held that a parody's commercial nature is not a bar to a finding of fair use and is in fact only one element to be considered in a fair use analysis. It held that the Court of Appeals gave insufficient consideration to the nature of a parody in assessing the degree to which a parody copies. *Id.,* at 572, 594.

As noted in *Campbell,* "in truth, in literature, in science and art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before."*Id.* (quotation marks omitted). Until the 1976 Copyright Act, the doctrine of fair use grew exclusively out of the common law. *See Id.,* at 576;*Folsom v. Marsh,* 9 F.Cas 342, 348 (C.D.Mass.1900) (CCD Mass. 1841) (Story, J.) (Stating fair use test). With the Copyright Act, Congress restated the common law tradition of fair use. The statute provides that the use or reproduction of a copyrighted work is "not an infringement of copyright" if it is used "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research."17 U.S.C.A. § 107. In determining whether the work has been used for such a purpose, the statute lists four nonexclusive factors to consider: 1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; 2) the nature of the copyrighted work; 3) the amount and substantiality

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 15
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

of the portion used; and 4) the effect of the use upon the potential market for, or value of, the copyrighted work. 17 U.S.C. § 107(1)-(4). It has been found that "once a work is determined to be a parody, the second, third, and fourth factors are unlikely to militate against a finding of fair use."*Abilene Music, Inc., et al. v. Sony Music Entertainment, Inc., et al.,* 2003 WL 21415311, 4 (S.D.N.Y.2003).

**\*11** This section of the Copyright Act "intended that courts continue the common law tradition of fair use adjudication" and "permits and requires courts to avoid rigid application of the copyright statute, when, on occasion, it would stifle the very creativity which that law is designed to foster."*Campbell,* 510 U.S. at 577 (quotation marks omitted). Fair use analysis, therefore, always "calls for case-by-case analysis." *Id.* The fair use examples provided in § 107 are "illustrative and not limitative" and "provide only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses."*Id.;SeeNimmer* § 13.05 [A}, at 13-153 ("[T]he factors contained in Section 107 are merely by way of example, and are not an exhaustive enumeration."). The ultimate test of fair use, therefore, is whether the copyright law's goal of "promot[ing] the Progress of Science and useful Arts,"U.S. Const., art. I, § 8, cl., 8, "would be better served by allowing the use than by preventing it."*Arica Inst., Inc. v. Palmer,* 970 F.2d 1067, 1077 (2d Cir.1992) (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 589 (2d Cir.1960) (L.Hand, J.)). The burden of proof is on the defendants to demonstrate fair use.*Infinity Broadcast Corp. v. Kirkwood,* 150 F.3d 104, 107 (2d Cir.1998). Though recognizing that fair use is a "mixed question of law and fact," courts regularly resolve fair use issues at the summary judgment stage where there are no genuine issues of material fact. *Castle Rock Entertainment, Inc. v.Carol Publishing Group, Inc.* 150 F.3d 132, 136 (2d. Cir.1998).

Before considering these factors in detail, it is im-

portant to note the difference between an advertisement that promotes a parody of a copyrighted work and an advertisement that itself actually infringes a copyright. An advertisement which uses elements of a copyrighted work "does not necessarily ... [infringe] the copyright, if the product that it advertises constitutes a fair use of the copyrighted work."*Steinberg v. Columbia-Delphi Productions,* 663 F.Supp. 706, 714 (S.D.N.Y.1987) (citing *Warner Bros. v. American Broadcasting Cos.,* 720 F.2d 231, 242-44 (2d. Cir.1983) (finding that promotional broadcasts for a television series legally parodying the Superman comic strip character did not infringe copyright in Superman character)). On the other hand, an advertisement infringes a copyright when what is being advertised "bears no relationship to the copyrighted work."*Steinberg,* 663 F.Supp. at 714. In such a case, "[n]o matter how well known a copyrighted phrase becomes, its author is entitled to guard against its appropriation to promote the sale of commercial products."*Id.* (citing *Warner Bros.,* 720 F.2d at 242). However, even a wholly commercial advertisement may itself constitute a fair use. *Leibovitz v. Paramount Pictures Corp.,* 137 F.3d 109 (2d Cir.1998) (finding a poster of a pregnant Leslie Nielson, used to advertise "Naked Gun 33 1/3," to be a fair use of the photograph of Demi Moore it parodied).

**\*12** The first fair use factor to consider is "the purpose and character of the [allegedly infringing] use, including whether such use is of a commercial nature or is for nonprofit educational purposes."17 U.S.C. § 107(1). As this Court has already discussed, the Ralph Nader Political Ad's use is not commercial. The stated purpose of the defendants' advertisement was to raise public awareness of Ralph Nader's desire to be included in the upcoming, televised Presidential candidate debates. (Nader Aff. ¶ 14; Amato Aff. ¶ 11; Exs. 12-15). The Nader Ad depicted that the two major party candidates were beholden to special interests, which was the reason that Ralph Nader, who was not so beholden, should be included in the debates. (Defs.' Mem. in Supp. of Summ. J. 26).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                                                  Page 16
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

The more important question under the first factor, and in fair use analysis generally, is whether the allegedly infringing work "merely supersedes" the original work "or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message," *Campbell,* 510 U .S. at 579, in other words "whether and to what extent the new work is 'transformative." ' *Id.,* at 579 (quoting Leval, *Toward a Fair Use Standard,* 103 Harv.L.Rev. 1105, 1111 (1990)). If "the secondary use adds value to the original-if [copyrightable expression in the original work] is used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings-this is the very type of activity that the fair use doctrine intends to protect for the enrichment of society." *Id.* As stated in *Campbell,* the goal of copyright "is generally furthered by the creation of transformative works." *Id.,* at 579.

One such transformative use that is typically found to be fair use is a parody. Defendants' argument that Ralph Nader's Political Ad is transformative of MasterCard's Priceless Advertisements is as follows: Defendants believe that the MasterCard commercials' underlying message is "that MasterCard is the best way to pay for everything that matters."(Defs' Mem in Supp. for Summ. J. 27). The Nader Ad, on the other hand, portrays the cold, big-money arena of Presidential polities and contrasts Ralph Nader's "truth" as the remedy for the bought and paid-for positions of others. Through this message, defendants claim that the Nader Ad "lays bare the artifice of the original, which cloaks its materialistic message in warm, sugar-coated imagery that purports to elevate intangible values over the monetary values it in fact hawks" through parody (Defs' Mem. in Supp. of Summ. J. 27).

Parody has an obvious claim to transformative value. *SeeCampbell,* 510 U.S. at 577. A parody is characterized by an attempt to mimic an original, expressive, and usually famous work. *SeeId.,* at 586 ("parodies invariably copy publicly known, ex-

pressive works"). Focusing particularly on the fair use protection to which parodies are entitled, the Court in *Campbell* initially noted that "parody may or may not be fair use,"*Id.,* at 581, and "like any other use, has to work its way through the relevant factors, and be judged case by case, in light of the ends of the copyright law,"*Id.*The Court went on to say, "[T]he heart of any parodist's claim to quote from existing material is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works."*Id.,* at 580.The comment must have some "critical bearing on the substance or style of the original composition."*Id.* The relevant inquiry is "whether a parodic character *may reasonably be perceived."Id.* (emphasis added).

