## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 08-CV-1384 |
| v. | ) ) ) | Judge Bucklo<br>Magistrate Judge Mason |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |
| | ) | |

### THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'s OPPOSITION TO MORTON GROVE PHARMACEUTICALS, INC.'s MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

A year and a half after it first filed suit against the National Pediculosis Association, Inc. ("NPA"), plaintiff Morton Grove Pharmaceuticals, Inc. ("Morton Grove") seeks to file its fourth complaint against NPA, adding allegations regarding material that has been posted on NPA's website since well before Morton Grove filed its very first complaint against NPA in February 2007. Although Morton Grove argues that its proposed amendments are "narrow" and "merely provide more details about the claims already stated," the proposed amended complaint in fact radically expands Morton Grove's claims, which had previously been limited to thirteen specific statements on NPA's website, to include the entire website, which includes hundreds of individual pages. Moreover, Morton Grove's proposed amended complaint seeks to assert claims of the type it has argued in its motion to dismiss NPA's counterclaim are precluded by the First Amendment. Indeed, Morton Grove's proposed amendment serves no purpose other than to harass NPA for reporting adverse effects of Morton Grove's products. Furthermore, the proposed amendment alters Morton Grove's Lanham Act claim so as to make it dismissible for failure to meet the pleading standards for such a claim. Accordingly, the Court should deny

Morton Grove leave to file its amended complaint, both because of Morton Grove's bad faith and because the proposed amendment would be futile.

## BACKGROUND

Morton Grove seeks to make broad alterations to the scope of its claims through its proposed amendments in two ways. First, Morton Grove seeks to add thirty-eight new pages of content from NPA's website to Exhibit Ex. A of the complaint. (*See* Mot., Dkt. No. 77, Ex. A to Ex. 1 at pp. 1, 2, 4-10, 12, 13, 39-65.) All of these pages were available on NPA's website before Morton Grove filed its first complaint against NPA in February of 2007. Morton Grove's current complaint includes only twenty-six pages from NPA's website. Paragraph 22 of Morton Grove's proposed amended complaint alleges that *all* of these pages are "[e]xamples of the NPA's false advertising claims and other false statements." Morton Grove's Lanham Act claim (Count I) incorporates these pages and the balance of NPA's website, and brands them as "false and misleading advertising claims." (*Id.* at Ex. 1 ¶¶ 59-65.) For example, paragraph 59 of the proposed amended complaint alleges that "[t]he NPA's advertising claims set forth above are false and misleading descriptions and representations of fact about Lindane medications. In addition, these statements are misleading in context and violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)." Thus, while Morton Grove's current complaint alleges that thirteen distinct statements were false and misleading, the proposed amended complaint alleges that the "overall context and message of" NPA's entire website, the content of the sixty-nine attached pages, *and* the thirteen statements alleged in the current complaint are false and misleading in violation of the Lanham Act.

Second, Morton Grove proposes to amend the allegations of its complaint to add the following new allegations:

- "[T]he NPA violates norms and rules of advertising established by the FTC." (Mot., Dkt. No. 77 at Ex. 1 & Ex. 2 ¶ 22.)

- "Recent NPA employees admitted in depositions that they have no scientific background or training, did nothing verify that the posted material was correct, and did not vet the information with any scientists or licensed medical professionals." (*Id.*)

- "NPA has posted [on its website] several hundred MedWatch forms which it has completed.  MedWatch forms are typically used by consumers and their healthcare providers to report to the FDA adverse experiences that consumers have had with various drugs.  Here, the NPA solicits data from visitors to its website, uses that data to complete MedWatch forms, signs its name to these forms as the reporter, and submits the forms the FDA [*sic*].  Next to its name, the NPA indicates that it is a 'Health professional.'" (*Id.* ¶ 23.)

- "In fact, the NPA is not a 'Health professional' -- none of the members of its Board of Directors and none of its employees are licensed healthcare professionals, such as physicians, pharmacists, or nurses.  Nor does the NPA have any proximity to or involvement in the actual treatment of the patient, as is typical when a medical professional submits a MedWatch form.  The repeated representations that NPA is a 'Health professional' are false and misleading, contribute to the illusion of medical credentials that NPA projects on its website, and are part of the context in which the NPA's false statements were made." (*Id.* ¶ 24.)

- "The overall context and message of the NPA's website, identified in Paragraph 13, and statements creates with the viewer a false impression that misrepresents: (1) Lindane medications' effectiveness; (2) Lindane medications' harm to the environment; (3) that if you use Lindane medications, you significantly increase the risks of developing cancer and other serious adverse health effects; and (4) the NPA's statements are objective, represent the scientific norm, and come from scientifically- and medically-credentialed individuals." (*Id.* ¶ 25.)

- In each of the three counts of its proposed amended complaint, Morton Grove repeats and re-alleges all of its previous allegations, including the new allegations. (*Id.* ¶¶ 56, 66, 72.)

The MedWatch program referenced in Morton Grove's proposed amended complaint is the U.S. Food and Drug Administration's ("FDA") safety information and adverse event reporting program, designed to serve both healthcare professionals and the medical product-using public by allowing members of the public to fill out a form on the FDA's website to voluntarily report serious problems that they suspect are associated with the drugs and medical

devices they prescribe, dispense, or use. *See generally* FDA Med watch,

http://www.fda.gov/medwatch/What.htm (last visited Aug. 7, 2008). The FDA encourages

anyone aware of a serious side effect from lindane products to submit a MedWatch report.

*See* FDA Lindane Shampoo and Lindane Lotion Questions and Answers,

http://www.fda.gov/Cder/drug/infopage/lindane/lindaneQA.htm (last visited Aug. 7, 2008).

NPA provides the FDA form on its website, visitors to NPA's website who have experienced

adverse effects from headlice medications fill in the forms, and NPA submits them to the FDA.

(Mot., Dkt. No. 77, Ex. 1 at ¶ 23 & Ex. A at p. 48.) The FDA is aware of the activity, and has

even thanked NPA for its efforts. (*See, e.g.*, Ex. 1.) Further, the "FDA encourages anyone

aware of a serious side effect, including consumers or patients, to make a MedWatch report." *See*

FDA Lindane Shampoo and Lindane Lotion Questions and Answers,

http://www.fda.gov/Cder/drug/infopage/lindane/lindaneQA.htm#18 (last visited Aug. 7, 2008).

## ARGUMENT

Rule 15(a) provides in pertinent part that leave to amend "shall be freely given when

justice so requires." Fed. R. Civ. P. 15(a). Despite the apparent liberality of the rule, leave to

amend should not be granted automatically. *Jerrick v. Norfolk & W. Ry. Co.*, 124 F. Supp. 2d

1122, 1125 (N.D. Ill. 2000) (Bucklo, J.). In determining whether to grant leave to amend, the

district court may consider such factors as undue delay, bad faith, or dilatory tactics on the part

of the movant; repeated failures to cure deficiencies by amendments previously allowed; and

undue prejudice to the opposing party and futility of the amendment. *Foman v. Davis*, 371 U.S.

178, 182 (1962);. An amendment is futile where the proposed amendments would not survive a

motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Jerrick*, 124 F.

Supp. 2d at 1125 (denying motion for leave to amend based on futility); *see also, Holmes v.*

*Boehringer Ingelheim Pharm.*, 237 F. Supp. 2d 885, 887 (denying motion for leave to amend based on futility)(Bucklo, J.).

## I.    THE AMENDMENT IS PROPOSED IN BAD FAITH AND AFTER UNDUE DELAY.

The Court should deny Morton Grove's motion because the proposed amendment is proposed for the bad-faith purpose of harassing NPA for exercising its First Amendment right to petition the FDA, and Morton Grove's "new" allegations about NPA's website describe pages that have been part of that site since before Morton Grove filed all three of its previous complaints.

Despite Morton Grove's verbiage about "providing context" for NPA's statements (Mot. Dkt. No. 77, at ¶¶ 4-5), the proposed amendments serve no purpose other than to punish NPA for its submissions to the FDA.  NPA's submission of MedWatch reports provide no "context" for the NPA statements at issue in the current complaint; they appear on different portions of the website and are unrelated to the content of the statements.[1]  (*See id.* at Ex. A to Ex. 1, pp. 49-50.) In addition, although Morton Grove's proposed amended complaint would vastly expand Morton Grove's claims, Morton Grove is not seeking additional damages or injunctive relief as a result of any of the new allegations.  Thus, the proposed amendments serve no valid purpose in the lawsuit.

They do, however, serve Morton Grove's bad-faith purpose of harassing NPA in retaliation for filing MedWatch forms with the FDA, and chilling NPA's future submissions to the FDA.  As Morton Grove has repeatedly pointed out in its briefing in this action, making speech to the government the basis of a Lanham Act suit serves to discourage that speech.  (MG Mem. in Support of Mot. to Dismiss, Dkt. No. 67-2 at p. 18.)  It will also force NPA to expend

---

[1] Morton Grove's allegation about the testimony of NPA employees also does not add any "context" to the allegations about NPA's statements.  (Mot. Dkt. No. 77, Ex. 1 ¶ 22.)

additional resources in open-ended discovery regarding purportedly misleading statements spread over NPA's entire website, on such topics as what injury Morton Grove alleges was caused by all of the pages on the website.  Even if NPA were to limit its additional discovery inquiries to the approximately 400 pages of MedWatch forms, that would be a massive task.

Further evidencing Morton Grove's bad faith, Morton Grove recently argued in its motion to dismiss NPA's counterclaim that there can be no liability for a party's petitioning of the government.  (*See* MG Mem. in Support. of Mot. Dismiss, Dkt. No. 67-2, at pp. 12-15 and cases cited therein.)  In its opposition to Morton Grove's motion to dismiss, NPA did not dispute that this is the law, but rather argued that the right to petition protection was unavailable to Morton Grove because Morton Grove did not make any of the statements at issue in NPA's counterclaim to the government or any government agency.  (*See* NPA Opp. to Mot. Dismiss, Dkt. No. 85 at p. 15.)  Instead, Morton Grove's statements were either (a) statements made by *third-parties* that Morton Grove posted on its own public website as testimonials to help promote its products; or (b) statements made by Morton Grove to *private* third parties.  (*See* NPA Opp. to Mot. Dismiss, Dkt. No. 85 at p. 15).  As such, none of those statements are protected speech because they are not statements in which Morton Grove was directly petitioning the government.

In contrast, the MedWatch reports on NPA's website were clearly statements made by the NPA *directly* to the FDA.  As such, "[c]onstitutional concerns clearly exclude [NPA's MedWatch reports] from Lanham Act liability," and the fact that Morton Grove alleges they are false does not diminish this protection.  *See* MG Mem. in Support of Mot Dismiss, Dkt. No. 67-2, at P. 14; *see also New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007) (right to petition is protected whether or not "deceit" was used in petitioning government).

Morton Grove's bad faith is also demonstrated by its undue delay in seeking to add these allegations. Morton Grove waited a year and a half, during which it filed three different complaints against NPA, to seek to add claims based on information that has been on NPA's website since before Morton Grove filed its first complaint. Under similar circumstances, in *Glatt v. Chicago Park Dist.*, 87 F.3d 190, 194 (7th Cir. 1996), the Seventh Circuit upheld the district court's denial of plaintiff's motion for leave to amend, noting:

> Especially when the motion is filed long after the original complaint was filed (16 months after, in this case), and is based solely on a document that the movant had discovered more than a year earlier, the court is entitled to demand reasons for thinking that the denial of the motion would work a serious injustice. The court not only may but should consider the likelihood that the new claim is being added in a desperate effort to protract the litigation and complicate the defense; its probable merit; whether the claim could have been added earlier; and the burden on the defendant of having to meet it.

*See also Koch v. Koch Indus.*, 127 F.R.D. 206, 211 (D. Kan. 1989) (noting that bad faith may be inferred from "[a]wareness of facts and failure to include them in the [original] complaint"). "Generally, when a plaintiff withholds his true position from his opponent, especially when done for some ulterior purpose, the Court may view the action as having a bad faith motive unless satisfactory explanation clearly shows otherwise." *GSS Props., Inc. v. Kendale Shopping Ctr., Inc.*, 119 F.R.D. 379, 381 (M.D.N.C. 1988) (denying motion for leave to amend in light of plaintiff's "blatant" delay where plaintiff "was fully advised of the facts constituting the amendment" prior to filing original suit). This is particularly true where a plaintiff fails to add "new" allegations in previous iterations of his complaint. *See, e.g., Aloe Vera of Am., Inc. v. United States*, 233 F.R.D. 532, 536 (D. Ariz. 2005) (denying leave to amend where proposed amendment "does not offer any newly discovered facts unknown to the Plaintiffs at the time of the prior two amendments").

Although Morton Grove asserts that its new allegations "are mainly gathered from documents the NPA had in its possession" (Mot., Dkt. No. 77 at ¶ 6), in fact, virtually all of the material Morton Grove now seeks to add was available on NPA's website when Morton Grove filed its first suit against NPA on February 7, 2007, when it amended that complaint on June 19, 2007, and when it filed the current action on March 7, 2008. Similarly, the "new" allegation that NPA does not employ doctors has been in each complaint filed by Morton Grove, and its repetition does not add any "context." (*See, e.g.,* Original Compl., Dkt. No. 1 at ¶ 2). The fact that Morton Grove has only now sought to add these allegations is evidence of its improper purpose for doing so. *See Koch*, 127 F.R.D. at 211.

Although Morton Grove's new allegations do not advance its cause in any substantive way, they do muddy the issues in the lawsuit and require substantial additional discovery by NPA. Among other things, they would require NPA to serve new discovery regarding: (1) the information on NPA's website that Morton Grove claims is false and misleading; (2) the "norms and rules of advertising established by the FTC" Morton Grove alleges NPA has violated; (3) the basis for Morton Grove's allegation that NPA is not a health professional; and (4) the injury Morton Grove claims to have suffered as a result of the newly-alleged conduct. In addition, the proposed amendment would permit Morton Grove to endlessly shift its allegations regarding which NPA statements are allegedly false; as discovery continues to demonstrate that NPA's statements contain accurate information from reliable sources, Morton Grove will simply shift its claims to other statements on NPA's website, as it has done in each new iteration of its complaint so far.

## II.    THE PROPOSED AMENDMENT WOULD BE FUTILE.

The Court should deny Morton Grove's motion for the additional reason that its proposed amended complaint would be subject to dismissal for failure to state a claim with respect to all of

its new allegations.  Specifically, the proposed amended complaint changes Morton Grove's

Lanham Act claim, which is subject to Rule 9(b), such that it is not pled with the requisite

specificity, adds allegations that fail as a matter of law, and purports to provide "context" that is

irrelevant to its non-Lanham Act claims.

A.    **Morton Grove's Proposed New Lanham Act Claim Fails To Adequately Identify The Allegedly False Statements.**

To state a claim under the false or deceptive advertising prong of § 43(a) of the Lanham

Act, a plaintiff must allege, among other things, "a false statement of fact by the defendant in a

commercial advertisement about its own or another's product" and that "the plaintiff has been or

is likely to be injured as a result of the false statement."  *See Hot Wax, Inc. v. Turtle Wax, Inc.*,

191 F.3d 813, 819 (7th Cir. 1999).  Moreover, a plaintiff alleging false representation or false

advertising under the Lanham Act must comply with the heightened pleading requirements of

Rule 9(b) of the Federal Rules of Civil Procedure.  *CardioNet, Inc. v. LifeWatch Corp.*, No. 07 C

6625, 2008 WL 567031, at *2 (N.D. Ill. Feb. 27, 2008) (App. 1); *see also Conditioned Ocular*

*Enhancements, Inc. v. Bonaventura,* 458 F. Supp. 2d 704, 709 (N.D. Ill. 2006).  For example, in

*CardioNet*, in dismissing claims for failure to plead the who, what, when, and where of the

allegedly false or misleading statements, the court noted that "[t]he particulars of the false and

misleading statements were also absent" from the allegations.  2008 WL 567031, at *3.  The

court stated that the "bare bones" allegation that CardioNet "advertised and made other

statements…to the effect that its device is superior to and/or [safer than the] LifeStar ACT

Device, merely allege[d] that unspecified advertisements *had the effect* of implying that

CardioNet's device was superior and safer."  *Id.* (emphasis in original; internal quotation

omitted).  The court further stated that such vague allegations left the court and the counterclaim

defendant "to speculate what specific advertisements and statements underlie" the Lanham Act claim. *Id.*

Similarly, here, Morton Grove has failed to identify, let alone to state with any particularity, the allegedly false or misleading statements and has left the NPA "to speculate what specific advertisements and statements" Morton Grove claims are actionable. Morton Grove's proposed amendments include vague allegations such as "[t]he overall context and message of the NPA's website … and statements creates with the viewer a false impression that misrepresents" the safety of lindane and NPA's credentials, and the proposed allegations assert broadly that the sixty-nine attached pages from NPA's website are "examples" of NPA's allegedly misleading statements. (Mot., Dkt. No. 77, Ex. 1 at ¶¶ 25, 23.) Far from giving NPA any actual notice of what specific statements on the NPA's website are allegedly false and misleading, Morton Grove's proposed allegations leave NPA (and this Court) to speculate what specific statements underlie Morton Grove's Lanham Act claim. Based on Morton Grove's proposed allegations, NPA cannot properly defend itself. Much like the claimant in *CardioNet*, Morton Grove has merely made "bare bones" allegations that some unspecified statements, which may be located in the thirty-eight new pages attached to the proposed amended complaint or somewhere else on NPA's website, are false and misleading, and accordingly its allegations do not even satisfy Morton Grove's notice pleading obligations under Rule 8, much less Rule 9(b)'s heightened standards.

