IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 08-CV-1384 |
| v. | ) ) | Judge Bucklo Magistrate Judge Mason |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) ) | |

**OBJECTIONS TO ORDER ON MOTION TO COMPEL PRODUCTION OF
DOCUMENTS RELATED TO ECOLOGY CENTER SETTLEMENT**

**EXHIBIT INDEX**

Exhibit A    Memorandum in Support of Defendant National Pediculosis Association, Inc.'s Motion to Compel Production of Documents Related to Ecology Center Settlement

Exhibit B    The National Pediculosis Association, Inc.'s Reply in Support of Its Motion to Compel Production of Documents Related to Ecology Center Settlement

Exhibit C    August 14, 2008 Order Denying Motion to Compel

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MORTON GROVE PHARMACEUTICALS, INC., )
                                     )
         Plaintiff,                )     No.: 08-CV-1384
                                     )
           v.                  )     Judge Bucklo
                                     )     Magistrate Judge Mason
THE NATIONAL PEDICULOSIS          )
ASSOCIATION, INC.,                )     **JURY TRIAL DEMANDED**
                                     )
        Defendant.            )
                                     )

## MEMORANDUM IN SUPPORT OF DEFENDANT THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS RELATED TO ECOLOGY CENTER SETTLEMENT

Despite the fact that plaintiff Morton Grove Pharmaceuticals, Inc. ("Morton Grove") alleges in its current complaint that its settlement with the Ecology Center -- a third-party non-profit organization Morton Grove previously sued as a co-defendant in the prior action -- is proof that statements made by defendant The National Pediculosis Association, Inc. ("NPA") are false, Morton Grove refuses to produce documents relating to the negotiation of that settlement. Morton Grove maintains that the settlement documents are not relevant or admissible and that the policy of encouraging settlement should protect them. NPA agrees that they are not relevant and will object to Morton Grove's efforts to use this settlement as evidence of anything. The Court, however, may not agree, and Morton Grove should not be permitted to use the parts of the settlement it likes as a sword but then use the fact that it is a settlement as a shield to prevent NPA from having full discovery. This is especially true here because the purported settlement consisted of the Ecology Center paying no money, making no admission of wrongdoing, and "clarifying" only certain statements, but not all statements over which Morton Grove had sued,

for only two weeks on its website. Therefore, the Court should compel Morton Grove to produce these documents.

## BACKGROUND

Morton Grove manufactures prescription-only headlice and scabies treatments that contain the chemical lindane. Lindane was banned for agricultural purposes by the Environmental Protection Agency in 2006 and has been banned for all purposes by the State of California since 2002. In 2003, the FDA required Morton Grove to put a Black Box warning on all of its lindane products. In recent years, Morton Grove has spent significant resources on a coordinated marketing, lobbying and litigation campaign, including law suits against non-profit organizations that have spoken out about the dangers of lindane, to boost its sales.

Defendant The National Pediculosis Association, Inc. ("NPA") is a 501(c)(3) non-profit organization. NPA began in 1983 as a parents group concerned about a lice outbreak in a Boston-area school. Since 1997, NPA has sold a LiceMeister® comb (a preventative non-prescription headlice comb) as part of its mission of protecting children from the misuse of potentially harmful lice treatments. Despite Morton Grove's unsubstantiated attacks on NPA's non-profit status, the federal government has recognized NPA as a 501(c)(3) tax-exempt organization since 1983, and NPA has received numerous awards and accolades for its public-interest work.

### A.    Morton Grove's Lawsuits Against Non-Profit Organizations

On July 14, 2006, Morton Grove sued the Ecology Center, Inc. ("Ecology Center"), a non-profit organization in Michigan, for statements it made about the dangers of lindane. On February 6, 2007, Morton Grove amended its complaint to include NPA and added a Lanham

2

Act false advertising claim against NPA, based on Morton Grove's assertion that NPA's non-prescription comb made it a competitor of Morton Grove's prescription-only products.

On November 30, 2007, Judge Bucklo granted NPA's motion to sever NPA from Ecology Center, despite Morton Grove's arguments that NPA and Ecology Center made "strikingly similar" statements and engaged in a "common attack campaign on Lindane medications." (*See* Case No. 06-CV03815, Dkt. No. 112, Morton Grove's Mem. Opp. to NPA's Mot. to Dismiss or Sever, at 4-5.)

**B.      Morton Grove Settles with Ecology Center**

Between the time the case was severed and when Morton Grove re-filed its complaint against NPA, Morton Grove settled its suit against Ecology Center.  NPA believes that Morton Grove waited almost four months before it re-filed its complaint against NPA so that it could use the settlement offensively against NPA in this litigation.  (*See* Ex. 1, ¶ 13.)[1]  Morton Grove repeatedly refers to its settlement with Ecology Center in the instant complaint as "evidence" that statements made by NPA are false.  (Compl. ¶¶ 30-43.)

Ecology Center paid no money to Morton Grove as part of the settlement, and there was no admission of liability or wrongdoing.  (Ex. 2.)  Instead, Ecology Center only posted on its website for two weeks "clarifications" relating to some of the statements over which Morton Grove had sued.  (*Id.*)  Notably, however, Ecology Center did not "clarify" the majority of statements Morton Grove sued over, presumably because Morton Grove realized they were true or could not convince Ecology Center otherwise.  In fact, while Morton Grove sued Ecology

---

[1] Despite the fact that Ecology Center publicly states that "The terms of the settlement are not confidential and are available from the Ecology Center upon request" (Ex. 2), Morton Grove has told NPA's counsel that the settlement terms are confidential and it has marked the settlement agreement "Confidential."  Therefore, NPA is submitting the settlement agreement (Ex. 1) separately under seal.  This example of Morton Grove's overuse of the "Confidential" designation is precisely why NPA objected to Morton Grove's protective order in this case.

Center for 16 statements (*see* 2007 Sec. Am. Compl. ¶¶ 33-35, Dkt. 89), Ecology Center only "clarified" 5 of those statements (as well as two other statements).  (Exs. 2 and 3.)

Moreover, several of the statements that Ecology Center did *not* clarify are somewhat similar to the NPA statements Morton Grove is currently suing for.  For example, Morton Grove sued Ecology Center for the statement, "An FDA approved lice comb is an effective, non-chemical approach to treat lice infestation (example:  LiceMeister Comb produced by the National Pediculosis Association)" (Sec. Am. Compl. ¶ 33(b)), and Ecology Center did *not* "clarify" it. (Ex. 3.)  Yet, Morton Grove is currently suing NPA for the statements "Be Sure You Provide A Non-Chemical Choice For Your Children" and "The Licemeister is the safe and cost effective way to win the war against head lice and keep the kids in school safe, lice and nit free." (Compl. ¶ 40).  Also *compare* ¶ 35(c) of Sec. Am. Compl. *with* ¶ 37 of current Complaint.

### C.    Morton Grove's Current Lawsuit Against NPA

In March 2008, almost four months after the cases were severed, Morton Grove finally re-filed its complaint against NPA.  Morton Grove dropped its defamation claims, dropped some of the statements at issue and added others, and dropped its claims for damages.

In paragraphs 30, 35, 39, and 43 of the Complaint, while addressing NPA statements Morton Grove alleges are false, Morton Grove alleges that that "almost identical" statements were retracted by "NPA's former co-defendant, the Ecology Center."  In each of these paragraphs, Morton Grove cites directly to Ecology Center's "clarifications."

It is significant to note that Ecology Center's posts are "clarifications" and not "retractions" as Morton Grove asserts.  Moreover, despite the fact that Morton Grove attempts to make it appear that Ecology Center was somehow incorrect in its essential argument that lindane is dangerous, the settlement entails no admission of wrongdoing by Ecology Center.  (Ex. 2.)

In addition to extensively referring to the settlement in its Complaint as supposed evidence of the falsity of NPA's statements, Morton Grove recently used it in its motion for a protective order and to quash a subpoena. (*See* Dkt. 44 at n.3).

**D.      Discovery Relating to Settlement Materials**

Because of Morton Grove's use of the settlement in its complaint, on April 7, 2008, NPA requested documents regarding the settlement through Request No. 5 of its Third Set of Requests for Production of Document and Things:

> All documents relating to Morton Grove's settlement with the Ecology Center, Inc., including but not limited to settlement agreements, drafts or proposals exchanged between the parties, correspondence with the Ecology Center or others regarding the settlement, documents relating to paragraphs 30, 35, 39, and 43 and Morton Grove's complaint, and public statements made by Morton Grove about the settlement.

(Ex. 4.) Morton Grove objected stating, among other things, that responsive documents are not relevant, are protected by a "non-disclosure agreement" and would not be admissible in this action because of Federal Rule of Evidence 408. *Id.* Morton Grove agreed only to produce the final agreement and public statements about the final agreement, refusing to produce correspondence between the parties about the settlement negotiations and internal documents relating to the settlement. *See id.*

**E.      Attempts to Resolve Discovery Issues**

On May 21, 2008, the parties met and conferred, and agreed that they were at an impasse and had satisfied their obligations under Local Rule 37.2. (Ex. 5, Decl. of W. Thomson ¶ 5.)

**ARGUMENT**

Morton Grove wants to have its cake and eat it too. Namely, it wants to tout the Ecology Center settlement in its Complaint and use it against NPA as evidence of falsity of NPA's statements, but also wants to block NPA from discovery of the process through which the

settlement was reached.  While NPA believes that Ecology Center's "clarifications" are

irrelevant to the truth of NPA's statements, Morton Grove has forced the issue by using it

offensively against NPA.[2]  Because Morton Grove injected the settlement into this case, Morton

Grove cannot now argue that the settlement is irrelevant and that policy reasons supporting

settlements should shield Ecology Center settlement documents from discovery.[3]

## I.    THE COURT SHOULD GRANT NPA'S MOTION BECAUSE MORTON GROVE HAS PUT THE SETTLEMENT AT ISSUE

Under Federal Rule of Civil Procedure 26(b)(1), "[r]elevant information need not be

admissible at trial if the discovery appears reasonably calculated to lead to the discovery of

admissible evidence."  Therefore, "[t]he burden rests upon the objecting party to show why a

particular discovery request is improper." *Koken*, 2006 WL 1749689, *3 (granting defendants'

motion to compel where plaintiff did not meet her burden to show that the requested discovery

was "neither relevant nor reasonably likely to lead to the discovery of admissible evidence").  To

meet its burden, Morton Grove "must show specifically how, despite the broad and liberal

construction afforded the federal discovery rules, each discovery request is not relevant or is

overly broad, burdensome or oppressive." *Burkybile v. Mitsubishi Motors Corp.*, No. 04 C 4932,

2006 WL 2325506, *6 n.6 (N.D. Ill. 2006).

A party cannot allege facts in its complaint and then attempt to prevent discovery of those

facts.  In *Hammond v. Air Line Pilots Assoc.*, No. 87 C 2792, 1987 WL 20421, *1 (N.D. Ill. Nov.

---

[2] During the parties May 21, 2008 meet and confer, NPA suggested that if Morton Grove really believes the settlement is not relevant, it should stipulate to not using it affirmatively in this case. Morton Grove refused.  (Ex. 5, ¶ 6.)

[3] While Morton Grove has claimed that its settlement negotiations are subject to a confidentiality agreement (Ex. 4), Ecology Center has publicly stated otherwise.  (Ex. 2).  To the extent there is a viable non-disclosure agreement at issue, that does not shield its discovery from this case, unless and until Morton Grove seeks a protective order, which it does not deserve given its cavalier use of the settlement in this case.

20, 1987), plaintiffs alleged in their complaint that union members were pressured to approve proposed agreements between union and management in a secret vote. When the defendants inquired as to how plaintiffs voted, the plaintiffs argued that that information was covered by a qualified privilege. The court rejected this argument, finding that the plaintiffs had put the matter "in issue" through the allegations about the vote in their complaint. "Under established principles, a party may not hide behind a privilege when he has placed in issue the contents of the matter of the privilege." *Id.*

Morton Grove clearly is attempting to put its settlement with Ecology Center at issue in this lawsuit in connection with one of the key issues in the case: whether statements made by NPA are false. In its complaint, Morton Grove states that the settlement with Ecology Center is evidence that NPA's statements are false. Although NPA disagrees, it is nevertheless entitled to test the validity of that purported evidence. For example, NPA is entitled to inquire into what led up to the final settlement agreement, including what Morton Grove did to entice Ecology Center to settle (especially in light of the Ecology Center's continued campaign against lindane[4]), and why Morton Grove was not able to persuade Ecology Center to clarify all of the statements at issue or whether it even attempted to get Ecology Center to do so.

Because Morton Grove put its settlement with Ecology Center at issue, it cannot try to avoid full discovery of the settlement.

## II.    RULE 408 DOES NOT PREVENT DISCOVERY OF SETTLEMENT MATERIALS

Morton Grove incorrectly asserts that Federal Rule of Evidence 408 allows it to withhold settlement documents from NPA. Rule 408 is not a bar to discovery of settlement materials.

---

[4] *See, e.g.,* Ex. 2 ("We strongly support legislation to phase out pharmaceutical use of lindane"); Ex. 6, May 15, 2008 Ecology Center press release discussing the Michigan House of Representatives' recent passage of a bill limiting lindane use.)

*McNally Tunnelling Corp. v. City of Evanston,* No. 00 C 6979, 2001 WL 1246630, *1 (N.D. Ill.

Oct. 18, 2001) (granting motion to compel settlement agreement and holding "Rule 408 is

concerned solely with admissibility of evidence, it does not limit the discovery of evidence");

*The Thermos Co. v. Starbucks Corp.*, No. 96 C 3833, 1998 WL 781120, *5 (N.D. Ill. Nov. 3,

1998) (granting motion to compel and holding that "[a]lthough documents produced in

settlement negotiations may be found inadmissible at trial, they are nonetheless discoverable.")

Rule 408, which primarily deals with *admissibility* of evidence, provides that evidence of

the following is not admissible when offered to prove liability for or amount of a claim or to

impeach prior inconsistent statements:

> (1) furnishing or offering or promising to furnish—or accepting or
> offering or promising to accept—a valuable consideration in
> compromising or attempting to compromise the claim; and
> (2) conduct or statements made in compromise negotiations regarding the
> claim…

But evidence from settlement negotiations can be admitted to show bias, prejudice of a witness,

rebuttal, impeachment, knowledge of intent, and estoppel, among other things. *See Zurich Am.*

*Ins. Co. v. Watts Industs.*, 417 F.3d 682, 689 (7th Cir. 2005). Moreover, courts lean toward

admitting settlement negotiation material "when the settlement communications at issue arise out

of a dispute distinct from the one for which the evidence is being offered." *Id.* (admitting

settlement letter from an action that was "not totally unrelated" to the action at bar).

Where, as here, parties have attempted to use settlement matters offensively, courts have

denied their attempts to use Rule 408 as a shield. In *Thompson v. Safeway Ins.*, No. 01 C 3260,

2002 WL 500547, *2 (N.D. Ill. Apr. 2, 2002), plaintiff argued that defendant had engaged in

undue delay and bad faith in regards to her health benefits coverage claim. Defendant attached

to its motion for summary judgment materials generated in the course of settlement discussions

with plaintiff. Plaintiff sought to strike these materials under Rule 408. The court denied

plaintiff's motion: "It would be an abuse of Rule 408 to allow a plaintiff during compromise

negotiations to complicate and delay resolution of the matter, point to that delay as evidence of

defendant's bad faith, and then prevent the defendant from explaining its actions because

settlement discussions were involved." *Id.*

Because Morton Grove has offensively employed the settlement, it cannot hide behind

Rule 408.

## CONCLUSION

For the reasons stated above, this Court should grant NPA's motion to compel and enter

an order requiring Morton Grove to produce all non-privileged documents that are responsive to

Request No. 5 of NPA's Third Set of Requests for the Production of Documents and Things

within 14 days.

Dated: June 5, 2008

Respectfully submitted,

THE NATIONAL PEDICULOSIS
ASSOCIATION, INC.

By:   s/ Debbie L. Berman
        One of Its Attorneys

Debbie L. Berman (#67205154)
Amanda S. Amert (#6271860)
Wade A. Thomson (#6282174)
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, IL 60611
Telephone: 312 222-9350
Facsimile: 312 527-0484

# Exhibit 1

**EXHIBIT 1 IS FILED SEPARATELY UNDER SEAL**
**PURSUANT TO THE PROTECTIVE ORDER ENTERED ON APRIL 22, 2008**

# Exhibit 2





| Take Action | Donate Now | Events | About Us | Membership | Newsletters | Press | Publications | Links | Contact Us |

&lt;&lt; Back to Main Press Page

**Clean Car Campaign**

**Environmental Education**

**Greening Chemistry**

**Greening Healthcare**

**Safe Kids, Homes, Towns**

**Save Land, Build Community**

**Trash & Recycling**

**Ecology Center Campaigns**

Search



Our recycling affiliate

**amazon.com®**
Ecology Center Bookstore

# Drug Company Drops SLAPP Suit Against Ecology Center

**Children's health advocates call for immediate legislative action to restrict lindane**

March 12, 2008

The Ecology Center announced today an end to the SLAPP suit filed against it by Morton Grove Pharmaceuticals. After nearly two years of litigation where the company alleged at least $9.3 million in damages, the parties entered into a settlement in which Morton Grove drops its lawsuit and the Ecology Center makes no payment to the company, nor any admission of liability.

"We consider this outcome an unqualified victory," said Mike Garfield, Director of the Ecology Center. "We're glad to be able once again to focus 100% of our efforts on protecting public health and the environment."

In early 2006, the Ecology Center, medical professionals, and other environmental organizations launched a campaign to urge the Michigan Legislature to restrict the use of pharmaceutical lindane. Lindane is a chemical ingredient that has been banned for all uses in 52 countries and the state of California due to concerns about public health and the environment. In 2006, lindane was voluntarily withdrawn for use in U.S. agriculture. Lindane is also no longer used in the U.S. in the military and on livestock and pets. Yet, lindane can be used in Michigan for prescription treatments for head lice and scabies.

Morton Grove Pharmaceuticals filed suit in July 2006 in U.S. District Court in Chicago charging the Ecology Center, one of its employees, and two members of the Michigan Chapter of the American Academy of Pediatrics with defamation, tortious interference, trade disparagement, and deceptive trade practices.

Despite those allegations, the settlement requires the Ecology Center to:

- Make no financial payment to Morton Grove;
- Make no admission of liability; and
- Post seven minor clarifications of previous statements on lindane on its website for two weeks -- clarifications similar to ones the Center offered to make when first threatened with the SLAPP suit almost two years ago.

The terms of the settlement are not confidential and are available from the Ecology Center upon request.

"We strongly support legislation to phase out pharmaceutical use of lindane," said Sheila Gahagan, M.D., M.P.H., immediate past-president of the American Academy of Pediatrics (Michigan Chapter). "The lawsuit was an unfortunate and intentional diversion to the important work of protecting children's health."

The Ecology Center's Garfield added, "From the outset, we viewed Morton Grove's lawsuit as a baseless tactic designed to stifle public debate. Instead of engaging in a public discussion with the Michigan Legislature on this important public issue, the company instead tried to silence us."

Ecology Center — Lindane Update

Case 1:08-cv-01384    Document 116-2    Filed 08/28/2008    Page 16 of 100
Case 1:08-cv-01384    Document 50-2    Filed 06/05/2008    Page 5 of 33 Page 2 of 2

House Bill 4569, introduced by Rep. Ted Hammon, would restrict pharmaceutical use of lindane in the State of Michigan.  Major health professional organizations in Michigan support the bill, including the Michigan Chapter of the American Academy of Pediatrics, the Michigan Nurses Association, the Michigan Association of School Nurses, the Michigan Pharmacists Association, and the Wayne County Medical Society.  The Michigan Department of Community Health does not recommend lindane use for either head lice or scabies.

"The state's most prestigious medical authorities are calling for a restriction on the ingredient lindane," said Tracey Easthope, MPH, Environmental Health Director of the Ecology Center. "The Michigan Legislature should act now to protect the public from this toxic pesticide."

Michigan's House Committee on Great Lakes and the Environment is currently taking testimony on HB 4569 and is expected to vote on the bill in the next few weeks.

# # #

*For questions regarding this statement, please contact:*

Mike Garfield, 734-761-3186 x104 or **michaelg@ecocenter.org**

Tracey Easthope, 734-761-3186 x109 or **tracey@ecocenter.org**

**Back to Top**

# Exhibit 3

## The Ecology Center's Clarification of Statements Regarding Lindane

(1)     *In the FDA's Adverse Event Reporting System, 20% of those reporting health effects due to lindane used the product according to the directions.*

**CLARIFICATION:** The 2002 FDA review of 50 years of adverse event reports relating to lindane medications identified 488 reports. Of those 488 reports, 74 were classified as serious. Of the 74 serious cases, "Forty-three (58%) described misuse of lindane," while "14 cases reported using lindane according to the label." Based on this report, the FDA concluded that, "[i]n all age groups, adverse events occurred mainly in patients who appeared to have misapplied or orally ingested lindane."