**\*13** Plaintiff claims that because there is nothing in the Nader Ad which "comments on or refers to MasterCard or its Priceless Ads" (Pl.'s Mem. in Opp'n to Summ. J. 11), it cannot be classified as a parody. However, the Supreme Court in *Campbell* stated "[p]arody serves its goals whether labeled or not, and there is no reason to require parody to state the obvious (or even the reasonably perceived)."*Id.,* n. 17. The Court also added, "[w]hile we might not assign a high rank to the parodic element here, we think it fair to say that [defendant's] song reasonably could be perceived as commenting on the original or criticizing it, to some degree."*Id.,* at 583.In fact, the Court declined to evaluate the parody, stating that "[t]he threshold question when fair use is raised in defense of parody is whether the parodic character may reasonably be perceived. Whether, going beyond that, parody is in good taste or bad does not and should not matter to fair use."*Id.,* at 582.In finding a parodic element in defendant's infringement of plaintiff's song, the Court also commented that the defendants in that case would have even more easily met the requirement had there been less risk of "market substitution" of the parody for the original:

A parody that more loosely targets an original than the parody presented here may still be sufficiently

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 17
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

aimed at an original work to come within our ana-
lysis of parody. If a parody whose wide dissemina-
tion in the market runs the risk of serving as a sub-
stitute for the original ..., it is more incumbent on
one claiming fair use to establish the extent of
transformation and the parody's critical relationship
to the original. By contrast, when there is little or
no risk of market substitution, whether because of
the large extent of transformation of the earlier
work, the new work's minimal distribution in the
market, the small extent to which it borrows from
the original, or other factors, taking parodic aim at
an original is a less critical factor in the analysis,
and looser forms of parody may be found to be fair
use ...

*Campbell,* 510 U.S. at 580, n. 14.

Where, as here, the parody really has no demon-
strative capacity to divert sales from the original, as
was stated in *Campbell,* a showing of "the parody's
critical relationship to the original" is less vital in
the fair use analysis.

The Nader Ad does add something new and quali-
fies as a "transformative" work. Whether it
"comments" on the original is the issue in question.
MasterCard's message depicted in its Priceless Ad-
vertisements is very plain and straightforward. In a
series of advertisements, MasterCard presents vari-
ous intangible moments that are highly valuable,
yet unable to be "purchased" or are "priceless."
Hence, "there are some things that money can't
buy."[FN3] This idea is followed by the message, that
the viewer-consumer can purchase everything else
with their MasterCard credit card-"for everything
else, there's MasterCard." Ralph Nader's Political
Ad attempts to show various ways different Presid-
ential candidates can be bought in the "big-money
arena of Presidential politics" (Def's Mem. in Supp.
Summ. J. 27) and contrasts the "priceless" truth
represented by Ralph Nader as the remedy for the
bought and paid for positions of others. Through
this depiction, Ralph Nader argues that he not only
sends across his own message, but that he wittingly
comments on the craft of the original, "which

cloaks its materialistic message in warm, sugar-
coated imagery that purports to elevate intangible
values over the monetary values it in fact
hawks."*Id.* This commentary "may reasonably be
perceived." The message need not be popular nor
agreed with. It may be subtle rather than obvious. It
need only be reasonably perceived. Ralph Nader's
Political Ad is sufficiently a parody for the pur-
poses of a fair use analysis, and consequently, is
transformative.

> FN3. It should be noted that with regard to
> the phrase "there are some things that
> money can't buy," not even MasterCard
> claims that phrase is its original creation.

**\*14** The second statutory factor, "the nature of the
copyrighted work," § 107(2), relates to whether the
original work is " 'creative' as opposed to 'factual,'
as well as to whether the work has been previously
published."*Feiner v. H.R. Industries,* 10 F .Supp.2d
310, 314 (S.D.N.Y.1998). Original works that are
creative in nature will generally receive greater
copyright protection. *See e.g.Ringgold v. Black En-
tertainment Television, Inc.,* 126 F.3d 70, 80 (2d
Cir.1997). A previously published work available
to the general public will receive less protection un-
der the fair use doctrine than an unpublished work
which has not yet been released to the general pub-
lic by its author. *Feiner,* 10 F.Supp.2d at 314;*Arica
Institute, Inc. v. Palmer,* 970 F.2d 1067, 1078 (2d
Cir.1992).

The creative nature of plaintiff's Priceless Advert-
isements places these advertisements in the "core of
intended copyright protection." *Campbell,* 510 U.S.
at 586. Although this seems to favor plaintiff,
courts have recognized that "this factor may be of
less (or even of no) importance when assessed in
the context of certain transformative uses."*Castle
Rock Entertainment, Inc. v. Carol Publishing
Group, Inc.,* 150 F.3d 132, 144 (2d Cir.1998);
*Seealso Leibovitz v. Paramount Pictures Corpora-
tion,* 2000 WL 1010830, 4 (S.D.N.Y.2000) ("It is
well established that the second factor-the nature of
the copyrighted work-is not very important to the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

fair use analysis."); *Abilene Music, Inc., et al. v. Sony Music Entertainment, Inc., et al.,* 2003 WL 21415311, 4 (S.D.N.Y.2003)* ("the second factor, the nature of the original work, is not heavily weighted in cases involving parodies"). In particular, giving this factor undue weight in a fair use analysis would prevent findings of fair uses which advance science and art through criticism or commentary. *Seee.g.Campbell,* 510 U.S. at 586 (finding second factor unlikely to "help in separating the fair use sheep from the infringing goats in a parody case since parodies almost invariably copy publicly known, expressive works."). This factor is without much force in most cases, and its relevance here is slight.

In assessing the third factor, the Court must focus on only the protected phrases of the Priceless Advertisements. Further, the amount and substantiality of the portion used in relation to the copyrighted work as a whole must be examined in context to determine whether the extent of the copying is consistent with or more than necessary to further the purpose and character of the use. *SeeCampbell,* 510 U.S. at 586-587. In the parody context, this concerns "what else the parodist did besides go to the heart of the original."*Liebowitz v. Paramount Pictures Corp.,* 137 F.3d 109 (2d Cir.1998) (quoting *Campbell,* 510 U.S. at 589). Although the Ralph Nader Political Ad copied the word "priceless" and the phrase "there are some things money can't buy" and used them in a similar manner, the greater part of the Nader Ad is original-the narration, the supertitles, and the film imagery is rather different from the MasterCard commercials. The substance of the message is different from the message communicated by the advertisement it copies. In order for the Ralph Nader Political Ad to be considered a legitimate parody of the Priceless Advertisement, it necessarily must take enough from MasterCard's advertisement to assure that the viewer will be reminded of the ad that it borrows from.

**\*15** As outlined in *Leibovitz,* 137 F.3d at 113, the Court in *Campbell* made three important points

concerning the third-factor. First, consideration must be given not only to the quantity of the materials taken but also to "their quality and importance" to the original work. *Campbell,* 510 U.S. at 587. Second, "the parody must be able to 'conjure up' at least enough of the original to make the object of its critical wit recognizable."*Id.,* at 588.Third, the court explained that "[o]nce enough has been taken to assure identification, how much more is reasonable will depend, say, on the extent to which the [copying work's] overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original."*Id.* Thus, as the Court in *Campbell* noted, the third factor "enquiry will harken back to the first of the statutory factors,"*Id.,* at 586, with the consideration of the purpose and character of the copying, as well as look to the fourth statutory factor in addressing the potential for market substitution. *Id.,* at 587."That approach leaves the third factor with little, if any, weight against fair use so long as the first and fourth factors favor the parodist."*Liebowitz,* 137 F.3d at 116. As this Court has already found, the first factor is in favor of the defendants in that defendants' use of the Priceless Advertisements is not commercial in nature and is a transformative parody of those advertisements.