**B.    Claims Based On NPA's Submission Of MedWatch Forms To The FDA Fail As A Matter Of Law.**

**1.    NPA's statements petitioning the FDA are protected by the First Amendment.**

As discussed above, Morton Grove's proposed amended complaint improperly seeks to assert claims for speech protected by the First Amendment. *See infra* § I; *see also Aida Food*

*and Liquor, Inc. v. City of Chi.*, No. 03 C 4341, 2004 WL 719663, at *8 (N.D. Ill. Mar. 31, 2004)

(dismissing claim against private party defendants because, even assuming they complained to

the city for the purpose of forcing plaintiffs out of business, their petitioning was immune) (App.

2); *Village of Lake Barrington v. Hogan*, 649 N.E.2d 1366, 1374, 208 Ill. Dec. 705, 713 (Ill.

App. Ct. 1995) (affirming dismissal of complaint against citizens who petitioned

government)(App. 3).  Because these claims fail as a matter of law, the proposed amendment is

futile.

> **2.    On its face, NPA's marking the health professional box on the MedWatch form is not false or misleading.**

In its proposed amended complaint, Morton Grove adds two paragraphs (¶¶ 23-24)

alleging that NPA's submittal of MedWatch forms to the FDA were somehow false and

misleading.  Morton Grove claims that NPA marking the "yes" box under "Health Professional"

on the MedWatch forms (Mot., Dkt. No. 77, Ex. A to Ex. 1, at pp. 49-50) is false and misleading

and "contribute[s] to the illusion of medical credentials that the NPA projects on its website…."

(*Id.*, Ex. 1 at ¶ 24).   As the attached pages from NPA's website show, the healthcare

professional checkbox is located directly above a line for the person submitting the form to

identify him or herself, which NPA fills in with "National Pediculosis Association." (*Id.*,  Ex. A

to Ex. 1, at pp. 49-50).

There is no way that NPA's marking "yes" under "health professional" is false or

misleading in the  context of even the MedWatch form alone, let alone in the context of NPA's

entire website.  No reasonable viewer could think that the "National Pediculosis Association" is

a doctor or a pharmacist, and a review of the NPA's website in its entirety, as incorporated into

Morton Grove's proposed amended complaint, makes clear that the NPA identifies itself as a

non-profit organization that "serves the public by providing independent and helpful information

and resources." (*Id.*, Ex. A to Ex. 1 at p. 3). NPA's website further states that visitors should submit information about adverse reactions to lindane products and other lice or scabies products so that NPA can submit the information and "seek assistance from experts and governmental agencies including the Food and Drug Administration (FDA)." (*Id.*, Ex. A to Ex. 1 at p. 48.)

Moreover, the term "health professional" is not defined by the FDA, as Morton Grove has suggested[2], as limited to doctors or healthcare providers. The FDA makes MedWatch forms available on its website so that the public can report adverse reactions and other problems with FDA regulated drugs and medical devices. (*See* Medwatch Voluntary Reporting, http://www.fda.gov/medwatch/how.htm (last visited Aug. 7, 2008)). The FDA's website groups those wishing to submit MedWatch forms into two groups: consumers (which NPA obviously is not) and "health professionals," which is not defined in either the FDA's website or the corresponding Code of Federal Regulations (Food and Drugs, 21 C.F.R. §1 et seq. (2008)). There is nothing misleading about NPA accurately indicating that its role is more that of a "health professional" than a consumer. Thus, these claims are also subject to dismissal and the proposed amendment is futile.

---

[2] During the deposition of former NPA employee Dan Sheridan  Morton Grove presented a section of the Code of Federal Regulations defining a different term, "health care provider," from an unrelated section of the Code that has no bearing on this litigation. Morton Grove uses the same unrelated term in paragraph 23 of its proposed amended complaint.

## CONCLUSION

For all the foregoing reasons, defendant the National Pediculosis Association, Inc.

respectfully requests that this Court deny Morton Grove Pharmaceuticals, Inc.'s motion for leave

to file an amended complaint.

Dated:  August 7, 2008                              Respectfully Submitted,

                                                    THE NATIONAL PEDICULOSIS
                                                    ASSOCIATION, INC.


                                                    By:  ___s/ Debbie L. Berman_____
                                                              One of Its Attorneys

Debbie L. Berman (#6205154)
Amanda S. Amert (#6271860)
Wade A. Thomson (#6282174)
April A. Otterberg (#6290396)
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, Illinois  60611
312-222-9350

## CERTIFICATE OF SERVICE

I, Debbie L. Berman, hereby certify that on August 7, 2008, I caused copies of the foregoing **The National Pediculosis Association, Inc.'s Opposition to Morton Grove Pharmaceuticals, Inc.'s Motion for Leave to File Amended Complaint,** to be served upon the following via electronic filing through the CM/ECF system:

Timothy Joseph Rivelli  (trivelli@winston.com)
W. Gordon Dobie  (wdobie@winston.com)
William Charles O'Neil  (*woneil@winston.com*)
Cherish M. Keller  (*ckeller@winston.com*)
WINSTON & STRAWN, LLP
35 West Wacker Drive
41st Floor
Chicago, IL  60601
Telephone:  (312) 558-5600
Facsimile:  (312) 558-5700


s/ Debbie L. Berman
        Debbie L. Berman

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MORTON GROVE | ) | |
| PHARMACEUTICALS, INC., | ) | |
| | ) | No. 08-CV-1384 |
| Plaintiff, | ) | |
| | ) | Judge Bucklo |
| v. | ) | Magistrate Judge Mason |
| | ) | |
| THE NATIONAL PEDICULOSIS | ) | **JURY TRIAL DEMANDED** |
| ASSOCIATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPPOSITION TO MORTON GROVE PHARMACEUTICALS, INC.'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

### EXHIBIT INDEX

Exhibit 1     Email from FDA to NPA@headlice.org

# EXHIBIT 1

-----Original Message-----
From: Goetsch, Roger A [mailto:roger.goetsch@fda.hhs.gov]
Sent: Monday, May 05, 2008 8:03 AM
To: npa@headlice.org
Subject: RE: Adverse Event MedWatch

Thanks!

-----Original Message-----
From: npa@headlice.org [mailto:npa@headlice.org]
Sent: Saturday, May 03, 2008 6:27 PM
To: Goetsch, Roger A
Subject: Adverse Event MedWatch

Roger -- As always we have the personal identifiers on file.  Deborah

-----Original Message-----
From: web@headlice.org [mailto:web@headlice.org]
Sent: Saturday, May 03, 2008 10:40 AM
To: medwatch@headlice.org
Subject: MedWatch Report

*************************************************************
****
***
name:              Hin
address:
city:
state:             SC
zip:               29332
phone:             864-998-
email:             @hotmail.com
date_of_birth:     05/11/2000
sex:               female
weight:            30
event_or_problem:      Adverse Event & Product Problem
outcome_death:     yes
outcome_threat:
outcome_hospital:
outcome_disability:
outcome_anomaly:
outcome_intervention:
outcome_other:
event_date:        12/24/05
medication_name:      generic lice shampoo
medicine_other:       Permethrin
therapy_date_from:    03/2005
therapy_date_to:      07/2005
stopped_after_use:    no
lotnum:
reappeared_after_reintro: doesn't apply
Date:              05/03/08
Time:              10:39 AM

event_description:

NPA 86358

Hayley was diagnosed with a brain tumor after being treated for headlice.
Diagnosed on 06/21/05 died six months and three days later.

relevant_history:

Eczema

dose_frequency:

2 times with shampoo

indicated_use:

headlice

other_medications:

2

NPA 86359

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 08-CV-1384 |
| v. | ) ) | Judge Bucklo Magistrate Judge Mason |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |

**OPPOSITION TO MORTON GROVE PHARMACEUTICALS, INC.'S MOTION TO
FOR LEAVE TO FILE AMENDED COMPLAINT**

**APPENDIX OF ATTACHED CASES**

App. 1    *CardioNet, Inc. v. LifeWatch Corp.*, No. 07 C 6625, 2008 WL 567031 (N.D. Ill. Feb. 27, 2008)

App. 2    *Aida Food and Liquor, Inc. v. City of Chi.*, No. 03 C 4341, 2004 WL 719663 (N.D. Ill. Mar. 31, 2004)

App.  3    *Village of Lake Barrington v. Hogan*, 649 N.E.2d 1366, 208 Ill. Dec. 705 (Ill. App. Ct. 1995)

# APPENDIX 1

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2008 WL 567031 (N.D.Ill.)
**2008 WL 567031 (N.D.Ill.)**

**H**

CardioNet, Inc. v. LifeWatch Corp.
N.D.Ill.,2008.

United States District Court,N.D. Illinois,Eastern
Division.
CARDIONET, INC., Plaintiff,
v.
LIFEWATCH CORP., Hanna Konarzewska, M.D.,
Joel Lehman and Lisa Ament, Defendants.
Lifewatch Corp., Counter-plaintiff,
v.
Cardionet, Inc., Counter-defendant.
**Civil Action No. 07 C 6625.**

Feb. 27, 2008.

Thomas L. Duston, Alisa Colleen Simmons,
Gregory James Chinlund, Julianne Marie Hartzell,
Marshall, Gerstein & Borun, Chicago, IL, Amy L.
Kashiwabara, Julie L. Fieber, Richard Keenan, Fol-
ger Levin & Kahn LLP, San Francisco, CA, for
Plaintiff/Counter-defendant.
Sean W. Gallagher, Bartlit Beck Herman Palenchar
& Scott LLP, Chicago, IL, Alexander Kaplan, Julie
A. McCane, Kevin J. Perra, Proskauer Rose LLP,
New York, NY, Michael P. Kelleher, Folger Levin
& Kahn LLP, San Francisco, CA, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

SUZANNE B. CONLON, District Judge.
**\*1** Counter-plaintiff Life Watch Corp. ("Life
Watch") sues counter-defendant CardioNet, Inc.
("CardioNet") for trade secret misappropriation un-
der the Illinois Trade Secrets Act, 765 ILCS 1065/1
*et seq.* (Count I), violation of the Lanham Act, 15
U.S.C. § 1125(a) (Count II), violation of the Illinois
Uniform Deceptive Trade Practices Act
("IUDTPA"), 815 ILCS 510/2 (Count III), violation
of the Illinois Consumer Fraud and Deceptive
Trade Practices Act ("ICFA"), 815 ILCS 505/2
(Count IV), interference with expectation of busi-
ness relationships (Count V), and unfair competi-
tion (Count VI). CardioNet moves to dismiss
Counts II, III, IV, V, and VI. For the reasons stated
below, CardioNet's motion is granted in part.

### I. MOTION TO DISMISS STANDARD

A motion to dismiss under Rule 12(b)(6) challenges
a counterclaim on the basis of a failure to state a
claim on which relief can be granted. In ruling on
the motion, the court accepts as true all well-
pleaded facts and draws all reasonable inferences
from those facts in Life Watch's favor. *Jackson v.
E.J. Brack Corp.,* 176 F.3d 971, 977 (7th Cir.1999).
The counterclaim must allege "enough facts to state
a claim to relief that is plausible on its face."*Bell
Atlantic Corp. v. Twombly,* --- U.S. ----, ----, 127
S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). Life-
Watch need only provide enough detail to give Car-
dioNet fair notice of its claims, show that the
claims are plausible, rather than merely speculative,
and that relief is warranted. *EEOC v. Concentra
Health Care Servs., Inc.,* 496 F.3d 773, 776 (7th
Cir.2007) (quoting *Twombly,* 127 S.Ct. at 1964
(further citations omitted)).

### II. BACKGROUND

CardioNet and LifeWatch are competitors that
make heart monitoring devices. In January 2007,
LifeWatch launched a heart monitoring device
called the LifeStar Ambulatory Cardiac Telemetry
(the "LifeStar ACT") in the United States. The
LifeStar ACT is comprised of wireless sensors
worn by patients and a cellular phone that monitors
a patient's heart rhythm. If irregular heart events oc-
cur, the LifeStar ACT transmits data to a LifeWatch
service center for analysis and response.

The LifeStar ACT is not sold to users; rather, it is
only prescribed to patients, LifeWatch and affili-
ated companies have expended significant time and
resources in developing and protecting the confid-
ential, proprietary, and trade secret software that

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 567031 (N.D.Ill.)
**2008 WL 567031 (N.D.Ill.)**

makes up the LifeStar ACT system.

In June 2007, a physician improperly arranged to have a LifeStar ACT system delivered to CardioNet's CEO in San Diego, California. Without Life Watch's knowledge, CardioNet's CEO, its head of research, and its head of product development, examined and tampered with the LifeStar ACT device. They took detailed photographs of it, copied written materials, removed the circuit board and shielding material from the sensor, and performed electrical tests,

CardioNet then allowed the device to be delivered to the patient for whom it was prescribed. The device was eventually returned to LifeWatch for circulation to other patients. CardioNet did not inform LifeWatch that it tampered with the device, and denied ever doing so. CardioNet used the information obtained from inspection of the LifeStar ACT to develop the next generation of its competing device.

**\*2** CardioNet also used information it learned from the device to further its marketing strategy. CardioNet misrepresented in advertisements and statements to physicians and governmental and private third party insurers that (1) its device was the only FDA approved and Medicare reimbursed arrhythmia detection and alarm system; (2) the LifeStar ACT device did not and could not meet the FDA's requirements for approval of an arrhythmia detection and alarm system; and (3) its device was superior and/or safer than the LifeStar ACT device. LifeWatch contends these statements were false and misleading because the LifeStar ACT had and has FDA approval, and the statements wrongfully suggest that the LifeStar ACT is less safe or reliable than CardioNet's device.

CardioNet moves to dismiss LifeWatch's counterclaims premised on false and misleading advertisements (Counts II-VI). CardioNet advances the following: (1) LifeWatch failed to plead required elements of its Lanham Act and intentional interference claims; (2) LifeWatch's statutory claims are a

species of fraud and do not satisfy Rule 9(b)'s particularity requirements; (3) allegations that CardioNet's device is "superior," more "reliable" or "safer" than LifeWatch's are non-actionable puffery; and (4) allegations regarding FDA requirements for the parties' medical devices fail because they are not subject to consumer fraud statutes.[FN1]

> FN1. CardioNet improperly refers to materials beyond the pleadings, which are not considered on a Rule 12(b)(6) motion. *See Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 479 (7th Cir.2002). CardioNet also requests judicial notice of two documents indicating that the FDA approved the LifeStar ACT device as an arrhythmia detector and alarm on December 18, 2007. Because judicial notice is unnecessary in resolving CardioNet's motion, the questionable request is moot.