(2)     *Fourteen other deaths have been attributed to lindane, but have not been confirmed. All of these 14 deaths involved topical application; in 5 cases use was in accordance with directions.*

**CLARIFICATION:** The statement should have read that fourteen other deaths have been associated with (not attributed to) lindane. In this FDA report, only two deaths were attributed to lindane, one in an adult and one in an infant, each involving misuse of the product.

(3)     *The use of pediculicidal shampoos (including lindane) was associated with increased risk of childhood leukemia, with odds ratios of 1.5 (95% CI 0.9 to 2.5) for use of pesticide in one head lice episode and 1.9 (95% CI 1.1 to 3.3) for use of pesticide in two or more episodes.*

**CLARIFICATION:** Six of the 568 children participating in this study were treated with lindane shampoo. The authors concluded that leukemia was "significantly associated with maternal home insecticide use during pregnancy and during childhood, with garden insecticide use, and fungicide use during childhood." With respect to insecticidal shampoo treatment (e.g., permethrin, malathion, lindane, etc.), the authors determined that the issue "requires further study." The reported 95% confidence interval for lindane was CI 0.5 to 8.7.

(4)     *Lindane is acutely toxic to the nervous system and can cause numbness, motor restlessness, anxiety, tremors, cramps and unconsciousness.*

**CLARIFICATION:** Although acute side effects, such as those noted above, have been reported for lindane, the majority of such events have resulted from oral ingestion (which is not how lindane medications are directed to be applied).

(5)     *One dose of lindane can contaminate 6 million gallons of water.*

**CLARIFICATION:** This statement is from the publication Environmental Quality Management, (Winter, 2002; pp. 89-95), citing a Los Angeles County Sanitation District calculation. In 2002, the EPA concluded that "the Agency does not have risk concerns for concentrations of lindane in surface water used as a source of drinking water from consumer use for both lice and scabies."

(6)    *Lindane is classified as a possible cancer-causing agent by the EPA*

**CLARIFICATION:**  While it is possible to access a page on the EPA website which posts this sentence (based on an older EPA assessment), current information on the EPA website notes that the EPA updated the cancer classification of lindane in 2003 to "suggestive evidence of carcinogenicity, but not sufficient to assess cancer risk to humans."  The above statement remains attributable to the position of the International Agency for Research on Cancer based on a 1987 monograph.

(7)    *Due to its toxicity, the FDA recommends not using lindane to treat individuals weighing less than 110 pounds- this corresponds to most children on whom lindane is used.*

**CLARIFICATION:** The FDA-approved prescription labeling for both Lindane Lotion and Lindane Shampoo states in a boxed warning that these medications "should be used with caution in infants, children, the elderly, and individuals with other skin conditions and those who weigh <110 lbs (50kg) as they may be at risk of serious neurotoxicity."  Lindane Lotion and Lindane Shampoo are FDA approved as second-line medications for the treatment of scabies, pubic lice (crabs) and head lice.

# Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC. | ) ) ) | |
| Plaintiff, | ) ) | No: 08-CV-1384 |
| v. | ) ) | Judge Bucklo |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., | ) ) ) | Magistrate Judge Mason |
| Defendant. | ) ) ) | |

**MORTON GROVE PHARMACEUTICALS, INC.'S RESPONSE TO
DEFENDANT THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'S
THIRD SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS**

Plaintiff Morton Grove Pharmaceuticals, Inc. ("Morton Grove"), by and through its attorneys Winston & Strawn LLP, hereby responds to Defendant the National Pediculosis Association, Inc.'s ("NPA's") Third Set of Requests for Production as follows:

**PRELIMINARY STATEMENT**

In responding to the NPA's Requests for Production, Morton Grove does not concede the relevancy, materiality, or admissibility of the Requests for Production or the subject(s) to which the Requests for Production refer. Morton Grove's responses are made subject to, and without in any way waiving or intending to waive, any objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence or for any other purpose, of any of the documents produced or referred to, or of any of the responses given herein, or of the subject matter thereof, in any proceeding. Such responses are made specifically subject to the right to object to any discovery proceeding involving or relating to the subject matter of the Requests for Production.

## GENERAL OBJECTIONS

Each of these objections is incorporated into each and every one of Morton Grove's Responses as if fully set forth therein, and is in addition to any specific objections stated in response to a particular Request.

1.      Morton Grove objects to these requests for production to the extent that they seek disclosure of any protected or privileged information, including attorney-client communications and/or attorney work product. The inadvertent disclosure of such information or documents is not intended to be, and shall not be deemed to be, a waiver of any applicable protection or privilege.

2.      Morton Grove objects to these requests for production and their definitions and instructions to the extent they attempt to alter the scope of discovery under the Federal Rules of Civil Procedure, the Local Rules of this Court, and/or any applicable Standing Order.

3.      Morton Grove objects to these requests for production to the extent they are premature, overly broad, unduly burdensome, and/or calculated to harass, and to the extent they are not reasonably calculated to lead to the discovery of admissible evidence.

4.      Morton Grove objects to these requests for production to the extent they are vague and ambiguous and call for speculation outside the personal knowledge of Morton Grove's representatives.

5.      Morton Grove's response that it will produce documents responsive to any particular request should not be construed as meaning that documents responsive to that request exist. Such response means only that Morton Grove will produce documents requested by the NPA if they are in Morton Grove's possession, custody, or control and are not subject to any applicable privilege.

2

6.    Morton Grove objects to these requests for production to the extent they require Morton Grove to obtain documents and/or things from persons or entities over whom it has no control.

7.    Morton Grove objects to these requests for production to the extent they seek legal conclusions and/or would require Morton Grove to reach a legal conclusion in order to prepare a response.

8.    Morton Grove objects to these requests for production to the extent they seek documents in the public domain and, therefore, equally as accessible to the NPA.

9.    Morton Grove objects to these requests for production to the extent that they highly duplicative of prior requests issued in this action.

10.    Morton Grove reserves the right to assert all evidentiary objections under the Federal Rules of Evidence in connection with all documents it produces.

11.    To the extent the document requests assume knowledge or conduct by Morton Grove that is without factual basis, Morton Grove, by answering these document requests, does not intend to imply, acknowledge, or concede that the conduct or knowledge assumed by a particular document request actually occurred.

12.    Morton Grove's response to any of these requests for production does not constitute acquiescence or agreement to any definition proposed by the NPA, and is made without waiver of Morton Grove's right to object to such definition(s).

13.    Morton Grove expressly reserves the right to supplement its responses to these requests for production with additional documents as they become available to it in the course of the litigation.

3

## REQUESTS

**REQUEST NO. 1:**    All documents relied upon or referred to in the Complaint or in the preparation of the Complaint (to the extent not already produced).

**RESPONSE:**        Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced.

**REQUEST NO. 2:**    All documents relating to Morton Grove's public statements that NPA "holds itself out as a nonprofit health organization but actually makes its money by marketing a competitive medical device to lindane shampoo without employing a single licensed healthcare professional." (*See* www.lindane.com/facts/; www.lindanetruth.com/facts/ as of April 6, 2008.)

**RESPONSE:**        Morton Grove objects to this request on the basis that it is redundant of other requests for production served by NPA.  Morton Grove further objects to this request because it seeks documents already in the NPA's possession, custody, or control.  Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced and are not publicly available to NPA (e.g., content of www.headlice.org or www.lindane.org).

**REQUEST NO. 3:**    Organizational charts listing Morton Grove's employees (current and former), officers, directors, board members (advisory or otherwise) and consultants.

**RESPONSE:**        Morton Grove objects on the basis that this request asks for documents not currently in existence.  Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control.

4

**REQUEST NO. 4:**   All documents relating to the U.S. Food and Drug Administration's December 13, 2007 Warning Letter to Morton Grove, including but not limited to any responses, drafts of responses, documents reflecting actions taken in response, or communications regarding the FDA Warning Letter or actions taken in response thereto.

**RESPONSE:**          Morton Grove objects to this request on the basis that it is redundant of

other requests for production served by NPA.  Subject to and without waiving its objections,

Morton Grove states that it will produce responsive, non-privileged documents in its possession,

custody, or control.

**REQUEST NO. 5:**   All documents relating to Morton Grove's settlement with the Ecology Center, Inc., including but not limited to settlement agreements, drafts or proposals exchanged between the parties, correspondence with the Ecology Center or others regarding the settlement, documents relating to paragraphs 30, 35, 39, and 43 of Morton Grove's complaint, and public statements made by Morton Grove about the settlement.

**RESPONSE:**          Morton Grove objects to this request because it seeks documents protected

by the attorney-client privilege and by a non-disclosure agreement.  Morton Grove also objects

to this request to the extent it seeks documents that are not relevant to this action or admissible in

this action.  Subject to and without waiving its objections, Morton Grove states that it will

produce the final settlement agreement between Morton Grove and the Ecology Center, Inc., the

related court filing, the document posted to the Ecology Center, Inc.'s website as a result of the

settlement, and any written public statements made by Morton Grove regarding the settlement.

**REQUEST NO. 6:**   All documents relating to Morton Grove's allegation that NPA's statements were false statements of fact in a commercial advertisement about its own or another product.

**RESPONSE:**          Morton Grove objects to this request because it seeks documents already

in the NPA's possession, custody, or control.  Subject to and without waiving its objections,

Morton Grove states that it will produce responsive, non-privileged documents in its possession,

custody, or control, to the extent they have not already been produced.  Morton Grove also notes

that this subject will likely be addressed by expert testimony at a future point in this action.

5

**REQUEST NO. 7:** All documents relating to Morton Grove's allegations that NPA's statements actually deceived or are likely to deceive a substantial segment of the public.

**RESPONSE:** Morton Grove objects to this request because it seeks documents already in the NPA's possession, custody, or control. Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced. Morton Grove also notes that this subject will likely be addressed by expert testimony at a future point in this action

**REQUEST NO. 8:** All documents relating to Morton Grove's allegation that NPA's statements were material or likely to influence the purchasing decisions of consumers.

**RESPONSE:** Morton Grove objects to this request because it seeks documents already in the NPA's possession, custody, or control. Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced. Morton Grove also notes that this subject will likely be addressed by expert testimony at a future point in this action

**REQUEST NO. 9:** All documents relating to Morton Grove's allegations that Morton Grove has been or is likely to be injured as a result of NPA's statements, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products.

**RESPONSE:** Morton Grove objects to this request because it seeks documents already in the NPA's possession, custody, or control. Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced.

**REQUEST NO. 10:** All documents relating to Morton Grove's allegations contained in paragraph 2 of its Complaint.

**RESPONSE:** Morton Grove objects to this request because it seeks documents already in the NPA's possession, custody, or control. Subject to and without waiving its objections,

Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced.

**REQUEST NO. 11:** All documents relating to Morton Grove's allegations contained in paragraph 6 of its Complaint.

**RESPONSE:**       Morton Grove objects to this request because it is redundant of other requests for production served by NPA. Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control.

**REQUEST NO. 12:** All documents relating to Morton Grove's allegations contained in paragraph 11 of its Complaint.

**RESPONSE:**       Morton Grove objects to this request because it seeks documents already in the NPA's possession, custody, or control. Morton Grove also objects to this request on the basis that it is redundant of other requests for production served by NPA. Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced.

**REQUEST NO. 13:** All documents relating to Morton Grove's allegations contained in paragraph 13 of its Complaint.

**RESPONSE:**       Morton Grove objects to this request because it seeks documents already in the NPA's possession, custody, or control. Morton Grove objects to this request on the basis that it is redundant of other requests for production served by NPA. Morton Grove also objects to this request because it is unduly burdensome and calculated to harass. Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been

produced and are not publicly available to NPA (e.g., content of www.headlice.org or www.lindane.org).

**REQUEST NO. 14:** All documents relating to Morton Grove's allegations contained in paragraph 22 of its Complaint.

**RESPONSE:**        Morton Grove objects to this request because it seeks documents already in the NPA's possession, custody, or control. Morton Grove also objects to this request on the basis that it is redundant of other requests for production served by NPA. Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced.

**REQUEST NO. 15:** All documents relating to Morton Grove's allegations contained in paragraphs 27 - 29 and 31 of its Complaint.

**RESPONSE:**        Morton Grove objects to this request because it seeks documents already in the NPA's possession, custody, or control. Morton Grove also objects to this request on the basis that it is redundant of other requests for production served by NPA. Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced.

**REQUEST NO. 16:** All documents relating to Morton Grove's allegations contained in paragraph 34 of its Complaint.

**RESPONSE:**        Morton Grove objects to this request on the basis that it is redundant of other requests for production served by NPA. Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced.

**REQUEST NO. 17:** All documents relating to Morton Grove's allegations contained in paragraph 38 of its Complaint.

**RESPONSE:**        Morton Grove objects to this request because it seeks documents already in the NPA's possession, custody, or control.  Morton Grove also objects to this request on the basis that it is redundant of other requests for production served by NPA.  Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced.

**REQUEST NO. 18:** All documents relating to Morton Grove's allegations contained in paragraphs 41 - 42 of its Complaint.

**RESPONSE:**        Morton Grove objects to this request because it seeks documents already in the NPA's possession, custody, or control.  Morton Grove also objects to this request on the basis that it is redundant of other requests for production served by NPA.  Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced.

**REQUEST NO. 19:** All documents relating to Morton Grove's allegations contained in paragraph 45 of its Complaint.

**RESPONSE:**        Morton Grove objects to this request on the basis that it is redundant of other requests for production served by NPA.  Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced.

9

**REQUEST NO. 20:** All documents relating to Morton Grove's allegations contained in paragraph 47 of its Complaint.

**RESPONSE:**     Morton Grove objects to this request because it seeks documents already in the NPA's possession, custody, or control. Morton Grove also objects to this request on the basis that it is redundant of other requests for production served by NPA. Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced.

**REQUEST NO. 21:** All documents relating to Morton Grove's allegations contained in paragraph 48 of its Complaint.

**RESPONSE:**     Morton Grove objects to this request because it seeks documents already in the NPA's possession, custody, or control. Morton Grove also objects to this request on the basis that it is redundant of other requests for production served by NPA. Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced.

**REQUEST NO. 22:** All documents relating to Morton Grove's allegations contained in paragraph 50 of its Complaint.

**RESPONSE:**     Morton Grove objects to this request because it seeks documents already in the NPA's possession, custody, or control. Morton Grove objects to this request on the basis that it is redundant of other requests for production served by NPA. Morton Grove also objects to this request on the grounds that it is unduly burdensome and calculated to harass. Subject to and without waiving its objections, Morton Grove states that it will produce responsive, non-privileged documents in its possession, custody, or control, to the extent they have not already been produced and are not equally available to NPA.

10

Dated:  May 12, 2008                Respectfully Submitted,


                                    **MORTON GROVE PHARMACEUTICALS, INC.**


                                    By: _____
                                        One of Its Attorneys

W. Gordon Dobie (wdobie@winston.com)
Timothy Rivelli (trivelli@winston.com)
William C. O'Neil (woneil@winston.com)
Cherish M. Keller (ckeller@winston.com)
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
T:  (312) 558-5600
F:  (312) 558-5700

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of May 2008, I caused to be served a copy of **Morton Grove Pharmaceuticals, Inc.'s Response to Defendant The National Pediculosis Association, Inc.'s Third Set of Requests for Production of Documents and Things** to be served on counsel of record via e-mail and U.S. mail:

> Debbie L. Berman
> Jennifer A. Hasch
> Amanda S. Amert
> Wade A. Thomson
> April A. Otterberg
> JENNER & BLOCK LLP
> 330 North Wabash Avenue
> Chicago, Illinois 60611
> T: (312) 222-9350
> F: (312) 527-0484

12

# Exhibit 5

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC., | ) ) | |
| Plaintiff, | ) ) | No.: 08-CV-1384 |
| v. | ) ) | Judge Bucklo |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., | ) ) ) | Magistrate Judge Mason **JURY TRIAL DEMANDED** |
| Defendant. | ) ) ) | |

## DECLARATION OF WADE A. THOMSON IN SUPPORT OF DEFENDANT THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'s MOTION TO COMPEL PRODUCTION OF DOCUMENTS REALTED TO ECOLOGY CENTER SETTLEMENT

I, Wade A. Thomson, pursuant to 28 U.S.C. § 1746, declares as follows:

1.      I am one of the attorneys for defendant the National Pediculosis Association, Inc. ("NPA") in this matter.

2.      The statements made in this declaration are based on my personal knowledge.

3.      On May 13, 2008, I wrote a letter to counsel for Morton Grove Pharmaceuticals, Inc. ("Morton Grove") explaining NPA's position that Morton Grove could not withhold documents relating to the Ecology Center given its use of the settlement in its Complaint. (Ex. A.)

4.      On May 19, 2008, Ms. Keller responded with a letter stating that the settlement documents were subject to a non-disclosure agreement and that they were "protected by Rule 408" and "not even admissible." (Ex. B.)

5.      On May 21, 2008, Mr. O'Neil and Ms. Keller (on behalf of plaintiff), and April Otterberg and I (on behalf of defendant) participated in a telephonic meet and confer. The

parties again discussed their differences, and agreed that they were at an impasse and had

satisfied their obligations under Local Rule 37.2.

6.     During the parties May 21, 2008 meet and confer, I suggested that if Morton

Grove really believes the settlement is not relevant, it should stipulate to not using it

affirmatively in this case.  Morton Grove refused.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 5th day of June, 2008.

                                        s/ Wade A. Thomson
                                        Wade A. Thomson

7

# Exhibit A

# JENNER & BLOCK

May 13, 2008

Jenner & Block LLP          Chicago
330 N. Wabash Avenue        Dallas
Chicago, IL 60611           New York
Tel 312-222-9350            Washington, DC
www.jenner.com

**VIA E-MAIL**

William O'Neil
Cherish M. Keller
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL  60601-9703

Wade A. Thomson
Tel  312 840-8613
Fax  312 840-8713
wthomson@jenner.com

Re:    **Morton Grove Pharmaceuticals v. National Pediculosis Association**
       **Case No. 06-CV-3815**

Dear Bill & Cherish:

Yesterday we received Morton Grove's responses to NPA's 3rd set of document requests. Two responses particularly concern us.

Request No. 5:  This request seeks all documents relating to Morton Grove's settlement with the Ecology Center, including but not limited to settlement agreements, drafts or proposals exchanged between the parties. Morton Grove objected to the extent the request sought documents that were not relevant or admissible and "documents protected by the attorney-client privilege and by a non-disclosure agreement." In the first instance, there is no obviously no attorney-client privilege for the documents exchanged between Morton Grove and Ecology Center. And as we understand it, there is no confidentiality provision in the settlement agreement. Even if there were a confidentiality provision, Morton Grove must produce the requested materials absent an order from the court.

Second, as you know, Morton Grove repeatedly referred to and touted the settlement in its complaint, referring to it as a "retraction," in a naked attempt to bolster Morton Grove's claim that NPA's statements are false. While NPA does not believe the actions Ecology Center took in regards to their different statements bear on the truth of NPA's statements, because Morton Grove has put the settlement at issue in this matter, it cannot now hide behind arguments of relevancy or admissibility. Documents exchanged between Morton Grove and Ecology Center about the settlement will show precisely what exactly the Ecology Center admitted to, retracted, and what it did not, thereby allowing NPA to test Morton Grove's arguments. Please let me know by the close of business on Friday, May 16 whether Morton Grove will produce drafts, proposals and correspondence exchanged between Morton Grove and the Ecology Center. If Morton Grove will not produce these documents, NPA will file a motion to compel.

Request No. 22:  This request seeks all documents relating to Morton Grove's allegations contained in paragraph 50 of its complaint. Morton Grove's response states that it will produce all documents to the extent they have not already been produced and "are not equally available to

William O'Neil
May 13, 2008
Page 2

NPA." Please let me know what documents if any, besides the January 22, 2007 letter, Morton
Grove is alluding to as being "equally available to NPA."

Sincerely,

Wade A. Thomson

cc:     W. Gordon Dobie
        Debbie L. Berman
        Amanda S. Amert

# Exhibit B

# WINSTON & STRAWN LLP

43 RUE DU RHONE
1204 GENEVA, SWITZERLAND

99 GRESHAM STREET
LONDON EC2V 7NG

333 SOUTH GRAND AVENUE
LOS ANGELES, CALIFORNIA 90071-1543

WRITER'S DIRECT DIAL NUMBER

(312) 558-8829
ckeller@winston.com

35 WEST WACKER DRIVE
CHICAGO, ILLINOIS 60601-9703

(312) 558-5600

FACSIMILE (312) 558-5700

www.winston.com

200 PARK AVENUE
NEW YORK, NEW YORK 10166-4193

25 AVENUE MARCEAU
75116 PARIS, FRANCE

101 CALIFORNIA STREET
SAN FRANCISCO, CALIFORNIA 94111-5894

1700 K STREET, N.W.
WASHINGTON, D.C. 20006-3817

May 19, 2008

**VIA EMAIL**

Wade A. Thomson
Jenner & Block LLP
330 N. Wabash Ave.
Chicago, IL 60611

        **Re:**    *Morton Grove v. NPA*

Dear Wade:

      I write in response to your May 19th letter. In brief, Morton Grove's positions on the two requests you mention are as follows:

      *Request No. 5:*

      This request asks for "[a]ll documents relating to" the settlement, which includes correspondence about the settlement between Morton Grove and its attorneys. Those documents are protected by the attorney-client privilege.