The fourth factor looks at "the effect of the use upon the potential market for or value of the copyrighted work."*Campbell,* 510 U.S. at 588. As the *Campbell* opinion explained, if the secondary work harms the market for the original through criticism or parody, rather than by offering a market substitute for the original that supersedes it, it does not produce a harm cognizable under the Copyright Act." *Id.,* at 592.If the secondary copied use offers itself as a market substitute and in that way harms the market value of the original, this factor argues strongly against a finding of fair use. *SeeOn Davis v. The Gap, Inc.,* 246 F.2d 152, 175 (2nd Cir.2001). In this case, the Nader Ad is sufficiently transformative of MasterCard's Priceless Advertisements. The Ralph Nader Political Ad may serve a general

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046
**2004 WL 434404 (S.D.N.Y.)**

overlapping market, the viewing public. However, it serves an entirely different purpose than the Priceless Advertisements, a political non-commercial purpose. For this reason, the fourth factor also weighs heavily in the defendant's favor for a finding of fair use.

There is no genuine issue of material fact after weighing the factors pertinent to a finding of fair use. The Nader Ad is a non-infringing fair use parody of MasterCard's Priceless Advertisements under Section 107 of the Copyright Act. Accordingly, defendants' motion for summary judgment dismissing Count Four of MasterCard's complaint is granted.[FN4]

> FN4. Defendants also argue that they are entitled to summary judgment on plaintiff's Count Four because the Nader Ad did not copy any "protected expression" from the Priceless Advertisements. Since this Court finds the Nader Ad to be a non-infringing fair use parody of MasterCard's Priceless Advertisements under Section 107 and grants summary judgment in favor of defendants on this basis, it is not necessary for the Court to address this argument.

5. *Deceptive Trade Practices*

*16 [14] In Count Nine, plaintiff claims that through defendants' use of plaintiff's marks in the Nader Ad, defendants intentionally deceived and misled the public in violation of N.Y. Gen. Bus. Law § 349. Defendants argue that plaintiff's Count Nine should be dismissed again because the Nader Ad is political, rather than commercial in nature. Defendants also contend that the requirements of the statute are not met, in that the defendants did not intend to deceive and there is no evidence of actual deception.

Section 349 prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."N.Y. Gen. Bus. Law § 349(a). In order to establish a claim under

Section 349, it must be shown that the defendant committed "a material deceptive act or practice directed to consumers that caused actual harm."*Boule, et al. v. Hutton, et al.,* 328 F.3d 84, 93-94 (2d Cir.2003) (citing *Marcus v. AT & T Corp.,* 138 F.3d 46, 63 (2d Cir.1998)). An act is considered deceptive within the meaning of Section 349 only if it is of such a nature to mislead a reasonable consumer. *Id.* at 94 (citing *Marcus,* 138 F.3d at 64.). Further, in order to prevail on a Section 349 claim, it must be shown that the defendant intentionally deceived consumers. *Eastern American Trio Products, Inc. v. Tang Electronic Corporation, et al.,* 97 F.Supp.2d 295, 423 (S.D.N.Y.2000); *Seealso* *Samara Bros., Inc. v. Wal-Mart Stores, Inc. .,* 165 F.3d 120, 131 (2d Cir.1998), *rev'd on other grounds,* 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

In the present case, as previously discussed, defendants' use of plaintiff's marks in the Nader Ad is political, not commercial, in nature. The Ad was not being used in connection with the sale or promotion of a product or service, nor in the conduct of business, trade or commerce. There is no evidence the defendants intended to deceive, nor any evidence of actual consumer deception. Both are required showings under Section 349. Therefore, MasterCard's Count Nine is dismissed and defendants' motion for summary judgment on this count is granted.

*CONCLUSION*

For the foregoing reasons, defendants' motion for summary judgment is hereby GRANTED in its entirety.

S.D.N.Y.,2004.
MasterCard Intern. Inc. v. Nader 2000 Primary Committee, Inc.
Not Reported in F.Supp.2d, 2004 WL 434404 (S.D.N.Y.), 2004 Copr.L.Dec. P 28,781, 70 U.S.P.Q.2d 1046

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 7

Not Reported in F.Supp.2d                                                              Page 1
Not Reported in F.Supp.2d, 2003 WL 22859492 (N.D.Ill.)
**2003 WL 22859492 (N.D.Ill.)**

H
Eazypower Corp. v. Alden Corp.
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
EAZYPOWER CORPORATION, an Illinois cor-
poration, Plaintiff,
v.
ALDEN CORPORATION, a Connecticut corpora-
tion, Defendant.
**No. 03 C 3164.**

Dec. 2, 2003.

Robert B. Breisblatt, Kara Eve Foster Cenar,
Joseph Eben Cwik, Philip Dale Segrest, Jr., Welsh
& Katz, Ltd., Lee F. Grossman, Eric P Martin,
Grossman & Flight, LLC, Chicago, IL, for Plaintiff.
Jeffrey Edward Schiller, Michael Daehyun Lee,
Schuyler, Roche & Zwirner, Chicago, IL, Wm
Tucker Griffith, John C Linderman, McCormick,
Paulding & Huber, LLP, Hartford, CT, for Defend-
ant.

*MEMORANDUM, OPINION AND ORDER*

ANDERSEN, J.
**\*1** This case is before the Court on Alden Corpora-
tion's motion to dismiss Eazypower's complaint.
For the following reasons, the motion to dismiss is
denied.

BACKGROUND

Eazypower Corporation is a manufacturing com-
pany that sells screwdriver tips and related power
tool accessories. One of its products is a broken
screw remover set (the "Screw Remover Set"),
which is used to remove broken or worn out screws.
On or about April 4, 2000, Alden Corporation filed
a patent application with the United States Patent
and Trademark Office (the "Patent Office") for a
screwdriver bit, which is used to remove damaged

screws. Alden's patent application was published on
October 4, 2001, and the Patent Office allowed the
patent on March 19, 2003. At that time, Alden
began to send notice letters to potential infringers.
However, Alden's patent did not issue until July 22,
2003.

On or about April 4, 2003, Alden sent a letter to
Eazypower which stated that Alden had a pending
patent that had been "allowed" by the Patent Office
and that the soon-to-be-issued patent "will be in-
fringed by, or contributorily infringed by" Eazypo-
wer's Screw Remover Set. About ten days later on
April 14, 2003, Eazypower received a second letter
from Alden that reiterated the infringement allega-
tions and referenced the patent application as num-
ber 20010026737.

Eazypower responded to Alden's letter on or about
April 23, 2003, in which Eazypower denied the al-
leged infringement and asserted that the allegations
appeared to be baseless, made in bad faith and viol-
ated unfair competition law. Despite Alden's assur-
ances that it would not contact any of Eazypower's
customers, Ace Hardware, one of Eazypower's cus-
tomers, did in fact receive a similar cease and desist
letter from Alden. As a result, Eazypower corres-
ponded with Alden again on or about April 30,
2003 and demanded that Alden cease writing letters
to Eazypower's customers, alleging that Eazypo-
wer's Screw Remover Set infringes or contributor-
ily infringes Alden's not-yet-issued patent. At that
time, Eazypower also requested information from
Alden about the patent claims and how Eazypo-
wer's Screw Remover Set allegedly infringed the
patent. Alden responded that it needed Eazypower's
production drawings in order to determine how the
Screw Remover Set infringed Alden's anticipated
patent.

On May 12, 2003, Eazypower filed a five-count
complaint against Alden, including allegations of
unfair competition and patent-related violations,
resulting from Alden's infringement notice letters

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22859492 (N.D.Ill.)
**2003 WL 22859492 (N.D.Ill.)**

and soon-to-be issued patent. Specifically, the complaint contained the following claims: (1) Count I alleges a violation of section 43(a) of the Lanham Act for alleged false and/or misleading statements made to prospective customers of Eazypower; (2) Count II alleges a violation of Illinois' Uniform Deceptive Trade Practices Act; (3) Count III asserts a claim for tortious interference with prospective business relationships; (4) Count V alleges unclean hands; and (5) Count VI sought a declaratory judgment that Alden's soon-to-be-issued patent is invalid and/or not infringed by Eazypower's product. Noticeably, Eazypower did not include a Count IV in its original complaint.