## III. DISCUSSION

### A. Rule 9(b)

CardioNet argues LifeWatch's Lanham Act, IUDTPA, and ICFA counterclaims (Counts II-IV) are insufficient to state a claim. However, the sufficiency of the allegations cannot be properly assessed because the claims fail to meet the heightened pleading requirements of Fed.R.Civ.P. 9(b). Fed.R.Civ.P. 9(b) requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

Claims that allege false representation or false advertising under the Lanham Act are subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b).*Conditioned Ocular Enhancement, Inc. v. Bonaventura,* 458 F.Supp.2d 704, 709 (N.D.Ill.2006) (Zagel, J.) (citations omitted). IUDTPA and ICFA claims sounding in fraud must also meet the pleading requirements of Rule 9(b).*Id.* (ICFA claim); *Am. Top English, Inc. v. Lexicon Mktg. .(USA), Inc.,* No. 03 C 7021, 2004

Slip Copy                                                                                                      Page 3
Slip Copy, 2008 WL 567031 (N.D.Ill.)
**2008 WL 567031 (N.D.Ill.)**

WL 1403695, at *4-5 (N.D.Ill. June 21, 2004) (Conlon, J.) (ICFA claim); *Gold v. Golden G. T., LLC,* No. 05 C 288, 2005 WL 2465815, at *6 (N.D.Ill. Oct.4, 2005) (Filip, J.) (ICFA and IUDTPA claims); *Nakajima All Co., Ltd. v. SL Ventures Corp.,* No. 00 C 6594, 2001 WL 641415, *6-7 (N.D.Ill. June 4, 2001) (Gettleman, J.) (ICFA and IUDTPA claims).[FN2]

> FN2. Under Illinois law, ICFA claims must also be pleaded with the same specificity as common law fraud claims. *Smith v. Prime Cable of Chicago,* 276 Ill.App.3d 843, 857, 658 N.E.2d 1325, 1335, 213 Ill.Dec. 304,314 (Ill.App.Ct.1995) (citations omitted).

LifeWatch's argument that Rule 9(b) does not apply to its IUDTPA and ICFA claims because they do not sound in fraud is belied by its allegations. LifeWatch alleges that after CardioNet inspected the LifeStar ACT device, CardioNet knowingly and deliberately made misrepresentations in its marketing strategy. Countercl. ¶ 28. LifeWatch contends that CardioNet falsely misled physicians and third party insurers into believing that: (1) its device was the only FDA approved and Medicare reimbursed arrhythmia detection and alarm system; (2) the LifeStar ACT device did not and could not meet the FDA's requirements for approval of an arrhythmia detection and alarm system; and (3) its device was superior and/or safer than the LifeStar ACT device. Because these allegations sound in fraud, Rule 9(b)'s specificity requirements apply to LifeWatch's IUDTPA and ICFA counterclaims. *See, e.g., Nakajima,* 2001 WL 641415, at *6-7 (Rule 9(b) applies to allegations of false or misleading advertisements/statements that sound in fraud).

**\*3** Under Rule 9(b), LifeWatch's Lanham Act, IUDTPA, and ICFA counterclaims must allege "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated."*Bankers Trust Co. v. Old Republic Ins. Co.,* 959 F.2d 677, 683 (7th Cir.1992)

(quoting *Sears v. Likens,* 912 F.2d 889, 893 (7th Cir.1990)). In other words, LifeWatch must plead the "who, what, when, and where of the alleged fraud."*Uni*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir.1992). The absence of essential details renders these counterclaims deficient.

LifeWatch does not identify *who* made false and misleading statements, *when* they were made, *where* they were made, or the medium in which they were made. The particulars of the false and misleading statements are also absent. For example, LifeWatch's bare-bones allegation that CardioNet "advertised and made other statements ... to the effect that its device is superior to and/or safer than the LifeStar ACT device" merely alleges that unspecified advertisements *had the effect* of implying that CardioNet's device was superior and safer. Countercl. ¶ 31. These nebulous allegations fall short of Rule 9(b)'s requirements. *See, e.g., Nakajima,* 2001 WL 641415, at *6-7. CardioNet and the court are left to speculate what specific advertisements and statements underlie LifeWatch's claims. Accordingly, counterclaims II-IV are dismissed.

**B. State Common Law Claims**

*1. Intentional Interference With Expectation of Business Relationships*

CardioNet argues LifeWatch's intentional interference with expectation of business relationships counterclaim should be dismissed because LifeWatch did not identify any specific relationships subjected to interference. To state a claim for tortious interference with a prospective economic advantage, LifeWatch must allege: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional and malicious interference inducing or causing a breach of termination of the relationship or expectancy; (4) resultant damage to the party whose relationship has been disrupted. *Small v. Sussman,* 306

Ill.App.3d 639, 648, 239 Ill.Dec. 366, 713 N.E.2d 1216 (Ill.App.Ct.1999). The acts that form the basis of tortious interference must be directed at parties other than CardioNet. *Cont'l Mobile Tel. Co. ., Inc. v. Chicago SMSA Ltd. P'ship*, 225 Ill.App.3d 317, 325, 167 Ill.Dec. 554, 587 N.E.2d 1169 (Ill.App.Ct.1992). Although LifeWatch contends that CardioNet must *specifically* identify a third party with which it had a potential business relationship, LifeWatch may alternatively allege a prospective class of third parties against whom the conduct was directed. *See Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill.App.3d 524, 529, 137 Ill.Dec. 409, 546 N.E.2d 33 (Ill.App.Ct.1989).

**\*4** Construing allegations in its favor, LifeWatch alleges CardioNet's false and misleading advertisements were directed toward physicians, private insurers, and Medicare reimbursement providers-the targeted consumers of their LifeStar ACT product. This constitutes a prospective class of third parties adequate to give CardioNet notice of its claim. *See, e.g., Russian Media Group, LLC v. Cable Am., Inc.*, No. 06 C 3578, 2008 WL 360692, \*5 (N.D.Ill. Feb.7, 2008) (Darrah, J.) (allegations that defendants' conduct was directed against third party consumers was sufficient to withstand dismissal).

LifeWatch also adequately pleads independent wrongful conduct to withstand dismissal of its intentional interference counterclaim. LifeWatch alleges CardioNet intentionally interfered with its prospective relationships by knowingly issuing false and misleading statements to limited consumers of the LifeStar ACT device. This allegation of wrongdoing is sufficient to give CardioNet notice of its intentional interference claim. *See, e.g., Conditioned Ocular Enhancement*, 458 F.Supp.2d at 712 (intentional interference claim adequately pleaded under Rule 8(a)).

### 2. Unfair Competition

Illinois courts have not specifically enumerated the

elements of the common law tort of unfair competition. *See Gorgonz Group, Inc. v. Mormon Holdings, Inc.*, No. 00 G 2992, 2001 WL 103406, \*3-4 (N.D.Ill. Jan.30, 2001) (Kennelly, J.) (citing *Custom Bus. Sys., Inc. v. Boise Cascade Corp.*, 68 Ill.App.3d 50, 52, 24 Ill.Dec. 801, 385 N.E.2d 942, 944 (Ill.App.Ct.1979)). However, the allegations underlying a claim of tortious interference with prospective economic advantage also suffice to state a claim for unfair competition.*Id.; see also Zenith Elec. Corp. v. Exzec, Inc.*, No. 93 C 5041, 1997 WL 223067, at \*5 (N.D.Ill. Mar.27, 1997) (Manning, J.). Because LifeWatch adequately alleges intentional interference, LifeWatch's unfair competition claim is sufficient as well.

### IV. CONCLUSION

For the foregoing reasons, CardioNet's motion to dismiss is granted in part. Counts II, III, and IV of LifeWatch's counterclaims are dismissed.

N.D.Ill.,2008.
CardioNet, Inc. v. LifeWatch Corp.
Slip Copy, 2008 WL 567031 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

# APPENDIX 2

Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2004 WL 719663 (N.D.Ill.)
**2004 WL 719663 (N.D.Ill.)**

**H**
Aida Food and Liquor, Inc. v. City of Chicoago
N.D.Ill.,2004.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
AIDA FOOD AND LIQUOR, INC., and Eassa Fak-
houry, Plaintiffs,
v.
THE CITY OF CHICAGO, a municipal corpora-
tion, John Robertson, individually and in his capa-
city as Department of Buildings Commissioner,
Timothy Hutchinson, individually and in his capa-
city as Department of Buildings Deputy Commis-
sioner, Don Gibbson, individually and in his capa-
city of Departments of Buildings inspector, Cecilia
Coffman, individually and in her capacity as De-
partment of Public Health inspector, Latasha R.
Thomas, individually and in her capacity as Alder-
man of the 17th Ward, Rev. Michael L. Pfleger, in-
dividually and in his capacity as Pastor of the Faith
Community of St. Sabina Church, and the Catholic
Bishop of Chicago, a corporation sole, Defendants.
**No. 03 C 4341.**

March 31, 2004.

Maurice J. Salem, Salem Law Office, Palos
Heights, IL, for Plaintiffs.
Michael J. Dolesh, Mardell Nereim, Caroline K.
Sheerin, City of Chicago, Department of Law,
Thomas Stephen Moore, Jane Farwell Anderson,
Anderson & Moore, P.C., Chicago, IL, for Defend-
ants.

*MEMORANDUM OPINION AND ORDER*

COAR, J.
*1 Before this court are two motions to dismiss.
The first motion to dismiss was filed on behalf of
Rev. Michael L. Pfleger ("Father Pfleger") and the
Catholic Bishop of Chicago, to dismiss all claims
against them. The second motion to dismiss was
filed by the City of Chicago, including various offi-

cials and employees named in Plaintiffs' suit
("City" or "City Defendants"). The motion filed by
the City Defendants requests dismissal of all but the
Plaintiffs' Fourth Amendment claims. For the reas-
ons set forth below, both motions to dismiss are
granted. All claims against Father Pfleger and the
Catholic Bishop of Chicago are dismissed, with
prejudice, in their entirety. Additionally, City De-
fendants' partial motion to dismiss is granted. The
following claims are dismissed with prejudice: (1)
Plaintiffs' substantive due process claims; and (2)
Count II of Plaintiffs' Complaint. The following
claims are dismissed without prejudice: (1) Claims
of municipal and official capacity liability (with the
exception of John Robertson, where the official *and*
individual capacity claims are dismissed without
prejudice); (2) Plaintiffs' procedural due process
claims; and (3) Any Fourteenth Amendment claims
that are independent of the claims raised in
Plaintiffs' Section § 1985(3) cause of action.

FACTUAL BACKGROUND

Eassa Fakhoury ("Fakhoury") is the President and
sole shareholder of Aida's Food and Liquor, Inc
("Aida"), which is also owned by
Fakhoury.[FN1] (Pl.Comp.¶ 3). The property is two-
story building located at 7023 Halsted Street in
Chicago, in which Aida and a Chinese store oper-
ate. *Id.* Plaintiffs' claims arise from what Fakhoury
believes is the Defendants' attempts to force him
out of business. On June 29, 2000, Fakhoury re-
ceived a letter from the city of Chicago, indicating
that his property had been designated by the City
management for acquisition (Pl.Comp.¶ 4).
However, the City management was unsuccessful in
getting the U.S. Department of Housing and Urban
Development to purchase the property. (Pl.Comp.¶
5). Subsequently, the developments the City, State,
and Federal governments made to surrounding
property caused Plaintiffs' property value to double.
(Pl.Comp.¶ 6). Immediately thereafter, City in-
spectors began to visit Plaintiffs' store up to three

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 719663 (N.D.Ill.)
**2004 WL 719663 (N.D.Ill.)**

Page 2

times a week, when in the past, inspectors would only visit the store once or twice a year. (Pl.Comp.¶ 7). These frequent visits led to certain actions and decisions that Plaintiffs believe resulted in constitutional violations.

> FN1. Fakhoury and Aida are referred to collectively as "Plaintiffs"

I. Visits from Cecilia Coffman, Department of Public Health Inspector

On February 22, 2001, Defendant Cecilia Coffman ("Coffman"), an inspector with the Department of Public Health, came to inspect Fakhoury's store, and found a small gap on the front door. (Pl. Comp .¶ 15). The following week, on March 1, 2001, Coffman returned to inspect the door and found that it was still in violation of the applicable code provision. *Id.* Plaintiffs' store was shut down, and Fakhoury had to pay $2500 in fines to the City. *Id.*

**\*2** On a subsequent visit, Coffman cited Plaintiffs for having a two compartment sink, and required that Fakhoury replace it with a one compartment sink, which cost $300. (Pl.Comp.¶ 16). Coffman regularly came to the store and cited Plaintiffs with numerous violations regarding the cold cuts in the deli area in the store. On more than ten different inspections, Coffman required that Plaintiffs throw out all of the cold cuts in the deli. (Pl.Comp.¶ 17). This cost Plaintiffs hundreds of dollars, and eventually, they permanently closed the deli area of the store. *Id.*

II. Required Maintenance of Vacant Lot Adjacent to Plaintiffs' Property

On the morning of March 11, 2001, Lieutenant Laskey ("Laskey") of the Chicago Police Department came to Plaintiffs' store, and told Fakhoury there were beer bottles and cans in a vacant lot adjacent to Plaintiff's store. (Pl.Comp.¶ 18). Although the lot is owned by City, Laskey cited Plaintiff with a violation, which caused the City to revoke Plaintiffs' liquor license without a hearing.*Id.*[FN2] City police

and inspectors required the Plaintiffs to maintain the adjacent vacant lot, although it is City property, and would issue citations and fines if the lot was not maintained. (Pl.Comp.¶ 19).

> FN2. The Plaintiffs can still sell liquor because they possess a state liquor license, which can only be revoked after a hearing is held on the violation. (Pl.Comp.¶ 18). However, because the City still has not conducted a hearing on the revocation of the city license, Plaintiffs face increased administrative burdens and costs in maintaining the state liquor license. (Pl.Comp.¶ 18).

On March 8, 2002, inspectors came to Plaintiffs' store and issued a citation for bricks on the adjacent lot, and an ice machine in the store. (Pl.Comp.¶ 21). Plaintiffs were required to go to court and pay a $500 fine. *Id.* On August 8, 2002, an inspector came while repairmen were working on the store's chimney and issued a citation to Plaintiffs, requiring that they pay a $100 fine for having some of the chimney's bricks laying on the empty adjacent lot. (Pl.Comp.¶ 22).

III. Allegations That Father Pfleger's Complaints Resulted in Numerous Building Code Violations for Plaintiffs

Plaintiffs also allege that Father Pfleger, a pastor at the Faith Community of St. Sabina Church, and his parishioners, attempted to force Plaintiffs out of business by making complaints to the City. (Pl.Comp.¶ 23). Father Pfleger and his parishioners came into Plaintiffs' store to inspect and make certain requests, including that Fakhoury discontinue the sale of tobacco products in his store. *Id.* Plaintiffs claim that following visits from Father Pfleger or his parishioners, a City inspector would visit Plaintiffs' store and make the same complaints that Father Pfleger or his parishioners did. *Id.*

One particular example of this practice occurred on

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 719663 (N.D.Ill.)
**2004 WL 719663 (N.D.Ill.)**

August 20, 2002. On that date, Father Pfleger sent a letter to Plaintiffs that complained about an electrical box in the store. (Pl.Comp.¶ 24). On August 22, 2002, Don Gibson ("Gibson"), an inspector for the Department of Buildings, came to inspect the electrical box, and based on his inspection, ordered that Plaintiffs' entire building be shut down.[FN3](Pl.Comp.¶ 24). Subsequently, Fakhoury attempted to complete the necessary work repairs. However, Hutchinson informed Plaintiff that he could not issue a work permit without approval from Latasha Thomas, Plaintiff's Alderwoman. (Pl.Comp.¶ 30). However, Plaintiffs were unable to obtain that approval. (Pl.Comp.¶ 31).

> FN3. On August 16, 2002, in the Circuit Court of Cook County, a hearing was held to address Plaintiffs' building's electrical issue. (Pl.Comp.¶ 25). An order was entered directing Fakhoury to make repairs to the electrical units and wires within the building in accordance with the instructions of Kevin Callahan ("Callahan"), an inspector with the Department of Buildings, by October 11, 2002. *Id.* Judge Sheehan, with the consent of Callahan, allowed the Plaintiff to keep his entire building open while repairs were made. *Id.* However, when Plaintiff showed the court order to Gibson, and Timothy Hutchinson, Deputy Commissioner for the Department of Buildings ("Hutchinson"), they stated that the present electrical violation was different from the electrical violation that Callahan cited, and therefore the August 16, 2002 court order was not applicable. (Pl.Comp.¶ 28)

**\*3** On September 24, 2002, an order was entered that allowed Plaintiffs to commence work in the store immediately, and directed the Department of Buildings to issue a work permit within fourteen days. (Pl.Comp.¶ 34). Later that same day, a Department of Buildings inspector placed a large "stop work" sticker on Plaintiffs' store window. *Id.*

However, Plaintiffs commenced repair work on the electrical system. *Id.* The following day, a police officer and a Department of Buildings inspector came to the store and attempted to stop the work, but Fakhoury presented the court order and refused to stop.*Id.* Similar circumstances arose on October 4, 2002. A police officer came to the store and demanded that everyone stop working, but again, Fakhoury showed the officer the court order and refused to stop working. (Pl.Comp.¶ 35).