      Morton Grove and the Ecology Center entered into a confidentiality and non-disclosure agreement related to the parties' settlement correspondence. Such correspondence is also protected by Rule 408 of the Federal Rules of Evidence, and is not even admissible evidence. You requested to know "precisely what exactly the Ecology Center admitted to, retracted, and what it did not." The non-confidential settlement agreement and the Ecology Center's subsequently published retractions, which Morton Grove stated it will produce, show exactly that.

      *Request No. 22:*

      This request asks for "[a]ll documents relating to" the allegations in paragraph 50 of Morton Grove's complaint. Thus, the January 22, 2007 letter is relevant and is in NPA's possession. In addition, the request may be interpreted to ask for all documents relating to the

WINSTON & STRAWN LLP

Wade A. Thomson
May 19, 2008
Page 2

last sentence in paragraph 50, which mentions the previous case (No. 06-CV-3815). Documents filed and exchanged between the parties in that case are equally accessible to NPA.

*** 

Morton Grove is amenable to discussing these items in further detail during a meet and confer conference.

Best regards,

*Cherish M. Keller*

Cherish M. Keller

cc:    William C. O'Neil

# Exhibit 6

Case 1:08-cv-01384    Document 50-2    Filed 06/06/2008    Page 32 of 38





Working for a safe, environment where people live, work and play

| Take Action | Donate Now | Events | About Us | Membership | Newsletters | Press | Publications | Links | Contact Us |

Clean Car Campaign

Environmental Education

Greening Chemistry

Greening Healthcare

Safe Kids, Homes, Towns

Save Land, Build Community

Trash & Recycling

Ecology Center Campaigns

[ Search ]



Our recycling affiliate

**amazon.com®**

Ecology Center Bookstore

<< Back to Main Press Page

## House Overwhelmingly Passes Restrictions on Dangerous Pesticide Lindane

**Bi-Partisan vote (72-35) to protect Michigan children's from pharmaceutical lindane**

May 15, 2008

Health professionals and environmentalists praised the Michigan House of Representatives for overwhelming passing (72-35) important legislation protecting children's health today.

In a bipartisan vote, members of the House approved common sense restrictions on the use of lindane, a hazardous pesticide used in pharmaceuticals for the treatment of lice and scabies.

"This is an important vote for children's health.  We applaud legislators for supporting this measure, and urge the Senate to quickly pass the bill," said Jon Fliegel M.D., chair of the legislative committee of the American Academy of Pediatrics (Michigan Chapter).

"This is an important vote to help reduce a persistent, bioaccumulative toxic chemical from entering the Great Lakes," said Tracey Easthope, MPH, of the Michigan Network for Children's Environmental Health and the Ecology Center.  "Many thanks to the sponsor of the legislation, Rep. Ted Hammon, and for the leadership of House Committee on Great Lakes & Environment Chair Rebekah Warren for prioritizing children's health."

In 2003, the Food and Drug Administration issued a public health advisory for lindane. The agency recommended lindane-containing products be used with caution for infants, children, the elderly, and those who weigh less than 110 pounds, as they may be at risk of serious neurotoxicity.

In 2006, lindane was voluntarily withdrawn from agricultural uses.

Lindane is also no longer used in the U.S. in the military or on livestock.  Yet, lindane is regularly applied to the scalps of Michigan children.

The bill passed today (HB 4569) would require lindane be used only under a physician's direct supervision.  Major health organizations support the bill, including the Michigan Chapter of the American Academy of Pediatrics, the Michigan Nurses Association, the American Nurses Association, the Michigan Association of School Nurses, the Michigan Pharmacists Association, and the Wayne County Medical Society of Southeast Michigan.  Major environmental organizations also support the bill, including the Michigan Environmental Council, Clean Water Action, Ecology Center, Sierra Club and Michigan League of Conservation Voters.  The Michigan Department of Community Health does not recommend lindane use for either head lice or scabies and supports the legislation.

"The state's prestigious medical authorities are calling for a restriction on the

ingredient lindane," said Molly Polverento of the Michigan Environmental Council. "We thank the House and urge swift action in the Senate to protect the public from this toxic pesticide."

The Michigan Network for Children's Environmental Health is a coalition of health professionals, health-affected groups, environmental organizations, and others dedicated to a safe and less toxic world for Michigan's children.

Members include: • American Academy of Pediatrics (Michigan Chapter) • Arab Community Center for Economic and Social Services (ACCESS) • Association for Children's Mental Health • Clean Water Fund • Detroiters Working for Environmental Justice • East Michigan Environmental Action Council • Ecology Center • Healthy Homes Coalition of West Michigan • Learning Disabilities Association (LDA) of Michigan • Local Motion • Michigan Coalition for Children and Families • Michigan Council for Maternal and Child Health • Michigan Environmental Council • Michigan Nurses Association • Science and Environmental Health Network

# # #

*For questions regarding this statement, please contact:*

Molly Polverento, Michigan Environmental Council: 517-881-1234

Gen Howe, Ecology Center: 617-833-3847

**Back to Top**

Take Action    Donate    Events    About    Membership    Newsletters    Press    Publications    Links    Contact
117 N. Division St., Ann Arbor, MI 48104-1580 USA • phone 734-761-3186 • fax 734-663-2414 •    info@ecocenter.org

http://www.ecocenter.org/press/releases/20080515.php                                6/5/2008

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MORTON GROVE PHARMACEUTICALS, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 08-CV-1384 |
| vs. | ) ) ) | Judge Bucklo Magistrate Judge Mason |
| THE NATIONAL PEDICULOSIS ASSOCIATION, INC., | ) ) ) | |
| Defendant. | ) ) | |

### THE NATIONAL PEDICULOSIS ASSOCIATION, INC.'s REPLY IN SUPPORT OF ITS MOTION TO COMPEL PRODUCTION OF DOCUMENTS RELATED TO ECOLOGY CENTER SETTLEMENT

Morton Grove's response focuses on the case law and public policy applicable when a party attempts to put at issue the other party's settlement agreement, but that is not the case here. It is Morton Grove that intends to use its own settlement agreement with the Ecology Center as "evidence" that NPA's statements are false. As explained below, it is clear that Morton Grove entered into that settlement with the express purpose of using it against NPA in this litigation and at the same time invoking the public policy encouraging settlements to prevent NPA from defending itself against this "evidence." That public policy, however, is not served by gamesmanship like Morton Grove's. Because Morton Grove -- not NPA -- wants to use its own settlement agreement offensively in this case, NPA should be permitted to conduct discovery into the circumstances surrounding that settlement, including the negotiations between Morton Grove and the Ecology Center. Accordingly, NPA's motion to compel should be granted, or Morton Grove should be barred from using its settlement with the Ecology Center for any purpose in this litigation.

First, Morton Grove does not even attempt to distinguish *Thompson v. Safeway, Inc.*, No. 01 C 3260, 2002 WL 500547 (N. D. Ill. Apr. 2, 2002), the case cited by NPA in its opening memorandum (Mem. at 8-9), or cite any cases to the contrary.  The court in *Thompson* specifically held that a party may not put the terms of a settlement agreement at issue and then hide behind Federal Rule of Evidence 408.  2002 WL 500547, at *2.  There, the plaintiff tried to prevent the defendants from using "materials, which were generated in the course of settlement negotiations" to rebut the plaintiff's allegations that the defendant had acted with bad faith and with undue delay.  *Id.*  The Court rejected the plaintiff's argument, holding:  "It would be an abuse of Rule 408 to allow a plaintiff during compromise negotiations to complicate and delay resolution of the matter, point to that delay as evidence of the defendant's bad faith, and then prevent the defendant from explaining its actions because settlement discussions were involved." *Id.* (citations omitted).  Other courts considering the issue have similarly held that, where a settling party seeks to affirmatively use its own settlement as evidence, it cannot hide behind the shield of Rule 408.  *See, e.g.*, *Am. Family Life Assurance Co. of Columbus v. Teasdale*, 733 F.2d 559, 568 (8th Cir. 1984) (holding that, after plaintiff offered testimony about its settlement of a similar dispute with a third party, district court properly admitted testimony about settlement negotiations as relevant to (1) the "hostility [plaintiff] and its key witnesses harbored toward anyone who was critical of its product;" (2) the evidentiary weight of the settlement; and (3) to rebut plaintiff's claim that its sales dropped because of defendant's press release).

That is precisely what Morton Grove is improperly attempting to do here.  As explained in NPA's opening memorandum, Morton Grove alleges in its complaint that its settlement with the Ecology Center is "evidence" that NPA's statements at issue are false.  (Mem. at 3.)  Morton Grove admits that it has "put in issue the fact that the Ecology Center publicly acknowledged

that its statements -- which are nearly identical to the NPA's statements -- were false and needed to be clarified." (Resp. at 3.)  Despite this admission, Morton Grove, like the plaintiff in *Thompson*, then argues that NPA should not be permitted to use or even discover settlement negotiation materials, thus preventing NPA from explaining what actually occurred.  The Court should not permit Morton Grove to abuse Rule 408 in this way.

Second, the cases cited by Morton Grove are inapposite.  In those cases, the courts held that the production of settlement documents was inappropriate because the documents were not relevant, not because some blanket policy existed that barred discovery of such documents.  *See, e.g.*, *Info. Techs. Int'l, Inc. v. ITI of N. Fl.*, No. 01 C 4668, 2002 WL 356509, at *2 (N.D. Ill. Mar. 6, 2002) (Mason, M.J.) ("*ITI*") (holding "[w]e are not convinced that drafts of the agreement or other such documents are relevant").

In this case, to the extent that the Ecology Center's so-called retractions are relevant[1], the negotiations would be relevant, at a minimum, to the weight the so-called retractions should be given.  For example, curiously, Morton Grove had the Ecology Center "retract" two statements that were the subject of the claims against NPA, but were ***not*** the subject of any of Morton Grove's claims against the Ecology Center.  NPA is entitled to find out how and why this occurred, including what inducements Morton Grove may have offered the Ecology Center to do so.  These issues are relevant because they bear directly on the credibility of the entire settlement agreement, *i.e.*, whether or not that settlement was simply a sham for Morton Grove to use against NPA in this lawsuit.  Similarly, the Ecology Center "retracted" only *some* of the statements at issue in the claims against it.  Again, why the Ecology Center refused to retract the

[1] Morton Grove's assertion (Resp. at 2) that the parties do not dispute that the settlement negotiations are irrelevant is inaccurate.  Morton Grove asserts that the Ecology Center's so-called retractions are relevant.  NPA disagrees.  If, however, the Court finds that the settlement terms are relevant, the negotiations through which those terms were reached are equally relevant.

3

others may be relevant to Morton Grove's attempt to use these "retractions" to show falsity. It is quite possible that the Ecology Center refused to retract the others and told Morton Grove that they unequivocally were accurate. Unlike in *ITI*, the final settlement agreement here plainly does *not* contain the entirety of the parties' discussions or agreement especially as to these issues, and, therefore, NPA should be permitted discovery. *See ITI*, 2002 WL 356509, at *2 (holding production of settlement negotiation documents not necessary in part because "[t]he final agreement should incorporate all previous discussions").

Third, Morton Grove's argument that the public policy behind preventing discovery into settlements should apply here because it had an agreement with the Ecology Center to keep the negotiations confidential is disingenuous at best. (Resp. at 1.) The purported confidentiality agreement arose at Morton Grove's, not the Ecology Center's, insistence. It appears that Morton Grove deliberately insisted on this agreement so that it affirmatively could try to use it to frustrate NPA's attempts to seek discovery, as it currently is doing. Indeed, it is apparent from Morton Grove's response and the settlement agreement itself that Morton Grove's goal in settling with the Ecology Center was to use that agreement offensively against NPA in this lawsuit. (*See* ¶ 13 of Exhibit 1 to NPA's Motion to Compel, filed under seal.)

Furthermore, Morton Grove's blanket assertion concerning the scope of this confidentiality agreement is belied by the "agreement" itself. The e-mail correspondence Morton Grove attaches to its response demonstrates that, at Morton Grove's request, the Ecology Center agreed to keep a single Morton Grove "proposal" confidential, not every document or conversation exchanged in the course of negotiating the settlement. (*See* Resp. at Ex. A.) In any event, such a private confidentiality agreement is not a valid excuse from production, particularly given that the final agreement is public, the Ecology Center and Morton Grove have both ,

4

publicly commented on the settlement, this Court already has entered a protective order in this case, and the confidentiality provision was at Morton Grove's insistence so that it could use it precisely as it is attempting to do right now. *See Channelmark Corp. v. Destinations Prods. Int'l, Inc.*, No. 99 C 214, 2000 WL 968818, at *5 (N.D. Ill. July 7, 2000) (enforcing subpoena of information relating to settlement agreement despite confidentiality agreement and holding the "public reaps no benefit by allowing settlement agreements to suppress evidence" and protective order provided adequate protection).

For all the foregoing reasons, as well as the reasons set forth in NPA's opening brief, NPA's motion should be granted.

Dated:  June 25, 2008                    Respectfully Submitted,

                                         THE NATIONAL PEDICULOSIS
                                         ASSOCIATION, INC.


                                         By:   s/ Debbie L. Berman
                                                One of Its Attorneys

Debbie L. Berman (#6205154)
Amanda S. Amert (#6271860)
Wade A. Thomson (#6282174)
April A. Otterberg (#6290396)
JENNER & BLOCK LLP
330 N. Wabash Avenue
Chicago, Illinois  60611
312-222-9350

## CERTIFICATE OF SERVICE

I, Debbie L. Berman, hereby certify that on June 25, 2008, I caused copies of the foregoing **Defendant The National Pediculosis Association, Inc.'s Reply in Support of Its Motion to Compel Production of Documents Related to Ecology Center Settlement,** to be served upon the following via electronic filing through the CM/ECF system:

> Timothy Joseph Rivelli  (trivelli@winston.com)
> W. Gordon Dobie  (wdobie@winston.com)
> William Charles O'Neil  (*woneil@winston.com*)
> Cherish M. Keller  (*ckeller@winston.com*)
> WINSTON & STRAWN, LLP
> 35 West Wacker Drive
> 41st Floor
> Chicago, IL  60601
> Telephone:  (312) 558-5600
> Facsimile:  (312) 558-5700

<div align="center">

s/ Debbie L. Berman
Debbie L. Berman

</div>

# EXHIBIT C

Order Form (01/2005)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine Bucklo | Sitting Judge if Other than Assigned Judge | Michael T. Mason |
|---|---|---|---|
| **CASE NUMBER** | 08 C 1384 | **DATE** | 8/14/2008 |
| **CASE TITLE** | Morton Grove Pharmaceuticals vs. National Pediculous Association, Inc. | | |

**DOCKET ENTRY TEXT**

Defendant the National Pediculosis Association, Inc's ("NPA") motion to compel production of documents related to Ecology Center settlement [49] is denied. For further details, see text below.

■[ For further details see text below.]

Docketing to mail notices.

---

## STATEMENT

The document request at issue is request number 5 of NPA's third set of document requests to Morton Grove Pharmaceuticals, Inc. ("Morton Grove"). NPA requests "all documents relating to Morton Grove's settlement with the Ecology Center, Inc., including, but not limited to settlement agreements, drafts or proposals exchanged between the parties, correspondence with the Ecology Center or others regarding the settlement, documents relating to paragraphs 30, 35, 39, and 43 of Morton Grove's complaint, and public statements made by Morton Grove about the settlement." Ex. 4, no. 5 to Motion to Compel.

In response to NPA's document request no. 5, Morton Grove produced its final settlement agreement with Ecology Center, the related court filing, the document posted on the Ecology Center's website as a result of the settlement and any written public statements made by Morton Grove regarding the settlement. Ex. 4, no. 5 to Motion to Compel. In its motion to compel, NPA argues that it is also entitled to the negotiation documents leading to Morton Grove's settlement with the Ecology Center and Morton Grove's internal documents relating to the settlement. Morton Grove objects to this request because it seeks documents protected by the attorney-client privilege and by a non-disclosure agreement. Morton Grove also objects to the request to the extent it seeks documents that are not relevant to ths action or admissible in this action.

NPA responds that Morton Grove should produce these documents because Morton Grove has put them at issue in this case by stating in its complaint that Ecology Center, a former defendant in a separate action, published a retraction that clarifies similar statements to those in dispute in this case. Complaint, ¶¶ 30, 35, 39, 43. NPA expounds that the documents regarding the negotiations should be produced in addition to those previously produced because the "inducements that Morton Grove may have offered the Ecology Center ... are relevant because they bear directly on the credibility of the entire settlement agreement, *i.e.* whether or not that settlement was simply a sham for Morton Grove to use against NPA in this lawsuit."

Case 1:08-cv-01384    Document 99    Filed 08/14/2008    Page 2 of 2

## STATEMENT

Reply, p. 3.  However, Morton Grove has not put the credibility of its settlement with Ecology Center at issue in this case.  The documents previously produced by Morton Grove regarding the settlement are sufficient to satisfy the issues it raises in paragraphs 30, 35, 39, and 43 of its complaint.

Courts are generally reluctant to order disclosure of negotiations or documents related to a settlement agreement.  *See Information Technologies International, Inc. v. ITI of Northern Florida, Inc.*, 2002 WL 356509 (N.D.Ill); *Davenport v. Indiana Masonic Home Foundation, Inc.*, 2003 WL 1888986 (S.D. Ind). Morton Grove does not need to produce any of the documents which set forth the negotiations leading up to the settlement.  We are not convinced that drafts of the agreement or such documents are relevant.

NPA attempts to prove its arguments by arguing that Federal Rule of Evidence Rule 408 does not apply.  As NPA correctly points out, Rule 408 is not a bar to discovery of settlement materials.  Rule 408 regulates documents that are admitted into evidence.  At this point of litigation, whether or not the settlement agreement will be admitted into evidence is not at issue.

Based on the foregoing, defendant's motion to compel is denied.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

MORTON GROVE                    )
PHARMACEUTICALS, INC.,          )
                                )    No. 08-CV-1384
        Plaintiff,              )
                                )    Judge Bucklo
            v.                  )    Magistrate Judge Mason
                                )
THE NATIONAL PEDICULOSIS        )    **JURY TRIAL DEMANDED**
ASSOCIATION, INC.,              )
                                )
        Defendant.              )

**OBJECTIONS TO ORDER ON MOTION TO COMPEL DOCUMENTS RELATED TO**
**ECOLOGY CENTER SETTLEMENT MATERIALS**

**APPENDIX OF ATTACHED CASES CITED IN EXHIBITS**

1.  *Koken v. Am. Patriot Ins., Agency, Inc.*, No. 05 C 1049, 2006 WL 1749689 (N.D. Ill. June 20, 2006).

2.  *Burkybile v. Mitsubishi Motors Corp.*, No 04 C 4932, 2006 WL 2325506 (N.D. Ill. Aug. 2, 2006).

3.  *Hammond v. Air Line Pilots Ass'n.*, No. 87 C 2792, 1987 WL 20421 (N.D. Ill. Nov. 20, 1987).

4.  *Thermos Co. v. Starbucks Corp.*, No. 96 C 3833, 1998 WL 781120 (N.D. Ill. Nov. 3, 1998).

5.  *McNally Tunnelling Corp. v. City of Evanston*, No. 00 C 6979, 2001 WL 1246630 (N.D. Ill. Oct. 18, 2001).

6.  *Thompson v. Safeway, Inc.*, No. 01 C 3260, 2002 WL 50047 (N.D. Ill. April 2, 2002).

1

Westlaw.

Slip Copy                                                                                          Page 1
Slip Copy, 2006 WL 1749689 (N.D.Ill.)

**H**

Koken v. American Patriot Ins. Agency, Inc.
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
    United States District Court,N.D. Illinois, Eastern
                    Division.
M. Diane KOKEN, acting in her official capacity as
Insurance Commissioner of the Commonwealth of
Pennsylvania as Statutory Liquidator of Legion In-
surance Company and Villanova Insurance Com-
pany, Plaintiff,
                        v.
AMERICAN PATRIOT INSURANCE AGENCY,
INC., a Wisconsin corporation, and Lysa Jo Saran,
        an Individual, Defendants.
                **No. 05 C 1049.**

                  June 20, 2006.

James Raymond Dashiell, Dashiell Law Offices,
LLC, Chicago, IL, Charlotte E. Thomas, Wolf
Block Schorr and Solis-Cohen LLP, Philadelphia,
PA, for Plaintiff.
Bruce Robert Meckler, Matthew Robert Wilder-
muth, Mitchell J. Edlund, Peter Petrakis, Steven
Dale Pearson, Meckler, Bulger & Tilson, Chicago,
IL, for Defendants.