**\*2** Alden then filed a motion to dismiss the complaint pursuant to Federal Rule 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim. Alden argues that Counts I, II, III, and V should be dismissed because its actions are immunized under the *Noerr-Pennington* doctrine. Alden also asserts that Count VI for non-infringement should be dismissed because its patent, at that time, had not issued and no actual justiciable controversy exists, and that Eazypower is simply seeking an advisory opinion.

On July 22, 2003, the day that the patent issued, Alden filed a patent infringement suit in the United States District Court for the District of Connecticut. That same day, Eazypower filed an amended complaint to include Count IV seeking declaratory judgment of non-infringement of Alden's now issued patent and amended Count IV seeking declaratory judgment of no provisional remedy. The other claims alleged in Eazypower's first complaint remain the same in the amended complaint.

Notwithstanding the filing of the amended complaint, the parties continued to brief the motion to dismiss that was filed before Eazypower amended its complaint. Although, Eazypower filed an amended complaint without leave from the Court, this Court would have granted leave. Therefore, the original complaint is moot, and we are considering this motion as a motion to dismiss to the

amended complaint.

## DISCUSSION

In ruling on a motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Szumny v. Am. Gen. Fin., Inc .,* 246 F.3d 1065, 1067 (7th Cir.2001). The purpose of a motion to dismiss is not to decide the merits of the challenged claims but to test the sufficiency of the complaint. *Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524 n. 1 (7th Cir.1996). A court will grant a motion to dismiss only if it is impossible for the plaintiff to prevail under any set of facts that could be proven consistent with the allegations. *Forseth v. Village of Sussex,* 199 F.3d 363, 368 (7th Cir.2000).

## I. Counts I, II, III and V of Eazypower's Amended Complaint State Claims for Relief

Alden contends that Counts I, II, III and V of Eazypower's amended complaint should be dismissed pursuant to Federal Rule 12(b)(6) for failure to state a claim on which relief could be granted. Counts I, II, III and V allege violations of the Lanham Act and Illinois Deceptive Trade Practices Act, tortious interference with prospective trade practices and unclean hands. These allegations are based on Alden's correspondence with Eazypower and its customers relating to the issuance of Alden's patent and allegations that Eazypower's Screw Remover Set would infringe the anticipated patent. Alden argues that the *Noerr-Pennington* doctrine immunizes its conduct from suit.

The *Noerr-Pennington* doctrine is based on Sherman Act considerations as well as the First Amendment right to petition the government. *Tarpley v. Keistler,* 188 F.3d 788, 794 (7th Cir.1999) ("[P]arties may petition the government for official action favorable to their interests without fear of suit, even if the result of the petition, if granted might harm the interests of others."). Originally, the

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22859492 (N.D.Ill.)
**2003 WL 22859492 (N.D.Ill.)**

doctrine was limited to antitrust actions, but has been extended to protect acts reasonably related to the petitioning process, including the sending of cease and desist letters to alleged infringers. *See e.g., Versatile Plastics v. Sknowbest, Inc.,* 247 F.Supp.2d 1098, 1103 (E.D.Wis.2003); *Thermos Co. v. Igloo Products Corp.,* 1995 WL 842002, at *4-5 (N.D.Ill. Sept.27, 1995).

*\*3* In *Versatile Plastics,* the plaintiffs filed an action seeking a declaratory judgment of non-infringement and also asserted claims of tortious interference, trade libel, antitrust and conspiracy resulting from infringement notice letters sent on behalf of the defendants. 247 F.Supp.2d at 1099. The court discussed the *Noerr-Pennington* doctrine and its transition from the antitrust arena into protecting acts "reasonably related to the petitioning litigation process," specifically the sending of cease and desist letters to alleged patent infringers. *Id.* at 1103-04.The court recognized that patent laws explicitly sanction and require notice letters to be sent to potential infringers in certain situations in order for the patent owner to recover damages. *Id.* at 1104.More importantly, the court acknowledged that the Federal Circuit, which has exclusive jurisdiction over patent appeals, has held that a patent owner "has the right to ... enforce its patent, and that includes threatening alleged infringers with suit."*Id.* at 1105 (quoting *Zenith Electronics Corp. v. Exzec, Inc.,* 182 F.3d 1340, 1353 (Fed.Cir.1999)). Ultimately, the court concluded that a patent holder who sends a cease and desist letter to persons believed to be infringing is entitled to some protection from liability for damages. *Id.* at 1105.

We agree. However, the protection afforded to patent owners under the *Noerr-Pennington* doctrine is not unlimited. In *Zenith Electronics Corp. v. Exzec, Inc.,* the Federal Circuit held that a patentee was not shielded from liability for unfair competition under the Lanham Act for statements made in the marketplace about potential infringement if such statements were made in bad faith. 182 F.3d 1340, 1353 (Fed.Cir.1999). Thus, *Noerr-Pennington* immunity may not extend to Alden's infringement notice letters if its correspondence with Eazypower and/or its customers was conducted in bad faith or without a reasonable belief that Eazypower's Screw Remover Set, in fact, would infringe Alden's patent.

Specifically, Eazypower has alleged that Alden's allegations of infringement were made in bad faith and without any knowledge that Eazypower's Screw Remover Set did, in fact, infringe Alden's soon-to-be-issued patent. Eazypower also argues that, although Alden stated that it would not contact any of Eazypower's customers, Alden, in fact, did correspond with some of Eazypower's customers about potential infringement. Eazypower also claims that Alden did not comply with the actual notice provisions of the relevant patent laws.

Even though Alden ultimately may be protected by the *Noerr-Pennington* doctrine, we believe that Eazypower has alleged sufficient facts of bad faith to withstand a motion to dismiss. Thus, the motion to dismiss Counts I, II, III and V is denied.

## II. The Filing of the Amended Complaint Cures Count IV's Jurisdictional Defect

In Count IV of the amended complaint, Eazypower seeks a declaratory judgment of infringement and/or invalidity with respect to Alden's patent, which had not been issued at the time Eazypower filed its original complaint. Alden argues this Court lacks subject matter jurisdiction to consider this claim as there is no actual justiciable controversy as required by the Declaratory Judgment Act.

*\*4* Eazypower contends that the jurisdictional defect was cured by the filing of its amended complaint after Alden's patent issued. However, Alden argues that Eazypower did not seek leave from this Court to supplement its pleading as required by Federal Rule 15(d). Regardless, this Court would have granted leave to amend. Thus, the filing of the amended complaint did cure the jurisdictional de-

Not Reported in F.Supp.2d, 2003 WL 22859492 (N.D.Ill.)
**2003 WL 22859492 (N.D.Ill.)**

fect relating to Count IV, and Alden's motion to dismiss Count IV of the amended complaint is denied. Finally, the motion to dismiss does not address Count VI, which seeks a declaration of no provisional remedy under 35 U.S.C. 154(d). For this reason, Count VI withstands this motion to dismiss.

CONCLUSION

For the foregoing reasons, Alden's motion to dismiss is denied.

N.D.Ill.,2003.
Eazypower Corp. v. Alden Corp.
Not Reported in F.Supp.2d, 2003 WL 22859492 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 8

Westlaw.

Not Reported in F.Supp.2d                                        Page 1
Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.)
**2003 WL 21798735 (N.D.Ill.)**

C

McDonagh v. Bergan
N.D.Ill.,2003.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Dr. Brian MCDONAGH, individually, and Illinois
Phlebology Associates, an Illinois professional cor-
poration, Plaintiffs,
v.
John BERGAN, Defendant.
**No. 03 C 1465.**

July 25, 2003.