Plaintiffs completed the necessary work on October 7, 2002. (Pl.Comp.¶ 37). On October 8, 2002, Plaintiff contacted Inspector Larry Doggette ("Doggette"), who agreed to come and inspect the store's electrical system, although he was advised by his supervisors not to inspect Plaintiffs' store. *Id.* On October 11, 2002, at a scheduled court hearing before Judge Cunningham, City assistant corporation counsel, Christopher Grunewald, could not explain to the Judge why the Department of Buildings refused to comply with his September 24, 2002 order directing the City to issue a work permit. (Pl.Comp.¶ 38). Additionally, inspector Doggette came to the court hearing, and testified that the electrical work was completed. *Id.*[FN4] However, most of the forty violations in Gibson's complaint were not completed and Plaintiffs did not dispute this fact. *Id.* Notwithstanding the fact that all violations were not remedied, Grunewald withdrew Gibson's complaint, and the court issued an order dismissing the complaint, which allowed the Plaintiffs to open their store. *Id.* After the store opened, the Department of Buildings sent inspectors and police officers to Plaintiffs' store to attempt to shut it down. (Pl.Comp.¶ 41). The Plaintiff presented the court order, refused to have his business shut down, and had to physically stop the police and inspectors from shutting down the store. *Id.* No arrests were made, but the Defendants continued to send inspectors who attempted to shut the store down. *Id.*

> FN4. On November 26, 2002, Doggette informed Fakhoury that he was suspended for three days by the Department of Build-

Not Reported in F.Supp.2d                                                                                          Page 4
Not Reported in F.Supp.2d, 2004 WL 719663 (N.D.Ill.)
**2004 WL 719663 (N.D.Ill.)**

ings for inspecting Plaintiff's store and testifying that Plaintiff completed the necessary electrical work. (Pl.Comp.¶ 40)

On October 16, 2002, John Moran ("Moran") a plumbing inspector, came to Plaintiffs' store to conduct an inspection. Moran attempted to shut down the entire building due to plumbing problems in the basement. (Pl.Comp.¶ 43). Fakhoury physically stopped Moran from going into the basement, and Plaintiffs' attorney threatened to hold Moran personally liable. (Pl.Comp.¶ 42). The following day, Ed Shields ("Shields"), a Department of Buildings electrical inspector, arrived at Plaintiffs' store to conduct an inspection. (Pl.Comp.¶ 43). Shields asked why the store was opened, and demanded that the store be shut down. *Id.* Fakhoury showed the October 11, 2002 court order to Shields, and told him that he would physically stop anyone from shutting down the store. *Id.*

IV. Plaintiffs' Failed Attempts to Purchase Adjacent Lot

*4 Plaintiffs made numerous attempts to purchase the vacant lot adjacent to his store. (Pl.Comp.¶ 49). City officials refused to sell the lot to Plaintiffs unless they obtained a letter of support from Alderwoman Thomas. *Id.* However, Alderwoman Thomas refused to issue the letter of support. *Id.* City inspectors and police officers continued to require that Plaintiffs maintain the lot, or be subject to citations and fines. (Pl.Comp.¶ 50).

V. Plaintiffs' Failed Attempt to Acquire Building Permit for Chinese Restaurant

On June 11, 2003, Fakhoury hired Larry Steve ("Steve"), a contractor, to make repairs to the Chinese restaurant so that Plaintiffs could open it for business. (Pl.Comp.¶ 51) On June 12, 2002, Steve went to the Department of Buildings to obtain a work permit. Steve was informed that the application for the work permit was complete, and all he needed was the Alderwoman's approval.*Id.* On

June 16, 2003, Steve went to Thomas' office, where approval was refused. *Id.* Steve told Fakhoury there was "something like a lien on the building in the Department of Buildings' computer" that prohibits any work permit from being issued without Thomas' approval. (Pl.Comp.¶ 51).

DISCUSSION

I. Legal Standard for a Motion to Dismiss

In ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court "must accept all well pleaded allegations as true. In addition, the Court must view these allegations in the light most favorable to the plaintiff."*Gomez v. Illinois Board of Education,* 811 F.2d 1030, 1039 (7th Cir.1987). A party's claim should only be dismissed if it is clear that no set of facts in support of the claim would entitle the party to relief.*Ledford v. Sullivan,* 105 F.3d 354, 356 (7th Cir.1997). (*quotingHishon v. King & Spaulding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)).

II. Analysis of Plaintiffs' Claims

Plaintiffs bring claims under 42 U.S.C. § 1983 ("Section 1983"), alleging that the City Defendants, under color of law, violated certain constitutional rights. In Count I, Plaintiffs allege a violation of the Fourth Amendment right against unreasonable search and seizure.[FN5] Additionally, the Plaintiffs allege that the Defendants deprived them of their procedural and substantive due process rights under the Fifth Amendment. In Count II, Plaintiffs allege a conspiracy in violation of 42 U.S.C. § 1985(3). Plaintiffs allege that Father Pfleger and his parishioners conspired with the City Defendants to violate their Fourth, Fifth and Fourteenth Amendment rights. The Court will address Plaintiffs' Claims in the following order: (1) Plaintiffs' Count I § 1983 claims against City Defendants; (2) Plaintiffs' Count I and Count II claims Against Father Pfleger and the Catholic Bishop of Chicago; and (2) Plaintiffs' § 1985(3) claims against the City De-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 5
Not Reported in F.Supp.2d, 2004 WL 719663 (N.D.Ill.)
**2004 WL 719663 (N.D.Ill.)**

fendants.

> FN5. The City Defendants do not move to dismiss this claim under Fed.R.Civ.P. 12(b)(6).

A. Plaintiffs' Count I § 1983 Claims Against City Defendants

*1. Legal Standard for § 1983 Claims*

**\*5** Plaintiffs contend that under color of law, various City employees and officials from the Department of Buildings, Department of Public Health, and Alderwoman Thomas, infringed their Fifth and Fourteenth Amendment rights.Section 1983"is not itself a source of substantive rights," but rather provides "a method for vindicating federal rights elsewhere conferred."*Baker v. McCollan,* 443 U.S. 137, 144, n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). The first step in a § 1983 claim is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Therefore, in order to establish a valid claim under § 1983, Plaintiffs must establish that the various city employees and officials, under color of law, violated their rights under the Fifth and Fourteenth Amendments.

*2. Is Municipal Liability Properly Alleged?*

Before liability can attach under § 1983, a Plaintiff must properly allege an appropriate legal basis for that liability. The City Defendants contend that the Plaintiffs have failed to properly plead municipal liability with respect to: (1) the City of Chicago; (2) City officials and employees in their official capacity; and (3) Commissioner John Robertson of the Department of Buildings in his official *and* individual capacities.

*a. Plaintiffs' Allegations of Municipal Liability*

Plaintiffs name the City of Chicago as a defendant,

apparently under a theory of *respondeat superior.*However, *respondeat superior* is not a basis for rendering municipalities liable for the constitutional torts of their employees under § 1983. *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 663, n. 7, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1973). The Plaintiffs must show either: "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority."*McTigue v. City of Chicago,* 60 F.3d 381, 382 (7th Cir.1995). Plaintiffs' Complaint does not sufficiently allege under which theory the City of Chicago should be liable, and in fairness to their adversaries, Plaintiffs must "apprise [defendants] of the substance of the allegations."*Uptown People's Community Health Services Bd. of Directors v. Bd. of Comm'rs of Cook County,* 647 F.2d 727, 739 (7th Cir.1981) (*citingCohen v. Illinois Institute of Technology,* 524 F.2d 818 (7th Cir.1975)).

*b. Plaintiffs' Allegations of "Official Capacity" Liability*

Additionally, Plaintiffs fail to state under what theory of liability the city officials, in their official capacity, are being sued. When suit is brought against a government officer in his or her official capacity, the Plaintiff is actually suing the government entity for which that officer works. *McMurry v. Sheahan,* 927 F.Supp. 1082, 1089 (N.D.Ill.1996) (*citingKentucky v. Graham,* 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). To properly state a claim for liability based upon official capacity, "a plaintiff must allege that the defendant promulgated or enforced a policy or custom in his official capacity as one with decisional authority, which led to the deprivation of Plaintiff's constitutional rights."*McMurry,* 927 F.Supp. at 1088-89 (*citingMonell,* 436 U.S. 658, 98 S.Ct. 2018, 56

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2004 WL 719663 (N.D.Ill.)
**2004 WL 719663 (N.D.Ill.)**

L.Ed.2d 611))."The government entity, through its officers, in establishing or maintaining a policy or custom, must be the moving force behind the deprivation."*Id.* Based upon this standard, Plaintiffs have failed to properly allege how the officials named in their suit are liable. Therefore, Plaintiffs' claims against the City of Chicago, and all named officials and employees of the City of Chicago (in their official capacity), are dismissed without prejudice, as Plaintiffs must properly allege a basis for liability in order to state a claim for relief.[FN6]

> FN6. Plaintiffs also bring suit against all City Defendants in their individual capacities. Plaintiffs state a claim for relief against Hutchinson, Gibbson, Coffman and Thomas in their individual capacities, as the Complaint alleges that they caused or participated in the violation of his Constitutional rights. *SeeWolfe-Lille v. Sonquist,* 699 F.2d 864, 869 (7th Cir.1983) ("Section 1983 creates a cause of action based upon personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in the alleged constitutional deprivation.") However, there is no allegation that John Robertson personally participated in a constitutional deprivation. Consequently, Plaintiffs' suit against Robertson in his individual capacity is dismissed without prejudice.

*3. Plaintiffs' Procedural Due Process Claims*

**\*6** Plaintiffs contend that the City of Chicago deprived them of their procedural due process rights to their: (1) business, by shutting down the store and refusing to issue a work permit; (2) liquor license, by revocation without a hearing; (3) the vacant adjacent lot. To analyze a procedural due process claim under § 1983, the Court must engage in a two-step analysis. The Court must determine whether: (1) the Plaintiffs have been deprived of a protected interest; and (2) If so, determine what process is due. *Doherty v. City of Chicago,* 75 F.3d

318, 322 (7th Cir.1996) (*citingLogan v. Zimmerman Brush Co.,* 455 U.S. 422, 428, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982))."The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."*Doherty,* 754 F.3d at 322. The state is not always required to provide a pre-deprivation hearing when a loss involves property. *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). In *Hudson* the Court held:

> An unauthorized intentional deprivation of a property interest does not constitute a violation of the Due Process clause if a meaningful postdeprivation remedy for the loss is available. *Id.* at 533.[A] complaint does not state a valid procedural due process objection-and a valid § 1983 claim-if it does not include a challenge to the fundamental fairness of the state's procedures ... [I]f a procedural due process claim lacks a colorable objection to the validity of the State's procedures, no constitutional violation has been alleged.

*Hudson,* 468 U.S. at 539. Therefore, a plaintiff must avail herself of the remedies guaranteed by state law or demonstrate that the available remedies are inadequate. *Doherty,* 75 F.3d at 323.

As an initial matter, the Court must address whether the Plaintiffs have a property interest in the vacant lot next their business, because, "[i]n any case alleging a denial of due process for the deprivation of a property right, the basic question is whether the property right exists."*Zemke v. City of Chicago,* 100 F.3d 511, 513 (7th Cir.1996). The right to the property must involve a "legitimate claim of entitlement." *New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474, 1479 (7th Cir.1990) (*citingBoard of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Plaintiffs' state that the vacant lot is owned by the City of Chicago. (Pl.Comp.¶ 18). Therefore, Plaintiffs have no property rights to this vacant lot, and cannot make any procedural due process claims with regard to that property.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
Not Reported in F.Supp.2d, 2004 WL 719663 (N.D.Ill.)
**2004 WL 719663 (N.D.Ill.)**

However, accepting Plaintiffs' facts as true, they have a vested property interest in their place of business, work permit, and liquor license. However, Plaintiffs' claims of procedural due process are inadequate, as they do not allege that Plaintiffs' availed themselves of all remedies guaranteed by state law; nor do Plaintiffs' claims allege that those state remedies are inadequate. Therefore, with respect to Plaintiffs' procedural due process claim concerning their place of business, building permit, and liquor license, those claims are dismissed without prejudice. Plaintiffs must claim that they availed themselves of all appropriate state remedies or that those remedies are inadequate.

*4. Plaintiffs' Substantive Due Process Claims*

**\*7** As with their procedural due process claims, Plaintiffs' substantive due process claims allege an unconstitutional deprivation of their: (1) business; (2) liquor license; and (3) the adjacent vacant lot. Because the Court has determined that Plaintiffs have no property interests in the adjacent vacant lot, the Court will only address Plaintiffs' substantive due process claims with regards to the business (which includes the work permit) and liquor license.

Unless a fundamental right is violated, substantive due process requires only that the practice be rationally related to a legitimate government interest, meaning, "that the practice be neither arbitrary nor irrational."*Lee v. City of Chicago,* 330 F.3d 456, 467 (7th Cir.2003). Where, as with Plaintiffs' claim, the substantive due process challenge involves only a property interest, a plaintiff must show "either the inadequacy of state law remedies or an independent constitutional violation" before the court will review the claims.*Id.* (quoting*Doherty v. City of Chicago,* 75 F.3d at 323-26 (7th Cir.1996)).

As with their procedural due process claims, Plaintiffs' substantive due process claims fail to allege the inadequacy of state law remedies. When a Plaintiff alleges a regulatory takings claim, it will only be ripe for adjudication after the Plaintiff has pursued all available state remedies for seeking compensation. *Williamson v. County Regional Planning Comms'n v. Hamilton Bank.* 473 U.S. 172, 194, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985). Plaintiffs have not sufficiently alleged an exhaustion of all state remedies; therefore, this claim is dismissed without prejudice.

Secondly, the Court must address whether Plaintiffs sufficiently allege an independent constitutional violation. Though unclear from their Complaint, in their Response to the City Defendants' Motion to Dismiss, Plaintiffs contend that their substantive due process claims are premised on violations of the Fourth and Fourteenth Amendments. However, Plaintiffs' Fourth and Fourteenth Amendment claims cannot be used to support their substantive due process claim. "[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process."*Tesch v. County of Green Lake,* 157 F.3d 465, 471 (7th Cir.1998) (quoting*U.S. v. Lanier.* 520 U.S. 259, 271, n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997)); see also*Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (citing*Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)) (If "a particular amendment 'provides an explicit textual source of constitutional protection' against a particular source of government behavior 'that Amendment, not the more generalized notion of 'substantive due process', must be the guide for analyzing these claims." "). Therefore, Plaintiffs' substantive due process claims are dismissed with prejudice, as they cannot state a claim upon which relief can be granted.[FN7]

> FN7. The Court will address Plaintiffs' Fourteenth Amendment claims when analyzing their claims under § 1985(3).

**B. Plaintiffs' Claims Against Father Pfleger and the Catholic Bishop of Chicago**

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 719663 (N.D.Ill.)
**2004 WL 719663 (N.D.Ill.)**

*1. Plaintiffs' Allegations*

**\*8** Plaintiffs' Complaint alleges that Father Pfleger and his parishioners visited Plaintiffs' store, made various complaints, then complained to City officials about potential municipal code violations. Shortly thereafter, the City would cite the Plaintiffs for those violations. Plaintiffs' Complaint appears to imply that Father Pfleger and his parishioners reported the violations for the purpose of forcing the Plaintiffs out of business. It is on this basis that Plaintiffs base their claims against Father Pfleger and the Catholic Bishop of Chicago.