        *MEMORANDUM OPINION AND ORDER*

NOLAN, Magistrate J.
**\*1** Plaintiff M. Diane Koken, Insurance Commis-
sioner of the Commonwealth of Pennsylvania
("Liquidator"), is the Statutory Liquidator for two
insolvent Pennsylvania insurance companies: Le-
gion Insurance Company ("Legion") and Villanova
Insurance Company ("Villanova"). In this lawsuit,
the Liquidator seeks to recover more than $4 mil-
lion in premiums and commissions allegedly due to
the insurance companies pursuant to a Limited
Agency Agreement between Legion and Defendant
American Patriot Insurance Agency, Inc.
("Patriot"). The Liquidator alleges that Defendant

Lysa Jo Saran is also liable in her capacity as Pres-
ident of Patriot. Defendants deny that they owe any
money to the Liquidator and have asserted several
affirmative defenses to liability, including that Le-
gion and its related companies perpetrated a fraud
upon Patriot and its owner/shareholders, Diane and
Kenneth Hendricks.

Defendants have filed a motion to compel seeking
(1) a complete copy of Reinsurance Treaty 103; and
(2) a copy of a Consulting Agreement between the
Liquidator and Andrew Walsh, Legion's former
general counsel. For the reasons set forth here, the
motion is granted.

                    *BACKGROUND*

Patriot is an insurance producer that marketed and
sold Legion policies pursuant to a March 23, 1997
Limited Agency Agreement. (Cmplt.¶¶ 11, 12.) On
July 25, 2003, the Commonwealth Court of
Pennsylvania issued an order placing Legion in li-
quidation and appointing M. Diane Koken as the
Liquidator. (Ex. C to Cmplt.) On February 22,
2005, the Liquidator filed suit against Patriot al-
leging breach of contract, breach of fiduciary duty,
and negligence, and demanding an accounting of
premiums and commissions due under the Agree-
ment. Defendants have asserted 11 affirmative de-
fenses to liability, including fraud.

A. The Rent-a-Captive Insurance Program

The alleged fraud relates to a so-called
"Rent-a-Captive" workers' compensation insurance
program marketed to Patriot by Mutual Risk Man-
agement, Ltd. ("Mutual Risk"), Commonwealth
Risk Services, L.P. ("Commonwealth Risk"), Le-
gion, Villanova, and Mutual Indemnity (Bermuda),
Ltd. ("MIB") (collectively, the "Mutual Entities").
In or about March of 1997, Patriot decided to estab-
lish a Rent-a-Captive program called the "Roofers'
Advantage Program" (the "Program"). In connec-

Slip Copy                                                                              Page 2
Slip Copy, 2006 WL 1749689 (N.D.Ill.)

tion with that Program, Patriot executed the following documents: (1) a proposal provided by Commonwealth Risk; (2) an agency agreement between Legion and Patriot (the Limited Agency Agreement); and (3) a Shareholder Agreement between Patriot and Mutual Holdings (Bermuda), Ltd. ("Mutual Holdings").

Under the Program, Legion acted as an insurance company issuing workers' compensation policies to roofing contractors on Patriot's behalf. Legion transmitted a Proposal to Patriot for each Program year setting forth projected premium payments minus projected financial expenses, resulting in a "Total Loss Fund." Legion retained 10% of the premiums at the beginning of each Program year to pay losses and expenses for that year. Legion then ceded the remainder of the Total Loss Fund (the "Ceded Loss Fund") to its reinsurer (MIB) under Reinsurance Treaty 103. As the insurer, Legion had primary responsibility for all insured losses up to the applicable policy limits. Once the losses and expenses in a Program year exceeded Legion's 10% retention, however, MIB would reimburse Legion for additional losses up to an agreed-upon cap, which MIB would pay out of the Ceded Loss Fund. If losses exceeded the Ceded Loss Fund, Patriot assumed responsibility for payment up to a certain amount, referred to as the Aggregate Attachment Point.

**\*2** The parties disagree as to the liability distribution after this point. Defendants claim that all amounts exceeding the Aggregate Attachment Point became the responsibility of Legion. The Liquidator insists that pursuant to a 1993 Amendment to the Reinsurance Treaty, MIB provided an additional "fourth layer" of reinsurance coverage. This dispute is relevant to Defendants' fraud affirmative defense as described below.

## B. The Alleged Fraud

Citing an April 7, 2002 affidavit from Eric Bossard, Legion's former Vice President, and a December 1,

2005 affidavit from James Agnew, former Vice President of Commonwealth Risk, Defendants claim that in February 2000, Bossard and Agnew met with Lysa Saran and Diane Hendricks at Patriot's offices in Oak Brook, Illinois to discuss the Program. According to Bossard and Agnew, Mrs. Hendricks expressed concern about growing losses under the Program, and about her belief that Patriot's potential liability extended beyond the Aggregate Attachment Point. Agnew told Mrs. Hendricks that he would look into her concerns. (Bossard Aff. ¶¶ 20, 21; Agnew Aff. ¶¶ 5-7.)

Within a week, Bossard and Agnew returned to Legion's offices, where they took part in several discussions relating to Patriot. Bossard and Agnew first met with Glenn Partridge, Legion's Executive Vice President, and Richard Turner, President of Commonwealth Risk, in Partridge's office. During the meeting, Bossard expressly conveyed Mrs. Hendricks's belief that Patriot was responsible for all amounts above the Aggregate Attachment Point. The four men then called Andrew Walsh, Legion's general counsel, who purportedly confirmed that, in fact, Legion was responsible for all losses in excess of the Aggregate Attachment Point. He indicated, further, that the Program documents could not be amended retroactively to place the legal obligation on Patriot. (Id. ¶¶ 22, 23; Agnew Aff. ¶¶ 8-10.)

At this point, Walsh joined Bossard, Agnew, Partridge, and Turner in Partridge's office. The gentlemen called David Alexander, President of MIB, and relayed Mrs. Hendricks's concerns to him. Partridge then asked if the attendees thought they could induce Patriot to pay additional amounts to cap these perceived, though non-existent, losses. The gentlemen decided that they would request $1 million. At the end of the meeting, Walsh, Partridge, Turner, and Alexander instructed Bossard to inform Mrs. Hendricks that Patriot was liable beyond the Aggregate Attachment Point, but that she could remedy the situation by purchasing reinsurance at a cost of $1 million. Patriot agreed to the proposal, but Legion never purchased the reinsurance. (Id. ¶¶

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                                  Page 3
Slip Copy, 2006 WL 1749689 (N.D.Ill.)

24, 25; Agnew Aff. ¶¶ 11-14.)

For its part, Legion denies any wrongdoing, insisting that pursuant to the 1993 Amendment to the Reinsurance Treaty, Patriot was in fact liable for losses above the Aggregate Attachment Point. Legion claims that the $1 million was for MIB's agreement not to seek reimbursement from the Hendrickses at the fourth layer of reinsurance and that, because MIB never purchased additional insurance, it is now carrying $1 million as a payable credit to the Hendrickses.

## C. The Walsh Deposition

**\*3** During the deposition of Andrew Walsh, Patriot's counsel asked Walsh to review Bossard's April 7, 2002 affidavit setting forth the alleged fraud, and to comment on the discussions described therein. Counsel for the Liquidator objected on the basis of attorney-client privilege. Counsel for the Liquidator raised similar objections at the deposition of Richard Turner, and indicated that they would take the same position at the deposition of Glenn Partridge. Defendants filed a motion to overrule the claim of privilege pursuant to the crime-fraud exception, which this court denied without prejudice on May 9, 2006. (Minute Order of 5/9/06, Doc. 77.) Defendants have appealed that ruling to the district court.

Walsh also testified at his deposition that when he left Legion in November 2003, he entered into a Consulting Agreement with the Liquidator. Walsh described this as a "one year consulting contract, that required [him] to provide services relating to certain ongoing arbitrations that might come up as well as be available for consulting on issues that might come up."(Walsh Dep., at 33.) Walsh was compensated for his consulting services on an hourly basis plus expenses. (*Id.* at 37.)Walsh testified that in connection with the Agreement, he was given continued access to certain emails and documents as decided by Legion's President Joseph Boyle. (*Id.* at 33-34.)Walsh was unable to recall,

however, whether he retained any documents relating to the American Patriot Program; whether the Liquidator or Legion signed the Consulting Agreement; the date the Agreement was signed; or whether the parties discussed the issue of indemnification during the negotiation process, which lasted "a couple of days." (*Id.* at 35-38.)

## D. The Motion to Compel

In light of the Liquidator's reliance on Reinsurance Treaty 103 in defense of Defendants' motion to overrule the attorney-client privilege, Defendants now move to compel the Liquidator to produce a complete copy of that Treaty. Defendants also seek a copy of the Consulting Agreement Walsh entered into with the Liquidator.

## *DISCUSSION*

Federal Rule of Civil Procedure 26(b)(1) prescribes the scope of matters upon which a party may seek discovery. "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party ... Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."FED. R. CIV. P. 26(b)(1)."Requests for discovery are relevant if there is any possibility that the information sought may be relevant to the subject matter of the action."*Kodish v. Oakbrook Terrace Fire Protection Dist.*, 235 F.R.D. 447 (N.D.Ill.2006) (citing *Rubin v. Islamic Republic of Iran,* 349 F.Supp.2d 1108, 1111 (N.D.Ill.2004)). The burden rests upon the objecting party to show why a particular discovery request is improper. *Id.*

## A. Reinsurance Treaty 103

**\*4** The Liquidator has produced a copy of Reinsurance Treaty 103 together with "a complete set of those exhibits referenced in Article 3 that refer to the American Patriot programs."(Pl. Resp., at 3.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                                                                    Page 4
Slip Copy, 2006 WL 1749689 (N.D.Ill.)

Defendants argue that the Liquidator should also be required to produce exhibits to that Treaty which relate to other insurance programs. Defendants note that Walsh testified at his deposition that in order to understand whether the aggregate limits of the Reinsurance Treaty have been impaired and, thus, determine each participant's excess exposure, "[y]ou would need to know the loss experience of other programs."(Walsh Dep., at 89.) The Liquidator insists that Defendants are confusing "exposure to actual losses after they occur with exposure to potential losses before they occur."(Pl. Resp., at 4.) In the Liquidator's view, "[w]hether or not losses actually occurred at some future point is not relevant to whether or not there was risk at the time the insurance was purchased."(*Id.* at 5.)

As noted, the Liquidator has relied on Reinsurance Treaty 103 in opposing Defendants' fraud affirmative defense and motion to overrule attorney-client privilege. The Liquidator has thus placed the Reinsurance Treaty and its proper interpretation at issue in this case. The Liquidator may ultimately establish that Patriot's potential risk did not depend upon the loss experience of other programs, but Defendants are not required to take the Liquidator's word for this proposition. "Requests for discovery are relevant if there is any possibility that the information sought may be relevant to the subject matter of the action," and "[t]he scope of discovery should be broad in order to aid in the search for truth."*Kodish,* 235 F.R.D. 447. The Liquidator has not met her burden of establishing that the complete Reinsurance Treaty is neither relevant nor reasonably likely to lead to the discovery of admissible evidence.

The Liquidator nonetheless objects that producing the additional exhibits will be unduly burdensome. She estimates that there are approximately 2,000 exhibits relating to other insurance programs, and notes that the documents "may contain confidential, privileged or proprietary information."(Pl. Resp., at 5.) Under FED. R. CIV. P. 26(c), a court may, for good cause shown, limit discovery that is unduly burdensome. *Patterson v. Avery Dennison Corp.,*

281 F.3d 676, 681-82 (7th Cir.2002)."In deciding whether good cause exists, the court must balance the interests of the parties, taking into account the likelihood of the request leading to the discovery of relevant materials and the burden of production."*Ferus ex rel. Estate of Ricciardi v. U.S.,* No. 05 C 50009, 2006 WL 1460011, at *1 (N.D.Ill. May 24, 2006). The Liquidator has not demonstrated that the burden of producing the exhibits outweighs the likely benefit to Patriot and, thus, Defendants' motion to compel is granted.

To the extent the exhibits may contain confidential information, the parties may properly agree amongst themselves to limit disclosure of unfiled discovery information to certain specified persons during the litigation and not to voluntarily disseminate such information to other persons. Such a confidentiality agreement amongst the parties regarding the categories of the information they seek to protect from dissemination to persons not involved in the lawsuit does not require court approval or intervention.[FN1] *See Taffinger v. Bethlehem Steel Corp.,* No. Civ. A. 00-4668, 2001 WL 1287625, at *3 (E.D.Pa. Oct.24, 2001).

> FN1. The court reminds the parties that in the event they do seek a protective order, they must comply with Judge Holderman's standing order.

B. Consulting Agreement

**\*5** Defendants also seek a copy of the Consulting Agreement Walsh entered into with the Liquidator when he left Legion in November 2003. The Liquidator has refused, arguing that to the extent Defendants were able to depose Walsh regarding the terms of the Agreement, it would be cumulative to require her to produce the actual Agreement. (Pl. Resp., at 1.) The court disagrees. Defendants first learned about the existence of the Agreement at Walsh's deposition, and he was unable to recall many of its details. Thus, Defendants have not received a full and fair opportunity to explore the document. The Liquidator does not dispute that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Slip Copy                                                    Page 5
Slip Copy, 2006 WL 1749689 (N.D.Ill.)

"evidence regarding compensation [from a party] is relevant to a witness's bias and credibility." *Portis v. City of Chicago*, No. 02 C 3139, U.S. Dist. LEXIS 18241, at *12 (N.D.Ill. Aug. 24, 2005) (Nolan, J.) Significantly, the Liquidator had sued Walsh in the Commonwealth Court of Pennsylvania, but dropped that suit prior to entering into the Agreement. (Ex. 7 to Def. Mem.) The Liquidator has relied on Walsh's interpretation of the Reinsurance Treaty to defeat Defendants' fraud affirmative defense and Defendants are entitled to explore his potential bias. The Liquidator is thus ordered to produce the Consulting Agreement.

Once again, to the extent the exhibits may contain confidential information, the parties may properly agree amongst themselves to limit disclosure of unfiled discovery information to certain specified persons without the need for court approval or intervention. *See Taffinger,* 2001 WL 1287625, at *3.

### CONCLUSION

For the reasons stated above, Defendants' first motion to compel [Doc. 94] is granted.

N.D.Ill.,2006.
Koken v. American Patriot Ins. Agency, Inc.
Slip Copy, 2006 WL 1749689 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

2

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2006 WL 2325506 (N.D.Ill.)

**H**
Burkybile v. Mitsubishi Motors Corp.
N.D.Ill.,2006.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
Ralph BURKYBILE, Plaintiff,
v.
MITSUBISHI MOTORS CORPORATION, a for-
eign corporation, Mitsubishi Motor Manufacturing
of America, Inc., a foreign corporation, Amaki Iron
Works Co., Ltd., a foreign corporation, Defendants.
**No. 04 C 4932.**

Aug. 2, 2006.

Robert J. Dargis, Richard F. Mallen, Richard F.
Mallen & Associates, Chicago, IL, for Plaintiff.
Stanley V. Boychuck, Anthony Joseph Monaco,
John Paul Arranz, Swanson, Martin & Bell, LLP,
Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

JEFFREY COLE, United States Magistrate Judge.
**\*1** Mr. Burkybile has moved for entry of an order
compelling defendants to answer supplemental dis-
covery consisting of requests to admit and requests
to produce documents. The defendants have respon-
ded by seeking a protective order precluding discov-
ery from their non-testifying expert.

I.

BACKGROUND

On February 17, 2004, the plaintiff was injured
when his 1995 Mitsubishi Eclipse GS left the road
and struck a utility pole. The question is whether
the left, lower, lateral control arm ball joint was
separated as a result of the collision or separated
causing the collision. Plaintiff filed suit on May 30,

2004, and, after discovery had closed, was granted
leave to amend his complaint to add Count IV,
which charged "Negligent Recall" in connection
with the 1995 Mitsubishi Eclipse and other
vehicles, which had as its subject matter the ball
joint and boot device that is the subject of the in-
stant case. The court also granted plaintiff's motion
to reopen and extend discovery. Then, on March
16, 2006, the court adopted the plaintiff's proposed
new schedule for discovery, ordering discovery
closed by August 25, 2006.

Thereafter, the plaintiff tendered a "Supplemental
Request to Produce and a Request to Admit Certain
Facts."The first of the three categories of requested
documents consisted of warranty claim information
for certain recalled vehicles. (*Motion to Compel*,
Ex. 2, ¶¶ 1-3). The second sought any documenta-
tion of comments made by the president of Mit-
subishi and Mitsubishi's quality control officer at a
February 15, 2001 news conference regarding a
vehicle recall campaign that covered front suspen-
sion parts. (*Id.*, ¶ 4). The plaintiff also requested ad-
missions regarding the February 2001 statements of
Mitsubishi's president and quality control officer.
(*Motion to Compel*, Ex. 3). The third category per-
tained to defendants' retained experts, Tandy En-
gineering and Michael Holcomb. (*Motion to Com-
pel*, Ex. 2, ¶¶ 5-7).

Tandy Engineering purchased and, according to
plaintiff, modified a demonstration vehicle, and
evaluated engineering issues regarding the ball
joints. Although neither party elaborates to any ex-
tent on this exercise, the idea was apparently to
simulate the wear that plaintiff's Eclipse had in-
curred-both the test vehicle and plaintiff's had over
100,000 miles on them. (*Motion to Compel*, ¶ 7;
*Defendants' Motion for Protective Order*, at 1-2, 5).
Defendants expert witness-their *testifying* expert
witness-Mr. Holcomb, then utilized the vehicle in
his testing. The document request-as well as a sub-
poena to Tandy Engineering-sought information on
the test vehicle's history, the modifications that

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2006 WL 2325506 (N.D.Ill.)

Page 2

were made, the parts that were changed, and any tests that were performed. The plaintiff also served a subpoena on Tandy Engineering for documents relating to its work with the test vehicle. (*Motion to Compel*, Ex. 4).

The defendants objected to all of these the discovery requests. There was the predictable and inadequate objection that the requests were "overly broad, unduly burdensome, unreasonable as to time and scope, and seek information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence," and that they were "vague, ambiguous, and over broad." The defendants also complained that the requests referred to five-year-old statements made by then-employees. (*Motion to Compel*, Exs. 5-10). Finally, the defendants contended that the requests went "beyond the Court's limited purpose for reopening discovery, which was to allow plaintiff to conduct discovery solely on the issue of the alleged negligent recall and for purposes of rebuttal of defendants' experts."(*Id.*). There was apparently no response to the subpoena to Tandy Engineering, other than the defendants' motion for a protective order.

**\*2** Under Rule 26(c), Federal Rules of Civil Procedure, a party seeking a protective order must show "good cause." In cases where a party seeks an order precluding discovery from an expert it does not intend to call as a witness, courts have found the moving party's initial showing sufficient where it can demonstrate that the expert was hired in anticipation of litigation but will not be testifying. *See*Rule 26(b)(4)(B). It then falls to the other party to demonstrate exceptional circumstances requiring discovery. *See Eliasen v. Hamilton*, 111 F.R.D. 396, 402 (N.D.Ill.1986); *Brill-Edwards v. Ryder Truck Rental, Inc.*, Nos. 01-915, 01-1768, 2003 WL 23511733, \*2 (D.Conn. Jan.24, 2003); *Industrial Maritime Carriers, Inc. v. PT (Persero) Inka*, 179 F.R.D. 153, 154 (E.D.Pa.1998).

The parties met twice, pursuant to Local Rule 37.2, to attempt to resolve their discovery dispute. Defendants indicated they would stand on their objec-

tions in the Request to Produce and the Request to Admit. When plaintiff asked for some support for their position, the defendants y indicated only that their objections were grounded in Rule 26 and the fact that Tandy Engineering was a "consulting expert." (*Motion to Compel*, at 2). Plaintiff then filed his motion to compel, and the defendants filed their response and requested a protective order as to Tandy Engineering.

## II.

## ANALYSIS

### A.

### Mr. Burkybile Has Not Demonstrated He Is Entitled To Discovery From Defendant's Non-Testifying Expert

In criminal cases, the government has a constitutional obligation to disclose test results (or any other evidence) favorable to a defendant. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). There is no comparable obligation imposed on parties in civil cases where the evidence would derive from a non-testifying expert. Indeed, Rule 26(b)(4)(B) of the Federal Rules of Civil Procedure"forbids the judge to order disclosure in pretrial discovery of the facts found or opinions formulated by an opponent's non-testifying experts except (so far as relevant to this case) 'upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means." ' *Braun v. Lorillard Inc.*, 84 F.3d 230, 236 (7th Cir.1996)(parenthesis in original).[FN1] There is no dispute that Tandy Engineering was retained as a consulting expert, and no one from that firm will be testifying.[FN2]

FN1. The Rule provides in pertinent part:

Not Reported in F.Supp.2d                                                                                        Page 3
Not Reported in F.Supp.2d, 2006 WL 2325506 (N.D.Ill.)

A party may, through interrogatories or by deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not expected to be called as a witness at trial ... upon a showing of exceptional circumstances under which it is impracticable for the party seeking discovery to obtain facts or opinions on the same subject by other means.