*MEMORANDUM OPINION AND ORDER*

MORAN, Senior J.
**\*1** Plaintiffs Brian McDonagh and Illinois Phle-
bology Associates brought this action against de-
fendant John Bergan alleging defamation, tortious
interference with economic advantage, unfair com-
petition and civil conspiracy arising from state-
ments that Bergan allegedly made about a medical
process developed by the plaintiffs. Defendant filed
a motion to dismiss the complaint in its entirety for
failure to state a claim pursuant to Fed.R.Civ.P.
12(b)(6). For the following reasons, defendant's
motion is granted.

*BACKGROUND*

Plaintiffs are physicians who specialize in the treat-
ment of varicose veins using a procedure known as
sclerotherapy, whereby a solution is injected into
the veins to sclerose them. In 1992, plaintiff Brian
McDonagh developed a method of sclerotherapy
now known as COMPASS, which he presented to
the World Congress of Phlebology in 1995. This
method, which uses ultrasound technology to guide
the injections, is allegedly less invasive and less ex-
pensive than traditional surgical treatment. Defend-
ant John Bergan is a well-known vascular surgeon

who is allegedly financially involved in a surgical
method of treating varicose veins which is known
as VNUS Closure.

Plaintiffs allege that Bergan is frequently consulted
by numerous individuals and entities, including in-
surance companies, regarding varicose vein treat-
ments. They claim that Bergan, along with other
unnamed parties who have a financial stake in
VNUS Closure, engaged in a scheme to disparage
COMPASS in an effort to advance VNUS Closure.
In furtherance of this scheme defendant allegedly
told various medical societies and insurance carri-
ers that sclerotherapy was "not good medicine" and
that the costs of sclerotherapy should not be
covered by health insurance providers.

Plaintiffs specifically allege that defendant, in con-
nection with insurance policy reviews, has stated:

"a. that a recent article finding COMPASS more ef-
fective than surgical alternatives, peer reviewed by
surgeons and published in the leading publication in
this field, the Journal "Phlebology," is baseless and
false;

b. that the editors of "Phlebology" "must have been
too busy" and let the referenced article through for
publication "by mistake" (in fact, Bergan is himself
a member of the Editorial Advisory Board of
"Phlebology" and the article was reviewed for ap-
proximately nine months before publication);

c. that the COMPASS protocol could not close the
sapheno-femoral junction and the greater saphenous
vein and therefore was not a viable treatment al-
ternative;

d. that the accessory branches of veins, feeders and
below knee greater saphenousvein (which are
treated by the COMPASS protocol but not by
VNUS Closure) are "irrelevant" or should be
treated by procedures not covered by insurance;

e. that the complete regeneration of the varicose or

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.)
**2003 WL 21798735 (N.D.Ill.)**

accessory vein after surgical treatment does not constitute a failure of the treatment;

f. that an information Table (regarding the failure rate of surgical procedures) attached to the referenced COMPASS article was invalid because "most of the studies referenced" in the Table "were for high ligation and not for stripping";

**\*2** g. that the COMPASS treatment protocol is not an advisable or effective method to treat most varicose vein cases; and

h. that the VNUS Closure protocol for the treatment of varicose vein disease is superior to COMPASS and a more advisable protocol in most if not all cases." (Complaint, ¶ 11).[FN1]

> FN1. It is unclear whether any of those representations were made within the applicable statute of limitations.

As a result of these alleged statements, plaintiffs claim that insurers have denied coverage for sclerotherapy and many patients therefore choose not to undergo the treatment.

### DISCUSSION

In deciding a Rule 12(b)(6) motion to dismiss or strike a pleading we must assume the truth of all well-pleaded factual allegations, making all inferences in the non-movant's favor. *Sidney S. Arst Co. v. Pipefitters Welfare Educ. Fund,* 25 F.3d 417, 420 (7th Cir.1994). The court should dismiss a claim only if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

### Count I-Defamation

In order to state a claim for defamation, plaintiffs must allege facts showing that the defendant made a false statement of fact concerning the plaintiff,

that there was an unprivileged communication of the statement to a third party, and that plaintiffs were damaged by the publication. *Myers v. The Telegraph,* 332 Ill.App.3d 917, 922, 773 N.E.2d 192, 197 (5th Dist.2002).

A statement of opinion about matters of public concern that does not contain fully provable factual elements is entirely protected by the Constitution.*Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20 (1990). This protection applies to all statements that cannot be reasonably construed as factual statements about an individual. *Id* . Under Illinois law, such a statement is not actionable if it is an opinion relating to an individual's acts rather than the individual, the listener can perceive a factual basis for the statements and draw his or her own conclusions, and the statement relates to a matter of public concern. *Lancaster Foundation v. Skolrich,* 1992 WL 211063, \*3 (N.D.Ill.1992). More importantly, the Illinois courts give heightened protection to statements about medical science, a matter of public concern where widely varied approaches and opinions exist. *Aroonsakul v. Shannon,* 279 Ill.App.3d 345, 353, 664 N.E.2d 1094, 1100 (2nd Dist.1996), citing*Spelson v. CBS, Inc.,* 581 F.Supp. 1195, 1202 (N.D.Ill.1984).[FN2]

> FN2. We note that this differs from a privileged communication of a factual statement. Generally, when a physician communicates facts to an insurance carrier regarding the advisability of coverage, such a statement is protected by a qualified privilege. *SeeRodriguez-Erdmann v. Ravenswood Hospital Medical Center,* 190 Ill.App.3d 24, 32, 545 N.E.2d 979, 984 (1st Dist.1989). Such a privilege can be overcome by a showing that the defendant acted with an intent to harm the plaintiffs, as plaintiffs clearly allege here. *Id.* Expressions of opinion however are protected by the First Amendment and are never actionable, regardless of intent, because they cannot be proven true or false. *Spelson,*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

581 F. Supp at 1202.

In *Aroonsakul,* defendant allegedly attacked plaintiff's treatment of numerous incurable diseases, stating that the plaintiff had no research to substantiate her claims. 279 Ill.App.3d at 348, 664 N.E.2d at 1097. She stated that the plaintiff's method was "just as outrageous as saying that toenail polish cures Parkinson's Disease, to me."*Id.* The court found that these statements were about plaintiff's treatment methods rather than defamatory statements about plaintiff individually. 279 Ill.App.3d at 353-54, 664 N.E.2d at 1100. As a result, the statements were constitutionally protected opinions. *Id.*

*3 This is not to say that all defendants are immune from suit for defamation when speaking about other physicians. Statements that impugn the character or qualifications of a physician are clearly actionable. *Barakat v. Matz,* 271 Ill.App.3d 662, 648 N.E.2d 1033 (1st Dist.1995); *Erickson v. Aetna Life & Casualty Co.,* 127 Ill.App.3d 753, 469 N.E.2d 679 (2nd Dist.1984). In *Barakat,* a doctor who was reviewing the claims of another told a workers' compensation insurer that plaintiff's "practice was a joke" and that the plaintiff was "not any good as a doctor."271 Ill.App.3d at 672, 648 N.E.2d at 1042. Because these were not expressions of disagreement over medical treatments, but rather statements about the professional conduct and character of the plaintiff, the court held that they were actionable. *Id.*

The statements allegedly made by Bergan closely resemble those in *Aroonsakul.*If plaintiffs' allegations are true, defendant criticized their method of treating varicose veins and their research in support of this method. The alleged statements are not capable of being proven true or false. Moreover, as in *Lancaster Foundation,* the statements provided third parties who heard them a factual basis with which they could draw their own conclusions about sclerotherapy and the research in support of it. 1992 WL 211063 at *3. According to Illinois law, disagreements of this type amongst medical professionals should be settled by discussion and research in the medical community, not by the courts. While

courts certainly do not sanction the abuse of a position of trust by a physician, there is no actionable claim for defamation unless defendant makes *factually* misleading statements.