Father Pfleger and the Catholic Bishop of Chicago contend that the Noerr-Pennington doctrine provides absolute immunity to Father Pfleger, his parishioners, and the Catholic Bishop of Chicago, even if Father Pfleger can be deemed a "state actor." Plaintiffs contend that the Noerr-Pennington doctrine does not provide absolute immunity because Father Pfleger and his parishioners acted as "arms of the City" when reporting code violations.FN8Viewing all allegations in the light most favorable to Plaintiff, the Court must assume that Father Pfleger and his parishioners complained to the city for the purpose of forcing Plaintiffs out of business, and when they engaged in this behavior, they were state actors.

> FN8. Plaintiffs contends that members of the St. Sabina Parish received City training prior to reporting Plaintiffs' Municipal Code violations to the City. (*See* Pl. Response to Father Pfleger and Catholic Bishop, p. 2).

*2. Does the Noerr-Pennington Doctrine Provide Absolute Immunity?*

Citizens have a first amendment right to "petition the Government for a redress of grievances."*Tarpley v. Keistler*, 188 F.3d 788, 794 (7th Cir.1999). (*citing*U.S. CONST. amend. 1). Consequently, individuals may petition the government for official action favorable to their interests, even if the petitioning efforts harm the interests of others, and still be immune from suit. *Id.* (*citing*United *Mine Workers of America v. Pennington*, 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)). This is called Noerr-Pennington immunity. *Id.* The Noerr-Pennington doctrine was originally applied in antitrust cases. *SeeEastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *seealsoPennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). However, its reach has been extended to other causes of actions, including allegations of civil rights violations under § 1983. *Tarpley,* 188 F.3d 788, 794 (7th Cir.1999) (*citingNickum v. Village of Saybrook,* 972 F.Supp. 1160, 1171 (C.D.Ill.1997)). Noerr-Pennington's extension to civil rights cases is applicable in this circumstance. Under the Noerr-Pennington doctrine, Father Pfleger and his parishioners could petition the City government solely for their own interest, even if those interests were detrimental to the Plaintiffs. The First Amendment right to petition is "absolutely privileged from attack under the Civil Rights Act of 1871."*Reichenberger v. Pritchard,* 660 F.2d 280, 288-89 (7th Cir.1981) (holding that the Noerr-Pennington doctrine bars Section 1985(3) claims arising from private lobbying efforts).

Plaintiffs contend that because Father Pfleger and his parishioners engaged in behavior that can be construed as state action, the Noerr-Pennington doctrine is inapplicable, and the Defendants cannot receive absolute immunity from suit. However, in *Tarpley,* the Seventh Circuit held that even if a private party defendant could be construed as a state actor, plaintiff's claims are still barred under the Noerr-Pennington doctrine. *Tarpley,* 188 F.3d at 793-94. Other Circuits have similarly held that private *and* state actors are protected under the *Noerr-Pennington* doctrine. *SeeMariana v. Fisher,* 338 F.3d 189, 197-200 (3rd Cir.2003) (holding that lobbying activities of state actors are protected by the Noerr-Pennington doctrine); *Manistee Town Center v. City of Glendale,* 227 F.3d 1090, 1092-94 (9th Cir.2000) (holding that the lobbying activities of

Not Reported in F.Supp.2d                                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 719663 (N.D.Ill.)
**2004 WL 719663 (N.D.Ill.)**

governmental entities and officials are protected by *Noerr-Pennington*); *Miracle Mile Associates v. City of Rochester,* 617 F.2d 18 (2nd Cir.1980) (holding the lobbying activities of city and city officials are protected by Noerr-Pennington). Therefore, although Father Pfleger and his parishioners may be considered state actors, the Noerr-Pennington doctrine is applicable to their city lobbying activities. Consequently, Father Pfleger and the Catholic Bishop of Chicago are absolutely immune from suit for their petitioning efforts.

**\*9** Because the Noerr-Pennington doctrine bars Plaintiffs' claims against Father Pfleger and his parishioners, the Plaintiffs cannot state a claim against those defendants for conspiracy under § 1985(3) .[FN9] Courts have held that the Noerr-Pennington doctrine shields defendants from civil conspiracy allegations in violation of § 1983. *Nickum v. Village of Saybrook,* 972 F.Supp. 1160, 1171 (C.D.Ill.1997) (citing*Video Intl. Prod., Inc. v. Warner-Amex Cable Communications Inc.,* 858 F.2d 1075 (5th Cir.1988)); see also*City of Columbia v. Omni Outdoor Advertising,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991).

> FN9.Section 1985(3), in relevant part, states:
>
> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws ... the party so injured or deprived may have an action for damages occasioned by such injury or deprivation, against any one or more of the conspirators.

*a. Is the "Sham" Exception to the Noerr-Pen-*

*nington Doctrine Applicable to Plaintiffs' Claims?*

There is a "sham" exception to the Noerr-Pennington doctrine. The "sham" exception encompasses situations "in which a publicity campaign, ostensibly directed toward influencing governmental actions, is a mere sham to cover what is actually ... an attempt to interfere directly with the business relationships of a competitor."*Noerr,* 365 U.S. at 144. In order to invoke the sham exception to the Noerr-Pennington doctrine, the Plaintiff must allege that the defendant was not genuinely interested in influencing government action. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 57-60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993).

The "sham" exception is inapplicable to Plaintiffs' claims against Father Pfleger and his parishioners. Plaintiffs and Father Pfleger are not business competitors. Additionally, the Complaint alleges that Father Pfleger and his parishioners engaged in the petitioning activity specifically to influence City officials in order to force Plaintiffs out of business. Consequently, the Noerr-Pennington doctrine bars all claims against Father Pfleger and the Catholic Bishop of Chicago, including Plaintiffs' claims of a conspiracy under Section 1985(3). Therefore, all claims against Father Pfleger and the Catholic Bishop of Chicago are dismissed with prejudice.

C. Plaintiffs' Count III Section 1985(3) Claims Against City Defendants

Because all claims against Father Pfleger and the Catholic Bishop of Chicago have been dismissed, the Court must analyze whether Plaintiffs can maintain their § 1985(3) Claim against the City Defendants. Four elements are necessary to properly allege a conspiracy under § 1985(3):(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal protection and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 10
Not Reported in F.Supp.2d, 2004 WL 719663 (N.D.Ill.)
**2004 WL 719663 (N.D.Ill.)**

either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Bowman v. City of Franklin,* 980 F.2d 1104, 1109 (7th Cir.1992) (*citing United Brotherhood of Carpenters and Joiners, Local 610 v. Scott,* 463 U.S. 825, 828-29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983)). The Court will address whether: (1) City officials, working for the same municipal entity, can engage in a conspiracy; and (2) Plaintiffs have sufficiently alleged some type of class-based discrimination under § 1985(3).

*1. Does the Intra-Corporation Conspiracy Doctrine Preclude a Conspiracy Between City Defendants*

**\*10** The Seventh Circuit has adopted the rule that a corporation cannot conspire with its own agents or employees. *Allen v. City of Chicago,* 828 F.Supp. 543, 564 (N.D.Ill.1993) (*citing Travis v. Gary Community Mental Health Center, Inc.,* 921 F.2d 108, 110-11 (7th Cir.1990)). *Allen* held that the intra-corporation conspiracy doctrine applies equally to public and private entities, and all employees of a city are part of the same "municipal corporation." *Allen,* 828 F.Supp. at 564. It is undisputed that all of the City Defendants are officials or employees of the City of Chicago. As a consequence, they are all part of the same "municipal corporation." Therefore, because all claims against Father Pfleger and the Catholic Bishop of Chicago have been dismissed, Plaintiff cannot sustain his claim under § 1985(3), as all City Defendants are part of the same entity, and the intra-corporate conspiracy doctrine bars allegations of conspiracy. Therefore, Count II of Plaintiffs' Complaint is dismissed with prejudice.

*2. Have Plaintiffs Sufficiently Alleged Class Based Discrimination*[FN10]

    FN10. Although the applicability of the intra-corporation conspiracy doctrine moots the issue of whether Plaintiffs sufficiently alleged any type of class based discrimina-

tion under § 1985(3), the Court will still address this issue to determine whether the Plaintiff has an independent cause of action under the Fourteenth Amendment.

To meet the second element of a conspiracy under § 1985(3), the Plaintiff must allege "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions." *Roach v. City of Evansville,* 111 F.3d 544, 547 (7th Cir.1997) (*citing Griffin v. Breckenridge,* 403 U.S. 88, 102, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)); *See Also Allen,* 828 F.Supp. at 564 (*citing Grimes v. Smith,* 776 F.2d 1359, 1366 (7th Cir.1985)) ("The Seventh Circuit has explicitly held that conspiracy claims brought pursuant to § 1985(3) do not reach nonracial, political conspiracies."). Plaintiffs' conspiracy allegations allege a political conspiracy, and Plaintiffs make clear in their Response to Father Pfleger and Catholic Bishop of Chicago's motion to dismiss that this is not about racial discrimination. Consequently, Plaintiffs do not allege any type of class-based discrimination for purposes of § 1985(3).

Plaintiffs contend that the "class" under which they bring suit is the "class of one" equal protection theory. In order to bring a successful claim under this theory, the Plaintiffs must show that they were: (1) "intentionally treated different from others similarly situated and that there is no rational basis for the difference in treatment" or (2) "that the government is treating unequally those individuals who are prima facie identical in all relevant respects, and that the cause of the differential treatment is a 'totally illegitimate animus toward the plaintiff by the defendant.' " *Nevel v. Village of Schaumburg,* 297 F.3d 673, 681 (7th Cir.2002), (*citing Albiero v. City of Kankakee,* 246 F.3d 927, 932 (7th Cir.2001)). Under the second approach, if the government would have taken the action anyway, the animus will not condemn the action. *Id.* "Ill will must be the sole cause of the complained-of action." *Id.*[FN11]

    FN11. Various courts have held that a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 719663 (N.D.Ill.)
**2004 WL 719663 (N.D.Ill.)**

"class of one" theory cannot be used to support a claim under Section 1985(3) *See* *Burns v. State Police Association of Massachusetts,* 230 F.3d 8, 12, n. 4 (1st Cir.2000) (a § 1985 equal protection claim requires race or other invidious discrimination); *see also* *Undofer v. University of Toledo,* 2002 WL 1263957 at *2 (6th Cir. June 5, 2002) (class of one allegations do not state a cause of action under § 1985).

*11 Notwithstanding Plaintiffs' lack of a sufficient claim under § 1985(3), the Plaintiffs can proceed against the City Defendants under a class of one equal protection theory. Plaintiffs' Complaint provides sufficient allegations and facts to state a claim under the class of one equal protection theory. Therefore, Plaintiffs' Fourteenth Amendment claims against the City Defendants are dismissed without prejudice. Plaintiffs are granted leave to plead their Fourteenth Amendment claims as an action independent of their dismissed § 1985(3) claims.

CONCLUSION

For the foregoing reasons, both motions to dismiss are granted. All claims against Father Pfleger and the Catholic Bishop of Chicago are dismissed, with prejudice, in their entirety. Additionally, City Defendants' partial motion to dismiss is granted. The following claims are dismissed with prejudice: (1) Plaintiffs' substantive due process claims; and (2) Count II of Plaintiffs' Complaint. The following claims are dismissed without prejudice: (1) Claims of municipal and official capacity liability (with the exception of John Robertson, where the official *and* individual capacity claims are dismissed without prejudice); (2) Plaintiffs' procedural due process claims; and (3) Any Fourteenth Amendment claims that are independent of the claims raised in Plaintiffs' Section 1985(3) cause of action.

N.D.Ill.,2004.

Aida Food and Liquor, Inc. v. City of Chicoago
Not Reported in F.Supp.2d, 2004 WL 719663 (N.D.Ill.)

END OF DOCUMENT

# APPENDIX 3

Westlaw.

649 N.E.2d 1366                                                          Page 1
272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705
**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

**H**

Village of Lake Barrington v. Hogan
Ill.App. 2 Dist.,1995.

Appellate Court of Illinois,Second District.
The VILLAGE OF LAKE BARRINGTON et al.,
Plaintiffs-Appellants and Counterdefendants and
Cross-Appellees,
v.
Mary E. HOGAN et al., Defendants-Appellees and
Counterplaintiffs and Third-Party Plaintiffs and
Cross-Appellants (Cole Taylor Bank, as Trustee, et
al., Defendants-Appellees and Cross-Appellants;
Lake Barrington Industrial Park Association, Coun-
terplaintiff and Third-Party Plaintiff and Cross-
Appellant; Nancy Smith et al., Third-Party Defend-
ants and Cross-Appellees).
No. 2-94-0839.

May 2, 1995.
Rehearing Denied June 9, 1995.

Village sued objecting voters and property owners,
seeking declaration that village ordinances adopting
special service area were valid, and alleging tor-
tious interference with contract and tortious inter-
ference with economic advantage. Defendants
counterclaimed against village, alleging that their
civil rights were violated by village's suit and seek-
ing declaration that ordinances were invalid, and
they filed third-party complaint against village at-
torney and village president. The Circuit Court,
Lake County, William D. Block, J., dismissed vil-
lage's tort claims and imposed sanctions against vil-
lage and village attorney, entered summary judg-
ment finding that ordinances were invalidly en-
acted, and dismissed defendants' counterclaims.
Village, village attorney, and defendants appealed.
The Appellate Court, Thomas, J., held that: (1)
based on lack of statutory notice to taxpayer who
was party to proceeding, particular parcel of land
had to be excluded from special service area; (2)
village's notice of proposed special service area
complied with statutory notice requirements; (3)

defendants enjoyed conditional privilege from vil-
lage's tortious interference claims, based on their
exercise of First Amendment right to petition for
redress of grievances; (4) trial court could impose
sanctions based on lack of legitimate purpose for
village's tort claims; (5) defendants could maintain
§ 1983 counterclaims under sham litigation excep-
tion to *Noerr -Pennington* doctrine; (6) village
president was qualified immune from civil rights
claims; (7) qualified immunity did not extend to
village attorney; and (8) defendants failed to sup-
port equal protection claims.

Affirmed in part; reversed in part and remanded.

West Headnotes

**[1] Municipal Corporations 268 ⬅⬆450(4)**

268 Municipal Corporations
    268IX Public Improvements
        268IX(E) Assessments for Benefits, and Spe-
cial Taxes
            268k450 Assessment or Taxing Districts
                268k450(4) k. Proceedings for Estab-
lishment. Most Cited Cases
Notice of hearing regarding establishment of spe-
cial service area, as required under Special Service
Area Tax Act, is jurisdictional, and lack of notice to
some taxpayers within special service area does not
invalidate entire service area. 35 ILCS 235/5 (1992
Bar Ed.).

**[2] Municipal Corporations 268 ⬅⬆450(4)**

268 Municipal Corporations
    268IX Public Improvements
        268IX(E) Assessments for Benefits, and Spe-
cial Taxes
            268k450 Assessment or Taxing Districts
                268k450(4) k. Proceedings for Estab-
lishment. Most Cited Cases
Although lack of notice to some taxpayers within
special service area would not invalidate entire ser-
vice area, particular parcel of land had to be ex-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

649 N.E.2d 1366                                                                                                          Page 2
272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705
**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

cluded from special service area created by village
ordinance when person in whose name taxes had
been paid for that parcel did not receive mailed no-
tice of hearing on proposed ordinance to create spe-
cial service area, and that person was party to pro-
ceeding regarding validity of ordinance. 35 ILCS
235/5 (1992 Bar Ed.).

**[3] Statutes 361 ⟨⟩227**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k227 k. Construction as Mandatory or
Directory. Most Cited Cases
To determine whether statute is mandatory or dis-
cretionary, courts look first to language of statute as
best indication of legislative intent.

**[4] Statutes 361 ⟨⟩227**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k227 k. Construction as Mandatory or
Directory. Most Cited Cases
If statute imposes duties and by express language
provides that omission to perform duties renders
proceeding void, then courts are bound to construe
those provisions as "mandatory."

**[5] Statutes 361 ⟨⟩227**

361 Statutes
    361VI Construction and Operation
        361VI(A) General Rules of Construction
            361k227 k. Construction as Mandatory or
Directory. Most Cited Cases
In most cases, statute simply provides that certain
acts shall be done within particular time or in par-
ticular manner and does not declare that their per-
formance is essential to validity of proceeding, and
in these cases, statute is "directory."