FN2. Whether the results of Tandy Engineering tests were adverse to the defendants' case is of no moment. The protection of the non-testifying expert under Rule 26(b)(4)(B) is an end that the drafters of the Rule concluded justified nondiscoverability. *See Braun,* 84 F.3d at 236 ("The underlying rule, that of nondisclosure, invites shopping for favorable expert witnesses and facilitates the concealment of negative test results. That is neither here nor there; the exception is a narrow one."); *Spearman Industries,* 128 F.Supp.2d at 1152 ("perfectly permissible" for party to choose not to use expert because of an adverse opinion)

The party seeking discovery from the non-testifying expert consulted in anticipation of litigation "carries a heavy burden in demonstrating the existence of exceptional circumstances."*Spearman Industries. Inc. v. St. Paul Fire and Marine Ins. Co.,* 128 F.Supp.2d 1148, 1151 (N.D.Ill.2001); 8 Wright, Miller & Marcus, *Federal Practice and Procedure* § 2032 (2d ed.1994). Generally, "exceptional circumstances" will be found to exist when: (1) the condition observed by the expert is no longer observable; or (2) the condition is subject to replication, but the costs would be judicially prohibitive. *See, e.g., Braun v. Lorillard, Inc.,* 84 F.3d 230, 236 (7th Cir.1996).

**\*3** Mr. Burkybile argues that he needs facts regard-

ing the history of the test vehicle, its modifications, and the results of any test performed on it before it came into Mr. Holcomb's possession. There is no dispute that plaintiff had the opportunity to depose Mr. Holcomb, the expert who employed Tandy Engineering's test vehicle in his tests or that the defendants will not be utilizing any of the tests Tandy Engineering performed on the vehicle. Although the defendants have made the test vehicle available for plaintiff's inspection, the plaintiff has inexplicably chosen not to take advantage of that availability. There is no claim that the deposition of Mr. Holcomb was inadequate to reveal what was done by Tandy to the vehicle or was in any other way insufficient to enable Mr. Burkybile's counsel to obtain information about what was done to the test vehicle.[FN3] Nonetheless, the plaintiff insists that an inspection of the vehicle by experts of his choosing is not an adequate substitute for detailed information on the test vehicle from Tandy Engineering.

FN3. While the defendants are free to invoke Rule 20(b)(4)(B), there may (or there may not) be issues about the admissibility of Mr. Holcomb's testimony at trial should he attempt to rely on what Tandy Engineering told him was done to the vehicle. While Rule 703 was intended to liberalize the rules relating to expert testimony, it was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the "mouthpiece" of the witnesses on whose statements or opinions the expert's opinion necessarily rests. *See Dura Automotive Systems of Indiana, Inc. v. CTS Corp.,* 285 F.3d 609. 613 (7th Cir.2002); *In re Sulfuric Acid Antitrust Litigation,* 235 F.R.D. 646 (N.D.Ill.2006).

These circumstances are not the kinds of "exceptional" circumstances that require the production of information from the defendants' nontestifying consultant. (*Plaintiff's Reply Memorandum,* at 7). Neither *Eliasen v. Hamilton,* 111

Not Reported in F.Supp.2d                                                                                                   Page 4
Not Reported in F.Supp.2d, 2006 WL 2325506 (N.D.Ill.)

F.R.D. 396, 397 (N.D.Ill.1986) nor *Portis v. City of Chicago,* No. 02-3139 (N.D.Ill. Aug. 24, 2005), an unpublished memorandum opinion and order support the contention. In *Eliasen,* the plaintiff hired two experts, one to testify and one as a consultant. The consultant prepared a report that the testifying export employed. The defendants were able to obtain the report in discovery, but were not able to depose the consultant about his preparation of the report. The court held that Rule 26(b)(4)(B) was designed to prohibit exactly that kind of discovery. 111 F.R.D. at 401-02. The same principle applies here. Plaintiff has access to the vehicle-as the defendant in *Eliasen* had access to the report-and may inspect it as he pleases. Thus, in both instances, there is a "different avenue" to the information used by the testifying expert. 111 F.R.D. 399-400.As a result, "exceptional circumstances" were not demonstrated in *Eliasen* and cannot be demonstrated here.

In *Portis,* the plaintiffs engaged a computer expert to create a computer database of information regarding the arrests of class members in that case. When the defendant sought production of the database during discovery, the plaintiffs objected on work product grounds. The court overruled the plaintiffs' objection and, in so doing, cited several factors that it felt constituted "undue hardship" to the defendant and lack of prejudice to the plaintiffs. As to the defendant, the court noted the cost of re-creating the database from scratch would be about $90,000, and that access to the database would significantly ease the task of confirming the class list and materially advance the litigation without significant prejudice to the plaintiffs.*Portis, v. City of Chicago,* No. 02-3139, 2004 WL 1535854, *4 (N.D.Ill. July 7, 2004). As for the plaintiffs, the court found that, since they originally sought to collaborate with the defendant on the database, they would not be unduly prejudiced by sharing it with the defendant, provided they were fairly compensated for their extensive work. *Id.* The court found that the defendant could not reproduce the database without undue hardship and granted the

defendant access to the database provided expenses were shared.

**\*4** As discovery progressed, the defendant sought to depose the computer consultant who had created the database. The plaintiffs did not object to the deposition, but wanted to limit the scope of the questioning. *Portis, Slip op.* at 12. The court found that because the plaintiffs would be using the actual database in their case-in-chief at trial, the defendant was entitled to explore the preparation of the database at the deposition of the computer consultant.*Id.* The court relied upon *Pearl Brewing Co. v. Schlitz Brewing Co.,* 415 F.Supp. 1122 (S.D.Tex.1976) and *Derrickson v. Circuit City Stores, Inc.,* No. 95-3296 (D.Md. Mar. 19, 1999), two other computer databases cases in which courts found that details of the data compilation and formulation of computer systems could not be gained from any other source. *Id.*

What these cases said of the complexity of recreating a computer database cannot be said of the automobile in this case. In *Grindell v. American Motors Corp.,* 108 F.R.D. 94, 95 (W.D.N.Y.1985), the court quashed a subpoena for a non-testifying expert whom the defendant retained to evaluate tests performed on vehicles involved in products liability litigation. In applying Rule 26(b)(4)(B), the court held that the plaintiff had not shown exceptional circumstances and explained that the plaintiffs were free to hire their own experts to examine the vehicles. 108 F.R.D. at 95. Similarly, in *Hermsdorfer v. American Motors Corp.,* 96 F.R.D. 13 (W.D.N.Y.1982), the plaintiffs sought to depose three experts in the field of vehicular testing who, under contract with defendants, performed experiments with the vehicle in question and similar vehicles. The court found that the plaintiffs failed to show exceptional circumstances under Rule 26(b)(4)(B) in part because they had access to models of the vehicle in question with which further tests and studies could be conducted. 96 F.R.D. at 14. That means the material considered by the defendants' testifying expert is sufficiently available

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                          Page 5
Not Reported in F.Supp.2d, 2006 WL 2325506 (N.D.Ill.)

to the plaintiff-the scope of discovery allowable under the rule does not go beyond the scope of material considered by the testifying expert. *Eliasen,* 111 F.R.D. at 399. The plaintiff here has the same access that was available in both *Grindell* and *Hermsdorfer.*

Of course, any testing takes time and money. But the plaintiff has not argued that these expenditures would be prohibitive. *See Braun,* 84 F.3d at 236. He simply argues that an inspection will not be as good as simply obtaining the information he wants from the defendants' non-testifying expert. (*Plaintiff's Reply Memorandum,* at 7). Why that is true is not explained. Moreover, Rule 26(b)(4)(B) was designed in part to prevent a party from building his own case by means of his opponent's financial resources, superior diligence, and more aggressive preparation. *Ager v. Jane C. Stormont Hospital and Training School for Nurses,* 622 F.2d 496, 502 (10th Cir.1980); *Sunrise Opportunities, Inc. v. Regier,* No. 05-2825, 2006 WL 581150, *7 (N.D.Ill. Mar.7, 2006); *Eliasen,* 111 F.R.D. at 401.

**\*5** In the instant case, the plaintiff inexplicably has not availed himself of the opportunity to examine the test vehicle about which he claims the urgent need to secure information. Consequently, Mr. Burkybile's argument is unpersuasive. There simply are not exceptional circumstances requiring discovery from the defendants' non-testifying expert regarding the tests it ran on the vehicle that was purchased for evaluative purposes. Of course, as a policy matter, one may take issue with Rule 26(b)(4)(B). But that is the rule in the federal courts and it is not for judges to find ways to circumvent its clear prohibitions. *Compare* Frankfurter, *John Marshall and the Judicial Function,* in Government Under Law, 31 (1956).

## B.

### The Plaintiff Is Entitled To Limited Discovery Of Documents Pertaining To Defendants' Warranty

### Claim Information

On March 16, 2006, the parties appeared before Chief Judge Holderman regarding the negligent recall count in the amended complaint, an anticipated motion to dismiss that count, and a possible extension of discovery to address that new count. (*Defendants' Motion for Protective Order,* Ex. A, Transcript of 3/12/06, at 2). Judge Holderman indicated that there had been more than one recall, and that defendant Mitsubishi took it upon itself to engage in the recall.(*Id.*).[FN4] Judge Holderman then explained his position on additional discovery:

> FN4. Count IV charged that there had been three recall campaigns.

I am not saying that all the discovery will be ordered if there is continued objection by defense counsel, and I actually think that defense counsel has been very reasonable in its approach at this point ... but I am going to allow discovery to proceed in connection with this recall, the now pending recall count, until I rule on the motion, because I don't think it is going to be that much of an added burden.

(*Id.* at 3). The parties then agreed that there could be no claim for a failure to recall, but that once a recall was undertaken, as the judge put it, "a different set of rules may apply."(*Id.* at 5).

Defense counsel then expressed his concern that the plaintiff, in fact, had failed to adequately plead that a recall had been undertaken. (*Id.* at 5-6). Judge Holderman, however, reminded defense counsel that notice pleading applied and that if there were any facts that could support a claim the allegations would be adequate. (*Id.* at 6). Thus, if the warranty claims relate to actions taken once the recall was undertaken, they might be relevant. (*Id.* at 6). Defense counsel continued to protest relevance, however, and stated that the plaintiff claimed he never even received a recall notice. (*Id.* at 7).[FN5] But the court explained:

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2325506 (N.D.Ill.)

FN5. Paragraph 16(c) of Count IV charged that Mitsubishi had failed to act reasonably in that it had failed to take steps to insure that the current owners of the recalled vehicles were properly notified of the recall campaign and the consequences of failing to have the lower control arm and ball joint inspected. The amended complaint alleged that Mr. Burkybile had not received notice of the recall.

That may be an issue to be decided at the trial, but in the discovery context, relevance is a little-you know, it is broader. And so the fact that it may not matter at the trial with regard to this plaintiff, it doesn't mean it may not be discoverable.

So given our discussion here, I am going to adopt the plaintiff's schedule.(*Id.* at 7).

**\*6** The court expressed the hope that the parties were now informed of what the proper scope of discovery was, and indicated he would refer the matter here and that any further problems with discovery parameters could be addressed at that time. (*Id.* at 7).

The defendants continue to maintain that the discovery requests are not relevant, although Chief Judge Holderman has already clearly determined they are-at least to some degree. The defendants also argue that the requests are untimely, although Judge Holderman extended discovery, at least in part, for the purpose of discovery into the warranty claims. Finally, the defendants submit that the requests are unduly burdensome.

The defendants maintain the same objections in their combined motion for protective order/response to plaintiff's motion to compel that they originally interposed to plaintiff's document requests regarding warranty information:

Objection. This Request is vague, ambiguous, overly broad, unduly burdensome, oppressive and seeks documents that are neither relevant nor reas-

onably calculated to lead to the discovery of admissible evidence since the Request is not limited to the issues in this case, to a reasonable and relevant time frame, not limited to the model vehicle involved in this case, and not limited to incidents with facts substantially similar to the incident in this case. This Request goes beyond the Court's limited purpose for reopening discovery, which was to allow plaintiff to conduct discovery solely on the issue of the alleged negligent recall and for purposes of rebuttal of defendants' experts. [Defendants] also object[ ] to the extent that this Request seeks documents that are protected by the attorney-client privilege or the attorney work product doctrine. Further, [defendants] object[ ] to the extent Plaintiff seeks claimants' confidential and private information.

(*Defendants' Motion for a Protective Order,* at 8-9).

Rule 34(a), Federal Rules of Civil Procedure, provides that a party may request, among other things, the production of documents that "constitute or contain matters within the scope of Rule 26(b)...." Both the text of Rule 26(b) and the decisions interpreting it attest to the extraordinary breadth of discovery in the federal courts: "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action.... The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. Rule 26(b)(1).*See Clark v. Experian Information Solutions, Inc.,* 2006 WL 931677 at \*3 (N.D.Ill.2006)(Holderman, J.).

If the party from whom the documents are requested objects to their production, that party has the burden to show why a discovery request is improper. *See*Rule 34(b); *Gile v. United Airlines, Inc.,* 95 F.3d 492, 495 (7th Cir.1996).*In re Sulfuric Acid Antitrust Litigation,* 231 F.R.D. 331, 337 (N.D.Ill.2005). That burden cannot be met by a reflexive invocation of "the same baseless, often abused litany" that the requested discovery is "vague,

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 2006 WL 2325506 (N.D.Ill.)

ambiguous, overly broad, unduly burdensome" or that it is "neither relevant nor reasonably calculated to lead to the discovery of admissible evidence."*Swift v. First USA Bank,* No. 98-8238, 1999 WL 1212561 (N.D.Ill.Dec.15, 1999). Despite court's repeated admonitions that these sorts of "boilerplate" objections are ineffectual,[FN6] their use continues unabated, with the consequent institutional burdens, *Szabo Food Service, Inc. v. Canteen Corp.,* 823 F.2d 1073, 1077 (7th Cir.1987); *Channell v. Citicorp Nat. Services, Inc.,* 89 F.3d 379, 386 (7th Cir.1996), and the needless imposition of costs on the opposing party.

> FN6. *See In re Aircrash Disaster Near Roselawn, Ind. Oct. 31, 1994,* 172 F.R.D. 295 (N.D.Ill.1997)(rejecting generic, non-specific, boilerplate objections); *Klein v. AIG Trading Group Inc.,* 228 F.R.D. 418, 424 (D.Conn.2005)(overruling objections that consisting of "the familiar litany that the [requests] are burdensome, oppressive or overly broad"); *American Rock Salt Co., LLC v. Norfolk Southern Corp.,* 228 F.R.D. 426, 432 (W.D.N.Y.2005)("generalized objections that discovery requests are vague, overly broad, or unduly burdensome are not acceptable"); *Athridge v. Aetna Casualty and Surety Co.,* 184 F.R.D. 181, 190-91 (D.D.C.1998) (rejecting general boilerplate objections). Defendants must show specifically how, despite the broad and liberal construction afforded the federal discovery rules, each discovery request is not relevant or is overly broad, burdensome or oppressive. *Roesberg v. Johns-Mansville Corp.,* 85 F.R.D. 292, 297 (E.D.Pa.1980); *Compagnie Francaise d'Assurance Pour le Commerce Exterieur v. Phillips Petroleum Co.,* 105 F.R.D. 16, 42 (S.D.N.Y.1984); *Klein v. AIG Trading Group Inc.,* 228 F.R.D. 418, 422 (D.Conn.2005).

**\*7** Here, as to plaintiff's warranty claim requests,

the defendants discuss only their objections as to relevance, timeliness, and undue burden. Their remaining objections are overruled as unsupported.

<div align="center">

1.

</div>

<div align="center">

Warranty Claims Relating To Action Taken Once
The First Recall Was Undertaken Are Relevant

</div>

The dispute over the relevance of plaintiff's warranty claim document requests stems from their different understandings of Judge Holderman's statements at the March 16, 2006 hearing. Defendants argue that, based on Judge Holderman's comments, plaintiff's request for all documents reflecting claims made under warranty from 1993 until 2004 are irrelevant. The defendants submit that, even under a negligent recall theory, the only arguably relevant warranty claim information would be limited to those claims from the time of the first recall in 1999 until the time of the accident in 2004. (*Defendants' Motion for Protective order,* at 9-10). According to the plaintiff, however, Judge Holderman opened the door to all discovery of warranty claim information. (*Plaintiff's Reply Memorandum,* at 4).

At the hearing, there was no dispute that there could be no claim for a failure to recall, but that once a recall was undertaken, "a different set of rules may apply."(*Id.* at 5).*See Modelski v. Navistar Intern. Transp. Corp.,* 302 Ill.App.3d 879, 890, 236 Ill.Dec. 394, 707 N.E.2d 239, 247 (1st Dist.1999)("a manufacturer is under no duty to issue post-sale warnings or to retrofit its products to remedy defects first discovered after a product has left its control.").[FN7] Hence, warranty claims preceding the first recall of the vehicles in question in 1999 would not be relevant to plaintiff's negligent recall claim *under Count IV of the amended complaint.*[FN8] Judge Holderman said as much at the hearing on March 1st:

> FN7. Despite Judge Holderman's instruction to the parties that they "cite cases ...

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2325506 (N.D.Ill.)

on this particular area of the law," neither party has done so. (*Defendants' Motion for a Protective Order*, at 7-12; *Plaintiff's Reply Memorandum*, at 4-6). To paraphrase Judge Easterbrook in a similar context: "What do the [Illinois] courts themselves say on this subject [of negligent recall]? It is not our job to do the legal research that [the parties] ha [ve] omitted. Claims under state law have been forfeited."*Bretford Mfg., Inc. v. Smith System Mfg. Corp.*, 419 F.3d 576, 581 (7th Cir.2005).*Accord Davis v. Carter*,_F.3d_ (June 28, 2006 7th Cir.).

FN8. Documents evidencing complaints by Eclipse owners regarding the particular part involved in the instant case are relevant to other counts of the amended complaint. But discovery on those counts is closed.

So your theory with regard to the warranty claims at this point, the way you have articulated it, if it goes to the reasonableness of having a recall, really aren't relevant; but if they relate to the action taken once the voluntary recall was undertaken, then you might have a theory. (Transcript of 3/12/06, at 6).

Our's is a hierarchical system and the decisions of superior courts are binding on inferior courts. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1092 (7th Cir.2004). Thus, in light of Judge Holderman's observations, the only warranty claims relevant for present discovery purposes are those that relate to actions taken once the recall was undertaken in 1999.

In arguing to the contrary, plaintiff not only ignores Judge Holderman's pronouncement on the issue, but misinterprets his indication that warranty claims might be relevant, even if plaintiff had not received a recall notice. This statement was in response to defense counsel's question of how any warranty claims could be relevant if the plaintiff claimed he never received a notice. (Transcript of 3/12/06, at

7). Given the context of the comment, it cannot be interpreted to mean that warranty claims from any time period are relevant. (*Plaintiff's Reply Memorandum*, at 4-5). That interpretation would be nonsensical and would make the balance of Judge Holderman's observations meaningless. "Judges expect their pronunciamentos to be read in context...."*Wisehart v. Davis*, 408 F.3d 321, 326 (7th Cir.2005)(Posner, J.).*Cf. Penry v. Lynaugh*, 492 U.S. 302, 358, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989)(Scalia, J., concurring and dissenting in part). The rule applies to oral rulings or observations no less than to formal, written opinions.

2.

Plaintiff's Limited Discovery Requests Are Not Unduly Burdensome

**\*8** The defendants argue that they have already provided the plaintiff with the warranty information from the period for 1999 on. In response to plaintiff's First Supplemental Requests for Production issued and answered a year ago, in May 2005, the defendants produced Quarterly Non-Compliance Reports submitted to NHTSA. According to the defendants, the information plaintiff seeks is in those Quarterly Reports. (*Defendants' Motion for Protective Order*, at 10; Ex. B).

Beyond that, defendants submit that requiring them to find each and every document during an 11-year time frame "reflecting claims" for in excess of 552,000 Mitsubishi vehicles, would be an undue burden. Over 362,000 vehicles had the lower lateral arm ball joints inspected or replaced under the recall, so even if each warranty claim consists of only one page, over 362,000 pages of documents would exist. In addition, over 700,000 Chrysler vehicles were also affected by the recall, bringing the total number of affected vehicles to well over 1,000,000. (*Defendants' Motion for Protective Order*, at 11-12).

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 2325506 (N.D.Ill.)

The plaintiff concedes that such a production would indeed be burdensome. He is, nonetheless, unsatisfied with the reports to the NHTSA. Instead, he asks that the defendants produce reports and data compilations which summarize, analyze, or categorize the basic warranty information [Request 2] and any documents that were utilized to compile the quarterly reports submitted to NHTSA for the three recalls at issue [Request 3]. (*Plaintiff's Reply Memorandum,* at 6). As plaintiffs suggest, it is likely that there was some compilation or summarization of information pertaining to the warranty claims, which allowed defendants to compile the quarterly reports. Accordingly, defendants shall produce any such summaries, abstracts, or data compilations for the relevant time period beginning in 1999.