Plaintiffs also fail to allege that defendant's statements concerned them, as is required for a defamation claim. As stated above, the alleged statements concerned COMPASS, sclerotherapy or the research supporting plaintiffs' methods. While it is true that a defamatory statement may be actionable even if it does not mention plaintiffs by name, third parties must be able to reasonably understand that the statement refers to the plaintiffs. *Beresky v. Teschner,* 64 Ill.App.3d 848, 851, 381 N.E.2d 979, 981 (2nd Dist.1978). Defendant never actually referred to a *person* in any of the alleged statements, but rather to a *process.*Plaintiffs do not allege that the insurance carriers knew that they were involved in the development of COMPASS or that any third parties understood the statements to be about them as individuals.

*Count II-Tortious Interference*

To state a claim for tortious interference with economic advantage, plaintiffs must allege a reasonable expectation of a business relationship, the defendant's knowledge of that relationship, and purposeful interference in the relationship that leads to damages. *Fellhauer v. City of Geneva,* 142 Ill.2d 495, 511, 568 N.E.2d 870, 878 (Ill.1991). In addition, plaintiffs must allege that defendant has committed some impropriety while interfering. *Dowd & Dowd, Ltd. v. Gleason,* 181 Ill.2d 460, 485, 693 N.E.2d 358, 371 (Ill.1998).

*4 Plaintiffs do not sufficiently allege purposeful interference by the defendant in their business relationships. They admit that the defendant did not contact the insurance carriers, but rather the carriers asked him to serve as a consultant. In fact, in the only specific example of interference alleged in the complaint, defendant was not even involved until the appeals process, weeks after the coverage for

sclerotherapy was denied. Plaintiffs simply allege that defendant recommended to insurance carriers that they not cover costs for sclerotherapy-not enough to state a claim for tortious interference. Public policy dictates that the right of the defendant to render his opinion overcomes the plaintiff's property right in the economic advantage. *Turner v. Fletcher,* 302 Ill.App.3d 1051, 1058, 706 N.E.2d 514, 519 (4th Dist.1999).

*Count III-Unfair Competition*

The tort of unfair competition in Illinois has been largely codified by the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510 *et seq.* (UDTPA). The UDTPA allows plaintiffs to seek injunctive relief, but not damages, upon a showing that they have been harmed by a competitor's business practices. 815 ILCS 510/3; *Smith v. Prime Cable of Chicago,* 276 Ill.App.3d 843, 860, 658 N.E.2d 1325, 1337 (1st Dist.1995). While the plaintiffs do not cite to the statute in their complaint, their specific allegations have been codified by the UDTPA, which states that it is a deceptive trade practice when a defendant "disparages the goods, services or business of another by false or misleading representation of fact."815 ILCS 510/2(8). While the UDTPA does not entirely preempt the common law of deceptive trade practices, plaintiff does not allege a separate common law tort that would be the basis for relief other than that provided by the UDTPA. See*Custom Business Systems, Inc. v. Boise Cascade Corp.,* 68 Ill.App.3d 50, 52-53, 385 N.E.2d 942, 944 (2nd Dist.1979).

In any case, in order to state a claim for relief plaintiffs need to allege that defendant made false representations of fact about plaintiffs' services. As stated above, the alleged statements are defendant's medical opinions about the effectiveness of sclerotherapy and COMPASS specifically. Again, we treat statements about medical science differently from statements in other areas because of the importance of encouraging public debate for the benefit of patients. *Aroonsakul,* 279 Ill.App. at 353, 664

N.E.2d at 1100.

Medical statements are not entirely immune from characterization as false statements. Plaintiffs cite to *Mead Johnson & Co. v. Abbott Laboratories,* 201 F.3d 883 (7th Cir.2000) and *Abbott Laboratories v. Watson Pharmaceuticals, Inc.,* 2001 WL 826870 (N.D.Ill.2001), as support for their claim that statements about medical science are frequently actionable in Illinois. Both, however, are easily distinguishable. Both *Mead Johnson* and *Abbott Laboratories* involved claims for false advertising under Section 43 of the Lanham Act, 15 U.S.C. § 1125. In *Mead Johnson,* defendants claimed that their infant formula was the "1[st] choice of doctors," despite the fact that survey evidence did not entirely support this claim. 281 F.2d at 883-84. Likewise, in *Abbott Laboratories,* the defendant made clear misrepresentations as to the FDA approval of its competitor, claiming that because plaintiff's application with the FDA was still pending, the product was unsafe. 2001 WL 826870 at *2. In this case, no such representation was made. Further, those cases do not involve a defendant doctor opining about the efficacy of a medical procedure. While plaintiffs disagree with defendant's characterization of their process and their research, they cannot say that he was factually mistaken when giving his opinion.

*Count IV-Civil Conspiracy*

**\*5** Under Illinois law, a civil conspiracy consists of a combination of two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means. *Adcock v. Brakegate, Ltd.,* 164 Ill.2d 54, 62-63, 645 N.E.2d 888, 894 (Ill.1994). The function of the claim is to extend tort liability beyond the active wrongdoer. *Id.* In order to state a claim for civil conspiracy a plaintiff must allege both an agreement between two or more parties and an act in furtherance of the agreement. *Id.* The alleged act in furtherance must itself be tortious or unlawful in character.*Id.*

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

While plaintiffs allege that defendant reached agreement with multiple unnamed parties to denounce sclerotherapy, they fail to sufficiently allege any tortious acts in furtherance of the agreement. Because the agreement itself is not enough, they fail to state a claim for civil conspiracy.

### CONCLUSION

For the foregoing reasons, defendant's motion to dismiss the complaint is granted.

N.D.Ill.,2003.
McDonagh v. Bergan
Not Reported in F.Supp.2d, 2003 WL 21798735 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 9

Westlaw.

Not Reported in F.Supp.2d                                                Page 1
Not Reported in F.Supp.2d, 2006 WL 566468 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 566468 (N.D.Ill.))**

**H**Papa John's Intern., Inc. v. Rezko
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
PAPA JOHN'S INTERNATIONAL, INC., a
Delaware corporation, and Papa John's Food Service,
Inc., a Kentucky corporation, Plaintiffs,
v.
Antoin S. REZKO, an individual resident of Illinois,
et al., Defendants.
**No. 04 C 3131.**

March 3, 2006.

Thomas Hill Peckham, Christopher Eric Paetsch,
Seyfarth Shaw, Chicago, IL, Barry T. Meek,
Cassandra C. Collins, Edward T. White, Michael J.
Lockerby, Hunton & Williams, Richmond, VA, for
Plaintiffs.
David C. Gustman, Ami Deepak Gandhi, Kellye L.
Fabian, Leland W. Hutchinson, Jr., Michael J. Kelly,
Freeborn & Peters, Eugene Edward Murphy, Jr., John
N. Hourihane, Jr., Murphy & Hourihane L.L.C.,
Mary Clare G. Bonaccorsi, Bryan Cave, Chicago, IL,
for Defendants.

*MEMORANDUM OPINION AND ORDER*

MORAN, Senior J.
**\*1** Plaintiffs Papa John's International, Inc. and Papa
John's Food Service, Inc. brought an action alleging
trademark infringement in violation of the Trademark
Act of 1946, copyright infringement in violation of
the Copyright Act of 1976, trade secret
misappropriation in violation of the Kentucky
Uniform Trade Secrets Act, and breach of contract.
The action stems from defendants' alleged non-
performance and default on a series of franchise
agreements and promissory notes. After defendants
filed a motion to dismiss plaintiffs' second amended
complaint and filed a number of counterclaims,
plaintiffs filed this motion for sanctions under FED.
R. CIV. P. 11 for defendants' alleged failure to make
a reasonable inquiry into the fact and law underlying
their filings. For the following reasons, we deny
plaintiffs' motion for sanctions.