**[6] Municipal Corporations 268 ⟨⟩450(4)**

268 Municipal Corporations

268IX Public Improvements
    268IX(E) Assessments for Benefits, and Spe-
cial Taxes
        268k450 Assessment or Taxing Districts
            268k450(4) k. Proceedings for Estab-
lishment. Most Cited Cases
Under Special Service Area Tax Act provision re-
quiring notice of hearing regarding establishment of
special service area, statutory criteria regarding
content of notice is directory and not mandatory;
statute does not provide that compliance with every
detail of content-of-notice provisions is essential to
validity of proceeding. 35 ILCS 235/5 (1992 Bar
Ed.).

**[7] Municipal Corporations 268 ⟨⟩450(4)**

268 Municipal Corporations
    268IX Public Improvements
        268IX(E) Assessments for Benefits, and Spe-
cial Taxes
            268k450 Assessment or Taxing Districts
               268k450(4) k. Proceedings for Estab-
lishment. Most Cited Cases
In its statutory notice of hearings regarding pro-
posed creation of special service area, village was
not required to notify taxpayers that interested per-
sons could object to formation of area first and then
have further opportunity to object to levy and issu-
ance of bonds. 35 ILCS 235/5 (1992 Bar Ed.).

**[8] Municipal Corporations 268 ⟨⟩450(4)**

268 Municipal Corporations
    268IX Public Improvements
        268IX(E) Assessments for Benefits, and Spe-
cial Taxes
            268k450 Assessment or Taxing Districts
               268k450(4) k. Proceedings for Estab-
lishment. Most Cited Cases
Special Service Area Tax Act does not require no-
tice of opportunity to file objections at hearing on
proposed establishment of special service area, but
rather notice need only provide that interested per-
sons have opportunity to file objections to amount
of tax levy. 35 ILCS 235/4(3) (1992 Bar Ed.).

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

649 N.E.2d 1366

272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705

**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

**[9] Municipal Corporations 268 ⬤➞450(4)**

268 Municipal Corporations
    268IX Public Improvements
        268IX(E) Assessments for Benefits, and Special Taxes
            268k450 Assessment or Taxing Districts
                268k450(4) k. Proceedings for Establishment. Most Cited Cases
Special Service Area Tax Act did not require village to ascertain and disclose owners of record at public hearing on proposed establishment of special service area; rather, purpose of statute cited by petitioning taxpayers was to provide date for determining owners of record with respect to objectors' petitions. 35 ILCS 235/9 (1992 Bar Ed.).

**[10] Pretrial Procedure 307A ⬤➞624**

307A Pretrial Procedure
    307AIII Dismissal
        307AIII(B) Involuntary Dismissal
            307AIII(B)4 Pleading, Defects In, in General
                307Ak623 Clear and Certain Nature of Insufficiency
                307Ak624 k. Availability of Relief Under Any State of Facts Provable. Most Cited Cases
Trial court should dismiss complaint for failure to state cause of action only if it is clear that no set of facts can be proved which will entitle plaintiff to recover.

**[11] Pretrial Procedure 307A ⬤➞680**

307A Pretrial Procedure
    307AIII Dismissal
        307AIII(B) Involuntary Dismissal
            307AIII(B)6 Proceedings and Effect
                307Ak680 k. Fact Questions. Most Cited Cases
In assessing sufficiency of complaint, court must take as true all well-pleaded facts and reasonable inferences drawn from those facts.

**[12] Torts 379 ⬤➞220**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k220 k. Defense, Justification or Privilege in General. Most Cited Cases
    (Formerly 379k16)
Courts will recognize privilege in intentional interference with contract cases where defendant was acting to protect interest which law deems to be of equal or greater value than plaintiff's contractual rights.

**[13] Constitutional Law 92 ⬤➞1435**

92 Constitutional Law
    92XV Right to Petition for Redress of Grievances
        92k1435 k. In General. Most Cited Cases
    (Formerly 92k91)

**Torts 379 ⬤➞220**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k220 k. Defense, Justification or Privilege in General. Most Cited Cases
    (Formerly 379k16)
Acts involving First Amendment right to petition government for redress of grievances involve interest protected by privilege applicable in intentional interference with contract cases. U.S.C.A. Const.Amend. 1.

**[14] Torts 379 ⬤➞217**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k217 k. Absence of Justification or Privilege. Most Cited Cases
    (Formerly 379k26(2))

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

649 N.E.2d 1366

272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705

**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

Page 4

**Torts 379 ☞255**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)3 Actions in General
                379k255 k. Pleading. Most Cited
Cases
    (Formerly 379k26(2))
Where conduct of defendant appears to be privileged from face of plaintiff's complaint alleging intentional interference with contract, plaintiff is required to plead and prove that defendant's actions were done without justification.

**[15] Torts 379 ☞255**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)3 Actions in General
                379k255 k. Pleading. Most Cited
Cases
    (Formerly 379k26(1))
To properly state cause of action for intentional interference with contractual rights, plaintiff must state more than mere assertion that defendant's conduct was unjustified when that conduct appears to be conditionally privileged; instead, plaintiff must set forth factual allegations from which it can reasonably be inferred that defendant's conduct was unjustified.

**[16] Torts 379 ☞220**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)1 In General
                379k220 k. Defense, Justification or
Privilege in General. Most Cited Cases
    (Formerly 379k16)
Ill-will alone is not enough to establish lack of "justification" in defendant's conduct, as required for claim of intentional interference with contract rights when that conduct appears to be condition-

ally privileged; there must be desire to harm, which is independent of and unrelated to desire to protect acting party's rights and which is not reasonably related to defense of recognized property or social interest.

**[17] Constitutional Law 92 ☞1435**

92 Constitutional Law
    92XV Right to Petition for Redress of Grievances
        92k1435 k. In General. Most Cited Cases
    (Formerly 92k91)

**Torts 379 ☞242**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)2 Particular Cases
                379k242 k. Contracts in General. Most
Cited Cases
    (Formerly 379k16)
Defendant taxpayers and property owners enjoyed conditional privilege from village's claims alleging that, by threatening through their attorney to litigate validity of ordinances creating special service area, defendants tortiously interfered with village's contract with securities company for sale of bonds to finance improvements to special service area and tortiously interfered with village's economic advantage; complaint simply indicated that defendants were exercising their First Amendment rights to petition government for redress of grievances, and that they were attempting to protect their property interests. U.S.C.A. Const.Amend. 1; 35 ILCS 235/1 et seq. (1992 Bar Ed.).

**[18] Torts 379 ☞242**

379 Torts
    379III Tortious Interference
        379III(B) Business or Contractual Relations
            379III(B)2 Particular Cases
                379k242 k. Contracts in General. Most
Cited Cases

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

649 N.E.2d 1366
272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705
**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

(Formerly 379k16)
In threatening to litigate validity of village ordin-
ances creating special service area, conduct of de-
fendant taxpayers and property owners, and not just
that of their attorney, was conditionally privileged
from village's claims that defendants tortiously in-
terfered with village's contract with securities com-
pany for sale of bonds to finance improvements to
special service area and tortiously interfered with
village's economic advantage. U.S.C.A.
Const.Amend. 1; 35 ILCS 235/1 et seq. (1992 Bar
Ed.).

**[19] Costs 102 ☞2**

102 Costs
    102I Nature, Grounds, and Extent of Right in
General
        102k1 Nature and Grounds of Right
            102k2 k. In General. Most Cited Cases
Purpose of sanctions rule is to penalize litigants
who plead frivolous or false matters or bring suit
without any basis in law. Sup.Ct.Rules, Rule 137.

**[20] Costs 102 ☞2**

102 Costs
    102I Nature, Grounds, and Extent of Right in
General
        102k1 Nature and Grounds of Right
            102k2 k. In General. Most Cited Cases
For purposes of imposing sanctions for frivolous or
baseless suit, test to be utilized in determining
whether violation has occurred is objective standard
of what was reasonable under circumstances at time
assertions were made. Sup.Ct.Rules, Rule 137.

**[21] Appeal and Error 30 ☞984(1)**

30 Appeal and Error
   30XVI Review
      30XVI(H) Discretion of Lower Court
         30k984 Costs and Allowances
            30k984(1) k. In General. Most Cited
Cases
Trial court's decision to impose sanctions will not

be disturbed absent "abuse of discretion," which
will be found only where trial court has made de-
cision no reasonable person could make.
Sup.Ct.Rules, Rule 137.

**[22] Attorney and Client 45 ☞24**

45 Attorney and Client
   45I The Office of Attorney
      45I(B) Privileges, Disabilities, and Liabilities
         45k24 k. Liability for Costs; Sanctions.
Most Cited Cases

**Costs 102 ☞2**

102 Costs
    102I Nature, Grounds, and Extent of Right in
General
        102k1 Nature and Grounds of Right
            102k2 k. In General. Most Cited Cases
Trial court was within its discretion in imposing
sanctions against village and village attorney, after
dismissing village's claims alleging that defendant
citizens' actions in threatening to litigate validity of
ordinances creating special service area for tax pur-
poses constituted tortious interference with con-
tract; defendants enjoyed privilege from claims
arising from exercise of right to petition for redress
of grievances, trial court found that claims were not
filed for legitimate purpose but to intimidate de-
fendants into withdrawing objections to special ser-
vice area, and village's argument that conditional
privilege only applied to attorneys was without
merit and did not represent good-faith argument for
modification of existing law. U.S.C.A.
Const.Amend. 1; 35 ILCS 235/1 et seq. (1992 Bar
Ed.); Sup.Ct.Rules, Rule 137.

**[23] Antitrust and Trade Regulation 29T ☞
903**

29T Antitrust and Trade Regulation
   29TXI Antitrust Exemptions and Defenses
      29Tk901 State Action
         29Tk903 k. Municipalities. Most Cited
Cases

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

649 N.E.2d 1366
272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705
**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

(Formerly 265k12(16.5))

Essence of "*Noerr-Pennington* doctrine" is that parties who petition government for governmental action favorable to themselves cannot be sued under Sherman Antitrust Act, even though their actions are motivated by anti-competitive intent. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

**[24] Antitrust and Trade Regulation 29T** 🔗
**903**

29T Antitrust and Trade Regulation
    29TXI Antitrust Exemptions and Defenses
        29Tk901 State Action
            29Tk903 k. Municipalities. Most Cited Cases
    (Formerly 265k12(16.5))

*Noerr-Pennington* doctrine, under which parties who petition government for governmental action favorable to themselves cannot be sued under Sherman Antitrust Act, has been extended to local governmental bodies to immunize them from suit. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

**[25] Antitrust and Trade Regulation 29T** 🔗
**904**

29T Antitrust and Trade Regulation
    29TXI Antitrust Exemptions and Defenses
        29Tk901 State Action
            29Tk904 k. Private Parties. Most Cited Cases
    (Formerly 265k12(16.5))

Although *Noerr-Pennington* doctrine provides that parties who petition government for governmental action favorable to themselves cannot be sued under Sherman Antitrust Act, exception to this doctrine has been carved out for "sham litigation," which requires that lawsuit be objectively baseless in sense that no reasonable litigant could realistically expect success on merits. Sherman Act, § 1 et seq., as amended, 15 U.S.C.A. § 1 et seq.

**[26] Antitrust and Trade Regulation 29T** 🔗

**904**

29T Antitrust and Trade Regulation
    29TXI Antitrust Exemptions and Defenses
        29Tk901 State Action
            29Tk904 k. Private Parties. Most Cited Cases
    (Formerly 265k12(16.5))

Single baseless suit is sufficient to invoke sham exception to *Noerr-Pennington* doctrine, which ordinarily precludes antitrust suit against parties who petition government for governmental action favorable to themselves.

**[27] Antitrust and Trade Regulation 29T** 🔗
**904**

29T Antitrust and Trade Regulation
    29TXI Antitrust Exemptions and Defenses
        29Tk901 State Action
            29Tk904 k. Private Parties. Most Cited Cases
    (Formerly 265k12(16.5))

Litigant need not prove that he was actually barred from access to courts as prerequisite to maintaining action with aid of sham exception to *Noerr-Pennington* doctrine, which ordinarily precludes antitrust suit against parties who petition government for governmental action favorable to themselves.

**[28] Constitutional Law 92** 🔗**2314**

92 Constitutional Law
    92XIX Rights to Open Courts, Remedies, and Justice
        92k2313 Conditions, Limitations, and Other Restrictions on Access and Remedies
            92k2314 k. In General. Most Cited Cases
    (Formerly 92k328)

Threat of litigation can chill constitutional right of access to courts even if threat was not successful. U.S.C.A. Const.Amend. 1.

**[29] Civil Rights 78** 🔗**1037**

78 Civil Rights

649 N.E.2d 1366

272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705

**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

78I Rights Protected and Discrimination Prohib-
ited in General
        78k1030 Acts or Conduct Causing Depriva-
tion
            78k1037 k. Malicious Prosecution and
False Imprisonment; Mental Health Commitments.
Most Cited Cases
        (Formerly 78k114)

Under sham litigation exception to *Noerr-
Pennington* doctrine, defendant citizens could bring
§ 1983 counterclaims against village alleging that
their rights were violated by village's suit, which
sought declaration that village ordinances adopting
special service area were valid and alleged that cit-
izens' threats to litigate special service area consti-
tuted tortious interference with contract and tortious
interference with economic advantage; village was
not entitled to file sham litigation even if declarat-
ory judgment count had merit, and village's tort
claims were clearly barred by defendants' condi-
tional privilege arising out of their own right to
seek redress of grievances. U.S.C.A. Const.Amend.
1; 42 U.S.C.A. § 1983; 35 ILCS 235/1 et seq. (1992
Bar Ed.).

**[30] Civil Rights 78 ☞1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-
ficers
                78k1376(2) k. Good Faith and Reason-
ableness; Knowledge and Clarity of Law; Motive
and Intent, in General. Most Cited Cases
        (Formerly 78k214(2))

Governmental officials performing discretionary
functions generally are shielded from liability from
civil damages insofar as their conduct does not vi-
olate clearly established statutes or constitutional
rights of which reasonable person would have
known. 42 U.S.C.A. § 1983.

**[31] Civil Rights 78 ☞1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-
ficers
                78k1376(2) k. Good Faith and Reason-
ableness; Knowledge and Clarity of Law; Motive
and Intent, in General. Most Cited Cases
        (Formerly 78k214(2))

Very action in question need not have previously
been held unlawful in order for official action to be
protected by qualified immunity, but rather, in light
of preexisting law, unlawfulness must be apparent.
42 U.S.C.A. § 1983.

**[32] Civil Rights 78 ☞1376(2)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-
ficers
                78k1376(2) k. Good Faith and Reason-
ableness; Knowledge and Clarity of Law; Motive
and Intent, in General. Most Cited Cases
        (Formerly 78k214(2))

Qualified immunity for governmental officials pro-
tects all but the plainly incompetent or those who
knowingly violate law. 42 U.S.C.A. § 1983.

**[33] Civil Rights 78 ☞1376(4)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith
and Probable Cause
            78k1376 Government Agencies and Of-
ficers
                78k1376(4) k. Municipalities and
Counties and Their Officers. Most Cited Cases
        (Formerly 78k214(4))

Reasonable village president would have relied on
advice of village attorney that course of conduct
village was pursuing was proper and legal, and thus

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

649 N.E.2d 1366

272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705

**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

village president was entitled to qualified immunity from citizens' civil rights claims against village alleging that their rights were violated by village's suit against citizens for tortious interference with contract and tortious interference with economic advantage based on citizens' threats to litigate ordinances creating special service area. 42 U.S.C.A. § 1983.

**[34] Civil Rights 78 ⟊1376(4)**

78 Civil Rights
    78III Federal Remedies in General
        78k1372 Privilege or Immunity; Good Faith and Probable Cause
            78k1376 Government Agencies and Officers
                78k1376(4) k. Municipalities and Counties and Their Officers. Most Cited Cases
    (Formerly 78k214(4))
Village attorney was not entitled to qualified immunity from citizens' civil rights claims alleging that their rights were violated by village's suit against citizens for tortious interference with contract and tortious interference with economic advantage based on citizens' threats to litigate ordinances creating special service area; village's suit was clearly barred by citizens' conditional privilege arising out of their right to seek redress of grievances. 42 U.S.C.A. § 1983.