### 3.

### The Plaintiff's Discovery Requests Are Timely

The defendants also argue that the requests for warranty information are untimely because discovery closed on January 31, 2006. (*Defendants' Motion for protective Order,* at 10). But discovery was re-opened once plaintiff amended his complaint to add a negligent recall count. Judge Holderman indicated that the scope of that extended discovery included warranty claims relating to actions taken once the 1999 recall was undertaken. (Transcript of 3/12/06, at 6). So the discovery requests here, occurring well before the new deadline of August 25th, are clearly timely. Defendants' reliance on *Lake v. Fairview Nursing Home, Inc.,* 151 F.3d 1033, 1998 WL 446662 (7th Cir. July 15, 1998), is mystifying. Apart from the fact that the citation of the case violates Seventh Circuit Rule 53(e), there was no extension of the discovery deadline in that case.

### C.

### Defendants Must Respond To Requests To Admit And Document Requests Regarding Statements By Corporate Officers At The February 15, 2001 News Conference

Plaintiff tendered Requests to Admit to the defendants which contained eight separate items regarding statements allegedly made by two high-ranking corporate officers of Mitsubishi Motors Corporation at a news conference on February 15, 2001. (*Plaintiff's Motion to Compel,* Ex. 3). Plaintiff also submitted a separate request for production of any documents or recordings that the defendants may have containing a verbatim rendition of those statements. (*Plaintiff's Motion to Compel,* Ex. 2, request 4). The plaintiff identified the news conference by date, by participants-Takashi Sonobe and/or Akira Okamoto-and by news articles reporting on the conference that plaintiff attached to both the Requests to Admit and the Request to Produce Documents. In those news articles, it was reported that Mr. Takashi, then Mitsubishi Motors CEO, called a second recall of certain vehicles for loose parts on a joint in the front suspension "a truly shoddy setup that deserves criticism."Mr. Akira Okamoto, executive officer in charge of quality, was reported to have said officials checking for defects mistakenly assumed they arose only on the assembly line. (*Plaintiff's Motion to Compel,* Exs. 2(A); 3(A-B)).

**\*9** In response to the Rule 34 document request, defendants indicated they were aware the two gentlemen were employees at that time, but were unaware of any recording or transcription containing a verbatim rendition of their comments at the news conference. They also objected to the request as "overly broad, unduly burdensome, unreasonable as to time and scope, and seek[ing] information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence."(*Plaintiff's Motion to Compel,* Exs. 8-10).

In response to the requests to admit, the defendants admitted that the two gentlemen did, in fact, hold the positions of CEO and executive officer in

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                              Page 10
Not Reported in F.Supp.2d, 2006 WL 2325506 (N.D.Ill.)

charge of quality control on the date in question. But in response to requests asking whether the statements were made and whether they applied to the recalls at issue here, the defendants again generally objected to the remaining request to admit as "vague, ambiguous, seek[ing] information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence."(*Id.*).[FN9]

> FN9. The defendants' essentially boilerplate objections are: "This Request is vague, ambiguous, over broad and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence since the Request is not limited to the vehicle or issues in this case, or to the reasonable and relevant time frame. [Defendants] also object[ ] to this Request because it is unduly burdensome, oppressive, and harassing since it seeks to have [defendant] verify if statements were made over five years ago, and seeks to have [defendant] verify the specific content of those alleged statements, as well as the context in which the alleged statements were made. Further, this Request goes beyond the Court's limited purpose for reopening discovery, which was to allow plaintiff to conduct discovery solely on the issue of the alleged negligent recall and for purposes of rebuttal of defendants' experts."

> (*Plaintiff's Motion to Compel,* Exs. 5-7, requests 3-8).

The defendants' response to the motion to compel does not elaborate on their boilerplate objections. (*Defendants' Motion for Protective Order,* at 12). Consequently, for the reasons discussed earlier, those objections are overruled. *See also O'Connor v. AM General Corp.,* No. 85-6679, 1992 WL 382366 at *2 (E.D.Pa. Dec.7, 1992)("The court may reject unjustified objections and order answers, and determine that, as to answers deemed non-compliant, either the matter be deemed admitted or

an amended answer be served."); *Booth Oil Site Administrative Group v. Safety-Kleen Corporation,* 194 F.R.D. 76, 80 (W.D.N.Y.2000)(same).

Defendants do, however, state that they will review and supplement their answers with regard to the news conference statements. (*Defendants' Motion for Protective Order,* at 12). While it is possible that the defendants do not have any verbatim recordings or transcripts of the statements at issue, they must provide the plaintiff with a definitive answer as to whether they do. As for the requests to admit, the defendants must respond. Failure to properly respond to those requests to admit will result in them being deemed admitted under Rule 36. *Laborers' Pension Fund v. Blackmore Sewer Const., Inc.,* 298 F.3d 600, 605 (7th Cir.2002); *United States v. Kasuboski,* 834 F.2d 1345, 1350 (7th Cir.1987).

## CONCLUSION

For the foregoing reasons, the plaintiff's Motion to Compel [# 54] is GRANTED in part and DENIED in part. The defendants' Motion for a Protective Order as to Tandy Engineering [# 57] is GRANTED.

N.D.Ill.,2006.
Burkybile v. Mitsubishi Motors Corp.
Not Reported in F.Supp.2d, 2006 WL 2325506 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

3

Westlaw.

Not Reported in F.Supp.                                                    Page 1
Not Reported in F.Supp., 1987 WL 20421 (N.D.Ill.)

H
Hammond v. Air Line Pilots Ass'n
N.D.Ill.,1987.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
David A. HAMMOND, et al., Plaintiffs,
v.
AIR LINE PILOTS ASSOCIATION, et al. Defendants.
No. 87 C 2792.

Nov. 20, 1987.

*MEMORANDUM DECISION*

JOAN HUMPHREY LEFKOW, United States Magistrate.

**\*1** On the parties joint motion for instructions concerning the propriety of certain plaintiffs' refusal to answer certain deposition questions, the court has read the submissions of the parties and concluded that the questions must be answered. In general, absent a claim of privilege, it is improper for counsel at a deposition to instruct a witness not to answer. Rather, the witness is to answer the question subject to objection. *Coates v. Johnson & Johnson,* 85 F.R.D. 731, 733 (N.D.Ill.1980).

A. *Union members votes on secret ballot.*

Defendants seek to inquire of the named plaintiffs how they voted on a secret ballot concerning acceptance of a proposed negotiated agreement between union and management. Even if one assumes that a qualified privilege attached to the secret ballot at issue, similar to that discussed in *International Union v. Garner,* 102 F.R.D. 108 (M.D.Tenn.1984), where as here plaintiffs have alleged that the union members were pressured to approve the proposed agreements, Amended Complaint paragraph 47(a). they have put in issue what affected the union members' decision to adopt the

agreement. The factual basis for this allegation necessarily derives from an examination of the representative plaintiffs' reasons for their vote. Their reasons cannot be explored without disclosing their votes. Under established principles, a party may not hide behind a privilege when he has placed in issue the contents of the matter within the privilege. *See, e.g., Panter v. Marshall Field & Co.,* 80 F.R.D. 718 (N.D.Ill.1978) (defense of reliance on advice of counsel waived attorney-client privilege); *Sklagan v. Greater Southeast Hospital,* 625 F.Supp. 991, 922 (D.D.C.1984) (physician-patient privilege waived by plaintiff placing her physical condition in issue in the lawsuit).

B. *Questions purportedly asking for a plaintiff's legal opinion or conclusion.*

Plaintiffs object to questions that touch on plaintiffs' opinion of the legal significance of certain allegations or the meaning of certain terms in the agreement at issue. This inquiry entails the individual plaintiffs' understanding of their rights as reflected in law, the agreement, or company policy. Defendants are entitled to make such an inquiry so long as the questions concern the factual basis for plaintiffs' claims. See *Baker Oil Tool Inc. v. Acme Resin Corp.,* 84 C 8690 (N.D.Ill. July 29, 1985) (Lexis) (it was proper to ask party questions concerning the factual basis for allegations contained in his pleading). The questions propounded do not cross the line of seeking purely legal interpretations from the witness. If the plaintiffs do not know the answer to a question they are, of course, not required to formulate an answer. Defendants may attempt to simplify or clarify the question so as to permit the witness to answer. *Baker Oil.*

C. *Questions in the nature of contention interrogatories.*

These questions are similar to those discussed in part B above. Although they are phrased in terms of

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1987 WL 20421 (N.D.Ill.)

contentions, the cited questions indicate that the de-
fendants are attempting to probe what the plaintiffs
believe the injustice they complain of to be. Al-
though some of the questions would be better
answered by examination of the complaint or the
relevant documents, the proper approach for the
plaintiffs is to answer the questions subject to ob-
jection and any appropriate qualification. By the
same token, defendants should rephrase the ques-
tions where possible to ask for facts that form the
basis for certain contentions, if those contentions
are established. Absent reformulation, however, the
court is simply not in a position to police depos-
itions on a question-by-question basis, and,
plaintiffs are directed to answer the deposition
questions as propounded.

**\*2** Under Rule 72(a), Fed.R.Civ.P., objections to
this order must be filed with the district judge with-
in ten days after its entry. Failure to object will con-
stitute a waiver of objections on appeal.

N.D.Ill.,1987.
Hammond v. Air Line Pilots Ass'n
Not Reported in F.Supp., 1987 WL 20421 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

4

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2001 WL 1246630 (N.D.Ill.)

H

McNally Tunneling Corp. v. City of Evanston, Illinois
N.D.Ill.,2001.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
McNALLY TUNNELING CORPORATION, an Illinois corporation Plaintiff,
v.
CITY OF EVANSTON, Illinois, Defendant.
**No. 00 C 6979.**

Oct. 18, 2001.

MEMORANDUM OPINION AND ORDER

NOLAN, Magistrate J.

**\*1** Before the Court is Plaintiff McNally Tunneling Corporation's ("McNally") Motion to Compel Production of a Settlement Agreement (Docket Entry # 58). Defendant City of Evanston ("Evanston") objects to McNally's characterization of the document as a settlement agreement, contending that the document is nothing more than a joint-defense agreement between Evanston and Harza Environmental Services ("Harza") that is protected from disclosure by the common interest doctrine. After examining the document *in camera,* this Court concludes that the document contains both a settlement agreement (paragraph # 3 through paragraph # 7) and a joint-defense agreement (remainder of document). For the following reasons, this Court grants McNally's motion to the extent it seeks production of the settlement agreement (paragraph # 3 through paragraph # 7) and denies McNally's motion to the extent it seeks production of the joint-defense agreement (remainder of document).

BACKGROUND

In 1997, Evanston contracted with McNally to provide services in connection with a $16 million sewer project. Evanston also contracted Harza to serve as the lead engineer and Evanston's representative on the project. Things did not go as planned and McNally sought increases in the contract terms regarding compensation and time allotted for completion. Evanston refused. After several attempts to resolve the dispute, McNally filed this breach-of-contract suit. McNally's contentions are based in part on the alleged failure of Evanston's agent, Harza, to discharge its duties as lead engineer.

DISCUSSION

The parties do not agree on whether the document at issue is a joint-defense agreement or a settlement agreement. This Court is not bound by either McNally or Evanston's characterization of the document. In *Tribune Co. v. Purcigliotti,* no. 93 Civ. 7222, 1997 WL 540810, at \*3 (S.D.N.Y. Sept. 3, 1997), the court rejected the party's contention that a document was solely a joint-defense agreement. The court in that case determined that the document contained both a joint-defense agreement and a "standstill" agreement.[FN1] *Id.* After reviewing the document in this case, this Court has come to a similar conclusion. Instead of bringing Harza into the case as a third-party defendant, Evanston entered into a settlement agreement with Harza (paragraph # 3 through paragraph # 7). Additionally, Evanston and Harza also entered into a joint-defense agreement, stating their intention to cooperate in defending McNally's claims. (entire document except paragraph # 3 through paragraph # 7). Despite the incorporation of both of these agreements into one document, this Court analyzes the joint-defense agreement and the settlement agreement as two separate documents.

> FN1. A "standstill" or "tolling" agreement is an agreement in which two or more parties on the same side of a lawsuit agree to not pursue legal claims against one another until some point in the future, usually

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 1246630 (N.D.Ill.)

after the present suit has been resolved.

A. Relevance of the Settlement Agreement [FN2]

> FN2. Evanston does not challenge the relevance of the joint-defense agreement.

Rule 26(b)(1) of the Federal Rules of Civil Procedure provides in pertinent part that: "Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party."Evanston argues that the settlement agreement is not relevant because Federal Rule of Evidence 408 precludes the use of settlement negotiations as evidence. This is incorrect for two reasons. First, Rule 408 is concerned solely with the admissibility of evidence; it does not limit the discovery of evidence. *Coltec Industries, Inc. v. American Motorists Ins.,* 197 F.R.D. 368, 372 (N.D.Ill.2000)*City of Wichita v. Aero Holdings, Inc.,* 192 F.R .D. 300, 301-302 (D.Kan.2000); *see also*Fed.R.Civ.P. 26(b)(1) ("Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."). Second, even if Evanston's reliance on Rule 408 was appropriate in the discovery context, the rule "does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness."Fed.R.Evid. 408; *see also Bankcard America, Inc. v. Universal Bancard Sys., Inc.,* 203 F.3d 477, 483 (7th Cir.2000). In this case, McNally argues that the settlement agreement is relevant to proving the bias or prejudice of a Harza witness. According to McNally, the contract between McNally and Evanston requires Harza to review McNally's claims for equitable adjustments to the contract terms. McNally contends that Evanston's refusal to adjust the contract terms was based on Harza's analysis of McNally's claims and, therefore, a Harza representative is likely to testify at trial. Evanston does not dispute any of these statements. McNally argues that, assuming the settlement agreement requires Harza to pay some portion of any judgment, the agreement provides Harza with a direct financial interest in the case-evidence that is relevant to

the potential bias of a Harza witness. This Court agrees. Accordingly, this Court concludes that the settlement agreement (paragraph # 3 through paragraph # 7) meets the broad standard of relevance imposed by Rule 26.

B. Application of the Common Interest Doctrine

**\*2** Evanston also argues that the common interest doctrine protects the settlement and joint-defense agreements from disclosure. The common interest doctrine is not an independent source of confidentiality. *In re Federal Trade Comm'n.* no. M18-304, 2001 WL 396522, at \*2 (S.D.N.Y. Apr. 19, 2001); *Smithkline Beecham Corp. v. Apotex Corp.,* 193 F.R.D. 530, 539 (N.D.Ill.2000). Rather, it simply extends the protection afforded by other doctrines, such as the attorney/client privilege and the work product rule.*In re Grand Jury Subpoenas, 89-3 and 89-4, John Doe 89-129,* 902 F.2d 244, 249 (4th Cir.1990); *Griffith v. Davis,* 161 F.R.D. 687, 692 (C.D.Cal.1995) (collecting cases). As a general matter, a party waives the confidentiality of privileged communications by disclosing the information to a third party. *In re Air Crash Disaster at Sioux City, Iowa,* 133 F.R.D. 515, 518 (N.D.Ill.1990). Under the common interest doctrine, however, the disclosure of privileged material to a third party will not result in waiver if the parties share a common interest in the case. *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989); *IBJ Whitehall Bank & Trust Co. v. Cory & Assoc., Inc.,* no. 97 C 5827, 1999 WL 617842, at \*3 (N.D.Ill. Aug. 12, 1999).

To constitute a "common interest" it is not enough that the parties have some interests that overlap; the parties must have a strong identity of interests. *See Katz v. AT & T Corp.,* 191 F.R.D. 433, 437 (E.D.Pa.2000) (interests must be identical); *North River Ins. Co. v. Columbia Casualty Co.,* No. 90 Civ. 2518, 1995 WL 5792, at \*4 (S.D.N.Y. Jan. 5, 1995) (same); *Union Carbide Corp. v. Delaware Chemical Co.,* 619 F.Supp. 1036, 1047 (D.Del.1985) (same); *see also Government of Vir-*

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1246630 (N.D.Ill.)

*gin Islands v. Joseph,* 685 F.2d 857, 862 (3d Cir.1982) (privilege inapplicable where defendants' interests were antagonistic). For example, in rejecting application of the common interest doctrine, one court reasoned that even assuming an insurer and an insured "shared an interest in lowering the amount of damages in the underlying action ... [they] did not ... share an interest in characterizing how that damage occurred, what type of damage has occurred, or how [the insured] responded to the damage."*Remington Arms Co. v. Liberty Mutual Ins. Co.,* 142 F.R.D. 408, 418 (D.Del.1992); *see also Beneficial Franchise Co. v. Bank One,* no. 00 C 2441, 2001 WL 492479, at *11 (N.D.Ill. May 9, 2001) ("the absence of any identified conflict among the defendants in their positions with respect to the case... show[s] that the common interest doctrine certainly may apply."); *cf. Tribune,* 1997 WL 540810, at *3 (standstill agreement does not relate to common interests). Consistent with the requirement that issues of privilege must be determined on a document-by-document basis, *Bowman v. Brush Wellman, Inc.,* no. 00 C 50264, 2001 WL 1098056, at *2 (N.D.Ill. Sept. 13, 2001), this Court will analyze whether Evanston and Harza have a sufficiently strong community of interests with regards to each of the agreements in this case.

**\*3** Applying these principles to the settlement agreement, it is clear that the settlement agreement relates to adverse interests between Evanston and Harza. Evanston acknowledged in open court the existence of adverse interests between itself and Harza. Evanston's attorney stated "we have to make a tactical decision as to whether we bring [Harza in as a third-party defendant]." Tran., February 6, 2001, at 3-4. Instead of bringing Harza into the suit, however, Evanston and Harza entered into the settlement agreement (paragraph # 3 through paragraph # 7). It appears that the parties approached this agreement at arm's length, each asserting a position directly in conflict with the other. This Court is not persuaded by Evanston's argument that the settlement agreement does not preclude either Evanston or Harza from suing one another. Al-

though the agreement may not explicitly release certain claims, the terms of the agreement, at the very least, significantly restrict the legal options Evanston and Harza may employ against one another in the future. Accordingly, this Court concludes that Evanston has failed to establish that the settlement agreement relates to common rather than adverse interests. Therefore, the common interest doctrine does not apply to the settlement agreement. As this is the only basis Evanston asserts to protect the settlement agreement from disclosure, this Court grants McNally's motion to the extent it seeks production of the settlement agreement (paragraph # 3 through paragraph # 7).*See Allendale Mutual Ins. Co. v. Bull Data Sys., Inc.,* 152 F.R.D. 132, 140 (N.D.Ill.1993) (assuming document privileged, court concluded privilege waived where disclosure to third party not protected by common interest doctrine).

Evanston next argues that the joint-defense agreement (entire document except paragraph # 3 through paragraph # 7) reflects Evanston and Harza's common interest in defending McNally's suit. This Court agrees. Unlike the settlement agreement which relates to future potential litigation between Evanston and Harza, the joint-defense agreement describes Evanston and Harza's joint strategy for defending McNally's suit. The Court recognizes that just because two parties agree to cooperate in defending a particular lawsuit does not automatically mean that the common interest doctrine applies. For example, although an insurer and an insured agree to cooperate in defending a lawsuit-reflecting their shared interest in lowering the total amount of damages-the common interest doctrine does not apply if those parties have an incentive to blame each other for alleged wrongful conduct. *E.g. Remington,* 142 F.R.D. at 418. In this case, however, because Evanston and Harza resolved their adverse interests in the settlement agreement, they do not have an incentive to blame each other for the alleged breach of contract. Accordingly, this Court concludes that Evanston and Harza have a common interest in defending McNally's suit, an in-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1246630 (N.D.Ill.)

terest that is reflected in the joint-defense agreement.

**\*4** Once a litigant establishes that it and another party has a sufficiently strong identity of interests regarding a certain document, to claim protection of the common interest doctrine, the litigant must then show that the document contains privileged information. *See Allendale,* 152 F.R.D. at 140 (common interest doctrine only protects documents which otherwise fall under a privilege); *see also In re Grand Jury Proceedings,* 220 F.3d 568, 701 (7th Cir.2000) (A party refusing to produce a document on the grounds of privilege bears the burden of establishing that the material is privileged). Evanston argues that the joint-defense agreement is protected by both the work product doctrine and the attorney/client privilege. The central purpose of the work product doctrine is to shelter the mental processes of an attorney, protecting from disclosure her analysis and preparation of her client's case. *United States v. Nobles,* 422 U.S. 225, 238 (1975) (discussing *Hickman v. Taylor,* 329 U.S. 495 (1947)). To claim protection of the doctrine, a party must demonstrate that the materials in question that would otherwise be discoverable were prepared in anticipation of litigation. *Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 976 (7th Cir.1996); *see also*Fed.R.Civ.P. 26(b)(3). The joint-defense agreement in this case was clearly prepared in anticipation of litigation. Moreover, after inspecting the joint-defense agreement, this Court notes that production of that document would reveal the mental processes of Evanston's attorney. Unlike the attorney client privilege, the work product doctrine provides only a qualified privilege. The privilege may be overcome if the party seeking discovery demonstrates that it has both a substantial need for the material and that it would suffer undue hardship if required to obtain the information in some other way. *See Logan,* 96 F.3d at 976;Fed.R.Civ.P. 26(b)(3). McNally does not make a substantial-need or an undue-hardship argument regarding the joint-defense agreement. Accordingly, this Court concludes that the joint-defense agreement (entire doc-

ument except paragraph # 3 through paragraph # 7) is protected by the work product doctrine.