*BACKGROUND*

Plaintiff Papa John's International, Inc. initially
brought this action against defendants PJ Chicago,
LLC, Chicago P.J., LLC, and East Coast PJ, LLC on
May 3, 2004. Defendants counterclaimed and
plaintiffs entered two amended complaints, adding
Papa John's Food Service, Inc. as a plaintiff and
Antoin Rezko as a defendant. Plaintiffs allege that
defendants illegally operated their restaurants under
Papa John's registered trademarks, and used Papa
John's registered copyrights, confidential operations
manual, and other trade secrets, without paying
royalties or other compensation to plaintiffs, and in
violation of covenants not-to-compete. These actions
allegedly took place both before and after plaintiffs
were terminated as Papa John's franchisees on May 3,
2004.

On May 10, 2004, plaintiffs filed a motion for
temporary restraining order or preliminary injunction.
Ten days later the parties agreed to a partial
resolution of that motion, wherein defendants agreed
to immediate cessation of the use of plaintiffs'
trademarks, confidential information regarding
recipes and food products, promotional material and
signs, and to display signs de-identifying their
restaurants from Papa John's. On June 30, 2004,
plaintiffs filed an emergency motion to show cause
regarding the May 20, 2004, order. The hearing was
set for August 5, 2004. Prior to the hearing, on
August 4, 2004, the parties came to an agreement and
entered into a written settlement agreement
("settlement agreement"). Within four months, both
parties had entered motions to enforce the settlement
agreement, plaintiffs filing on October 5, 2004, and
defendants filing on November 23, 2004. By the
middle of December 2004, settlement discussions
were re-initiated. Ultimately, those settlement
discussions were unsuccessful. On June 23, 2005,
both parties withdrew their motions to enforce the
August 4, 2004, settlement agreement-defendants'
motion was withdrawn without prejudice.

On July 8, 2005, defendants filed counterclaims and
moved to dismiss plaintiffs' second amended
complaint, contending that "Papa John's conduct

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 566468 (N.D.Ill.)

**(Cite as: Not Reported in F.Supp.2d, 2006 WL 566468 (N.D.Ill.))**

Page 2

following the signing of the Settlement Agreement prevented Defendants from fully performing their obligations under the Settlement Agreement" (defs' response, ex. 2, ¶ 7). Specifically, defendants alleged that plaintiffs were unable to come to a franchise agreement with Dr. Paul Ray, a third party to whom defendants were planning to sell their pizza stores, in large part because plaintiffs breached the terms of the settlement agreement. According to defendants, plaintiffs' "killed" the settlement agreement on May 6, 2005. Defendants' motion to dismiss plaintiffs' second amended complaint is predicated on the validity and enforceability of the settlement agreement.

**\*2** On October 11, 2005, with defendants' motion to dismiss outstanding, plaintiffs made this motion for sanctions. Plaintiffs argue that defendants' motion to dismiss and second counterclaim violate Rule11(b), which requires a party entering a court filing to make a reasonable inquiry into whether the allegations made therein have evidentiarysupport and are warranted by existing law or a non-frivolous argument for the alteration of the law. Plaintiffs contend that defendants' use of the settlement agreement is frivolous because it is no longer in effect, as shown through defendants' own statements. Defendants counter that the agreement is, in fact, in effect, and therefore their motion to dismiss and counterclaim are viable.

### DISCUSSION

Rule 11 requires that a signatory to a court document has "read the document, has conducted a reasonable inquiry into the facts and the law and is satisfied that the document is well grounded in both, and is acting without any improper motive."*Business Guides, Inc. v. Chromatic Communications Enterprises, Inc., 498 U.S. 533, 542, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991).* Failure to comply with such requirements will result in the imposition of sanctions, pursuant to Rule 11(c).

Rule 11 was instituted to deter baseless filings and streamline the administration of the courts. *Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).* And although sanctions may include payment of the other parties' expenses, in analyzing a motion for sanctions we are mindful of the rule's ultimate goal of deterrence. *Id.*

*See also Westfield Partners, Ltd. v. Hogan,* 744 F.Supp. 189, 193 (N.D.Ill.1990) ( "Compensation, although an important consideration, is not the only purpose underlying Rule 11. An even more important purpose is deterrence").

Potential violation of Rule 11 is analyzed under a negligence standard and turns on whether the conduct was objectively reasonable. *D'Aquino v. Citicorp/Diner's Club, Inc.,* 139 F.R.D. 357, 359 (N.D.Ill.1991) (*citing Hays v. Sony Corp. of America,* 847 F.2d 412, 418 (7th Cir.1988)). Therefore, an attorney's good faith is immaterial to the imposition of sanctions. *Id., at 360.* What constitutes a reasonable inquiry is case-specific and "may depend on such factors as how much time was available for investigation, whether counsel had to rely on a client for information as to the facts or whether the filed papers were based on a plausible view of the law." *Id., at 360.* In this case the defendants' use of the settlement agreement as the basis for their counterclaim and motion to dismiss requires us to consider whether the papers filed were based on a plausible view of the law. If the settlement agreement was clearly void and unenforceable, as plaintiffs contend, then defendants' reliance solely on the agreement would violate Rule 11. *See In re Alberto,* 119 B.R. 985, 992 (Bankr.N.D.Ill.1990) ("A pleading, motion, or paper is not well-grounded in fact if it is contradicted by uncontroverted evidence that was or should have been known to the attorney or the party signing the filing") (*citing Frazier v. Cast,* 771 F.2d 259, 263-65 (7th Cir.1985)).

**\*3** If, however, the settlement agreement may or may not have been enforceable, defendants' actions would not violate Rule 11. Because Rule 11 only requires that an argument be grounded in fact, analysis under Rule 11 is less stringent than analysis under FED. R. CIV. P. 12(b)(6). Just because a more fully developed record might indicate that the claim or argument is erroneous does not automatically translate to violation of Rule 11.*Foster v. Michelin Tire Corp.,* 108 F.R.D. 412, 415-16 (C.D.Ill.1985).*See also LaSalle Nat. Bank of Chicago v. County of DuPage,* 10 F.3d 1333, 1338 (7 th Cir.1993) ("Because Rule 11'is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories,' an attorney need not advance a winning argument to avoid Rule 11 sanctions"); *Rouhi v. Harza Engineering Co.,* 785 F.Supp. 1290,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 566468 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 566468 (N.D.Ill.))**

1296 (N.D.Ill.1992) (where there is a plausible reading of the law that would support the party's filing, Rule 11 sanctions are not appropriate).

Plaintiffs contend that defendants knew the settlement agreement was null and void, and therefore their reliance on it should be subject to Rule 11 sanctions. They suggest that statements made by counsel at a December 15, 2004, status conference display defendants' knowledge that the agreement was not in effect. Plaintiffs argue that, at that conference defense counsel twice admitted that the settlement agreement was "a nullity" (plfs' motion at 7). The first statement by defense counsel, Mr. Murphy, reads: "I will have one brief comment, Judge. It is Rezko's position that the settlement agreement previously stated by counsel is not in full force and effect that if it was, in fact, breached ... as far as Rezko is concerned we do have a settlement conference in place as we stand here today" (defs' response, ex. 1, at 13:19-14:1). The second statement is plaintiffs' counsel, Mr. Lockerby, stating: "The contingency that I identified up-front is that if GE does not agree by 12:00 o'clock noon a week from today, December 22nd, 2004, then this agreement is null and void and the parties to the litigations, which do not include Dr. Ray, have an appointment with the Court on December 29th for a hearing that does not involve Dr. Ray"(*id.,* at 15:2-8). Although that statement was made by plaintiffs' counsel, it was included to show that there was no dissent to that agreement from defense counsel. Plaintiffs also suggest that the withdrawal of defendants' motion to enforce the settlement agreement, withdrawn on June 23, 2005, indicates defendants' lack of confidence in the agreement.