**[35] Constitutional Law 92 ⟊3485**

92 Constitutional Law
    92XXVI Equal Protection
        92XXVI(E) Particular Issues and Applications
            92XXVI(E)2 Governments and Political Subdivisions in General
                92k3484 Public Improvements and Urban Renewal
                92k3485 k. In General. Most Cited Cases
    (Formerly 92k232(1))

**Municipal Corporations 268 ⟊450(2)**

268 Municipal Corporations
    268IX Public Improvements
        268IX(E) Assessments for Benefits, and Special Taxes
            268k450 Assessment or Taxing Districts
                268k450(2) k. Boundaries and Property Included. Most Cited Cases
Landowner's affidavit stating that he expressed opposition to special service area proposed by village and thereafter his property was excluded did not support citizens' equal protection claim, alleging that village intentionally gerrymandered special service area to exclude objecting owners and electors; Special Service Area Tax Act allowed property to be deleted from special service area as long as area remained contiguous after deletion, and village explained that special service area was designed to benefit industrial park and that challenged property was deleted because it was not strictly commercial. U.S.C.A. Const.Amend. 14; 35 ILCS 235/6 (1992 Bar Ed.).

**[36] Civil Rights 78 ⟊1419**

78 Civil Rights
    78III Federal Remedies in General
        78k1416 Weight and Sufficiency of Evidence
            78k1419 k. Property and Housing. Most Cited Cases
    (Formerly 78k242(4))

**Constitutional Law 92 ⟊3485**

92 Constitutional Law
    92XXVI Equal Protection
        92XXVI(E) Particular Issues and Applications
            92XXVI(E)2 Governments and Political Subdivisions in General
                92k3484 Public Improvements and Urban Renewal
                92k3485 k. In General. Most Cited Cases
    (Formerly 92k232(1))
Evidence that improvements would enhance ability to fight fires within district precluded citizens'

649 N.E.2d 1366

272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705

**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

equal protection claim alleging that special service area proposed by village was not needed and did not rationally relate to legitimate purpose. U.S.C.A. Const.Amend. 14; 35 ILCS 235/1 et seq. (1992 Bar Ed.).

**1370*228***709    William C. Barasha, Kurnik, Cipolla, Stephenson & Barasha, Arlington Heights, for Village of Lake Barrington.

John M. Mullen, Libertyville, James P. Bateman, Barrington, John E. Norton, O'Reilly, Cunningham, Norton & Mancini, Wheaton, for James Bateman and Nancy Bateman.

Daniel P. Field, Waukegan, Paul Harrison Stacey, Wheaton, for Mary Hogan, Ruth Loiacono, Sam Loiacono.

Justice THOMAS delivered the opinion of the court:

The plaintiffs, the Village of Lake Barrington and the Village of Lake Barrington Special Service Area Number Three (collectively the Village), filed a three-count amended complaint against the defendants, Mary E. Hogan, Sam Loiacono and Ruth Loiacono. Count I of the Village's amended complaint sought a declaration that the ordinances it adopted creating a special service area were valid. Count II of the amended complaint alleged that the defendants tortiously interfered with the Village's contract with the company that was to provide the bonding for the project. Count III of the amended complaint alleged that the defendants tortiously interfered with the Village's economic advantage. Pursuant to section 1983 of the Civil Rights Act (42 U.S.C. § 1983 (1988)), the defendants brought a two-count counterclaim against the plaintiffs and a third-party complaint against third-party defendants James Bateman and Nancy Smith. The defendants also brought a counterclaim seeking a declaration that the Village ordinances creating the special service area were invalid. The Village appeals from the trial court's summary judgment *229 order finding that the ordinances creating the special service area were not validly enacted. The Village and Bateman appeal the trial court's order imposing sanctions against them pursuant to Supreme Court

Rule 137 (134 Ill.2d R. 137). The **1371 ***710 defendants appeal the trial court's dismissal of their counterclaims.

The pleadings, exhibits, and affidavits on file reveal that in December 1990 John Reindl was hired by the Village to coordinate the creation and implementation of a special service area in a location known as the Lake Barrington Industrial Park (Park). The Village adopted its first ordinance with respect to the project on July 7, 1992, which established a public hearing date of July 29, 1992. The Village then attempted to satisfy the statutory notice requirements. Notice of the hearing was published in the Daily Herald on July 13, 1992.

According to Reindl's affidavit, he mailed notices to the person or persons in whose names the general taxes for the preceding year had been paid. He based his decision of who should receive notice on information appearing in duplicate tax receipts. He explained that when he sent the notices he was unaware this information was not as comprehensive as the actual tax bills and that the names of some individuals on behalf of whom taxes were also paid were left out. The notices were sent by first-class mail and also by certified mail.

Defendant Ruth Loiacono, one of two persons in whose names the taxes had been paid for a single parcel of land in the special service area, was not mailed a notice. A notice was signed for by her husband, defendant Sam Loiacono. Phyllis Pynsky, Mildred Drasen, and Margaret Malo were also not mailed notices, but they are not parties to this action.

After the public hearing was adjourned on July 29, 1992, defendants Mary Hogan, Sam Loiacono, and Ruth Loiacono filed objections to the service area. However, the total number of objections filed was less than the 51% required by statute to prevent the creation of the special service area, the levy of taxes, and the sale of bonds. Specifically, two of the five registered voters signed objections, and 46 out of 127 owners of record filed objections.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

649 N.E.2d 1366

272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705

**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

Thereafter, the Village adopted an ordinance establishing the special service area. The area consisted of 100 separate parcels and 127 owners of record. It also adopted an ordinance which provided for the levy of taxes and the sale of bonds in the aggregate amount of $7 million. The Village then entered into an agreement with Bernardi Securities, Inc., for the sale of the bonds.

According to the Village's amended complaint, Village attorney James Bateman had a series of communications with attorney James *230 Hecht, who represented defendant Mary Hogan. Hecht had attended a Village Board meeting, at which time he had raised certain legal objections to the establishment of the special service area. Bateman had a conversation with Hecht on November 12, 1992, in which Bateman disclosed to Hecht that the bond ordinance would be adopted very soon and that Hecht should conclude his review as soon as possible. On December 3, 1992, Hecht told Bateman in a telephone conversation that he was preparing a suit to enjoin the sale of the bonds. On December 9, 1992, in another telephone conversation, Bateman informed Hecht that his threat of litigation was holding up the bond sale closing, which had been set for December 14, 1992. According to the Village's amended complaint, Hecht's threat of litigation prevented the Village from closing on the bonds on December 14, 1992. On December 18, 1992, Bateman spoke on the telephone once more with Hecht, who was told that his threat of litigation was interfering with the ability of the Village to close on the sale of the bonds, since the Village could not represent to bond counsel that there was no pending or threatened litigation. In that conversation, Hecht denied that he had threatened litigation. Bateman then sent a letter to Hecht on December 21, 1992, to confirm this statement.

On December 22, 1992, Bateman had another telephone conversation with Hecht, in which Hecht refused to confirm his earlier denial that the defendants had threatened or were threatening suit and stated that he "did not like how this matter was go-

ing." Hecht's subsequent letter to Bateman of December 22, 1992, recited certain defects in the special service area proceedings.

The sale of the bonds never closed. The Village contends that the closing was prevented**1372 ***711 by the persistent threat of litigation by Hecht on behalf of defendant Mary Hogan and certain other undisclosed clients of Hecht.

According to the defendants' counterclaim, Hecht advised Bateman sometime prior to December 9, 1992, that a suit would be filed to contest the validity of the ordinances creating the special service area. Thereafter, Bateman met with Village president Nancy Smith, and the two agreed that the defendants should be dissuaded from filing a lawsuit. Notwithstanding the defendants' constitutional rights to challenge the validity of the ordinances, Bateman advised Hecht sometime before December 7, 1992, that if Hecht's clients sought a judicial determination of the validity of the ordinances, the Village would file an action for damages against his clients. At that point, Hecht's clients advised him not to file suit in view of the Village's threat to sue them for $6 million in damages.

*231 Thereafter, Bateman repeatedly attempted to ascertain the identity of Hecht's clients so that he could file suit against them on behalf of the Village. On January 5, 1993, the Village and Bateman carried out their threats and filed suit against the defendants, alleging in essence that the defendants were liable in tort for having considered to seek a judicial determination with respect to the validity of the ordinances.
[The following material is nonpublishable under Supreme Court Rule 23.]

On January 5, 1993, the Village filed a two-count complaint against defendants Mary Hogan, Sam Loiacono, and Ruth Loiacono seeking a declaration of the validity of the special service area ordinances as well as money damages for tortious interference with contract. The complaint was dismissed by the

649 N.E.2d 1366                                                                                    Page 11
272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705
**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

trial court, but the Village was granted leave to file an amended complaint, which it filed on March 22, 1993.

On April 15, 1993, the defendants filed a counterclaim against the Village and a third-party complaint against third-party defendants James Bateman and Nancy Smith. Counts I and II were brought pursuant to section 1983 of the Civil Rights Act and alleged that the Village's and third-party defendants' conduct violated the defendants' constitutional right to petition the court for a redress of grievances.

On April 21, 1993, the trial court dismissed with prejudice count II, the tortious interference with contract claim, and count III, the tortious interference with prospective economic advantage claim of the Village's amended complaint.

The defendants filed a counterclaim on July 26, 1993, in which they sought a declaration that the special service area ordinances were invalid. They filed their first amended counterclaim and third-party complaint on July 28, 1993. The theories of counts I and II remained the same, first amendment and equal protection claims for damages. The Village filed a motion to dismiss the amended counterclaim, as did the third-party defendant, James Bateman.

On November 22, 1993, the Village filed its motion for partial summary judgment as to count I of its amended complaint (declaratory judgment) and defendants' counterclaim for declaratory judgment.

The trial court dismissed with prejudice count I (first amendment) of the first amended counterclaim. The defendants filed a cross-motion for summary judgment.

On March 30, 1994, the trial court ruled on the cross-motions for summary judgment, finding that the notice mailed by the Village did not satisfy the statute for service upon individual owners and also that the notice was insufficient in content. On that

same day, the trial court denied count I of the defendants' counterclaim, but did not rule on count II of that claim. On May 4, 1994, the court granted the Village's summary judgment motion to dismiss count II of the defendants' counterclaim.

On May 16, 1994, the Village filed a motion to reconsider, asking the court to reverse its summary judgment order of March 30, 1994. The Village filed a notice of appeal on July 18, 1994.

On July 27, 1994, the defendants filed a Supreme Court Rule 137 motion for sanctions against the Village and attorney Bateman alleging that the tortious interference counts filed by the Village were not warranted by existing law and were filed for an improper purpose. The trial court granted the motion on August 11, 1994, finding that the Village filed the claim for the sole purpose of intimidating the defendants and that it was without any reasonable basis in law.

On August 16, 1994, the trial court entered an order denying a motion filed by the defendants for *nunc pro tunc* revision of the court's order of May 4, 1994. In that motion, the defendants had requested that the court delete language from the order stating that there was no just reason to delay enforcement or appeal. The trial court denied the motion, but in so doing the court found that the language in question was merely surplusage, because at the time the May 4 order was entered, it was a final order. On August 17, 1994, the Village and James Bateman filed their supplemental notice of appeal, and the defendants filed their cross-appeal.

Initially, we note that the defendants have filed a motion requesting that we strike a portion of the Village's appeal brief and enter sanctions against the Village for raising a meritless argument regarding the timeliness of the defendants' cross-appeal. The Village has filed a response to that motion and a cross-motion to dismiss the defendants' cross-appeal.

The Village argues that the defendants' cross-appeal

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

649 N.E.2d 1366                                                                     Page 12
272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705
**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

should be dismissed because it was not timely filed, and the July 27, 1994, motion for sanctions did not toll the time within which to file the cross-appeal. We disagree.

In *Gaynor v. Walsh* (1991), 219 Ill.App.3d 996, 162 Ill.Dec. 409, 579 N.E.2d 1223. a motion for sanctions was filed 25 days after the trial court's disposition of the last post-trial motion and five days after the other party had filed a notice of appeal. The court held that a Rule 137 motion for sanctions may be filed at any time during which the trial court has jurisdiction, which extends 30 days past the date the last order or judgment (which includes an order denying a post-trial motion) was issued in the case. (*Gaynor*, 219 Ill.App.3d at 1002, 162 Ill.Dec. 409, 579 N.E.2d 1223.) Moreover, the *Gaynor* court noted that the plaintiff's notice of appeal did not divest the trial court of jurisdiction to consider the defendant's later filed motion for sanctions. In fact, the court held that the plaintiff's notice of appeal was rendered premature by the filing of the motion for sanctions.

In the instant case, the trial court's May 4, 1994, order was a final order under Supreme Court Rule 301 (134 Ill.2d R. 301) because it disposed of all the claims in the case at the time it was entered. The trial court's July 18, 1994, order merely clarified that summary judgment had in fact been entered on March 30, 1994, with respect to the cross-motion for summary judgment on the validity of the ordinances. The final order entered on May 4, 1994, disposing of all the claims remaining in the case, was not rendered an order subject to Supreme Court Rule 304(a) (134Ill.2dR. 304(a)) merely because it contained Rule 304(a) language providing that there was "no just reason to delay enforcement or appeal."

Thus, the parties had 30 days from May 4, 1994, to file a notice of appeal or a post-trial motion. The Village filed a timely post-trial motion on May 16, 1994. That post-trial motion was denied on June 29, 1994. The defendants' motion for sanctions which was filed on July 27, 1994, within 30 days of the

denial of the post-trial motion, was timely and rendered the Village's notice of appeal premature. The trial court granted the defendants' motion for sanctions on August 11, 1994. Therefore, the defendants' cross-appeal and the Village's supplemental notice of appeal filed on August 17, 1994, were timely, as the appeals were filed within 30 days of the court's sanction order. While we find that the Village's argument on this issue substantially lacked merit, we decline to impose sanctions against the Village under Supreme Court Rule 375(b) (134Ill.2dR. 375(b)).

[The preceding material is nonpublishable under Supreme Court Rule 23.]

The Village first argues on appeal that the trial court erred in finding that the Village did not satisfy the statutory notice requirements. The Village contends that it was only required to comply substantially with the notice requirements, while the defendants claim that strict compliance was necessary.

Section 5 of the Special Service Area Tax Act (the Act) provides that notice of the hearing regarding the establishment of a special service area shall be given by publication in a newspaper of general circulation in the county and by mailing. (35 ILCS 235/5 (West 1992).) Section 5 further provides:

"Notice by mailing *shall* be given by depositing said notice in the United States mails *addressed to the person or persons in whose name the general taxes for the last preceding year were paid* on each lot * * * within the special service area. * * * In the event taxes for the last preceding year were not paid, the notice shall be sent to the person last listed on the tax rolls prior to that year as the owner of said property." (Emphasis added.) 35 ILCS 235/5 (West 1992).

In *Andrews v. County of Madison* (1977), 54 Ill.App.3d 343, 12 Ill.Dec. 35, 369 N.E.2d 532, the court had an opportunity to construe the notice requirements of section 5 of the Act. There, the plaintiffs brought an action to enjoin the county

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

649 N.E.2d 1366
272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705
**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

from taking any action in furtherance of its ordinance creating a special service area and providing for the financing of services in connection with the area. Among other things, the plaintiffs argued that the county failed to satisfy the notice requirements of section 5. The *Andrews* court held that the county substantially complied with the notice requirements even though some owners did not receive actual mail notice because the county sent some notices to mortgagees without any cross-reference to the actual owners of record.

In *Grais v. City of Chicago* (1992), 151 Ill.2d 197, 176 Ill.Dec. 47, 601 N.E.2d 745, our supreme court addressed the notice requirement of section 5 of the Act. There, notice was sent only to owners of commercial property within the special service area and not to owners of residential property. The court noted that the lack of notice was problematic because the statute requires that taxpayers be mailed individual notice before their property can be included within a special service area. However, the *232 plaintiff in *Grais* did not claim that he did not receive notice. The court found that it could not invalidate the entire special service area based on a lack of notice to some owners. The court further stated that any taxpayer who is eventually taxed may have an individual dispute with the city if notice was not provided to him or to his predecessor-in-interest.

[1][2] Applying *Grais* to the present case, we find that the clear import of the decision is that notice under the statute is not jurisdictional and the lack of notice to some taxpayers**1373 ***712 within the special service area does not invalidate the entire service area. However, we hold that the reasoning of *Grais* further requires that the Loiacono parcel be excluded from the special service area since Ruth Loiacono did not receive mail notice and she is a party to the instant proceeding. To the extent that *Andrews* is inconsistent with *Grais* and our holding on this issue, we decline to follow *Andrews*.