Evanston also contends that the joint-defense agreement is protected by the attorney/client privilege. When deciding claims of attorney/client privilege in diversity cases, federal courts apply the law of the state in which it sits. *See*Fed.R.Evid. 501; *Abbott Laboratories v. Alpha Therapeutic Corp.,* 200 F.R.D. 401, 404 (N.D.Ill.2001). Because Illinois courts apply Illinois law to such questions, *see Abbott Laboratories,* 200 F.R.D. at 405, this Court will apply Illinois law as well. The attorney/client privilege applies where (1) legal advice of any kind is sought, (2) from a professional legal advisor in her capacity as such, (3) the communications relating to that purpose, (4) made in confidence, (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor (8) except the protection be waived. *See* Graham, Cleary & Graham's Handbook of Illinois Evidence, § 505.1 at 328 (7th ed.1999) (citing *People v. Adam,* 280 N.E.2d 205, 207 (Ill.1972)). After inspecting the joint-defense agreement, this Court concludes that the attorney/client privilege applies to the communications contained in that agreement. Accordingly, McNally's motion to compel production of the joint-defense agreement (entire document except paragraph # 3 through paragraph # 7) is denied.

## CONCLUSION

**\*5** McNally's motion to compel is granted to the extent it seeks production of paragraph # 3 through paragraph # 7 of the document (the settlement agreement) and is denied to the extent it seeks production of any other part of the document (the joint-defense agreement).

N.D.Ill.,2001.
McNally Tunneling Corp. v. City of Evanston, Illinois
Not Reported in F.Supp.2d, 2001 WL 1246630 (N.D.Ill.)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1246630 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

5

Westlaw.

Not Reported in F.Supp.2d                                                        Page 1
Not Reported in F.Supp.2d, 1998 WL 781120 (N.D.Ill.)

▷
Thermos Co. v. Starbucks Corp.
N.D.Ill.,1998.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
THE THERMOS COMPANY and NIPPON
SANSO CORPORATION, Plaintiff,
v.
STARBUCKS CORPORATION AND PACIFIC
MARKET, INC., Defendant.
**No. 96 C 3833.**

Nov. 3, 1998.

MEMORANDUM OPINION AND ORDER

KOCORAS, District J.
*\*1* This matter is before the court on plaintiffs' motion to compel discovery. For the reasons set forth below, plaintiffs' motion is granted in part and denied in part.

BACKGROUND

Plaintiffs The Thermos Company and Nippon Sanso Corporation (collectively "Plaintiffs") assert defendants Starbucks Corporation ("Starbucks") and Pacific Market, Inc. ("PMI") (collectively "Defendants") willfully infringed Plaintiffs' '977 patent. The alleged infringement arises out of the so-called "plug method" utilized by PMI's supplier to manufacture travel tumblers and other vacuumware products. PMI distributes the allegedly infringing products to Starbucks. who, in turn, sells them.

In response to Plaintiffs' infringement claim, Defendants invoked an advice of counsel defense and produced two opinion letters of counsel to negate allegations of willful infringement. Through the present motion, Plaintiffs seek the production of all documents and information relating to any attorney-client communications or work product that ad-

dresses the '977 patent, including documents regarding possible patent infringement, prior art, the validity of Plaintiffs' '977 patent, and Defendants' redesign efforts.

DISCUSSION

A. The Advice of Counsel Defense

It is well established that the assertion of an advice of counsel defense results in a waiver of the attorney-client and work product protections.*Mushroom Assoc. v. Monterey Mushroom, Inc.,* 1992 WL 442892, at *3 (N.D.Cal.1992), citing *Handgards, Inc. v. Johnson & Johnson,* 413 F.Supp. 926, 929 (N.D.Cal.1976) (stating "[t]he deliberate injection of the advice of counsel defense into a case waives the attorney-client privilege as to communications and documents relating to the advice."). The waiver is limited, however, to communications and documents on the same subject matter relating to the legal advice relied upon. *See Abbot Laboratories v. Baxter Travenol Laboratories, Inc.,* 676 F.Supp. 831, 832 (N.D.Ill.1987); *Nye v. Sage Products, Inc.,* 98 F.R.D. 452, 453 (N.D.Ill.1982).

Principles of fairness support the waiver of the attorney-client or work product privileges where a party relies upon the advice of counsel defense.*Saint-Gobain/Norton Industrial Ceramics Corp. v. General Electric Co.,* 884 F.Supp. 31, 33 (D.Mass.1995) (patent infringement case). Principles of fairness also prevent a party from "disclos[ing] opinions which support its position, and simultaneously conceal[ing] those [opinions] which are adverse."*Id.; See also Emhart Industries v. Sankyo Seiki MFG., Co., Ltd.,* 1986 WL 13515, at *2 (N.D.Ill.1986) (stating "[b]asic fairness will not permit defendant to rely on two of said privileged documents and withhold the balance with reference to its defensive position that its infringement was not willful and deliberate."). Consequently, a party must produce not only the opin-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 781120 (N.D.Ill.)

ion letters relied upon, but also any other attorney communications involving the subject matter discussed in the opinion letter. *Technitrol, Inc. v. Digital Equipment Corp.,* 181 U.S.P.Q. 731, 732 (N.D.Ill.1974) (finding that "if the [waiver] rule were limited to only a particular counsel, a party might get several viewpoints and assert reliance on only one, thus barring an inquiry as to the actuality and reasonableness of that reliance.").

**\*2** In the present matter, we are asked to define the scope of Defendants' waiver. Relying upon Defendants' answers to interrogatories and Defendants' production of two opinion letters, Plaintiffs contend Defendants globally waived the attorney-client and work product privileges with respect to any issue of '977 patent (1) infringement, (2) prior art, (3) validity and (4) redesign efforts. Defendants, however, assert the scope of their wavier is limited to: (1) only communications or information regarding the alleged infringement of Plaintiffs' '977 patent; (2) communications or work product of attorneys other than their current trial counsel; and (3) opinions and information actually communicated to the Defendants. Defendants also assert that certain documents are inadmissible under Federal Rule of Evidence 408 because Defendants produced the documents in the course of settlement negotiations. We examine each issue in turn.

### B. Subject Matter of Defendants' Waiver

#### 1. Answers to Interrogatories

In their first set of interrogatories, Plaintiffs inquired as to whether Defendants ever received an opinion from counsel concerning infringement of Plaintiffs' '977 patent. If Defendants answered the interrogatory in the affirmative, Plaintiffs requested a list of the dates of such opinions and the names of the attorneys rendering the opinions. Defendants agreed to produce "any opinion of counsel regarding the validity or infringement" of the '977 patent. Through this interrogatory answer, Plaintiffs argue, Defendants globally waived the attorney-client

privilege with respect to both the validity and infringement issues.

Plaintiffs, however, mischaracterize the scope of Defendants' interrogatory response. The relevant interrogatory required Defendants to list information about the precise opinion letters responsive to Plaintiffs' request. Contrary to Plaintiffs' assertions here, Defendants did not agree to produce all opinions relating to validity or infringement; rather, they identified only a November 10, 1995 opinion letter authored by Michael Folise as responsive to Plaintiffs' interrogatory. The scope of Defendants' waiver, therefore, is limited to that opinion letter and any communications or documents related to the subject matter contained therein. Because the parties failed to supply the court with a copy of the November 10 letter, we are unable to determine what issues were discussed therein, and, therefore, the precise extent of Defendants' waiver.

#### 2. The Folise and Sakoi Opinion Letters

To support their advice of counsel defense, Defendants produced two letters reflecting the opinions of counsel and stated they would rely upon the two opinion letters to negate Plaintiffs' allegations of willful infringement. The first document, dated November 27, 1996, is a letter to PMI from Michael J. Folise, Defendants' original patent counsel ("the Folise opinion letter"). The Folise opinion letter includes Folise's belief that "based on [counsel's] understanding of the prior art," Defendants' proposed plug method would not infringe Plaintiffs' '977 patent. The Folise opinion letter expressly states that it does not include an analysis of the validity of the patent, nor does the letter address the issue of Defendants' redesign efforts.

**\*3** The second correspondence relied upon by Defendants is a May 22, 1997 letter to PMI from attorney Jeffrey M. Sakoi ("the Sakoi opinion letter"). The Sakoi opinion letter indicates PMI sought Sakoi's opinion on possible infringement. Sakoi concluded "[I]n our opinion, the process for manu-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                                                Page 3
Not Reported in F.Supp.2d, 1998 WL 781120 (N.D.Ill.)

facturing vacuum insulated containers detailed below does not infringe any claim of the '977 patent." The Sakoi opinion letter contains an extensive discussion of prior art and states Sakoi's opinion is based upon, *inter alia*, "the prior art cited and relied upon in the prosecution history [of the '977 patent]." Sakoi also compares the specific insulation methods utilized by Plaintiffs' '977 patent and Defendants' proposed plug method and opines on how a court might interpret the '977 patent. The Sakoi opinion letter concludes with a recognition of Defendants' attempts to design around Plaintiffs' '977 patent. We note the Defendants also produced to Plaintiffs a legal memorandum, authored by an attorney employed by Sakoi's law firm and sent to Sakoi, that expressly analyzes the validity of Plaintiffs' '977 patent. This memorandum predates the Sakoi opinion letter by approximately four weeks.

Contrary to Defendants' position, we think the Folise and Sakoi opinion letters addressed topics beyond simply whether Defendants' proposed plug method might infringe on Plaintiffs' '977 patent. The opinion letters (and the accompanying legal memorandum to Sakoi) also examine the (1) validity of the '977 patent, (2) prior art and (3) the comparative design of the two methods. These are the types of subject matters to which waiver attaches when a party relies upon the advice of counsel defense. For this reason, we think Plaintiffs are entitled to attorney-client communications and work product for the following subject matters: (1) patent infringement; (2) validity of the '977 patent; (3) prior art; and (4) comparative design, subject to the limitations discussed below. Plaintiffs are likewise entitled, subject to the limitations discussed below, to all documents within Defendants' possession that refer or relate to counsel's opinion on any of the above-listed subject matters and all documents Defendants submitted to counsel which contain information regarding any of the above-listed subject matters.

As to the topic of Defendants' redesign efforts, it is

apparent that Sakoi recognized Defendants developed the plug method in an effort to redesign Plaintiffs' '977 patent. It is unclear, however, whether any of Sakoi's opinions were based upon redesign efforts by Defendants. To the extent Defendants produced non-privileged, redesign documents to Sakoi, Plaintiff is entitled to production of those documents as well.

C. Work Product Communicated to Client

Plaintiffs also seek production of all work product defense counsel relied upon to reach their opinions, regardless of whether counsel communicated the work product to Defendants. Federal courts are split on the issue of whether non-communicated work product must be produced in these circumstances. *See Dunhall Pharmaceuticals v. Discus Dental,* 994 F.Supp. 1202, 1204-06 (C.D.Cal.1998). Plaintiffs rely upon cases that require a defendant asserting the advice of counsel defense to produce all documents relied upon or considered by counsel in conjunction with rendering his opinion, regardless of whether the underlying work product was communicated to the client. *See, e.g., Clintec Nutrition Co. v. Baxa Corp.,* 1996 WL 153881, at *1 (N.D.Ill.1996) (citations omitted); *Mushroom Assoc.,* 1992 WL 442892, at *5. Plaintiffs argue such broad production is necessary because they must be empowered to attack the defendants' advice of counsel defense by having access to circumstances and factors surrounding the advice. *Mushroom Assoc.,* 1992 WL 442892, at *5.

**\*4** Defendants argue that because the relevant issue is their state of mind during the period of the alleged infringement, work product not "communicated" to the client remains privileged. As noted above, support can be found for Defendants' argument as well. *See, e.g., Micron Separations Inc. v. Pall Corp.,* 159 F.R.D. 361, 363 (D.Mass.1995)."Counsel's mental impressions, conclusions, opinions or legal theories are not probative of a [client's] state of mind unless they have been communicated to that client."*Id.,* citing *Thorn*

Not Reported in F.Supp.2d                                    Page 4
Not Reported in F.Supp.2d, 1998 WL 781120 (N.D.Ill.)

*EMI North America, Inc. v. Micron Technology, Inc.,* 837 F.Supp. 616, 622 (D.Del.1993).

We find the *Micron Separations* and *Thorn EMI* rationale most persuasive. Because Defendants' state of mind is the relevant issue, we think Plaintiffs are entitled only to work product communicated to Defendants. The rationale behind our finding is best illustrated through a hypothetical. Consider a company hires counsel to issue an opinion on possible patent infringement. During her research, the retained counsel discovers information not fully supportive of the company's position but never communicates the information to her client. Instead, counsel continues researching the relevant issues and ultimately delivers a thorough opinion letter in which she concludes that her client's proposed activity would not infringe on an existing patent. Based upon counsel's opinion, the company manufactures its product, is subsequently sued for willful violation of an existing patent and raises the advice of counsel defense. In this scenario, we think work product not communicated to the company is irrelevant to the company's state of mind.

We think the same rationale applies to the present matter. Any documents defense counsel relied upon but did not communicate to Defendants are not probative of Defendants' state of mind. For this reason, on the subjects of patent validity, prior art, infringement and comparative design, Defendants need only produce work product communicated to them.

D. Opinions of Trial Counsel

We also must address whether Defendants' waiver extends to communications with, or work product of, their present trial counsel. Defendants contend the scope of their waiver is limited to the Folise and Sakoi opinion letters and, therefore, Plaintiffs are not entitled to opinions rendered and/or documents produced by their present counsel because such opinions or documents "were generated after the produced [opinion] letters."Plaintiffs assert that because Defendants waived the attorney-client and work product privileges as to certain subject matters, the waiver does not cease as of the date an opinion letter is authored.

As indicated above, a party asserting an advice of counsel defense waives the attorney-client and work product privileges for all attorney communications with the client on the same subject matter as the opinions relied upon for the defense. *Micron Separations,* 159 F.R.D. at 363. The scope of this waiver, however, is more limited with regard to the opinion work product of trial counsel. *Micron Separations,* 159 F.R.D. at 365;*Clintec Nutrition Co.,* 1996 WL 153881, at *1. Courts look to underlying principle of fairness to determine the extent to which waiver applies to documents generated by trial counsel and disclosed to the client. *Micron Separations,* 159 F.R.D. at 365, citing *Abbot Laboratories,* 676 F.Supp. at 832. In accordance with these fairness principles, the waiver as to trial counsel extends only to documents containing "potentially damaging information" or expressing "grave reservations respecting the opinion letter."*Micron Separations,* 159 F.R.D. at 365;*see also Clintec Nutrition Co.,* 1996 WL 153881, at *1.

**\*5** We therefore order Defendants to produce only those documents authored by their present trial counsel which (1) counsel communicated to Defendants and (2) contain conclusions that contradict or cast doubt on either the Folise or Sakoio opinions.

E. FRE 408

Finally, Plaintiffs seek production of non-privileged documents and communications regarding Defendants' redesign efforts. Information relating to redesign efforts are not immune from discovery simply because an attorney was involved in the process. *Upjohn Co. v. Mova Pharmaceutical Corp.,* 936 F.Supp. 55, 57 (D.Puerto Rico 1996) (stating that, even if the defendant developed its formulations in concert with its attorneys, "to characterize such interchanges as protected attorney-client com-

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                      Page 5
Not Reported in F.Supp.2d, 1998 WL 781120 (N.D.Ill.)

munications or work product would pull both doc-
trines from their respective roots.").

Defendants object to the production of redesign
documents under Federal Rule of Evidence 408.
Defendants contend these documents are nondis-
coverable because they produced them to Plaintiffs
during settlement negotiations in this matter. De-
fendants also assert the redesign documents are not
relevant to their advice of counsel defense. Al-
though Plaintiffs insist Defendants waived this ar-
gument, we address the merits of Defendants' asser-
tion. Rule 408 addresses only the issue of admissib-
ility. Although documents produced in settlement
negotiations may be found inadmissible at trial,
they are nonetheless discoverable. *Gen-Probe Inc.
v. Amoco Corp.,* 94C5069, 1996 WL 264707, at *3
(N.D.Ill.1996); *Glaxo, Inc. v. Torphram, Inc.,*
95C4686, 1996 WL 411487, at *5 (N.D.Ill.1996).
For this reason, Plaintiff is entitled to the produc-
tion of any non-privileged documents or commu-
nications relating to Defendants' redesign efforts.

To summarize our findings, Defendants shall pro-
duce:

1. any opinions of counsel, and any documents De-
fendants furnished to counsel, regarding the valid-
ity of the '977 patent, prior art, infringement and
comparative design;

2. any attorney work product relating to the above
subject matters, to the extent counsel communic-
ated such work product to Defendants;

3. any opinions or work product of current trial
counsel, but only to the extent counsel communic-
ated the information to Defendants and the opinion
or information contradicts or cast doubt on either
the Folise or Sakoi opinion letters; and

4. any non-privileged documents and/or communic-
ations relating to Defendants' redesign efforts.

CONCLUSION

For the reasons set forth above, Plaintiffs' motion to
compel is granted in part and denied in part.

N.D.Ill.,1998.
Thermos Co. v. Starbucks Corp.
Not Reported in F.Supp.2d, 1998 WL 781120
(N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

6

Westlaw.

Not Reported in F.Supp.2d                                                           Page 1
Not Reported in F.Supp.2d, 2002 WL 500547 (N.D.Ill.), 27 Employee Benefits Cas. 2458

C
Thompson v. Safeway, Inc.
N.D.Ill.,2002.

United States District Court, N.D. Illinois, Eastern
Division.
Jacqueline M. THOMPSON, and Caitlyn J.
Thompson, by her mother and next friend, Jac-
queline M. Thompson, Plaintiffs,
v.
SAFEWAY, INC. and DOMINICK'S SUPER-
MARKETS, INC., Defendants.
No. 01 C 3260.

April 2, 2002.

MEMORANDUM OPINION AND ORDER

LEINENWEBER, J.
*1 Before the Court is Defendant Safeway Inc.'s
("Safeway") and Dominick's Supermarkets Inc.'s
("Dominick's") Motion for Summary Judgment and
Plaintiff Jacqueline Thompson's ("Thompson") Mo-
tion to Strike Portions of Defendants' Motion for
Summary Judgment.

BACKGROUND

When newly-minted law school graduates are
sworn in as members of the Illinois bar, they are in-
evitably reminded of Abraham Lincoln's advice to
young lawyers:

Discourage litigation. Persuade your neighbors to
compromise whenever you can. Point out to them
how the nominal winner is often the real loser-in
fees, expenses, and waste of time. As a peace-
maker, the lawyer has a superior opportunity of be-
ing a good man. There will always be enough busi-
ness. Never stir up litigation.

Unfortunately, this advice appears to have gone un-
headed in this case.

Jacqueline Thompson worked for Dominick's, a
Safeway subsidiary, as a pharmacist for three
months during the summer of 1999, before return-
ing to law school. Thompson and her daughter
ceased thereafter to be eligible for coverage under
Dominick's health benefits plan as of December 25,
1999. When coverage ended, the Defendant by its
own admission failed to send Thompson a COBRA
notice informing her of the right to continue cover-
age for herself and her daughter at her own ex-
pense. Safeway contends that this was an inadvert-
ent error due at least in part to the administrative
difficulties created by the merger of Dominick's
and Safeway's computerized human resources in-
formation systems during the second half of 1999.
Thompson offers no evidence to the contrary.

In April 2000, Thompson learned of the loss of her
health benefits coverage. She wrote to Safeway's
General Counsel in July 2000 asserting numerous
legal claims, including a claim that Safeway failed
to send her a COBRA notice within 30 days of the
date her coverage terminated. She threatened to file
complaints with the EEOC, U.S. Department of
Labor, the IRS, the Illinois Department of Insur-
ance and the Illinois Department of Labor if Safe-
way did not cure the problem within five days. This
letter immediately transformed a simple adminis-
trative problem into a full-blown legal battle. After
several months of exchanging requests and ultimat-
ums, Safeway sent a COBRA packet to Ms.
Thompson providing her with retroactive health be-
nefits, with one full year being paid for by Safe-
way. After some confusion over the proper mailing
address, Ms. Thompson did finally receive her CO-
BRA benefits package by November 2000.