Defendants respond that they "and their counsel never asserted that the Settlement Agreement dated August 4, 2004 has no binding effect and is a nullity. Rather, just as Papa John's did in its motion to enforce the Settlement Agreement, Defendants consistently maintained that there was and is a binding agreement that was breached by Papa John's" (defs' response at 2). Specifically, defendants contend that Mr. Murphy's comment was "prefatory" and could not be read to state that the agreement was a nullity, which was obvious since both parties had pending motions to enforce that agreement on the date of the status conference at issue (*id.,* at 2-3). In fact, defendants did not withdraw their motion to

enforce the settlement agreement for another six months. Defendants also argue that Mr. Lockerby's statement referred only to an amendment to the agreement, "the failure [of which] did not abrogate the Settlement Agreement"(*id.,* at 3). As for the withdrawal of defendants' motion to enforce the agreement, defendants note that there was no stated reason for the withdrawal, and it was withdrawn without prejudice. Therefore, the withdrawal in no way signifies that the settlement agreement was void or unenforceable.

**\*4** We cannot find that defendants have explicitly indicated that the August 4, 2004, settlement agreement is null and void. Reading the transcript of the status conference as a whole, defense counsel's statements did not assert that the agreement was a nullity. And the fact that the motions to enforce were still pending at the time of the statements works to support defendants' contention that neither party considered or stated that the agreement was invalid. Further, at that December 15, 2004, status conference, plaintiffs' counsel stated, "Papa John's and Rezko already signed a settlement agreement. And what we're doing now is agreeing to an amendment ..." (defs response, ex. 1, at 10:22-24). As we understood the conversation, the discussion regarded potential amendments to the settlement agreement, not the agreement as a whole. In fact, a reading of the full status conference transcript shows that the conference took place to discuss "an offer by Papa John's to amend its preexisting settlement agreement with the Rezko codefendants ..." (defs' response, ex. 1 at 4:4-8), and to aid the parties in entering into an amended binding agreement (*id.,* at 12:12-19). Therefore, the December 15, 2004, statements do not necessarily evidence that defendants considered the settlement agreement a nullity. And, standing along, the withdrawal of the motion to enforce cannot be seen as a statement that the agreement is null and void.

Defendants may still be in violation of Rule 11 if there is no reading of the law that can be applied to give them a successful claim. A settlement agreement is a contract and, therefore, is governed by the principles of local law generally applied to contracts. *D. Patrick, Inc. v. Ford Motor Co.,* 8 F.3d 455, 460 (7th Cir.1993); *Laserage Technology Corp. v. Laserage Laboratories, Inc.,* 972 F.2d 799, 802 (7th Cir.1992).[FN1] In Kentucky, a party in material breach

Not Reported in F.Supp.2d                                                                                   Page 4
Not Reported in F.Supp.2d, 2006 WL 566468 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 566468 (N.D.Ill.))**

of a contract cannot enforce that contract. See*Jewett v. Hertich,* 2004 WL 1487105, *6 (Ky.App.Ct.2004); *Williamson v. Ingram,* 243 Ky. 749, 49 S.W.2d 1005, 1006 (Ky.App.Ct.1932). In this case both parties have asserted that the other is in breach of the settlement agreement. If it is true that defendants have breached the settlement agreement, they cannot assert the contract as the means by which to dismiss plaintiffs' second amended complaint.[FN2]We will not, however, address the merits of a breach of contract argument on this motion for sanctions under Rule 11. Although Rule 11 does impose a duty on parties and counsel to conduct reasonable inquiry into a claim or argument, "it was not intended to provide another level of pretrial review on the merits" of defendants' arguments.*Haroco, Inc. v. American Nat. Bank and Trust Co. of Chicago,* 121 F.R.D. 664, 671 (N.D.Ill.1988). Therefore, as there is clearly a debate over the enforceability of, and the adherence to the settlement agreement, we will not address the merits of such a breach in determining this motion.

> FN1. Because the franchise agreement included a choice of law provision-"this agreement and all claims arising from the relationship between us and you will be governed by the law of the Commonwealth of Kentucky without regard to its conflict of laws principles" (second am. cplt, ex. B, at 1)-we turn to Kentucky law.

> FN2. We note that defendants adamantly argue that they have complied with the settlement agreement to the best of their abilities, hampered only by plaintiffs' action and inaction (*see* defs' response, ex. 2, at 2).

**\*5** In the alternative, plaintiffs suggest that even if the settlement agreement is valid and enforceable, it cannot serve as a valid basis for a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) (plfs' reply at 5). Plaintiffs cite *Yattoni v. Oakbrook Terrace,*1991 U.S. Dist. LEXIS 10423 (N.D.Ill.1991), and the court's statement that a party cannot assert allegations outside of the complaint in a motion for dismissal pursuant to Rule 12(b)(6). It is true that in a 12(b)(6) analysis, arguments and documents attached to a defendant's pleadings cannot be considered without converting the motion to dismiss to a motion for summary judgment, with the exception of documents referred to in the plaintiff's

complaint and central to the claim. *Wright v. Associated Ins. Companies Inc.,* 29 F.3d 1244, 1248 (7th Cir.1994); *Venture Associates Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993). Therefore, we must inquire as to whether the settlement agreement falls into the exceptions as designated by the Seventh Circuit.

Plaintiffs do not attach the settlement agreement to the complaint, nor does the complaint make mention of it. And because the settlement agreement is essentially a release of liability, which is an affirmative defense under FED. R. CIV. P. 8(c), it appears that the agreement is not an appropriate basis for a motion to dismiss under Rule 12(b)(6).See*United States v. Lewis,* 411 F.3d 838, 842 (7th Cir.2005) (it was premature to grant a motion to dismiss based on an affirmative defense, unless the allegations of the complaint set forth everything necessary to satisfy the affirmative defense); *Xechem, Inc. v. Bristol-Myers Squibb Co.,* 372 F.3d 899, 901 (7th Cir.2004). Other courts, however, have found that the presence of a settlement agreement or liability release is appropriately considered on a motion to dismiss, even where the plaintiff did not attach it to his complaint. See*Stiegmeier v. Northwestern Growth Corp.,* 2000 WL 1670931, *2 (S.D.N.Y.2000) (considered a settlement agreement on a motion to dismiss where a related document was referred to in the complaint, the parties had notice of both documents, and the documents were integral to his claims); *Willis Corroon Corp. of Utah, Inc. v. United Capitol Ins. Co.,* 1998 WL 30069, *3 (N.D.Cal.1998) ("while the interim settlement agreement may not be 'central' to the substantive issues in Corroon's complaint, it clearly is central to Corroon's ability to bring this action since the agreement is a binding contract which allegedly limits the parties' right to sue. The agreement is therefore centrally relevant-and potentially dispositive-in the same way that facts indicating the existence of a statute of limitations or res judicata would be").See also*Ficke v. Johns,* 1996 WL 99424 (N.D.Ill.1996) (in addition to a reference to the release in the complaint, the release was "clearly central to plaintiff's allegations in that a determination of the Release's validity affects whether or not this action may proceed").

**\*6** As indicated above, there are conflicting views as to whether a settlement agreement-central to the claim's viability, but now here mentioned in the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 5
Not Reported in F.Supp.2d, 2006 WL 566468 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d, 2006 WL 566468 (N.D.Ill.))**

complaint-should be considered on a motion to
dismiss. Therefore, we find that the use of such a
document is not so clearly objectionable as to require
the imposition of sanctions.

### CONCLUSION

For the foregoing reasons, we deny plaintiffs' motion
for sanction under Rule 11.

N.D.Ill.,2006.
Papa John's Intern., Inc. v. Rezko
Not Reported in F.Supp.2d, 2006 WL 566468
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.