[3] The Village next argues that the trial court erred

in finding that the content of the notice sent by the Village did not satisfy the statutory criteria. The trial court did not specifically mention any particular defect in the notice to support its finding. However, the defendants alleged the following deficiencies in the notice: (1) that in addition to stating that the purpose of the hearing was to consider the special service area, it should have also stated that the hearing would decide whether to establish and fund the special service area; (2) that the notice did not state that interested persons could object to the formation of the area first and then have a further opportunity to object to the levy and issuance of bonds; (3) that the notice failed to advise interested persons that they could file objections regarding any issue appearing in the notice; (4) that it did not mention that the defendants could object to the issuance of bonds; and (5) that it did not state that interested persons would have an opportunity to file an objection *at the hearing.*

[4][5] Initially, we note that to determine whether a statute is mandatory or discretionary, courts look first to the language of the statute as the best indication of legislative intent. (*Pullen v. Mulligan* (1990), 138 Ill.2d 21, 65, 149 Ill.Dec. 215, 561 N.E.2d 585; *People ex rel. Village of Grayslake v. Village of Round Lake Beach* (1993), 242 Ill.App.3d 750, 756, 182 Ill.Dec. 527, 609 N.E.2d 1061.) If a statute imposes duties and by express language provides that the omission to perform the duties renders the proceeding void, then courts are bound to construe those provisions as mandatory. In most cases, however, the statute simply provides that certain acts shall be done within a particular time or in a particular manner and does not declare that their performance is essential to the validity of the proceeding; in these cases, the statute is directory. *People ex rel. Village of Grayslake*, 242 Ill.App.3d at 756, 182 Ill.Dec. 527, 609 N.E.2d 1061.

*233 [6][7][8][9] Applying the above-mentioned principles, we find that the statutory criteria regarding the content of the notice are directory and not

mandatory. The statute does not provide that compliance with every detail of the content-of-notice provisions is essential to the validity of the proceeding. More importantly, we find that the Village complied with the notice requirements of the statute. The first and fourth of the purported deficiencies listed above are belied by the notice itself. Regarding the second alleged deficiency, we note that the requirement suggested by the defendants is not mandated by statute. Thus, we will not require it either since more specificity is not required by the statute. (See *Schwarzbach v. City of Highland Park* (1980), 82 Ill.App.3d 807, 38 Ill.Dec. 87, 403 N.E.2d 102.) Lastly, we note that section 4(3) of the Act does not require notice of opportunity to file objections *at the hearing.* Rather, that section states only that the notice provide interested persons have an opportunity to file objections to the amount of the tax levy. Section 9 of the Act (35 ILCS 235/9 (West 1992)) does not require a different result. It does not require, as the defendants urge, that the Village ascertain and disclose the owners of record at the public hearing. Rather, its purpose is to provide a date for determining owners of record with respect to objectors' petitions. See 35 ILCS 235/9 (West 1992).

The Village next argues that the trial court erred in finding that counts II and III of its amended complaint failed to state a cause of action. Specifically, the Village contends that the court erred in finding that the defendants' conduct was conditionally privileged, because the privilege only applies to an attorney representing a client's interests. Count II of the amended complaint alleged that the defendants tortiously interfered with the Village's contract with Bernardi Securities, Inc., for the sale of the bonds to finance the improvements to the special service area. Count III alleged that the defendants tortiously**1374 ***713 interfered with the Village's economic advantage.

[10][11] A trial court should dismiss a complaint for failure to state a cause of action only if it is clear that no set of facts can be proved which will entitle the plaintiff to recover. (*People ex rel. Daley v. Datacom Systems Corp.* (1991), 146 Ill.2d 1, 11, 165 Ill.Dec. 655, 585 N.E.2d 51.) In assessing the sufficiency of the complaint, we must take as true all well-pleaded facts and reasonable inferences drawn from those facts. *Weinberger v. Bell Federal Savings & Loan Association* (1994), 262 Ill.App.3d 1047, 1049-50, 200 Ill.Dec. 308, 635 N.E.2d 647.

[12][13][14][15][16] It is well settled that Illinois courts will recognize a privilege in intentional interference with contract cases where the defendant was acting to protect an interest which the law deems to be of equal *234 or greater value than the plaintiff's contractual rights. (*HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.* (1989), 131 Ill.2d 145, 157, 137 Ill.Dec. 19, 545 N.E.2d 672.) It is axiomatic that acts involving the first amendment right to petition the government for redress of grievances involve an interest protected by the privilege. (*Arlington Heights National Bank v. Arlington Heights Federal Savings & Loan Association* (1967), 37 Ill.2d 546, 550, 229 N.E.2d 514; *Mannion v. Stallings & Co.* (1990), 204 Ill.App.3d 179, 189, 149 Ill.Dec. 438, 561 N.E.2d 1134.) Where the conduct of the defendant appears to be privileged from the face of the plaintiff's complaint, the plaintiff is required to plead and prove that the defendant's actions were done without justification. (*HPI Health Care*, 131 Ill.2d at 156, 137 Ill.Dec. 19, 545 N.E.2d 672; *Arlington Heights National Bank*, 37 Ill.2d at 551, 229 N.E.2d 514; *Mannion*, 204 Ill.App.3d 179, 149 Ill.Dec. 438, 561 N.E.2d 1134.) To state properly a cause of action for intentional interference with contractual rights, a plaintiff must state more than a mere assertion that the defendant's conduct was unjustified; instead, the plaintiff must set forth factual allegations from which it can reasonably be inferred that the defendant's conduct was unjustified. (*HPI Health Care*, 131 Ill.2d at 158, 137 Ill.Dec. 19, 545 N.E.2d 672.) Furthermore, ill-will alone is not enough to establish lack of "justification"; there must be a desire to harm, which is independent of and unrelated to a desire to protect the acting party's rights and which

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

649 N.E.2d 1366

272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705

**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

is not reasonably related to the defense of a recognized property or social interest. *Arlington Heights National Bank,* 37 Ill.2d at 551, 229 N.E.2d 514.

[17][18] Examining counts II and III of the Village's amended complaint, it is clear that the counts were based on the defendants' actions of hiring an attorney to protect their property rights with respect to the imposition of the special service area. The complaint alleges that the defendants' attorney raised questions with respect to the validity of the ordinances and threatened litigation. This simply indicates that the defendants were exercising their first amendment rights to petition government for a redress of grievances. They were also attempting to protect their property interests. We find that under the circumstances of the case the defendants enjoyed a conditional privilege. The Village's insistence that only the defendants' attorney's conduct was privileged and not the conduct of the defendants is wholly without merit and is an exercise in faulty syllogism. Moreover, we find that the plaintiff failed to allege facts indicating that the defendants' conduct was unjustified. Additionally, we note that given the circumstances it is clear that the plaintiffs could prove no set of facts which would entitle them to recover. Accordingly, the trial court properly dismissed with prejudice counts II and III of the Village's amended complaint.

**\*235** Next, the Village and attorney Bateman argue that the trial court erroneously imposed sanctions against them pursuant to Supreme Court Rule 137 (134 Ill.2d R. 137). They contend that the tort claims in counts II and III of the Village's amended complaint were filed in good faith and not for an improper purpose. We disagree.

[19][20][21] Supreme Court Rule 137 provides in relevant part:

"The signature of an attorney or party [on a pleading] constitutes a certificate by him that he has read the pleading * * * that to the best of his knowledge, information, and **\*\*1375 \*\*\*714** belief formed after reasonable inquiry it is * * * warranted by ex-

isting law or a good-faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. * * * If a pleading * * * is signed in violation of this rule, the court * * * may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay the other party or parties the amount of reasonable expenses incurred because of the filing of the pleading * * *." (134 Ill.2d R. 137.)

The purpose of Rule 137 is to penalize litigants who plead frivolous or false matters or bring suit without any basis in law. (*In re Marriage of Sykes* (1992), 231 Ill.App.3d 940, 946, 173 Ill.Dec. 347, 596 N.E.2d 1226.) The test to be utilized in determining whether a violation has occurred is an objective standard of what was reasonable under the circumstances at the time the assertions were made. (*Lewy v. Koeckritz International, Inc.* (1991), 211 Ill.App.3d 330, 334, 155 Ill.Dec. 848, 570 N.E.2d 361.) A trial court's decision to impose sanctions under the rule will not be disturbed absent an abuse of discretion, and an abuse of discretion will be found only where a trial court has made a decision no reasonable person could make. *In re Marriage of Sykes* (1992), 231 Ill.App.3d 940, 946, 173 Ill.Dec. 347, 596 N.E.2d 1226.

[22] Here, the trial court stated in its written sanction order that counts II and III were without any reasonable basis in law and did not represent a good-faith argument for the extension or modification of existing law. The court further found that the claims were not filed for any legitimate purpose other than to intimidate the defendants into withdrawing their objections to the special service area. We find that the court's conclusions were supported by the facts of this case. As stated previously, the Village's argument that the conditional privilege only applied to attorneys was without merit and did not represent a good-faith argument for the modification of existing law. Accordingly, we are unable

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

to say that no reasonable trial judge would have imposed sanctions in this case.

**\*236** We will now address the defendants' cross-appeal. Count I of the defendants' amended counterclaim alleged that the Village, attorney Bateman, and Village president Nancy Smith violated section 1983 of the Federal Civil Rights Act, in that they attempted to deter the defendants from seeking a judicial determination of the validity of the ordinances. The defendants first argue that the trial court erred in dismissing count I of their amended counterclaim on the basis that it was barred by the Noerr-Pennington doctrine. The defendants further argue that even if the Noerr-Pennington doctrine is initially applicable, the Village's conduct in filing its action for tort damages fell under the "sham" exception to the doctrine and was thus actionable pursuant to section 1983.

[23][24][25] The essence of the Noerr-Pennington doctrine is that parties who petition the government for governmental action favorable to themselves cannot be sued under the Sherman Anti-trust Act, even though their actions are motivated by anti-competitive intent. (*United Mine Workers of America v. Pennington* (1965), 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626, 636.) This doctrine has been extended to local governmental bodies to immunize them from suit. (*Monarch Entertainment Bureau, Inc. v. New Jersey Highway Authority* (D.N.J.1989), 715 F.Supp. 1290, 1301-03.) Courts, however, have carved out an exception to the doctrine for "sham" litigation. (*Bill Johnson's Restaurants, Inc. v. NLRB* (1983), 461 U.S. 731, 740, 103 S.Ct. 2161, 2168, 76 L.Ed.2d 277, 287; *California Motor Transport Co. v. Trucking Unlimited* (1972), 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642, 648; *Harrison v. Springdale Water & Sewer Comm'n* (8th Cir.1986), 780 F.2d 1422, 1428.) To constitute "sham" litigation a lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*

(1993), 508 U.S. 49, ----, 113 S.Ct. 1920, 1928, 123 L.Ed.2d 611, 624.

**\*\*1376 \*\*\*715** Here, the Village urges that the sham exception does not apply because this case does not involve any massive activities as in *California Motor Transport Co.* or repetitive lawsuits carrying the hallmark of insubstantial claims as in *Otter Tail Power Co. v. United States* (1973), 410 U.S. 366, 380, 93 S.Ct. 1022, 35 L.Ed.2d 359, 369. The Village also contends the exception is not applicable because the defendants were not eventually denied access to the courts.

[26][27][28] The Village's arguments are erroneous. A single baseless suit is sufficient to invoke the sham exception. (*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.* (9th Cir.1982), 690 F.2d 1240, 1254-57; **\*237**USS-POSCO Industries v. Contra Costa County Building & Construction Trades Council* (9th Cir.1994), 31 F.3d 800, 810-11.) Furthermore, a litigant need not prove that he was actually barred from access to the courts as a prerequisite to maintaining an action with the aid of the sham exception to the Noerr-Pennington doctrine. (*Clipper Exxpress,* 690 F.2d at 1257-59; *Harrison,* 780 F.2d at 1428.) Finally, a threat of litigation can chill the constitutional right of access to the courts even if the threat was not successful. *Silver v. Cormier* (10th Cir.1976), 529 F.2d 161, 163.

[29] The Village also argues that the sham exception should not apply because the declaratory judgment action was not a sham and the tort claims were not clearly barred by the conditional privilege. The Village's arguments must be rejected. It cites no authority for the proposition that it could file sham litigation as long as one of several counts in the complaint had merit. Regarding the issue of whether the tort claims were clearly barred by the conditional privilege, we have already touched on that contention with our finding that the trial court correctly imposed sanctions for the filing of a baseless lawsuit. Taking the well-pleaded facts of the defendants' amended counterclaim as true, we find a trier of fact could conclude that the defendants

649 N.E.2d 1366                                                                    Page 17
272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705
**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

were entitled to recover damages. Accordingly, count I of the defendants' amended counterclaim should not have been dismissed.

Third-party defendants Bateman and Smith contend that they enjoyed qualified immunity from suit as public officials.

[30][31][32] Governmental officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutes or constitutional rights of which a reasonable person would have known. (*Harlow v. Fitzgerald* (1982), 457 U.S. 800, 815, 102 S.Ct. 2727, 2736-37, 73 L.Ed.2d 396, 408-09.) This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent. (*Anderson v. Creighton* (1987), 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531.) In essence, the immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs* (1986), 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271, 278.

[33][34] Applying these standards, we find that a reasonable village president would have relied on the advice of the village attorney that the course of conduct the Village was pursuing was proper and legal, and thus we find immunity applies to Smith. However, we find that in light of the preexisting law the immunity does not extend to attorney *238 Bateman. Thus, we conclude that the trial court properly dismissed count I of the defendants' counterclaim as it pertained to Smith, but erred in dismissing that claim as it pertained to Bateman.

[35] The defendants next argue that the court erred in dismissing count II of their amended counterclaim. Count II alleged that the Village violated principles of equal protection by intentionally gerrymandering the special service area to exclude owners and electors who were opposed to the project. The defendants further argue that the spe-

cial service area was not needed and did not rationally relate to a legitimate purpose.

In support of its claim, the defendants presented the affidavit of Bruce Walterman. Walterman's affidavit revealed that he expressed his opposition to the special service **1377 ***716 area and thereafter his property was excluded. The defendants claim that he was excluded because he voiced his opposition and that this was improper.

[36] We find that the trial court properly dismissed the defendants' claim. Section 6 of the Special Service Area Tax Act specifically provides that a municipality may delete property from the special service area as long as the area remains contiguous after the deletion. (35 ILCS 235/6 (West 1992).) Here, the defendants do not argue that the area after the deletion of Walterman's property was not contiguous. Moreover, the Village explained that the special service area was designed to benefit the industrial park. The Village noted that Walterman's property was not strictly commercial since he lived on the property, and it was excluded for that reason. Regarding the defendants' claim that the special service area was not necessary or legitimate, we note that the evidence that the improvements would enhance the ability to fight fires within the district was unrebutted. Under these facts, we find that there was no issue of material fact with regard to a possible violation of the equal protection clause. Accordingly, we find that the trial court properly dismissed the plaintiffs' equal protection claim.

For the foregoing reasons, we reverse the trial court's order declaring the entire special service area to be invalid. However, we order that the Loiacono parcel be excluded for lack of notice. We affirm the trial court's order dismissing the Village's tort claims, counts II and III of its amended complaint. We also affirm the trial court's order of Rule 137 sanctions against the Village and attorney Bateman. Regarding the defendants' cross-appeal, we reverse the trial court's order dismissing count I of the defendants' counterclaim and third-party complaint and remand the cause for further proceed-

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

649 N.E.2d 1366
272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705
**272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705**

ings, but affirm the order with respect to the dismissal of third-party defendant Smith. We also affirm the trial court's order dismissing count II of the defendants' amended counterclaim.

**\*239** The judgment of the circuit court of Lake County is affirmed in part and reversed in part, and the cause is remanded for further proceedings consistent with this opinion.

Affirmed in part; reversed in part and remanded.

RATHJE and HUTCHINSON, JJ., concur.
Ill.App. 2 Dist.,1995.
Village of Lake Barrington v. Hogan
272 Ill.App.3d 225, 649 N.E.2d 1366, 208 Ill.Dec. 705

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.