MOTION FOR SUMMARY JUDGMENT

Standard

Summary judgment is appropriate where "the

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                          Page 2
Not Reported in F.Supp.2d, 2002 WL 500547 (N.D.Ill.), 27 Employee Benefits Cas. 2458

pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."FED. R. CIV. P. 56(c). The court must "review the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."*Vanasco v. National-Louis University,* 137 F.3d 962, 964 (7th Cir.1998). Nevertheless, the party who bears the burden of proof on an issue may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact that requires trial. *Warsco v. Preferred Technical Group,* 258 F.3d 557, 563 (7th Cir.2001). A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties,"*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). or by "some metaphysical doubt as to the material facts."*Matsushita Electric Industrial Company v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

DISCUSSION

I. Motion to Strike

*2 As an initial matter, the Plaintiff moves to strike numerous exhibits and statements contained in Defendant's Memorandum in Support of Summary Judgment and Rule 56.1 Statement of Uncontested Facts. The Plaintiff contends that these materials, which were generated in the course of settlement discussions, may not be admitted as evidence pursuant to FED. R. EVID. 408, and therefore may not be considered by this Court in ruling on the current motion for summary judgment. Rule 408 is not an absolute ban on all evidence regarding settlement negotiations. Rule 408 explicitly states that "[t]his rule does not require exclusion when evidence is offered for another purpose, such as ... negativing a contention of undue delay...." Courts have routinely admitted evidence of offers or agreements to com-

promise for purposes of rebuttal, for purposes of impeachment, or to show the defendant's knowledge and intent. *See, Bankcard America, Inc. v. Universal Bankcard Systems, Inc.,* 203 F.3d 477, 484 (7th Cir.2000).Rule 408's spirit and purpose must always be considered in its application. *Central Soya Co. v. Epstein Fisheries, Inc.,* 676 F.2d 939, 944 (7th Cir.1982). It would be an abuse of Rule 408 to allow a plaintiff during compromise negotiations to complicate and delay resolution of the matter, point to that delay as evidence of the defendant's bad faith, and then prevent the defendant from explaining its actions because settlement discussions were involved. *Bankcard America, Inc.,* 203 F.3d at 484. The materials submitted by the Defendant will only be considered to the extent they are offered to rebut the Plaintiff's allegations of undue delay and bad faith. The Plaintiff's Motion to Strike is therefore denied.

II. Motion for Summary Judgment

A. Count I-Violation of 29 U.S.C. § 1161

Plaintiff seeks to recover statutory damages under 29 U.S.C. § 1132(c)(1) for the Defendant's failure to provide timely a COBRA notice of beneficiary's rights as required under ERISA. 29 U.S.C. § 1166(a)(4). Under § 1132(c)(1), this Court may, in its discretion, award damages to the Plaintiff of up to $110 a day for every day the Defendant was in violation of the statute. However, an employer's procedural violations of ERISA entitle employees to monetary relief only in exceptional cases. *Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 979 (7th Cir.1999). The employer must have acted in bad faith, actively concealed the benefit plan, or otherwise prejudiced their employees by inducing their reliance on a faulty plan summary before recovery for procedural violations is warranted. *Kreutzer v. A.O. Smith Corp.,* 51 F.2d 739, 743 (7th Cir.1991).

In her brief, the Plaintiff defines bad faith as "a refusal to fulfill some duty ... prompted by ... some

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 500547 (N.D.Ill.), 27 Employee Benefits Cas. 2458

interested or sinister motive."Pl's Memorandum at 4. The record before the Court does indicate that it took considerable time for Safeway to resolve the problem and issue a COBRA notice. However, the record also indicates that this delay was almost certainly exacerbated by the overly shrill and adversarial approach Plaintiff's counsel took early on in his interactions with Safeway's counsel. The then ongoing merger between Dominick's and Safeway also provides a reasonable basis for the original inadvertent delay in sending out the COBRA notice. While the Plaintiff certainly endured great aggravation in pursuing her case, there is simply nothing before the Court to indicate that the Defendant acted in bad faith in its original failure to send out the COBRA notice and the subsequent delay in addressing the situation.

*B. Count II-Violation of 29 U.S.C. § 1025*

**\*3** ERISA authorizes the imposition of a penalty of up to $110 per day for a plan administrator's refusal or failure to comply with a document request which the administrator is required to produce under the Act. *See* 29 U.S.C. § 1132(c)(1). Plaintiff's counsel sent a letter to Safeway on September 22, 2000 requesting "all pertinent documents that may relate to [Jacqueline M. Thompson's] Benefits Package."The letter further states that "[t]his request is made pursuant to 29 U.S.C. 1132 et seq. and 29 C.F.R. 2560.503 et seq." However, those regulations only require a plan administrator to provide documents pertinent to a claim denial decision. There was no claim denial at issue here, only a dispute over the issuance of a COBRA notice. Since there was no claim denial as contemplated in the statute, no obligation exists on the part of the administrator to provide an explanation (*i.e.,* "pertinent documents"), and thus no basis for imposing liability pursuant to § 1132(c) exists. *See Kleinhans v. Lisle Sav. Profit Sharing Trust,* 810 F.2d 618, 624 (7th Cir.1987). Safeway's failure to respond to this letter is simply not a basis for imposing liability under 29 U.S.C. § 1132(c)(1).

CONCLUSION

For the reasons set forth above, Plaintiff's Motion to Strike is denied and Defendant's Motion for Summary Judgment is granted. The case is dismissed pursuant to FED. R. CIV. P. 56.

IT IS SO ORDERED.

N.D.Ill.,2002.
Thompson v. Safeway, Inc.
Not Reported in F.Supp.2d, 2002 WL 500547 (N.D.Ill.), 27 Employee Benefits Cas. 2458

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

MORTON GROVE                        )
PHARMACEUTICALS, INC.,              )
                                    )        No. 08-CV-1384
        Plaintiff,                  )
                                    )        Judge Bucklo
            v.                      )        Magistrate Judge Mason
                                    )
THE NATIONAL PEDICULOSIS            )        **JURY TRIAL DEMANDED**
ASSOCIATION, INC.,                  )
                                    )
        Defendant.                  )

**OBJECTIONS TO ORDER ON MOTION TO COMPEL DOCUMENTS RELATED TO
ECOLOGY CENTER SETTLEMENT MATERIALS**

**APPENDIX OF ATTACHED CASES**

App. 1    *Info. Techs. Int'l., Inc. V. ITI of North Florida, Inc.*, No. 01 C 4668, 2002 WL
          356509 (N.D. Ill. Mar. 6, 2002).

App. 2    *Davenport v. Indiana Masonic Home Found., Inc.*, No. IP 00-1047-CH/G, 2003
          WL 1888986 (S.D. Ind. Mar. 27, 2003).

# APPENDIX 1

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1
Not Reported in F.Supp.2d, 2002 WL 356509 (N.D.Ill.)

**H**

Information Technologies Intern., Inc. v. ITI of North Florida, Inc.
N.D.Ill.,2002.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
INFORMATION TECHNOLOGIES INTERNATIONAL, INC., an Illinois corporation, Plaintiff,
v.
ITI OF NORTH FLORIDA, INC., a Florida corporation, Global Network Solutions, Inc., a Florida corporation, Angelo V. Esposito, an individual, Matthew G. Alford, an individual, Marvin D. Lux, an individual, James B. Mitchell, an individual, Timothy Farren, an individual, Thomas Speer, an individual, Joseph Drysdale, an individual, Suzette Chauvin, an individual, and Rebecca J. Walden, an individual, Defendants.
**No. 01 C 4668.**

March 6, 2002.

MEMORANDUM OPINION AND ORDER

MASON, Magistrate J.
**\*1** Defendants ITI of North Florida et. al. (individually, "ITI-Florida", collectively, defendants) have filed a motion to compel certain discovery responses from plaintiff Information Technologies International, Inc. ("ITI"). All of the requested discovery concerns ITI's motion for an entry of contempt against the defendants because of their alleged breach of a temporary restraining order between the two parties. For the following reasons we grant the motion in part and deny it in part.

There are two sets of discovery requests at issue here: one served by defendant Esposito and one served by defendant ITI-Florida. Four of the six discovery requests served by Esposito relate to documents concerning former defendant Thomas Speer, who settled with the plaintiff and sub-

sequently submitted an affidavit in support of plaintiff's motion for contempt. These four requests are somewhat duplicative; they ask for the settlement agreement between ITI and Speer and all documents related to either Speer, the agreement, or his affidavit, including drafts of the agreement and affidavit and communications between the parties and Speer or attorneys for any such entity. The other two requests ask for any other agreements plaintiff ITI has entered into with any party or non-party and any documents concerning communications between either ITI or ITI-Florida and any of the individual defendants except Esposito and Speer.

In its reply to the motion to compel, ITI states that it has produced all non-privileged documents responsive to the requests served by Esposito, which in total constitute the settlement agreement with Speer and his affidavit, and that it has asked defendant on several occasions to clarify its requests if it seeks additional documents. To the extent that Esposito's requests also encompass ITI's attorney's files relating to the Speer settlement and any other future settlements, ITI objects on the ground of the attorney-client privilege, and also objects to producing any non-final documents relating to the settlement. Esposito disagrees that the settlement documents should not be produced and also notes that he asked for any correspondence between ITI or its attorneys and Speer or his attorney, none of which has been produced.

Both parties cite *White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D. 364 (N.D.Ill.2001) to support their positions regarding the production of background settlement documents. In that case, Magistrate Judge Denlow ordered the plaintiff to produce the settlement agreement it had entered into with one of the defendants, finding that the production of the agreement was relevant to the liability of the other defendants, who had all been accused of conspiring against plaintiff with regard to the purchase of valuable violins. Judge Denlow also noted that the terms of settlement agreements can often be helpful

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                      Page 2
Not Reported in F.Supp.2d, 2002 WL 356509 (N.D.Ill.)

in assessing a witness' bias and credibility. In this case, ITI has already produced the settlement agreement it has with Speer, and in Court, it agreed to produce the settlement agreements it has with two other former defendants.

**\*2** ITI does not need to produce any of the documents which set forth the negotiations leading up to the settlement(s). We are not convinced that drafts of the agreement or other such documents are relevant, especially since such production may have a chilling effect on parties' willingness to enter into settlement negotiations. *See White,* 203 F.R.D. at 367,*citing Vardon Golf v. BBMG Golf,* 156 F.R.D. 641, 652 (N.D.Ill.1994). The final agreement should incorporate all previous discussions and is sufficient to help the defendants assess Speer's credibility and bias. In open court, ITI informed the defendant that it does not have any responsive documents concerning the affidavit Speer submitted in support of the contempt motion or any of defendant's other requests; we order plaintiff to provide defendant with formal interrogatory responses to that effect.

The second part of the motion to compel concerns requests served by ITI-Florida having to do with ITI's calculations of its damages from the defendant's alleged breach of the TRO. Judge Coar ordered ITI to produce certain documents concerning damages, and to the extent that it has only produced a list of such documents, it must produce the actual pages. Further, ITI is ordered to answer ITI-Florida's interrogatories regarding the types of damages it is claiming, even if it cannot yet articulate the exact amounts.

Finally, both parties ask for monetary and other sanctions associated with the various discovery disputes. In January, the plaintiffs traveled to Florida in order to take the depositions of two individual plaintiffs, and to attend the deposition of Speer, noticed up by the defendants. Because the defendants believed that the plaintiff had not produced all relevant and responsive discovery documents, it refused to produce the individual defendants for de-

position and likewise cancelled Speer's deposition. Although it has not made a formal motion, ITI's response to the motion to compel asks to be reimbursed for the costs associated with its trip to Florida and also asks that we order the depositions of the individual defendants to take place in Chicago, as well as bar the defendants from rescheduling the deposition of Speer. Defendants seek the costs and fees associated in bringing this motion.

After listening to the parties' discussion in open court, we find that they are both somewhat responsible for the costs associated with the discovery disputes, and thus decline to award costs or fees to either side. We deny plaintiff's request that the depositions of the two individual defendants take place in Chicago and decline to bar a further deposition of Speer. It is so ordered.

N.D.Ill.,2002.
Information Technologies Intern.. Inc. v. ITI of North Florida, Inc.
Not Reported in F.Supp.2d, 2002 WL 356509 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# APPENDIX 2

Westlaw.

Not Reported in F.Supp.2d                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 1888986 (S.D.Ind.)

**H**

Davenport v. Indiana Masonic Home Foundation, Inc.

S.D.Ind.,2003.

Only the Westlaw citation is currently available.

United States District Court,S.D. Indiana,Indianapolis Division.

Nadine DAVENPORT, Plaintiff,

v.

INDIANA MASONIC HOME FOUNDATION, IN-CORPORATED, Grand Lodge of the Free and Accepted Masons d/b/a Indiana Masonic Home, David A. Ashbaugh, Dwight Singer, William D. Blasingame, Robert R. Stevens, John E. Grein, Robert Bailey, James L. Chesney, Max L. Carpenter, Douglas O. Fegenbush, Robert E. Hancock, Jr., Michael D. Brumback, Jerry B. Collins, George L. Korenski, George G. Jeffers, Darrell A. Veach, Robert M. Seibel, George E. Proctor, and other unnamed John Doe Indiana Masonic Home Foundation Incorporated Board Members, Defendants.

**No. IP 00-1047-CII/G.**

March 27, 2003.

Michael K. Sutherlin, Law Office of Michael Sutherlin & Associates, Indianapolis, IN, for plaintiffs. Richard P. Winegardner, Barnes & Thornburg, Indianapolis, IN, for defendant.

ENTRY ON DISCOVERY MOTIONS

DAVID F. HAMILTON, Judge.

**\*1** Plaintiff, Nadine Davenport, sues the Indiana Masonic Home Foundation, Inc. ("the Foundation") and members of its Board of Directors, alleging that her employer, the Indiana Masonic Home ("the Home"), discriminated against her on the basis of sex and race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Equal Pay Act, 29 U.S.C. § 206(d), and discriminated against her on the basis of a disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.* She also asserts contract and tort claims under Indiana law.

This matter comes before the court on plaintiff's September 11, 2000 Motion to Compel and related filings, and on plaintiff's September 9, 2000 Motion to Quash and for Protective Order and related filings. Having considered the foregoing and being duly advised, the court hereby denies plaintiff's Motion to Compel, denies plaintiff's Motion to Quash, and grants plaintiff's Motion for Protective Order.

*Plaintiff's Motion to Compel*

Plaintiff Davenport filed a Motion to Compel concerning documents and testimony she requested from Gail Hammond, Davenport's former supervisor. Mr. Hammond was also terminated by defendants and had reached a settlement agreement with them. Plaintiff's motion seeks to compel Hammond, a nonparty, to produce testimony and any documents relating to his complaint against the Foundation or his settlement of that complaint, including the confidential settlement agreement. There is no question that Hammond possesses information relevant to Davenport's lawsuit, since he was her supervisor and allegedly had some knowledge of the workings of the Board in relation to Davenport. However, it is not clear that Davenport needs access to all the documents she seeks in her requests to Mr. Hammond.

As a preliminary matter, it must be noted that plaintiff's counsel deposed Hammond on March 14, 2002. Discovery had been stayed as to Davenport's Title VII and ADA claims, so those issues were not addressed. However, plaintiff's counsel was free to address any other issues he chose. Since the Title VII and ADA claims are being resolved on summary judgment for defendants, the deposition can now be considered to be complete. Thus, to the extent plaintiff's motion seeks to compel deposition

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 1888986 (S.D.Ind.)

testimony from Hammond, the motion is moot. If plaintiff had not yet deposed Hammond, her motion would have been granted since his testimony concerning the events leading up to her termination is clearly relevant.

Plaintiff also seeks to compel Hammond to produce all documents, personal notes, and correspondence relating to the his complaint and the settlement of his complaint against the Home. The confidential settlement agreement that resulted from Hammond's complaint is included in plaintiff's request. Plaintiff claims it will reveal the true legal identity of her employer. Hammond apparently destroyed all of his personal notes and correspondence of his own accord, so the remaining documents are all in the possession of his attorneys. As to these documents, Hammond claims attorney-client privilege and his attorney claims work product privilege, including for a May 5, 1999 tape recording in which Mr. Hammond stated for his attorney his "best recollection" of the events concerning his own complaint against the Home.

**\*2** The court agrees with Hammond and defendants that the May 5, 1999 tape is protected by the attorney-client privilege, and that there is no reason to compel the production of any other confidential and/or privileged documents. The May 5, 1999 tape is a confidential communication between client and attorney for the purpose of obtaining legal advice from the attorney. Even plaintiff's asserted need for the document cannot justify breaching the attorney-client privilege. Plaintiff agrees that the other documents in the attorney's possession are all privileged, so no further ruling on them is needed.

Further, the addition of the Grand Lodge of the Free and Accepted Masons d/b/a Indiana Masonic Home as a defendant in this lawsuit detracts from the persuasiveness of the reason proffered by plaintiff for her request to discover the confidential settlement agreement. If plaintiff wins her case, she will clearly be able to obtain a judgment against her proper employer. The defendants' reluctance to reveal their interrelationships should and will serve to

cause them all to remain as defendants. However, it will not serve as the sole reason for the court to compel discovery of a confidential settlement agreement between defendants and another person. Settlement serves an important role in expediting and improving the efficiency of the litigation process. See *Grove Fresh Distribs., Inc. v. John Labatt Ltd.,* 888 F.Supp. 1427, 1441 (N.D.Ill.1995). Thus, courts are generally reluctant to order disclosure of negotiations or documents related to a settlement agreement. See *Butta-Brinkman v. FCA Int'l, Ltd.,* 164 F.R.D. 475, 476-77 (N.D.Ill.1995) (holding defendant not required to turn over confidential settlement agreements reached in other cases absent showing that plaintiff would be unable to obtain the relevant information through other discovery); *Cook v. Yellow Freight Sys., Inc.,* 132 F.R.D. 548, 550 (E.D.Cal.1990) (denying plaintiffs-employees' motion to compel production of material disclosed in settlement negotiations between employer and terminated employee who plaintiffs claimed sexually harassed them).

The entire confidential settlement agreement with Hammond has been submitted to the court for in camera review. It identifies "The Indiana Masonic Home" as Hammond's employer and one of the parties to the agreement. The agreement was signed by David Ashbaugh on behalf of "The Indiana Masonic Home." If that information is helpful to plaintiff, she might consider asking defendants to admit that it is true, but there is no need for granting plaintiff access to the entire agreement. Her motion to compel is therefore denied.

*Plaintiff's Motion to Quash and for Protective Order*

Defendants issued Non-Party Requests for Production of Documents and a subpoena duces tecum to Davenport's past employers and to the Indiana Department of Workforce Development. Plaintiff responded by filing a Motion to Quash and for Protective Order.

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 1888986 (S.D.Ind.)

**\*3** Defendants' non-party document requests to Davenport's former employers seek her employment records, including personnel, employment and medical files which specifically relate to her employment; payroll histories including her entitlement to benefits; and copies of any charges, complaints or lawsuits which concern her. Defendants' subpoena duces tecum and requests for documents to the Indiana Department of Workforce Development essentially seek any and all formal or informal files and documents pertaining to any claim for benefits made by or concerning Davenport. Plaintiff claims that the items requested are irrelevant to this action and that the requests are intended only to harass and annoy her by invading her privacy.

Under Federal Rule of Civil Procedure 26(b)(1), "[p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action."Fed.R.Civ.P. 26(b)(1)."The information sought need not be admissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."*Id.* Defendants assert generally that past employment records are commonly discovered in employment discrimination actions. Then they claim that records from Davenport's previous employers are specifically relevant for a number of reasons. First, they claim that Davenport's promissory estoppel claim put her past employment history at issue. Her promissory estoppel claim asserts that she gave up an offer from a previous employer because defendants promised her a secure employment future with the Indiana Masonic Home. Next, defendants argue that her past employment records are relevant to damages in that they would determine her past compensation and benefits and could also help defendants prove mitigation. Also relevant to the question of damages, defendants assert they need her past employment records in order to determine if any "after-acquired evidence" might be used to mitigate any damages for which they could be liable. Regarding her employment-related medical records, defendants claim Davenport put her medical history at issue by claiming emotional injuries. Finally, defendants claim they need her past employment records in order to ensure they have identified all of Davenport's past employers.

Regarding records sought from the Indiana Department of Workforce Development, defendants assert that they are relevant to the date of Davenport's termination. There was formerly a dispute surrounding the exact date of her termination, the outcome of which was determinative of whether her Title VII and ADA claims were time-barred. That issue is being resolved in favor of defendants on their Motion for Partial Summary Judgment. However, defendants also assert that the records of any benefits received by Davenport would be relevant to the mitigation of any damages for which they might be liable.

The court must agree with defendants that all of the information sought is discoverable under the broad discovery scheme contemplated by Rule 26. Defendants' explanations provide sufficient justification for their requests. All of the information sought is either directly relevant to plaintiff's assertions in her complaint, or reasonably calculated to lead to the discovery of admissible evidence. However, Davenport has a legitimate privacy interest in her employment and unemployment records. To protect that interest, the court grants her motion for a protective order encompassing any evidence produced by any of the requests for production made or subpoenas issued to her past employers and the Indiana Department of Workforce Development. Counsel shall confer and shall submit to the court no later than April 30, 2003 either a stipulated protective order restricting defendants' use and disclosure of the documents, or separate proposed protective orders with a short statement of their differences.

### *Conclusion*

**\*4** For all of the reasons discussed above: (1) plaintiff's Motion to Compel is DENIED; (2) plaintiff's Motion to Quash is DENIED; and (3)

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                           Page 4
Not Reported in F.Supp.2d, 2003 WL 1888986 (S.D.Ind.)

plaintiff's Motion for Protective Order is GRAN-
TED.

So ordered.

S.D.Ind.,2003.
Davenport v. Indiana Masonic Home Foundation,
Inc.
Not Reported in F.Supp.2d, 2003 WL 1888986
(S.D.Ind.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.